**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| ENVIRONMENTAL DEFENSE, )<br>257 Park Avenue South, New York, NY 10010, )<br>)<br>SIERRA CLUB, Inc., )<br>85 Second Street, 2nd Floor, San Francisco, CA 94105, )<br>)<br>Plaintiffs, )<br>)<br>)<br>v. )<br>)<br>UNITED STATES DEPARTMENT OF )<br>TRANSPORTATION, )<br>400 Seventh Street, S.W., Washington, DC 20590, )<br>)<br>MARY PETERS, in her official capacity as )<br>Secretary of Transportation, 400 Seventh Street, S.W., )<br>Washington, DC 20590, )<br>)<br>FEDERAL HIGHWAY ADMINISTRATION, )<br>400 Seventh Street, S.W., Washington, DC 20590, )<br>)<br>J. RICHARD CAPKA, in his official capacity as )<br>Federal Highway Administrator, 400 Seventh Street S.W., )<br>Washington, DC 20590, )<br>)<br>METROPOLITAN WASHINGTON COUNCIL OF )<br>GOVERNMENTS, 777 North Capitol Street, N.E., )<br>Suite 300, Washington, DC 20002, )<br>)<br>JAY FISETTE, in his official capacity as Board Chair of )<br>the Metropolitan Washington Council of Governments, )<br>777 North Capitol Street, N.E., Washington, DC 20002, )<br>)<br>NATIONAL CAPITAL REGION TRANSPORTATION )<br>PLANNING BOARD, 777 North Capitol Street, N.E., )<br>Suite 300, Washington, DC 20002, )<br>)<br>MICHAEL KNAPP, in his official capacity as Chairperson )<br>of the National Capital Region Transportation Planning )<br>Board, 777 North Capitol Street, N.E., Suite 300, )<br> | Civil Action No. |

Washington, DC  20002,                                    )
                                                          )
                        Defendants.                       )
                                                          )
_____)

# COMPLAINT

## NATURE OF ACTION

1.      Plaintiffs Environmental Defense and Sierra Club bring this action to enforce the
federally mandated duties of Defendants United States Department of Transportation
("USDOT"), Federal Highway Administration ("FHWA"), Metropolitan Washington
Council of Governments ("MWCOG"), National Capital Region Transportation
Planning Board ("TPB"), and their respective officials, to make a decision regarding a
the Intercounty Connector ("ICC") in the best overall public interest after considering
how the ICC meets the national and local objectives for transportation projects, the
environmental impacts of the ICC, and alternatives and mitigation measures which
minimize those impacts while meeting national and local transportation objectives.

2.      The proposed ICC would be an eighteen mile, six lane highway which, if constructed,
would bring 125,000 vehicles per day into quiet residential neighborhoods and scenic
parks and in close proximity to five schools where children, already attending school
in an area deemed by the Environmental Protection Agency ("EPA") to have
emissions levels of particulate matter with an aerodynamic diameter equal to or less
than 2.5 microns in size ("PM2.5") in excess of levels deemed safe for human health,
will be exposed to dangerous levels of toxic and particulate matter air pollution that
cause asthma, other respiratory diseases, cancer, cardiovascular disease and other

diseases that contribute to increased emergency and urgent care, long-term

hospitalization, increased medical costs, lost work and school days, and early death.

3.    In addition to the severe human health effects caused by the airborne pollution

resulting from the ICC project, the proposed ICC would destroy private property,

wetlands, and other natural areas home to endangered species.  In exchange for these

devastating health impacts, significant environmental destruction, and costs in excess

of 2.4 billion dollars, the ICC would, at best, reduce travel time by a meager six

minutes between central Montgomery County and BWI Airport, and will increase

travel time in other areas.

4.    Plaintiffs bring this action to enforce Defendants' mandatory duties to ensure

transportation project decisions are made in the best overall public interest.  Plaintiffs

challenge Defendants' approval of the ICC as well as the substantive findings made

by USDOT, acting through the FHWA, and the Maryland Department of

Transportation, through the Maryland State Highway Administration, (collectively,

"lead agencies"), in the Record of Decision ("ROD"), the final agency action

approving the ICC project.  Defendants used deficient and inaccurate analyses of

direct, indirect, and cumulative impacts from the selected alternative, combined with

an overly narrow project purpose to freeze out project alternatives and mitigation

measures proposed by the Plaintiffs.  Defendants ignored alternatives in the record

that would better meet national transportation planning objectives to minimize

transportation-related fuel consumption and air pollution, foster economic growth and

development, and increase the mobility of all area residents, including those without

vehicles.  Defendants also ignored alternatives in the record that would better meet

regional transportation planning objectives to reduce vehicle miles traveled and reliance on single occupant vehicles. The Defendants' analysis of health, environmental, and land-use consequences is inadequate because the lead agencies omitted significant and adverse impacts in their assessment of significant costs and benefits of the project, and relied on an unrealistic characterization of the project's success in meeting regional and national statutory objectives. The lead agencies' consistent underestimation of costs, overestimation of benefits, and failure to disclose the human health and environmental impacts evince a pattern of agency neglect for statutory duties to protect the human environment while constructing federally-funded transportation projects.

5.    Plaintiffs allege that, by issuing the ROD and approving the ICC, the lead agencies, the MWCOG and their respective officials violated the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), 23 U.S.C. § 134, the Federal-Aid Highways Act ("FAHA"), 23 U.S.C. § 109, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-70f, and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-06.

6.    Plaintiffs seek a declaration that Defendants' approval of the ICC and the FY2005-2010 and FY2006-2011 Metropolitan Transportation Improvement Programs ("Metropolitan TIPs") and 2004 and 2005 Constrained Long-Range Plans ("CLR Plans"), which included the ICC, violated federal highway laws, NEPA, and the APA. Plaintiffs ask the Court to set aside the Metropolitan TIPs and CLR Plans because they included the ICC without properly analyzing the ICC project's impact upon the Metropolitan TIP's or CLR Plans' ability to meet national or local

transportation objectives, in violation of federal law.  Plaintiffs also ask the Court to set aside the lead agencies' approval of the ICC because the lead agencies did not make a determination that the ICC would be in the best overall public interest after considering the required statutory factors as compared to alternatives in the record. To the extent the lead agencies made a determination pursuant to 23 U.S.C. § 109(h), they did not identify the costs of mitigating the adverse impacts of the ICC project or explain the factors they considered or weighed in reaching such a determination. Plaintiffs further ask the Court to set aside the lead agencies' approval of the ICC because they conducted an inadequate analysis of environmental impacts and alternatives and because their approval is arbitrary and capricious and not otherwise in accordance with law.

## PARTIES

## PLAINTIFFS AND STANDING

7.    Plaintiff Sierra Club ("Club") is a non- profit environmental and conservation organization incorporated under the laws of the state of California.  The Club is dedicated to promoting the responsible use of the earth's ecosystems and resources and protecting and restoring the quality of the natural and human environment to ensure a clean and healthful environment for all people.  The Club seeks to protect the interests of its members in the promotion of energy conservation, reduction of greenhouse gas emissions, and preservation of existing transportation systems.  The Club also seeks to increase the efficiency of transportation systems and the mobility of its members while minimizing air pollution and transportation-related fuel consumption, as well as the adverse economic, social, safety, and environmental

effects of transportation projects.  The Club has over 750,000 members, approximately 17,000 of whom reside in Maryland, and approximately 3,100 of whom reside in the District of Columbia ("D.C.").  The Club is authorized to bring this action on the behalf of itself and its members who will be injured by the project.

8.     Plaintiff Environmental Defense ("ED") is a non-profit environmental and conservation organization incorporated under the laws of New York.  ED is dedicated to protecting the environment for all people, including future generations.  ED seeks to ensure that there exists clean air, clean water, healthy food, and flourishing ecosystems for this and future generations.  ED seeks to protect the interests of its members in the promotion of energy conservation, reduction of global warming, and improved transportation systems.  ED also seeks to increase the efficiency of transportation systems and the mobility of its members while minimizing air pollution and transportation-related fuel consumption, as well as the adverse economic, social, safety, and environmental effects of transportation projects.  ED has 290,306 members nationally, 7,594 of whom reside in Maryland and 1,101 of whom reside in D.C.  ED is authorized to bring this action on behalf of itself and its members who will be injured by the project.

9.     The Club and ED, as well as their members, have long advocated responsible and well planned growth in the Maryland and D.C. metropolitan area.  In their long standing tradition of active participation in the transportation planning process, Plaintiffs have commented on various aspects of the transportation project in question, including the draft environmental impact study ("DEIS"), final

environmental impact study ("FEIS"), the 2006-2011 Metropolitan TIP, the National

Capital Region 2005 CLR Plan, and the Project-Level Conformity Determination.

10.    The organizational purposes of the Club and ED include educating the public on the

environmental effects and impacts of government actions.  Defendants' failure to

adequately study the environmental impacts of the ICC project in the Metropolitan

TIP, CLR Plan, FEIS, ROD, and the project-level conformity determination has

harmed the ability of the Club and ED to disseminate information to their members

and the general public regarding the environmental impacts of the ICC project.

Defendants' failure has further resulted in a drain on the Club's and ED's resources as

Plaintiffs have been required to develop evidence that should have been developed by

Defendants regarding the environmental effects of the ICC project to properly inform

the public of the project's environmental impacts.

11.    The Club and ED seek to promote efficient and environmentally protective

transportation systems and prevent ill-conceived transportation plans, programs, and

projects which will harm the public interest and increase the level of motor vehicle

emissions.  Defendants' failure to study reasonable alternatives to and consider for

adoption mitigation measures for the ICC project harms Plaintiffs' ability to promote

sound transportation plans, programs, and projects which minimize environmental

harm and promote smart growth.  Defendants' failure has drained the Club's and

ED's resources as Plaintiffs have expended their resources to study and analyze

transportation alternatives to and mitigation measures for the ICC to promote the

continued consideration of such alternatives by the lead agencies.

12.    The D.C. and Maryland members of the Club and ED, who need not participate in this suit or in the relief sought, are also injured by the ICC project.  A number of Plaintiffs' members live in close proximity to the ICC project right-of way and frequently travel to the ICC right-of-way and surrounding areas to enjoy the aesthetic beauty of the area, including parks and wetlands, recreate, take their children to school, shop, and work and will be harmed by the increased air pollution they will breathe resulting from the construction of the ICC project and the increased vehicular pollution resulting from the ICC project.

13.    Those members of the Club and ED who reside, work or recreate near the project and who travel to or through the project area will be further injured by the increased noise, litter, traffic, pollution, and health risks resulting from the ICC project, as their ability to use the area, including parks and wetlands, for recreational purposes and aesthetic enjoyment will be diminished.

14.    Those members of the Club and ED who reside, work or recreate near the ICC project and travel to or through the project area will be further injured by the increase in secondary traffic resulting from the project, which will increase local delays and disrupt their mobility.

15.    As an example of some of the injuries suffered by members of the Club and ED, Beth Gatti, a member of the Club, is an asthmatic recovering from a kidney transplant.  She also has a son who is asthmatic.  Ms. Gatti and her son live in close proximity to the ICC right-of-way.  She and her son, as asthmatics, are particularly susceptible to the negative health effects of particulate matter and other motor vehicle pollution and will

be injured by the increased air pollution resulting from the vehicular traffic along the ICC corridor.

16.    The D.C. and Maryland members of the Club and ED will be injured by the lead agencies' overly narrow purpose and need statement because it precluded consideration of transportation alternatives which would have reduced air pollution and fuel consumption and increased their mobility, thereby resulting in less injury to them.

17.    The D.C. and Maryland members of the Club and ED will be further injured by the approval of the ICC project as the project will cause the National Capital Region to fall into nonattainment of the PM2.5 National Ambient Air Quality Standards ("NAAQS") and/or delay timely attainment of the NAAQS as the area affected by emissions from the project will experience levels of PM2.5 pollution above those deemed safe for human health.

18.    The ICC project will injure Plaintiffs' members by affecting the ability of the National Capital Region to meet the PM2.5 NAAQS which will limit the ability of the National Capital Region to obtain federal funds for improvements to the existing transportation system.

19.    Defendants' failure to adequately study and analyze the environmental effects of the ICC project, failure to consider less harmful alternatives or develop mitigation measures to eliminate or minimize adverse effects, failure to choose the alternative that is in the best overall public interest, and failure to properly administer the statutory requirements are the causes of the injuries of Plaintiffs and their members.

20.    Vacating the decision approving the ICC project until the statutory requirements are

properly administered and an adequate study of the environmental impacts,

alternatives, and mitigation measures can be conducted, will redress the Plaintiffs'

and their members' injuries because it will ensure the project's impacts are

adequately considered and evaluated and enable the lead agencies to determine, based

upon consideration of the full impacts and minimal benefits of the project, that the

project is not in the best overall interest of the public.

21.    Vacating the Metropolitan TIPs and CLR Plans, or striking from such CLR Plans and

Metropolitan TIPs the ICC project, until a project-level conformity determination for

the ICC project is made will redress Plaintiffs' and their members' injuries because

the ICC project cannot proceed until its impact upon the transportation plans and

programs and their cumulative air pollution impacts are considered.  This would

reduce the amount of pollution to which the Plaintiffs' members would be exposed.

22.    Unless the relief sought herein is granted, the substantial health, financial, aesthetic,

recreational, and environmental interests of the Plaintiffs and their members will

continue to be adversely affected and injured by the Defendants' actions and

omissions.

**DEFENDANTS**

23.    Defendant USDOT, the executive department of the federal government responsible

for oversight of the transportation planning process pursuant to the Department of

Transportation Act, 49 U.S.C. § 303(c), is responsible for making the determination

of whether a project is in the best overall public interest pursuant to 23 U.S.C. §

109(h), determining the conformity of a project pursuant to 42 U.S.C. § 7506(c), and

implementing the requirements of NEPA with respect to highway projects, 23 U.S.C. § 139.  The headquarters of USDOT are in D.C.

24.    Defendant Mary E. Peters is the Secretary of Transportation for USDOT.  Secretary Peters is responsible for the administration, operations, and activities of USDOT, including oversight of the FHWA.  In her official capacity, Secretary Peters resides in D.C.  Defendants USDOT and Secretary Peters are referred to collectively in this complaint as USDOT.

25.    FHWA is the agency within USDOT primarily responsible for highway planning and funding as well as the approval of access permits for highway projects that connect to existing interstate highways.  FHWA is the lead federal agency responsible for approving the ICC project.  The headquarters of FHWA are in D.C.

26.    Defendant J. Richard Capka is the Administrator of FHWA. Administrator Capka is responsible for the administration, operations, and activities of FHWA and its various divisions.  In his official capacity, Administrator Capka resides in D.C.  He is being sued in his official capacity only.  Defendants FHWA and Administrator Capka are referred to collectively in this complaint as FHWA.  Defendants USDOT and FHWA are referred to collectively in this complaint as the federal defendants.

27.    Defendant, the MWCOG is a regional organization of Washington area local governments.  It, through the TPB, determined that the Metropolitan TIPs and CLR Plans, which included the ICC project, conformed with the Maryland state implementation plan and federal conformity regulations.  The headquarters of MWCOG are located in D.C.

28.   Defendant Jay Fisette is Board Chair of the MWCOG.  Chairperson Fisette is responsible for the administration, operations, and activities of MWCOG, including the TPB.  In his official capacity, Chairperson Fisette resides in D.C.  He is being sued in his official capacity only.  Defendants MWCOG and Chairperson Fisette are referred to collectively in this complaint as MWCOG.

29.   Defendant TPB, an organization within MWCOG, is the federally designated Metropolitan Planning Organization ("MPO") for the National Capital Planning Region, which includes D.C. and portions of Maryland and Virginia.  TPB prepares highway and transportation plans and programs that the federal government must approve in order for federal-aid transportation funds to flow to the National Capital Region.  TPB prepared and approved the Metropolitan TIPs and CLR Plans, which included the ICC project.  The headquarters of TPB are located in D.C.

30.   Defendant Michael Knapp is Chairperson of the TPB.  Chairperson Knapp is responsible for the administration, operations, and activities of TPB.  In his official capacity, Chairperson Knapp resides in D.C.  He is sued in his official capacity only.  Defendants TPB and Chairperson Knapp are referred to collectively in this complaint as TPB.  Defendants MWCOG and TPB are referred to collectively in this complaint as the MPO.

### JURISDICTION

31.   This court has federal question jurisdiction, 28 U.S.C. § 1331, over Plaintiffs' claims against the federal defendants and MPO arising under the Administrative Procedure Act, 5 U.S.C. §§ 701-06, Federal-Aid Highways Act, 23 U.S.C. § 109, SAFETEA-LU, 23 U.S.C. § 134, National Environmental Policy Act, 42 U.S.C. §§ 4321-70f, the

Clean Air Act, 42 U.S.C. § 7604, and the Freedom of Information Act, U.S.C. § 552(a)(4)(B).


**PART I:   CAUSES OF ACTION RELATING TO DEFENDANTS' FAILURE TO ADHERE TO FEDERAL TRANSPORTATION LAWS, THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE ADMINISTRATIVE PROCEDURE ACT.**

### FACTUAL BACKGROUND

32.    In 1983, FHWA attempted to construct an "Intercounty Connector" road between upper Montgomery County and I-95 in Prince George's County.

33.    In 1990, the United States Department of the Interior commented on the ICC, stating that "[i]f locations for a four-lane, divided, limited-access highway were considered *de novo*, using today's standards without reference to past planning decisions, it is unlikely that the ICC Master Plan alignment would be a location of choice. Consequently, we see no valid reason why the . . . loss of scarce natural resources and other environmental amenities should be accepted in light of today's environmental criteria."

34.    The ICC project would be the nation's third largest construction project and would be located within the National Capital Region, an area currently designated in nonattainment of the standards for PM2.5 pollution under 40 C.F.R. § 81.309.

35.    The FHWA and Maryland State Highway Administration issued a DEIS regarding the ICC project, which is substantially similar to the ICC project approved by the lead agencies, in 1997.

36.    In 1997, the United States Department of the Interior concluded that the proposed
       ICC Master Plan Alignment, which is similar to the ICC Corridor 1 alternative
       approved by the lead agencies, was "the most environmentally damaging alternative."

37.    In 1997, the EPA gave the proposed ICC Master Plan Alignment its lowest rating,
       concluding the project was "environmentally unsatisfactory" because it would cause
       "adverse environmental impacts that are of sufficient magnitude that they are
       unsatisfactory from the standpoint of public health or welfare or environmental
       quality."  The EPA and the Department of Interior recommended rejecting an ICC
       alignment substantially similar to that approved by the lead agencies because of the
       project's significant adverse environmental impacts.

38.    In the spring of 1998, after reviewing these and other comments criticizing the
       proposed ICC, MDOT and the Maryland State Highway Administration put the ICC
       study on permanent hold.

39.    On September 22, 1999, the Maryland Governor cancelled the ICC NEPA study
       because the project costs outweighed its benefits.

40.    On February 27, 2003, United States Secretary of Transportation Norman Mineta
       designated the ICC as a high priority transportation infrastructure project pursuant to
       Executive Order 13,274, "Environmental Stewardship and Transportation
       Infrastructure Project Review," which authorizes expedited environmental reviews of
       high priority transportation infrastructure projects. 67 Fed. Reg. 59,449 (Sept. 18,
       2002).

41.    On June 3, 2003, FHWA published notice of its intent to prepare a DEIS for the ICC
       in cooperation with MDOT and the Maryland State Highway Administration,

establishing that "[t]he proposed project is intended to provide a multi-modal highway between I-270 in Montgomery County and I-95/US 1 in Prince George's County, Maryland" and that "a full range of multi-modal highway alternatives will be considered." 68 Fed. Reg. 33,221 (June 3, 2003).

42.    The FHWA and Maryland State Highway Administration released the revised DEIS on November 22, 2004.

43.    Plaintiffs submitted timely comments on the DEIS to the lead agencies in February 2005, including comments criticizing the overly narrow purpose and need statement as violating NEPA and informing federal defendants of reasonable alternatives, such as alternative modes of transportation and alternative methods for improving travel and access.

44.    In June 2003, the Prince George's County Council unanimously adopted Resolution CR-32-2003, opposing the ICC.

45.    The Prince George's County Council submitted comments on the DEIS, reiterating its opposition to the ICC.

46.    The Prince George's County Council, in its comments on the DEIS, indicated that the ICC construction was not in the best interests of the County because it would magnify regional inequities in economic development and opportunities between Montgomery and Prince George's counties and that there was no perceivable benefit to the County from an expenditure of $2 billion in federal and state funds.

47.    The Prince George's County Council, in its comments on the DEIS, indicated that county residents would benefit instead from expenditure of transportation funds on

critical mass transit projects such as the Purple Line from New Carrollton to Bethesda or the Yellow Line extension across the Woodrow Wilson Bridge.

48. The ICC was included in the National Capital Region's CLR Plan on November 17, 2004, as a road which would run approximately eighteen miles between I-270 near Gaithersburg and I-95 near Laurel, Maryland.

49. The CLR Plan incorporating the ICC in 2004 was an amendment to the 2003 CLR Plan.

50. The federally-designated MPO responsible for approving transportation plans and programs such as the CLR Plans and Metropolitan TIPs for the National Capital Region is the TPB of the MWCOG.

51. The MPO was created in accordance with federal law pursuant to 23 U.S.C. § 134(d).

52. The CLR Plan is a comprehensive plan of transportation projects and a system-wide collection of strategies that the MPO seeks to implement over the next 25 years.

53. The MPO typically amends the CLR Plan every year, along with developing a new Metropolitan TIP.

54. A new air quality conformity determination must be made when CLR Plans and Metropolitan TIPs are amended unless only conformity-exempt projects are added to the CLR Plans and Metropolitan TIPs. 40 C.F.R. § 93.104(b), (c).

55. The Maryland Consolidated Transportation Plan ("State TIP") adopted the approved Metropolitan TIPs and CLR Plans.

56. The State TIP included the ICC as a transportation priority.

57. Federal defendants approved the State TIP, finding the State TIP planning process consistent with 23 U.S.C. § 134.

58.   The FY2005-2010 Metropolitan TIP, which included the ICC, established that the air quality conformity analysis of the CLR Plan would utilize the Round 6.4 A Cooperative Forecasts of population, households, and jobs, based upon the local land use plans and zoning.

59.   The MPO conducted the required conformity analysis for the 2004 CLR Plan amendment and FY2005-2010 Metropolitan TIP on November 17, 2004.  In conducting this conformity analysis, the MPO utilized Travel Forecasting Model 2.1D.

60.   The MPO based its conformity determination on the Corridor 1 alternative because MPO determined the Corridor 1 alternative is expected to result in the "worst-case" air emissions of the alternatives under consideration.

61.   Neither the 2004 CLR Plan, nor the conformity determination for the 2004 CLR Plan/FY2005-2010 Metropolitan TIP, contains a reference to any local land use plan, regional transportation plan, or the 1998 TPB Vision Plan.

62.   Plaintiff ED commented on the 2004 CLR Plan's inclusion of the ICC project, as well as the conformity determination regarding the CLR Plan, by letter on November 16, 2004.

63.   Plaintiff ED commented on the 2005-2010 Metropolitan TIP at a TPB meeting on November 17, 2004, and in a letter dated December 13, 2004.

64.   On July 11, 2005, Governor Ehrlich announced the State's preference to build the ICC along the Corridor 1 alignment.

65.   On July 29, 2005, Governor Ehrlich announced receipt of $18 million in federal funding for the proposed project.

66.    The federal funding announced by Governor Ehrlich had not been approved by the federal defendants on July 29, 2005.

67.    The 2005 amendment to the CLR Plan, which included the ICC project, and the FY2006-2011 Metropolitan TIP were approved by the MPO on October 19, 2005.

68.    On February 21, 2006, the FHWA determined the 2005 CLR Plan and FY2006-2011 Metropolitan TIP conformed with the Maryland State Implementation Plan ("SIP") and applicable regulations.

69.    Plaintiff ED commented on the 2005 CLR Plan and FY2006-2011 Metropolitan TIP approvals, as well as the conformity determination regarding the Metropolitan TIP and CLR Plan, on April 6, 2005, through a letter to the Chairman of the MPO.

70.    Plaintiff ED commented in its April 6, 2005, letter that the approved Metropolitan TIP and CLR Plan suggest that: "transportation agencies are neglecting to focus on transit except as an afterthought in designing and planning toll managed lanes . . . We fear the result of this will be construction of more new road capacity than is necessary, promoting more traffic growth and sprawl, with . . . inadequate attention to mitigation of the adverse affects of new highway capacity on public health, the environment, and the need for other transportation investments in communities."

71.    At the time the FHWA determined the 2005 CLR Plan and FY2006-2011 Metropolitan TIP conformed with the Maryland SIP, the lead agencies had not made a project-level conformity determination regarding the ICC project.

72.    On January 3, 2006, the lead agencies issued a FEIS for the ICC project.

73.    In the FEIS, the lead agencies selected Corridor 1 ("selected alternative") as the preferred alternative.

74.     At the time the lead agencies issued the FEIS, no project-level conformity determination on the ICC project had been made.

75.     Plaintiffs ED and the Club submitted timely comments on the FEIS.

76.     Plaintiffs' comments on the FEIS noted that they did not supersede or replace Plaintiffs' comments on the DEIS because most of the deficiencies noted in those comments remained unaddressed.

77.     The FEIS identified five project goals for the ICC study area: (1) to increase community mobility and safety; (2) to facilitate the movement of goods and people to and from economic centers in the Study Area; (3) to provide cost-effective transportation to serve existing and future development patterns based on local land use planning; (4) to assist in restoring natural, human, and cultural resources from past development impacts; and (5) to advance homeland security.

78.     The FEIS contained a purpose and need statement of the ICC project as linking "existing and proposed development areas between the I-270 and I-95/US 1 corridors within central and eastern Montgomery County and northwestern Prince George's County with a state-of-the-art, multi-modal, east-west highway that limits access and accommodates passenger and goods movement."

79.     The lead agencies did not provide any evidence establishing a need for more east-west travel.

80.     This purpose and need precluded consideration in the FEIS of any non-highway, public transit, mixed mode, or expansion of existing highways alternatives, including expansion efforts already under consideration by the State.

81.    The EPA and the Maryland Department of the Environment, participating agencies in the FEIS, objected to the narrow purpose and need statement of the ICC project during the comment period.

82.    Thomas C. Voltaggio, Deputy Regional Administrator, EPA Region III expressed concern about the narrowness of the statement, writing "[t]he term 'east-west highway' should be modified to reflect that the study includes multi-modal transportation options. 'Highway' could be replaced by the phrase 'transportation system' or 'transportation improvements.' The concept of a mass transit component to the transportation solution is not evident throughout the P&N Statement."

83.    The Maryland Department of the Environment commented that, "[a]s presented, . . . [t]his purpose effectively eliminates any alternative(s) that do not include a new highway."

84.    Similarly, the United States Department of Interior commented that, "[t]he description of a 'limited access, east-west highway' is so narrowly construed that it eliminates alternatives that could reasonably provide the increased mobility of goods and people which is desired."

85.    The purpose and need statement enabled the lead agencies to reject proposed non-highway and public transit alternatives because such alternatives could not meet the purpose and need as defined by the lead agencies.

86.    The FEIS cites the transportation objectives of two planning documents as the basis for the project purpose and need statement: the 2005 CLR Plan and the Montgomery County General Plan Refinement of 1993.

87.    At the time of ICC analysis, the 1998 TPB Vision Plan, the Montgomery County General Plan Refinement of 1993 and the Prince George's County General Plan of 2002 were the most recent approved regional and local plans.

88.    The CLR Plan is designed to achieve, in part, the following objectives: "[t]The projects in the [CLR Plan] should contribute to the regional goals and objectives laid out in the TPB Vision. The [CLR Plan] must include only those projects the region can afford.  The [CLR Plan] must conform to air quality improvement goals.  The [CLR Plan] must not have disproportionately high and adverse effects on low-income, minority, and disabled populations."

89.    The Montgomery County General Plan Refinement of 1993 describes changes in the objectives of the program over time, citing the "movement from accommodating travel demand toward managing travel demand and encouraging availability of alternatives to the single-occupant vehicle."  The Plan Refinement contains a strategy to "[g]ive priority to establishing exclusive travelways for transit and high occupancy vehicles."

90.    Other regional plans applicable to the project, such as the 1998 TPB Vision Plan and the Prince George's County General Plan of 2002, contained objectives related to environmental protection not incorporated into the purpose and need statement.

91.    The 1998 TPB Vision Plan includes objectives to protect the region's natural environment, including the "[r]eduction in reliance on the single-occupant vehicle by offering attractive, efficient and affordable alternatives . . . [including i]ncreased transit mode share . . .  [and r]eduction in per capita vehicle miles traveled." [JC 12]

92.    The 2002 Prince George's County General Plan's objectives are to "[r]educe average commuter miles traveled by 25% by 2025; [i]ncrease the proportion of transit trips by 25% by 2025; [i]ncrease public funding of transportation infrastructure in the Developed Tier; [and r]educe average vehicle miles traveled by 2025."

93.    The ICC is forecasted to increase vehicle miles traveled ("VMT") by twenty percent.

94.    The lead agencies claim that "[n]on-highway alternatives were not summarily discarded during the scoping process" and that "[e]very alternative was screened to determine whether it met the purpose and need or if the alternative presented incurable environmental or engineering obstacles."

95.    A report, The Intercounty Connector: Performance and Alternatives ("the Smart Mobility Report"), was prepared by ED, the Club, Chesapeake Bay Foundation, Audubon Naturalist Society, the Coalition for Smarter Growth, and Solutions Not Sprawl, with the assistance of Smart Mobility, Inc. ("SMI"). Plaintiffs submitted the Smart Mobility Report to the lead agencies during the DEIS comment period.

96.    SMI is an expert in transportation planning and modeling secondary impacts of transportation projects. SMI's expertise includes modeling travel demand, regional air quality, and analyzing land use and transportation systems. Within the last five years, SMI has been hired as a consultant in nearly two dozen transportation and land use planning projects nationwide.

97.    SMI, in its Smart Mobility Report, analyzed four transportation alternatives proposed by the Plaintiffs against the ICC Build and No-Build alternatives, and demonstrated that each of the four alternatives would result in fewer vehicle hours traveled ("VHT"), VMT, and vehicle hours delay ("VHD") than the ICC project.

98.    SMI proposed a transit-oriented land use and investment alternative, which includes the "additional transit, light rail, and localized road improvements."

99.    SMI stated that the transit-oriented land use and investment alternative is "supported by master plans and incentives to redirect much of the future growth in jobs and households in Montgomery and northern Prince George's counties to be in close proximity to public transit and improve the local job-housing balance."

100.    SMI concluded that, compared with the ICC selected alternative, the transit-oriented land use and investment alternative would result in 8.8% lower VHT and 10.7% lower VHD.

101.    The lead agencies did not retain for further consideration the transit-oriented land use and investment alternative because they concluded it would not significantly reduce traffic congestion on the Capital Beltway.

102.    SMI proposed a toll lanes/express bus alternative, which includes the "a network of toll lanes comprised of both newly constructed toll lanes and converting some existing lanes to toll lanes on I-270, I-495 (the Beltway), and I-95.  Both high occupancy and single occupancy vehicles would pay tolls. Extensive express bus service is assumed on the toll lanes."

103.    SMI concluded that, compared with the ICC selected alternative, the toll lanes/express bus alternative would result in 8.1% lower VHT and 10.6% lower VHD.

104.    The lead agencies rejected highway expansion alternatives because they determined those alternatives could not meet transportation demand for long-distance trips, concluding, "according to previous traffic studies, approximately 75 percent of the

motorists that would use a new alignment would have an origin, a destination, or both an origin and a destination outside the Study Area."

105.    The lead agencies concluded in FEIS that only 5-8% of travelers on the ICC during peak travel period would travel the full length of the ICC and that 92-95% of motorists would use the ICC for short distance trips.

106.    The lead agencies identified that the ICC is "aimed primarily for more through trips" as opposed to improving local traffic patterns.

107.    SMI concluded that the "ICC will necessarily increase traffic on other roadways, particularly those north-south roadways with ICC interchanges."

108.    SMI proposed an alternative to convert some existing freeway and HOV lanes to high occupancy toll ("HOT") lanes and to provide new express bus services.  In contrast to the previous alternative, none of the HOT lanes would be newly constructed lanes.

109.    SMI concluded that, compared with the ICC alternative, the conversion to HOT lanes and use of an express bus service would result in 9.7% lower VHT and 8.6% lower VHD.

110.    SMI proposed a transit-oriented HOT Lane-Rail and Express Bus alternative (the "Hybrid Alternative"), which includes "most of the rail transit improvements from the Transit Oriented alternative, and the converted HOT-express bus lanes from the Convert to HOT alternative."

111.    SMI concluded that the Hybrid Alternative produced the best overall performance.

112.    SMI concluded that, compared with the ICC alternative, the Hybrid Alternative would result in 12.9% lower VHT and 16.9% lower VHD.

113.    The lead agencies did not retain for further consideration transit alternatives because they concluded transit options would have low ridership volume.

114.    The lead agencies made this determination based on population data from the early 1990s.

115.    Population in Montgomery and Prince George's counties has grown significantly since the early 1990s.

116.    The lead agencies further did not analyze transit options using the same assumptions or timeframes that were used to analyze the ICC build alternative.

117.    The lead agencies dismissed the alternatives proposed in the Smart Mobility Report stating that the report's measures of effectiveness were "inappropriate for a project-specific study," because, for example, "[i]n a highly congested network such as the Washington, DC region, the more appropriate performance measures are a function of vehicle delay, not vehicle hours of travel[]."

118.    Despite requested by commenters, the lead agencies provided no information or data supporting their conclusion that the ICC would reduce total travel time.

119.    Plaintiffs submitted record evidence that the No-Build scenario would result in less VHT and VHD, as compared to the ICC Build alternative.

120.    Plaintiffs submitted evidence in the record that the Hybrid Alternative and the transit-oriented land use and investment, toll lanes/express bus, and HOT lanes and express bus service alternatives proposed in the Smart Mobility Report would reduce VHT, VMT, and VHD as compared to the ICC Build alternative.

121.    Plaintiffs submitted record evidence that transit alternatives could reduce VHT, VMT, and VHD as compared to the ICC Build or No-Build alternatives.

122.   The lead agencies referenced the Maryland-National Capital Park and Planning Commission's 2002 project-specific study of the ICC.

123.   The Maryland-National Capital Park and Planning Commission's 2002 project-specific study of the ICC relied upon VHT as a key performance measure.

124.   The lead agencies do not use VHT as a measure of the ICC project's performance.

125.   The Smart Mobility Report employs both VHT and VHD as measures of vehicle delay.

126.   The lead agencies did not demonstrate or determine that the transit alternatives identified in the Smart Mobility Report could not meet the five transportation needs identified in the FEIS to increase community mobility and safety, facilitate the movement of goods and people to and from economic centers in the Study Area, provide cost-effective transportation to serve existing and future development patterns based on local land use planning, assist in restoring natural, human, and cultural resources from past development impacts, and advance homeland security.

127.   The lead agencies did not demonstrate or determine that the public transit alternatives identified in the Smart Mobility Report could not meet the objectives in the 2005 CLR Plan, 1998 TPB Vision Plan, Montgomery County General Plan Refinement of 1993, or the Prince George's County General Plan of 2002.

128.   The lead agencies did not demonstrate that public transit alternatives, combined with highway expansion alternatives, could not meet the objectives in the 2005 CLR Plan, 1998 TPB Vision Plan, the Montgomery County General Plan Refinement of 1993, and the Prince George's County General Plan of 2002.

129.    The lead agencies did not demonstrate that public transit alternatives, combined with highway expansion alternatives, could not meet the five identified transportation needs the project is intended to address.

130.    Transit alternatives to the ICC, proposed by Plaintiffs and other commenters, would serve regional objectives including reducing VMT, dependence on single occupancy vehicles, and increasing the proportion of transit trips.

131.    Plaintiffs established that transit alternatives could reduce dependence on single occupancy vehicles more than the ICC Build or No-Build alternatives.

132.    Plaintiffs submitted record evidence that transit alternatives could increase the proportion of transit trips among travelers more than the ICC Build or No-Build alternatives.

133.    Plaintiffs established that transit alternatives could reduce more transportation-related fuel consumption than the ICC Build or No-Build alternatives.

134.    Plaintiffs submitted record evidence that transit alternatives could reduce more air pollution than the ICC Build or No-Build alternatives.

135.    Plaintiffs submitted record evidence that transit alternatives could increase mobility as defined in the 2005 CLR Plan, 1998 TPB Vision Plan, the Montgomery County General Plan Refinement of 1993, and the Prince George's County General Plan of 2002.

136.    Plaintiffs submitted record evidence that transit alternatives could foster equitable regional economic growth and development as defined in the Prince George's County General Plan of 2002.

137.  Transit alternatives to the ICC in the record would better accomplish the national objectives established by 23 U.S.C. § 134(a) including minimizing transportation-related fuel consumption and air pollution, increasing mobility of people and goods, and fostering economic growth and development than the ICC.

138.  Several projects included in the 2003 CLR Plan, currently being studied by the State of Maryland in separate NEPA documents, "were suggested as alternatives, separately or integrated, to the proposed ICC during the scoping phase and in comments on the DEIS."

139.  None of the transportation projects suggested as alternatives by the Smart Mobility Report, including, the transit-oriented land use and investment alternative, the toll lanes/express bus alternative, the conversion to HOT lanes and express bus service alternative, and the Hybrid alternative were retained for detailed study in the FEIS.

140.  The lead agencies, however, incorporated the expected travel impacts of some of the alternatives proposed in the Smart Mobility Report, including roadway improvements along the Capital Beltway, toll lanes on the Beltway, and roadway, toll, and transit improvements in the I-270 corridor into their baseline analysis for the selected alternative.

141.  The lead agencies did not incorporate the expected travel impacts of any alternative proposed in the Smart Mobility Report into their baseline analysis for the No-Build Alternative.

142.  Plaintiffs commented that an FEIS should "consider, as an alternative to the proposed highway project, delaying that highway 'until after . . . public transit expansion.'"

143.    The lead agencies did not analyze whether public transit options should be implemented prior to or after the construction of the selected alternative.

144.    The lead agencies rejected conclusions and alternatives in the Smart Mobility Report based upon criticisms of the report's methodology and the inability of the alternatives studied in the report to meet the project's highway purpose and need statement.

145.    The lead agencies rejected the conclusions and alternatives in the Smart Mobility Report based upon criticisms of the report's measures of effectiveness, study area breadth, and the land use and travel forecasting methodology.

146.    The lead agencies did not analyze the alternatives presented in the Smart Mobility Report using the methodology they used to measure performance of the ICC selected alternative.

147.    The lead agencies did not determine whether the alternatives analyzed in the Smart Mobility Report perform better than the ICC selected alternative on any measure of effectiveness.

148.    The lead agencies did not retain for further consideration the Hybrid Alternative because it would "reduce automobile trips by only five percent" and would not "relieve traffic by approximately 10 percent."

149.    The lead agencies rejected consideration of alternatives presented by the Smart Mobility Report because the "majority of the [Measures of Effectiveness] used in the SMI Report reflect the objective of reducing regional auto travel and increasing regional transit use, which are not objectives of the ICC purpose and need."

150.    VHT is a common Measure of Effectiveness used by transportation planners to compare the ability of transportation alternatives to reduce the travel time cost burden that may be imposed on residents of a region as they satisfy their mobility needs.

151.    The lead agencies challenged the appropriateness of comparing alternatives for their ability to reduce VMT, noting, "because cars have become cleaner due to advanced emissions technology, the effect of VMT on air quality has become less significant than it was in previous decades."

152.    VHT and VMT are metrics used by transportation planners to determine the impact of a transportation project on user mobility.

153.    The lead agencies did not use VMT, VHT, or VHD to evaluate alternatives to the ICC.

154.    The lead agencies used VMT to evaluate carbon monoxide emissions.

155.    The lead agencies did not disclose or evaluate these basic measures of transportation system performance commonly used to evaluate project effectiveness and compare alternatives.

156.    The lead agencies do not evaluate alternatives to the ICC project according to their ability to accomplish the statutory planning objectives of increasing the mobility of people and goods, fostering economic development, minimizing fuel consumption, and minimizing air pollution.

157.    The measures used to evaluate the effectiveness of the ICC alternatives in the FEIS study included, "screenline volumes, accessibility to jobs, changes in daily and intersection peak hour traffic, total hours of congestion at major intersections in the corridor, and accident data."

158.  Plaintiffs challenged the measures of effectiveness used by the lead agencies because "the study team applied only project-level measures and did not consider the more regional measures (i.e., vehicle hours of travel and vehicle miles of travel)."

159.  The lead agencies rejected Measures of Effectiveness used in local land use planning documents, including increased access to transportation and decreased reliance on the automobile.

160.  The lead agencies failed to identify or analyze alternatives to determine which alternative would best minimize transportation-related fuel consumption.

161.  The lead agencies failed to identify or analyze alternatives to determine which alternative would best foster economic growth and development, as defined in the Prince George's County General Plan of 2002.

162.  The Prince George's County General Plan of 2002 identified twenty-five development centers, none of which are within the ICC study area.

163.  The selected alternative, according to the Prince George's County Council, will increase the inequitable distribution of economic growth and development between Montgomery and Prince George's County.

164.  The selected alternative will not foster the economic growth and development objectives defined by Prince George's County General Plan of 2002.

165.  The lead agencies did not identify or analyze alternatives to determine which alternative would best increase mobility as defined in the 1998 TPB Vision Plan and the Montgomery County General Plan Refinement of 1993.

166.  The lead agencies defined mobility in the FEIS as "the ability to travel between two points."

167.    The lead agencies, in the FEIS, determined mobility is achieved by "assist[ing] the over loaded local road systems which currently provides for east-west mobility needs."

168.    The lead agencies defined mobility in the ROD as "the ability to reach a destination in a time and cost that is satisfactory to the traveler."

169.    The lead agencies defined mobility in their responses to comments as "measured in terms of auto trips" and therefore "improvements in mobility were judged in terms of the amount of auto trips reduction in relation to normal traffic growth rates."

170.    None of the definitions of mobility used by the lead agencies included the promotion of transportation alternatives to driving.

171.    The Montgomery County General Plan Refinement defines mobility as "an efficient transportation system" providing "a wide range of alternatives."

172.    The 1998 TPB Vision Plan, while not specifically defining mobility, links improved mobility with "reduced reliance on the automobile."

173.    The 2002 Prince George's County General Plan of 2002, while not specifically defining mobility, contains objectives to "[r]educe average commuter miles traveled by 25% by 2025; [i]ncrease the proportion of transit trips by 25% by 2025; [i]ncrease public funding of transportation infrastructure in the Developed Tier; [and r]educe average vehicle miles traveled by 2025."

174.    The lead agencies did not determine how many automobile trips would be reduced from the ICC.

175.  SMI concluded that the ICC will be ineffective at relieving congestion in the study area because the increased traffic resulting from the ICC project will be "3 times the reduction in traffic forecast for parallel roads."

176.  The lead agencies concluded that Capital Beltway traffic will not be significantly decreased by construction of the ICC.

177.  SMI concluded that Capital Beltway traffic is expected to increase by approximately the same amount irrespective of whether the ICC is constructed.

178.  Plaintiffs provided evidence that traffic volumes at I-270, the Beltway, and the arterials would increase with the construction of the ICC.

179.  SMI concluded that travel delays (VHT) are highest for the ICC Build alternative, as compared to a No-Build alternative and the four alternatives analyzed in the Smart Mobility Report and proposed by the Plaintiffs.

180.  SMI concluded that VHD are highest for the ICC Build alternative, as compared to a No-Build alternative and the four alternatives analyzed in the Smart Mobility Report and proposed by the Plaintiffs.

181.  The selected alternative will provide less mobility, as defined in the 1998 TPB Vision Plan, the Montgomery County General Plan Refinement of 1993, and the Prince George's County General Plan of 2002, than other alternatives presented to the lead agencies.

182.  The lead agencies did not identify the inconsistencies between the ICC project and regional and local plan objectives.

183.    Plaintiffs submitted record evidence that the area studied by the lead agencies was too small to reflect the actual area impacted by the ICC, thereby removing from analysis many foreseeable adverse impacts which should be analyzed.

184.    Plaintiffs presented record evidence that the alternatives analyzed in the Smart Mobility Report would "all produce less air pollution than the ICC alternative."

185.    The lead agencies do not compare alternatives to determine which will produce less air pollution, and which will have a greater adverse impact on public health or have a greater impact on enhancing the public health.

186.    The lead agencies, in the FEIS, do not account for local hot spot impacts of particulate matter emitted from the project on compliance with the NAAQS for particulate matter.

187.    The lead agencies do not account for the impacts of Mobile Source Air Toxic ("MSAT") pollutants emitted from the project on concentrations of such pollutants in the ambient air, on public exposure to such pollutants, or on the adverse health impacts that will result from exposure to MSATs.

188.    The lead agencies do not determine whether the ICC will delay timely attainment of the NAAQS for ozone by increasing regional emissions of Volatile Organic Compounds and Nitrogen Oxide.

189.    Congress listed benzene, 1,3 butadiene and formaldehyde as statutory MSAT pollutants in the 1990 Clean Air Act amendments when it required EPA to set vehicle emission standards for these pollutants. 42 U.S.C. § 7521(l).

190.    EPA included the three statutory MSATs and seven additional MSATs on a list of 33

        priority pollutants targeted for control under EPA's Integrated National Urban Air

        Toxics Strategy. 64 Fed. Reg. 38,706 (July 19, 1999).

191.    The Integrated National Urban Air Toxics Strategy "established a list of urban

        [Hazardous Air Pollutants] which pose the greatest threats to public health in urban

        areas, considering emissions from major, area and mobile sources." 64 Fed. Reg. at

        38,714.

192.    EPA found based on the health risks associated with the mobile source pollutants

        listed for control in the National Urban Air Toxics Strategy that "mobile sources are

        an important contributor to the urban air toxics problem." 64 Fed. Reg. at 38,705.

193.    EPA noted that "21 compounds emitted from motor vehicles . . . are known or

        suspected to cause cancer or other serious health effects.  Our Mobile Source Air

        Toxics list includes various volatile organic compounds and metals, as well as diesel

        particulate matter and diesel exhaust organic gases."  66 Fed. Reg. 17,229 (Mar. 29,

        2001).

194.    EPA identified that "[m]obile sources contribute significantly to the nationwide risk

        from breathing outdoor sources of air toxics.  Mobile sources were responsible for

        about 44% of outdoor toxic emissions, almost 50% of the cancer risk, and 74% of the

        noncancer risk according to EPA's National-Scale Air Toxics Assessment (NATA)."

        71 Fed. Reg. 15,804, 15,808 (Mar. 29, 2006); 64 Fed. Reg. 38,705 (July 19, 1999).

195.    The NATA estimates of cancer and noncancer health risks are based upon a modeling

        analysis that estimates emissions of the 33 priority pollutants listed in the National

Urban Air Toxics Strategy by census tract, and predicts concentrations and exposures by the population in each census tract for each pollutant.

196.    The pollutant concentrations and exposure estimates are used to estimate cancer and noncancer health risks based upon the unit risk factors for each pollutant reported in the Integrated Risk Information System maintained by EPA.

197.    The NATA analysis for the six census tracts in Prince George's County where the I-95 corridor is located (800105, 800106, 800203, 807405, 807406, and 807407) reports pollutant concentrations for the MSAT pollutants benzene, 1,3 butadiene and diesel particulate matter that exceed the concentrations reported for most other areas of Prince George's County.

198.    EPA noted that "people who live or work near major roads . . . are likely to have higher exposures and risk, which are not reflected in [the National Air Toxics Assessment]."  71 Fed. Reg. 15, 804, 15,808 (Mar. 29, 2006).

199.    EPA concluded that "diesel exhaust (specifically, diesel particulate matter and diesel exhaust organic gases) is one of the pollutants that pose the greatest relative cancer risk."  71 Fed. Reg. at 15,808.

200.    The risks estimated by EPA in NATA for public exposure to MSATs in the census tracts along I-95 and I-270 in the vicinity of the proposed interchanges with the ICC exceed the 1 in 100,000 cancer risk level established by Maryland as the maximum acceptable cancer risk in its Toxic Air Pollution ("TAP") program. COMAR § 26.11.15.

201.    MOBILE6.2 is the latest group of input files used for emissions modeling, approved by the EPA for use in estimating vehicular emissions of MSATs.

202.    MOBILE6.2, with adjustments necessary to correct for unique local features or other modeling issues, is the emissions model recognized by the EPA to provide the most accurate estimates of MSAT emissions from motor vehicles.

203.    Plaintiffs informed the lead agencies that there were several dispersion models available for use in conjunction with MOBILE6.2 to consider how emissions at the project-level will be expected to disperse in the atmosphere and contribute to concentrations of MSATs and particulate matter in the ambient air.

204.    Plaintiffs informed the lead agencies that there were several dispersion models available for use in conjunction with MOBILE6.2 to estimate how MSATs concentrations could impact the health of people breathing air in locations close to the ICC.

205.    The lead agencies did not use any dispersion model to estimate MSAT concentrations in the ambient air.

206.    The lead agencies stated that because the MOBILE6.2 inputs into a dispersion model had "high uncertainty bounds," such inputs would create "uncertainty bounds in estimated concentration levels" of a factor of 2.

207.    The lead agencies cited this uncertainty as their reason for not predicting potential human exposure to concentrations of MSATs emitted from vehicular traffic on the ICC.

208.    The lead agencies used MOBILE6.2 to estimate emissions for their carbon monoxide (CO) micro-scale analysis despite the same levels of uncertainty present in CO dispersion modeling.

209.    The lead agencies only determined what the MSAT emissions resulting from the ICC would be in 2030.

210.    The lead agencies determined the ICC would increase MSAT emissions six to eight percent relative to the No Build alternative.

211.    The lead agencies did not compare the MSAT emissions expected from transit-based alternatives with those expected from the No Build or ICC alternatives.

212.    Alternatives proposed by Plaintiffs would result in the emission of fewer MSATs than the ICC.

213.    The lead agencies did not determine where those emissions would travel or how they would affect human health or the environment.

214.    The lead agencies did not determine the MSAT emissions resulting from the ICC during peak travel periods.

215.    Plaintiffs informed the lead agencies that their MSATs analysis "failed to evaluate the peak MSAT emission conditions that would be associated with a decision to build the ICC" project, occurring in 2010-2020, the years immediately after the ICC would be open to traffic.

216.    The lead agencies estimated that emissions from motor vehicles would be highest during the first years that the project would be open for service.

217.    The MSATs analysis did not include any analysis for the initial years that the project would be open for service.

218.    The MSATs analysis did not evaluate localized concentrations of MSAT emissions at sensitive receptor sites along the ICC right-of-way or the increased risk to health of those exposed to these increased concentrations.

219.    Plaintiffs submitted evidence regarding the availability of MSAT health hazard information in EPA's Integrated Risk Information System ("IRIS") and the MATES-II study.

220.    EPA's IRIS contains EPA's scientific position on the potential serious adverse health effects that may result from chronic (long term) and acute (short term) exposure to substances found in the environment.

221.    Plaintiffs submitted evidence of examples where EPA's IRIS and MATES-II studies were used to demonstrate the cancer risks and other significant public health risks attributable to exposure to toxic air pollutants.

222.    The lead agencies did not provide a summary of existing credible scientific evidence relevant to evaluating the health effects and foreseeable adverse impacts posed by increased exposure to MSATs from the ICC.

223.    The lead agencies failed to disclose to the public any estimates of the health impacts caused by airborne pollutants and air toxics emitted from vehicles traveling on the ICC.

224.    Plaintiffs commented that fine particles and toxic air pollutants are associated with a wide range of adverse and significant health impacts, including asthma, respiratory disease, and early death.

225.    The lead agencies did not incorporate emissions from projected induced development in the ICC project corridor or at the termini of the selected alternative in their analysis of cumulative environmental impacts of the selected alternative.

226.    Plaintiffs submitted evidence that the ICC project is located in an area where "local monitors in the vicinity of I-95, I-270, and I-495 show PM2.5 concentrations to be

only slightly below the NAAQS" and monitors located in Montgomery and Prince George's Counties show that region to be in marginal attainment with, or exceeding, the NAAQS.

227. Plaintiffs submitted record evidence that the secondary effects disclosed by the lead agencies failed to "include many areas where job or housing growth or decline related to the ICC construction could be anticipated," according to a land use change analysis conducted by authors who were members of the Expert Land Use Panel convened by the Maryland State Highway Administration.

228. The lead agencies failed to consider the adverse impacts of increased transportation-related fuel consumption resulting from the ICC on oil dependence and global climate change.

229. The Plaintiffs submitted evidence that "the ICC would increase regional petroleum fuel demand by 5% within 25 years compared to the no-build option and by 11% compared to the Hybrid alternative."

230. Plaintiffs submitted evidence that "the combinations of improvements to existing roads, better transit, and balanced growth . . . (the "Hybrid" Alternative) would cut fuel demand by 6% over that same time period. That translates to a savings of 29 million gallons of petroleum fuels annually, 260,000 metric tons of greenhouse gas emissions, and $31 million."

231. Plaintiffs commented that the "lead agencies' use of a single land use forecast for both ICC-Build and No-Build alternatives assumes that the ICC would have no impact whatsoever on land use as it evaluated traffic and air quality impacts." (JC 22)

232.    The lead agencies underestimated secondary land use impacts of the ICC, leading to underestimation of numerous other adverse environmental impacts by using the same land use pattern in ICC-Build and No-Build scenarios.

233.    The Club presented evidence that the ICC selected alternative would induce approximately 5,000 acres of development required by the ICC selected alternative, 3,400 acres of forest land lost, more than 200 acres of wetlands lost, and many miles of stream bank which would erode.

234.    The lead agencies did not provide information regarding independent verification and validation of the models they used to predict the impacts of the ICC on travel demand, traffic congestion, VMT, travel delays, transportation-related fuel consumption, or air pollution.

235.    Plaintiffs submitted evidence in the record that the transit-oriented land use and investment, the add toll land – express bus, convert HOT land – express bus, and the hybrid alternatives proposed in the Smart Mobility Report would reduce VHT, VMT, and VHD as compared to the ICC Build scenario.

236.    Cooperative Forecast Round 6.4A is the latest model available to estimate regional growth and induced travel demand from transportation projects.

237.    In September 2004, the MPO adopted Cooperative Forecast Round 6.4 as the preferred model to estimate regional growth and induced travel demand from transportation projects.

238.    Cooperative Forecast Round 6.4 replaced Cooperative Forecast Round 6.3.

239.    Cooperative Forecast Round 6.4 was adopted to correct the overestimation of secondary benefits from transportation projects, such as employment estimates.

240.  Travel Forecasting Model Version 2.1D is the latest traffic model adopted by the MPO.

241.  Travel Forecasting Model Version 2.1D was adopted to correct many of the errors present in Version 2.1C and to harmonize growth assumptions with those in the Cooperative Forecast Round 6.4 and Round 6.4A.

242.  The lead agencies used a traffic model that was very similar to Travel Forecasting Model Version 2.1C and Cooperative Forecast Round 6.3.

243.  The MPO released a new traffic model attempting to address criticisms of Model 2.1C prior to the lead agencies' issuance of the DEIS.

244.  These criticisms were known to the lead agencies prior to publication of the DEIS.

245.  The lead agencies did not re-model the traffic flow of the ICC project using a traffic model significantly improved from Model 2.1C that could have addressed major issues raised by the Transportation and Research Board and other reviewers of the model.

246.  Plaintiffs submitted evidence stating that the lead agencies "relie[d] on seriously flawed computer transportation modeling methods."

247.  The Transportation and Research Board criticized Model 2.1C "because the statistical measures indicate that estimated link volumes did not match observed traffic counts as closely as the committee would expect in model validation. Specifically, the committee found that 8 of 33 facility type traffic volume classes had percent Root Mean Square Error (RMSE) values that were unacceptable. Comparing the results of the 2.1D model versus the 2.1C model, the percent RMSE values by volume class improved in 23 of the 41 total classes."

248.   The lead agencies did not provide any evidence demonstrating how the adjustments they made to Version 2.1C for use in the ICC FEIS resolved the inadequacies of Version 2.1C identified by the Transportation and Research Board regarding the model's analysis of traffic facility volume classes.

249.   The Transportation and Research Board expressed concern "that the transportation model should more accurately allocate daily traffic to individual links by time period than any global percentage."  The Transportation and Research Board also criticized 2.1C for "over-predict[ing] vehicles entering or leaving the Metro Core, during the PM peak period by 52 percent in 1994 and by 37 percent in 2000." (Explanation from SMI, A Citizen Guide to Critiques of the Metropolitan Washington Area Travel Model: What Does it all Mean? at 5.)

250.   The lead agencies did not provide any evidence demonstrating how the adjustments they made to Version 2.1C for use in the ICC FEIS resolved the inadequacies of Version 2.1C identified by the Transportation and Research Board regarding the model's analysis of time-of-day of traffic.

251.   The adjustments made by the lead agencies to Version 2.1C did not resolve the above described modeling errors identified by the Transportation Research Board.

252.   The Travel Forecasting Model version 2.1C contained traffic volume matching errors associated with underestimation of traffic and of air pollution emissions. (Explanation from SMI, at 6-9).

253.   Travel Forecasting Model version 2.1D improved 2.1C by addressing some of the serious TRB criticisms, including updates on the Volume-Delay Function, the toll modeling capability, the cost components, and zonal area type designations.

254.    The Smart Mobility Report utilized the Travel Forecasting Model Version 2.1D#28 as its methodology for travel forecasting.

255.    The MPO used Travel Forecasting Model Version 2.1D#50 for its travel forecasting when analyzing the 2004 CLR Plan and FY2005-2010 Metropolitan TIP.

256.    The lead agencies used Version 2.1C in the FEIS, stating that it is "better suited than Version 2.1D for use in the ICC FEIS."

257.    The lead agencies did not use the same traffic models in analyzing the ICC that was used by the MPO and MWCOG in forecasting regional travel in the 2004 CLR Plan and FY2005-2010 Metropolitan TIP, which included the ICC.

258.    The lead agencies used Cooperative Forecast Round 6.3 and a sensitivity analysis using Cooperative Forecast Round 6.4A in its traffic analysis for the ICC alternative.

259.    Version 2.1C was not designed to be used in conjunction with Cooperative Forecast Round 6.4A.

260.    Using Version 2.1C with Cooperative Forecast Round 6.4A resulted in skewed traffic modeling results that underestimated induced demand and future traffic growth.

261.    The lead agencies did not compare alternatives for their impact on induced traffic demand because they did not analyze alternatives to the ICC using the Traffic Sensitivity Analysis conducted for the ICC project.

262.    Plaintiffs criticized the lead agencies' failure to use the same travel forecasting model as that used by the MPO in its forecasting of regional travel patterns which included the ICC.

263. The lead agencies underestimated impacts from likely periods of congestion, such as accidents or idling times at busy intersections, by optimizing signal timing in emissions analyses.

264. The FEIS notes that "the study area will experience continued increases in the demand for east-west travel, resulting in longer periods of congestion on existing routes."

265. SMI "found that the ICC build alternative would increase congestion delay relative to the no-build alternative."

266. The lead agencies did not consider the significant automobile-dependent sprawl development in areas not now urbanized or that have low density development likely to result from the ICC project.

267. The lead agencies did not identify or consider alternatives that could avoid or minimize the air pollution impacts described.

268. The lead agencies did not quantify the costs associated with mitigating the air pollution impacts caused by the selected alternative.

269. Plaintiffs presented evidence of mitigation measures such as "relocating the elementary schools and day care centers away from the traffic, accelerated diesel retrofit programs to reduce emission exposures, traffic management and pricing measures designed to reduce adverse health exposure of the public, and improvements to travel alternatives that reduce traffic related air pollution exposure."

270. Plaintiffs contend that these mitigation measures could reduce the amount of air pollution caused by the ICC project and could avoid, eliminate, or minimize the adverse health impacts resulting from the air pollution associated with the project.

271. The lead agencies failed to avoid, eliminate, or minimize the adverse health impacts suffered by individuals and children in schools, day care centers, and homes with proximity to the ICC selected alternative.

272. On June 23, 2006, the lead agencies published in the Federal Register notice of approval of the selected alternative and availability of the ROD required by 40 CFR § 1505.2. 71 Fed. Reg. 36, 164. The approval, contained in the ROD, constitutes a final agency action. 40 CFR § 1500.3.

273. Federal approval of a project is required before federal funds can be committed to a transportation project. 23 USC § 106(a).

274. USDOT, acting through the FHWA, by letter dated July 14, 2006, authorized "eligible costs for construction of ICC Contract A (from I-270/I-370 to east of MD 97) and eligible ROW acquisition costs for ICC contracts A,B,C,D and E."

275. Federal funding has been committed to the ICC project.

276. The lead agencies analyzed small-scale refinements to the selected alternative after the FEIS was submitted and determined those refinements did not alter the conclusions made in the FEIS or ROD.

277. The ROD did not include additional or independent analysis of the environmental consequences of the ICC project or other alternatives presented which were not included in the FEIS.

278. The lead agencies did not determine that the ICC project was in the best overall public interest after considering how the ICC meets the national and local objectives for transportation projects, the environmental impacts of the ICC, and alternatives and mitigation measures which minimize those impacts.

279.    The lead agencies did not consider and compare alternatives to determine which alternative was in the best overall public interest after considering how each alternative meets the national and local objectives for transportation projects, the environmental impacts of the ICC, and alternatives and mitigation measures which minimize those impacts.

280.    The lead agencies did not determine that the ICC selected alternative best promotes the national transportation objectives to minimize transportation-related fuel consumption and air pollution, increase mobility of people and goods, or foster economic growth and development.

281.    The lead agencies did not analyze the alternatives in the record to determine which alternative would best promote the national transportation objectives to minimize transportation-related fuel consumption and air pollution, increase mobility of people and goods, or foster economic growth and development.

282.    The lead agencies did not determine that the ICC selected alternative best promotes the applicable local and regional transportation objectives to reduce reliance on single occupant vehicles and VMT and increase the transportation share of transit options.

283.    The lead agencies did not analyze the alternatives in the record to determine which alternative best promotes the applicable local and regional transportation objectives to reduce reliance on single occupant vehicles and VMT and increase the transportation share of transit options.

284.    The lead agencies did not identify whether the five transportation needs identified could not reasonably be achieved through alternatives providing for minimal new

highway construction or through improvements in, or adoption of, transit alternatives, including mass transit alternatives.

285. The lead agencies did not identify the inconsistencies between the ICC project and Maryland law and regional and local plan objectives.

286. The lead agencies did not identify how those inconsistencies would be resolved.

287. Plaintiffs submitted evidence in the record that proposed alternatives would reduce VHT, VHD, VMT, and vehicle delay as compared to the ICC build scenario.

288. The lead agencies did not analyze record evidence demonstrating the selected alternative will not substantially reduce traffic delay and could increase secondary traffic delays.

289. The lead agencies determined that the selected alternative would, at best, reduce travel time by "six minutes for people coming from central Montgomery County and going to BWI Airport." (David Dunmire, "A Short History of the Intercounty Connector" at http://savecommunities.org/background.html, citing speech of Governor Glendening August 2002 interview on county cable channel.)

290. Baltimore/Washington International Thurgood Marshall Airport is not located within the ICC study area.

291. Improving access to BWI Airport is not an identified project need.

292. The FEIS agreed with SMI's conclusion that the "ICC will necessarily increase traffic on other roadways, particularly those north-south roadways with ICC interchanges." Congestion is heaviest on north-south arterial roadways in the ICC study area.

293. The selected alternative will increase local traffic delays.

294.   The lead agencies determined that "[b]y satisfying their obligations under NEPA and the Clean Air Act, FHWA and [Maryland State Highway Administration] have also satisfied their obligation under Section 109(h) of the Highway Act.  Section 109(h) does not impose obligations on state or federal agencies beyond what is required under NEPA and the Clean Air Act, and does not mandate a separate public interest determination."

## CLAIMS

### FEDERAL-AID HIGHWAYS ACT VIOLATIONS

295.   Plaintiffs incorporate by reference the allegations set forth above.

296.   The Federal-Aid Highways Act ("FAHA") requires the federal defendants to consider alternative courses of action and make a decision in the "best overall public interest." 23 U.S.C. §§ 109(a), (h); 23 C.F.R. § 771.105(b).

297.   FAHA requires the federal defendants to weigh "possible adverse economic, social, and environmental effects relating to any proposed project" and the "costs of eliminating or minimizing such adverse effects" against any travel benefits of the proposed project prior to determining whether the project is in "the best overall public interest."  23 U.S.C. §§ 109(a), (h); 23 C.F.R. § 771.105(b); 23 C.F.R. §§ 771.101, .107(b); 40 C.F.R. § 1505.2(b).

298.   A project may not be approved for federal funding unless FHWA first makes the findings required by 23 U.S.C. §§ 109(a), (h); 23 C.F.R. § 771.105(b); 23 C.F.R. §§ 771.101, .107(b).

299.    Adverse effects to be assessed include: the adverse effects of air, noise, and water pollution; destruction or disruption of man-made natural resources, aesthetic values, community cohesion, and the availability of public facilities and services; adverse employment effects and tax and property value losses; injurious displacement of people, businesses, or farms; and disruption of desirable community and regional growth. 23 U.S.C. § 109(h)(1)-(5).

## COUNT 1

300.    FAHA requires the federal defendants to make a determination that the project will be in the "best overall public interest." 23 U.S.C. § 109(h); 23 C.F.R. § 771.105(b).

301.    The federal defendants violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by failing to make a public interest determination under 23 U.S.C. § 109(h) which addressed all of the statutory factors listed under § 109(h).

302.    The federal defendants violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by failing to make a public interest determination that is sufficient as a matter of law. The federal defendants acted arbitrarily, capriciously, or otherwise not in accordance with law when they determined § 109(h) "does not impose obligations on state or federal agencies beyond what is required under NEPA" and "does not mandate a separate public interest determination."

303.    As a result, the federal defendants' approval of the selected alternative was arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706.

## COUNT 2

304. FAHA requires the federal defendants to consider alternative courses of action and make a determination that the project will be in the "best overall public interest." 23 U.S.C. § 109(h); 23 C.F.R. § 771.105(b).

305. The federal defendants violated 23 U.S.C. § 109(h), 23 C.F.R. § 771.105(b), and 40 C.F.R. § 1505.2(b) by failing to consider alternatives identified in the record to determine which alternative would be in the "best overall public interest."

306. The federal defendants further violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b), by failing to select the alternative in the "best overall public interest."

## COUNT 3

307. FAHA requires the federal defendants to weigh the full costs of eliminating or minimizing potential adverse effects against any travel benefits the project may create and make a determination that the project will be in the "best overall public interest." 23 U.S.C. § 109(h); 23 C.F.R. § 771.105(b).

308. Had the federal defendants determined that the benefits of the selected alternative would outweigh its costs and explained the basis for its decision as required by law, 40 C.F.R. § 1505.2(b), such a decision would have been arbitrary and capricious because it would have been contrary to the weight of the evidence in the record. 5 U.S.C. § 706.

309. The federal defendants violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by arbitrarily and capriciously approving the selected alternative without adequate record support demonstrating that the selected alternative would achieve its intended travel benefits. 5 U.S.C. § 706.

310.   The federal defendants violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by arbitrarily and capriciously approving the selected alternative despite substantial record evidence demonstrating the selected alternative would not achieve the objectives of adopted regional plans, including but not limited to objectives requiring that projects substantially reduce traffic and per capita VHT, VHD, and VMT and increase the use of public transit.  Instead, evidence in the record demonstrated that the project will defeat the objectives of regional plans by increasing traffic delays and reliance on single-occupant vehicles.  5 U.S.C. § 706.

311.   The federal defendants violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by arbitrarily and capriciously approving the selected alternative despite substantial record evidence demonstrating the selected alternative would result in significant increased air pollution, resulting in significant injuries to human health and the environment. 5 U.S.C. § 706.

312.   The federal defendants violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by arbitrarily and capriciously approving the selected alternative without adequate record support demonstrating that the selected alternative will eliminate or minimize significant adverse social, economic and environmental effects, including adverse health effects, health care costs, costs of travel delay, VMT, and other costs to the public. 5 U.S.C. § 706.

313.   The federal defendants arbitrarily and capriciously dismissed and removed alternatives proposed by Plaintiffs and in the Smart Mobility Report from further consideration despite their potential to mitigate the adverse effects of the proposed project while providing greater travel benefits to the public.  5 U.S.C. § 706.

314.　As a result, the federal defendants' approval of the selected alternative was arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706.

## COUNT 4

315.　FAHA requires the federal defendants to take the costs of eliminating or minimizing a project's adverse effects into consideration when making their determination that a project is in the "best overall public interest." 23 U.S.C. § 109(h).

316.　The federal defendants violated 23 U.S.C. § 109(h) by failing to determine the costs of eliminating or minimizing the adverse health effects attributable to air pollution.

317.　As a result, the federal defendants' approval of the selected alternative was arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706.

## COUNT 5

318.　FAHA requires that measures necessary to mitigate adverse impacts be incorporated into the action. 23 C.F.R. § 771.105(d).

319.　The federal defendants violated 23 C.F.R. § 771.105(d) by failing to incorporate measures necessary to mitigate adverse impacts into the project, such as those necessary to minimize or eliminate human exposure to air pollutants resulting from the project.

320.　The federal defendants violated 23 C.F.R. § 771.105(d) by ignoring transportation alternatives presented through comments which could have mitigated the air pollution impacts of the selected alternative.

321.　As a result, the federal defendants' approval of the selected alternative was arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706.

## COUNT 6

322.    FAHA requires the federal defendants to consider, eliminate, or minimize the social, economic, and environmental impacts of the proposed project, as well as national environmental protection objectives, in making a final decision on a highway project. 23 U.S.C. § 109(h); 23 C.F.R. § 771.105(b).

323.    The federal defendants violated their mandatory duties under 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by not considering and evaluating alternatives to determine which best accomplishes the national objectives to minimize air pollution and transportation-related fuel consumption, 23 U.S.C. § 134(a).

324.    As a result, the federal defendants' approval of the selected alternative was arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706.

## COUNT 7

325.    FAHA requires that when the federal defendants determine whether a project is in the overall public interest they consider, eliminate, or minimize the social, economic and environmental impacts of the proposed project, and consider State and local environmental protection objectives in making a final decision on a highway project. 23 U.S.C. § 109(h); 23 C.F.R. § 771.105(b).

326.    The federal defendants violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by not identifying, considering, and evaluating alternatives to determine which alternative best accomplishes the local objectives established in the Prince George's County General Plan of 2002 to eliminate or minimize adverse social, economic, and environmental impacts of transportation projects by reducing the average VMT, VHD, and VHT of commuters and residents and by increasing the proportion of transit trips.

327.   The federal defendants further violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by not identifying, considering, and evaluating alternatives to determine which alternative best accomplishes the local objectives established in the Montgomery County General Plan Refinement of 1993 to eliminate or minimize adverse social, economic, and environmental impacts of transportation projects by creating an efficient transportation system with a wide variety of alternatives.

328.   The federal defendants further violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by not identifying, considering, and evaluating alternatives to determine which alternative best accomplishes the local objectives established by the 1998 TPB Vision Plan to eliminate or minimize adverse social, economic, and environmental impacts of transportation projects by reducing reliance on the single-occupant vehicle and per-capita VMT, VHT, and VHD and increase the share of transit-based travel.

329.   The federal defendants further violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by not identifying, considering, and evaluating alternatives to determine which alternative best accomplishes the local objectives established in the Prince George's County General Plan of 2002 to eliminate or minimize adverse social, economic, and environmental impacts of transportation projects by fostering equitable regional economic growth and development.

330.   As a result, the federal defendants' approval of the selected alternative was arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706.

## COUNT 8

331.   The combination and cumulative impact of the failures of and omissions by the federal defendants described above in Counts 1-7 make their approval of the selected

alternative arbitrary and capricious or otherwise not in accordance with law.  5 U.S.C.

§ 706.

## SAFE, ACCOUNTABLE, FLEXIBLE, EFFICIENT TRANSPORTATION EQUITY ACT: A LEGACY FOR USERS VIOLATIONS

332.    Plaintiffs incorporate by reference the allegations set forth above.

333.    The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy For

Users ("SAFETEA-LU"), identifies four statutory objectives in the national interest

that must be considered and accomplished by and through the adoption and

implementation of metropolitan transportation plans and programs, including meeting

mobility needs of people and freight, fostering economic growth and development,

minimizing fuel consumption, and minimizing air pollution.  23 U.S.C. § 134(a); 23

C.F.R. §§ 450.316, 450.322.

334.    SAFETEA-LU requires that MPOs and states "accomplish" the "objectives" in 23

U.S.C. § 134(a). 23 U.S.C. §§ 134(c), 135(a).

335.    SAFETEA-LU requires MPOs to approve regional transportation plans which

contain, at a minimum, "multimodal capacity increases based on regional priorities

and needs."  23 U.S.C. § 134(i)(2)(E).

336.    SAFETEA-LU also requires the MPO to approve transportation plans and programs

only after "due consideration of other related planning activities within the

metropolitan area" and a variety of national transportation planning factors.  23

U.S.C. § 134(g)(3); 23 C.F.R. § 450.316(a).

337.   SAFETEA-LU requires that the approved Metropolitan TIP be included without modification in the State TIP after the required conformity findings are made. 23 C.F.R. § 450.216(a).

338.   Projects must come from and implement the objectives of the approved Metropolitan TIP and CLR Plan.  23 U.S.C. §§ 134, 135; 23 C.F.R. § 450.324(f)(2).

339.   Federally funded projects in metropolitan areas must be carried out from an approved Metropolitan TIP. 23 U.S.C. § 134(j)(5).

**COUNT 9**

340.   SAFETEA-LU requires that the MPO adopt a long range plan and transportation improvement program that accomplish each of the four statutory objectives, including meeting the mobility needs of people and freight. 23 U.S.C. §§ 134(a), (c).

341.   The MPO violated 23 U.S.C. §§ 134(a), (c) by including in the Metropolitan TIPs and CLR Plans the ICC project without considering how the CLR Plans and Metropolitan TIPs accomplish the statutory objective of meeting the mobility needs of people or freight described in the 1998 TPB Vision Plan, Prince George's County General Plan of 2002, and the Montgomery County General Plan Refinement of 1993, as required by 23 U.S.C. § 134(a).

342.   As a result, the MPO unlawfully approved the Metropolitan TIPs and CLR Plans which include the ICC project because they fail to accomplish the national transportation objective required by 23 U.S.C. §§ 134(a), (c).

**COUNT 10**

343.   SAFETEA-LU requires that the MPO adopt a long range plan and transportation improvement program that accomplish each of the four statutory objectives, including

fostering economic growth and development within and between urbanized areas. 23 U.S.C. §§ 134(a), (c).

344.    The MPO violated 23 U.S.C. §§ 134(a), (c) by including in the Metropolitan TIPs and CLR Plans the ICC project without considering how the CLR Plans and Metropolitan TIPs accomplish the statutory objective of fostering regional economic growth and development described in the Prince George's County General Plan of 2002, and as required by 23 U.S.C. 134(a) .

345.    As a result, the MPO unlawfully approved the Metropolitan TIPs and CLR Plans which include the ICC project because they fail to accomplish the national transportation objective required by 23 U.S.C. §§ 134(a), (c).

**COUNT 11**

346.    SAFETEA-LU requires that the MPO adopt a long range plan and transportation improvement program that accomplish each of the four statutory objectives, including minimizing transportation-related fuel consumption.  23 U.S.C. §§ 134(a), (c).

347.    The MPO violated 23 U.S.C. §§ 134(a), (c) by including in the Metropolitan TIPs and CLR Plans the ICC project without considering how the CLR Plans and Metropolitan TIPs accomplish the statutory objective of minimizing transportation-related fuel consumption in the area affected by the ICC.

348.    As a result, the MPO unlawfully approved the Metropolitan TIPs and CLR Plans which include the ICC project because they fail to accomplish the national transportation objective required by 23 U.S.C. §§ 134(a), (c).

**COUNT 12**

349. SAFETEA-LU requires that the MPO adopt a long range plan and transportation improvement program that accomplish each of the four statutory objectives, including minimizing air pollution. 23 U.S.C. §§ 134(a), (c).

350. The MPO violated 23 U.S.C. §§ 134(a), (c) by including in the Metropolitan TIPs and CLR Plans the ICC project without considering how the CLR Plans and Metropolitan TIPs accomplish the statutory objective of minimizing air pollution, including, but not limited to:

    a. Particulate matter;

    b. Mobile Source Air Toxics; and

    c. Greenhouse gases.

351. As a result, the MPO unlawfully approved the Metropolitan TIPs and CLR Plans which include the ICC project because they fail to accomplish the national transportation objective required by 23 U.S.C. §§ 134(a), (c).

## COUNT 13

352. The metropolitan transportation planning process requires that a major investment study be considered by the MPO before it amends a Metropolitan TIP or CLR Plan. 23 C.F.R. § 450.318(a).

353. No major investment study was prepared in accordance with the requirements of 23 C.F.R. § 450.318(a) by the MPO, or prepared by the Maryland State Highway Administration for consideration by the MPO, at any time prior to adoption of the amendment to the Metropolitan TIP and CLR Plan to include the ICC project.

354. It was unlawful for the MPO to amend the MTIP and CLR Plan to include the ICC project without first preparing a major investment study in accordance with the

requirements of 23 C.F.R. § 450.318(a), including an evaluation "of the effectiveness and cost-effectiveness of alternative investments or strategies in attaining local, State and national goals and objectives."

## COUNT 14

355. SAFETEA-LU requires that the State Transportation Improvement Program ("State TIP") adopt a project identical to the project or phase of the project as described in the approved Metropolitan TIP.  23 U.S.C. § 135(g)(4)(D).

356. SAFETEA-LU requires that the approved Metropolitan TIP be included without modification in the State TIP after the required conformity findings are made. 23 C.F.R. § 450.216(a).

357. SAFETEA-LU requires that the Secretary find that the transportation planning process, through which statewide transportation plans and programs are developed, is consistent with 23 U.S.C. § 134, containing the national planning objectives, 23 U.S.C. 134(a). 23 U.S.C. § 135(g)(7).

358. The federal defendants violated 23 U.S.C. § 135(g)(7) by approving the State TIP, including the faulty Metropolitan TIP, because the Metropolitan TIP planning process is not consistent with 23 U.S.C. § 134(a), (c) as the process did not evaluate the impact of the project on the national planning objectives.

359. As a result, the federal defendants unlawfully approved the State TIP containing the ICC because the planning process did not ensure compliance with the national planning objectives required by 23 U.S.C. §§ 134(a), (c).

## COUNT 15

360.    The combination and cumulative impact of the failures of, and omissions by, the MPO described above in Counts 9-14 make its approval of the Metropolitan TIPs and CLR Plans arbitrary and capricious or otherwise not in accordance with law.  5 U.S.C. § 706.

361.    As a result, federal approval of the ICC project must be set aside because the project does not come from a properly approved Metropolitan TIP or CLR Plan.  23 U.S.C. § 134(j)(5).

362.    Federal approval of the State TIP must also be set aside because the State TIP planning process was not consistent with 23 U.S.C. § 134.


## NATIONAL ENVIRONMENTAL POLICY ACT & ADMINISTRATIVE PROCEDURE ACT VIOLATIONS

363.    Plaintiffs incorporate by reference the allegations set forth above.

364.    The National Environmental Policy Act ("NEPA") requires federal agencies to prepare a detailed statement of environmental impacts, known as an Environmental Impact Statement ("EIS"), for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.3.

365.    Major federal actions include approval of specific projects, such as construction or management activities, and "projects" include federal and federally assisted activities. 40 C.F.R. § 1508.18(b)(4).

366.    An EIS must describe, among other things, the environmental impacts of the proposed action, including direct, indirect, and cumulative impacts, any adverse environmental effects which cannot be avoided should the proposal be implemented,

alternatives to the proposed action, and mitigation measures to avoid or minimize adverse impacts. 42 U.S.C. § 4332(2)(C); 40 C.F.R. Parts 1500-08.

367.  The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. 40 C.F.R. §§ 1500.1(c); 1502.1.

368.  The term "effects" and "impacts" may be used interchangeably and include ecological, aesthetic, historic, cultural, economic, social or health effects, whether direct, indirect, or cumulative in nature.  40 C.F.R. § 1508.8.

369.  Beneficial effects that enhance the human environment must also be considered. 40 C.F.R. §§ 1502.1; 1508.8(b); 1508.27(b)(1).

370.  The "human environment" is defined as including the natural and physical environment and the relationship of people with that environment, including health. 40 C.F.R. § 1508.14; 1508.27(b)(2).

## COUNT 16 – Purpose and Need

371.  NEPA requires federal agencies to specify the underlying purpose and need to which the defendants are responding in proposing various project alternatives.  40 C.F.R. § 1502.13.

372.   The purpose and need statement of a transportation EIS cannot be so unreasonably narrow that only one alternative can be selected when there are reasonable, environmentally less harmful alternatives that could have been selected to effectuate a broader purpose and need statement. See 23 C.F.R. § 771.111(f)(3).

373.  The federal defendants violated 40 C.F.R. § 1502.14 and 23 C.F.R. § 771.111(f)(3) by precluding consideration of any non-highway alternatives, including alternatives

proposed in the Smart Mobility Report and those proposed by Plaintiffs, when they described the purpose and need of the ICC project as a "state-of-the-art, multi-modal, east-west highway that limits access and accommodates passenger and goods movement."

374.     The federal defendants further violated 40 C.F.R. § 1502.14 and 23 C.F.R. § 771.111(f)(3) by arbitrarily and capriciously defining the ICC project's purpose and need in such a way as to preclude detailed consideration of alternatives that better serve the national transportation objectives of SAFETEA-LU to minimize transportation-related fuel consumption and air pollution, increase the mobility of people and freight, and foster regional economic growth and development, 23 U.S.C. § 134(a), as required by 23 C.F.R. § 771.105(b).

375.     For the foregoing reasons, the federal defendants' approval of the selected alternative was arbitrary and capricious or otherwise not in accordance with law because it was based upon an unreasonably narrow purpose and need statement.  5 U.S.C. § 706.

### COUNT 17 – Purpose and Need

376.     The federal defendants arbitrarily and capriciously relied on the 2005 CLR Plan and the Montgomery County General Plan Refinement of 1993 to justify the purpose and need statement for the ICC project since those plans cannot reasonably be read to justify the purpose and need statement used. 5 U.S.C. § 706.

377.     The federal defendants arbitrarily and capriciously relied on the 2005 CLR Plan and the Montgomery County General Plan Refinement of 1993 to justify the purpose and need statement for the ICC project because the CLR Plan and Plan Refinement did not include consideration of the adverse and beneficial economic, environmental, and

social impacts of alternatives to the project as identified in a major investment study required by 23 C.F.R. § 450.318.

378.    The federal defendants arbitrarily and capriciously relied on the 2005 CLR Plan and the Montgomery County General Plan Refinement of 1993 to justify the purpose and need statement for the ICC project because the CLR Plan and Plan Refinement did not satisfy the requirements for a NEPA document and may not lawfully be relied upon to satisfy the requirement for a statement of purpose and need. 40 C.F.R. §§ 1506.3, 1506.4.

379.    The federal defendants arbitrarily and capriciously ignored public statements of concern, including those from cooperating federal and state agencies, regarding the narrowness of the statement of purpose and need. 5 U.S.C. § 706.

380.    For the foregoing reasons, the federal defendants' approval of the selected alternative was arbitrary and capricious or otherwise not in accordance with law because it was based upon an unreasonably narrow purpose and need statement.  5 U.S.C. § 706.

### COUNT 18 - Alternatives

381.    NEPA requires federal agencies to rigorously explore and objectively evaluate all reasonable alternatives to the proposed agency action.  40 C.F.R. § 1502.14.

382.    The federal defendants violated 40 C.F.R. § 1502.14 by failing to rigorously explore and objectively evaluate reasonable alternatives proposed by Plaintiffs and in the Smart Mobility Report that would simultaneously protect human health by reducing emissions of air pollutants and improve traffic conditions by reducing VMT, VHT, and VHD.

383.    As a result, the federal defendants' approval of the selected alternative based on incomplete, irrelevant, and/or inaccurate data without rigorously exploring and objectively evaluating reasonable alternatives, despite evidence in the record informing them of the existence of such alternatives, was arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706.

384.    Further, the federal defendants' inconsistent application of assumptions and measures of effectiveness to the various alternatives, which then formed the defendants' basis for for removing alternatives from further consideration was arbitrary and capricious or otherwise not in accordance with law.  5 U.S.C. § 706.

### COUNT 19 – Direct and Indirect Environmental Impacts

385.    NEPA requires federal agencies to prepare an EIS which adequately identifies, studies, and discloses the direct and indirect impacts on the human environment of a federally funded project and the measures available to mitigate such impacts.  40 C.F.R. § 1502.16.

386.    The federal defendants violated 40 C.F.R. § 1502.16 by failing to adequately identify, study, and disclose the direct and indirect land use and induced demand impacts of the alternatives presented, including the selected alternative.

387.    The federal defendants violated 40 C.F.R. § 1502.16 by failing to identify, study, and disclose the direct and indirect impacts of the alternatives presented, including the selected alternative, from the construction of at least two new park and ride lots, modifications to existing park and ride lots, and the Express Bus Service. [JC p. 14].

388.    The federal defendants violated 40 C.F.R. § 1502.16 by failing to adequately identify, study, and disclose the direct and indirect impacts of the alternatives presented,

including the selected alternative, from increased travel demand, including increased motor vehicle trips, VMT, and VHT.

389.    The federal defendants violated 40 C.F.R. § 1502.16 by failing to adequately identify, study, and disclose the direct and indirect impacts of the  alternatives presented, including the selected alternative, from increased emissions of air pollutants from motor vehicles due to increased fuel consumption and traffic congestion.

390.    The federal defendants violated 40 C.F.R. § 1502.16(h) by failing to adequately identify, study, and disclose the means to mitigate each of the adverse environmental impacts for the alternatives presented.

391.    As a result, the federal defendants' approval of the selected alternative based on incomplete, irrelevant, and/or inaccurate data without adequately identifying, studying, and disclosing the direct and indirect environmental impacts of the alternatives presented, including the selected alternative, was arbitrary and capricious or otherwise not in accordance with law.  5 U.S.C. § 706.

**COUNT 20 – Direct and Indirect Health Impacts**

392.    NEPA requires federal agencies to prepare an EIS which adequately identifies, studies, and discloses the direct and indirect impacts on the human environment, including human health, of a federally funded project.  40 C.F.R. § 1502.16.

393.    The federal defendants violated 40 C.F.R. § 1502.16 by failing to adequately identify, study, and disclose the direct and indirect impacts of the alternatives presented, including the selected alternative, on the human health of individuals living, working, attending school, recreating or traveling within or around the ICC right-of-way,

including irreversible health impacts such as asthma, respiratory diseases, cancer, and early death.

394.  The federal defendants violated 40 C.F.R. § 1502.16 by failing to identify, study, and disclose the direct and indirect health impacts caused by increased air pollution from the alternatives presented, including the selected alternative, such as increased incidents of asthma, respiratory disease, cancer, and early death.

395.  The federal defendants violated 40 C.F.R. § 1502.16(h) by failing to adequately identify, study, and disclose the means to mitigate each of the adverse health impacts for the alternatives presented.

396.  As a result, the federal defendants' approval of the selected alternative based on incomplete, irrelevant, and/or inaccurate data without identifying, studying, and disclosing the direct and indirect health impacts of the selected alternative was arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706.

397.  Further, the federal defendants' approval of the selected alternative based upon an inadequate analysis of MSAT and particulate matter emissions and associated health impacts from the selected alternative, and their failure to use the best available techniques to evaluate the hot spot impacts of those emissions when they used those techniques to determine the hot spot impacts of other emissions, was arbitrary and capricious or otherwise not in accordance with law.  5 U.S.C. § 706.

## COUNT 21 – Disclosure

398.  NEPA requires federal agencies to prepare an EIS which shall "provide a full and fair discussion of significant environmental impacts and shall inform decisionmakers and

the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

399. The federal defendants violated 40 C.F.R. § 1502.1 by failing to provide a full and fair discussion of the direct, indirect, and cumulative environmental and health impacts that would result from each of the reasonable alternatives proposed by the public and thereby failing to inform decisionmakers and the public of the reasonable alternatives which would enhance the quality of the human environment.

400. The federal defendants violated § 1502.1 by failing to provide a full and fair discussion of the direct and indirect impacts of alternatives presented, including the selected alternative, which protect, restore, and enhance the environment, 40 C.F.R. § 1500.1(c).

401. As a result, the federal defendants' approval of the selected alternative based upon incomplete, irrelevant, and/or inadequate data without adequately discussing the direct, indirect, and cumulative environmental and health impacts of the alternatives presented, including the selected alternative, was arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706.

**COUNT 22 - Mitigation**

402. NEPA requires federal agencies to prepare an EIS which discusses means to mitigate adverse environmental impacts. 40 C.F.R. § 1502.16(h).

403. NEPA requires federal agencies to prepare an EIS which states whether all practicable means to avoid or minimize environmental harm from the selected alternative have been adopted, and if not, why they were not. 40 C.F.R. § 1505.2(c).

404. The federal defendants violated 40 C.F.R. § 1502.16(h) by failing to discuss means to mitigate the adverse environmental impacts of the selected alternative, evidenced by Plaintiffs and others, that would avoid or minimize adverse environmental impacts of the selected alternative.

405. The federal defendants violated 40 C.F.R. § 1505.2(c) by failing to explain why all practicable means to avoid or minimize environmental harm from the selected alternative have not been adopted.

406. As a result, the federal defendants' approval of the selected alternative based on incomplete, irrelevant, and/or inaccurate data without discussing means to mitigate adverse environmental impacts from the selected alternative, including whether such mitigation measures were adopted or why they were not, was arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706.

## COUNT 23 – Cooperation with State and Local Agencies

407. NEPA requires federal agencies to prepare an EIS which discusses any inconsistency between the proposed action and any approved state or local plan or law and to describe the extent such an inconsistency would be resolved. 40 C.F.R. §§ 1506.2(d); 1502.16(c).

408. Maryland law requires proponents of new transportation projects to demonstrate that the proposed project's purpose could not reasonably be achieved through projects providing for minimal new highway construction or through improvements in, or adoption of, transit alternatives, including mass transit alternatives. MD. CODE ANN., TRANSP. § 8-102(b).

409.    The federal defendants violated 40 C.F.R. § 1506.2(d) and 40 C.F.R. § 1502.16(c) by

failing to discuss the inconsistency between the ICC project and Maryland law, MD.

CODE ANN., TRANSP. § 8-102(b), which requires that "the State Highway

Administration may not proceed to the final project planning phase unless it has been

determined that the objective of the proposed project cannot be reasonably

achieved through:

    (1) Improvements in highway maintenance and safety;

    (2) Projects that modify existing highways but provide for minimal relocation or

    new highway construction; and

    (3) Improvements in, or adoption of, transit alternatives, including mass transit

    alternatives."

410.    The federal defendants violated 40 C.F.R. §§ 1506.2(d); 1502.16(c) by failing to

disclose or address the conflict between the objectives articulated in regional plans to

increase transit use and the mobility of all residents, including those without vehicles,

reduce the average number of VMT, and foster economic growth and development in

Prince George's County, and the purpose and need statement of the ICC project.

411.    As a result, the federal defendants' approval of the selected alternative without

disclosing the conflict arising between Maryland law, the regional planning document

objectives and the selected alternative was arbitrary and capricious or otherwise not in

accordance with law. 5 U.S.C. § 706.

## COUNT 24

412.    The combination and cumulative impact of the failures of, and omissions by, the

federal defendants described above in Counts 16-23 make their approval of the

selected alternative arbitrary and capricious or otherwise not in accordance with law.

5 U.S.C. § 706.


**PART II –    CAUSES OF ACTION RELATED TO DETERMINATION THAT ICC PROJECT AND THE REGIONAL TRANSPORTATION IMPROVEMENT PROGRAM CONFORMS UNDER THE CLEAN AIR ACT.**

413.    Plaintiffs incorporate by reference the allegations set forth above.

414.    Section 176(c) of the Clean Air Act establishes mandatory requirements that must be satisfied before a transportation plan, program or project may be approved or funded by USDOT, and before the MPO may adopt a transportation plan or program that includes a transportation project such as the ICC Project. 42 U.S.C. § 7506(c).

415.    Section 176(c) declares that "[n]o Department of the Federal Government shall engage in, support in any way, or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title. . . .  The assurance of conformity to such an implementation plan shall be an affirmative responsibility of the head of such department." 42 U.S.C. § 7506(c)(1).

416.    Section 176(c) also declares that "[n]o metropolitan planning organization designated under section 134 of Title 23, shall give its approval to any project, program, or plan which does not conform to an implementation plan approved or promulgated under section 7410 of this title." 42 U.S.C. § 7506(c)(1).

417.    Section 176(c) declares that –

Conformity with an implementation plan means:

(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air

71

quality standards and achieving expeditious attainment of such standards; and

(B) that such activities will not--

(i) cause or contribute to any new violation of any standard in any area;

(ii) increase the frequency or severity of any existing violation of any standard in any area; or

(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

42 U.S.C. § 7506(c)(1).

418. The statutory requirements for making conformity determinations established by section 176(c) of the Clean Air Act are supplemented by criteria and procedures for making conformity determinations promulgated by the U.S. Environmental Protection Agency by rule pursuant section 176(c)(4)(A) of the Clean Air Act. 42 U.S.C. § 7506(c)(4)(A); 40 C.F.R. Part 93.

## FACTS RELATED TO CONFORMITY DETERMINATION

419. The ICC is an 18 mile, 6 lane, limited access tolled highway designed to link I-95 at its eastern terminus in Prince Georges County, to I-370 and I-270 at its western terminus in Montgomery County, Maryland.

420. The ICC is—

a) a "highway project" within the meaning of that term as defined in 40 CFR § 93.101;

b) a "regionally significant project" within the meaning of that term as defined in 40 CFR § 93.101;

c) an "FHWA/FTA project" within the meaning of that term as defined in 40 CFR § 93.101; and

    d) subject to the project level conformity tests enacted in 42 U.S.C. §

      7506(c)(1)(A) and (B), and the regulatory tests promulgated by the U.S.

      Environmental Protection Agency in 40 CFR § 93.116;

    e) a new highway project "that ha[s] a significant number of or significant

      increase in diesel vehicles" within the meaning of that phrase as it appears in 40

      CFR § 93.123(b)(1)(i) (as amended at 71 Fed. Reg. 12,468, 12,510 (Mar. 10,

      2006)).

421. USDOT, acting through the FHWA, is required by 40 CFR § 93.116(a) to perform

the demonstration of conformity for the ICC Project "according to the consultation

requirements of § 93.105(c)(1)(i) and the methodology requirements of § 93.123."

422. USDOT, acting through the FHWA, issued the ROD approving the ICC on May 29,

2006.

423. USDOT, acting through the FHWA, by letter dated July 14, 2006, authorized

"eligible costs for construction of ICC Contract A (from I-270/I-370 to east of MD

97) and eligible ROW acquisition costs for ICC contracts A,B,C,D and E."

424. The authorization granted on July 14, 2006, is limited to the ICC segment identified

as Contract A, and is subject to conditions, including but not limited to:

    a) 8) This project is authorized as Advanced Construction, obligation of federal

      funds will occur when project is converted to regular financing.

    b) 12) MSHA will submit a Project Management Plan (PMP) for FHWA

      acceptance and approval prior to requesting concurrence in award for the

      Contract A. FHWA will not concur in the award of the contract if SHA fails to

      obtain FHWA approval for the PMP.

425. No authorization for an award of federal funds pursuant to 23 U.S.C. § 106 has been granted for ICC Contracts B, C, D, or E.

426. No approval of plans, specifications and estimates for the ICC, as required by 23 U.S.C § 106(a), has been granted by the USDOT, acting through the FHWA.

427. Access permits to allow the ICC project to be connected to existing federal interstate highways I-95 and I-370 have not yet been approved by the USDOT, acting through the FHWA.

428. USDOT, acting through the FHWA, issued a "Project Level Conformity Determination for the Intercounty Connector Project in Maryland" as part of the ROD on May 29, 2006.

429. The approvals and permits described in paragraphs 422, 423, 424, and 428, supra, were issued unlawfully because they were issued without first making a conformity determination that complies with the statutory and regulatory conformity tests in section 176(c) of the CAA, and 40 C.F.R. Part 93.

430. EPA issued a determination on May 19, 2004, declaring that the emissions model "MOBILE6.2 . . . will be the approved model for estimating motor vehicle exhaust, [and]… emissions in PM2.5 SIPS and conformity determinations, until replaced by newer models or methods . . . . MOBILE6.2 . . . must be used in all PM2.5 conformity analyses."  69 Fed. Reg. at 28,832.

431. The MOBILE6.2 model has not been replaced by a newer model or method for estimating emissions of PM2.5 from motor vehicles.

432. Federal defendants did not use the MOBILE model "for estimating motor vehicle exhaust [and] emissions" of PM2.5 in making the conformity determination for the ICC project.

433. The Project Level Conformity Determination did not determine that the ICC conforms to the revised 24-hour national ambient air quality standard for PM2.5 promulgated October 17, 2006. 71 Fed. Reg. 61,143.

434. The Transportation Planning Board ("TPB") of the Metropolitan Washington Council of Governments, is the organization designated pursuant to 23 U.S.C. § 134(d) as the MPO for the National Capital Planning Region.

435. The MPO adopted and approved the FY2005-2010 and FY2006-2011 Metropolitan Transportation Improvement Programs ("Metropolitan TIPs") and 2004 and 2005 Constrained Long-Range Plans ("CLR Plans") which program federal and state funds for all transportation investments in the National Capital Planning Region, including the ICC project.

436. The Metropolitan TIP allocating funds for the ICC project was adopted and approved in December 2005, before a determination had been that the ICC conforms to the applicable implementation plan as required by the Clean Air Act.

437. The Metropolitan TIP adopted by the MPO was incorporated into the Maryland State TIP as required by 23 C.F.R. § 450.216(a), which was subsequently approved by the federal defendants pursuant to 23 U.S.C. § 135(f).

438. Notice of the violations of the Clean Air Act alleged in this Complaint was served upon defendants pursuant to the requirements of 42 U.S.C. § 7604(b). A true and correct copy of said Notice is attached hereto and marked as Plaintiffs' Exhibit A.

**COUNT 25: Failure to Determine Concentrations of Future PM2.5 Resulting from
Pollutants Emitted from the ICC**

439.    Plaintiffs incorporate by reference the allegations set forth above.

440.    The standards for which a lawful demonstration of conformity has not been made for

the ICC are the annual and 24-hour NAAQS for PM2.5. 40 CFR §§ 50.7(b), (c),

50.13.

441.    EPA's conformity rule establishes the criteria and procedures to be applied when

determining whether the localized concentrations of PM2.5 resulting from the

pollution emitted from a proposed highway will cause new, more frequent or more

severe violations of the NAAQS which is prohibited by the two statutory tests in §§

176(c)(1)(B)(i), (ii) of the Clean Air Act.

442.    The relevant portions of 40 CFR § 93.116(a) (as amended by 71 Fed. Reg. 12,468,

12,510 (Mar. 10, 2006)) require that:

> The FHWA/FTA project must not cause or contribute to any new
> localized CO, PM10, and/or PM2.5 violations or increase the frequency or
> severity of any existing CO, PM10, and/or PM2.5 violations in CO, PM10,
> and PM2.5 nonattainment and maintenance areas. *** This criterion is
> satisfied for all other FHWA/FTA projects in CO, PM10 and PM2.5
> nonattainment and maintenance areas if it is demonstrated that during the
> time frame of the transportation plan (or regional emissions analysis) no
> new local violations will be created and the severity or number of existing
> violations will not be increased as a result of the project.

443.    The timeframe of the latest transportation plan and regional emissions analysis for the

National Capital Region is 2030.

444.    The demonstration required by 40 C.F.R. § 93.116(a) "must be performed according

to the consultation requirements of Sec.  93.105(c)(1)(i) and the methodology

requirements of Sec.  93.123." 40 C.F.R. § 93.116(a).

445.    The methodology prescribed by 40 C.F.R. § 93.123(c) requires that compliance with

the NAAQS be determined by calculating estimated future pollutant concentrations to

result from the transportation project and adding that concentration to future

background pollution levels.

> Estimated pollutant concentrations must be based on the total emissions
> burden which may result from the implementation of the project,
> summed together with future background concentrations.

> 40 C.F.R. § 93.123(c)(1).

446.    Section 93.123(c)(1) of the rule requires that: "total concentration must be estimated

and analyzed at appropriate receptor locations in the area substantially affected by the

project."

447.    The federal defendants' conformity determination identified two "worst-case" hot

spot locations where emissions from the ICC Project are expected to contribute most

to the future total concentration of PM2.5:

> Location # 1: "The location with the overall highest traffic impact in the
>
> corridor is where the I-370/ICC meets I-270 and includes the traffic
>
> volumes from MD 355. The total overall 2010 traffic volume in this area
>
> would be 333,300 vehicles per day."
>
> Location #2: "The second location has the highest truck percent where the
>
> ICC interests with I-95."

448.    The federal defendants determined that the receptor locations to be used for the

purpose of estimating future air quality should be located using three criteria:

> Instead, receptor locations are located where the maximum total project
> concentration is likely to occur, where the general public is likely to have
> access and where it is reasonable in terms of proximity to the intersection
> or roadway. Based on the traffic levels and existing and future

development in the ICC project area, it was determined that the appropriate receptor locations were where the emissions impacts were likely to be the greatest. Two locations were chosen, the location with the overall highest traffic impact in the corridor where the I-370/ICC meets I-270 and the location with highest truck percent where the ICC intersects with I-95.

449. The federal defendants did not at any time prior to making the Conformity Determination or issuance of the ROD determine, analyze or estimate a total concentration for PM2.5 at the selected receptor locations in the area substantially affected by the project.

450. The failure to determine, analyze or estimate a total concentration for PM2.5 at the selected receptor locations in the area substantially affected by the project constitutes a failure to consider the relevant factors required by law, and a failure to find the facts required by law to demonstrate that the ICC project conforms as required by the Clean Air Act.

**COUNT 26: Failure to Determine Current Background Concentration of PM2.5 at the Selected Local Receptors in the Area Affected by the Project**

451. Plaintiffs incorporate by reference the allegations set forth above.

452. The EPA conformity rule establishes the procedure for making the determination of the total concentration of PM2.5 at the receptor locations where the maximum total project concentration is likely to occur based upon a formula that requires the determination of four inputs to calculate a future background concentration: "[t]he future background concentration should be estimated by multiplying current background by the ratio of future to current traffic and the ratio of future to current emission factors." 40 C.F.R. § 93.123(c)(2).

453.   The first input to the formula that must be determined is the "current background" concentration at the receptor locations where the maximum total project concentration is likely to occur in the area affected by the project. 40 C.F.R. § 93.123(c)(2).

454.   The evidence available to federal defendants demonstrates that the receptor locations where the maximum total project concentration is likely to occur are within 40 meters, or less, of the traffic lanes.

455.   EPA requires that monitors used to represent public exposure to both annual and 24-hour concentrations of PM2.5 in the ambient air affected by highway emissions be located at the "middle scale" or "neighborhood scale." 40 C.F.R. Part 58, app. D, ¶ 2.8.

456.   Under the monitor siting criteria adopted by EPA, monitors sited to represent population exposure to highway emissions at the "middle scale" must be located 20 meters from the highway, and monitors sited to represent population exposure at the "neighborhood scale" must be located 40 meters from the highway.  40 C.F.R. Part 58, app. E, ¶ 8.3 (2005).

457.   For purposes of determining compliance with the NAAQS for PM2.5 where the maximum total project concentration is likely to occur, and to meet EPA criteria for the selection of receptor locations that represent public exposure to highway emissions, estimates of concentrations of PM2.5 must be made for receptor locations no greater than 20 to 40 meters from the highway.

458.   To determine the total concentration of PM2.5 where the maximum total project concentration is likely to occur, estimated emissions from the ICC must be added to the "current background" concentration at the receptor locations.

459.    The federal defendants made their determination of "current background" concentrations using data from monitor # 240330030, located at 12003 Old Baltimore Pike, Beltsville, MD 20705. The monitor is generally referred to in the conformity determination as the "Muirkirk" monitor.

460.    The Muirkirk monitor lies approximately —

    a) 2.0 miles from the traffic lanes in the Baltimore-Washington Parkway;

    b) 1.6 miles from the traffic lanes in the I-95 corridor; and

    c) 0.3 miles (450 meters) from the traffic lanes of US Highway 1.

461.    The federal defendants report that the average daily traffic reported in the Conformity Determination for the US 1 corridor is 37,400 vehicles, with about 3,000 of these vehicles being trucks (37,400 x 0.08).

462.    The federal defendants report that the average daily traffic expected at Hot Spot location #1 is 333,300 vehicles, with an estimated 22,000 of these vehicles being trucks.

463.    The federal defendants report that the average daily traffic expected at Hot Spot location #2 is 261,800 vehicles, with an estimated 27,500 of these vehicles being trucks.

464.    The concentrations of PM2.5 measured at the Muirkirk monitor are representative of PM2.5 in residential neighborhoods in Montgomery and Prince George's counties under current conditions that exist along the future ICC right-of-way that are 1.6 to 2.0 miles from a heavily trafficked freeway.

465.    The concentrations of PM2.5 measured at the Muirkirk monitor are not representative of the "current background" PM2.5 that would be expected to be measured at the

receptor locations where the maximum total project concentration is likely to occur in the neighborhoods adjacent to the Hot Spot locations #1 and #2 where the ICC joins an existing heavily trafficked freeway.

466.    The federal defendants did not install and operate, or request any state or local agency to install and operate, an air quality monitor to measure the "current background" concentrations of PM2.5 at the receptor locations where the maximum total project concentration is likely to occur in the neighborhoods adjacent to I-95 and I-270/I-370 at the Hot Spot locations #1 and #2.

467.    The federal defendants' guidance authorizes the use of Title 23 funds for the installation and operation of an air quality monitor as a transportation planning activity "in the event that air quality monitoring is necessary to determine the air quality impacts of a proposed project." 58 Fed. Reg. 150 (Jan. 4, 1993).

468.    The federal defendants identified no published research reports or scientific data to demonstrate that a monitor located 1.6 miles from the I-95 traffic lanes could be representative of "current background" concentrations of PM2.5 at the receptor locations where the maximum total project concentration is likely to occur in the neighborhoods adjacent to I-95 and I-270/I-370 at the Hot Spot locations #1 or #2.

469.    Evidence in the record of the Conformity Determination demonstrates that the receptor locations where the maximum total project concentration is likely to occur, and which are likely to be representative of neighborhood population exposures, are within 20 to 40 meters of the existing traffic lanes on I-95 and I-270/I-370 near the planned junctions with the ICC project.

470.   Research studies designed to measure the impact of highway emissions on PM2.5 use black carbon as the indicator of the contribution from motor vehicles because a) all black carbon particles collected in monitors that measure particles in the ambient air are smaller than 2.5 micrometers in diameter, b) black carbon is a product of the incomplete combustion in internal combustion engines of carbon-based fuels such as gasoline and diesel fuel, c) is generally not emitted from industrial sources or electric power generating units, and d) in residential and commercial neighborhoods is almost entirely emitted from motor vehicles.

471.   Evidence contained in research studies of the impact of highway emissions on black carbon concentrations show that a) black carbon concentrations are highest in the ambient air downwind from heavily trafficked highways, and b) that concentrations of black carbon 20 meters from a freeway are 2.0 times greater than at 90 meters (average 19.4 vs 7.8), 3 times greater than at 150 meters (average 19.4 vs 6.5), and 3.3 times greater than at 300 meters (average 19.4 vs 5.5).

472.   Evidence from the I-710 freeway study also shows that black carbon concentrations at 300 meters are about 20% higher than the concentrations measured upwind from the highway (upwind 4.6 µg/m3 vs 5.5 µg/m3 at 300 meters downwind), indicating that at some distance beyond 300 meters, but not greater than 1000 meters, the black carbon emitted from a specific highway source will not be detectably greater than the concentrations generally found in the urban atmosphere.

473.   Other studies of highway black carbon emissions submitted show similar relationships between concentrations of black carbon and the distance from other heavily trafficked highways in various urban environments.

474.    The available scientific research is reflected in a Settlement Agreement between

FHWA and the Sierra Club in the US 95 litigation in Las Vegas, NV. The Agreement

requires the federal defendants to conduct a research program to measure

concentrations of various pollutants in proximity to heavily trafficked highways.

475.    Appendix A to the Settlement Agreement describes the parameters to be satisfied

when siting monitors for the highway emissions monitoring research program:

> The selection of monitoring sites at each study location will be consistent
> with the Protocol that will prescribe, to the extent possible, uniform
> criteria for selecting the distance between the monitor locations and the
> edge of the highway right-of-way. The Protocol will provide for as many
> as five monitors at various distances between the roadway and 300 meters,
> including one adjacent to the highway, one at approximately 300 meters
> away from the highway, and one to three monitors in between, depending
> on local conditions. The monitoring stations directly adjacent to the
> highway will be consistent with EPA's siting criteria for a microscale
> monitor (40 CFR Part 58, Appendix E ¶ 8.3). In each metropolitan area
> where a monitoring study is undertaken, FHWA will also collect data at a
> distance significantly away (at least 1000 meters) from any known source
> of MSATs to determine urban background concentrations for comparison
> purposes.

476.    The federal defendants acknowledged as part of the Settlement Agreement that a

monitor located as far as the Muirkirk monitor from the nearest heavily trafficked

freeway, i.e., 1.6 miles (about 2000 meters), will not be expected to measure any

incremental impact of emissions from the highway greater than the urban background

concentrations.

477.    The federal defendants acknowledged as part of the Settlement Agreement that a

monitor located as far as the Muirkirk monitor from the nearest heavily trafficked

freeway, i.e., 1.6 miles (about 2000 meters), will not be expected to measure any

incremental impact of emissions from the highway greater than the urban background

concentrations.

478.    In view of federal defendants' failure, either in the proposed Conformity

Determination, the final Conformity Determination, or in response to comments

based on credible, relevant scientific research, to identify any data or research studies

that would support an inference that a monitor located 1.6 miles from the I-95

corridor is relevant to determining, analyzing or estimating the "current background"

concentration of PM2.5 at the receptor locations where the maximum total project

concentration is likely to occur in the neighborhoods adjacent to I-95 and I-270/I-370

at the Hot Spot locations #1 or #2, the federal defendants' reliance on the

concentrations of PM2.5 measured at the Muirkirk monitor as the basis for estimating

the "current background" concentration for the ICC is not relevant to the

determination required to be made by law, in not based on reasoned decisionmaking,

has no support in the record, and is arbitrary and capricious.

**COUNT 27: Failure to Use Method Required by Conformity Rule for Determining Current Background Concentration**

479.    Plaintiffs incorporate by reference the allegations set forth above.

480.    The 2006 revision to the hot spot rule extends to PM2.5 the requirement that "[t]he

demonstration required by § 93.116 ("Localized CO, PM10 and PM2.5 violations")

must be based on quantitative analysis using the applicable air quality models, data

bases, and other requirements specified in 40 CFR part 51, Appendix W (Guideline

on Air Quality Models)." 40 C.F.R. § 93.123(a)(1) (as amended 71 Fed. Reg. at

12,510).

481.    Appendix W specifically describes the procedures to be followed when source

impacts are to be determined using monitoring with modeling tools, or when

modeling tools are determined not to be available. 40 CFR part 51, app. W, ¶ 10.2.2.

482. In this case where existing emissions from the highways located at the termini of the ICC contribute to the "current background" concentration of PM2.5 at the receptor locations where the maximum total project concentration is expected to occur at the Hot Spot locations #1 or #2, the measurement of current background concentrations must be developed in compliance with the requirements in Appendix W, ¶ 10.2.2.

483. Appendix W, ¶ 10.2.2 requires that a monitoring network be established to measure the impacts of emissions from existing sources on the NAAQS.

484. Appendix W, ¶ 10.2.2 requires, with the approval of the "[a]ppropriate reviewing authority," that a monitoring network be designed to "locate the points of maximum concentration" based upon criteria that include, but are not limited to, need for collection of meteorological data, number, type and location of monitors, and other factors.

485. The federal defendants have not designed a monitoring network, or established even a single monitor, to address the criteria identified by EPA in Appendix W.

486. The Muirkirk monitor relied upon by the federal defendants has not been established to satisfy the criteria identified by EPA in Appendix W, ¶ 10.2.2.b.ii, with respect to either locating points of maximum concentration, measuring the current background at expected points of maximum concentration, or estimating the total concentration that will result from adding PM2.5 emissions from the ICC project.

487. In view of the federal defendants' failure to measure current background concentrations in compliance with the requirements in Appendix W, ¶ 10.2.2, at Hot Spot locations #1 and #2 where existing emissions from the highways located at the termini of the ICC contribute to the "current background" concentration of PM2.5 at

the receptor locations where the maximum total project concentration is expected to occur, the federal defendants have not obtained the evidence relevant to making the conformity determination as required by law.

488.     The federal defendants' conformity determination, which was based upon a finding that PM2.5 concentrations comply with the NAAQS for PM2.5 without establishing a monitoring network consistent with the requirements of 40 C.F.R. Part 51, Appendix W, to identify the point of peak concentration at the Hot Spot locations #1 and #2 where emissions from existing highways are contributing to the "current background" concentration of PM2.5 at the receptor locations where the maximum total project concentration is likely to occur, is not consistent with law, not relevant to the determination required to be made by law, and arbitrary and capricious.

## COUNT 28: NEPA Requires Siting of Air Quality Monitors to Determine Baseline Concentration of PM2.5

489.     Plaintiffs incorporate by reference the allegations set forth above.

490.     In implementing its obligations to disclose cumulative impacts under NEPA, the federal defendants require an air quality analysis "for the EIS [which] is a calculation of the anticipated pollutant emissions, dispersion and resultant concentration in the vicinity of the proposed project." 46 Fed. Reg. 8428 (Jan. 26, 1981).

491.     By rule, the Secretary of Transportation requires that "[t]o the fullest extent possible, all environmental investigations, reviews, and consultations be coordinated as a single process, and compliance with all applicable environmental requirements be reflected in the environmental document required by this regulation. 23 C.F.R. § 771.105(a).

492.    By rule, the Secretary of Transportation requires that "the CEQ regulation apply to actions where the Administration exercises sufficient control to condition the permit or project approval." 23 C.F.R. § 771.109(a)(1).

493.    The CEQ regulation under NEPA applies to the conformity determination for the ICC because the FHWA "exercises sufficient control to condition the permit or project approval."

494.    The CEQ regulation under NEPA requires that an "Environmental Impact Statement . . . state how alternatives considered in it and decisions based on it will or will not achieve the requirements of … the Act and other environmental laws and policies," and that an EIS must consider "whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 CFR §§ 1502.2(d), 1508.27(b)(10).

495.    A conformity determination is based on whether the proposed action will or will not achieve the requirements of the CAA and must be included in the consideration of alternatives in the EIS.

496.    The Secretary of Transportation formally concurred with EPA (as required by 42 U.S.C. § 7506(c)(4)(A)) in adopting the policy, in response to public comments requesting that EPA adopt a procedure for public participation in the conformity criteria and procedures, "that project-level conformity determinations will be made as part of the NEPA process." 58 Fed. Reg. 62,209/3 (Nov. 24, 1993).

497.    USDOT issued guidance explaining that "[i]n order to create the opportunity for "one-stop" shopping at the Federal level, the document prepared to comply with the NEPA is the instrument used to address the requirements [of] all other related

environmental laws, such as the CAAA." <u>A Guide to Metropolitan Transportation Planning Under ISTEA</u>, Pub. No. FHWA-PD-95-031 HPD-1/7-95(1M)QE), at 27.

498.    The CEQ rule implementing NEPA requires analysis of the cumulative effects of a proposed action. 40 C.F.R. § 1508.8.

499.    CEQ guidance implementing the requirement for analysis of the cumulative effects of a proposed action explains that "[t]he critical element . . . is defining an appropriate baseline or threshold condition of the resource, ecosystem, and human community beyond which adverse or beneficial change would cause significant degradation or enhancement of the resource, respectively."

500.    By failing to establish a monitoring network designed to locate the points of highest existing concentrations of PM2.5 in the neighborhoods adjacent to I-95 and I-270/I-370 at the Hot Spot locations #1 or #2 where the maximum total project concentration is expected to occur, FHWA has violated the duty under NEPA to determine the baseline air quality as the necessary starting point for determining the cumulative impact of emissions from the proposed project.

**COUNT 29: Failure to Estimate Current Background Emissions Using PM2.5 Data from Existing Monitors in the D.C.-Maryland-Virginia Nonattainment Area that Are Close to Heavily Trafficked Highways Is Arbitrary and Capricious**

501.    Plaintiffs incorporate by reference the allegations set forth above.

502.    To the extent that establishing a monitoring network to determine the current background concentration is not required, then it was arbitrary and capricious not to rely upon measured concentrations of PM2.5 from monitors that are within 300 meters from heavily trafficked highways.

503.   Scientific research measuring carbon emitted from highways shows that monitors located within 300 meters are significantly influenced by emissions from such highways.

504.   Evidence submitted by commenters and available to the federal defendants demonstrates that all monitors measuring violations of the annual NAAQS for PM2.5 within the Washington-Maryland-Virginia nonattainment area are located within 300 meters of highways.

505.   Evidence provided by the federal defendants in the Conformity Determination demonstrate that all PM2.5 monitors within the Washington-Maryland-Virginia nonattainment area that are located within 300 meters of a major highway violate the revised 24-hour NAAQS for PM2.5.

506.   Evidence provided by commenters demonstrate that carbon particles emitted from highways add from 2 to 3 µg/m3 to concentrations of PM2.5 in areas adjacent or near to highways compared to areas 300meters or more away from highways.

507.   At Hot Spot location #2, diesel trucks make up a larger share of total vehicles than at any other location for which truck data were reported by the federal defendants.

508.   At Hot Spot location #2, the larger percentage of trucks as vehicles traveling on the ICC and north-south highways will increase total PM2.5 emissions compared to locations with comparable total average daily traffic, but fewer trucks.

509.   The federal defendants fail to consider or discuss the evidence submitted showing that at locations in the Washington-Maryland-Virginia nonattainment area where PM2.5 is monitored within 300 meters of a major highway, the NAAQS for PM2.5 is violated.

510. No evidence identified by the federal defendants supports the conclusion that emissions from vehicles traveling on I-95 as a result of the ICC will not cause a violation of the annual or revised 24-hour NAAQS for PM2.5 at the receptor area where the greatest concentrations are expected at Hot Spot location #2 which is less than 300 meters from the ICC/I-95 interchange.

511. The federal defendants' conclusion that the annual NAAQS for PM2.5 will not be violated at Hot Spot #2 does not consider the record evidence of violations within 300 meters of major highways in the Washington-Maryland-Virginia nonattainment area and therefore unreasonably omits consideration of relevant, substantial evidence in the record.

512. The federal defendants' conclusion is arbitrary and capricious and otherwise not in accordance with law.

### COUNT 30: Failure to Determine the Ratio of Future to Current Traffic for the Analysis Year at Hot Spot Location #1

513. Plaintiffs incorporate by reference the allegations set forth above.

514. The second set of data required by the Hot Spot rule to be used in determining the "total concentration" of PM2.5 that will result when project emissions are added to baseline pollution levels is "the ratio of future to current traffic." 40 C.F.R. § 93.123(c)(2).

515. The Conformity Determination reports the expected total average daily traffic (ADT) and truck traffic at the Hot Spot locations #1 and #2 for 2010, the analysis year.

516. Neither the proposed Conformity Determination, the final Conformity Determination, nor the response to comments provides information to show what the current traffic levels are at Hot Spot location #1.

517. The Conformity Determination contains no information that can be used to determine "the ratio of future to current traffic" for Hot Spot location #1.

518. Without this information, no determination can be made regarding the increase in traffic between current levels and future levels at Hot Spot location #1 as a result of building the ICC.

519. The federal defendants' failure to obtain the information relevant to determining the increase in traffic at Hot Spot location #1 violates 40 C.F.R. § 93.123(c) and makes it impossible to determine the magnitude of emission increases that will result from increased traffic associated with the ICC project at Hot Spot location #1.

520. Making a conformity determination without obtaining the information required by the conformity rule is inconsistent with law, arbitrary and capricious.

**COUNT 31: Failure to Determine the Ratio of Future to Current Traffic for the Analysis Year at Hot Spot Location #2**

521. Plaintiffs incorporate by reference the allegations set forth above.

522. The Conformity Determination contains information that shows the current average daily traffic (ADT) levels in 2004 for the two existing highways that are expected to contribute emissions to Hot Spot location # 2 – US 1 (31,875) and I-95 (178,900).

523. The Conformity Determination estimates that ADT on these routes will increase to 221,800 by 2010 and that traffic from the ICC will add another 40,000 vehicles/day at location #2.

524. It can be determined from the data provided in the Conformity Determination that "the ratio of future to current traffic" for Hot Spot location #2 is 1.30 (261,800 ÷ 200,775).

525.    For Hot Spot location #2, traffic contributing to emissions at that location will increase by 30% between 2004 and 2010.

526.    In order for emissions of PM2.5 not to increase by 2010 at Hot Spot location #2, 30% of the vehicles traveling through that location today would have to be replaced with zero emitting vehicles by 2010.

527.    The "the ratio of future to current traffic" for Hot Spot location #2 is not discussed or considered in the Conformity Determination.

528.    Without any discussion of the increased ADT at this location, the federal defendants conclude that "PM2.5 emissions are expected to be reduced in the project area, as demonstrated by projected reductions in the regional emissions analysis, as well as by national projections by EPA reflecting the impacts of national emissions control programs, such as the 2007 Heavy-duty Diesel Rule."

529.    The federal defendants provide no rational explanation for how emissions from existing and future vehicles will be reduced to the degree necessary to offset a 30% increase in ADT at Hot Spot location #2 by 2010.

530.    Making a conformity determination without analyzing or considering the information available to determine "the ratio of future to current traffic" for Hot Spot location #2, violates 40 C.F.R. § 93.123(c).

531.    Making a conformity determination without developing, analyzing, or considering the information needed to determine the facts required by law to be used in making the determination is an abuse of discretion, arbitrary and capricious, and otherwise not in accordance with law.

**COUNT 32: Using Projected Average Traffic Estimates for 2010 that Are Less than Current Monitored Traffic at the Hot Spot Locations and Less than Estimates Published by FHWA Is Arbitrary and Capricious**

532.    Plaintiffs incorporate by reference the allegations set forth above.

533.    The Conformity Determination reports that total projected traffic at Hot Spot location #1 in 2010 is based upon expected ADT on "I-270 [which] is projected to carry 184,700 vehicles per day."

534.    The Maryland State Highway Administration's project traffic stations on I-270 just south and north of the current interchange with I-370 reported ADT in 2005 of 219,375 (monitoring station B2965, 0.1 mile north of Shady Grove Road), and 207,575 (monitoring station B2966, 0.1 mile north of I-370). (Md. State Hwy. Admin., AADT'S From Station History for the Years 2001 - 2005 & AAWDT'S From Station History for the Year 2005, at 120 (2005), underline available at http://www.sha.state.md.us/SHAServices/TrafficReports/station_history.pdf).

535.    The projected traffic counts for 2010 on I-270 that were reported in the Conformity Determination are at levels last measured by the Maryland State Highway Administration in 1999 and are significantly below the traffic counts measured by the Maryland State Highway Administration on 1-270 in 2005. (Md. State Hwy. Admin., Montgomery County Traffic Volume Map (1999), underline available at http://www.sha.state.md.us/SHAServices/mapsBrochures/maps/oppe/trafficvolumem aps/1999/montgomery.pdf).

536.    The Conformity Determination reports that total projected traffic at Hot Spot location #2 in 2010 is based upon expected ADT on I-95 which is projected to carry 184,400 vehicles per day.

537.   The Maryland State Highway Administration's program traffic stations on I-95 north
       of the planned interchange with ICC reported traffic counts in 2005 of 198,925
       (monitoring station B3350, 0.1 mile north of Old Gunpowder Road). (Md. State Hwy.
       Admin., AADT'S From Station History for the Years 2001 - 2005 & AAWDT'S From
       Station History for the Year 2005, at 138 (2005), available at
       http://www.sha.state.md.us/SHAServices/TrafficReports/station_history.pdf).

538.   The projected traffic counts for 2010 on I-95 that were reported in the Conformity
       Determination for Hot Spot #2 are at levels last measured by the Maryland State
       Highway Administration before 2003, and are significantly below the traffic counts
       measured by the Maryland State Highway Administration on I-95 in 2005. (Md. State
       Hwy. Admin., AADT'S From Station History for the Years 2001 - 2005 &
       AAWDT'S From Station History for the Year 2005, at 138 (2005), available at
       http://www.sha.state.md.us/SHAServices/TrafficReports/station_history.pdf).

539.   The Conformity Determination reports, in Table 1, that trucks are expected to
       represent 12% of all daily traffic on I-95 in 2010.

540.   A study of freight traffic in the United States conducted by the FHWA, Office of
       Freight Management and Operations, projected that average daily truck traffic on I-95
       in Maryland near the ICC interchange would be 31,527 by 2010 (ID 62103),
       compared to the estimate of 21,528 trucks per day (184,400 x 12%) used in the
       Conformity Determination. (FHWA, Freight Analysis Framework Highway Truck
       Volume and Capacity Analysis, Network Data Files (2002), at
       http://ops.fhwa.dot.gov/freight/freight_analysis/faf/faf_highwaycap.htm).

541.    Adding emissions from 10,000 more trucks per day than assumed in the conformity determination would increase total vehicle emissions of PM2.5 in the area of Hot Spot #2 by nearly one-third.

542.    It is arbitrary and capricious for the federal defendants to significantly underestimate expected vehicle emissions in the Hot Spot locations by using projected future traffic counts for 2010 that are less than current, reported traffic counts for 2005, and by using estimates of truck traffic that ignore official estimates of truck traffic on I-95 for 2010 published by the FHWA Office of Freight Management and Operations.

**COUNT 33: Not Using Emission Factors from MOBILE6.2 in the Manner Required by the Conformity Rule Is Arbitrary and Capricious**

543.    Plaintiffs incorporate by reference the allegations set forth above.

544.    The third input to the formula for determining conformity required by EPA's conformity rule is "the ratio of future to current emission factors." 40 C.F.R. § 93.123(c)(2).

545.    The emission factors are the emissions per mile emitted by different classes of motor vehicles that will be operated on the ICC, and the connecting and adjacent highways that contribute emissions at the Hot Spot locations.

546.    Emission factors for each model year of 16 vehicle classes are provided by EPA's MOBILE model.

547.    The MOBILE6 model was revised to include emission factors for PM2.5, and released by EPA as MOBILE6.2 for use in all conformity determinations made after publication in the Federal Register. 69 Fed. Reg. 28,831 (May 19, 2004).

548.    The federal defendants based its conformity determination on the inference drawn from the regional emissions analysis prepared by the MPO: "PM2.5 emissions are

expected to be reduced in the project area, as demonstrated by projected reductions in the regional emissions analysis."

549.  The regional emissions analysis conducted by the MPO was prepared using emissions factors in MOBILE6.2.

550.  The regional emissions analysis was conducted to demonstrate changes in aggregate emissions from all transportation sources throughout the Washington-Maryland-Virginia metropolitan area designated as nonattainment for PM2.5. The regional emissions analysis compared baseline emissions in 2002 with expected regional emissions in 2010 and 2030.

551.  The regional emissions analysis did not provide any information relevant to determining the change in emissions at Hot Spot locations #1 and #2 between the 2005 baseline year and the 2010 hot spot analysis year because it did not include emissions estimates for 2005, could not account for the high percentage of trucks on I-95 and I-270 compared to the truck share of regional traffic, and did not account for the large change in total average daily traffic at each hot spot location.

552.  By relying on the regional emissions analysis to estimate changes in emissions at the hot spot locations, the federal defendants relied upon emission factors from the MOBILE6.2 in making its conformity determination, but did not apply those factors in the manner required by the conformity rule.

553.  The federal defendants did not use the emission factors from the MOBILE6.2 in the formula prescribed by EPA's conformity rule, 40 C.F.R. § 93.123(c)(2), which requires that the change in emissions factors between the air quality baseline year (2005) and the analysis year (2010) be applied to the vehicle classes expected in the

hot spot locations and that changes in emissions between years be compared with the change in traffic volumes expected in those locations as a result of the proposed ICC project.

554. The federal defendants' failure to apply the emissions factors contained in MOBILE6.2 in the manner prescribed by the conformity rule is inconsistent with law, and otherwise arbitrary and capricious.

**COUNT 34: Conformity with Revised NAAQS for PM2.5 Has Not Been Determined**

555. Plaintiffs incorporate by reference the allegations set forth above.

556. The federal defendants' Conformity Determination finds conformity based upon the annual and 24-hour PM2.5 NAAQS that were in effect on May 29, 2006.

557. EPA proposed to revise the NAAQS for PM2.5 on January 17, 2006. 71 Fed. Reg. 2619.

558. Commenters brought the proposed revision to the NAAQS to the attention of federal defendants in April 2006.

559. On October 17, 2006, the EPA published its final revision to the 24-hour NAAQS for PM2.5, reducing the standard from 65 µg/3 to 35 µg/m3. 71 Fed. Reg. 61,143.

560. No determination has been made by the federal defendants that emissions from the ICC project will meet the requirements of section 176(c) of the Clean Air Act and 40 C.F.R. § 93.116 with respect to the current 24-hour NAAQS for PM2.5.

561. Section 176(c) of the Clean Air Act prohibits any approval, or funding for the ICC Project that has been completed or granted subsequent to October 17, 2006, until a determination has been made that the Project conforms to the applicable implementation plan in accordance with the Act and 40 C.F.R. § 93.116 by

demonstrating that emissions from the Project will not cause new, more frequent or more severe violations of the revised 24-hour NAAQS for PM2.5, and will not interfere with timely attainment of the NAAQS for PM2.5.

**COUNT 35: No Determination Has Been Made that Project Emissions Will Not Delay Timely Attainment of the NAAQS**

562.     Plaintiffs incorporate by reference the allegations set forth above.

563.     Based upon evidence demonstrating that either the annual or revised 24-hour NAAQS for PM2.5 is being violated at each monitor located within 300 meters of a major highway in the Washington-Maryland-Virginia nonattainment area, the NAAQS for PM2.5 is likely being violated at the hot spot locations #1 and #2 in the receptor area adjacent to I-95 and I-270/I-370.

564.     In hot spot locations where the NAAQS is being violated, CAA § 176(c)(1)(B)(iii) requires a demonstration that emissions from the project will not delay timely attainment of the NAAQS.

565.     The federal defendants have made no determination that emissions from the project will not delay timely attainment of the NAAQS as required by § 176(c)(1)(B)(iii).

**COUNT 36: Adequate Opportunity for Comment Has Not Been Provided As Required by Law**

566.     Plaintiffs incorporate by reference the allegations set forth above.

567.     By rule, the Secretary of Transportation requires that "[t]o the fullest extent possible, all environmental investigations, reviews, and consultations be coordinated as a single process, and compliance with all applicable environmental requirements be reflected in the environmental document required by this regulation." 23 C.F.R. § 771.105(a).

568.    By rule, the Secretary of Transportation requires that "the CEQ regulation apply to actions where the Administration exercises sufficient control to condition the permit or project approval." 23 C.F.R. § 771.109(a)(1).

569.    The CEQ regulation under NEPA applies to the conformity determination for the ICC because the federal defendants "exercise[] sufficient control to condition the permit or project approval."

570.    The CEQ regulation under NEPA requires that an "Environmental Impact Statement shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of … the Act and other environmental laws and policies," and that an EIS must consider "whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. §§ 1502.2(d), 1508.27(b)(10).

571.    A conformity determination is based on whether the proposed action will or will not achieve the requirements of the CAA and must be included in the consideration of alternatives in the EIS.

572.    The Secretary of Transportation formally concurred with EPA (as required by 42 U.S.C. § 7506(c)(4)(A)) in adopting the policy, in response to public comments requesting that EPA adopt a procedure for public participation in the conformity criteria and procedures, "that project-level conformity determinations will be made as part of the NEPA process." 58 Fed. Reg. 62,209/3 (Nov. 24, 1993).

573.    USDOT issued guidance explaining that "[i]n order to create the opportunity for "one-stop" shopping at the Federal level, the document prepared to comply with the NEPA is the instrument used to address the requirements [of] all other related

environmental laws, such as the CAAA." <u>A Guide to Metropolitan Transportation</u>

<u>Planning Under ISTEA</u>, Pub. No. FHWA-PD-95-031 HPD-1/7-95(1M)QE), at 27.

574.    As a determination required to be made as part of the NEPA process, the Conformity

Determination may be made only after compliance with the procedures established

pursuant to NEPA, including but not limited to the publication of notice and an

opportunity for public comment.

575.    The Project-level Conformity Determination is a supplement to the DEIS for the ICC

project because the project-level PM2.5 conformity determination was not addressed

in any earlier NEPA document.

576.    NEPA regulation requires a minimum comment period of 45 days on a draft or

supplemental environmental impact statement.  40 C.F.R. § 1506.10(c).

577.    The period allowed for public comment on the proposed conformity determination

was less than 45 days.

578.    On April 8, 2006, Plaintiffs submitted a request for data available to federal

defendants that was relevant to the conformity determination but not made available

as part of the proposed conformity determination published for comment, including

but not limited to, information regarding the share of traffic represented by trucks at

the hot spot locations.

579.    As part of the request for data, commenters requested an extension of the comment

period to allow for 45 days to prepare comments after the requested data was made

available in order to allow an adequate opportunity to confirm and analyze the data,

and to prepare a modeling analysis that complies with the conformity rule.

580.    The federal defendants released the requested data eight days before the close of the comment period, but denied Plaintiffs' request for additional time to comment on the proposed conformity determination.

581.    Information regarding the estimation of truck traffic and other data highly relevant to the conformity determination was not made available to the public at the beginning of the public comment period as required by 40 C.F.R. § 93.105(e).

582.    Information regarding the estimation of truck traffic and other data highly relevant to the conformity determination was not made available to the public until 8 days prior to the close of the period for public comments.

583.    Plaintiffs were prejudiced by the lack of time to prepare adequate comments addressing various aspects of the conformity determination, including but not limited to, having an inadequate opportunity to research data regarding projected truck traffic in the hot spot locations, identify sources of traffic counts for the hot spot locations, evaluate emissions factors for trucks and motor vehicles, and perform a complete modeling analysis using emissions factors from MOBILE6.2 and an appropriate dispersion model to predict concentrations of PM2.5 in the ambient air.

584.    The federal defendants' denial of requests for the full 45-day opportunity to prepare and submit comments as required by NEPA is inconsistent with law, and otherwise arbitrary and capricious.

**COUNT 37: The MPO Unlawfully Included the ICC project in the Metropolitan TIP Before the Project Was Found to Conform**

585.    Section 176(c)(1) of the Clean Air Act prohibits the U.S. Department of Transportation from granting any approval, funding or "support in any way" for an activity such as a highway project before a determination has been made that the

project conforms to the applicable implementation plan in accordance with the criteria established by law.

586.    Section 176(c)(1) of the Clean Air Act prohibits the MPO from giving its "approval to any project, program or plan which does not conform."

587.    The MPO unlawfully adopted the Metropolitan TIPs in 2004 and 2005 and the CLR Plans allocating federal funds for the ICC project before the project had been found to conform under the Clean Air Act.

588.    The USDOT, when acting on the State TIP that contained the Metropolitan TIPs allocating funds to the ICC, unlawfully approved the State TIP because it allocated funds to the ICC project before the project had been found to conform.

## COUNT 38: CLAIM FOR RELEASE OF DOCUMENTS UNDER THE FREEDOM OF INFORMATION ACT

589.    On November 8, 2006, Environmental Defense and the Sierra Club served on the FHWA a request pursuant to the Freedom of Information Act ("FOIA") for documents and information related to findings required to have been made by FHWA as part of the conformity determination for the ICC project.

590.    The time allowed by law for responding to the November 8 request has expired.

591.    To date, the requesting parties have received from FHWA only an acknowledgement that the request had been received and assigned to the Maryland Division Office for response.

592.    None of the requested documents have been received to date.

593.   Pursuant to FOIA, 5 U.S.C. § 552, *as amended*, Plaintiffs have a right to obtain, and

an agency has a duty to release, public documents and other information in the

possession and control of the agency.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request this Court, pursuant to 5 U.S.C. § 706, and pursuant to the

Court's equitable powers, to:

(1)   Enter judgment against the Defendants and in favor of the Plaintiffs for

each violation alleged in this Complaint;

(2)   Declare that the federal defendants have violated FAHA, SAFETEA-LU,

NEPA, the CAA, and the APA.

(3)   Declare that the Conformity Determination was void *ab initio* and

provided no lawful basis for granting any approval or authorization of

federal funds in reliance thereon;

(4)   Declare that the MPO violated SAFETEA-LU and the APA.

(5)   Vacate the CLR Plans and the Metropolitan TIPs which both include the

ICC project, or strike from such CLR Plans and Metropolitan TIPs the

ICC project, until such time as

a.   a major investment study is prepared in accordance with

the requirements of 23 C.F.R. §450.318;

b.   a determination is made pursuant to 23 U.S.C. § 134(a);

    c.  the CLR Plans and Metropolitan TIPs are analyzed to ensure that they accomplish the national transportation objectives if the ICC project is added to the Plans and TIPs;

    d.  the studies and analyses required by 23 C.F.R. § 450.316(a)(13) have been conducted to support the findings required by 23 U.S.C. § 109(h); and

    e.  the project has been found to be in conformity pursuant to 42 U.S.C. § 7506(c) and the implementing regulations in 40 C.F.R. Part 93A;

(6)    Vacate the action by the federal defendants unlawfully approving the State TIP that contained funding for the ICC because the State TIP incorporated the unlawfully adopted Metropolitan TIP in violation of 23 U.S.C. § 135(f)(3).

(7)    Vacate the federal defendants' approval of or authorization of funding for the ICC project and remand to the federal defendants for:

    a.  preparation of a revised EIS that includes an adequate analysis of alternatives and a discussion of the identified adverse impacts on human health that would result from each alternative;

    b.  an adequate analysis of how the alternatives would best accomplish the national transportation planning objectives in 23 U.S.C. § 134(a);

      c.  an adequate analysis of the costs of eliminating or minimizing such effects; and

      d.  a reasoned determination explaining why the ICC is in the best overall public interest as required by 23 U.S.C. § 109(h).

(8)     Find that Defendants failed to make a lawful conformity determination for the reasons set forth herein;

(9)     Compel FHWA to respond fully to Plaintiffs' FOIA request within twenty days, or in no event later than the date established by the Court for the filing of the administrative record in this proceeding;

(10)    Enjoin the federal defendants from transferring or authorizing the use of funds approved prior to judgment for any action related to the construction of the ICC until the actions required by law have been completed;

(11)    Award Plaintiffs attorneys' fees and costs pursuant to the Clean Air Act, 42 U.S.C. § 7604, the Equal Access to Justice Act, 28 U.S.C. § 2412, FOIA, and other applicable statutes; and

(12)    Award Plaintiffs all other relief the Court deems just and proper.


DATED:   December 20, 2006          Respectfully submitted,


                            _____

                            Hope Babcock, Director
                                (Fed/D.C. Bar No. 14639)
                            Erik Bluemel, Staff Attorney
                                (Admitted in N.Y., D.C.)
                            Institute for Public Representation

Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C.  20001
Phone: 202-662-9535
Fax: 202-662-9634

Robert E. Yuhnke
        (C.O. Bar No. 012686)
Robert E. Yuhnke & Associates
2910 Country Road 67
Boulder, CO  80303
Phone: 303-499-0425

*Counsel for Plaintiffs*
*Environmental Defense and Sierra Club*

.



EXH. A

## NOTICE OF INTENT TO COMMENCE CIVIL ACTION
## TO REMEDY VIOLATION OF THE CLEAN AIR ACT

Pursuant to 42 U.S.C. Section 7604(b)(1), Environmental Defense and the Sierra Club, on behalf of themselves and their members, hereby give notice of their intent to commence a civil action against Mary Peters, in her capacity as the Secretary of Transportation, for approving the Intercounty Connector Project ("ICC Project"), a major highway project linking I-95 in Prince Georges County, Maryland, with I-370 and I-270 in Montgomery County, Maryland, on May 29, 2006, see 71 Fed. Reg. 36,164 (June 23, 2006), and against the Secretary of Transportation and the National Capital Region Transportation Planning Board, acting as the designated metropolitan planning organization pursuant to 23 U.S.C. § 134(d), for approving the Transportation Improvement Program that programmed funds for the ICC Project in violation of the Clean Air Act (CAA). In the event such violations have not been remedied within 60 days following receipt of this Notice, the parties intend to commence a civil action to remedy such violations of the Act. As further specified below, the Secretary has approved the ICC Project, and the Transportation Improvement Program allocating federal funds for the ICC Project in violation of requirements of the Act and implementing regulations prohibiting approval by the Secretary of Transportation of any transportation project that will cause or contribute to violations of the National Ambient Air Quality standards.

Pursuant to the Clean Air Act, 42 U.S.C. §7407(d)(1), the Administrator of the U.S. Environmental Protection Agency has designated Prince Georges and Montgomery Counties, Maryland, the area where the ICC Project is located, as part of the Washington, DC-MD-VA nonattainment area for the pollutant "PM2.5" (particulate matter with an aerodynamic diameter equal to or less than 2.5 microns in size). 40 C.F.R. § 81.321. See 70 Fed. Reg. 979 (January 5, 2005). Because the area is designated nonattainment for PM2.5, the Clean Air Act requires that any transportation project and transportation improvement program approved or funded by the Secretary of Transportation in the area must first be shown to satisfy the conformity requirements of the Act. 42 U.S.C. §7506(c)(5).

The statutory provisions relevant to this Notice prohibit the Department of Transportation, as a Federal agency, from "approv[ing], accept[ing] or fund[ing] any transportation plan, program or project unless such plan, program or project has been found to conform to any applicable implementation plan in effect under this chapter." 42 U.S.C. §7506(c)(2). "Conformity to an implementation plan means—(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and (B) that such activities will not—(i) cause or contribute to any new violation of any standard in any area; (ii) increase the frequency or severity of any existing violation of any standard in any area; or (iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area." 42 U.S.C. §7506(c)(1).

1

**NOTICE OF INTENT TO COMMENCE CIVIL ACTION
TO REMEDY VIOLATIONS OF THE CLEAN AIR ACT**
**October 20, 2006**
Page 2

EPA has promulgated regulations establishing criteria and procedures that the Secretary must satisfy when making the required showing that emissions from a federally funded or approved highway project will not cause or contribute to any new violation of any standard, or increase the frequency or severity of any existing violation. 40 C.F.R. §§ 93.116 and 93.123. The Secretary has approved the ICC Project without making the findings required by the Act and § 93.116 based upon the criteria required by § 93.123(b) and (c), and related EPA regulations. The failure to make findings required by the applicable criteria include, but are not limited to, the failure to determine the current background concentration of PM2.5 at appropriate receptor locations in the area substantially affected by the project, the failure to determine future back ground concentrations, the failure to use available emissions factors to determine the ratio between current and future emissions, and the failure to apply emissions factors in the ratio of current to future traffic. Credible and relevant evidence available to the Secretary demonstrates that emissions from the proposed ICC Project will add emissions in an area where the National Ambient Air Quality Standard for PM2.5 is being violated, or nearly violated, and that adding further emissions will cause or contribute to ambient air quality in violation of the National Ambient Air Quality Standard.

The Secretary of Transportation and the National Capital Region Transportation Planning Board, acting as the designated metropolitan planning organization pursuant to 23 U.S.C. § 134(d), violated the Clean Air Act by approving the Transportation Improvement Program for the National Capital Region because it allocates federal funds for the ICC Project which does not satisfy the statutory and regulatory requirements for a conforming transportation project pursuant to 42 U.S.C. § 7506(c) and regulations implementing the Act.

These violations are continuing until such actions are taken as are necessary to remedy the violations.

The above-named organizations intend to commence a civil action to enforce the legal duties described in this letter unless the approval for the ICC Project is withdrawn and funding commitments for the Project removed from the Transportation Improvement Program, or the findings required by the Act and applicable regulations have been made within sixty days of the postmark date of this Notice.

The undersigned attorneys are acting as legal counsel for the above-named organizations in this matter. Any communications should be addressed to the undersigned as follows: Hope Babcock and Erik Bluemel, Institute For Public Representation, Georgetown University Law Center, 600 New Jersey Avenue, N.W., Washington, D.C. 20001; 202-662-9535.

A copy of any written correspondence should be forwarded to Robert E. Yuhnke, 2910 County

NOTICE OF INTENT TO COMMENCE CIVIL ACTION
TO REMEDY VIOLATIONS OF THE CLEAN AIR ACT
October 20, 2006
Page 3

Road 67, Boulder, Colorado 80303; 303-499-0425.


ROBERT E. YUHNKE
Robert E. Yuhnke & Associates    October 20, 2006


HOPE BABCOCK    (by REY)
Director, IPR


ON BEHALF OF:

> Environmental Defense
> Sixth Floor
> 1650 Connecticut Avenue, N.W.
> Washington, D.C. 20009

> Sierra Club
> 85 Second Street, Second Floor
> San Francisco, California 94105-3441

JS-44
(Rev. 1/05 DC)

**CIVIL COVER SHEET**

06 2176
C
GK

---

**I (a) PLAINTIFFS**

*Environmental Defense + Sierra Club*

RECEIVED
U.S. DISTRICT COURT

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF *New York*
(EXCEPT IN U.S. PLAINTIFF CASES)   88888

2006 DEC 20

NANCY M.
MAYER-WHITTINGTON
CLERK

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
*Hope M. Babcock*   202-662-95
*Institute for Public Representation*
*600 New Jersey Ave NW Wash, DC 20001*

**DEFENDANTS**

CLERK
U.S. BANKRUPTCY

*U.S. Dept. of Transportation, et al.*
COURT FOR Cal.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   29
(IN U.S. PLAINTIFF CASES ONLY)

CASE NUMBER   1:06CV02176

JUDGE: Gladys Kessler

DECK TYPE: Administrative Agency Rev

DATE STAMP: 12/20/2006

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP FOR PLAIN.**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☒ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☒ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ **G.** *Habeas Corpus/ 2255*<br><br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ **H.** *Employment Discrimination*<br><br>☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **I.** *FOIA/PRIVACY ACT*<br><br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **J.** *Student Loan*<br><br>☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ☐ **K.** *Labor/ERISA (non-employment)*<br><br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ **L.** *Other Civil Rights (non-employment)*<br><br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ **M.** *Contract*<br><br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ **N.** *Three-Judge Court*<br><br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ Multi district Litigation  ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

SAFETEA-LU, 23 U.S.C. § 134, FAHA, 23 USC § 109, NEPA, 42 USC 4321-70f, APA 5 USC § 701-706
- Plaintiffs allege that approval of transportation project violates federal highway laws, the National Envtl Policy Act, the APA

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23  **DEMAND $** N/A  Check YES only if demanded in complaint  **JURY DEMAND:** ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  ☐ YES ☒ NO  If yes, please complete related case form.

DATE Dec. 20, 2006  SIGNATURE OF ATTORNEY OF RECORD  *Hope M. Babcock* ✓

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

RECEIVED

DEC 2 0 2006

N:\forms\js-44.wpd

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT