IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Environmental Defense and Sierra Club, | ) | |
| Plaintiffs, | ) | Civil Action No. 06-2176 |
| v. | ) | |
| | ) | |
| United States Department of Transportation, | ) | MOTION TO TRANSFER |
| et. al., | ) | |
| Defendants. | ) | |

The United States Department of Transportation ("DOT"), Mary E. Peters, in her official

capacity as Secretary of the DOT, the Federal Highway Administration ("FHWA"), and J.

Richard Capka, in his official capacity as FHWA Administrator (collectively, "the Federal

Defendants") move pursuant to 28 U.S.C. § 1404(a) to transfer this action to the United States

District Court for the District of Maryland where it can be consolidated with the related case filed

in that jurisdiction.

All defendants in this action consent to this motion. Plaintiffs in this action oppose the

transfer.

The facts and authorities supporting this motion are set forth in the accompanying

Memorandum in Support of Motion to Transfer.

<div style="margin-left:40%">

MATTHEW MCKEOWN
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

CYNTHIA J. MORRIS (D.C. Bar No. 358776)
SCOTT J. JORDAN
Environmental Defense Section
WELLS BURGESS
LAURA MAROLDY

</div>

1

RACHEL DOUGAN
Natural Resources Section
P.O. Box 3986
Washington, DC  20026-3986
(202) 616-7554 (Morris)
E-mail: C.J.Morris@usdoj.gov
(202) 305-0445 (Burgess)
E-mail: Wells.Burgess@usdoj.gov

By:    /s/ Cynthia J. Morris
       Cynthia J. Morris

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Environmental Defense and Sierra Club, ) | Civil Action No. 06-2176 |
| Plaintiffs, ) | |
| v. ) | MEMORANDUM IN SUPPORT OF |
| United States Department of Transportation,) | MOTION TO TRANSFER |
| et. al., ) | |
| Defendants. ) | |

## INTRODUCTION

The United States Department of Transportation ("DOT"), Mary E. Peters, in her official

capacity as Secretary of the DOT, the Federal Highway Administration ("FHWA"), and J.

Richard Capka, in his official capacity as FHWA Administrator (collectively, "the Federal

Defendants") move pursuant to 28 U.S.C. § 1404(a) to transfer this action to the United States

District Court for the District of Maryland where it can be consolidated with the related case filed

in that jurisdiction.  The other defendants in this action, the Metropolitan Washington Council of

Governments ("MWCOG"), Jay Fisette, in his official capacity as Board Chair of the MWCOG,[1]

the National Capital Region Transportation Planning Board ("TPB"), and Michael Knapp, in his

official capacity as Chairperson of the TPB[2] (collectively, the "Metropolitan Planning

Organization" or "MPO") consent to this motion.   Plaintiffs in this action oppose the transfer.

On December 20, 2006, two environmental groups residing in Maryland and two

Maryland individual residents filed an action in the United States District Court for the District

---

[1]The current Board Chair of the MWCOG is Vincent C. Gray.

[2]The current Chairperson of the TPB is Katherine Hutchins.

1

of Maryland, Southern Division, no. 8:06-cv-03386-AW ( the "Maryland Action"), seeking to

enjoin the Inter-County Connector Project (the "ICC" or "Project") a combined highway, transit

and recreational trail project located in Montgomery and Prince George Counties, Maryland.

Plaintiffs in the Maryland Action are the Audubon Naturalist Society of the Central Atlantic

States ("ANS"), the Maryland Native Plant Society ("MNPS") and Roger Metcalf and Eve

Burton, residents whose house will be taken by the Project.  All of the Federal Defendants in this

action are also named as Defendants in the Maryland Action, in addition to the United States

Army Corps of Engineers ("Corps"), Colonel Peter W. Mueller, Commander and District

Engineer of the Corps, Baltimore District, and Janet M. Vine, Chief, Regulatory Branch of the

Corps, Baltimore District.  See Complaint and Civil Cover Sheet attached as Exhibits A and B.

The State of Maryland, through its agencies, the Maryland Department of Transportation ("Md.

DOT"), the Maryland State Highway Administration ("Md. SHA"), and the Maryland

Transportation Authority ("Md. TA") (collectively the "State") has moved to intervene in that

action as a defendant.  A copy of the Motion to Intervene is attached hereto as Exhibit C.

On the same date, but a few hours later,[3]  Plaintiffs Sierra Club and Environmental

Defense filed this action in this Court seeking to enjoin the Project (the "D.C. Action"), and

making, in part, identical claims to the Maryland Action.  See Complaint and Civil Cover Sheet

(dkt. no. 1).  On January 10, 2007, Plaintiffs filed a Notice of Related Case in this action advising

this Court that this action "involves common issues of fact," and "grows out of the same event or

---

[3] Both lawsuits were filed on the last day permitted under the 180-day statute of limitations
enacted as part of the Safe, Accountable, Flexible, Efficient, Transportation Equity Act: A
Legacy for Users, Pub. L. 109-59, 119 Stat. 1144, 1857, August 10, 2005, codified at 23 U.S.C. §
139(l)(1).

transaction" as the Maryland Action. (Dkt. no. 4).

The interests of justice require that these two cases be consolidated in a single action because both actions challenge the ICC Project, they raise common questions of law and fact, they assert similar and overlapping claims, and they seek identical relief. The cases cannot be consolidated at this time because they are pending in different Districts, thus transfer is an indispensable first step towards consolidation. Upon transfer of this case to the District of Maryland, the Federal Defendants intend to seek consolidation of this case with the Maryland Action for all purposes.

<div align="center">

**FACTUAL BACKGROUND**[4]

</div>

## I.    DESCRIPTION OF THE PROJECT

The Project is an undertaking of the State of Maryland. The Federal Government's role is limited to its funding, permitting, approvals and other environmental responsibilities as required by various federal laws. Legal compliance for the Project was a joint responsibility of the Maryland Division of the FHWA, the DOT, Md. DOT, the Md. SHA and the Md. TA, as lead agencies. ROD at 5 fn 5.[5] The Final EIS complying with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, and the Final Section 4(f) Evaluation complying with Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303, were signed by Nelson Castellanos, Maryland Division Administrator of the FHWA, and the Maryland State agency

---

[4]The facts referenced in this motion are supported by the Record of Decision ("ROD") and the Final Environmental Impact Statement ("Final EIS"). These documents can be accessed on the ICC Project web site at www.ICCProject.com.

[5] Cooperating agencies were the United States Environmental Protection Agency ("EPA"), the Corps, and the Maryland Department of the Environment ("MDE"). The Corps was also the permitting agency for the CWA section 404 permit required by the Project. Final EIS S-1.

<div align="center">

3

</div>

heads of Md. DOT, Md. SHA and Md. TA. The ROD was also a product of the Maryland

Division of the FHWA, located at 10 South Howard Street, Baltimore, Maryland, and was signed

by Mr. Castellanos.

### A.    Location

The Project involves the construction of an 18-mile highway running in an East-West

direction across Montgomery and Prince George's Counties, Maryland, largely following a

transportation corridor designated in local land use plans, together with associated express bus

transit, and associated pedestrian and bicycling trails. ROD at 7-14. The Project is entirely

located in Maryland, north of the Capital Beltway, and the "Study Area," which determined

where its direct impacts would be experienced and analyzed, is entirely within the State of

Maryland. See, e.g., Final EIS S-42 - S- 43 and Figure S-8. The Project is designed to

implement the long planned highway consistent with the Maryland Smart Growth Act. ROD at

6, 60-61.

### B.    Process

The Environmental documents and supporting Technical Reports were made available to

the public (in addition to website availability) at locations and government centers located

entirely in Maryland, including the FHWA Maryland Division offices in Baltimore. See Final

EIS at VIII-14 and Table VIII- 9 (Draft EIS availability); letter of January 4, 2006 from Md.

SHA, attachment ICC, Final EIS, Distribution and Availability Policy. Public Open House

Meetings, Public Workshops, Public Hearings, as well as County Fair and Shopping Center

Outreach events all took place in Maryland. See Final EIS Tables VIII-3; VIII-4; VIII-5; VIII-6;

VIII-7; VIII-8. All community meetings on the Draft EIS were held in Maryland. See Final EIS

Table VIII-11. Direct mailings were sent to residents of the Study Area. See Final EIS VIII - 16.

Public comment on the NEPA documents was to be directed to the Md. SHA Project Manager,

the Md. TA Deputy Director, and to Mr. Castellanos at the FHWA Maryland Division offices.

See Draft EIS and Final EIS cover sheets. The ICC website directed questions to the Md. SHA

offices in Baltimore. See www.iccstudy.org

The project-level PM2.5 Conformity Determination for the ICC, which is challenged in

the D.C. Action, was prepared by the Md. SHA, the Md. TA and FHWA and sent out for public

comment by Neil Pedersen, Administrator of the Md. SHA. Website comments were invited, and

mailed comments were directed to the Project Manager for Md. SHA in Baltimore. See

www.iccproject.com/what-why.php.

The permit issued by the Corps pursuant to CWA section 404, which is challenged in the

Maryland Action, was issued by the Baltimore District in Maryland.

**C.     Plaintiffs' Participation in the Administrative Process**

Both the Maryland Plaintiffs and the D.C. Plaintiffs participated prominently in the

administrative process leading to the decision to approve the Project. That participation did not

suggest the division of claims that now appears in these two lawsuits. On March 23, 2006,

Michael Replogle, Transportation Director of Environmental Defense, submitted a single set of

comments on the Final EIS on behalf of ANS and the MNPS (Plaintiffs in the Maryland Action)

the Sierra Club - Maryland Chapter, and Environmental Defense (Plaintiffs in the D.C. Action),

and the Chesapeake Bay Foundation, using a return address in Silver Spring, Md. The comments

asserted virtually all of the matters now asserted as the basis for claims against the Federal

Defendants by ANS and MNPS in the Maryland Action, and by Environmental Defense and

5

Sierra Club in the D.C. Action. The joint comments also addressed the issues under Section 4(f)

of the DOT Act now asserted only in the Maryland Action. Those Comments are attached as

Exhibit D. On April 26, 2006, the Plaintiffs also submitted joint comments on the CAA

conformity issues which are the basis for Part II of the Complaint in the D.C. Action, also with a

return address in Silver Spring, Md. Those Comments are attached as Exhibit E.

## II.    DESCRIPTION OF THE CHALLENGES TO THE PROJECT

### A.    The Maryland Action

Maryland Plaintiffs assert claims under NEPA, including allegations of illegally narrow

purpose and need statement (Count 1); failure to consider reasonable alternatives (Count 2);

failure to adequately reconcile projected impacts with stated purposes (Count 3); failure to

identify and assess environmental impacts, including air quality impacts relating to alleged

modeling deficiencies, see paragraph 127, and "induced travel demand," see paragraph 120

(Count 4); failure to adequately consider state law regarding rare, endangered and threatened

species (Count 5); and inadequate assessment, discussion and provision of proposed mitigation

measures (Count 6).

Plaintiffs also assert claims under Section 4(f) of the Department of Transportation Act,

alleging failure to consider reasonable and prudent alternatives (Count 7); failure to consider

constructive use impacts (Count 8); and failure to propose adequate mitigation (Count 9).

Finally, they complain under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387 that the

Corps, in issuing a permit under section 404 of the CWA to place fill in waters of the United

States, failed to conduct an adequate public interest analysis or adequately assess all practicable

alternatives (Count 10). For relief, Maryland Plaintiffs seek a declaratory judgment, vacatur of

the Record of Decision and the Corps' CWA section 404 permit, a mandatory injunction to do a new EIS, and an injunction against putting contracts out to bid for, condemnations or partial condemnations in anticipation of, or ground-disturbing or forestry activities related to, the construction of the proposed highway and related infrastructure. Maryland Complaint at 49.

**B.    The D.C. Action**

Plaintiffs in this action make essentially the same claims under NEPA that the Maryland Plaintiffs assert: unlawfully narrow purpose and need (Count 16); alleged arbitrary reliance on a Montgomery County land use plan (Counts 17 ); failure to explore reasonable alternatives (Count 18); failure to assess environmental impacts, including impacts from air pollution, and induced travel demand (Count 19); failure to assess and discuss mitigation (Counts 19, 20, 22); and failure to discuss an alleged inconsistency with Maryland law (Count 23). Plaintiffs further allege related violations by the Federal Defendants of Federal Aid-Highways Act ("FAHA"), 23 U.S.C. § 109, including allegations which focus on the failure to consider appropriate alternatives (Counts 2, 5, 6, 7); failure to determine adverse environmental effects, including air pollution effects (Counts 3, 4); and failure to mitigate adverse effects (Count 5). The FAHA allegations also challenge the Project's consistency with the objectives of local land use plans (¶ 310), including those of Montgomery (¶ 327) and Prince George's Counties (¶¶ 326, 329) (Counts 3, 7).

The balance of Plaintiffs' claims in the D.C. Action focus on air quality. They allege violations of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q, focusing on the project-level PM2.5 Conformity Determination for the Project (Counts 25 through 27; 29 through 35), and related NEPA allegations challenging the assessment of air quality impacts (Count 28) and

alleged lack of opportunity to comment (Count 36). Plaintiffs also allege violations of the Safe,

Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-

LU"), 23 U.S.C. § 134, focusing on the alleged failures of the MPO in approving/amending the

Metropolitan Transportation Improvement Program ("TIP") and Constrained Long-Range Plan

("CLRP") (Counts 9 through 13), and approval of the Maryland State TIP by the Federal

Defendants (Count 14). These allegations are repeated in one count under the CAA (Count 37).

A Freedom of Information Act ("FOIA") claim is appended to the end of the D.C. Complaint

(Count 38).

The D.C. Complaint requests relief against the Federal Defendants in the form of a

declaratory judgment, plus vacatur of the conformity determination, the approval of the Maryland

State TIP; the approval of, or authorization of, funding for the ICC Project pending a revised EIS,

and the appropriate findings required by FAHA and SAFETEA-LU. D.C. Plaintiffs also seek to

enjoin the Federal Defendants from transferring or authorizing the use of funds for any action

related to the construction of the ICC Project. D.C. Complaint at 103-105. The D.C. Complaint

also seeks a declaratory judgment against the MPO and vacatur of the CLRP and the

Metropolitan TIP, or alternatively, striking the ICC Project from those plans. Id.

## ARGUMENT

## I.    THE TWO ACTIONS SHOULD BE CONSOLIDATED IN A SINGLE ACTION

There is a strong interest in consolidating all challenges to the Project in a single forum.

The challenges are based on the same voluminous administrative record and challenge the same

Record of Decision. The Complaints assert similar challenges to the Project and seek identical

relief. Judicial efficiency is served by a single briefing schedule in a single court. Moreover, if

8

judicial review of the Project proceeded in both courts, there would be a risk of inconsistent findings.

For these reasons, the Federal Defendants seek transfer of this case to the District of Maryland, where it may be consolidated with the Maryland Action. Transfer is a necessary first step in consolidation. In a very recent decision, this Court has recognized the propriety of such a transfer for purposes of consolidation with a case pending in another District. Scarborough v. National Ass'n of Surety Bond Producers, No. 06-79, 2007 WL 417020 (D.D.C. Feb. 7, 2007) at * 3-4.

## II.    THE D.C. ACTION SHOULD BE TRANSFERRED TO THE DISTRICT OF MARYLAND

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Section 1404(a) places "discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" Hawksbill Sea Turtle v. FEMA, 939 F. Supp. 1, 3 (D.D.C. 1996) (quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 27 (1988)). The burden is on the moving party to demonstrate that transfer would be proper. DeLoach v. Philip Morris Cos., 132 F. Supp. 2d 22, 24 (D.D.C. 2000) (citing Reiffin v. Microsoft Corp., 104 F. Supp. 2d 48, 50 (D.D.C. 2000)).

The Court should transfer a case if the balance of private and public interests weighs in favor of transfer. National Wildlife Fed'n v. Harvey, 437 F. Supp. 2d 42, 46 ( D.D.C. 2006) (citing Greater Yellowstone Coalition v. Bosworth, 180 F. Supp. 2d 124, 127 (D.D.C. 2001)). Private interest considerations include: (1) the plaintiff's choice of forum, unless the balance of

convenience is strongly in favor of the defendant; (2) the defendant's choice of forum; (3)
whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the
witnesses; and (6) the ease of access to sources of proof.  Berenson v. Nat'l Fin. Servs., L.L.C.,
319 F. Supp. 2d 1, 2-3 (D.D.C. 2004); Trout Unlimited v. United States Dep't of Agric., 944 F.
Supp. 13, 16 (D.D.C. 1996).  The public interest factors include: (1) the degree to which the
courts in both venues are familiar with the governing laws; (2) the relative congestions of the
calendars of the transferee and transferor courts; and (3) the local interest in deciding local
controversies at home.  Id., 944 F. Supp. at 16.

**A.     The Action Could Have Been Brought in the District of Maryland.**

A threshold question under Section 1404(a) is whether the action "might have been
brought" in the District of Maryland. Van Dusen v. Barrack, 376 U.S. 612, 616 (1964).  Under 28
U.S.C. § 1391(e)(2), a " civil action in which a defendant is an officer or employee of the United
States or any agency thereof acting in his official capacity . . . or an agency of the United States . .
. may . . . be brought in any judicial district in which . . . a substantial part of the events or
omissions giving rise to the claim occurred, or a substantial part of the property that is the subject
of the action is situated. . . ." 28 U.S.C. § 1391(e)(2).  As the above Statement of Facts
demonstrates, virtually all of the operative facts in this case, including the signing of the Record
of Decision approving the Project, occurred in the District of Maryland as the joint action of the
FHWA's Maryland Division located in Baltimore, the Md. SHA, and the Md. TA.  There is no
question but that this action could have been brought in the District of Maryland.

Plaintiffs made no allegations upon which this Court could conclude that venue is proper
in D.C.; indeed, they made no allegations at all in the D.C. Action expressly regarding venue.  In

10

<u>Valley Community Preservation Comm'n v. Mineta</u>, 231 F. Supp. 2d. 23, 44 (D.D.C. 2002), the

Court considered the venue for a challenge to a proposed highway project, and granted a motion

to transfer from the District of Columbia to New Mexico because "[c]learly the events and

omissions of greatest significance to this litigation occurred in New Mexico." <u>Id.</u>. <u>See also,</u>

<u>Mundy v. Weinberger</u>, 554 F. Supp. 811 (D.D.C. 1982) (Venue was held proper in D.C. on the

ground that the "claim arose" there because "plaintiff's grievance and the acts that gave rise to it

are inextricably bound up with the District of Columbia in its role as the nation's capital" even

though the defendants' "involvement in this suit may well have consisted primarily of decision-

making in their Pentagon offices [in Virginia]." 554 F. Supp. at 818.

     That Plaintiffs have also sought to assert claims against the TPB does not change this

result. The TPB is composed of the Local and State governments surrounding the Nation's

capital, including numerous State and local representatives. The CLRP and the Metropolitan TIP

challenged in the D.C. Complaint include portions of Maryland, including the entire Study Area

for the Project. http://www.mwcog.org/transportation/tpb/. As the federally-designated MPO for

the Region, the TPB provides a forum for the regional cooperation in the development of

transportation plans. The deficiencies that Plaintiffs in the D.C. Action allege regarding the

planning process relate exclusively to the ICC Project, which is located in Maryland. The TPB

exercises no direct control over the funding or implementation of the ICC Project. As all of

Plaintiffs' purported claims relate directly to a highway project in Maryland, this action could

have been brought in Maryland as to all claims and all defendants.

**B.    Private Interest Considerations Weigh in Favor of Transfer.**

     Private interest considerations include: (1) the plaintiff's choice of forum, unless the

balance of convenience is strongly in favor of the defendant; (2) the defendant's choice of forum;

(3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of

the witnesses; and (6) the ease of access to sources of proof. Berenson, 319 F. Supp. 2d at 2-3.

Each of these factors weighs heavily in favor of transfer to the District of Maryland.

### 1.    Plaintiffs' Choice of Forum

Although Plaintiffs in this action have obviously chosen this forum, there is no apparent

basis for a preference.  There is no allegation in the Complaint that even mentions venue or

otherwise warrants filing of this action in this District.  As this Court has recognized,

"diminished consideration is accorded to a plaintiff's choice of forum where, as here, that forum

has no meaningful ties to the controversy." Payne v. Giant of Maryland, L.L.C., No. 05-897,

2006 WL 1793303 at * 3 (D.D.C. June 28, 2006) (quoting Islamic Republic of Iran v. Boeing

Co., 477 F. Supp. 142, 144 (D.D.C. 1979)).

Moreover, a plaintiff's choice of forum is entitled to substantially less deference when the

forum preferred by the plaintiff is not his home forum. Piper Aircraft v. Reyno, 454 U.S. 235,

255-56 (1981); Boers v. United States, 133 F.Supp.2d 64, 65 (D.D.C. 2001); McGlamry v.

Lappin, No. 06-143, 2006 WL 1382185, at * 2 (D.D.C. May 18 , 2006).  Both of the Plaintiffs in

the D.C. Action are national environmental organizations.  Environmental Defense is domiciled

at 257 Park Avenue South, New York, N.Y., and Sierra Club is domiciled at 85 Second Street,

San Francisco California.  Complaint at 1.  Thus, the D.C. Plaintiffs have no specific connection

to the District of Columbia.  As this Court stated in Deloach v Philip Morris Cos,, 132 F. Supp.

2d 22, 24-25 (D.D.C. 2000):

> it is important to note that although a plaintiff's choice of forum is
> ordinarily accorded a significant degree of deference, numerous

cases in this Circuit recognize that such a choice receives substantially less deference where the plaintiffs, as here, neither reside in, nor have any substantial connection to, that forum. See Reiffin, 104 F. Supp. 2d at 52; Hawksbill Sea Turtle, 939 F. Supp. at 3; Chung, 903 F. Supp. at 165; Comptroller of Currency v. Calhoun First Nat'l Bank, 626 F. Supp. 137, 140 n.9 (D.D.C. 1985); Islamic Republic of Iran v. Boeing Co., 477 F. Supp. 142, 144 (D.D.C. 1979) (noting that plaintiff's choice of forum is accorded "diminished consideration" where that forum "has no meaningful ties to the controversy and no particular interest in the parties or subject matter). (citations omitted).

By contrast, the Plaintiffs in the Maryland Action are all Maryland residents. Plaintiff ANS is incorporated in the State of Maryland, and approximately 3,500 of its 5,000 members reside in Maryland. Complaint ¶¶ 3,4. Plaintiff MPNS is incorporated in the State of Maryland and all of its 517 members reside in the State of Maryland. Complaint ¶¶ 8, 9. The two individual Plaintiffs are residents of the State of Maryland. Those Maryland Plaintiffs have no connection to or interest in the District of Columbia. Thus, to the extent the two actions are to be consolidated, the District of Maryland is the more appropriate forum to recognize the interests of Plaintiffs.

## 2.    **Defendant's Choice of Forum**

All of the Defendants in this action support transfer of this action to the District of Maryland based on consideration of the private and public interest factors discussed below. Most importantly, the Project is located in the State of Maryland and the State of Maryland has the greater interest in the Project.

By contrast, the Defendants in the Maryland Action would not consent to a transfer of the Maryland Action to the District of Columbia. The Corps is a federal defendant represented by the same counsel as the Federal Defendants in this case, and thus shares the preference for

13

transfer of this action to the District of Maryland. The State of Maryland also prefers the District of Maryland, as indicated by its filing of a motion to intervene in that action.

### 3. Whether the Claim Arose in the Transferee Forum

The Project is a Maryland Project, consisting of a highway connecting Montgomery County and Prince George's County in Maryland. No portion of the Project is within the District of Columbia. As noted above, all of the relevant documents were signed in the State of Maryland and the CWA section 404 permit was issued by the Corps in Maryland. This factor weighs heavily in favor of transfer to the District of Maryland.

This Court has often granted motions to transfer based on this factor. See, e.g., S. Utah Wilderness Alliance v. Norton, 315 F. Supp. 2d 82, 88 (D.D.C. 2004) (granting transfer to the forum where government decisions being challenged were made); Berenson, 319 F. Supp. 2d at 4 (same); Payne, 2006 WL 1793303 at * 4 (transfer granted when all events giving rise to the controversy occurred in the transferee state).

### 4. Convenience of the Parties

Because Plaintiffs in this case are national organizations, the District of Maryland is equally convenient for Plaintiffs as the District of Columbia. By contrast, the District of Maryland is the more convenient forum for the Plaintiffs in the Maryland Action, as all of the Plaintiffs in that case are residents of the State of Maryland. The District of Maryland is also the more convenient forum for the State of Maryland, which has intervened in the Maryland Action. Accordingly, the balance of convenience of the parties weighs in favor of transfer to the District of Maryland.

5.    **Convenience of the Witnesses and Ease of Access to Sources of Proof**

Because this case is a challenge to administrative decisions, judicial review will be based on the administrative records. Therefore, there will be no proofs other than copies of the administrative records, which can be made available to either court. Similarly, there will be no witnesses or live testimony with respect to the decision on the merits of the claims.[9] Accordingly, these factors are not significant considerations in this case.

C.    **Public Interest Considerations Weigh in Favor of Transfer.**

The public interest factors include: (1) the degree to which the courts in both venues are familiar with the governing laws; (2) the relative congestions of the calendars of the transferee and transferor courts; and (3) the local interest in deciding local controversies at home. Payne, 2006 WL 1793303 at * 5, citing Berenson, 319 F. Supp. 2d at 4.

1.    **The transferrees' familiarity with the governing laws**

The fact that this case arises under federal statutes does not give rise to a preference for the District of Columbia. This case is a challenge to an administrative decision, and all United States District Courts are familiar with the standards governing review of administrative decisions. Therefore, this factor is not a significant consideration in this case.

2. **The relative congestions of the calendars of the transferee and transferor courts**

Because this matter will be decided based on the administrative records, the merits will likely be decided based on cross-motions for summary judgment. There will be no need for discovery or trial. Therefore, the congestion of the courts' dockets is not a significant concern.

---

[9]To the extent testimony is required to establish standing of the organizational plaintiffs, the individual members alleging standing are residents of Maryland.

When the balance weighs in favor of transfer on the other public interest factors, this factor need not be considered by the court. Payne, 2006 WL 1793303 at * 5, n.5.

### 3.    The local interest in deciding local controversies at home

This Court has characterized this as "the most persuasive factor supporting the appropriateness of transfer." DeLoach, 132 F. Supp. 2d at 26. Particularly because the first two factors are of limited significance in a record review case, this factor of local interest is the single most important public interest factor for consideration, and it weighs heavily in favor of transfer.

There is a strong local interest in resolving this issue in the State of Maryland where the Project exists. As noted above, the entire Project is located in the State of Maryland, and the approval and permits for the Project were signed in Maryland. The Project has been of significant interest to Maryland residents and elected officials throughout the planning stage and will remain of significant interest through the construction and completion of the Project. Thus, Plaintiffs' allegations are far more likely to "constitute a matter of great public concern" to the citizens of Maryland than to the citizens of the District of Columbia. DeLoach, 132 F. Supp. 2d at 26 (quoting Hawskbill, 939 F. Supp. at 4). "[C]ontroversies should be resolved in the locale where they arise." Kafack v. Primerica Life Ins. Co., 934 F. Supp. 3, 9 (D.D.C. 2006). Therefore, the challenges to the ICC Project should be decided in the State of Maryland where the impacts of the Project will be felt.

### CONCLUSION

For the foregoing reasons, the Federal Defendants respectfully request that this action be transferred to the United States District Court for the District of Maryland, where it may be consolidated with the related case pending in that Court.

MATTHEW MCKEOWN
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

CYNTHIA J. MORRIS (D.C. Bar No. 358776)
SCOTT J. JORDAN
Environmental Defense Section
WELLS BURGESS
LAURA MAROLDY
RACHEL DOUGAN
Natural Resources Section
P.O. Box 3986
Washington, DC  20026-3986
(202) 616-7554 (Morris)
E-mail: C.J.Morris@usdoj.gov
(202) 305-0445 (Burgess)
E-mail: Wells.Burgess@usdoj.gov

By:    /s/ Cynthia J. Morris
       Cynthia J. Morris

CERTIFICATE OF SERVICE

I hereby certify that, on February 21, 2007, I caused to be served a true and accurate copy of the foregoing MOTION TO TRANSFER, MEMORANDUM IN SUPPORT, PROPOSED ORDER AND EXHIBITS by filing through this Court's electronic filing system and by direct electronic transmission upon:

Hope Madeline Babcock                         Attorney for Plaintiffs
babcock@law.georgetown.edu

Erik B. Bluemel                               Attorney for Plaintiffs
ebb25@law.georgetown.edu

Margaret N. Strand                            Attorney for Defendants Metropolitan
mstrand@venable.com                           Washington Council of Governments,
                                              Jay Fishette, National Capital Region
                                              Transportation Planning Board, and
                                              Michael Knapp

and by direct electronic transmission upon:

Robert E. Yuhnke                              Attorney for Plaintiffs
bob.yuhnke@prodigy.net

_____
Scott J. Jordan

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                          )
Environmental Defense and Sierra Club,    )
                       Plaintiffs,        )      Civil Action No. 06-2176
              v.                          )
                                          )      [PROPOSED]
United States Department of Transportation,)     ORDER ON TRANSFER
et. al.,                                   )
                       Defendants.         )
                                          )
```

Having considered the United States' motion to transfer this action to the United States

District Court for the District of Maryland and responses thereto, and finding that the District of

Maryland is the proper venue for this challenge because the events of significance ocurred in the

State of Maryland, it is hereby

ORDERED, that the case is hereby transferred to the United States District Court for the District

of Maryland, Southern Division.

IT IS SO ORDERED THIS ____ day of _____.


_____
Gladys Kessler
United States District Judge

1

*EXHIBIT A*

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2006 DEC 20  A 9: 00

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

CLERK'S OFFICE
AT GREENBELT

BY_____ DEPUTY

AUDUBON NATURALIST SOCIETY OF THE        )
CENTRAL ATLANTIC STATES, INC.,           )
Montgomery County, 8940 Jones Mill Road, Chevy )
Chase, MD  29815;                        )
                                         )        **RWT 06 CV 3386**
                                         )   CIVIL ACTION
MARYLAND NATIVE PLANT SOCIETY, INC.,     )
Montgomery County, 2416 Lillian Drive, Silver )
Spring, MD 20902;                        )   **COMPLAINT FOR**
                                         )   **INJUNCTIVE AND**
                                         )   **DECLARATORY RELIEF**
ROGER METCALF and EVE BURTON,            )
Montgomery County, 17104 Overhill Rd.,   )
Derwood, MD  20855;                      )
                                         )
Plaintiffs,                              )
                                         )
                                         )
             v.                          )
                                         )
                                         )
UNITED STATES DEPARTMENT OF              )
TRANSPORTATION ("USDOT"),                )
400 Seventh Street, S.W., Washington, DC 20590; )
                                         )
MARY E. PETERS, Secretary of Transportation, )
400 Seventh Street, S.W., Washington, DC 20590; )
                                         )
FEDERAL HIGHWAY ADMINISTRATION           )
("FHWA")                                 )
400 Seventh Street, S.W., Washington, DC  20590; )
                                         )
J. RICHARD CAPKA, Administrator of FHWA, )
400 Seventh Street, S.W., Washington, DC  20590; )
                                         )
NELSON CASTELLANOS, Division             )
Administrator of FHWA, Maryland Division,
10 South Howard Street, Baltimore, MD  21201; )
                                         )
UNITED STATES ARMY CORPS OF              )
ENGINEERS ("ACOE"),                      )
441 G Street, N.W., Washington, DC  20314-1000; )

COL. PETER W. MUELLER, Commander and )
District Engineer of ACOE, Baltimore District, )
10 South Howard St., Baltimore, MD 21201; )
  )
JANET M. VINE, Chief, Regulatory Branch of )
ACOE, Baltimore District, )
10 South Howard St., Baltimore, MD 21201; )
  )
  )
Defendants. )

## **INTRODUCTION**

1.      On May 29, 2006, the federal government and the State of Maryland resurrected

the twice-repudiated Intercounty Connector ("ICC") highway project in Montgomery and Prince

George's Counties.  In so doing, they  propose to spend Billions of dollars for a toll road to connect I-95

and I-270 while doing little or nothing to alleviate traffic congestion on existing roads.  Besides its

enormous financial cost to Maryland taxpayers, the ICC would cause irreparable environmental harm to

precious resources of exceptional quality, needlessly promote suburban sprawl, and ensure

governmental inattention to truly significant transportation problems in Suburban Maryland that

continue to plague millions.

2.      Audubon Naturalist Society of the Central Atlantic States, Inc. ("ANS"),

Maryland Native Plant Society ("MNPS"), and Roger Metcalf and Eve Burton (the "Metcalf-Burtons")

bring this action to enforce the statutory duties ascribed to the Federal Highway Administration

("FHWA") of the United States Department of Transportation ("USDOT") regarding the ICC.  Plaintiffs

assert that the final actions of Defendants violate the National Environmental Policy Act, 42 U.S.C. §§

4321 *et seq.* ("NEPA") and its implementing regulations, the Department of Transportation Act of 1966,

2

49 U.S.C. § 303 ("Section 4(f)") and its implementing regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*. ("APA"). In violating these measures, Defendants have failed to (a) develop a reasonable Purpose and Need statement for the proposed ICC as required by NEPA, (b) consider reasonable alternatives to constructing the ICC along its proposed alignment as mandated by NEPA, and (c) conduct an accurate assessment of and mitigation for the impacts of the proposed toll road upon parkland protected by Section 4(f) of the Department of Transportation Act. Plaintiffs also seek to enforce the duties ascribed to the Army Corps of Engineers ("ACOE") under the provisions of the Clean Water Act ("CWA") that protect waters of the United States. Plaintiffs assert that the final actions of ACOE violate Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and its implementing regulations, as well as the National Environmental Policy Act.

## PARTIES

### PLAINTIFFS

3.      Plaintiff ANS is a non-profit environmental and conservation organization incorporated under the laws of the State of Maryland. Among the purposes for which it is organized, ANS especially concentrates its activities on the development and protection of biodiversity and wildlife habitat in the mid-Atlantic region.

4.      ANS brings this action on behalf of itself and its adversely affected members. ANS has more than 5,000 members in the mid-Atlantic region, approximately 3,500 of whom live in Maryland. Many members currently live, recreate or work within the proposed ICC project area. Specifically, members live and work in the area where the ambient air quality, land use, noise, loss of recreational opportunities and other factors would be adversely affected by construction of the ICC.

5.      ANS and its members have long been advocates of responsible, well-planned growth in the Washington D.C. metropolitan area, participating in transportation planning processes on state, regional and local government levels.  ANS's activities and those of its members in land use, transportation, air quality, water quality and habitat conservation have included community organizing; publishing educational materials; submitting comments on state implementation plans, transportation plans and programs, conformity analyses, proposed permits and Environmental Impact Statements ("EIS"), including the ICC EIS; attending and speaking at public meetings; speaking to students and civic and other organizations; and holding seminars and symposia – all in support of land use and transportation options that promote environmental integrity and conservation.

6.      ANS members will suffer adverse health and property impacts from increased air pollution attributable to the ICC if Defendants' actions are not reversed.

7.      In addition, ANS members would lose convenient access to parklands in close proximity to their homes as a result of the ICC and lose opportunities to actively and passively enjoy the natural environment; the parklands and waters that ANS members regularly use would be substantially degraded, thereby adversely affecting their use and enjoyment.

8.      Plaintiff MNPS is a state-wide, non-profit environmental and conservation organization incorporated under the laws of the State of Maryland.  Its purpose is to promote, sponsor and implement education, research and service activities to promote the conservation and propagation of Maryland native plants and their habitats.

9.      MNPS brings this action on behalf of itself and its adversely affected members. The Society currently has 517 members in the State of Maryland, 204 of whom reside in Montgomery

County. Many members currently live, recreate or work within the proposed ICC project area. Specifically, members live and recreate in areas where land use would be adversely affected by the ICC.

10.     MNPS and its members have been active in promoting conservation and restoration of Maryland native plants and their habitats for fourteen years. MNPS's and its members' activities in land use and conservation include participating in community coalitions, publishing educational materials, submitting comments on EISs (including both past and present ICC EISs), attending and speaking at public meetings, sponsoring field trips and habitat restoration projects (including within the ICC project area), and teaching at seminars and symposia – all in support of efforts to research, promote, and educate the public about Maryland native plants and their habitats.

11.     MNPS has sponsored field trips in at least six of the parklands through which the ICC would pass and adversely affect, including Rock Creek Regional Park, North Branch Stream Valley Park, Layhill Local Park, Northwest Branch Recreational Park, Northwest Branch Stream Valley Park-Unit 5, and Upper Paint Branch Stream Valley Park.

12.     MNPS has sought and has been granted permission by the Maryland National Capital Parks and Planning Commission to lead invasive species removal projects in local parks such as the Northwest Branch and Rock Creek Regional Parks. Invasive species control is an important activity to restore the habitat of Maryland native plants.

13.     Society members would suffer adverse impacts from the ICC project that would pave over and otherwise harm important habitat for Maryland native plants. The ICC project would jeopardize state rare, threatened and endangered species such as the Trailing Stichwort, the Halberd-leaved Greenbrier, the Rough-leaved Aster, and the Woolly Sedge.

5

14.    MNPS members have been harmed by Defendants' failure to consider seriously any transportation option other than construction of a highway along what is generally the ICC's proposed alignment.

15.    MNPS members have been injured by Defendants' failure to accurately identify and protect the parklands that are protected by Section 4(f) of the Department of Transportation Act and that would be used by the ICC, both directly and indirectly. This failure is compounded by Defendants' failure to propose adequate parkland mitigation sites.

16.    MNPS members would suffer adverse impacts from the ICC project, including decreased quality of recreational and educational opportunities due to the large amount of parkland slated to be used, directly and indirectly, by the proposed project, and by Defendants' decision to propose functional parkland mitigation sites that are located distant from where the ICC would be built.

17.    Plaintiffs Roger Metcalf and Eve Burton (together, the "Metcalf-Burtons") are husband and wife. They and their children have lived in a home located in the Cashell Estates neighborhood of Montgomery County for twenty-three years. The ICC would cut directly through this neighborhood, splitting the community in half, and taking their home and the homes of many of their neighbors. Built in the 1950s, Cashell Estates is one of the earliest communities in central Montgomery County. Cashell Estates preceded any concept of an ICC. The lot sizes in this community generally are about 1-2 acres and thus are extremely rare in the sprawling suburbs of Washington, D.C.

18.    The Metcalf-Burtons own a custom-built home with hardwood floors, solid pine paneling, and a fireplace. In 1989 they built an addition to their home, including a front and back deck, further tailoring its features to their family and to take advantage of the abundant natural amenities of their neighborhood. The family home is located approximately a quarter mile from Redland Park and

6

Rock Creek Regional Park, and a half mile from Mill Creek Stream Valley Park. Their family frequents the Mill Creek Stream Valley Park and Rock Creek Regional Park for education and recreation. The family uses the area to study plants and animals. Additionally, the Metcalf-Burtons and their family have participated in educational activities conducted by MNPS in these parks, including nature hikes to learn to distinguish varieties of oaks, flowers, birds and salamanders.

19.    The Metcalf-Burtons would suffer adverse impacts from the ICC project, including the taking of their family home and destruction of their community and recreation areas.

20.    The Metcalf-Burtons have been harmed by Defendants' failure to consider any transportation alternative other than construction of an east-west highway and by Defendants' flawed analyses concerning the impacts—direct, indirect and cumulative—of the proposed project.

21.    The Metcalf-Burtons would be injured by Defendants' failure to provide parkland mitigation sites reasonably near the parkland that would be adversely impacted by the ICC.

22.    The injuries to Plaintiffs ANS, MNPS, and the Metcalf-Burtons are caused by the actions and omissions of Defendants and would be redressed by the relief sought in this complaint. Unless the relief sought herein is granted, the recreational, environmental, homestead, aesthetic, and other substantial interests of Plaintiffs will continue to be adversely affected and irreparably injured by Defendants' unlawful and arbitrary actions and omissions.

## DEFENDANTS

23.    Defendant United States Department of Transportation ("USDOT") is the executive department of the federal government responsible for approval of highway projects financed, at least in part, by federal funds.

24.    Defendant Mary E. Peters is the Secretary of Transportation. In that capacity, she is responsible for the administration, operations, and activities of USDOT, including the supervision of the operations and activities of the Federal Highway Administration ("FHWA"), a subsidiary agency of USDOT. Defendant Secretary Peters is sued in her official capacity.

25.    Defendants USDOT and Secretary Peters sometimes are referred to collectively in this complaint as "USDOT."

26.    Defendant FHWA is an agency of the United States that finances, supervises, and directs the Federal Highway system of the United States. FHWA is responsible for ensuring that the federal highway program is implemented in compliance with various federal statutes, including NEPA.

27.    Defendant J. Richard Capka is the Administrator of FHWA. In that capacity, he is responsible for the administration, operation, and activities of FHWA. Defendant Capka is sued in his official capacity.

28.    Defendant Nelson Castellanos is the Division Administrator of the Maryland Division of FHWA. He signed the FHWA Record of Decision ("ROD") approving the ICC on May 29, 2006. Defendant Castellanos is sued in his official capacity.

29.    Defendants FHWA, Administrator Capka and Division Administrator Castellanos are sometimes referred to collectively in this complaint as "FHWA."

30.    Defendant United States Army Corps of Engineers ("ACOE") is an agency of the United States with jurisdiction over waters of the United States as defined in the Clean Water Act.

31.    Defendant Colonel Peter W. Mueller is the Commander and District Engineer of the Baltimore District of ACOE. Defendant Mueller is sued in his official capacity.

8

32.    Defendant Janet M. Vine is Chief of the Regulatory Branch of the Baltimore District of ACOE. She signed the ACOE Clean Water Act § 404 ROD and issued Permit 05-60011-1 on June 13, 2006, to Maryland State Highway Administration ("SHA") and Maryland Transportation Authority ("MTA"). Defendant Vine is sued in her official capacity.

33.    Defendants ACOE, Branch Chief Vine, and Colonel Mueller are sometimes referred to collectively in this complaint as "ACOE."

## JURISDICTION AND VENUE

34.    This Court has jurisdiction of this action under 28 U.S.C. § 1331 (federal question).

35.    Venue is proper in this District under 28 U.S.C. § 1391(e) because Defendants USDOT, FHWA and ACOE are agencies of the federal government, and because the action would take place in the District of Maryland. All Maryland parties are resident within the Southern Division of the District of Maryland.

## FACTS

## CHRONOLOGY OF KEY EVENTS

36.    In 1983 and again in 1997, FHWA attempted to construct an "Intercounty Connector" road between upper Montgomery County and I-95 in Prince Georges County. This proposed road was intended to follow generally the same ICC alignment ultimately adopted by FHWA and Maryland in 2006. As "proposals for major federal action significantly affecting the quality of the human environment," FHWA was obligated by the National Environmental Policy Act in both 1983 and then again in 1997 to publish a Draft Environmental Impact Statement/Draft Section 4(f) Evaluation on

9

each occasion that the ICC was proposed.[1]  Both times, cooperating federal agencies recommended against proceeding with the proposed action because of the extensive adverse environmental impacts along what would be essentially the same "Corridor 1" that Defendants propose for the ICC today.

37.    In 1990 the U.S. Department of the Interior commented on the then-pending environmental impact statement/Section 4(f) Evaluation for the ICC, stating that "[i]f locations for a four-lane, divided, limited-access highway were considered *de novo*, using today's standards without reference to past planning decisions, it is unlikely that the ICC Master Plan alignment would be a location of choice.  Consequently, we see no valid reason why the [ ] loss of scarce natural resources and other environmental amenities should be accepted in light of today's environmental criteria."

38.    In 1997, the U.S. Department of the Interior concluded that the proposed Master Plan Alignment, nearly the same as Defendants currently propose for the ICC today, was "the most environmentally damaging alternative."

39.    Similarly, the U.S. Environmental Protection Agency (USEPA) "raised serious concerns about each of the build alternatives [in the original 1983 Draft EIS] and determined that Alternate G was environmentally unacceptable."  In 1997, USEPA again concluded that the proposed Master Plan Alignment was "environmentally unsatisfactory," its lowest rating, meaning that the "adverse environmental impacts … are of sufficient magnitude that they are unsatisfactory from the standpoint of public health or welfare or environmental quality."  USEPA's negative rating was based on the proposed Master Plan Alignment's significant "impact to natural ecosystem, forest fragmentation, direct loss of habitat, increased wildlife mortality, and increased air and noise pollution."

---

[1] Corridor 1, the selected alignment in the 2006 Record of Decision ("ROD"), was the preferred alignment in the most recent EIS. This alignment corresponds to the preferred alignment in the 1997 EIS, called the "Master Plan Alignment," and the preferred alignment in the 1983 EIS, then also called "Alternate G-modified."  In the latest environmental analysis, the other alignment was designated as "Corridor 2" which earlier had been called the "Northern Alternative."

40.    In 1997, USEPA recommended dropping from further consideration nearly the same alignment as the one selected in the 2006 ROD due to the unacceptable adverse environmental impacts. The U.S. Department of the Interior agreed with USEPA and actually recommended that both alternatives be removed from further consideration because of the primary and secondary adverse environmental impacts associated with them.

41.    In the spring of 1998, after reviewing these and other comments criticizing the proposed ICC, the Maryland Department of Transportation ("MDOT") and SHA placed the ICC study on indefinite hold. The Governor commissioned an expert panel known as the Transportation Solutions Group to study the transportation needs in the area and to develop short- and long-term solutions to address these needs. Based on the Group's own conclusions, and comments from the public and government agencies, the Maryland Governor cancelled the ICC NEPA study on September 22, 1999, explaining that the negative impacts of the proposed action outweighed its benefits.

42.    Despite these well documented, significant adverse environmental and community impacts that building a highway along either the Corridor 1 or Corridor 2 alignments would cause, the ICC was resurrected in 2002. Both then gubernatorial candidate Robert Ehrlich and then Montgomery County Executive Douglas M. Duncan concluded that a resurrected ICC should be declared a "Priority Project" under President George W. Bush's Executive Order 13274, "Environmental Stewardship and Transportation Infrastructure Project Review." Among other actions, E.O. 13274 authorized "expedited environmental reviews of high priority transportation infrastructure projects."

43.    On February 27, 2003, U.S. Secretary of Transportation Norman Mineta designated the ICC as a high priority transportation infrastructure project. However, FHWA had not yet

11

begun the environmental review process required under the National Environmental Policy Act ("NEPA").

44.    Even at this early stage, Defendants USDOT and FHWA already had decided that the project necessarily would consist of constructing a new highway between two specified points. Three months after the ICC was placed on the Priority Projects list, FHWA published notice of its intent to prepare a Draft Environmental Impact Statement ("EIS")/Draft Section 4(f) Evaluation for the Intercounty Connector in cooperation with MDOT and SHA. The June 3, 2003, notice explained that "[t]he proposed ICC project is intended to provide a multi-modal highway between I-270 in Montgomery County and I-95/US 1 in Prince George's County, Maryland" and that "a full range of multi-modal **highway** alternatives will be considered" during the expedited review process. (Emphasis added). Governor Ehrlich held an official press conference on June 11, 2003, to kick-off the initiation of the ICC NEPA study, in which he promised the road **would be built**.

45.    In June and September of 2003, FHWA held public meetings, ostensibly to determine the scope of issues to be addressed in the environmental impact statement process required by NEPA and other federal measures, and to identify the significant issues related to the proposed action. At the first of these events, FHWA released for public comment a Draft Purpose and Need Statement for the project. This document described the underlying purpose to which FHWA was responding by its proposed action.

46.    In response, FHWA received many negative comments, criticizing the overly narrow and restrictive nature of the draft Purpose and Need Statement. Writers assailed the draft Purpose and Need Statement as fatally wounding the integrity of the overall NEPA process for the ICC. Plaintiff ANS stated: "As drafted, the [draft Purpose and Need Statement] effectively prejudges the

12

outcome of the environmental impact review process required by the National Environmental Policy Act [ ] by foreclosing consideration of alternatives to the proposed ICC project that would do less harm to the environment, and may be at least equally effective in addressing the mobility and access problems of the Study Area.... Because a Purpose and Need Statement provides the framework and focus for the environmental impact study that is to follow, it may be unlawful to draft it in a way that effectively pre-determines the agency's eventual course of action. The [Purpose and Need Statement] as drafted, however, does exactly that."

47.     USEPA also criticized the proposed Purpose and Need Statement. According to USEPA, the Statement was flawed because it stated goals for the project rather than a problem to be addressed and studied in the EIS. USEPA explained that "a strong P & N Statement clearly separates goals and objectives from the need or problems." In general, USEPA recommended that the Statement should be revised "to clearly express needs with emphasis on specific, factual data...that show a particular problem."

48.     Other commenters criticized additional aspects of the draft Purpose and Need Statement, such as the premise that the ICC would improve traffic conditions on I-95 and I-270. Commenters explained that the ICC would be expected actually to **increase traffic** on north-south highways with which it would have an interchange, including I-95 and I-270. The commenters noted that FHWA had stated in the 1997 Draft EIS prepared for that iteration of the ICC that "None of the ICC alternatives will have a substantial impact on the levels of service [*i.e.*, congestion] experienced by motorists on the Capital Beltway, I-270 or I-95 within the Study Area."

49.     In June 2003, the Prince George's County Council unanimously adopted Resolution CR-32-2003, opposing construction of the ICC. In its comments on the Defendants'

proposed Purpose and Need Statement for the ICC, the Council explained that its opposition to this

project rested in part on the conviction that mass transit projects would serve the mobility needs of

County residents much better than construction of a six lane toll road.

      50.    Two months after the second scoping session, in November 2003, Defendant

FHWA, in cooperation with SHA, identified the suggested alternatives that would be included in the

ICC NEPA Study.  Remarkably, there were only two alternatives identified.  Both alternatives involved

construction of a new highway, albeit along slightly different alignments; no other road construction or

"build" alternatives, or combinations of alternatives, were suggested.

      51.    As part of the NEPA process, Defendants established a so-called "Expert Land

Use Panel" to identify future land use scenarios in the ICC Study Area.  The Panel was to estimate

secondary growth that would result from the ICC, looking at three different scenarios - No Action,

Corridor 1, and Corridor 2.

      52.    On November 22, 2004, FHWA and SHA announced the release of the Draft EIS

and Draft Section 4(f) Evaluation for the proposed project.  Consistent with FHWA's February 2003

determination that the project would only include consideration of a new highway between two points to

serve the middle of Montgomery and Prince George's Counties, the Draft EIS excluded any build

alternative that did not involve construction of a new highway, retaining only the two alignments for the

toll road.  FHWA and SHA announced that the comment period for the Draft EIS would close on

February 27, 2005.

      53.    Once again, the Corridor 1 alignment extends approximately eighteen miles from

I-370/I-270 near the Shady Grove Metrorail Station to I-95 and US 1 south of Laurel.  As described in

the Preferred Alternative section of the Final EIS, the Corridor 1 alignment would have eight

interchanges. The Corridor 2 alignment is located further north in the ICC Study Area, extending

approximately twenty miles from I-370/I-270 near the Shady Grove Metrorail Station to I-95/US 1 south

of Laurel. The Corridor 2 alignment would also have eight interchanges.

      54.    Defendants made available the complete Economic Impact Study of the ICC

simultaneously with the Draft EIS. The purpose of the Economic Impact Study ostensibly was to study

the potential economic impact of the ICC. Remarkably, however, the study omitted any discussion of

the economic or transportation impact of highway tolls, even though tolls have been a critical

component of the proposed project since it was resurrected in 2002. Nor did the study consider

economic costs alongside its consideration of economic benefits – even omitting the cost of constructing

the highway that had been projected in the EIS - or include a discount rate in its benefits calculations.

      55.    The Prince George's County Council also submitted comments critical of the

Draft EIS. Besides its major environmental concerns, the Council opposed the ICC because its

construction would further "magnify regional inequities in economic development and job base between

Montgomery and Prince George's Counties."

      56.    The Plaintiff organizations were among many that also submitted comments on

the Draft EIS. Plaintiff organizations included within their comments a report prepared in January,

2005, by Smart Mobility, Inc., ("SMI"). SMI specializes in integrating transportation and land use

modeling, engineering and planning. SMI's expertise includes travel demand modeling, regional air

quality modeling, and analysis of land use/transportation systems. Over the past five years, SMI has

served as a consultant in nearly two dozen transportation and land use planning projects nationwide.

Here, the SMI Report analyzed six transportation and/or land use scenarios, including Corridor 1 for the

ICC, a no-build option, and four other possible alternatives to constructing a new, six-lane highway.

Through the use of widely accepted travel forecasting methodologies, SMI found that the ICC option would rank as the next to worst performer in diverting traffic from local roads and major arterials. Using well-established, commonly utilized criteria, the SMI Report also found that the ICC was the only alternative that actually would **increase** vehicle miles traveled and vehicle trips made each day. Moreover, the Report demonstrated that all of the other alternatives produced fewer total hours of delay due to congestion than the ICC, and all of them also were less expensive to construct.

57.    The comments submitted by the U.S. Department of the Interior ("USDOI") on the ICC Draft Section 4(f) Evaluation criticized the document's failure to consider "constructive use" impacts on parkland that would be located adjacent to the ICC. "The Department believes that constructive use of parkland due to loss of FIDS [Forest Interior Dwelling Species] habitat and due to the introduction of noise, vibration, and visual disruption should be accounted for in the [Draft EIS]."

58.    USEPA is charged by Section 309 of the Clean Air Act, 42 U.S.C. § 7609, with evaluating every EIS prepared by a federal agency pursuant to the National Environmental Policy Act. Here, USEPA rated the environmental impacts associated with the Corridor 1 alignment as "Environmental Objections" due to the "direct, indirect and cumulative impacts of this highway alignment on water quality, stream habitat (particularly the reproducing trout stream), high quality wetland resources, terrestrial resources of the parkland, and impacts to the residential communities." USEPA rated the environmental impacts of Corridor 2 less severely than Corridor 1, as "environmental concerns."

59.    Both USDOI and USEPA recommended selection of Corridor 2 as the Preferred Alternative because Corridor 2 was projected to have fewer adverse impacts on environmental resources than would Corridor 1.

16

60.    On July 11, 2005, Governor Ehrlich announced the State's preference to build the ICC along the Corridor 1 alignment, and on July 29, 2005, he announced receipt of $18 million in federal funding for the proposed project, which had not yet been approved by Defendant FHWA.

61.    On January 6, 2006, the Final EIS was released to the public. This Final EIS contained considerable new material, including a Sensitivity Analysis for the traffic analysis and a Comparative Water Resources Hazard Assessment. However, there were no material changes to the project's stated Purpose and Need, no consideration of any other alternatives to the proposed action, and no quantitative analyses of the potentially severe water quality impacts due to expected land use change in and about the selected Corridor.

62.    The Final EIS also included FHWA's response to the many comments generated by the Draft EIS. In large measure, these responses either ignored the difficult issues raised by commenters, or attempted to paper over the inconsistencies, discrepancies, and internal contradictions that were identified by commenters.

63.    On May 29, 2006, FHWA issued its final approval for the ICC in a Record of Decision ("ROD") that identified the Selected Alternative, Corridor 1, as approved for construction. Two weeks later, on June 13, 2006, the Maryland Department of Environment issued its Section 401 Water Quality Certification and, separately, ACOE issued its Section 404 permit. The Corps adopted the Environmental Impact Statement prepared by FHWA to satisfy its own obligations under NEPA.

## STATUTORY AND REGULATORY FRAMEWORK

### A.    National Environmental Policy Act ("NEPA")

64.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. The statute requires federal agencies to identify and consider the environmental impacts of

proposed federal actions, and obligates federal agencies to consider alternatives, as well as measures that could avoid or reduce adverse impacts, *before* taking action to assist or approve a project that may significantly affect the environment.

65.    For any proposed major federal action that is expected to significantly affect the quality of the human environment, such as federal approval of the ICC, NEPA requires "a detailed statement" that fully analyzes "the environmental impact of the proposed action" and its alternatives. 42 U.S.C. § 4332 (2)(C); 40 C.F.R. § 1502.14. This mandate is intended to inject environmental considerations into the federal agency's decision-making process, to inform the public and to ensure all that the agency took a "hard look" at environmental concerns *prior* to making a decision to proceed with the project. The EIS serves as a means of assessing environmental impact, rather than justifying decisions already made. 40 C.F.R. § 1502.2(g).

66.    An EIS must contain a statement of the "underlying purpose and need to which the agency is responding in proposing the alternatives" to be studied in the EIS. 40 C.F.R. § 1502.13. The Purpose and Need statement may not be drawn so narrowly as to be a self-fulfilling prophecy, allowing only one alternative to satisfy the project goal.

67.    The alternatives analysis "is the heart of the environmental impact statement," and NEPA requires federal agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives," including "the alternative of no action," and "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14. A properly conducted alternatives evaluation is linked to the evaluation of environmental consequences and therefore is inherently flawed by any failure to adequately consider the environmental consequences of a proposed action.  An agency must use the

18

NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the environment. If the agency artificially constricts the definition of the project's purpose, and thereby excludes truly reasonable alternatives from consideration, the EIS cannot fulfill its role, and the agency has not satisfied the requirements of NEPA.

68.    NEPA also requires federal agencies to "utilize a systematic, interdisciplinary approach which will insure the integrated use of natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment." 42 U.S.C. § 4332(A). The Council on Environmental Quality, which is charged with implementing NEPA, requires agencies to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." 40 C.F.R. § 1502.24. This obligation includes the duty to identify any methodology used in the EIS to predict potential environmental impacts, and to make explicit reference to the scientific process or other sources relied upon for the agency's conclusions.

69.    As part of its duty to present a full and fair discussion of significant environmental impacts, an agency must include consideration not only of those impacts that may be directly attributable to the proposed action, but also indirect and cumulative impacts as well. 40 C.F.R. § 1502.16; see also 40 C.F.R. §§ 1508.7, 1508.8, 1508.27. Indirect impacts are those caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Cumulative impacts are the impacts on the environment which result from the incremental impact of a project when added to other past, present and reasonably foreseeable future actions, regardless of what agency (either federal or non-federal) or person undertakes such other actions. For federal highway projects, an EIS

must include consideration of the impacts of induced demand for travel created by the proposed project, as well as future secondary and cumulative land use impacts.

70.    Finally, FHWA regulations implementing NEPA require FHWA to give consideration to mitigation measures to avoid or minimize environmental harm.  Proposed mitigation measures must be included in the EIS and the ROD.  23 C.F.R. §§ 771.126 & 777.127.

**B.  Department of Transportation Act ("DOT Act") Section 4(f)**

71.    Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303, provides that the Secretary of Transportation "shall not approve any program or project . . . which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless and until certain statutory provisions are satisfactorily discharged. The Supreme Court has said this provision means protection of section 4(f) lands "was to be given paramount importance." *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U.S. 402, 412-413 (1971).

72.    FHWA regulations implementing Section 4(f) require an evaluation of "[a]ny use of lands from a section 4(f) property. . .early in the development of the action when alternatives to the proposed action are under study." 23 C.F.R. § 771.135(b). The Section 4(f) evaluation, and the subsequent Section 4(f) determination, constitutes FHWA's decision on whether a proposed highway project should be allowed to proceed, if the road will "use" Section 4(f) resources.  Under FHWA regulations, a federal highway "uses" statutorily protected land either (a) when Section 4(f) property is permanently incorporated into the project, or (b) when the project "constructively" uses the Section 4(f)

20

property.  23 C.F.R. § 771.135(p)(1).  Constructive use occurs "when the transportation project does not incorporate land from a section 4(f) resource, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired."  The Section 4(f) Evaluation must determine whether "(1) there is no prudent and feasible alternative to using that land," and (2) whether the project "includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use."  49 U.S.C. §303(c); 23 U.S.C. § 138.  An alternative is feasible unless "as a matter of sound engineering" it should not be built.

73.     An alternative is considered imprudent under section 4(f) only if "there are unique problems or unusual factors involved in the use of alternatives that avoid these properties or that the cost, social, economic, and environmental impacts, or community disruption resulting from such alternatives reach extraordinary magnitudes."  23 C.F.R. § 771.135(a)(2).

## C.  Clean Water Act ("CWA")

74.     The Clean Water Act, 33 U.S.C. § 1251 *et seq.,* is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251 (a)(2).  Dredged or fill materials, such as disturbed or excavated soils, are pollutants under the CWA.  See 33 U.S.C. § 1362(6).  Section 404 of the CWA, 33 U.S.C. § 1344, authorizes the Army Corps of Engineers ("ACOE") to issue permits to discharge or place "dredged or fill materials" into waters of the United States, including wetlands, only at specified sites and under prescribed circumstances and conditions.

75.     The Section 404 permit program places a high priority on the control of activities that are potentially damaging to the nation's wetlands and other waters.  Regulations promulgated by

USEPA pursuant to section 404(b)(1), known as the 404(b)(1) Guidelines, 40 C.F.R. §§ 230.1 *et seq.*,

and additional regulations and guidance issued by USEPA and ACOE further define the ACOE's duty in

evaluating individual permits under the CWA.

### D. **Administrative Procedure Act ("APA")**

76.    The Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, waives a federal

agency's sovereign immunity from suit in specified instances.  It also requires that federal agency

actions and decisions follow all statutorily prescribed procedures and comply with all applicable laws.

The APA also authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and

conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law…" 5 U.S.C. § 706(2).

### COUNT 1

### VIOLATION OF NEPA AND NEPA REGULATIONS:

### ILLEGALLY NARROW PURPOSE AND NEED STATEMENT

77.    Plaintiffs repeat and reallege Paragraphs 1 - 76 as though fully set forth herein.

78.    Defendants have an affirmative duty under NEPA and its implementing

regulations to develop a "Purpose and Need" section in the EIS which adequately describes the

underlying basis for the proposed agency action.

79.    In the EIS prepared for the ICC, Defendants identified five project goals for the

suburban Maryland area, or "Study Area" to be served by the project: (1) to increase community

mobility and safety; (2) to facilitate the movement of goods and people to and from economic centers in

the Study Area; (3) to provide cost-effective transportation to serve existing and future development

patterns based on local land use planning; (4) to assist in restoring natural, human, and cultural resources from past development impacts; and (5) to advance homeland security.

80.    Defendants then stated "[t]he purpose of the ICC project is to address these five needs within the Study Area." (ROD at 33). However, the purpose and need for the proposed action was narrowly stated to "link existing and proposed development areas between the I-270 and I-95/US 1 Corridors within central and eastern Montgomery County and northwestern Prince George's County with a State-of-the-art, multi-modal, east-west highway that limits access and accommodates passenger and goods movements." (ROD at 33).

81.    In that declaration, Defendants defined the purpose of the contemplated project so narrowly as to permit only one alternative – an east-west toll road between two specified points – to accomplish these goals, making the EIS nothing more than a formality, with the outcome already determined. As early as fall 2003, Defendants pre-judged the project to eliminate from consideration any mode of transportation other than a new highway.

82.    Although the needs identified may be generic ones that could be met by a variety of transportation projects in the Study Area, the purpose statement arbitrarily and capriciously limits the alternatives under consideration to only those that involve building a toll road. No need ever was established for more east-west travel, yet the purpose statement specifies that only an east-west highway would be considered. Further, the EIS arbitrarily defines terms employed in the identified needs to support the purpose statement. For example, "mobility" is measured according to FHWA's response to comments in the EIS only in terms of "auto trips," rather than the general sense of an ability to travel between two points. Thus improvements in mobility were measured solely by the number of auto trips,

and overall improvements in mobility were ignored in defending this unduly constricted statement of Purpose and Need.

83.    A "primary objective" of the ICC  Purpose and Need statement is stated to be increasing community mobility in the east-west direction.  As explained in the Final EIS, improved mobility is achieved by "assist[ing] the over loaded local road systems [sic] which currently provides for east-west mobility needs."  However, traffic volume on the local road network - and in several places, on the Capital Beltway - actually is forecasted to *increase* as a result of building the ICC, producing the exact opposite result required to meet this project need.  FHWA ignores this fact even though it comes from its own EIS.  Put simply, it has failed to reconcile this foreseeable impact of building the ICC with the stated primary objective of the project.

84.    As a result of these deficiencies and others, both individually and collectively, Defendants FHWA and USDOT violated NEPA's statutory and regulatory requirements regarding the adequate identification of a proposed project's Purpose and Need.

85.    These deficiencies, both individually and collectively, render Defendants' Purpose and Need statement and development and approval of the six-lane ICC toll road as violations of NEPA, and as arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

## COUNT 2

## VIOLATION OF NEPA AND NEPA REGULATIONS:

## FAILURE TO CONSIDER REASONABLE ALTERNATIVES

86.    Plaintiffs repeat and reallege Paragraphs 1 - 85  as though fully set forth herein.

87.    Defendants have a positive duty under NEPA and its implementing regulations to rigorously explore, and objectively assess, all reasonable alternatives.  This alternatives analysis is

considered by NEPA regulations to be "the heart of the environmental impact statement." Defendants were required to assess in detail all reasonable alternatives to constructing the ICC, allowing reviewers of the EIS to evaluate and participate in the decision-making process.

88.    Defendants failed to consider reasonable alternatives to constructing a six-lane east-west toll road, and failed to provide adequate explanations for why certain alternatives were rejected from serious consideration.

89.    In the EIS process, Defendants also identified the need to "increase community mobility and safety" as an essential project goal. However, because the EIS and the ROD contain conflicting definitions of "mobility," FHWA could not determine whether the Selected Alternative, or any other alternative, meets this stated need. For example, the Final EIS at one point defined mobility as "the ability to travel between two points." (Final EIS at IV-338). Elsewhere, the ROD explains "mobility is…the ability to reach a destination in a time and cost that is satisfactory to the traveler." (ROD at 63, footnote 12). Then, in responding to comments on the EIS, FHWA declared: "Mobility is measured in terms of auto trips," thus, "improvements in mobility were judged in terms of the amount of auto trip reduction in relation to normal traffic growth rates." These definitions of mobility are themselves contradictory and also conflict with the other components of the Purpose and Need statement such that under no circumstances can the Selected ICC Alternative be found to meet the Purpose and Need statement.

90.    FHWA rejected the Transit-only Alternative because the projected ridership levels on a transitway (*i.e.*, Metro) were projected to be "less than the generally accepted minimum ridership threshold volumes for new rail systems in the United States." (Final EIS at III-15). Although the Final EIS predicted that 11,500 passengers per day will ride the ICC express buses on Corridor 1,

this document never considered whether this level of ridership for its alternative would meet the minimum ridership threshold volume used to reject the Transit-only Alternative. Further, the FHWA's conclusion that Metro ridership volume would be too low to serve as a viable option was based not on current data but on the outdated 1997 Draft EIS results, using outdated population data from the early 1990s for Montgomery and Prince George's Counties. Clearly, both counties have grown tremendously in the intervening 15 years. Additionally, the 1997 Draft EIS evaluated ridership for design year 2020, compared to the current EIS which evaluates ridership for design year 2030. However, FHWA had no interest in gathering new data that might require it to give serious consideration to a Transit-only Alternative to a six-lane toll road.

91.     Defendants acted illegally in their consideration of highway safety. To demonstrate that the ICC would satisfy the stated need of improving safety, the Final EIS claims the ICC would result in a mere **ten** fewer vehicle crashes per year in 2030 than the 5,085 crashes projected for the No-Build Alternative. Moreover, this statistically insignificant 0.2% improvement in the annual crash rates was said to satisfy the project's need to **improve** safety, even while recognizing that crashes on the high-speed ICC toll road likely would be far more severe: "[w]ith higher speeds, like those anticipated on the ICC, typically more severe accidents can occur compared to the local roads." Similarly, FHWA improperly dismissed four Alternatives from further study in part because they were said to produce only minimal safety improvements.

92.     FHWA arbitrarily and capriciously dismissed alternatives from consideration in the ICC EIS using rationales contradicted by the actual impacts of the Selected ICC Alternative on the local road network. At least four other alternatives were dismissed, in part, because they would not reduce, or would increase, traffic on local roads in the Study Area. Yet the Selected ICC Alternative

itself was found to **increase** traffic volume on the local road system and on selected segments of the Capital Beltway. Nevertheless, the Final EIS concluded that these increased traffic impacts on the local road network **meet the need** of improved mobility in the Study Area.

93.     The Final EIS concludes that only 5%-8% of travelers on the ICC during the peak period would travel the entire length of the ICC, from I-270 to I-95. Accordingly, the overwhelming number of ICC users, some 92-95% of all travelers on the ICC, are expected to make only local, or shorter distance trips. This statistic is cited to support FHWA's conclusion that "the ICC serves the project purpose and need by connecting the existing and planned development **within** the Study Area to the I-95 and I-270 corridors." However, the Final EIS dismissed the "Upgrade Existing Roads Alternative (Alternative No. 2)" in part because that alternative would not sufficiently accommodate **long-distance** trips, explaining that "according to previous traffic studies, approximately 75 percent of the motorists that would use a new alignment would have an origin, a destination, or both an origin and a destination outside the Study Area." FHWA further states that "MD 28/MD 198 [another proposed transportation alternative] are mainly intended for local traffic, while the ICC is aimed primarily for more through trips." It is impossible to meet the purpose and need of increasing connectivity **within** the Study Area by constructing a highway to facilitate "through trips."

94.     According to the EIS, "Alternative 6," another alternative, did not warrant detailed consideration because it would "reduce automobile trips by only five percent, which is equivalent to a few years of normal traffic growth, and, therefore, would not eliminate the need for roadway improvements." FHWA explained that "an appreciable reduction [in auto travel] would be one where roadway improvements would relieve traffic by approximately 10 percent." However, nowhere in the ICC EIS is the percentage of reduction of automobile trips by the ICC disclosed, thus it is

27

unknown whether the Selected ICC Alternative meets Defendants' own standard of effectiveness.

Again, FHWA uses one set of criteria to discard disfavored alternatives to their two toll road alignments

while applying different standards when measuring the effectiveness of the two alternatives retained for

serious consideration.

95.    The Final EIS is clear that the proposed project was "not designed or intended to

relieve Capital Beltway (I-495) congestion" and in fact the Selected Alternative "shows little

improvement on the Beltway." Yet, Defendant FHWA improperly dismissed the Balanced Land Use

Alternative (Alternative No. 5) from further consideration in part because it would not provide a

significant reduction in traffic congestion for "major roadways, such as the Capital Beltway."

96.    Defendants relied on their unlawfully narrow purpose to exclude from

consideration in the EIS otherwise reasonable alternatives which would improve access and mobility in

the Study Area, at a lower cost and with fewer adverse impacts on the environment. Defendants also

rely on flawed assumptions in rejecting certain alternatives from the EIS alternatives analysis. Such

flawed assumptions and deficiencies included, but were not limited to:

a)    defining the Study Area for the EIS too narrowly. This sleight-of-hand prevents the EIS

from capturing all localized impacts attributable to the proposed project and also improperly

eliminates from consideration those alternatives which are not fully contained within the Study Area

but would address access and mobility concerns for residents and businesses in the Study Area;

b)    relying on outdated information, from 1997 or earlier. Such sloth conveniently allows

FHWA to support elimination of mass transit alternatives from the EIS because the population and

development, *at that time*, allegedly would not support adequate ridership;

28

c)      engaging in piecemeal planning.  This official myopia includes failing to provide any rationale for not including alternatives that are currently under study in separate environmental review processes, such as  High Occupancy Toll ("HOT") lanes on the existing Washington Capitol Beltway and expansion of the Metrorail system along the Bi-County Transitway, or "Purple Line";

d)      treating mass transit and highway transportation as mutually exclusive alternatives.  Such outdated thinking precludes consideration of any transportation alternative that symbiotically combines rail with highway expansion and future land use change;

e)      rejecting one proposed alternative because it would increase traffic on a limited number of roads within the Study Area.  This determination is the epitome of arbitrary conduct because FHWA has decided to retain the ICC Selected Alternative even though the ICC was shown in its own EIS to increase overall traffic on at least 17 segments of local roads in the Study Area;

f)      rejecting alternatives out of hand because they include north-south facilities.  FHWA's obsession with an East-West toll road has caused it to ignore the true situation in the Study Area.  In reality, north-south facilities factually are under the highest levels of stress and congestion conditions while FHWA fails to provide evidence of the existence of unmet demand for east-west travel.  Despite requests, FHWA has declined to study how improved travel on north-south arterial roads also may improve east-west travel times;

g)      rejecting an alternative because it would not provide for "continuous" movement between "economic centers."  Again, FHWA has invented a standard to kill a proposed alternative to the ICC that never appears within the EIS, save for eliminating that alternative from consideration.  The EIS is silent on the need for "continuous" travel between two points and there is no discussion or identification of those centers.

97.    As a result of these deficiencies and others, both individually and collectively, Defendants FHWA and USDOT violated NEPA's statutory and regulatory requirements regarding the analysis of project alternatives.

98.    These deficiencies, both individually and collectively, render Defendants' alternatives analysis and development and approval of the six-lane ICC toll road as violations of the National Environmental Policy Act and as arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

## COUNT 3

## VIOLATION OF NEPA AND NEPA REGULATIONS:

## FAILURE TO ADEQUATELY RECONCILE PROJECTED

## IMPACTS WITH STATED PURPOSES

99.    Plaintiffs repeat and reallege Paragraphs 1- 98 as though fully set forth herein.

100.    Defendants have violated NEPA and its implementing regulations by failing to adequately reconcile its analysis of the reasonably foreseeable impacts of the ICC with the stated purposes for the proposed action.

101.    The Final EIS explains that the Selected ICC Alternative would increase the total Study Area network's Million Vehicle Miles Traveled by approximately 20 percent over the No-Build Alternative.  Increased vehicle miles traveled in the Study Area directly conflicts with the adopted local planning objective of reducing vehicle miles traveled, and cannot be reconciled with FHWA's determination to provide a transportation project that reflects local land use planning objectives.  Indeed, in approving the Final EIS, FHWA stated that it gave "significant weight to these local land use

objectives in making its decision among the build alternatives for this project," yet it provides no explanation of how these conflicts are reconciled.

102.     Defendants' selection of the ICC's Corridor 1 alignment depends, in part, on the planned provision of express bus service to meet the "multimodal" aspect of the Purpose and Need.  The ICC EIS concludes that provision of an express bus service using the ICC will increase by "approximately 38 percent [ ] the projected Corridor 1 ridership and 54 percent [ ] the projected Corridor 2 ridership" over the No Build Alternative baseline, which does not have the new bus service.  FHWA attributed a higher level of ridership and new transit riders to ICC's connection to existing transit service centers.  At the same time, however, FHWA rejected out of hand a Transit-Only Alternative, which would connect existing transit service centers, finding that transit systems were ineffective in the suburbs.  The Final EIS explains that "it is difficult in most suburbs to make transit convenient…Most people cannot easily walk from their homes to a bus stop. [citation omitted]".  Defendants cannot reconcile their analysis of an express bus study with their rejection of the Transit-only Alternative.  Data abound showing the overwhelming success of Metro, and of "light rail" systems in other urban areas.  Even Defendants had concluded that the availability of transit in Montgomery and Prince George's Counties spurs ridership and, contrary to their statements elsewhere, commuters are willing to change modes and risk being stranded at lunch to travel via transit.

103.     FHWA relies on expected travel time savings for 100 representative east-west trips in the year 2030 to support its selection of Corridor 1 as the Selected ICC Alternative.  (ROD at 65).  However, FHWA has never made public the number of travelers measured or the origins and destinations that were used to perform the total travel time savings calculation.  Neither the ROD nor the Final EIS provides this data, despite requests for such information in comments submitted on the Draft

31

EIS.[2] Moreover, FHWA cannot use data generated ten years ago that projects transit ridership in 2020 when, as described here, it relies on more current data for 2030 to discuss travel time savings.

104.    Apart from the criteria used to measure travel time savings, FHWA impermissibly relies on time travel savings for trips to and from the BWI Thurgood Marshall Airport ("BWI"). BWI is not within the ICC Study Area, as defined by Defendant FHWA. Indeed, improving accessibility to the BWI Airport was not identified as a need for this project. Including any benefit that may be gained from the ICC for travel between BWI and the Study Area is arbitrary and capricious because it does not meet the stated purpose and need for this project.

105.    From the outset of this NEPA process, Defendants identified the need "to advance homeland security" as a critical reason for building the ICC. However, the Final EIS is silent as to how, and the overall administrative record fails to contain any evidence that, the ICC project possibly would address this need. For example, there is no evidence of any modeling scenario depicting use of the ICC during emergency conditions. Nor is there any showing of how an east-west toll road would benefit homeland security when past emergencies have demonstrated the need for greater capacity on the radial access roads running to and from the Nation's Capital. This mere lip service in the EIS to homeland security cannot satisfy NEPA or its implementing regulations.

106.    Similarly, although Defendants defined the purpose of the ICC project to include an east-west highway, they failed to provide evidence of a significant demand for cross-corridor travel between I-95 and I-270. FHWA admits that *radial* patterns of traffic predominate in the Study Area and that **only 1%** of all Study Area trips actually go between the I-270 and I-95 corridors. The ICC cannot

---

[2] The number of trips by origin-destination pair was apparently available through a Freedom of Information Act request. The 100 (or 110) representative east-west trips contained in the EIS represent only approximately 25% of the morning peak hour travel within the Study Area. This information is critical to evaluating the actual benefits realized from the Selected Alternative. For example, only about 6% of the trips benefit significantly from the ICC, with a travel time savings of five minutes or more.

improve this radial traffic pattern and FHWA offers no reason why the ICC should have priority over other measures that could provide meaningful traffic relief to the region.

107.    As a result of each of these deficiencies, both individually and collectively, Defendants FHWA and USDOT violated NEPA's statutory and regulatory requirements by failing to provide the degree and level of analysis required for such matters, and acted in a manner that is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

## COUNT 4

## VIOLATION OF NEPA AND NEPA REGULATIONS:

## FAILURE TO PROPERLY IDENTIFY AND ASSESS ENVIRONMENTAL IMPACTS OF THE PROPOSED ACTION

108.    Plaintiffs repeat and reallege Paragraphs 1 - 107 as though fully set forth herein.

109.    Defendants had a duty under NEPA and its implementing regulations to assess the reasonably foreseeable impacts of the proposed project on air, aquatic resources, threatened species and other subjects.  To fulfill this duty, Defendants were required to assess direct impacts, indirect effects (also called secondary impacts) as well as cumulative impacts of the proposed project and alternatives. Cumulative impacts analysis requires Defendants to assess the incremental impact of the proposed action when added to other past, present, and reasonably foreseeable future actions by federal and non-federal actors alike.

110.    Defendants failed to incorporate into their environmental impacts analysis an adequate discussion of the reasonably foreseeable growth in and around the Study Area as a result of the construction of the six-lane ICC toll road.  The inadequacy of the analysis conducted in the Final EIS can be demonstrated by comparing it to the findings of Defendants' own Expert Land Use Panel.

33

111.    Defendants' failure to fully describe the reasonably foreseeable impacts of growth resulting from approval of the ICC resulted in an inaccurate assessment of environmental impacts and potential benefits of the proposed project.  The omission of induced growth impacts in the traffic modeling, air quality, and aquatic resources analyses allows decision makers to rely upon a fatally defective EIS in selecting a Build Alternative that will have far greater adverse environmental impacts than described in that flawed analysis.  This systematic underestimation of negative environmental impacts of the proposed project precluded Defendants from taking the required "hard look" at the environmental consequences of the proposed action and prevented meaningful comparison among all reasonable alternatives.

112.    The Final EIS is defective for failing to fully describe the reasonably foreseeable impacts to the vital aquatic resources of the region.  The area to be affected by the proposed project contains significant aquatic resources, including the Paint Branch watershed, the Good Hope and Gum Spring tributaries, and numerous other streams, tributaries, and wetlands.  The proposed project is located within the threatened Anacostia Watershed, which drains into the Potomac River and then into the endangered Chesapeake Bay.  The Paint Branch contains tributaries that are considered "the two most critical and high quality streams within the ecosystem" and contains the only naturally reproducing brown trout population in the metropolitan Washington, D.C. area.  Other aquatic resources, such as the Anacostia River, already violate state water quality standards and are listed under §303(d) of the Clean Water Act as "impaired waters."  Pursuant to the Clean Water Act, Defendants' project cannot, as a matter of law, cause or contribute to the violation of water quality standards.  Nor can it cause or contribute to the violation of Maryland's antidegradation policy.

34

113.    Defendants failed to assess the cumulative surface water impacts of the Selected ICC Alternative.  Instead, Defendants unreasonably limited their analysis to only the narrow impervious surface of the six-lane toll road and the right of way, failing entirely to include any analysis of surface water impacts from induced or secondary impacts, thereby impermissibly underestimating the adverse impacts to surface water.

114.    Defendants' measured the reasonably foreseeable impacts of the two Build Alternatives in different and inconsistent ways.  They did not include the results of their own Expert Land Use Panel in the analysis of likely impacts to surface water resulting from adoption of the Selected ICC Alternative.  This failure is not consistent with how Defendants analyzed surface water impacts from Corridor 2, where they did include pollutant loads from *both* the impervious surface of the six-lane toll road and secondary development.  The Final EIS clearly describes the indirect impacts to the Rocky Gorge Reservoir if nearby Corridor 2 were adopted as the Selected ICC Alternative. The lack of any quantitative analysis and discussion of indirect water quality impacts attributable to Corridor 1, the Selected Alternative, in the Final EIS – especially with respect to the severely stressed Anacostia, Potomac, and larger Chesapeake Bay watersheds – violates NEPA.

115.    Defendants also utilized different methodologies to analyze water quality impacts of the six-lane toll road for each Corridor.  Defendants used a quantitative model, the SIMPLE model, to analyze impacts to the Rocky Gorge Reservoir from the adoption of nearby Corridor 2 but failed to employ the same model, or any quantitative model, to analyze impacts to water quality for the Selected ICC Alternative.  Once more, this use of an inconsistent methodology to analyze surface water impacts of the proposed project impermissibly biases any comparison of environmental impacts between Corridor 1 and Corridor 2.

35

116.    Defendants' failure to include adequate discussion of secondary impacts in their assessment of cumulative impacts of the proposed project on surface water prevents them from presenting the necessary information and analyses to allow the agencies, decision-makers and the public to understand the impacts of the six-lane toll road, and the other alternatives.

117.    Defendants failed to accurately assess the impacts of the proposed new six-lane toll road by using a single, unvarying land use, population and employment forecast for analyzing all alternatives, including the no action alternative, in the Draft EIS and Final EIS.

118.    Defendants' traffic impacts analysis is further undermined by using an outdated travel forecast model (Model Version 2.1C), while a thoroughly updated and corrected official version was available.

119.    Defendants failed to include the results of its own Expert Land Use Panel in its traffic modeling for the same EIS, thereby excluding consideration of induced growth impacts on the traffic.

120.    Defendants failed to accurately assess induced travel demand created by the proposed six-lane toll road. In particular, Defendants failed to use the September 2004 regional growth forecast (Round 6.4A) that was developed specifically to capture anticipated growth from the proposed project, as determined by the Expert Land Use Panel.

121.    Defendants' failure to use an accurate growth forecast causes a significant underestimation of traffic impacts while simultaneously overestimating the traffic benefits of the proposed project, leading to an inaccurate assessment of the proposed project.

122.    Defendants impermissibly skewed the traffic modeling results favorably for the Build Alternatives by using and relying on an inaccurate regional growth forecast (Round 6.3) instead of

the corrected growth forecast for the region (Round 6.4) for the baseline, No-Build alternative. The Round 6.4 growth forecast, adopted in September 2004, significantly reduced employment estimates for the Study Area from the Round 6.3 forecast.

123.    Defendants further skewed the traffic modeling results in the Traffic Sensitivity Analysis by proceeding to pair an outdated, flawed travel forecast model (Model Version 2.1C) with the updated regional growth forecast (Round 6.4A), instead of using the updated travel forecast model (Model Version 2.1D) which was harmonized for both September 2004 growth forecasts, Round 6.4 and Round 6.4A.

124.    The Traffic Sensitivity Analysis is further flawed because it was performed for only the Preferred Alternative, precluding meaningful comparison of Corridors 1 and 2.

125.    Defendants failed to adequately explain why they did not use the accurate, updated regional growth forecasts in the EIS.

126.    Defendants failed to adequately explain why they did not use the accurate combination of regional growth forecasts and travel forecast models in the EIS.

127.    As a result of these modeling deficiencies, Defendants failed to accurately assess the air-quality impacts of the proposed project resulting from the emissions of carbon monoxide ("CO"). Defendants' CO analysis was premised on traffic projections that omitted traffic volumes associated with the updated regional population growth forecast that included the induced-growth projections as a result of the ICC (Round 6.4A). The Sensitivity Analysis does not cure this deficiency.

128.    Furthermore, the Final EIS is replete with assertions regarding the presence or absence of potential environmental impacts for which Defendants provide no support or documentation, in direct violation of NEPA implementing regulations that require federal agencies to document, by

footnote or otherwise, the scientific bases and methodologies used for statements contained in the EIS. See, 40 C.F.R. § 1502.24.

129.    As a result of these deficiencies, both individually and collectively, Defendants FHWA and USDOT have violated NEPA, and have acted in a manner that is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

## COUNT 5

## VIOLATION OF NEPA AND NEPA REGULATIONS:

## FAILURE TO ADEQUATELY CONSIDER STATE LAW REGARDING RARE,

## THREATENED AND ENDANGERED SPECIES

130.    Plaintiffs repeat and reallege Paragraphs 1 - 129 as though fully set forth herein.

131.    Defendants had a duty under NEPA to address and consider how their actions comport with Maryland state law protecting wildlife and plant species deemed to be in need of conservation by the Maryland Secretary of Natural Resources because they are rare, threatened or endangered.  40 C.F.R. §§ 1502.16 and 1506.2(d).

132.    The Maryland Nongame and Endangered Species Conservation Act, Md. Code Ann., Natural Resources, § 10-2A-01-09 (2006), prohibits the "taking" of a species in need of conservation.  Under Maryland state law, all state departments are required to "utilize their authorities in furtherance of the purposes of this [Act]…by taking any action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of the endangered species or threatened species or result in the destruction or modification of habitat of the species which is deemed…to be critical."  Md. Regs. (COMAR) 08.03.08.

38

133.    Defendants failed to fulfill their NEPA responsibility to reconcile their proposed action with Maryland state law because the construction and operation of the proposed project will require directly taking rare and endangered plants and further harming and jeopardizing other threatened and endangered species by destroying or modifying critical habitat.

134.    Construction of the ICC would result in the unlawful taking of a population of a Maryland state-endangered species called the "Trailing Stichwort" which inhabits the North Branch Rock Creek Park.

135.    As a result of each of the above deficiencies, both individually and collectively, Defendants FHWA and USDOT have violated NEPA statutory and regulatory requirements, and have acted in a manner that is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

## COUNT 6

## VIOLATION OF NEPA AND NEPA REGULATIONS:

## INADEQUATE ASSESSMENT, DISCUSSION, AND PROVISION OF PROPOSED

## MITIGATION MEASURES

136.    Plaintiffs repeat and reallege Paragraphs 1 - 135 as though fully set forth herein.

137.    Defendants have a duty under NEPA and its implementing regulations to provide in the EIS a reasonably complete discussion of possible measures to mitigate the environmental harm that building the ICC would cause.

138.    Defendants' evaluation of such possible mitigation measures was based on a flawed analysis of the ICC's impacts, and, therefore, was inadequate.

139.    Defendants failed to adequately evaluate measures necessary to mitigate the ICC project's reasonably foreseeable impacts from induced growth and development.

140.    Defendants' evaluation of mitigation for the project's reasonably foreseeable impacts to streams, tributaries and wetlands was flawed because the identified replacement sites for these aquatic resources are outside the critical affected watersheds and in significant part outside of the Study Area.

141.    As a result of each of the above deficiencies, both individually and collectively, Defendants FHWA and USDOT violated NEPA statutory and regulatory requirements regarding the mitigation measures.

142.    As a result of each of the above deficiencies, both individually and collectively, Defendants' mitigation measures, and their development and approval of the six-lane toll road are in violation of the National Environmental Policy Act and were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

## COUNT 7

## VIOLATION OF SECTION 4(f) OF THE

## DEPARTMENT OF TRANSPORTATION ACT:

## FAILURE TO CONSIDER FEASIBLE AND PRUDENT ALTERNATIVES

143.    Plaintiffs repeat and reallege Paragraphs 1 - 142 as though fully set forth herein.

144.    Defendants have an affirmative duty under Section 4(f) of the Department of Transportation Act and its implementing regulations to consider all feasible and prudent alternatives to a proposed project that would have adverse impacts upon lands protected by Section 4(f).

145.    Defendants FHWA and USDOT failed to consider any new construction or "build alternative" other than construction of a new east-west toll road, in the Study Area.  Only two potential alignments were considered for the new toll road.

146.    Defendants' flawed Purpose and Need statement under NEPA cannot lawfully support rejecting as imprudent other alternatives that do not so severely impact Section 4(f) properties.

147.    As a result of each of the above deficiencies, both individually and collectively, Defendants' constricted alternatives analysis violated Section 4(f) of the Department of Transportation Act and was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

<div align="center">

**COUNT 8**

**VIOLATION OF SECTION 4(f) OF THE**

**DEPARTMENT OF TRANSPORTATION ACT:**

**FAILURE TO CONSIDER CONSTRUCTIVE USE IMPACTS**

</div>

148.    Plaintiffs repeat and reallege Paragraphs 1 - 147 as though fully set forth herein.

149.    Defendants FHWA and USDOT have an affirmative duty to consider the proposed ICC project's constructive use of Section 4(f) properties.  Constructive use includes, but is not limited to, noise, change in access, visual intrusions, air quality degradation, loss of function and other indirect uses of Section 4(f) resources caused by proximity of the proposed project.

150.    Defendants failed to fully and accurately assess these indirect impacts of the proposed ICC project on Section 4(f) properties.

151.    In approving permits under the Clean Water Act for this project, ACOE noted that SHA consultants had estimated 176 acres of parkland beyond the ICC highway reservation would be impacted by noise (projected noise levels of 66 dBA or a 10 dBA increase over existing noise levels).

However, there is no detail or specificity in the Defendants' Section 4(f) analysis allowing either the federal decision makers or the public to identify these 176 acres or to learn how ACOE came to this conclusion. As a result, the Section 4(f) analysis is flawed because it does not disclose or describe the actual parklands that would be substantially impacted by the ICC.

152.    Although Defendants identified fifty potential Section 4(f) resources in the Study Area, only thirteen of them are said to be "used" by the ICC, depending on the alignment selected.[3]  In addition, Defendants considered twelve Section 4(f) resources for constructive use.  Thus, twenty-five, or half, of the fifty Section 4(f) resources initially identified by Defendants were not discussed or analyzed in the Final Section 4(f) Evaluation.[4]  Defendants have provided no rationale for these omissions.

153.    Further, Defendants did not consider the constructive use impacts on numerous other Section 4(f) resources located near the ICC project.  For example, noise impacts to East Norbeck Local Park were not discussed in Defendants' 4(f) Evaluation even though the park would directly abut the new highway.

154.    Defendants' interpretation of section 4(f), excluding consideration of constructive use for section 4(f) properties either located adjacent to the highway or through which the highway would run, thus directly using a minimal number of acres but leaving the rest of the property intact, is arbitrary and capricious, undermines section 4(f) and frustrates the goal of Congress in passing this legislation.

---

[3] Two Section 4(f) properties, the Patuxent River Watershed Conservation Park and Edgewood II, were identified as subject to direct use for certain sub-alignments for Corridor 2.  In the event that these sub-alignments were not selected, both properties would likely experience constructive use by their proximity to Corridor 2.  No constructive use analysis was performed on these properties, however.
[4] The Free Methodist Church Camp Meeting Ground is included on both FEIS Figure V-1 and Figure V-58.  The ICC would not use any property from the Meeting Ground.  However, a constructive use of the Meeting Ground was found to occur, depending on the selected alignment of the highway.  (FEIS V-47 and V-154-V-157).

155.    As a result of these and other deficiencies, both individually and collectively, Defendants' Section 4(f) analysis violates Section 4(f) of the Department of Transportation Act.

## COUNT 9

## VIOLATION OF SECTION 4(f) OF THE

## DEPARTMENT OF TRANSPORTATION ACT:

## FAILURE TO PROPOSE ADEQUATE MITIGATION

156.    Plaintiffs repeat and reallege Paragraphs 1 - 155 as though fully set forth herein.

157.    Defendants FHWA and USDOT had a positive duty under the Section 4(f) and the implementing regulations to identify and describe appropriate measures to mitigate impacts to Section 4(f) properties to be incorporated into the ICC Project.

158.    Defendants' proposed mitigation sites fail to mitigate sufficiently the adverse environmental impacts that would be caused by the proposed ICC project, in part because this mitigation package is overly focused on the number of acres of parkland that will be replaced, impermissibly minimizing consideration of the qualitative features of the parkland mitigation properties.  Contrary to the expectation under Section 4(f) of mitigation in kind, Defendants seek to replace many acres of mature forests and habitat for sensitive Forest Interior Dwelling Species with open fields and other lands which offer nothing more than the potential, after several generations, to develop mature forests. Put simply, Defendants have violated Section 4(f) by swapping high-quality protected property for lands that could take generations to become equivalent in value, if they ever do.

159.    Several of the properties that are proposed for use as adequate mitigation for protected woodland park properties taken by the ICC will require reforestation.  For example, Defendants proposed the Dungan Property for mitigation to parkland, even though it is merely a 45-acre

43

former agricultural field that offers only opportunities for reforestation. Over half of the property would be reforested, the remaining parcel contains immature forest cover infested with non-native invasive vines and herbs and non-diverse native species. These lands hardly qualify as adequate mitigation for the protected properties to be used by the ICC, which have been described by USEPA as having especially high ecological value.

160.    Of the 776.6 acres of new parkland identified for mitigation credits, 249.5 acres are potential reforestation projects – meaning they are not currently forested. It may take 40 years to develop on these mitigation properties mature eastern hardwood forests such as those which would be lost due to the ICC. This is not the type of mitigation contemplated by Section 4(f).

161.    One parcel, the Casey Property at Hoyles Mill, represents roughly two-thirds of the total parkland mitigation package. This property consists of 459 acres, of which 118 acres is open fields that "may be available for reforestation."

162.    Of course, the significant adverse impacts to parkland attributable to the ICC all would occur within the ICC Study Area. Yet the Casey Property is located miles from the ICC Study Area in Poolesville, an area of Montgomery County already rich in open space. Additionally, the Casey Property is located in the Little Seneca watershed, not in the Rock Creek or Anacostia watersheds where the ICC would be located. In other words, the largest and most mature parkland property identified for mitigation credit fails to offer any mitigation for impacts to watersheds impacted by the ICC and thus is inadequate.

163.    Defendants failed to propose an equivalent amount of parkland mitigation sites. Defendants' Section 4(f) Evaluation was premised on an erroneous interpretation of when constructive

use of Section 4(f) property occurs, resulting in an underestimation of adverse impacts to Section 4(f) property.

164.   Defendants have not proposed an equivalent amount of parkland for mitigation credit. Defendants' Section 4(f) Evaluation was premised on an erroneous assertion that parcels of property located in the Upper Paint Branch Park, near Paint Branch and Gum Springs, were acquired for transportation purposes and form part of the Designated Transportation Area. Defendants offered no support for this assertion, which resulted in an underestimation of adverse impacts to Section 4(f) property.

165.   As a result of each of the above deficiencies, both individually and collectively, Defendants' Section 4(f) analysis and proposed mitigation plan violates Section 4(f) of the Department of Transportation Act and it was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

## COUNT 10

## VIOLATION OF SECTION 404 OF THE CLEAN WATER ACT:

## FAILURE TO CONDUCT AN ADEQUATE PUBLIC INTEREST ANALYSIS OR

## ADEQUATELY ASSESS ALL PRACTICABLE ALTERNATIVES

166.   Plaintiffs repeat and reallege Paragraphs 1 - 165 as though fully set forth herein.

167.   Section 404 of the Clean Water Act ("§ 404"), 33 U.S.C. § 1344(a), allows the Secretary of the Army, through ACOE, to issue permits "for the discharge of dredged or fill material into the navigable waters at specified ... sites" and under specified conditions. ACOE issues such permits under guidance and requirements imposed by both ACOE regulations, at 33 C.F.R. §§ 320.1 *et seq.*, and USEPA's § 404(b)(1) guidelines, at 40 C.F.R. §§ 230.1 *et seq.*

168.    Defendants FHWA and USDOT, in the ICC EIS and ROD, acknowledged that the ICC project will result in "the discharge of dredged or fill material into the navigable waters" and thus will require a § 404 permit.

169.    ACOE's regulations under § 404 recognize that "[m]ost wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest," 33 C.F.R. § 320.4(b)(1). Similarly, USEPA's § 404(b)(1) guidelines caution that "[f]rom a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines" and that "[t]he guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources." 40 C.F.R. § 230.1(d). Consequently, ACOE regulations stipulate that "[t]he decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest," 33 C.F.R. § 320.4(a)(1), and "[n]o permit will be granted which involves the alteration of wetlands ... unless the district engineer concludes, on the basis of the [public interest] analysis ... that the benefits of the proposed alteration outweigh the damage to the wetlands resource." 33 C.F.R. § 320.4(b)(4).

170.    Defendant ACOE's approval of the § 404 permit for the ICC Project failed to adequately assess the public interest, as required by its own regulations. ACOE's § 404 ROD relied for its permit approval on the ICC EIS and ROD, documents whose numerous and fatal deficiencies are chronicled above. As a result, ACOE's public interest analysis, as explicated in its § 404 ROD, is deficient and legally inadequate.

46

171.   In addition, "in evaluating whether a particular discharge activity should be permitted," ACOE officials "shall apply the [USEPA] section 404(b)(1) guidelines." 33 C.F.R. § 320.4(b)(4). Those guidelines provide in part that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a).

172.   Defendant ACOE issued a § 404 permit for the ICC on the basis of a deficient assessment of practical alternatives. ACOE relied on the deficient ICC EIS in considering only the two build alternatives, Corridor 1 and Corridor 2, and neglected to consider any other practicable alternatives.

173.   Furthermore, Defendant ACOE's determination that Corridor 1 is the "Least Environmentally Damaging Practicable Alternative" relied on the ICC EIS's deficient assessment and comparison of the anticipated impacts of Corridors 1 and 2.

174.   As a result of each of the above deficiencies, both individually and collectively, Defendant ACOE violated the Clean Water Act's regulatory requirements in its approval and issuance of the § 404 permit.

175.   As a result of each of the above deficiencies, both individually and collectively, Defendant ACOE's approval and issuance of the § 404 permit was in violation of the Clean Water Act, and it was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

## COUNT 11

## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT

176.   Plaintiffs repeat and reallege Paragraphs 1 - 175 as though fully set forth herein.

177.    The Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law…" 5 U.S.C. § 706(2).

178.    Defendants FHWA and USDOT's approval of the ICC Project through adoption of the ICC Project ROD and Defendant ACOE's approval of a § 404 permit were, in light of the violations of NEPA, the Department of Transportation Act, the Clean Water Act, and applicable regulations under these statutes noted above, arbitrary and capricious and thus in violation of the Administrative Procedure Act.

**Demand for Relief**

WHEREFORE, Plaintiffs respectfully request the Court to:

1.      Enter judgment in favor of Plaintiffs and against Defendants on all Counts asserted in this Complaint;

2.      Declare that Defendants FHWA and USDOT have violated the National Environmental Policy Act, Section 4(f) of the Department of Transportation Act, and the Administrative Procedure Act;

3.      Vacate the Record of Decision for the ICC Project;

4.      Declare that Defendant ACOE has violated the Clean Water Act and the Administrative Procedure Act;

5.      Order Defendants to conduct a new Environmental Impact Statement to remedy all violations of law identified herein;

6.      Vacate the Clean Water Act § 404 permit for the ICC Project issued by ACOE to the Maryland State Highway Administration and the Maryland Transportation Authority;

7.      Issue an injunction to Defendants to take any and all steps necessary and appropriate to prevent Maryland agencies from taking any action pursuant to the proposed ICC Project that may result in irreparable harm. Such actions would include, but not be limited to, putting contracts out to bid for, completely or partially condemning any property in anticipation of, or engaging in any ground-disturbing or forestry activities related to, construction of the proposed highway and related infrastructure. This injunction would remain in place until Defendants have fully complied with NEPA, Section 4(f) of the Department of Transportation Act, the Clean Water Act, and the Administrative Procedure Act;

8.    Award Plaintiffs their attorney's fees and costs pursuant to the Equal Access to

Justice Act, 28 U.S.C. § 2412, and other applicable statutes; and

9.    Grant such other relief as this Court deems appropriate.

Timothy J. Sullivan (#05401)
Brennan, Sullivan, & McKenna, LLP
5407 Water Street, Suite 105
Upper Marlboro, Maryland 20772
301-952-1400 (telephone)
301-952-1480 (facsimile)


Langley R. Shook
Peter R. Steenland
Constance A. Sadler
William E. Gerard
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
202-736-8000 (telephone)
202-736-8711 (facsimile)


Attorneys for Plaintiffs, Audubon Naturalist
Society of the Central Atlantic States, Inc.,
Maryland Native Plant Society, and Roger
Metcalf and Eve Burton

Exhibit B

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

RWT 06CV3386

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Audubon Naturalist Society of the Central Atlantic States, Inc.; Maryland Native Plant Society, Inc.; Roger Metcalf and Eve Burton

## DEFENDANTS

United States Department of Transportation; Mary E. Peters, Secretary of Transportation; et al.

**(b)** County of Residence of First Listed Plaintiff    Montgomery

(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    N/A (Federal Agencies)

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Timothy J. Sullivan, Esq., Brennan, Sullivan, & McKenna, LLP, 5407 Water Street, Suite 105, Upper Marlboro, Maryland 20772, 301-952-1400;

Attorneys (If Known)

United States Department of Justice; United States Attorney for the District of Maryland

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY

☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS

☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

### PRISONER PETITIONS

☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY

☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY

☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS

☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY

☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS

☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES

☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☒ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. §§ 4321 et seq.; 49 U.S.C. § 303, 33 U.S.C. § 1344; 5 U.S.C. §§ 551 et seq.

Brief description of cause:
Defendants' actions violate the National Environmental Policy Act as well as other statutes and regulations.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE    12/19/06

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

AUDUBON NATURALIST             *
SOCIETY, *et al.*
                               *
        Plaintiffs
                               *
v.                                       Civil Case No. 06-3386-AW
                               *
UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*        *

STATE OF MARYLAND              *
707 N. Calvert Street, 4th Floor
Baltimore, Maryland  21202     *

        Defendant-Intervenor   *

*     *     *     *     *     *     *     *     *     *     *     *     *

## THE STATE OF MARYLAND'S MOTION TO INTERVENE

The State of Maryland, by and through its agencies, including but not limited to the

Maryland Department of Transportation (MDOT), the Maryland State Highway Administration

(SHA) and the Maryland Transportation Authority (MdTA) (collectively, the "State"), pursuant

to Rule 24 of the Federal Rules of Civil Procedure, hereby moves to intervene as a defendant in

the above-captioned action, and, in support thereof, states:

1.    The State of Maryland meets the requirements for intervention of right under

Fed.R.Civ.P. 24(a)(2).

2.    Alternatively, the State should be permitted to intervene pursuant to Fed.R.Civ.P.

24(b)(2).

3.    Plaintiffs and the federal defendants have been advised of the State's desire to

intervene in this action.  Plaintiffs, through counsel, Langley R. Shook, have advised that they do

not oppose the State's intervention in this action in this Court. The federal defendants have not yet entered appearances in this matter, however, through communications with the US Department of Justice, they have indicated that they support the State's intervention in this action.

4.     The State incorporates by reference the accompanying Memorandum in Support of the State of Maryland's Motion to Intervene as if fully set forth herein.

5.     A proposed Answer to the Complaint for Injunctive and Declaratory Relief also accompanies this Motion.

WHEREFORE, the State of Maryland respectfully requests the following relief:

(A)     That the State of Maryland be granted intervention of right, or in the alternative, be permitted to intervene in this action, as a defendant.

(B)     Such other and further relief as the Court may allow.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

_/s/ Linda D. Strozyk_____
Linda D. Strozyk, Fed Bar No. 08667
Assistant Attorney General
The State Highway Administration
707 N. Calvert Street, 4th Floor
Baltimore, Maryland 21202
(410) 545-0040

_/s/ Kristin Case Lawrence_____
Kristin Case Lawrence, Fed Bar No. 24558
Assistant Attorney General
The State Highway Administration
707 N. Calvert Street, 4th Floor
Baltimore, Maryland 21202
(410) 545-0040

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of February, 2007, that a copy of the

foregoing Motion to Intervene and Memorandum in Support was mailed, postage prepaid, to:

United States Department of Transportation
USDOT
400 Seventh Street, S.W.
Washington, DC  20590

Mary E. Peters
Secretary of Transportation
400 Seventh Street, S.W.
Washington, DC  20590

Federal Highway Administration
FHWA
400 Seventh Street, S.W.
Washington, DC  20590

J. Richard Capka
Administrator of FHWA
400 Seventh Street, S.W.
Washington, DC  20590

United States Army Corps of Engineers
ACOE
441 G. Street, N.W.
Washington, DC  20314-1000

Col. Peter W. Mueller
Commander and District Engineer
ACOE Baltimore District
10 South Howard Street
Baltimore, Maryland  21201

Janet M. Vine, Chief
Regulatory Branch of ACOE
Baltimore District
10 South Howard Street
Baltimore, Maryland  21201

Timothy J. Sullivan, Esquire
Brennan, Sullivan & McKenna, LLP
5407 Water Street, Suite 105
Upper Marlboro, Maryland  20772

Langley R. Shook, Esquire
Peter R. Steenland, Esquire
Constance A. Sadler, Esquire
William E. Gerard, Esquire
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC  20005

N:\OAG\Environmental\ICC\Litigation\motion to intervene.doc

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

AUDUBON NATURALIST                        *
SOCIETY, *et al.*,
                                          *
         Plaintiffs,
                                          *
    v.                                         Civil Case No. 06-3386-AW
                                          *
UNITED STATES DEPARTMENT
OF TRANSPORTATION, *et al.,*               *

         Defendants,                      *

*    *    *    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM IN SUPPORT OF THE**
**STATE OF MARYLAND'S MOTION TO INTERVENE**

The State of Maryland, through its attorneys, Douglas F. Gansler, Attorney General of

Maryland, and Linda D. Strozyk, Assistant Attorney General, hereby submits this

Memorandum in Support of its Motion to Intervene as a defendant in this action.

**INTRODUCTION**

The State of Maryland has proposed a major public works project to construct a multi-

modal highway known as the InterCounty Connector Project (the "ICC"). The ICC will link

the I-270/I-370 corridor in Montgomery County, Maryland with the I-95/Route 1 corridor in

Prince George's County, Maryland. In order to construct the ICC, the State was required to

obtain several federal approvals. In this action, the plaintiffs seek to block Maryland's public

works initiative by challenging the issuance of those federal approvals. The State seeks to

intervene in this action to uphold the approvals it has obtained and to defend the process by

which those approvals were obtained.

## ARGUMENT

**I.     THE STATE OF MARYLAND IS ENTITLED TO INTERVENE TO PROTECT IMPORTANT PUBLIC INTERESTS THAT ARE AT STAKE IN THIS LITIGATION.**

The State is entitled to intervene in this action as of right under Federal Rule of Civil Procedure 24(a)(2).   Intervention as of right under that provision is justified where the proposed intervenor satisfies four requirements:  (1)  the applicant must have an interest in the subject matter sufficient to merit intervention; (2) disposition of the action might impair or impede the applicant's ability to protect its interest; (3) the applicant's interest is not adequately represented by the existing parties to the litigation; and (4) the application must be timely.  *See Scardelletti v. Debarr*, 265 F.3d 195, 202 (4th Cir. 2001), *rev'd on other grounds sub nom. Devlin v. Scardelletti,* 536 U.S. 1 (2002).  These requirements are to be construed liberally in favor of intervention.  *See Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986); *Brink v. DaLesio*, 667 F.2d 420, 428 (4th Cir. 1981).  The State of Maryland meets the requirements for intervention of right under Rule 24(a) as discussed below.

### A.     The State Of Maryland Has A Vital Interest In The Environmental Studies For And The Implementation Of The ICC.

The ICC is a vital public works initiative for the citizens of Maryland.  The State initiated the environmental studies for the ICC and was extensively involved in the lengthy administrative processes challenged by the plaintiffs in this case.  The project at issue not only serves vital transportation needs of Maryland citizens but is unprecedented in its commitment

2

to minimizing the impact of the highway on other important public concerns. Moreover, under the unique financing structure of the ICC, a significant majority of the estimated $2.45 billion total cost of the ICC is funded with State dollars. In fact, if you include State bond sales of $750 million that will be backed by future federal aid dollars (GARVEE Bonds), over 99% of the project costs will be borne by the State, not the federal government. Even if the GARVEE Bonds are considered federal dollars, over 68% of the ICC project costs are direct State dollars. Either way, the State's financial interest in the ICC significantly exceeds the typical state interest in a federal aid highway project that is usually planned, designed and constructed with 80% to 90% federal dollars.

An east-west highway connecting I-95/US1 in Prince George's County to western Montgomery County was first proposed in the 1950s and has been a component of local and State transportation plans ever since. These plans, designed to balance land use, environmental, and transportation needs, were continually reviewed and updated by the Maryland National Capital Park and Planning Commission and the Montgomery and Prince George's County governments with extensive public participation.

Previous proposals to build the highway underwent extensive review and comment in the 1980s and 1990s, as part of two separate federal studies under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*. ("NEPA"). Subsequently, the Governor of Maryland convened a "blue ribbon" commission to conduct a broad study of the transportation and land use issues confronting the region. Studies of these issues were also performed by the National Capital Region Transportation Planning Board ("TPB") and Montgomery County. The Blue

3

Ribbon Panel, TPB and Montgomery County all independently concluded that the transportation issues facing the region were so complicated that no single project could cure them. While each of these studies produced varying recommendations, the studies uniformly concluded that an east-west highway initiative was necessary.

In the half-century since an east-west highway was first proposed, the need for increased mobility and transportation safety has increased. In the 1990s alone, the population within the region grew by more than 25%. The only east-west limited access highway connecting Montgomery and Prince George's Counties, I-495, is located on the southern edge of the region and operates under congested conditions much of the time. Drivers in the region also use narrow roads not designed for longer east-west trips, creating congestion on those roads and long delays. The existing congestion is expected to worsen in the coming decades.

In response to these long-standing problems and in accordance with the recommendations of transportation and land use planning experts, federal, county and State transportation officials concluded that efforts to pursue the ICC project should be renewed. In early 2003, the ICC was designated by the United States Department of Transportation as a priority project under Executive Order 13274, and the NEPA study process was begun. Pursuant to that executive order, the NEPA study proceeded by involving 21 federal, State and local transportation, environmental, and planning agencies. The State of Maryland was thus involved early and integrally in the federal administrative process through the participation of the Maryland State Highway Administration ("SHA"), the Maryland Transportation Authority ("MdTA"), the Maryland Department of the Environment ("MDE") and other State agencies.

4

Maryland citizens were also intensively involved in the NEPA study process, which incorporated a comprehensive public involvement plan, including public meetings, workshops, and hearings attended by thousands of people.

Maryland's participation was crucial because of the difficulty of balancing transportation, environmental and socioeconomic needs in this monumental public works initiative. The State's active participation was also vital because of the need to coordinate federal administrative processes with State law and to ensure that State program objectives were properly taken into account. The early, continuous and extraordinary efforts of environmental resource protection agencies at the federal, State and local levels in offering solutions to avoid, minimize, and mitigate the impact of the highway produced an ICC very different from earlier proposals.

This collaborative process culminated in an ICC project that is consistent with State program objectives and is designed to minimize potential harm to the natural and human environment through engineering and design modifications to the proposed highway, a comprehensive mitigation package and a broad program of environmental stewardship activities. The resulting ICC plan involves an 18-mile controlled access highway with eight interchanges that will utilize electronic toll collection at highway speeds, with a variable toll rate to reduce congestion. An important component of the project is an express bus service, with connections at major transit centers and car and bicycle park-and-ride facilities, which will carry an estimated 11,500 passengers daily. The ICC plan also expands bicycle and pedestrian trails, with construction of approximately 11.4 miles of new bicycle/pedestrian trails

and 3.0 miles of reconstructed trails. The result will be a continuous east-west path extending the entire breadth of the ICC corridor and improving access to subway and bus stations. The project also includes 63 environmental stewardship activities that will address stresses caused by past development in the area. These environmental activities are in addition to measures required to mitigate the environmental impacts of the ICC. The project also incorporates a "mitigation package" which includes 20,700 linear feet of stream restorations, three fish blockages removal projects, creation of 83 acres of wetlands, 25 wildlife passage improvements, nearly 800 acres of new parkland and seven reforestation sites.

The plaintiffs allege that environmental assessments performed under NEPA, Section 404 of the Clean Water Act, 33 U.S.C. § 1344 ("CWA"), and the Department of Transportation Act of 1966, 49 U.S.C. § 303 ("Section 4(f)") were deficient. The State of Maryland initiated the challenged process for coordinating these environmental assessments, and it is the recipient of the Army Corps of Engineers' permit challenged by the plaintiffs. As the project moves forward, the State will be primarily responsible for the funding, design and construction of the highway, as well as the environmental stewardship and mitigation programs that are incorporated in the ICC project as approved. The State of Maryland's interest in defending the approvals and permits issued through the challenged processes is sufficient to merit intervention as of right. *See Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 135-36 (1967) (state's interest in competitive natural gas market was sufficient under Rule 24(a)(2)); *Gottlieb v. Lincoln Nat'l Life Ins. Co.*, 388 F. Supp.2d 574, 578 (D. Md. 2005) (state insurance agency had protectable interest in action against insurer for misrepresentation);

*Environmental Defense Fund v. Costle*, 79 F.R.D. 235, 238-39 (D.D.C. 1978) (interest of state entities in a NEPA challenge regarding salinity standards in the Colorado River Basin was sufficient under Rule 24(a)(2)); *Sierra Club v. Froehlke*, 359 F. Supp. 1289, 1336 (S.D. Tex. 1973) (interests of municipal governments in a NEPA challenge to a river project in those municipalities was sufficient under Rule 24(a)(2)).

**B.    Disposition Of This Action Could Impair Or Impede The Interests Of The State.**

The consequences to the State of granting the types of relief sought by the plaintiffs would be, if anything, *more* severe than the consequences felt by the named federal defendants. The plaintiffs' prayer for relief seeks: an order directing that a new environmental impact statement be prepared and an order vacating the Section 404 permit issued by the Army Corps of Engineers, Complaint at 49 (Demand for Relief ¶¶ 5, 6). The third form of injunctive relief sought is an order requiring the federal defendants "to take any and all steps necessary and appropriate to prevent Maryland agencies from taking any action pursuant to the proposed ICC Project. . . ." Complaint at 49 (Demand for Relief ¶ 7). Such orders, although nominally directed at the federal defendants, would operate primarily on State agencies and would therefore, "*[a]s a practical matter*, impair or impede [*the State's*] ability to protect [its] interest[s]. Fed. R. Civ. P. 24(a)(2) (emphasis added).

Courts have also recognized that the potential monetary impact of litigation can satisfy this element of the standard for intervention as of right. *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733-35 (D.C. Cir. 2003). The State has already expended considerable

7

resources in the three-year environmental impact studies and the federal approval processes, and it has committed hundreds of millions of dollars to implementation of the ICC project approved through that process. The potential for delay engendered by this litigation is itself costly in that delay will significantly increase the costs of providing the intended benefits.

Postponement or outright prevention of the ICC project would also impose non-fiscal costs on the State and its citizens by depriving them of the benefits of both improved mobility and safety in their transportation system and improved environmental conditions from the ICC's many stewardship projects. Furthermore, the ICC as currently approved is consistent with the land use plans of the State and its local governments. A change in those plans would inevitably cause an impact on the program objectives of the State and its local governments, including the State's landmark Smart Growth policy. Md. Code, §5-7A-01 *et seq*. of the State Finance & Procurement Article. Clearly, this action carries the potential to impair the interests of the State to a degree sufficient to justify the State's participation in the litigation.

## C.    The State Is Best Positioned To Represent Its Unique Interests In This Action.

The State's interests, while largely aligned with those of the federal defendants, go beyond the federal interests in this case; as a result, the State's interests will not be "adequately represented by existing parties" to the action. Fed. R. Civ. P. 24(a)(2). The standard for determining whether existing parties may not adequately represent the interest of a proposed intervenor is not a stringent one. *See Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 (1972); *see also Feller*, 802 F.2d at 729-31; *Gottlieb*, 388 F. Supp. 2d at 578.

Although the State's interest in defending the federal environmental impact statement and Record of Decision may coincide in many ways with the interests of the federal defendants, that general alignment of interests, by itself, does not mean that "adequacy of representation is ensured for purposes of Rule 24(a)(2)." *See Natural Resources Defense Council v. Costle*, 561 F. 2d 904, 912 (D.D.C. 1977).   "[M]erely because parties share a general interest in the legality of a program or regulation does not mean their particular interests coincide so that representation by the agency alone is justified." *Am. Horse Protection Ass'n, Inc. v Veneman*, 200 F.R.D. 153, 159 (D.D.C. 2001); *see also Fund for Animals, Inc. v. Norton*, 322 F.3d at 733-35; *U.S. v. American Tel. & Tel. Co.* , 642 F.2d 1285, 1293 ( D.C. Cir. 1980).

The State's interest in the ICC project differs in many important aspects from the interest of the federal defendants.  Whereas the federal defendants' charge is to defend the administrative processes by which the ICC approvals and permits were issued, the State seeks to protect additional interests focused on advancing the project that received those approvals, the public benefits associated with that project, and the incorporation of State and local policy and program objectives into the project design.[1]

The ICC as currently approved is a project that not only provides needed transportation

---

[1] The State has a greater interest in avoiding additional costs associated with delay than the federal defendants at this juncture.  As noted above, the lion's share of the funding for the project will come from State, not federal, sources.

9

infrastructure but also creates and preserves acres of parkland and park facilities for residents of Maryland, balances the benefits and adverse impacts on community, environmental and cultural resources; and is consistent with Maryland's land use plans and laws. No party is in a better position than the State to present to this Court the features of the approved ICC project that demonstrate the success of the approval and permitting process from which that project emerged.

### D.    The State's Application For Intervention Is Timely.

To determine whether an application for intervention is timely, the following factors are examined:  (1) how far the suit has progressed, (2) the prejudice that delay might cause other parties (as weighed against the prejudice to the would-be intervenor by denying intervention), and (3) the reason for the tardiness in moving to intervene.  *Scardelletti,* 265 F.3d at 202; *Belton Indus. v. United States,* 6 F.3d 756, 762 (Fed. Cir. 1993); *see also NAACP v. New York,* 413 U.S. 345, 366 (1973); *Gottlieb,* 388 F. Supp. 2d at 578.

The State's application for intervention is timely.  The State is applying for intervention in the very early stages of this litigation; as of the filing of this motion, there has been neither an answer nor a responsive motion filed by any defendant, and no scheduling order has been issued.  The State's intervention at this juncture would not result in delay or prejudice to the other parties to this action.  Because the application for intervention is timely and the other requirements of Rule 24(a)(2) are met, the State is entitled to intervene as of right.

## II.    THE STATE'S INTERVENTION ALSO IS JUSTIFIED UNDER THE STANDARDS FOR PERMISSIVE INTERVENTION.

10

The State's intervention is also appropriate under the standards for permissive intervention, under Rule 24(b). Rule 24(b)(2) provides that "[u]pon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common." Permissive intervention is discretionary, based on a showing of: (1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action. *E.E.O.C. v. Nat'l Children's Center, Inc.*, 146 F.3d 1042, 1046 (D.C.Cir. 1998).

The State seeks to intervene in this action because of its unique interest in the ICC project. The State's unique interest does not, however, alter the basic defenses available to the federal defendants, and the State does not seek to introduce additional claims that would require an independent basis for subject matter jurisdiction. The State's defense of the federal approval and permitting processes also necessarily has questions of law and fact in common with those implicated by the plaintiffs' claims and the existing defendants' defenses. Finally, as discussed above, the State's application to intervene is timely and would not "unduly delay or prejudice the adjudication of the rights of the original parties." Fed. R. Civ. P. 24(b). Indeed, the State has a strong interest in the swift resolution of the case. For these reasons, this Court's exercise of discretion to permit the State's intervention as a defendant in this action would be proper.

## CONCLUSION

For the reasons set forth above, the State respectfully requests that it be permitted to

11

intervene as a defendant in this action.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

_/s/ Linda D. Strozyk_____
Linda D. Strozyk, Fed Bar No. 08667
Assistant Attorney General
The State Highway Administration
707 N. Calvert Street, 4th Floor
Baltimore, Maryland 21202
(410) 545-0040

_/s/ Kristin Case Lawrence_____
Kristin Case Lawrence, Fed Bar No. 24558
Assistant Attorney General
The State Highway Administration
707 N. Calvert Street, 4th Floor
Baltimore, Maryland 21202
(410) 545-0040



# Chesapeake Bay Foundation

*Environmental Protection and Restoration*
*Environmental Education*



## Maryland Native Plant Society
P.O. Box 4877, Silver Spring, MD 20914 · www.mdflora.org
**Appreciation · Education · Conservation**



AUDUBON
NATURALIST
SOCIETY
OF THE CENTRAL
ATLANTIC STATES, INC.

**Montgomery County Group**

SIERRA
CLUB
FOUNDED 1892



enVIRONMENTAL DeFeNSe
finding the ways that work

March 23, 2006

Mr. Nelson J. Castellanos
Division Administrator
Federal Highway Administration
City Crescent Building
10 South Howard Street
Suite 2450
Baltimore, MD 21201

Mr. Wesley Mitchell
Project Manager
Office of Planning and Preliminary Engineering
Maryland State Highway Administration
707 North Calvert Street
Mail Stop C-301
Baltimore, MD 21202

Ms. Janet Vine
Chief
Regulatory Branch CENAB-OP-R
U.S. Army Corps of Engineers,
Baltimore District
10 South Howard St.
Rm. 8600-W
Baltimore, MD 21201

Dear. Ms. Vine and Messrs. Castellanos and Mitchell:

Enclosed please find comments on the Final Environmental Impact Statement/Final Section 4(f) Evaluation for the proposed Intercounty Connector from the Audubon Naturalist Society of the Central Atlantic States, Chesapeake Bay Foundation, Environmental Defense, the Sierra Club - Maryland Chapter, and the Maryland Native Plant Society.

Headquarters: 6 Herndon Avenue, Annapolis, MD 21403 • 410-268-8816, fax 410-268-6687
Maryland Office: 6 Herndon Avenue, Annapolis, MD 21403 • 410-268-8833, fax 410-280-3513
Pennsylvania Office: The Old Water Works Building, 614 North Front Street, Suite G, Harrisburg, PA 17101 • 717-234-5550, fax 717-234-9632
Virginia Office: 1108 East Main Street, Suite 1600, Richmond, VA 23219 • 804-780-1392, fax 804-648-4011

Printed on recycled paper

March 23, 2006

Mr. Nelson J. Castellanos
Division Administrator
Federal Highway Administration
City Crescent Building
10 South Howard Street
Suite 2450
Baltimore, MD 21201

Mr. Wesley Mitchell                         Ms. Janet Vine
Project Manager                             Chief
Office of Planning and Preliminary          Regulatory Branch CENAB-OP-R
Engineering                                 U.S. Army Corps of Engineers,
Maryland State Highway Administration       Baltimore District
707 North Calvert Street                    10 South Howard St.
Mail Stop C-301                             Rm. 8600-W
Baltimore, MD 21202                         Baltimore, MD 21201

Dear. Ms. Vine and Messrs. Castellanos and Mitchell:

The Audubon Naturalist Society of the Central Atlantic States ("Audubon Naturalist
Society"), Chesapeake Bay Foundation, Environmental Defense, the Sierra Club - Maryland
Chapter ("Sierra Club"), and the Maryland Native Plant Society (collectively, "the
Commenters") submit the following comments on the recently released Final Environmental
Impact Statement /Section 4(f) Evaluation ("FEIS") prepared by the Maryland State Highway
Administration ("SHA"), the Maryland Transportation Authority, and the Federal Highway
Administration ("FHWA") (collectively, "Lead Agencies") on the proposed Intercounty
Connector ("ICC") project linking the I-270 and I-95/U.S. 1 corridors in Montgomery and Prince
George's Counties, Maryland. Our organizations also submitted comments on the Draft
Environmental Impact Statement ("DEIS") for the ICC. Our more limited comments herein on
the FEIS do not supersede or replace the comments previously submitted by Audubon Naturalist
Society, Chesapeake Bay Foundation, Environmental Defense, Sierra Club, the Maryland Native
Plant Society, and others, with regard to the DEIS. Rather, most of the deficiencies noted in
those comments remain unaddressed by the FEIS. Further, at the time of drafting these
comments, FHWA and SHA reportedly are in the process of conducting a required air quality
analysis for fine particulate matter ("PM 2.5") hotspots for the ICC project. Thus, we are waiting

to review a critical analysis of one of the ICC's potentially most significant environmental impacts, an analysis that should be part of the FEIS so all aspects may be considered together. After reviewing the results of the PM 2.5 analysis, we reserve the right to request integration of those results into the FEIS' analysis of impacts and alternatives and re-publication of the FEIS for comment.

We believe that the FEIS falls far short of meeting clearly established standards of adequacy under the National Environmental Policy Act ("NEPA"). The document ignores implementing regulations of the Council on Environmental Quality ("CEQ"), court decisions that provide a roadmap for agency compliance with NEPA, the requirements under Section 4(f) of the Department of Transportation Act, and Section 109 of the Federal-Aid Highway Act.[1]

With respect to the hundreds of pages of detailed criticism of the DEIS submitted by the signatories of this letter and others, the Lead Agencies have conducted or referenced *some* additional studies and modeling and have included *some* additional analyses in the FEIS. However, as described in more detail below, these studies fail to resolve serious deficiencies in the analysis of environmental impacts, transportation modeling, and other critical areas of concern. This is because these studies, modeling runs, and analyses are incomplete, inconsistent, and themselves so flawed as to offer little to no improvement over the information provided in the DEIS.

In other areas, the Lead Agencies provided no further study or analysis in the FEIS in response to criticism of its models and analyses relied upon in the DEIS. Instead, a frequent approach in the FEIS is merely to dismiss studies, models, and other analyses offered by commenters, without further consideration. Similarly, as was pointed out in comments to the DEIS, the FEIS repeatedly relies on bare assertions and unsupported assumptions for many of its major conclusions. These omissions are violations of CEQ regulation, which mandate that agencies "shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. §

---

[1] 23 U.S.C. 109(h) requires that before a project is approved by the Secretary, it must have been analyzed to determine whether it is in "the best overall public interest" taking into account the costs of mitigating the adverse impacts on the environment and the mobility benefits. The Act specifically requires "the possible adverse effects" of "air pollution" to be included in the analysis.

1502.24. This letter identifies an illustrative list of such violations, in addition to those examples given in our and others' comments to the DEIS.

The FEIS ignores important past ICC history[2] and viable alternative. An overly narrow statement of purpose and need, crafted to produce a preordained outcome, is cited to justify the Lead Agencies' decision to exclude several better-performing and less environmentally harmful alternatives. This defect dooms the document because, as we show in our study of alternatives, there are other legitimate, effective alternatives that would, unlike the ICC, adequately address the access needs of the region, at lower cost and with less environmental damage.

As a matter of law, this document is not sufficient to either inform the public or provide the crucial information on impacts and alternatives necessary for sound decision-making – essential functions of an environmental impact statement. There are too many lingering and newly identified deficiencies, too many missing or incomplete analyses, and too many unsupported or deficient assertions, to meet the government's obligations under NEPA, Section 4(f), or related implementing regulations. In other words, there are too many deep wounds in the EIS process for the Lead Agencies to fix with a few simple band-aids. Lacking substantial further study, modeling, analysis, and consideration by the Lead Agencies – in the form of a supplemental EIS – this fatally flawed product is a legally insufficient foundation upon which to base the government's decision to construct the ICC.

---

[2] For example, the DEIS and FEIS are misleading with regard to the timing and reasoning underlying the abandonment of the 1997 ICC study process. The FEIS states that the former study posed "a political controversy" and that a decision was made by the Governor to abandon it. FEIS at S-5. In reality, the 1999 decision to abandon the ICC project was made after the DEIS was completed, and was based on the high environmental cost and low transportation improvement value demonstrated, as well as on the very strong environmental objections from the major federal environmental agencies. "Glendening said that environmental concerns have prompted him to rethink his enthusiasm for the…highway and that he now wants to end the project altogether. 'The ICC and its [highway] alternatives…will not work, should not work,' Glendening said in an interview. He said that early planning for the road did not take environmental concerns adequately into account …". "Governor Abandons Intercounty Connector…" by Daniel LeDuc, *Washington Post*, March 7, 1998, D1. In addition, we note that many agencies have objected, in prior rounds of consideration of the ICC and facing issues which are in nearly every case unresolved by the current plan, to the construction of the ICC.

3

## I. PURPOSE AND NEED

### A. The FEIS Has Retained An Overly Narrow Purpose And Need Statement Without Adequate Justification

The FEIS, like the DEIS, utilizes an overly narrow purpose and need statement which effectively prejudges the outcome of the EIS process in violation of NEPA. As discussed in our comments on the DEIS and in the Smart Mobility, Inc. report, there are reasonable, feasible, and prudent alternatives that perform better and are less costly than the ICC. However, the purpose and need statement is used to exclude consideration of alternatives to construction of a new expressway within the study corridor.

The project purpose statement calls for "a state-of-the-art, multi-modal, east-west highway." Courts have warned that if a purpose is defined too narrowly, "only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality."[3] To avoid this problem, FHWA guidance states that "consistent with NEPA, the purpose and need statement should be a statement of a transportation problem, not a specific solution."[4] By calling for a new highway, the ICC purpose statement is an excellent example of just such a "specific solution-" based statement.

Including the term "highway" in the ICC purpose statement precludes an unbiased consideration of non-highway alternatives. Otherwise, the purpose for building a highway is to build a highway, not serve a public need to transport people and goods. Needless to say, when evaluated against a project purpose statement that calls for "a state-of-the-art, multi-modal, east-west highway," non-highway alternatives and alternatives that would improve existing highways are easily screened out of the alternative evaluation process. The only alternatives included in the FEIS for analysis relate to the concept of building a new highway[5] – "required" by the singular nature of the purpose and need statement. Not adequately considered are other modes of

---

[3] *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C.Cir.1991).
[4] Linking the Transportation Planning and National Environmental Policy Act Processes, Procedural Guidance 9 (Feb 2005). FHWA/ FTA. Accessed at http://environment.fhwa.dot.gov/strmlng/pdfs/Planning_NEPAGuidance.pdf.
[5] This fact undermines the FEIS claim that "None of the alternatives considered were eliminated simply because they were not a "highway." Each alternative was evaluated against the P&N (purpose and need statement) to determine whether the alternative could adequately address the underlying purpose and need for the project." FEIS, App. R-6, at 2.

transportation and other methods for improving travel and access, such as better management of existing highways, transit, and future land use change.

The Lead Agencies defend the narrow purpose and need statement by asserting that it is supported by the transportation planning process. However, they provide no evidence to show how that process supports such a limited purpose and need.

The FEIS states that the purpose and need statement can be shaped by the regional transportation planning process. In particular, the FEIS points to recent FHWA guidelines, which "confirm" that there are two ways in which the transportation planning process can begin limiting the alternative solutions to be evaluated during the NEPA process: (a) shaping the purpose and need for the project or, (b) evaluating alternatives during planning studies and eliminating some of the alternatives from detailed study in the NEPA process prior to the start of the project-level NEPA process.

According to the FEIS, the ICC project purpose and need statement is based on the transportation goals and objectives of two planning documents in particular – the Regional Transportation Planning Board's ("TPB") Constrained Long Range Plan ("CLRP") and the Montgomery County Master Plan of Highways.[6] Neither of these plans is included for reference in the FEIS.

A review of the CLRP and the Montgomery County Master Plan of Highways reveals clearly that the ICC transportation planning process does not provide evidence for the use of an overly narrow purpose and need statement in the FEIS. We note that neither of these plans attempts to identify the transportation problem that the proposed ICC project is designed to address, attempts to identify the specific goals and objectives that the ICC is designed to accomplish, or requires the ICC to be a toll road or be funded by other non-traditional funding sources. The CLRP simply defines the ICC project as a road which would run approximately 20 miles between I-270 near Gaithersburg and I-95 near Laurel, Maryland.[7] The only reference to the ICC project in relation to an identified transportation problem is "how to best develop a

---

[6] FEIS, App. R-9 at 2; FEIS, App. R-6 at 1.
[7] *Financially Constrained Long-Range Transportation Plan: 2003 Update*, National Capital Region Transportation Planning Board (2004) at 4-2.

consensus regarding how to best develop a web of multi-modal transportation connections given the opposing views on new highways, such as the Intercounty Connector."[8] The Montgomery County Master Plan of Highways illustrates numerous types of planned and existing roadways and cautions, "this map has not been approved or adopted by the Montgomery County Council nor the Montgomery County Planning Board."[9]

The FEIS also asserts that "all the participating state and federal agencies agreed on the appropriateness of the project's purpose and need statement, and US Army Corps of Engineers and the Maryland Department of the Environment formally concurred."[10]  However, this does not lend support to the Lead Agencies' overly constrained purpose and need. The formal concurrence of the U.S. Army Corps of Engineers and the Maryland Department of the Environment, among other agencies, is not indicative of the merits of the Lead Agencies' claim, and in any event does not justify a wrong choice by FHWA.  Since the ICC has been identified as a priority transportation project, and fast-tracked, CEQ regulations require these agencies to defer to FHWA.[11]   Therefore the "concurrence"—actually just silence—of these agencies during this particular round of study cannot be interpreted as evidence of expert agency support for an overly narrow purpose and need statement or for the environmental, transportation, or other merits of the project.

In fact, involved agencies have specifically objected to the narrow purpose and need statement.  For example, Thomas C. Voltaggio (Deputy Regional Administrator, USEPA Region III) expressed concern over the use of a purpose and need statement that precludes the consideration of non-highway alternatives:

> The term "east-west highway" should be modified to reflect that the study includes multi-modal transportation options. "Highway" could be replaced by the phrase "transportation system" or "transportation improvements". The concept of a mass transit

---

[8] *Id.* at 5-20.
[9] *Master Plan of Highways, Montgomery County MD,* Maryland-National Capital Park and Planning Commission  (April, 2005).
[10] FEIS, App. R-9, at 4.
[11] *See* 40 C.F.R. 1501.5; *see also* 23 C.F.R. 771.109(c)(2).

component to the transportation solution is not evident throughout the P&N Statement.[12]

The Maryland Department of the Environment's Comments on the ICC Purpose and Need Statement (January 30, 2003) hit the nail on the head:

> As presented, the purpose of the ICC project is to link existing and proposed development areas between I-270 and I-95/US 1 with a 'state-of-the-art, limited access, east-west highway.' This purpose effectively eliminates any alternative(s) that do not include a new highway.

Federal transportation planning law provides the general objectives to be served by planning, development, design and operation of the public transportation system. The congressionally defined objectives for federally funded transportation programs and projects are:

> ``(a) Policy.--It is in the national interest to--
> ``(1) encourage and promote the safe and efficient management, operation, and development of surface transportation systems that will serve the mobility needs of people and freight and foster economic growth and development within and between States and urbanized areas, while minimizing transportation-related fuel consumption and air pollution through metropolitan and statewide transportation planning processes identified in this chapter;....

23 U.S.C. § 134(a) (as amended 2005). The purpose and need for a proposed component of a metropolitan transportation system must be measured by how it serves these objectives. If the Metropolitan Planning Organization adopts a plan containing a specific project as necessary to satisfy these objectives, that plan may create a presumption that the project will satisfy these objectives. But inclusion of a project in a plan does not eliminate the obligation under NEPA to consider alternatives that will achieve the substantive statutory objectives in a less environmentally destructive way. Here, many commenters have proposed alternatives that better achieves all the statutory goals by providing for enhanced mobility, economic development in the project area, with lower emissions of air pollutants and less fuel consumption. An alternative

---

[12] Letter from Thomas C. Voltaggio, Deputy Regional Administrator, U.S. Environmental Protection Agency Region III (June 30, 2003), at 2.

that better accomplishes the objectives enacted in the Federal Aid Highway Act may not be rejected in favor of a project that is less consistent with substantive statutory objectives.

### B. The FEIS Fails To Support Even The Overly Constricted "Needs" It Has Identified

The Lead Agencies have failed to offer a project that meets even the extremely narrow purpose and need statement they crafted. This failure is in part due to a contradiction between i) the "need" to reflect local land use planning objectives and the "need" to increase mobility, as defined in the FEIS; and ii) the "need" to build east-west or circumferential transportation infrastructure. Other reasons for the preferred alternative not satisfying the purpose and need statement include failing to study the proposed express bus service on the tollroad and misconstruing local land use planning documents. In the latter case, the FEIS claims that the ICC connects major regional economic centers, when in reality it does not.

#### 1.   Regional and Local Land Use Planning Objectives Do Not Support the ICC

FEIS Appendix R-6 claims that the ICC is consistent with the goals and objectives in local transportation plans: "[t]he ICC project [purpose and need] is based upon and consistent with the transportation goals and objectives of the  local and state governments responsible for land use and transportation planning in the study area."[13]  The FEIS refers specifically to the Metropolitan Washington Council of Governments' ("MWCOG") goal statements in the 1998 Transportation Planning Board ("TPB") Vision Plan, and the Montgomery County General Plan Refinement ("GPR") of 1993. Elsewhere the FEIS calls the ICC consistent with the development goals in the Prince George's County General Plan of 2002 ("GP").[14]

Upon closer examination of the local planning documents cited by the FEIS, it becomes evident that the Lead Agencies ignored other transportation goals and objectives in order to pursue the proposed ICC.  The goals and objectives forwarded by local planning documents, but ignored by the FEIS, include increased access to transportation and decreased reliance on the automobile.  The Lead Agencies fail to explain why these local goals are not included in the purpose and need statement. In fact, the FEIS goes so far as to spurn the alternate land use/transit

---

[13] FEIS, App. R-6, at 1.
[14] These documents are hereby incorporated by reference into this letter, but, given their volume, they have not been attached.  However, these planning documents have been cited in the FEIS and its Appendices.

scheme in the Smart Mobility Report, saying it addresses different needs than the FEIS, since "[a] majority of the [Measures of Effectiveness] used in the SMI Report reflect the objective of reducing regional auto travel and increasing regional transit use, which are not objectives of the ICC purpose and need."[15]  These Measures of Effectiveness ("MOEs") rejected by the FEIS are, of course, exactly the ones promoted by local land use planning documents.

Further, while the ICC is forecast to increase vehicle miles of travel ("VMT"), reducing per capita VMT is a key but unmet objective of the adopted metropolitan Washington Regional Transportation Plan. Due to projects like the ICC, which the FEIS admits will spur more development at the edge of the region, the regional plan fails to accomplish its VMT reduction objective. As the Plan states,

> "Daily VMT per capita increases 7 percent from 25 miles per person in 2005 to 27 miles per person in 2030…The development occurring in the outer jurisdictions increases the length of trips, which causes VMT to increase. The rate of growth in VMT per capita could be reduced by improved transit, more ridesharing, telecommuting incentives, and increased bicycle and pedestrian facility options. Compact, mixed-use development tends to be more pedestrian- and bike-friendly, which can encourage less driving."[16]

The FEIS relies on a constrained definition of the goal of "mobility" to justify the ICC over alternatives.  In response to numerous comments that criticized the FEIS for rejecting certain alternatives, the Lead Agencies particularly stress the "need" of mobility, stating that alternatives that do not include an east-west freeway fail to meet this need.  In a response to comment, the FEIS defines "mobility" as follows:

> "Mobility is typically characterized with the ability to travel long distances easily and quickly.
>
> …
>
> Limited access highways provide primarily a mobility function.
>
> …

---

[15] FEIS, App. R-9, at 5.
[16] Metropolitan Washington Council of Governments, *2003 Update to the Financially Constrained Long-Range Transportation Plan for the National Capital Region,* Washington, DC, at 5-29 and 5-30.

The ICC would be a good example of a roadway that can provide a high degree of mobility."[17]

In other responses, the FEIS notes the ICC alternatives' 20% <u>increase</u> in VMT as fulfilling the mobility goal.[18]  Finally, the FEIS responses stress the "need" to promote east-west mobility, but not radial mobility in the study area.[19]

However, a close examination of local plans' goals and objectives reveals no evidence that these documents promote the type of "mobility" described by the FEIS.

**a.**  The Prince George's County General Plan[20]

The Prince George's County General Plan ("GP") defines transportation goals and objectives that are different than those focused up by the FEIS.  The GP establishes objectives by which to measure implementation of the plan. Transportation objectives nowhere mention highway mobility or circumferential travel, and instead are more reasonably viewed as opposing an ICC with performance characteristics (such as increased VMT) favorably noted by the FEIS. In contrast, the GP's transportation objectives include:

"Reduce average commuter miles traveled by 25% by 2025

Increase the proportion of transit trips by 25% by 2025

Increase public funding of transportation infrastructure in the Developed Tier

Reduce average vehicle miles traveled by 2025."[21]

It is not clear how the Project Leads propose to meet these objectives without considering vehicle miles of travel or vehicle hours traveled – metrics specifically rejected in the FEIS, as the Project Leads felt they were inappropriate for measuring the effectiveness of the ICC.[22]

---

[17] FEIS, App. R-8, SHA response to Comment #1385.

[18] FEIS, App. R-8, SHA response to Comments # 11, 82.  Nowhere else in the FEIS are VMTs analyzed.  For further discussion regarding VMTs, see Sec. II.A.

[19] *See generally* FEIS, App. R-9.  The Appendix R-9 description of the alternatives in the Smart Mobility Report contains an entire section dismissing the land use/transit alternative for failing to provide a new facility for east-west through traffic. *Id.* at 12-13.

[20] *Prince George's County Approved General Plan: 2002*, Maryland-National Capital Park and Planning Commission (2002) ("GP"), available at http://www.mncppc.org/cpd/generalplan.htm.

[21] *See id.*

The ICC Purpose and Need Statement includes "facilitating the movement of goods and services between centers,"[23] but the Purpose and Need Statement does not actually state that there are any such centers at the Prince George's County end, aside from the planned center at Konterra.[24] The General Plan identifies twenty-five centers at three levels of importance, but none in the ICC study area.[25] This belies the FEIS claim that the ICC Purpose and Need and narrowing of alternatives responds to regional planning goals of connecting development centers. Instead, the GP demonstrates that all major metropolitan and regional centers have full transit service, that is, they are located at Metro stations.[26] Konterra, a planned development in the ICC area of I-95, is designated a "possible future center." It is forecast to have fewer jobs and less housing than the single Washingtonian development in Gaithersburg.[27]

As noted, I-95 is not designated as a Corridor, although U.S. 1 is designated a Corridor from the D.C. line out to just beyond the intersection with the ICC. The GP gives the following description of Corridors in the Developing Tier:

> "Generally contain less intense residential and nonresidential land uses than the Developed Tier Corridors and a mix of uses that are more community-oriented in scope. This development should occur at designated nodes and be planned **as transit-oriented development**."[28]

As stated in the FEIS, the GP shows the ICC study area in the "Developing Tier," the middle of three tiers with decreasing levels of density and development as one moves outward in the County. The Developing Tier extends from the Beltway to the outer County border in much of the County, except where the Rural Tier is shown in the southeastern County. About half the land area of the County is in the Developing Tier, so this designation by no means distinguishes the area served by the ICC.

---

[22] *See* discussion in Part II.A, *supra.*
[23] FEIS at I-1.
[24] *See id.* at S-4, I-22.
[25] *See id.*
[26] *See* GP, *supra* at note 20.
[27] *See id.*
[28] *See* GP, *supra* at note 20**Error! Bookmark not defined.**. (emphasis added).

**b.** Transportation Planning Board ("TPB") Vision Plan[29]

The TPB Vision Plan's goals do not support the Lead Agencies' arguments for excluding mobility criteria that favor non-highway alternatives. The TPB Vision Plan Goal 1 states "[r]easonable **access** at reasonable cost to everyone in the region"[30] not increased mobility, as a goal. Though subtle, there is a distinction between "mobility," as defined in the FEIS and "access": "access" can be enhanced by proximity and local travel improvements as well as by building a highway. The TPB Vision Plan also states as an objective to create "[a] web of multi-modal transportation connections which provide convenient access (including improved mobility with reduced reliance on the automobile) between regional core and regional activity centers, reinforcing existing transportation connections and creating new connections where appropriate."[31] Thus, the same document which is relied upon in the FEIS to support the ICC urges improved mobility without increasing vehicle miles traveled. As the FEIS concedes, mobility via a limited-access expressway by definition limits access and fails to advance the goal of improving access.

Vision Plan Goal 5 strives to develop a transportation system that protects the region's natural environment. It includes the following strategies: "[r]eduction in reliance on the single-occupant vehicle by offering attractive, efficient and affordable alternatives...[i]ncreased transit mode share...[r]eduction in per capita vehicle miles traveled."[32] The report of a recent MWCOG planning exercise cited in the FEIS Appendix R-9, "What If The Washington Region Grew Differently," repeats these objectives succinctly: "[p]romoting activity centers, [i]ncreasing transit use, [r]educing driving."[33] The map of activity centers that appears in this report shows a number of such activity centers in the I-270 Corridor but no others along the route of the ICC, except the outer end of the U.S. 1 corridor.[34]

---

[29] Transportation Planning Board Vision Plan  ("TPB Vision Plan"), *See* Attachment 3; available at http://www.mwcog.org/transportation/activities/vision/default.asp.
[30] *Id.* (emphasis added).
[31] *Id.*, at Goal 2, Objective (3).
[32] *Id.*
[33] *See* FEIS, App. R-9 at n.14.  Although cited in the FEIS, this report was not made available to the public through the NEPA process and is not currently available on the TPB website, although more recent version of this document are available.
[34] *See id.*

Finally, there are no goals, objectives or strategies in the Vision Plan that put a priority on circumferential facilities.[35]

### c.  The Montgomery County General Plan Refinement ("GPR")

The GPR shows the ICC route through the semi-rural Residential Wedge and Suburban Communities areas, neither of which is intended for intense development.[36]  The introduction to the GPR Transportation Goals and Objectives chapter describes changes since the goals were last written in 1969: "[o]ne important conceptual change in this goal is the movement from accommodating travel demand toward managing travel demand and encouraging availability of alternatives to the single-occupant vehicle."[37] This change in local planning is even more significant for the proposed ICC project which was initially conceived in the 1950s.

The goal does refer to "enhancing mobility," but the term is not used to mean simply longer distances traveled at higher speed, as in the FEIS.  Rather, in the GPR, as in the TPB Vision Plan, mobility is enhanced by "an efficient transportation system offering a wide range of alternatives..."[38] The only objective directed at road travel seeks to "[r]educe traffic delays on the road system without eroding quality of life in surrounding communities unless alternatives to the single-occupant vehicle are available."[39]  The Smart Mobility Report illustrates how reducing delay can be achieved as readily by reducing trips and distance traveled as by road-building.

Under the transit system goal is the strategy to "[g]ive priority to establishing exclusive travelways for transit and high occupancy vehicles serving the Urban Ring and (I-270) Corridor."[40] The document does contain a strategy giving priority to east-west travel improvements, the only place this appears in any of the plans considered. However, these GPR goals and objectives are not a ringing endorsement of long distance east-west road travel or increasing VMT as a goal, nor do they support the goal of focusing investment on a single facility that alleges to improve mobility for a very small share of travelers and encourages the single-occupancy vehicle approach which the GPR seeks to reduce.

---

[35] *See generally id.*
[36] *See* Montgomery County General Plan Refinement ("GPR").
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *See* GPR.

    **d.**  The Transportation Policy Report ("TPR") and the Montgomery
County Council's 10-year Transportation Plan ("10-year Plan")

    The FEIS also references the TPR and the 10-year Plan as support for its elimination of non-highway alternatives. The TPR has three manifestations: by the TPR Task Force,[41] the Planning Board[42] and the Council.[43] The Task Force's report does not include the ICC as a recommended facility.[44] None of these TPRs includes goals and objectives that clearly support singling out the ICC, contain a mobility goal as defined in the FEIS, or define a special need for east-west travel.[45]

    The 10-year Plan does not contain goals and objectives except within the narrative.[46] The ICC is listed, among many other facilities. Implied goals include reductions in the time of trips and in road congestion, along with increased transit travel, but east-west mobility is not emphasized. Three of eight trips singled out to show time savings are east-west trips, one a transit trip inside the Beltway, while five of the trips are radial.[47]

    **2.**  <u>Failure to Study Express Bus Service</u>

    The FEIS states that the proposed project must qualify as a "state-of-the-art, ***multi-modal***, east-west highway" in order to meet the project's purpose and need (emphasis added). However, the FEIS contains little information about the Express Bus Service that is allegedly part of the ICC project. The FEIS summarily states:

> The preferred alternative will include express bus service,
> construction of at least two new park and ride lots and
> modification to other existing park and ride lots. Six express bus
> routes have been identified for detailed study…The preferred

---

[41] *Transportation Policy Report*, Transportation Policy Task Force ("TPR Task Force"), accessed on March 21, 2006 at http://www.mc-mncppc.org/move/tprfinal_draft_appendix/taskforce_finaldraft.pdf.
[42] *Transportation Policy Report*, Transportation Planning Board (" TPR-TPB"), accessed on March 21, 2006 at http://www.mc-mncppc.org/transportation/tpr_final/TPRfinal_toc.shtm.
[43] *Transportation Policy Report*, Council ("TPR Council"), accessed on March 20, 2006 at http://www.montgomerycountymd.gov/content/council/2002news/0212tpr.pdf.
[44] Although a majority of task force members voted for the ICC, the Task Force can only make recommendations by consensus, defined as two thirds of its membership.
[45] *See supra* notes 41 - 43.
[46] *Montgomery County Council's 10-year Transportation Plan*, accessed on 21 March, 2006 at http://www.montgomerycountymd.gov/content/council/2004News/2004trans.pdf.
[47] *Id.*

alternative includes a commitment to complete the transit service study before the ICC opens to traffic [in 2010].[48]

Even though the "multi-modal" aspect of the proposed project has been known since the conclusion of the Purpose and Need scoping process in the fall of 2003, the Lead Agencies have yet to conduct or present any detailed analysis of this service. The FEIS does not contain a map of the bus routes and services assumed in the cursory FEIS express bus ridership analysis, information about the assumed bus service levels and characteristics, analysis of the capacity utilization of the assumed bus services,[49] nor any information on the character, purpose, and length of the transit trips purportedly served by this new service. The FEIS is therefore inadequate as it fails to provide (or even consider) information critical to decision makers and the public to determine whether the preferred alternative meets the purpose and need.

Further, the omission of the analysis of express bus service calls into question other results reported in the FEIS. The considerations endemic to express bus service, such as the number of buses traveling on the ICC, tolling for buses, exits for bus stops and transfers, will have an effect on the performance of the ICC which is not currently included in the traffic modeling as well as environmental analyses, such as the Mobile Source Air Toxics ("MSATs") analysis conducted by the Lead Agencies and the PM 2.5 analysis that is yet to be completed. The Record of Decision should not be issued until the Lead Agencies complete the study for the proposed express bus service and updates the traffic modeling and environmental analyses to take this into account. To proceed otherwise invite selecting a preferred alternative that fails to meet even the overly narrow purpose and need of the project and that has not been fully studied or disclosed for comment.

**3.** The FEIS Inaccurately Characterizes County Plans for the Eastern Portion of the ICC Study Area

The DEIS and FEIS repeat in several places erroneous interpretations of County plans for the eastern part of the ICC study area, and rely on these mischaracterizations to support their elimination of non-highway alternatives. For instance, the FEIS Summary section C.1.c.,

---

[48] FEIS, App. R-9, at 3-4.
[49] This analysis is critical to a determination of the cost-effectiveness and likelihood that such service levels might be sustained without incurring operating subsidies in excess of the farebox recovery ratios established under Maryland state law.

15

"Montgomery County and Prince George's Counties' General and Master Plans," states that the Montgomery general plan, "updated in 1993, envisioned the communities along I-270 as Corridor Cities, and the communities in the southern and eastern portions of the County as part of an Urban Ring around the District of Columbia."[50] However, the Urban Ring comprises only the *southern* part of the County, not the southern *and eastern* portions. The master plan for "eastern County" refers to a part of the Suburban Communities. The FEIS' statement is thus misleading because it implies that the ICC goes through an area planned for major development. In addition, in the Purpose and Need Statement, the FEIS states directly that the County has a policy of promoting concentrated development in the U.S. 29 "corridor," a corridor which does not in fact exist in County plans, much less as planned for concentrated development.

The same sections of the FEIS imply that I-95 is a planned development corridor and/or is currently a site of major development. The Summary section states that "Development and future growth is generally focused around the northern and western portions of [Prince George's] County."[51] This statement is misleading as current development and future growth are actually concentrated within and around the Beltway and major regional growth centers are planned in the south and center of Prince George's County (mostly at Metro stations, like Largo and Suitland), in contrast to the ICC study area. The "economic centers" listed around I-95 in the County have some planned and forecast growth but not enough to rise even to a Community Center designation in the GP. In fact, the I-95 economic centers listed in the FEIS Purpose and Need Statement are Baltimore/Washington International Thurgood Marshall Airport and Baltimore, which are not in Prince George's County or in the ICC study area.[52]

In conclusion, examination of the County plans, rather than the bald FEIS assertions, demonstrates that the ICC would not connect growth centers or even growth corridors. Instead, the ICC would connect a major western economic center/corridor with an eastern freeway through low density areas not planned or intended to become major economic centers.

---

[50] FEIS at S-4.
[51] *Id.*
[52] *Id.* at I-22.

## II. ALTERNATIVES CONSIDERED

The FEIS, like the DEIS, fails to adequately respond to a substantial body of evidence favoring consideration of alternatives other than construction of the ICC. Instead, the FEIS assessment of alternatives – like its constrained definition of purpose and need, and driven in part by that – considers only a narrowly drawn study area and narrowly drawn impacts. The FEIS evaluates alternatives on their potential to improve transportation going between two selected points in an east-west direction, and ignores related transportation needs and effects in any other parameters – such as north-south traffic and traffic on nearby major and minor routes. In so doing, the Lead Agencies dismiss a number of widely-accepted, widely-used, bread-and-butter metrics, metrics that are the standard for evaluating such projects – such as vehicle miles of travel and vehicle hours traveled – where alternatives heartily outperform the ICC on those metrics. This is not a serious consideration of alternatives, but rather a papering-over of information that illustrates the blunder of constructing a multi-billion dollar road that significantly underperforms a number of less expensive and less environmentally damaging alternatives.

### A. The FEIS Fails to Respond Adequately to Criticisms Leveled by The Smart Mobility, Inc. Report

Environmental Defense's comments on the DEIS demonstrated that the alternatives described in *The Intercounty Connector: Performance and Alternatives* ("Smart Mobility Report")[53] perform better than the ICC on a variety of travel effectiveness measures for the same or for less cost than the estimated construction cost of the ICC. The Smart Mobility Report demonstrates, that when a more realistic model is used, with more realistic inputs than are used in the ICC model, a number of alternatives outperform the ICC.

The Lead Agencies have sought to reject the conclusions of this study by criticizing the Smart Mobility Report methodology. However, their criticism contradicts professional

---

[53] The report titled *The Intercounty Connector:  Performance and Alternatives*, (Jan. 2005), was prepared by Environmental Defense, Chesapeake Bay Foundation, Audubon Naturalist Society, Sierra Club, the Coalition for Smarter Growth, and Solutions Not Sprawl, with the assistance of Smart Mobility, Inc. ("SMI"). This report was submitted to the Lead Agencies during the DEIS comment period.

experience and judgment, and in fact highlights some of the key omissions of the FEIS.[54] The

government's criticism of the methodology used by the environmental community targets the

following components: (1) measures of effectiveness ("MOEs"); (2) the study area boundary;

and (3) land use and travel forecasting methodology.

The Lead Agencies characterize the Smart Mobility Report's measures of effectiveness

as "inappropriate for a project-specific study:"[55]

> The majority of MOEs used in the SMI Report reflect the objective
> of reducing regional auto travel and increasing regional transit use,
> which are not objectives of the ICC purpose and need. Projects
> with these objectives are often urban and specifically designed to
> reduce mobile source emissions or increase modal choice.[56]

In particular, the Lead Agencies challenged the appropriateness of fundamental measures

of effectiveness, such as VMT and vehicle hours traveled ("VHT"). The FEIS does not use VMT

to evaluate alternatives to the ICC because "the effect of VMT on air quality has become less

significant than it was in previous decades."[57] In a similar manner, the Lead Agencies also

questions the use of VHT: "In a highly congested network such as the Washington, DC region,

the more appropriate performance measures are a function of vehicle delay, not vehicle hours of

travel [ ]."[58]

It is critical to note that the use and disclosure of VHT and other measures of

effectiveness is common practice among transportation planners. To say that VHT is not an

appropriate measure of vehicle delay defies logic. VHT helps to show which alternatives will

reduce the total amount of time that people in the study area must spend in their cars and trucks

as they satisfy their mobility needs. It is arbitrary and capricious for the FEIS to draw support

from Maryland-National Capital Park and Planning Commission's ("M-NCPPC") 2002 project-

specific study of the ICC—a study which relies upon VHT as a key performance measure—

while at the same time rejecting the use of the same measure of effectiveness in the Smart

---

[54] For more information regarding the SMI Report and the government's criticism of the study, see Attachment 1, Statement of Norman Marshall, President, Smart Mobility, Inc.
[55] FEIS, App. R-9, at 5.
[56] *Id.*
[57] *Id.*
[58] *Id.* at 6.

18

Mobility Report.[59] We also note that the Smart Mobility Report employs both VHT and vehicle hours of delay ("VHD") as measures of vehicle delay. These are performance measures supported by research performed for FHWA which represents the best work in the field.[60]

Comparing the VHD associated with each alternative demonstrates which alternative does a better job of reducing traffic delays in the study area. But even by that measure, the Smart Mobility Report found that the ICC build alternative would increase congestion delay relative to the no-build alternative. Moreover other reasonable and available alternatives not considered in the ICC FEIS would reduce congestion delay.

The FEIS additionally claims that the study area used in the Smart Mobility Report is too broad:

> The larger study areas used in the SMI Report mask the value of the ICC to the travel market it serves. By evaluating many trips that do not even travel in the area between I-270 and I-95/US 1, the SMI Report analysis is overly broad and beyond the scope of study identified in the FEIS.[61]

The Smart Mobility Report analyzes alternatives within *two* study areas: (1) the Smart Mobility Report ICC Study Area; (2) a Smart Mobility, Inc. second tier analysis. The Smart Mobility Report ICC Study Area was developed based on discussions with Maryland SHA staff early in the DEIS process. It includes portions of Montgomery and Prince George's Counties that are bounded by and include the Capital Beltway, I-270, and U.S. 1. It differs from the FEIS ICC Study Area only by the inclusion of those portions of Clarksburg and Germantown that are east of I-270, a small portion of northern Gaithersburg east of I-270, and rural largely undeveloped portions in northern Montgomery County near Damascus. The FEIS study area is defined too narrowly, excluding even areas that are just barely beyond the immediate endpoints of the proposed ICC, thus ignoring a large portion of the locations from which trips using the ICC would begin or end.[62] The Smart Mobility Report addressed this problem by evaluating the

---

[59] *Id.* at 6.
[60] *See Traffic Congestion and Reliability: Linking Solution to Problems – Final Report* (prepared for Federal Highway Administration by Cambridge Systematics, Inc., Texas Transportation Institute, July 19, 2004).
[61] FEIS, App. R-9, at 8.
[62] The narrowly defined ICC FEIS Study Area is also an issue in the proposed Section 4(f) compensatory mitigation where a large percentage of such proposed mitigation is located outside the study areas. See Section IV.C

performance of the ICC and alternatives against a second-tier analysis area composed of all of
Montgomery County and the portion of Prince George's County north of Central Avenue.

The FEIS also attacks the land use and travel forecasting methodology employed in the
Smart Mobility Report. The Lead Agencies assert that the ICC travel forecasting model –
Version 2.C – is "better suited" for use in the ICC FEIS than the more recent Version 2.D as
used in the Smart Mobility Report.[63]  It also faults the Smart Mobility Report for modifying land
use inputs to the travel forecasting model and not applying these changes equally to all
alternatives compared in the Smart Mobility Report analysis.[64]

To claim that an earlier, no longer used version of the travel forecasting model is
somehow "better suited" to this EIS than one in which some (though certainly not all) of the
many significant modeling defects have been corrected is arbitrary and capricious.  Smart
Mobility, Inc. utilized the very latest model available from MWCOG TPB in Fall 2004, while the
DEIS for the ICC (which was also under way at that time) used an earlier, thoroughly discredited
version.  The same discredited model is still relied upon in the FEIS.

To meet an agency's obligation to demonstrate that its selection of a model is not
arbitrary and capricious, it has the burden to show that the model selected more accurately
reflects the real world it is intended to represent than an alternative model. "An agency's use of a
model is arbitrary if that model 'bears no rational relationship to the reality it purports to
represent.'"[65]  "If, however, 'the model is challenged, the agency must provide a full analytical
defense.'"[66]  Where the model used by the Lead Agencies was shown to have major flaws in that it
failed to reliably account for observed travel behaviors and traffic patterns that the more recent
model was designed to correct, the use of the prior model is arbitrary and capricious.[67]

The Smart Mobility Report used the official land use forecast developed by MWCOG for
its ICC and No-Build alternatives and modified only the pattern of development for the Transit-

[63] *Id.*
[64] *Id.* at 9.
[65] *American Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1005 (D.C. Cir. 1997) (quotations and citations omitted)
quoted in *Columbia Falls Aluminum Co. v. EPA*, *139* F.3d 914, 923 (D.C.Cir. 1998)
[66] *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 921 (D.C. Cir. 1985); *see also Natural Resources Defense Council, Inc. v. Herrington*, 768 F.2d 1355, 1385 (D.C. Cir. 1985).
[67] See Section III.F, Transportation Effects, for a more thorough treatment of traffic modeling deficiencies in the FEIS.

Oriented Development ("TOD") and Hybrid alternatives it considered, respecting the county level MWCOG job and housing forecast control totals for 2030 in every case. The Smart Mobility Report analysis maintained rigorous consistency with adopted planning assumptions, correcting these only where independent expert opinion – including a concurrent FHWA-sponsored peer review panel for the Baltimore Transportation Planning Board[68] – confirmed the need to correct accounting errors.

Different modes and locations of transportation investment will produce different land use patterns. A huge body of planning science and research supports this statement. As the following quotation indicates, the FEIS also recognizes the influence of transportation investment decisions on local land use patterns:

> According to M-NCPPC planning officials, who have deep experience in regional land use issues, additional development pressures on land would be likely with the selection of the northern Corridor 2 alignment (as compared with the southern Corridor 1 alignment) because settled expectations from Master Plans, zoning and land uses contemplate the ICC in the lower Corridor 1 area. Montgomery County officials have also expressed the likelihood with a Corridor 2 selection of development in rural locations not planned for such through rezonings in the northern area of the county.[69]

Extensive economic development and planning research suggests there is general agreement among experts that new transportation investments tend to redistribute job and housing growth, rather than induce new growth. The proposed ICC would be expected to produce more automobile-dependent sprawl development in areas that are not now urbanized or have low density development, and to draw new development away from the more transit-oriented urban and suburban core areas. In contrast, the transit-oriented alternatives the Smart Mobility Report proposes would be expected to produce more transit-oriented development in areas that are already urbanized and to draw projected development away from low density

---

[68] U.S. Department of Transportation, Travel Model Improvement Program, December 2004, *Report on the Findings of the First Peer Review Panel of the Baltimore Metropolitan Council,* available at http://tmip.fhwa.dot.gov/services/peer_review_program/documents/bmc/ (12/10/04) at 11. *See also* Letter from Michael Replogle to Chris Zimmerman and Tom Dernoga, *New Federally-Supported Peer Review Panel Findings Call for Timely Reforms to Address Accounting Improprieties in TPB Travel Model Treatment of Job-Housing Balance*, December 13, 2004.
[69] FEIS at S-44.

automobile-dependent areas and greenfields development. That is the basis for modifying the official Round 6.4 forecast land use pattern in the Smart Mobility Report. Again, we reiterate that the total number of jobs and households in Montgomery and northern Prince George's County were held constant for each alternative. Furthermore, modifications to the pattern of development were built on the work of the Montgomery County Transportation Policy Report[70] and its Transit Emphasis scenario. The TOD Land Use Pattern extended these same principles to northern Prince George's County and is consistent with the county's new general plan.

The Lead Agencies' use of a single land use forecast for both ICC-Build and No-Build alternatives assumes that the ICC would have **no** impact whatsoever on land use as it evaluated traffic and air quality impacts. This assumption not only defies logic, but runs counter to a number of recent federal court rulings that have found it imperative that environmental reviews for major highway projects consider secondary and induced impacts on land use and traffic. Recognition of induced traffic was boosted in January 1997, when a U.S. District Court ruled that the Illinois Department of Transportation must consider effects of highway construction on development by tying its competing "build" and "no-build" scenarios to corresponding socioeconomic and land-use forecasts.[71] In 2001, it was found that FHWA had erred by using identical population and growth forecasts for Build and No-Build alternatives in its evaluation of impacts.[72] In short, there is legal precedent for considering different land use patterns when comparing No Build and various Build alternatives.[73]

The findings of the Smart Mobility Report clearly demonstrate that the ICC produces the *least* improvement to travel conditions in the region when compared with several reasonable alternatives that do not involve creating a completely new expressway corridor. Despite efforts of the Lead Agencies to portray alternatives presented in the Smart Mobility Report as difficult to compare to the ICC FEIS, the methodology and findings of the report are robust and in accordance with professional experience and judgment. Unlike the ICC FEIS modeling, the methods and assumptions for the Smart Mobility Report underwent a peer review process and

---

[70] See *supra*, Sec. I.B.2.
[71] *Sierra Club, Illinois Chapter v. U.S. Dept. of Transportation*, 932 F.Supp. 1037 (N.D. Ill. 1997).
[72] *North Carolina for Transp. Reform v. U.S. Dept. of Transportation*, 151 F. Supp.2d 661, 689 (D.N.C. 2001).

[73] *Id.* (finding FHWA erred by using identical population and growth forecasts for build and no-build alternatives); *Utahns for Better Transportation v. U.S. Dept. of Transportation*, 305 F.3d 1152 (10th Cir. 2002).

were found by notable modeling experts to be sound and reasonable. As Elizabeth Deakin, Professor of City and Regional Planning and the Director of the University of California Transportation Center, stated in her peer review letter,

> Based on my review I conclude that the alternatives the [Smart Mobility] report develops are reasonable and offer valuable options for consideration. Transit investment combined with transit-oriented land use planning and development, toll lanes, and HOT lanes are being considered in analyses across the country and are apt in this context. The formulation of the particular transit-oriented land use alternative analyzed in this report seems to have been carefully done, building upon general plans for the affected counties.
>
> The modeling approach taken in the report is reasonable and in accord with standard modeling practices. The reliance on the COG/TPB model allows the alternatives posited in the report to be directly compared to the alternatives developed in the ICC DEIS. While the model itself has a number of serious limitations, as noted in the report and many other studies, the direct comparability of results is important enough to justify its use here. **In addition, the corrections made in this report to balance trip productions and attractions are proper and should be done in any analysis.** (Emphasis Added). [74]

Keith Lawton, who until recently served for several decades as the Director of Technical Services for Metro, Portland, Oregon's metropolitan planning organization and metropolitan government, noted:

> Smart Mobility Inc. carried out the travel modeling work done for this study. I am familiar with the Principal, Norm Marshall, and consider this firm to be both competent and professional. The models used are standard trip-based "4-step" models as used by MWCOG, and as such treat all the alternatives in a consistent manner. The results are not surprising, and indeed, with the lack of an integrated land-use forecasting model, may well understate the differences among the alternatives. The results are, in general, consistent with modeling theory in terms of response to both more balanced population and employment, and to tolls applied in a "value pricing" context. Studies that I have been involved in, in

---

[74] Peer Review Letter of Elizabeth Deakin, January 17,2005 as referenced in Comments of Environmental Defense on the Draft Environmental Impact Statement (ED DEIS Comments), Attachment I: *The Intercounty Connector: Performance and Alternatives*, Environmental Defense, January 2005.

Portland, Oregon, have consistently shown the positive effects of a more balanced location of population and employment in terms of VMT, VHT, and VHD. The results certainly show that a more measured analysis of alternatives such as suggested by your necessarily quick study and analysis, would be in order before embarking on construction of the Intercounty Connector.[75]

## B.  Other Deficiencies Underlie the FEIS' Exclusion of Alternatives

Several sections of the FEIS claim to justify the narrow purpose and need based on existing regional and county transportation and land use plans. Elimination of alternatives, in turn, is based on whether these alternatives fulfill the narrow purpose and need defined in the EIS. However, as discussed above, an examination of the transportation and land use planning documents reveals that they do not support the FEIS arguments for eliminating non-highway alternatives and limiting the purpose and need to construction of an east-west highway, as claimed.

In sum, the examination of these documents and the FEIS rationales for eliminating alternatives leads to several major observations. First, although the ICC appears in regional and county transportation plans, these specific plans consist mainly of facility maps without narrative statements of the goals and objectives of the facilities.  Second, the narrative land use and transportation plans referenced by the FEIS contain generalized, region-wide goals and objectives that do not point to the ICC as a priority project, including goals and objectives such as connecting major regional economic centers for the purpose of concentrating growth at these centers, reducing car travel, and increasing transit use. Third, the DEIS contained, and the FEIS still contains, numerous errors and misrepresentations about the County planning documents' treatment of the eastern part of the ICC study area, creating the false appearance that the ICC fulfills objectives of connecting major economic centers. Finally, the DEIS and FEIS use incorrect statements about the principal non-highway alternatives and improve existing highways alternatives to ease the task of eliminating them from comparison with the ICC, although these

---

[75]  Peer Review Letter of Keith Lawton as referenced in Comments of Environmental Defense on the Draft Environmental Impact Statement (ED DEIS Comments), Attachment I: *The Intercounty Connector: Performance and Alternatives*, Environmental Defense, January 2005.

alternatives would better support adopted regional transportation plan goals and objectives than would the ICC.

1. Other Deficiencies underlie the FEIS's Elimination of Non-Highway Alternatives

According to Appendix R-9, the purpose and need can be limited to highway alternatives because the facility appears in regional and local transportation and land use plans, and is justified by the goals and objectives of those plans. We have seen that, while the ICC appears on plan maps, the plans' goals and objectives do not justify studying the ICC as the sole alternative to needs in the study area.

The FEIS states in several places, including in responses to DEIS comments, that "[t]he ICC study area is already substantially developed, as noted in M-NCPPC records, with nearly 80% of the planned households and employment in place in 2003."[76] This statement has been refuted in comments to the DEIS based on Montgomery County forecasts which show that growth of about a third in households is possible under current zoning. As noted, housing capacity has been added to several master plans since 2003. Only about half of employment capacity is built, with much of the remaining capacity in the I-270 Corridor. The underestimation of growth potential in the study area undermines other analyses in the FEIS, such as the traffic modeling and cumulative effects analysis thereby overestimating the alleged benefit to travel in the study area while simultaneously underestimating the adverse environmental consequences of the proposed action.

Furthermore, the FEIS identifies all the transportation studies being conducted by the State of Maryland that are contained in the 2003 CLRP.[77] The FEIS explains that "these transportation improvements are each being studied in a separate NEPA document because each proposed improvement is a distinct project with logical termini and independent utility."[78] Several of these projects were suggested as alternatives, separately or integrated, to the proposed ICC during the scoping phase and in comments on the DEIS, yet none of them were retained for detailed study for *this* NEPA document. The FEIS fails to provide an explanation as to why the

---

[76] *See, e.g.*, FEIS at III-17.
[77] FEIS, App. R-9 at 2.
[78] *Id.*

ICC should take precedence over these other planned transportation projects. This omission is especially troublesome given the importance of expanding public transit prior to constructing new roads. Recently, a Federal Court found a FEIS inadequate given, *inter alia*, its failure to consider, as an alternative to the proposed highway project, delaying that highway "until after … public transit expansion…"[79] The deficiency here is equally grave.

## III. ENVIRONMENTAL CONSEQUENCES

### A. Air Quality Impacts

After release of the DEIS, the Lead Agencies conducted a supplemental air quality analysis on six or seven[80] Mobile Source Air Toxics ("MSATs") which is incorporated into the FEIS as the Air Quality Technical Report Addendum ("AQTR"). This analysis is the only consideration of public health impacts in the ICC FEIS. This comment period is the first opportunity for the public to review and comment on the MSAT analysis. The MSAT analysis consists of estimating aggregate MSAT emissions by compound type at the level of the ICC study area for 2020. Unfortunately, this MSAT analysis and the current FEIS fail to adequately evaluate the significant adverse impacts the proposed highway is likely to have on human health, including the health of children and neighborhoods nearby the ICC study area. This is especially significant because of the proximity of a number of schools and day care centers to the proposed ICC.[81]

The current FEIS only includes two studies concerning air quality impacts of the proposed ICC: (1) MSATs and (2) Carbon Monoxide ("CO"). As discussed below, these studies contain significant flaws that undermine the reliability of their results and therefore mislead or fail to disclose the adverse environmental impacts of the proposed action. As previously mentioned, the fine particulates ("PM 2.5") analysis for the ICC project has not yet been publicly

---

[79] *Utahns For Better Transportation v. United States Dept. of Transportation*, 305 F.3d 1152, 1170 (10th Cir. 2002). The Court rejected USDOT's argument that it did not need to consider the option of developing transit prior to the proceeding with the highway project because "[r]egional transit choices that may be made in the future are not reasonable alternatives to off-set [sic] the need for new roadway construction now." *Id.* (citation omitted).

[80] The FEIS contains conflicting information about the number of MSATs the Lead Agencies studied. Although the FEIS lists six MSATs, in the FEIS preface it lists seven air toxics.80 the Lead Agencies should correct this inconsistency and discuss the results, if any, of the seventh toxic studied. The six toxics include diesel particulate matter and diesel exhaust organic gases (DPM + DEOG), benzene, 1,3-butadiene, formaldehyde, acetaldehyde, and acrolein.

[81] *See* ED DEIS Comments at 11, and *infra* Part III.A.2.

released. There is no indication that the PM 2.5 analysis will also include consideration of coarse particulate matter ("PM 10") impacts from the proposed ICC. Additionally, the FEIS does not analyze the ICC's impact on other pollutants for which National Ambient Air Quality Standards ("NAAQS") have been established, such as Nitrogen Oxide ("NOx") and Sulfur Dioxide ("SO2"), which may also adversely affect the environment and human health or create or worsen NAAQS violations. Combined, these flawed analyses and omissions of critical information regarding air quality impacts on the environment and public health fail to satisfy NEPA's requirement to take a "hard look" at environmental consequences. These analyses also fail to satisfy the Federal-Aid Highway Act's requirement to fully consider adverse effects of air pollution and propose mitigation measures in the best overall public interest.

Although we understand that a PM 2.5 analysis is forthcoming, it is still worthwhile to explore the initial failure of the Lead Agencies to consider the impacts of the proposed action on PM 2.5 in the study area both in the DEIS and the FEIS because this failure demonstrates a misunderstanding of NEPA that permeates the EIS. The NEPA rules impose an obligation to determine whether the proposed action will comply with standards established to protect the human environment. 40 C.F.R. § 1502.2(d). Thus, even without the new Transportation Conformity rule promulgated by EPA, an analysis of PM 2.5 impacts of a new six lane highway should have been performed on a **project level** in the EIS to evaluate the likelihood of the project causing violations of the regional air quality protection program. This analysis is required under NEPA.

Further, the Lead Agencies claim in the FEIS that "Federal agencies such as FHWA are not in the position to analyze the PM 2.5 hotspot modeling validity..." (FEIS, App. R-8 at 106). This response implicitly challenges the reliability of the emissions model developed by EPA to estimate PM 2.5 emissions. Because the Lead Agencies raise the issue of availability of models and information in other places in the FEIS, such as the MSAT analysis, as a rationale for not performing analysis for public health impacts, it is noteworthy that existing emissions models will be used for the forthcoming PM 2.5 analysis. Thus this concern of the Lead Agencies regarding model availability appears to have been fabricated.

1.  <u>MSATs Analysis Is Inadequate Because It Fails To Analyze Health Impacts</u>

27

The Lead Agencies claim they are unable to predict ICC-related health impacts at the project level for three reasons (1) uncertainties in the MOBILE 6.2 model; (2) the difficulty of assessing exposure to mobile source air toxic emissions; and (3) uncertainties surrounding the health effects of these pollutants.

> **a.** The MOBILE 6.2 model is adequate to analyze project-level MSAT emissions

The FEIS emphasizes that the MOBILE 6.2 model was not designed specifically to estimate emissions at the project level, has not undergone any validation at that level, and is not officially approved or recommended for that purpose by EPA.[82] However, US EPA experts responsible for air toxics emissions analysis attest to the adequacy of the MOBILE 6.2 model for analysis of project and link-level emissions for MSATs.[83] The Federal Aviation Administration within the U.S. Department of Transportation has incorporated MOBILE 6.2 emission factors into its Emissions and Dispersion Modeling System which is used to conduct project-level analysis. Moreover, EPA's *Technical Guidance on the Use of MOBILE6 for Emission Inventory Preparation* confirms the suitability of the MOBILE 6.2 for project-level emissions assessments:

> MOBILE6 was designed to account for differences in vehicle activity on different roadway types and allow for more precise modeling of emissions for individual roadway links.[84]
>
> ***
>
> If the user wishes to estimate emissions of an individual roadway link (or obtain separate results for a set of individual roadway links for use in a table), a single average speed estimate for each particular link or roadway segment must be used for each model run, instead of an average speed distribution.[85]

The MOBILE 6.2 model is the EPA-approved model for use in particulate matter conformity determinations and is capable of producing credible estimates of MSAT emissions

---

[82] FEIS at IV-324.
[83] Michael Replogle, Personal conversation with Richard Cook, US EPA Office of Transportation and Air Quality, February 16, 2006.
[84] *Technical Guidance on the Use of MOBILE 6 for Emission Inventory Preparation*, U.S. EPA Office of Air and Radiation, Office of Transportation and Air Quality (January, 2002), at 28.
[85] *Id.* at 40.

from individual highway segments.[86] While EPA plans to undertake additional research to refine
the evaluation of the emission characteristics of heavy duty diesel vehicles in the future to
produce greater precision in the estimates of MSAT and particulate emissions in future emission
models that succeed MOBILE 6.2, the current release of the model has been used in a number of
scientifically-accepted project-level hot spot analyses documented through peer reviewed
scientific studies. For example, EPA and state and local agencies have applied the MOBILE 6.2
link-based methodology in Portland, Oregon, where a 24,000 roadway link inventory of MSATs
was used to evaluate near-road pollution "hot spot" exposures.[87] The study concluded:

> The queries and programs developed for this study can also be
> adapted for use by other agencies with a need for geographically
> detailed analyses of motor vehicle emissions. This approach is
> useful in identifying potential highway mobile source emission
> "hotspots" for further study, and when used in dispersion
> modeling, may help better characterize the spatial distribution of
> concentrations of HAPs, particularly in urban centers where major
> roadways are located.[88]

The FEIS also claims that the MOBILE 6.2 has limitations for use in project-level
assessments of diesel particulate matter ("DPM") emissions as necessary for quantitative
analysis:

> The only conditions that affect DPM emissions in MOBILE 6.2 are
> fleet and fuel characteristics. However, activity factors such as
> speed, driving cycle, and number and distribution of engine starts
> per day do have an impact on actual DPM emissions from motor
> vehicles.[89]

The Portland study demonstrates that certain limitations of the MOBILE 6.2 model can
be addressed during MOBILE 6.2 post-processing steps. For instances, the Metro Planning
Department performed a regression analysis on emission rates for each MOBILE 6.2 generated

---

[86] *See* "Official Release of MOBILE 6.2 Motor Vehicle Emissions Factor Model and the December 2003 AP-42
Method for Reentrained Road Dust for SIP Development and Transportation Conformity." 69 Fed. Reg. 28830
(May 19, 2004).
[87] Stein, B; Walker, D; Cook, R.; Bailey, C. *Link-Based Calculation of Motor Vehicle Air Toxin Emissions Using
MOBILE 6.2,* Metro Planning Department, Portland, Oregon, October 9, 2002. Available at ftp://ftp.metro-
region.org/dist/tran/tf/toxins.
[88] *Id.* at 6.
[89] *Id.*

speed bin to produce speed curve equations that allow for the calculation of emissions --
including DPM - at any speed.[90]

A suite of dispersion models are readily available for use in conjunction with MOBILE
6.2 and other emission models to consider how emissions at the project-level might translate into
MSAT and particulate emission concentrations around potential "hot spots." Dispersion
modeling uses mathematical formulations to characterize the atmospheric processes that disperse
a pollutant emitted by a source. Based on emissions and meteorological inputs, a dispersion
model can be used to predict concentrations at selected downwind receptor locations. Kinnee *et
al.*[91] applied the Industrial Source Complex Short Term ("ISCST3") dispersion model, using
both gridded and link-based emissions, to evaluate the effect of improved spatial allocation of
emissions on ambient modeled benzene concentrations in Houston, Texas. Allocating on-road
mobile emissions to roadway link segments improved the agreement between modeled
concentrations when compared with monitor observations, and also resulted in higher estimated
concentrations in the urban center. Korenstein and Piazza[92] used the same ISCST3 model to
evaluate the increase in particulate load (PM 10) suffered by elementary school students who
attend school in proximity to a major highway interchange. The authors documented higher
exposure levels at schools that are situated in proximity to major roadway networks. These
exposure levels have been shown in other studies to cause serious and predictable levels of
negative health effects. Cohen, *et al.*[93] applied the CALPUFF dispersion model to Portland,
Oregon, assigning emissions to specific roadway links. The results of the Portland study support
the thesis that in order to capture localized impacts of hazardous air pollutants in a dispersion
model, there is a need to include individual roadway links.  Dispersion models are therefore
scientifically accepted and available, and could have been utilized by the Lead Agencies to
translate outputs from MOBILE 6.2 into estimates of likely MSAT and particulate emission
concentrations that would be experienced by children and adults breathing the air in locations

---

[90] *Id.*
[91] Kinnee, E.J.; Touma, J.S.; Mason, R.;Thurman, J.; Beidler, A..; Bailey, C.; Cook. R.; *Allocation of Onroad
Mobile Emissions to Road Segments for Air Toxics Modeling in an Urban Area*, Transport. Res. Part D, 9 ( 2004).
[92] Korenstein, S; Piazza, B., *An Exposure Assessment of PM10 from a Major Highway Interchange: Are Children in
Nearby Schools at Risk?*, 65 J. Envt'l. Health, at 9-17.
[93] Cohen. J.; Cook, R.; Bailey, C.; Carr, E., *Relationship Between Motor Vehicle Emissions of Hazardous Pollutants,
Roadway Proximity, and Ambient Concentrations in Portland, Oregon*; Environ. Model. Software 20 (2005), at 7.

close to highways such as the ICC or I-95, where traffic and emissions will increase significantly as a result of a decision to build the ICC.

In addition to dispersion models, a new generation of Eulerian grid-based models is now capable of comprehensively treating transport and chemical transformations of air toxics. Touma, *et al.*[94] present and discuss possible advanced approaches that can combine the grid-based models with micro-scale dispersion modeling. The authors conclude that a correct appraisal of many air toxics will require a combination of regional grid and local scale modeling. As a whole, these studies demonstrate that the current science of air quality modeling has advanced to a point that allows for comprehensive first-cut appraisals of air toxic emissions to be conducted on a localized basis at sites along highway corridors. Such appraisals can be conducted by integrating the MOBILE 6.2 model using emissions estimates at the roadway link-level with dispersion models, such as ISCST3, CALPUFF and CALINE-4, and by combining information from local-level dispersion models with information from regional grid-based models that can provide additional background pollutant concentration estimates.

> **b.** Lead Agencies should have conducted Exposure Assessments for Air Toxics

The FEIS highlights caveats of exposure assessment models and concludes that such caveats "present complications of understanding exposure at the project-level and thereby interpreting absolute emissions estimates with exposure impacts."[95] Assessing exposures and associated health risks is not simple, but it has largely been done for other agencies by EPA in its Integrated Risk Information System ("IRIS"). EPA has explained that IRIS "is an EPA database of scientific information that contains the Agency consensus scientific positions on the potential serious adverse health effects that may result from lifetime (chronic) exposure to substances found in the environment."[96] "Combined with information on specific exposure situations, the summary health hazard information in IRIS may be used in evaluating potential public health

---

[94] Touma, J.; Isakov, J.; Ching, J; Seigneur, C. *Air Quality Modeling of Hazardous Pollutants: Current Status and Future Directions,* 56 J. Air & Waste Manage. Assoc., at 1-12.
[95] FEIS at IV-326.
[96] 66 Fed. Reg. 17,235.

risks from environmental contaminants."[97] EPA used the data in IRIS to select the pollutants on the MSAT list.

The MATES-II study, summarized in Environmental Defense's DEIS comments, provides convincing evidence that the cancer risks attributable to exposure to toxic air pollutants at levels found in the Los Angeles air basin are significant from a public health perspective. MATES-II demonstrated that on-road vehicle emissions of the 31 toxic air pollutants measured in the air basin account for 50% of the total cancer risk associated with all toxic air pollutant emissions from all sources. The study also found that the range of cancer risks varied significantly across the region, from 1,120 in a million in the cleanest neighborhoods to about 1,740 in a million in the most polluted, with higher levels of cancer risk occurring near freeways and freeway junctions.[98] This analysis demonstrates that estimating health risks associated with MSATs is feasible.

Despite the availability of health hazard information in EPA's IRIS and the convincing evidence presented in MATES-II, the FEIS fails to evaluate localized concentrations of air toxic emissions at sensitive receptor sites along the ICC right-of-way, and the increased risk to health of those facing these increased exposures.

        **c.** Significant health effects caused by MSATs are well-recognized and should be mitigated.

Finally, in regards to health effects, the FEIS points out that "interpretation of this research and its implications for public health and the transportation community are expected to be addressed by EPA, as declared in the 2001 rulemaking."[99] Under 40 C.F.R. 1502.22 (b) the FHWA is required to include a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and an evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. Substantial evidence has emerged showing that fine particles and toxic air pollutants are associated with a wide range of adverse

---

[97] *Id.*

[98] South Coast Air Quality Management District, Multiple Air Toxics Exposure Study-II (Mar. 2000), available at http://www.aqmd.gov/matesiidf/matestoc.htm.

[99] FEIS at IV-328.

health impacts, including asthma, respiratory disease and early death.[100] The FEIS fails to provide the required summary of existing credible scientific evidence which is relevant to evaluating the health effects and foreseeable adverse impacts posed by increased exposures to MSATs that would be the result of a decision to build the ICC.

The above-referenced evidence, as a whole, demonstrates that the FEIS must be supplemented with further analysis to produce health risk estimates based on analysis of estimated increase in exposures to MSATs for those living, working, or attending school in close proximity to the ICC, and compared to a no-build case and other alternatives not presently considered in the FEIS. In addition, the FEIS neglects to identify mitigation strategies that might be undertaken to reduce these adverse health impacts. This failure is particularly noteworthy given that lifetime cancer risk from diesel soot in Montgomery and Prince George's Counties exceeds the risk of all other air toxics tracked by EPA combined, and that this risk is over 370 times greater than EPA's acceptable cancer level of 1 in a million.[101]

## 2. Flaws in the MSATs Analysis Protocol

The Lead Agencies failed to evaluate the peak MSAT emission conditions that would be associated with a decision to build the ICC, conditions that would occur soon after the facility is open to traffic. Instead, the FEIS evaluates only 2000 baseline and 2030 MSAT emissions. The Lead Agencies present a best case analysis, showing a dramatic decline (up to 92.5 percent) from 2000 baseline study-area MSATs by 2030.[102] This fails to evaluate the considerably higher MSAT emissions that will occur in 2010-2020, the years immediately after the ICC is planned to open to traffic. New, more stringent emission standards for heavy duty diesel vehicles and fuels do not go into effect until 2007. There will be a delay in realizing the anticipated reductions in MSAT emissions due to these standards because of the slow pace of motor vehicle fleet turnover. Dirtier older diesel vehicles sold as late as 2006 will not yet comply with the more stringent

---

[100] ED DEIS Comments at 9-16. See also Control of Hazardous Air Pollutants from Mobile Sources, (signed February 28, 2006) available at http://www.epa.gov/otaq/toxics.htm#mobile

[101] National Scale Air Toxics Assessment (NATA) as summarized on the Clean Air Task Force website, available at http://www.catf.us/projects/diesel/dieselhealth/county.php?c=24031&site=.

[102] See AQTR Addendum, Table V-3 at V-12. the Lead Agencies fails to provide any support (i.e., citations) for its assumption of such great decline in MSATs in violation. Rather, the Lead Agencies merely asserts that "FHWA is reasonably confident in the emissions trend between 2000 and 2030 and notes that it is in general agreement with EPA's projections about the decline in MSAT emissions over time."[102] AQTR Addendum at V-13.

emissions standards.  These vehicles will not be retired from service until nearly 2020 or even later (unless new actions are taken to accelerate retrofit or scrappage of such vehicles, or to restrict their use in the ICC study area) emitting MSATs at the current higher level.  The FEIS does not account for this delayed realization of MSAT emissions reduction and therefore the analysis considerably understates the aggregate MSAT emissions in the study area for the first decade of the ICC's operation.

The emissions estimation approach used in the MSAT analysis also conflicts with the approach used in the FEIS for the CO analysis where the Lead Agencies used a "rollback methodology" which "assumes that the number of stationary sources of CO and vehicle miles traveled increase at the same rate as the CO emission factors from these sources decrease.  This results in an equilibrium between improved technology and growth in local VMTs and other non-mobile sources of CO."[103]  In contrast, the MSAT analysis growth factors for new and existing sources of MSATs were not included.  These non-mobile sources of air toxics recognized as MSATs may contribute to future increases in background concentrations that may offset potential decreases in highway MSATs.

The FEIS states that the ICC build alternative will generate six to eight percent of the MSAT's within the ICC study area in 2030.  But it fails to evaluate how these emissions will be concentrated in the much smaller areas that are immediately proximate to the ICC, where the eight percent increase in MSATs across the much larger study area might easily result in a massive increase in MSAT emissions – potentially orders of magnitude greater than is now experienced on a localized basis in some of the sites along the ICC right-of-way. The FEIS also fails to evaluate how these concentrated emissions are likely to result in increased exposure of those living, working, or attending schools proximate to the ICC. Such an analysis must be undertaken in order for FHWA to satisfy its obligations under Section 109(h) of the Highway Act, as well as under NEPA.

### 3.  Optimization of Signal Timing in the CO Analysis is Inadequate

The Lead Agencies optimized signal timing in its Carbon Monoxide analysis, thereby eliminating from the forecast substantial emissions from likely periods of congestion, such as

---

[103] AQTR Addendum at V-9.

accidents or longer idling times at busy intersections. Optimization does not meet Clean Air Act requirements to use worst-case assumptions for air quality modeling or a range of operating conditions from average to worst case. The Lead Agencies acknowledged this requirement in its Carbon Monoxide analysis,[104] yet failed to keep its analysis consistent with worst-case assumptions. The optimization causes CO emissions, and therefore the environmental and health consequences of such emissions, to be underestimated. In order to comply with NEPA, the Lead Agencies should re-run the Carbon Monoxide analysis using operating conditions that represent likely usage patterns, *i.e.,* without optimizing traffic flow.

   4.  <u>Forthcoming PM 2.5 Hotspot Analysis Must Include Analysis of Hotspots along I-95, I-495, and I-270 in the Study Area</u>

In the current required study of PM 2.5 hotspots associated with the proposed ICC project, the Lead Agencies should include consideration of hotspots along the portion of I-95, I-495, and I-270 in the study area, in addition to hotspots along the ICC. Significant portions of each of these major highways are within the study area and the traffic modeling for the ICC shows increased annual average daily traffic ("AADT") along some segments of each of these highways. Although the FEIS fails to disclose actual traffic volumes by motor vehicle classification, preliminary examination of the SHA travel model files by Smart Mobility shows that selected segments of these highways currently carry, and are forecast to continue carrying, a substantial volume of trucks and heavy duty diesel vehicles.[105] Adding traffic to these already congested highways will contribute to increased motor vehicle emissions, including PM 2.5.

NEPA requires analysis of the cumulative effects of a proposed action. 42 C.F.R. § 1508.8. In determining the environmental consequences of cumulative effects, it is necessary for the lead agency to establish a pre-project baseline condition against which the predicted post-project condition can be compared. As CEQ guidance on NEPA explains "[t]he critical element. . . is defining an appropriate baseline or threshold condition of the resource, ecosystem, and human community beyond which adverse or beneficial change would cause significant degradation or enhancement of the resource, respectively."[106] According to CEQ, this

---

[104] FEIS at IV-308 - IV-309.
[105] Personal email correspondence, Brian Grady to Michael Replogle, March 8, 2006.
[106] *See* Attachment 4, "Determining the Environmental Consequences of Cumulative Effects" at 41.

comparison "is critical to the NEPA process."[107] Courts have also recognized the importance of establishing an accurate baseline: "Without establishing the baseline conditions which exist in the vicinity of [the proposed action], there is simply no way to determine what effect the proposed [project] will have on the environment and, consequently, no way to comply with NEPA." [108] The comparison is important to determine the extent of the impact and to determine what mitigation measures to implement to lessen the impact.

Further support for analyzing hotspots along I-95 as a result of the proposed ICC project is found in EPA's Transportation Conformity Final Rule. Specifically, EPA announced that the legal standard for transportation conformity under Clean Air Act Section 176(c)(1) is that "projects not create or worsen NAAQS violations."[109] Because FHWA and EPA have already determined that this new rule applies to the proposed ICC, the Lead Agencies must perform analyses to determine whether the proposed ICC will cause or worsen NAAQS violations not only along the ICC but also along I-95, I-495, and I-270 for PM 2.5.[110]

Further, NEPA requires the Lead Agencies to obtain information on the baseline condition of PM 2.5 along I-95, I-270, and I-495, if it is not already available. Section 1502.22(a) CEQ's implementing regulations provides:

> If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

"This section has been interpreted to mean that an agency is required to engage in reasonable research to supply missing information about the negative impacts that a project may produce."[111] Here, PM 2.5 concentration information is easily and inexpensively obtainable by the Lead Agencies by installing PM 2.5 monitors at hot spot locations along the highway. Due

---

[107] *Id.*

[108] *Half-Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)

[109] "Transportation Conformity Final Rule: PM 2.5 and PM 10 Hot-Spot Analyses in Project-Level Transportation Conformity Determinations for PM 2.5 and PM 10 National Ambient Air Quality Standards" 71 Fed. Reg. 12468 (March 10, 2006).

[110] *See* Letter from Neil Pederson, Maryland State Highway Administrator, March 3, 2006 (Attachment 5)

[111] *Hawaii County Green Party v. Clinton*, 124 F. Supp. 2d. 1173, 1190 (D. Hawaii, 2000)

to the significant adverse health impacts caused by PM 2.5 as well as the risk of violating NAAQS, this information is essential to a reasoned decision on the proposed ICC project.

The Lead Agencies must include a pre-project baseline condition for PM 2.5 along I-95, I-270, and I-495 in order to adequately assess the air quality impact of the proposed ICC. This baseline condition is particularly important for the proposed ICC project because it is located in a region designated by EPA for non-attainment for PM 2.5, and because local monitors in the vicinity of I-95, I-270, and I-495 show PM 2.5 concentration to be only slightly below the NAAQS. Based on our query of EPA's AirData website, four PM 2.5 monitors are located at three different monitoring sites in the Montgomery and Prince George's Counties region. None of the monitoring sites are within 300 meters of a major traffic facility. Three of the monitors are marginally in attainment of the NAAQS annual mean standard (15.0 μg/m3), and one monitor exceeds this standard. The results of our query of EPA's AirData database are of particular concern given the findings of the Northern Bus Garage Air Quality Monitoring Study.

The Northern Bus Garage Study was established by the Washington Metropolitan Area Transit Authority ("WMATA") and the D.C. Department of Health to respond to community concerns regarding the impact of Northern Bus Garage emissions activities on local air quality. With regard to the effect of bus garage activities on local air quality, the study found that daytime, weekday bus and truck traffic along 14th Street at the noon hour, when there is no Northern Bus Garage bus activity, is responsible for approximately 1 μg/m3 more DPM than is experienced by the city as a whole.[112] The study was designed to measure the contribution of DPM which represents a significant portion, although not all, of PM smaller than 2.5 μm in size emitted by motor vehicles. This research shows that particulate matter emissions attributable to levels of AADT typical of smaller corridors - *e.g.,* 14th Street, which carries approximately 8,200 vehicles according to the District of Columbia Department of Transportation's average annual daily traffic statistics - can contribute 1 ug/m3 to ambient PM 2.5 levels. Given the findings of the Northern Bus Garage Study, the background PM 2.5 concentrations which demonstrate that compliance with PM 2.5 NAAQS in the project area is within less than 1 μg/m3 of violating the NAAQS, and estimated Annual Average Daily Traffic ("AADT") levels for the

---

[112] "The Impact of the Northern Bus Garage on Local Air Quality". A Report to the Washington Metropolitan Area Transit Authority. Versar, Inc. May 2003, at 1-27.

ICC corridor which significantly exceed the traffic levels on 14th Street that were found to contribute a 1 μg/m3 increase to local PM, it is highly likely that the proposed ICC project will cause or contribute to PM 2.5 concentrations that will violate the NAAQS throughout the ICC corridor and adjacent segments of the I-95, I-270, and I-495 corridors. Consequently, it is critical that the FEIS include a modeling assessment to provide the best estimate of the magnitude of the NAAQS violations likely to occur at the points of greatest concentrations ("hot spots"), and identify and evaluate the effectiveness of mitigation strategies to reduce emissions to avoid the NAAQS violation.

These findings are especially significant because of the close proximity of a number of schools and day care centers to the proposed ICC. As documented in comments on the ICC DEIS, the Drew Elementary School playing fields are immediately adjacent to the ICC Right-of-Way ("ROW") and this school's building is less than 400 feet away from the ROW. Magruder High School is also located less than 900 feet away from the ROW under Rock Creek Option C, the alignment preferred by the Maryland-National Capital Park and Planning Commission and likely to be favored by the Maryland State Highway Administration as a way to reduce the substantial direct impacts to park resources posed by other possible ICC alignments. Blake High School on Norwood road is also within about 1600 feet of one of the ICC Corridor 2 alignments. The former Colesville Elementary School abuts the proposed New Hampshire Avenue interchange of the ICC, with its building within 400 feet of the ICC traffic. This has been converted into a day care center. Redland Middle School is within 1000 feet of Corridors 1&2 - Rock Creek Option C. The Briggs Chaney Middle School is also within 1000 feet of Corridor 2 - Spencerville Options A, B, & C to Burtonsville Option A. There are other schools adjacent to I-270, I-95, and I-495. These include Blair High School, which immediately adjoins sections of I-495 that the FEIS concedes will likely to experience increased traffic as a result of construction of the ICC.

In order to satisfy the Clean Air Act conformity test that the project not cause new, more severe or more frequent violations of the NAAQS, the baseline concentrations in the vicinity of expected hot spot areas where AADT will increase significantly must be known. Failure to determine the baseline condition will not allow the agency to analyze the impacts of emissions from increased traffic or the extent to which the NAAQS will be violated. It would violate NEPA

38

to not collect baseline data needed to determine whether the proposed ICC project would create new NAAQS violations or worsen existing NAAQS violations. It would also violate the CAA conformity rule which requires that the project level analysis be based upon "the total emissions burden which may result from the implementation of the project, summed together with future background concentrations."[113]

The conformity rule also requires that "the total concentration must be estimated and analyzed at appropriate receptor locations in the area substantially affected by the project."[114] These locations should be situated in places where project emissions are likely to have the greatest impact on ambient air quality. In order to select these locations, baseline data is necessary to determine where current highway emissions may be causing higher concentrations than those reported at the regional PM 2.5 monitoring stations referenced above. It is well established that heavily trafficked freeways can add 2-3 μg/m3 to regional background concentrations of PM 2.5.

a. Highway Project Emissions Are Significant Contributors to Ambient PM.

Evidence shows that major freeways contribute at least 3 μg/m3 to PM 2.5 concentrations in adjacent neighborhoods. The East Bay Children's Health study showed that mean PM 2.5 measured in a school yard, 60 meters downwind from a freeway with annual average daily trips (AADT) of 190,000, was 15 μg/m3, 3 μg/m3 above the levels reported at the regional scale monitors operated by the Air District (12 μg/m3).[115] A six-lane freeway carries 190,000 AADT. By comparison, 10-12 lane freeways included within the MATES-II study carry in excess of 320,000 AADT. It is clear that a moderate sized freeway of six lanes can add significantly to local concentrations of PM 2.5. Larger freeways can be expected to add significantly greater concentrations, and highways of 4 lanes or larger can be expected to contribute at least 1 μg/m3 or more to local concentrations of PM 2.5.

These data are consistent with modeled concentrations of PM 2.5 from a highway reported by Dutch researchers who estimate that the highway contributes about 3 μg/m3 at 60

---

[113] 40 C.F.R. 93.123(c).
[114] Id.
[115] Kim, et al., "East Bay Children's Respiratory Health Study," AJRCCM, Table 2.

meters, with the impact tailing off to about 1 μg/m3 at 100 meters.[116] In addition, these ranges are also supported by data from two PM 2.5 monitors located within 25 feet and 83 feet, respectively, from I-95 in Connecticut. The monitor located nearest the highway reports annual PM2.5 > 16 μg/m3, whereas the more distant monitor reports annual PM 2.5 between 14 and 15 μg/m3.[117]

A research project to investigate the contribution of transportation sources to black carbon ("BC"), elemental carbon ("EC") and PM 2.5 concentrations undertaken by the Puget Sound Clean Air Agency demonstrates similar results. At a monitoring station located within twenty meters of I-5 in downtown Seattle where AADT is more than 200,000, annual mean BC concentrations were found to be 2 μg/m3, compared to 0.4 at an urban residential site (Beacon Hill) 600 meters from I-5.[118] Correlations performed as part of the study demonstrate that BC contributes 25% to 30% of measured PM 2.5 at these sites.[119] Evidence in a separate Puget Sound Clean Air Act report shows that a high portion of total BC correlates with traffic, and that during the low traffic hours from 12:00 AM until 6:00 AM hourly BC concentrations drop to near zero.[120] Since vehicle PM includes other components, in addition to BC, the Seattle BC measurements are a close approximation of the minimum contribution of traffic emissions to PM 2.5 measured near the freeway. The difference in PM 2.5 reported at one of the highway sites included in the Puget Sound study (AirData site Duwamish) and the Beacon Hill site has consistently ranged from 2.4 to 2.9 μg/m3 over the last four years.[121] This would appear to be largely attributable to the difference in traffic loads and diesel vehicles between the two sites. The reported increase of 1.6 μg/m3 for BC adjacent to I-5 compared to the urban background would account for the difference in PM 2.5 based upon the BC/PM 2.5 ratio reported in the study. The impact of highway emissions on air quality measured next to I-5 is consistent with

[116] "On health risks of ambient PM in the Netherlands," Netherlands Aerosol Programme (October 2002), Fig. 9, at 54.

[117] See Comments on Proposed Hotspot Rule for PM10 and PM2.5 Prepared by Robert E. Yuhnke and Submitted on Behalf of Environmental Defense and Sierra Club, January 27, 2005. Accessed at www.epa.gov, EPA Docket Number OAR-2003-0049, Exhibit 1 "PM2.5 Monitor Data.xls."

[118] See id at Exhibit 2, "404-21 AMWA # manuscript Presentation – Aeth-FINAL.doc. See also Gilroy, M. et al, "Urban Air Monitoring Strategy – Preliminary Results Using Aethalometer™ Carbon Measurements for the Seattle Metropolitan Area" (April 2004), Table 2.

[119] Gilroy. at 9.

[120] Curtiss, H. et al., "Traffic Flows and Black Carbon Monitoring in the Urban Seattle Environment" (Intern Report, Puget Sound Clean Air Agency, 2004), Fig. 9 and 10.

[121] The Olive Street site next to I-5 appears not to be reported in AirData.

the 3 μg/m3 increase reported in the East Bay Children's Health Study for a comparably sized freeway when the additional components of vehicle PM other than BC are taken into account.

Thus various sources of data confirm that heavily trafficked highways can be expected to contribute an increment to urban background annual PM2.5 in the range of at least 2 to 3 μg/m3 in neighborhoods near the freeway traffic lanes.

These air quality impacts are significant in the context of the annual NAAQS of 15 μg/m3, especially when compared with other measures of significance adopted by EPA for other applications. Many nonattainment areas include counties that do not monitor violations of the NAAQS, or have determined design values for the development of control strategies based upon monitored concentrations from monitors that are not sited in the impact zone of highways and therefore do not account for the local impact of highway emissions. The local impacts from highways exceed the maximum contribution of interstate transport of PM 2.5 from Ohio (< 2.0 μg/m3 at the point of greatest out-of-state impact) estimated by EPA's modeling for the Interstate transport rule. If the contribution of emissions from this largest source of interstate emissions is significant under the Clean Air Act, then the emissions from 4-lane or larger highways must be considered as significant for purposes of requiring that these impacts be accounted for under the transportation project hot spot requirements.

b. Air Quality Monitors Are Not Sited to Detect Impacts of Highway Emissions on Ambient Air Quality.

The proposed ICC project corridor is located where no ambient air quality monitoring station is providing data that meets EPA monitoring siting criteria. Those criteria require that monitors sited for the purpose of measuring the ambient impact of highway emissions be located 5-15 meters from the closest traffic lane.[122] A search of EPA's AirData website and has not

---

[122] 40 C.F.R. Part 58, Appendix E, ¶ 8.3.
The intent is to locate category (a) NAMS sites in areas of highest concentrations whether it be from mobile or multiple stationary sources. If the area is primarily affected by mobile sources and the maximum concentration area(s) is judged to be a traffic corridor or street canyon location, then the monitors should be located near roadways with the highest traffic volume and at separation distances most likely to produce the highest concentrations. For the microscale traffic corridor station, the location must be between 5 and 15 meters from the major roadway. For the microscale street canyon site the location must be between 2 and 10 meters from the roadway. For the middle scale station, a range of acceptable distances from the roadway is shown in Figure 2. This figure also includes separation distances between a roadway and neighborhood or larger scale stations by default. Any station, 2 to 15 meters high,

identified any PM 2.5 monitors that report air quality data in the national AirData system located within less than 20 meters of a major highway in the Washington Metropolitan nonattainment area.[123] Only three out of 1490 monitors nationwide are located in PM 2.5 nonattainment areas. Two of these report violations of the NAAQS for PM 2.5 (northern NJ near I-78 and New Haven CT near I-95). The locations that the Washington metro area PM 2.5 monitors are measuring do not provide relevant air quality data for the purpose of assessing the impact of highway emissions on air quality because those monitors were not sited for that purpose based upon EPA's guidelines in Part 58 Appendix E. Air quality measured at monitors that do not satisfy the siting criteria for highways are relevant to showing that increased emissions from the highway threaten to cause new or more serious violations of the NAAQS, but are not adequate for the purpose of establishing baseline concentrations for use in making the conformity determination. Therefore LEAD AGENCIES must establish monitors at expected hot spot locations that satisfy EPA's siting criteria for the purpose of identifying baseline concentrations to be used for a quantitative air quality impact analysis for PM 2.5.

### 5. NOx, SO2, and PM Modeling

The FEIS fails to discuss the extent that pollution from nitrogen oxide, sulfur dioxide and coarse particulate matter will increase as a result of the ICC. FEIS Section IV.H merely states that Montgomery and Prince George's counties are currently in attainment under the Clean Air Act for nitrogen dioxide, sulfur dioxide and coarse particulate matter, but this fails to address the impact that the ICC will have on the future pollution levels of these substances or resolve whether emission increases from the project are likely to contribute to violations of the class II PSD increments for these pollutants.

According to the U.S. EPA, motor vehicles emissions are one of the primary sources of nitrogen oxide pollution, accounting for approximately 55% of NOx emissions from manmade

---

and further back than the middle scale requirements will generally be neighborhood, urban or regional scale. For example, according to Figure 2, if a PM sampler is primarily influenced by roadway emissions and that sampler is set back 10 meters from a 30,000 ADT road, the station should be classified as a micro scale, if the sampler height is between 2 and 7 meters. If the sampler height is between 7 and 15 meters, the station should be classified as middle scale. If the sample is 20 meters from the same road, it will be classified as middle scale; if 40 meters, neighborhood scale; and if 110 meters, an urban scale.

[123] See "Methodology for Determining Distance of PM 2.5 Monitors to Major Highways" (attached exhibit).

sources.[124] The nitrogen oxides form when the fuel that powers motor vehicles is burned. Sulfur dioxide gases are also formed from the burning of fuel. Coarse particulate matter "primary" particles often occur in the form of dust from roads, and "secondary" particles are formed in the atmosphere through sulfur dioxide and nitrogen oxide emissions, including emissions from automobiles. Therefore, it is likely that the concentration of motor vehicle traffic on the ICC, as well as increased congestion on I-95, will lead to increases in each of these pollutants and potentially to NAAQS violations.

There are serious health and environmental impacts concerns associated with each of these pollutants. Nitrogen oxide causes human respiratory problems, contributes to formation of acid rain, contributes to nutrient overload that deteriorates water quality, reacts to form toxic chemicals, causes visibility impairment and contributes to global warming, among other harms. The adverse effects of SO2 include respiratory illness, aggravation of heart and lung diseases, formation of acid rain and visibility impairment. Coarse particulate matter particles can cause numerous health problems and have been linked with illnesses and deaths from heart and lung diseases; they also can cause acidity in lakes and streams, change the nutrient balance in coastal waters and river basins, deplete the nutrients in soil, damage forests and farm crops and affect the diversity of ecosystems.

Without a discussion of the adverse environmental and health impacts that will occur as a result of increased pollution from nitrogen oxide, sulfur dioxide and coarse particulate matter, the EIS is inadequate.

6. The FEIS Fails To Disclose The Massive Body Of Recent Evidence Showing That Adverse Health Effects Will Likely Occur At Levels Of PM 2.5 That Meet EPA's 1997 NAAQS.

As documented in previous comments, consideration of the recent health effects literature is required because it provides compelling evidence that the 1997 NAAQS for particulate matter do not protect the public from adverse health effects that have been demonstrated at concentrations in compliance with the NAAQS.[125] Since EPA closed the record on its review of

---

[124] U.S. EPA, *NOx: What is it? Where does it come from?*, accessed at http://www.epa.gov/air/urbanair/nox/what.html.
[125] ED DEIS Comments at 9-19.

43

the PM NAAQS in 1997, hundreds of epidemiological research studies have been published by independent investigators reporting the relationship between exposures to PM and adverse health outcomes. These adverse effects include premature death, cardiovascular and respiratory diseases requiring hospitalization, and exacerbation of asthma and other respiratory conditions. This evidence is readily available to the Lead Agencies because it has been reviewed and summarized in EPA's "Air Quality Criteria for Particulate Matter."[126]

The response of the Lead Agencies provides no defense for their failure to disclose the recent evidence showing that adverse health effects will likely occur at levels of PM 2.5 that meet EPA's 1997 NAAQS. Nor does the FEIS provide any finding that public exposure to emissions expected from increased traffic in the ICC highway corridor will be below the levels associated with risks of adverse health effects considered to be significant from a public health perspective. When an agency cannot make a finding of no significant impact, NEPA requires that the impacts be addressed in an EIS.

## B. Water Quality

In addition to comments we provide in this section, we incorporate into these comments by reference the Statement of Stephen Prince (Attachment 2), which illustrates a number of lingering and new deficiencies in the FEIS treatment of water quality and secondary impacts.

### 1. The FEIS's Inconsistent, Incomplete, And Inadequate Modeling Of Water Quality Impacts Is Of No Use To A Decisionmaker

As noted in comments made by Chesapeake Bay Foundation, Environmental Defense, and Audubon Naturalist Society in response to the DEIS, the Lead Agencies failed to adequately assess the potential water pollution impacts, direct and indirect, that would or could result from the ICC. Those comments remain valid in light of the FEIS, and the Lead Agencies' response to these criticisms is an incomplete and inconsistent approach to modeling the impacts for the two build alternatives. As a result, the modeling of water quality impacts is simply inadequate either i) to assess the result of constructing the ICC on either route individually or ii) to compare impacts between the ICC build alternatives.

---

[126] *Air Quality Criteria for Particulate Matter*, U.S. EPA, Office of Research and Development.

In the FEIS, the Lead Agencies undertook two new water quality analyses. First, the Lead Agencies estimated the direct impacts on water quality due solely to the strip of land on the ICC right of way that would be converted to multi-lane highway in Corridor 1. Second, the Lead Agencies modeled the direct and indirect (*i.e.*, land use change) impacts of Corridor 2 on the Rocky Gorge Reservoir watershed, a watershed largely outside the ICC study area.[127]

The two analyses fall far short of plugging the holes identified in comments to the DEIS. To begin with, there is no way for an agency decisionmaker to compare alternatives with respect to their impact on water resources when the FEIS has taken widely divergent approaches in modeling each build alternative – measuring only direct impacts to water for Corridor 1, ignoring any indirect impacts due to induced or secondary development, while at the same time measuring direct impacts *and* indirect impacts to one watershed for Corridor 2. It defies logic to think that a decisionmaker could come to a reasoned decision with respect to the relative water quality impacts of the build alternatives on the basis of this apples-to-oranges comparison. At the very least, the Lead Agencies should have utilized a consistent approach to modeling the build alternatives.

In addition, the Lead Agencies' modeling for each build alternative is incomplete, even for Corridor 2. There is no apparent explanation for why the Lead Agencies would model direct and indirect impacts from Corridor 2 on only a single watershed, while omitting any analysis of other watersheds or surface water resources which are equally likely to be impacted by development of Corridor 2. This is especially troubling since the FEIS concluded that secondary and induced development resulting from Corridor 2 *would impact* water quality in the Rocky Gorge watershed.[128] In the case of Corridor 1, the Lead Agencies neglected to do *any* modeling of indirect impacts, instead merely assessing the water quality impacts of laying a strip of pavement on Corridor 1. Although one should expect localized impacts to surface waters as a result of the paving, regardless of the best management practices employed, this piece in

---

[127] "SHA developed a spreadsheet-based nonpoint source (NPS) pollutant load model in 2005 to estimate and compare annual pollutant loads for a variety of NPS pollutants for pre- and post-ICC land use conditions within ICC watersheds, including the Rocky Gorge Reservoir. One analysis performed focused on the corridor of land anticipated to be the ICC right of way under a Corridor 2 build alternative and summarized the NPS pollutant loads from the ICC for the watershed. **The other analyzed the pre- and post-ICC land use conditions in the Rocky Gorge Watershed based on results from the SCEA.** The model did not evaluate sediment or other pollutant loads associated with existing or potential future streambank erosion." FEIS at IV-189 (emphasis added).

[128] FEIS at IV-191.

45

isolation, without consideration of indirect impacts and land use changes, will not have substantial regional water quality implications. However, this result is not representative of the likely and reasonably predictable indirect water quality impacts due to a project such as the ICC.

Given these flaws, the FEIS modeling is simply inadequate for the purposes of determining the impacts to water quality of either Corridor 1 or Corridor 2, let alone a meaningful comparison of the two build alternatives. Since "[a]n EIS must analyze not only the direct impacts of a proposed action, but also the indirect impacts...,"[129] the Lead Agencies should have, at minimum, modeled *both* direct and indirect impacts for *all* watersheds and water resources reasonably likely to be impacted by either build alternative.

Finally, for the single watershed in which the Lead Agencies conducted any modeling of indirect impacts, the agency chose an overly simplistic spreadsheet model despite the existence of many more sophisticated, professionally-accepted and cost-effective models. In conducting the modeling on Corridor 2, the Lead Agencies utilized the "Simple Method" spreadsheet model[130] to calculate potential pollutant loads from urban sources, and added to that model certain "pollution export coefficients" to account for non-point source ("NPS") pollution loads from rural land (*e.g.*, agriculture or forest). This model is, indeed, relatively simple, based upon average annual rainfall, average imperviousness for certain land uses, and NPS pollutant loads from so-called "event mean concentrations" from the current literature.

The "Simple Method" is *too simple* to adequately and accurately model the water quality impacts of the ICC's two selected build alternatives. A number of other well-accepted and technically superior models and methodologies could have been used in lieu of the Simple Method. A competent consultant could use, for example, the "GWLF model" to conduct the analysis, breaking the predicted 5,000 acres of impact into appropriate sub-basins of the several watersheds; using the Secondary and Cumulative Effects Analysis ("SCEA") predictions; and estimating land use breakdowns, by percentage, for each one, based upon the proportion of jobs and housing in each. Montgomery County has fairly good hydrologic information on the streams, as well as soils data, and these data would be needed to calibrate the

---

[129] *Utahns For Better Transportation v. United States Dept. of Transportation*, 305 F.3d 1152, 1174 (10th Cir. 2002).
[130] Scheuler, T.R., 1987.

model. In addition, we understand that GWLF calculates not only pollutant inflow into the streams but even nitrogen delivery via groundwater. The cost, according to a Chesapeake Bay Foundation scientist acquainted with such modeling, is estimated to be well under $100,000. Given the scale of this project, such an assessment is mandated.

### 2. Uncertainty Plagues The Modeling Of Water Quality Impacts Due To Induced and Secondary Development

It is not clear from the Lead Agencies' study's description what future land uses in the ICC area were actually modeled, and therefore it is impossible to determine the validity of this analysis. The first sentence of the Lead Agencies' description indicates that "changes in land use from the ICC corridors and the [SCEA] were provided by SHA." But then the Lead Agencies state that

> "[t]he Rocky Gorge reservoir/SCEA boundary analysis compares NPS pollutant loads from existing land use to build-out of existing zoning and transportation land uses. Therefore, the only change in the future land use condition attributable to ICC construction along Corridor 2 is within the right of way strip."[131]

Thus it appears that in this limited analysis, conducted for *only* Corridor 2 and *only* for impacts upon Rocky Gorge, the Lead Agencies used merely the build-out of existing zoning and transportation land uses, rather than induced growth beyond existing zoning. However, even with these inappropriate limitations, the analysis did show that "[c]onstruction of Corridor 2 could ... potentially have an effect on water quality within the Rocky Gorge watershed... [o]f the six [pollutants] studied five of them increased in the future timeframe..."[132] This includes fecal coliform, up by 40%, total nitrogen, up by 7%, and total phosphorus, up by 16%, and an increase in metals by 82-83%.[133]

At the bare minimum, if the Lead Agencies thought that the "Simple Method" was adequate to model land use change, it should have used this model for Corridor 1, determining basin-specific loads or impacts upon the Anacostia, Rock Creek, and Upper Patuxent, and/or

---

[131] *Comparative Water Resources Hazard Assessment, Intercounty Connector, Montgomery & Prince George's County, Maryland,* prepared for: Maryland State Highway Administration and Maryland Transportation Authority, November 22, 2005, Appendix C ICC Pollutant Load Study (July 2005), at 3 (emphasis added).

[132] *Id.,* Comparative Water Resources Hazard Assessment at 28. It is telling that SHA excluded the descriptor "adverse" before the word "effect," since only negative effects on water quality are possible from such development.

[133] *See, e.g.,* FEIS at IV-184.

upon tributaries to these major streams (*e.g.,* the Paint Branch, Sligo Creek). A number of these water courses are already suffering from the effects of pollutants. For example, the Anacostia is already beset by fecal coliform and sediment problems and development spurred by the ICC would be expected to increase these pollutants. The Maryland Department of the Environment is expected to formally propose a TMDL for bacteria for the Anacostia shortly. The Secondary and Cumulative Impacts Analysis predicted some 5,000 acres of new development to be expected as a result of the ICC on Corridor 1, above and beyond that currently anticipated. Without any analysis of the impact of expected induced and secondary development on water quality, there is simply no basis for the FEIS's conclusion that Maryland antidegradation requirements and conformance to TMDLs will be accomplished simply by using so-called Best Management Practices ("BMPs") via their general stormwater permit.

In particular, we note that the SCEA findings were not included in the Lead Agencies' analysis of potential changes in water temperature and other impacts to the resident and reproducing brown trout population of the Upper Paint Branch (Good Hope tributary). The significance of the Upper Paint Branch is described in the comments of Regional Administrator Donald Welsh, U.S. EPA Region III:

> The changes in habitat and water quality represent a particular threat to the Good Hope and Gum Spring tributaries of Paint Branch, where the only naturally reproducing brown trout population in Montgomery County and the metropolitan Washington D.C. area exist. Regional sampling has demonstrated that water quality in this portion of the Paint Branch is the highest in the Anacostia watershed. The Paint Branch has been designated Class III (natural trout) waters by the State of Maryland. This resource is valued by the community and county, who have instituted a Special Protection Area (SPA), with restrictions on development and impervious surface, to help maintain water quality and trout population.[134]

In his review of the Lead Agencies' proposed stormwater mitigation plans, Regional Administrator Welsh also cautions:

> There is considerable risk that the trout population will be lost when highways span trout streams, with slope stormwater runoff,

---

[134] FEIS, App. R-3, at 25.

48

forest clearing, added sediment load, and the potential failure of
infiltration systems (allowing uncontrolled runoff or slow release
of potential hazardous spills).[135]

The most critical threat posed by a highway corridor that would span the Good Hope is
highlighted in the Department of Interior's Comments on the 1997 DEIS/Section 4(f) Evaluation
for the ICC:

We are especially concerned with **heated stormwater** entering the
Good Hope...The stormwater runoff will overwhelm the base
summer flows in this stream and overheat the water. The juvenile
and adult trout will be eradicated by these recurring events.[136]

The FEIS fails to adequately address how baseflow contributions in combination with
stormwater design and operational controls and stewardship measures will ensure that long-term
stream temperature conditions of the Good Hope tributary will not exceed the Use III standard.
In 2004, the Lead Agencies conducted a targeted temperature monitoring study in the Good
Hope subwatershed to evaluate the relative temperature effects of inputs from tributaries to the
Good Hope. The study concluded that despite warm water inflows in the headwaters of the
tributaries the baseflow contributions to these tributaries and the Good Hope mainstem were able
to largely mitigate these effects and maintain an average temperature below the Use III standard
in 2004.[137] However, the data collected for the study provide only a snapshot of existing
temperature and baseflow conditions over one summer season and **cannot be extrapolated to
predict long-term conditions.**[138] Based on spot monitoring conducted by local scientists on July
14, 2005, the temperature of the main branch of the Good Hope tributary spiked from 70 to 75
degrees after receiving warm water inflows from a 30-minute storm event. Such anecdotal
evidence demonstrates that temperature spikes following summer storm events pose a real and
significant threat to the long-term condition of the Good Hope brown trout population, and that
this existing threat would only be further exacerbated with increases in impervious covers as a
result of developing the ICC Corridor 1 alternative.

---

[135] FEIS at 25.
[136] *Comments on the DEIS/Section 4(f) Evaluation for the ICC*, United States Department of the Interior, Aug 19,
1997, at 49 (emphasis added).
[137] FEIS, App. D, at 14.
[138] *See id.*, Summary.

**3.** <u>Underestimation Of Induced Development Results In A Deficient Analysis Of Water Quality And Ecological Impacts</u>

    **a.** The FEIS Fails To Adequately Respond To Modeling That Shows That FEIS's Induced Development Forecasts Are Understated

Environmental Defense's comments to the DEIS noted that the Regional Earth Sciences Application Center (RESAC) study, conducted by scientists at the University of Maryland and Woods Hole National Laboratory, concluded that the DEIS likely underestimated induced development by 2030 by a factor of four or five for the study area, and thereby also substantially underestimated the likely adverse impacts that building the ICC would have on water quality and ecosystems in the Anacostia River and adjacent watersheds.

The FEIS attributes the differences in findings between the RESAC study and the FEIS to variations in methodology:

> The ELUP considered a wide variety of factors, some that may not have been considered in the same way by the University of Maryland's Regional Earth Sciences Application Center (RESAC), such as the existing and planned use patterns within the study area, changing real estate and other market forces and the economy. The other major difference, and benefit, of the ELUP process is the inclusion of the DELPHI method to determine the Group's position.[139]

The Lead Agencies additionally claim that the RESAC study did not consider existing land use patterns and objectives:

> The University of Maryland study was ... arguably not bound at all by the master planning process and goals of the M-NCPPC and County Councils. By using the SLEUTH model as a trends analysis from 1984 to the present, the research performed was not bound by the fact that nearly 80% of the planned residential development within the study area [h]as already occurred. The vast majority of the growth that the ELUP determined was found in the few areas in the study area where the developed [sic] has not reached this level.[140]

---

[139] FEIS, App. R-8, at 138.
[140] *Id.*

The FEIS is in error to state that local land use objectives were not considered in the RESAC Study; this erroneous assertion is used to call into question the validity of the independent study carried out by University of Maryland scientists which was the basis for Environmental Defense's earlier comments on the water quality impacts of the ICC. According to Dr. Stephen Prince of the University of Maryland, who reviewed this section of the FEIS:

> This response [in the FEIS] is factually incorrect. The model as run uses exclusion areas to model zoning restrictions, wetlands, parks, steep slopes etc. Each of these areas were assigned a probability of development appropriate to the level currently allowed by zoning etc. and physical constraints. The second charge is that the current development was not considered. This is also incorrect since SLEUTH is actually calibrated using 2000 and development in earlier years, then run forward to 2030. Thus the development in 2006 is allowed for. Nevertheless, since the ICC route passes through the northern edge of the Priority Funding Area, it is unlikely that much development occurred here in the past 5 yrs. Our analyses show the probable impact of the ICC on this area. What the ELUP fails to capture is the probability of zoning restrictions, rezoning and increased development pressure once the highway is completed. As for the ELUP process, we understand that the "average" of participants' opinions were so skewed between two extremes that an average is meaningless.[141]

As described in the DEIS comments, the RESAC study utilized the SLEUTH 3.0 Beta model to estimate growth. The model was calibrated using developed land. Once calibrated, the Current Trends and Smart Growth scenarios were run to estimated development in 2030. These scenarios assume a weak (Current Trends) and strong (Smart Growth) implementation of Priority Funding Areas ("PFAs") provided for in the Maryland Priority Funding Act.[142] The goals of the Priority Funding Act have been supported through the planning, zoning, growth management and preservation policies that have been employed by M-NCPPC and its two Counties over many years. Furthermore, as noted in our earlier comments, the construction of the ICC would put

---

[141] Personal correspondence, Dr. Stephen Prince to Michael Replogle, February 24, 2006 (Attachment 2).
[142] *See* ED DEIS Comments, Attachment 8: *Evaluation of Impacts of Alternative Transportation and Land Use Scenarios in the Anacostia River and Adjacent Watersheds Affected by the Proposed Intercounty Connector*, Regional Earth Sciences Application Center (RESAC), University of Maryland for Environmental Defense, February 2005, at 8-12.

significant pressure on local agencies to relax the Smart Growth policies and goals of the Priority Funding Act.[143]

**b.** The Lead Agencies' Reliance of the ELUP Process Over Well-Accepted, Objective Models and Studies Defies Logic

In order to explain discrepancies between the results of studies, such as the RESAC, and the FEIS analyses, the Lead Agencies embrace the "Expert Land Use Panel" ("ELUP") Process, also known as the "DELPHI Process." We are at a loss to understand why the Lead Agencies decided to ignore studies based on widely accepted models and neglected to use such models, in favor of a methodology which is based on synthesizing into a single opinion the views of fifteen people sitting around a table. Certainly, such a methodology is easier to use, and possibly, less expensive. But it is not a rigorous, scientific, and verifiable method, but is instead based on fifteen subjective opinions. Worse, it is based on an averaging of those opinions into a single position:

> The ELUP was comprised of 15 individuals, all of whom had their own viewpoints and opinions. For the purposes of the SCEA, results from all 15 individuals were processed into one representative allocation per forecast zone (one household and one employment) using a statistical average. This statistical average does not always allow for individual panelist viewpoints and opinions to be clearly represented.[144]

Furthermore, others have previously noted that the wide differences in opinion among panelists as to which areas would receive or lose development due to the ICC tended to cancel one another out and produce little composite change.[145] The group put together for the DELPHI exercise will pass judgment knowing their opinion might influence the outcome of the decision to build or not to build. Hence, there is also an uncontrolled bias inherent in the selection of the ELUP members.

Such a tool might well be appropriate for a cash-strapped municipality. However, given the existence of a number of well-accepted, sophisticated models, it seems strange that the Lead

---

[143] *Id.* at 32-33.
[144] FEIS SCEA at 7.
[145] Ewing, R. and Kuzmyak, J.R., *Comparing Forecasting Methods: Expert Land Use Panel vs. Simple Land Use Allocation Model* (Manuscript) (2005).

Agencies would turn to the ELUP process to assess a multi-billion-dollar road project connecting two major east coast roadways.

### C. Wetlands and Mitigation

Comments made by Chesapeake Bay Foundation, Audubon Naturalist Society, Environmental Defense, Sierra Club, and others with respect to the DEIS's treatment of affected wetlands remain unresolved by the FEIS. In addition, the FEIS has raised several additional issues.

First, the FEIS has reduced the number of acres said to be directly impacted by more finely revising its engineering plans, narrowing roadway widths in some places, or lengthening bridges in others. So instead of doubling the annual average of wetlands impacted statewide by permitted uses, this single project more accurately increases that number by about half (approximately 44 acres), in terms of direct impacts. Indirect and secondary impacts, however, are still very large, in the several hundreds of acres and many miles of stream valley/floodplain, and the impact is still greatest, by far, in the stressed Anacostia watershed. In DEIS comments, Audubon Naturalist Society and Chesapeake Bay Foundation noted an inconsistency among the § 404 permit materials (Joint Public Notice) and the DEIS as to the amount of wetlands to be impacted. The FEIS attempts to explain this contradiction by noting that earlier information in the permit materials was made more accurate as further study ensued. However, this suggests that one of these figures must have been inaccurate. Legally, a public notice – or worse, a permit, should not be issued based on inaccurate information.

Second, with respect to mitigation, the Army Corps of Engineers is said to be requiring in-kind wetlands mitigation, but many of the primary sites for mitigation, and many more of the "back-up" sites, are "out-of-watershed" locations – some are even in the Monocacy watershed outside Montgomery County. Mitigation should be conducted in the watersheds affected. Indeed, the Anacostia must regain wetlands by the scores of acres, not lose them, in order to come anywhere near restoration – an objective formally agreed to by Montgomery and Prince George's Counties.

Finally, while the FEIS considers avoidance and mitigation by alignment, it does not show how each major wetlands-impacting sub-facility (*e.g.,* the major bridge or wetlands

crossings) has been designed to avoid or minimize wetland impacts. Impact calculations to, for example, certain endangered species in these wetland areas, have not been presented.

### D. Rare, Threatened and Endangered ("RTE") Species

Under Maryland law, no person may "take" wildlife that the Secretary of Natural Resources deems to be in need of conservation except through the permitting process administered by the Department of Natural Resources ("DNR").[146] Maryland regulations define "take" as meaning "to harass, pursue, hunt, shoot, wound, kill, capture, or collect, or attempt to engage in any such conduct."[147] DNR grants permits allowing the taking of species in need of conservation only for scientific and educational purposes.[148] Furthermore, Maryland law states the following:

> All state departments and agencies, in consultation with and with the assistance of the Secretary, shall utilize their authorities in furtherance of the purposes of this subtitle by carrying out programs for the conservation of endangered species and threatened species listed pursuant to § 10-2A-04 (f) of this subtitle, and by taking any action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of the endangered species or threatened species or result in the destruction or modification of habitat of the species which is deemed by the Secretary to be critical.[149]

The Lead Agencies have violated these obligations because the construction and operation of the ICC will require the Lead Agencies to take species in need of conservation by killing or harming such species, jeopardizing the continued existence of state endangered and threatened species, and resulting in the destruction or modification of habitats the Secretary of Natural Resources has designated as Ecologically Significant Areas ("ESAs").

Section IV.F.10 of the FEIS acknowledges that both corridors would impact state endangered and threatened plants. Trailing stitchwort, a state endangered plant, would be impacted by Corridors 1 and 2 in North Branch Rock Creek Watershed. Halberd-leaved

---

[146] Md. Code Nat. Res. § 10-2A-03(c)(1); Md. Code Regs. 08.03.08.
[147] Md. Code Regs. 08.03.08.01.
[148] *See* Md. Code Regs. 08.03.08.
[149] Md. Code Nat. Res. §10-2A-06(c).

greenbrier, a state threatened plant, would be impacted by Corridor 2 within Little Paint Branch Watershed, and could be impacted by Fairland Options A and B in the Indian Creek Watershed. Several options in the Paint Branch Watershed could impact the habitat of featherbells, a state threatened plant. In addition, both corridors would cause indirect impacts, such as loss of habitat suitable for colonization, establishment of invasive species, and changes in soil composition, that would further jeopardize the plant species.

As Section IV.F.10 relates, the comely shiner, a state threatened fish species, would also be impacted by either corridor. If Corridor 1 is chosen, there would be impacts to this fish in the North Branch Rock Creek Watershed, Northwest Branch Watershed and Little Paint Branch Watershed. If Corridor 2 is chosen, the fish would be impacted within North Branch Rock Creek Watershed. The FEIS lists recommendations provided by the Maryland Department of Natural Resources in connection with impacts to the comely shiner but does not indicate whether it will follow these recommendations. While it is not clear the extent to which these recommendations would allow the Lead Agencies to avoid taking or jeopardizing the comely shiner, there is apparent in the FEIS no commitment by the Lead Agencies to follow these recommendations in order to reduce the harm to the species.

Moreover, Section IV.F.10 acknowledges that either corridor would result in destruction and modification of state-designated ESAs. Under various route options, the Redland Spring ESA, Northwest Branch – Bonifant Floodplain ESA, Spencerville Seeps ESA and McKnew Bog ESA would be bisected, and the Aitcheson Bog ESA would be impacted.

Section IV.F.10 includes a discussion of avoidance, minimization and mitigation efforts, but concedes that impacts to several ESAs and endangered and threatened plant species would be unavoidable based on the current alignments. This is unacceptable for purposes of SHA's state law obligations. If the Lead Agencies cannot find a way to avoid harming listed species and destroying or modifying critical habitat, then it is in violation of Maryland law.

These violations are perhaps not surprising, as the Lead Agencies have admitted that they have not even determined what their obligations are under state wildlife law. In response to a comment inquiring what permits are required "pursuant to COMAR 03.08.03 and Natural Resources Article 10-2A-01 through 10-2A-09," the Lead Agencies responded: "It has not been

55

determined at this time whether permitting authority will apply to the ICC project in regards to RTEs."[150]  In fact, however, a permit from DNR was obtained to conduct surveys for the endangered bog turtle in connection with the ICC, illustrating the applicability of the permitting requirements to the ICC project.

### E. Equity and Environmental Justice

As noted in Environmental Defense's comments to the DEIS, the proposed expenditure of $2.4 billion for the ICC needs to be evaluated for its impacts on equity and environmental justice pursuant to the requirements of Title VI of the Civil Rights Act of 1964 and the Presidential Executive Order on Environmental Justice, and the DEIS failed to meet these requirements. This comment remains valid with respect to the FEIS.  In fact, the response of the Lead Agencies to Environmental Defense's comments contradicts the text of the FEIS. The Lead Agencies state:

> The study team did **not** complete an analysis of potential impacts to Environmental Justice communities in accordance with USDOT's "Order to Address Environmental Justice in Minority Populations and Low Income Populations," 1997 (Order 6640.23) for implementing EO 12898.[151]

In contrast, the FEIS states:

> An analysis of potential environmental justice considerations for the ICC project was developed by analyzing the U.S. Department of Transportation's Order to Address Environmental Justice in Minority Populations and Low-Income Populations, 1997, the Federal Highway Administration's Order 6640.23, 1998 , and SHA's Environmental Justice Guidelines for Maryland State Highway Administration's Projects, 2001. These documents serve as guidance for implementing EO 12898 in its programs, policies, and activities.[152]

This inconsistency casts serious doubt on whether the required analysis was conducted or was adequately evaluated.  The statement in the FEIS represents yet another unsupported, conclusory statement by the Lead Agencies, as is the case throughout the FEIS.  In addition,

---

[150] FEIS, App. R-8, Comment No. 185.
[151] *Id.* at 62 (emphasis added).
[152] FEIS at II-7.

56

here, as in other places, the apparent contradiction between statements suggests that the

unsupported statement in the text of the FEIS is inaccurate and a smokescreen.

In its comments to the DEIS, Environmental Defense noted that:

> The ICC DEIS analysis has not adequately evaluated the
> distribution of benefits and burdens related to the transportation
> plan, particularly with regard to (a) exposure to hazardous air
> pollutants, noise, and stormwater-borne pollutants and their clean
> up cost, (b) the accessibility of jobs and services for those with
> restricted access to cars, (c) traffic safety hazards and their
> remediation for those especially dependent on walking or
> bicycling, (d) transportation consumer expenditures and taxation,
> (e) quality of transit services, such as the degree of overcrowding
> on vehicles, vehicle age, frequency of service, and comfort and
> safety of transit access, waiting, and transfer environments, or (f)
> availability of employer commuter subsidies. Nor has SHA,
> FHWA, or TPB shown a business justification for continued
> disparate impacts of transportation plans and projects on protected
> populations, as required by law.[153]

The FEIS simply ignored this comment and failed to disclose either the methodology or

the results of its environmental justice analysis, instead relying on conclusory statements such as

that quoted above. The FEIS states:

> A map analysis was conducted to identify whether environmental
> effects would be disproportionately high and adverse for
> environmental justice populations. Based on the results of all
> technical studies conducted for this project, the physical location of
> potential adverse impacts to the man-made as well as the natural
> environment was identified. The location of these effects was
> analyzed to determine whether patterns or concentrations of
> adverse effects occurred in areas with environmental justice
> populations. A table summarizing the results of the map analysis
> can be found in **Appendix E.**[154]

We would like to note for the record that the above-referenced Appendix E of the

Socioeconomic and Land Use Technical Report is not included in the PDF format of the

Socioeconomic and Land Use Technical Report, obtained from the ICC website. Without the

---

[153] ED DEIS Comments.
[154] FEIS at III-21 (emphasis added).

opportunity to review the findings of the map analysis, it is difficult to evaluate the basis used to determine that "[i]n general, it has been determined that all areas that contain environmental justice populations would experience beneficial or adverse effects similar to those of the overall study area population."[155] Based on the text provided in the FEIS[156] we can, however, guess that the analysis of impacts to environmental justice populations does not address the issues raised in our previous comments, such as exposure to hazardous air pollutants, noise, and stormwater-borne pollutants and their clean up cost; the accessibility of jobs and services for those with restricted access to cars; and traffic safety hazards.

The FEIS's minimal assessment of mobility and access for environmental justice populations and individual community areas supports this assumption. In regards to mobility and access, the Lead Agencies limits its scope of analysis to the following questions:

> Would there be a barrier effect that would cut off neighbors from one another or are there paths to which residents now walk or ride their bicycles that would be adversely affected?

> Would residents find it easier or more difficult to leave their neighborhoods?

> Would local access from the neighborhoods be altered, and if so, how?[157]

The FEIS does not attempt to evaluate the disparate impacts of the ICC on access to jobs for low-income and minority households. We highlight this point because the Smart Mobility, Inc. Report found that the ICC would disproportionately improve access to jobs by public transportation and automobile for higher income households, while producing far less access to jobs benefits for low and moderate-income households. In comparison, the less costly Transit-Oriented Land Use and Investment alternative would produce greater job access gains for all income groups but especially for low-income households.

In addition, as noted in Environmental Defense's DEIS comments, the analysis by Smart Mobility, Inc. found that the ICC would likely be used almost exclusively by travelers who are

---

[155] *Id.* at IV-23.
[156] *Id.* at IV-23 - IV-27.
[157] *Id.* at III-21, III-29.

from upper-middle and high-income households, providing little usage benefit to poor and lower-middle income travelers. The FEIS describes the potential that low-income residents would be denied the benefits of ICC transportation improvements:

> For each alternative, many of the benefits of improved mobility occur across the study area. Travelers on existing local roads would experience a relief in future congestion; however, the greatest benefit for travelers would be experienced by those who currently use the local road network and would be able to make their trip on the new facility.
>
> Low-income travelers that would travel by bus on the toll facility would not be directly subject to the toll; therefore, these individuals would not be denied the full benefit of improved transportation. Those that travel by car could also shift their travel times, consolidate trips, or carpool to avoid the highest tolls. If unable to afford any toll, low-income travelers that use a private car to travel in the study area would still be able to use the existing road network for free, and would experience improved mobility, accessibility, and safety on the local roadway network as a result of the Build Alternatives. These individuals would therefore still benefit from either of the Build Alternatives, although not to the same degree as those who could afford to use the toll facility.[158]

The FEIS fails to disclose the fact that use of toll facility accounts could deny individuals with poor or no credit history the benefits attributed to the ICC. Based on our review of practices at other toll facilities it is probable that the ICC toll facility accounts will be limited to credit card users only. The FEIS fails to assess the disparate impact of this limitation on lower-income and minority households. In addition, the Lead Agencies should extend the comment period to permit review of Appendix E due to its late release.

The FEIS does not demonstrate that a full and fair environmental justice impact assessment has been conducted for the ICC, and the blanket statements and assertions in the FEIS text do nothing to correct this critical short-coming.

## F.  Transportation Effects

In addition to comments we provide in this section, we incorporate into these comments by reference the Statement of Norman Marshall (Attachment 1), which illustrates a number of

---

[158] *Id.* at III-26.

lingering and new deficiencies in the FEIS treatment of traffic modeling, comparison of alternatives based on transportation data, and attempts to link modeling data to the identified purpose and needs.

    **1.** <u>The Lead Agencies' Response to Transportation Modeling Comments Remains Flawed</u>

A number of serious deficiencies with the computer transportation modeling methods, identified by Environmental Defense and others in comments to the DEIS, remain unresolved. Further, the FEIS response to these comments is inadequate and fails to disclose the methods underlying the Lead Agencies' findings.

Six (6) unresolved issues with the ICC transportation and air quality modeling are highlighted in earlier comments.[159] Many of these same concerns regarding the soundness of TPB travel forecasting models were raised in a September 8, 2003 letter from David J. Forkenbrock, Chairman of the Transportation Research Board, Committee for the Review of Travel Demand Modeling.[160]

The FEIS makes no attempt to respond to any of the six unresolved transportation modeling issues documented in those earlier comments. Moreover, the response of the Lead Agencies to modeling comments raised by others is inadequate and not fully documented. After a thorough review of the FEIS document and technical appendices, we note that the FEIS response to issues related to travel forecasting modeling is limited to only a discussion of the Version 2.1D model and the Version 2.1C model validation process:

> The model used for the DEIS (ICC model) was rigorously validated for the study area and was found to match an expanded set of existing traffic counts on over 40 of 44 cutlines within the study area. The validation is documented in **Appendix G** to the Travel Analysis Technical Report....An analysis was performed to determine how well the Version 2.1D model estimates existing traffic volumes in the study area as compared to the ICC model. That evaluation found that Version 2.1D did not provide acceptable results on 14 of the 44 cutlines.[161]

---

[159] *See* ED DEIS Comments at 25.
[160] *See id.*, Attachment 3.
[161] FEIS at IV-387 (emphasis added).

> The model used for the ICC DEIS was rigorously validated
> for the study area and was found to match existing traffic counts on
> over 40 locations within the study area. A technical description of
> the model refinements is contained in **Appendix F** of the ICC
> Travel Analysis Technical Report.[162]

We would like to note for the record that the above-referenced Appendix G and Appendix F of the ICC Travel Analysis Technical Report are not included in the PDF format of the ICC Travel Analysis Technical Report. In addition, we note that no documentation of the Lead Agencies' evaluation of the Version 2.1D model is provided in the FEIS. Without access to these documents, we, and other members of the public, cannot fairly comment on or evaluate the information they include. We have requested an extension of the comment period in part to enable us to review these documents that are part of the FEIS.

In earlier communications with SHA we raised our concerns about the adequacy of the Transportation Planning Board model for evaluating the ICC FEIS. SHA rebuffed our requests to participate on a technical modeling oversight panel for the DEIS analysis to help address modeling integrity issues in a constructive fashion. The Lead Agencies should upgrade the modeling used to support a new EIS or a supplemental EIS for the ICC before proceeding to a record of decision.

### 2. The Sensitivity Analysis Is Not Sufficient To Remedy The Severe Flaws In The Modeling With Respect To Induced And Secondary Development

One serious and inadequately addressed problem lies in the modeling of induced development resulting from the construction of the ICC. As noted in Audubon Naturalist Society, Environmental Defense, and Chesapeake Bay Foundation's comments to the DEIS, the traffic modeling in the DEIS was deficient, in that it failed to account for secondary and induced development impacts in comparing the build and no-build alternatives, using identical land use inputs for both. The FEIS references a Sensitivity Analysis that the Lead Agencies performed on the traffic modeling for the ICC in an attempt to cure modeling deficiencies in the DEIS. However, as noted below, the FEIS's reevaluation of forecasted travel impacts that could result from induced development if the ICC is constructed is not fully documented, and is based on apples to oranges comparisons that fail to provide a useful comparison between no-build and

---

[162] FEIS. App. R-6, at 7 (emphasis added).

build alternatives. It was noted in earlier comments that Section 1502.22 of the CEQ implementing regulations requires consideration of all reasonably foreseeable significant environmental impacts including induced development, but the FEIS's treatment is wholly inadequate for this purpose.[163]

The traffic modeling in the EIS is insufficient to discharge the responsibility of the Lead Agencies under NEPA to provide accurate information about the impact and effectiveness of the ICC in three significant ways. First, in the FEIS sensitivity test the wrong baseline is used to compare the traffic modeling for the Preferred Alternative to the No-build baseline, thereby underestimating the induced growth of the ICC. Second, the Lead Agencies initially used the incorrect growth forecast to model the ICC in the DEIS, underestimating the induced growth of the ICC. The sensitivity test in the FEIS is inadequate to cure this critical defect. Third, the Lead Agencies' traffic modeling was based upon a model that was severely criticized by the Transportation Research Board. Despite the fact that these criticisms about the traffic model were well known to the Lead Agencies prior to publication of the DEIS, and despite the fact that MWCOG released a new model attempting to address these criticisms prior to the publication of the DEIS, the Lead Agencies failed to re-model the ICC in the DEIS or the FEIS based upon this new information. Failure to account for the induced growth of the ICC in its traffic model is a significant oversight, the effects of which permeate and undermine all traffic modeling results and air quality analysis in the DEIS and FEIS. The Lead Agencies should re-model the ICC using the appropriate growth forecast in order to provide accurate information about the impacts of the ICC to decisionmakers and the public.

> a.  Problems with the model used by the DEIS (and retained in the FEIS)

Transportation modeling published in the DEIS used traffic model version 2.1C and Forecast Round 6.3. Model 2.1C was criticized by the Transportation Research Board in 2003, and in spring 2004, the regional growth forecasts were revised to what became the Round 6.4 growth forecast. Round 6.4 reduced employment in Montgomery County by **50,000 jobs.** In September of 2004 another growth forecast, Round 6.4A, was produced by the Council of Governments and adopted by the Transportation Planning Board ("TPB"). Round 6.4A took into account the results of the ELUP convened as part of the ICC study to determine the induced

---

[163] *See* ED DEIS Comments at 28.

growth in the study area from the ICC. Round 6.4A added 25,000 jobs and 35,000 jobs to Montgomery and Prince George's Counties respectively, above the Round 6.4 total. Though modeling on the ICC was still being done, according to accounts of meetings at the time, the impact of Round 6.4A induced growth was not tested or addressed at all in the DEIS Section IV.J. on transportation or in the transportation appendices.

Around the same time as the adoption of Round 6.4, Model Version 2.1D was finalized. This model version corrected some of the problems in 2.1C that were identified by the TRB. Certain adjustments were made to the Round 6.4 forecasts when entered in the 2.1D model to address other problems. These newer model and forecast versions were used jointly for modeling by the MWCOG beginning in summer 2004. Yet simultaneous modeling for the DEIS was done with older versions of the model (2.1C) and forecasts (Round 6.3). The problems with using the older versions for the DEIS were called to the attention of SHA by Environmental Defense in the summer of 2004 in meetings of the Travel Forecasting Subcommittee of the Metropolitan Washington Council of Governments and in meetings with the ICC EIS project manager held at Audubon headquarters. A number of commentators criticized the DEIS for failing to use the most recent land use inputs, forecasts, and traffic model, as the later versions could significantly change the results and improve model performance.

**b.** Problems with the purported "fix" in the FEIS

To assess the potential effect of increased development on traffic forecasts, a sensitivity analysis was conducted by the Lead Agencies using MWCOG's Round 6.4A traffic forecasts. The results of this sensitivity analysis are summarized in the FEIS:

> Travel volumes on the proposed ICC and some local roads in this portion of the study area would be expected to increase along with the more robust planned land uses, especially in the northeastern portions of Prince George's County, which includes Konterra. In the case of capacity along the ICC, the ICC would have more than enough capacity to accommodate this volume increase. Some of the local roadway network intersections would feel a greater stress from this increased volume.[164]

---

[164] FEIS at IV-388.

However, there are a number of serious problems with the sensitivity analysis in the FEIS. First, in the test run reported in the FEIS, there is an apples to oranges comparison between the preferred alternative build scenario and no-build baseline scenario. In this run, the Lead Agencies combined the out-of-date model version 2.1C with the Round 6.4A growth forecast to produce modeling results for the ICC preferred alternative route **only**. The FEIS then compared these results with the no-build alternative, which was based on an earlier growth forecast, Round 6.3. Recall that Round 6.3 included 50,000 more employees in Montgomery County. This was due to an error in overcounting jobs in year 2000 data, which was corrected in the Round 6.4 forecast. Round 6.4A added 25,000 jobs to the baseline figure of Round 6.4, representing growth due to the ICC. In other words, in comparing a model run with Round 6.4A for the preferred alternative, the only meaningful comparison would be to a run using the Round 6.4 forecast for the no-build alternative. By using the outdated Round 6.3 forecast for the no-build alternative, the FEIS presents a meaningless comparison between a build alternative which assumes an increase of 25,000 over the baseline, and a baseline no-build alternative that in fact assumes 25,000 more jobs than the build alternative. This is entirely nonsensical, and it highlights one of many apples-to-oranges comparisons upon which the Lead Agencies rely to rationalize their choice of the ICC over a variety of alternatives.

Second, this test run is flawed for an additional reason – it uses an updated growth forecast as an input to an outdated, earlier model. The Round 6.4A growth forecast was developed as an input to Model Version 2.1D, with parameters and assumptions matching those in Version 2.1D. However, the FEIS sensitivity test uses the Round 6.4A forecast with the outdated 2.1C model version. The Lead Agencies defend the use of the outdated Version 2.1C by claiming that Model Version 2.1C is the better model. However, they offer no criteria on which they base this claim, a claim which is belied by the fact that Model Version 2.1D was adopted and used for the conformity analysis in summer 2004 when the ICC was first included for construction in the Regional Transportation Plan by TRB and MWCOG, in direct response to recognized flaws in Version 2.1C.

Third, two additional, similarly severely flawed, sensitivity test runs were made by the Lead Agencies, and not reported in the FEIS. These runs, though not mentioned in the FEIS, were reported in a May 2005 letter from SHA to County Council members Phil Andrews and

64

Marilyn Praisner. These tests were apparently as follows: the first test inappropriately combined the Round 6.4 forecasts with Model Version 2.1C; and the second test inappropriately combined Round 6.3 and Version 2.1D. Both tests were run for the two build alternatives only. The only data sent with the letter showed "screenline" data for the various combinations, which is meaningless since land use inputs were mismatched with the traffic models. The output parameters presented are not useful in judging the variation caused by differences in growth, which is, of course, the critical question asked by these sensitivity tests. The "screenline" data provided with the letter to Council members seems to vary randomly, with no logical connection to the set of inputs. A final tantalizing sentence states, "Some of the local roadway network intersections would feel a greater stress from this increased volume." Yet the authors feel no need to spell out the result by showing the intersections with more traffic and congestion.

Fourth, the FEIS fails to document or reference the basis for its determination that induced development would not impact mobility along the ICC. Additionally, it fails to quantify impacts to the local roadway network. Finally, in its consideration of secondary and cumulative impacts, the FEIS fails to address impacts to air quality resources.

### c. Needed action to resolve modeling deficiencies

In order to address the fundamental comparison problems in the EIS modeling, the Lead Agencies at a minimum need to re-run the model as follows: i) run the no-build alternative, using Model Version 2.1D and the Round 6.4 forecast input; ii) run the ICC preferred build alternative, using Model Version 2.1D and the Round 6.4 forecast; **and** iii) run the ICC preferred build alternative, using Model Version 2.1D and the Round 6.4A forecast. The results of these model runs would be compared to the existing results with Round 6.3 and Model Version 2.1C, using a variety of parameters. If the Lead Agencies had done the right thing in summer 2004, when the new model and forecast were released, or even in spring of 2005 after receiving comments on the DEIS, they could have done the "post-processing" necessary to show comparable parameters as in the section IV-J, and produced some of the more statistically sound outputs like VMT, hours of travel, delay, miles traveled on local roads, and time taken by the average trip.

Moreover, this analysis should take into account the interaction of changes in forecast regional job-housing imbalances for future years with the assumptions for external traffic coming

into and leaving the modeled region, in line with the recommendations of the 2004 FHWA Baltimore Travel Model Peer Review, which commented on this problem with regard to both the Baltimore and Washington regional models. That panel found:

> "There were <u>significant concerns</u> regarding the population and employment forecasting procedures, in particular the fact that there are no employment control totals for the Baltimore-Washington Region. <u>Employment and job projections need to be addressed by both Baltimore and Washington, DC planning agencies because the projected labor pool in the combined regions cannot possibly fill the projected number of new jobs. Both agencies project new jobs that far outstrip the number of individuals in the labor pool</u>..."[165]

### 3.  Other Issues Relating To The Transportation Analysis

- Although the FEIS claims that the ICC will substantially improve the volume to capacity ratio ("V/C") of "nearly half" of the intersections at the failing level of service ("LOS") grades of E and F in the AM Peak hour,[166] this observation exaggerates even what the Lead Agencies' data indicates about the ICC. In fact, based on the Lead Agencies' data, only 10 out of 27, or roughly 1/3 of intersections, will achieve an even 10% improvement in that peak hour. Further, while improvement from one letter "grade" to the next better one may be perceptible when a 10% or higher improvement is achieved, when that improvement means going from one "F" Level of Service with a 1.39 V/C to another "F" LOS at 1.25 V/C, improvement is not noticeable.

- The FEIS states that no intersections reflect degraded V/C greater than 10% or more.[167] This statement is in contradiction with the Lead Agencies' own data, which indicates degraded V/C for: i) U.S. 1/Contee Road, at -14%; ii) U.S. 29 N.B./Briggs Chaney, at -30%; iii) I-95 N.B./Contee at -119%; iv) MD 97/Bel Pre at -15% (PM peak);  v) U.S. 1/Ritz Way at -11% (PM peak); and vi) 197/198 at Irving Drive, at -19% (PM peak).  In the PM peak, 38 of 50 V/C ratios show "improvement," but many of those improvements are so miniscule as to be unnoticeable by the traveling public.

- In addition to the methodological problems with the travel time modeling, as noted in Chesapeake Bay Foundation and Audubon Naturalist Society's DEIS comments, the FEIS calculation of travel time savings suffers from another flaw. The FEIS reports a travel time

---

[165] U.S. Department of Transportation, Travel Model Improvement Program, December 2004, *Report on the Findings of the First Peer Review Panel of the Baltimore Metropolitan Council,* http://tmip.fhwa.dot.gov/services/peer_review_program/documents/bmc/ (12/10/04) at 11 (emphasis added).
[166] FEIS at IV-370 ("...of 27 intersections operating with LOS E or F in the AM Peak hour, in the No-Action alternative, 10, or nearly half, are expected to improve the V/C by 10% or more... [for the ICC Corridor I alternative]...").
[167] *Id.*

savings of 3,000 hours/year for Corridor 1,[168] but does not report the total amount of travel time in or through the study area (the denominator), so it is not clear whether 3,000 hours' savings is significant or insignificant in its own right.

- There appears to be an arithmetic error with the developed acreage estimates in Figure IV-24 on page IV-401. The table lists "no action" developed acres at 170,294 and developed acres as a result of Corridor 1 at 174,240. However, according to the FEIS, construction of Corridor 1, *in addition to* the no-action secondary growth impacts of 2,512 acres, is expected to result in 4,945 acres of secondary growth.

### G. Cost-Benefit Analysis

Many parties submitted comments on the DEIS addressing the severe flaws in the "Economic Impact Study" that the Lead Agencies commissioned of the Maryland Transportation Initiative at the University of Maryland and relied upon in the DEIS. For example, Chesapeake Bay Foundation and Audubon Naturalist Society's comments pointed out in detail numerous flaws in the document and cautioned that such a flawed study could not be relied upon to justify the ICC.[169] As the release of the FEIS brought no changes to the study, the Lead Agencies continue to rely on a flawed document in its attempted justification of the transportation project.

Moreover, the Lead Agencies' continued reliance on the study is inconsistent with the CEQ regulations governing NEPA actions. Under these regulations, "[i]f a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences."[170] While the FEIS discusses and relies upon the conclusions in the economic benefits study, it does not append, incorporate or even provide a full citation to the study. This violates the CEQ NEPA regulations and makes it difficult for interested members of the public to access the study in order to evaluate the FEIS's conclusions that are based on the study.

Additionally, the CEQ regulations state that "the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should

---

[168] *Id.* at VII-31.
[169] *See* Chesapeake Bay Foundation and Audubon Naturalist Society, Comments on the Draft Environmental Impact Statement/Draft Section 4(f) Evaluation on the Intercounty Connector (2004), at 31-38.
[170] 40 C.F.R. § 1502.23.

not be when there are important qualitative considerations."[171]  Yet the FEIS relies on monetary expressions of the benefits the study claims will result from the ICC, without attempting to quantify in monetary terms either costs easily capable of such quantification (such as user toll costs), or costs resulting from "qualitative considerations," such as the destruction of environmental resources. *See, e.g.,* FEIS at IV-91 ("With estimated annual travel savings valued at nearly $203 million for trips originating or destined to the ICC impact area in 2010, and $250 million in 2030. . . ."). Such a one-sided use of monetary figures is inconsistent with the CEQ regulations and the clear intent of NEPA.

This fatally flawed economic study was crucial to the Lead Agencies' evaluation of the project. It dramatically overstates the benefits of the ICC and ignores all of the project's costs. The Lead Agencies' reliance on this study undercuts two key functions of the EIS--ensuring that the agency takes a "hard look" at the ICC's adverse environmental effects, and ensuring that members of the public have accurate information to enable them to evaluate the project. *See Hughes River Watershed Conservancy v. Glickman,* 81 F. 3d 437 (4th Cir. 1996) (rejecting an EIS because of its on reliance on a faulty economic study that inflated the benefits of the project).

## H. Oil Dependence and Related Issues

In comments to the DEIS, Environmental Defense noted that the DEIS failed to consider the adverse impacts on the interrelated problems of oil dependence, greenhouse gas emissions, and global warming. Environmental Defense's earlier comments provide a detailed analysis of the impact that the ICC will have on oil dependence and greenhouse gas emissions.[172] Those comments remain valid with respect to the FEIS. The Lead Agencies provides the following rationale for not conducting an analysis of greenhouse gas emissions:

> From a NEPA perspective, it is analytically problematic to conduct a project level analysis of greenhouse gas emissions on a problem that is global in nature. It is technically unfeasible to accurately model how increases or decreases of $CO_2$ emissions at a project scale would add or subtract to the carbon emissions from around the world. Given the level of uncertainty involved, the results of

---

[171] *Id.*
[172] *See* ED DEIS Comments at 33.

68

> such an analysis would not be likely to inform decision-making at
> the project level, while adding considerable administrative burdens
> to the NEPA process. The scope of such an analysis, with any
> results being purely speculative, goes far beyond the disclosure of
> impacts needed to make sound transportation decisions. For these
> reasons, FHWA has determined that it is inappropriate to attempt
> to address greenhouse gas emissions through the NEPA
> process...Greenhouse gasses, which may lead to global warming
> are not Criteria Pollutants. Therefore are not required to be
> analyzed and are not included in the FEIS.[173]

While we refute the claim that an analysis of greenhouse gas emissions "goes far beyond the disclosure of impacts needed to make sound transportation decisions," we do acknowledge that the Lead Agencies has, at least in part, made an effort to respond to our concerns regarding the impact of the ICC on global warming.

In contrast, we note the FEIS completely ignores adverse impacts of the ICC on oil dependence. According to Environmental Defense's analysis as discussed in DEIS comments, building the ICC would increase regional petroleum fuel demand by 5% within 25 years compared to the no-build option and by 11% compared to the Hybrid alternative identified in the Smart Mobility Report, *The Intercounty Connector: Performance and Alternatives.*[174]

As stated in the President's most recent State of the Union address, reducing oil dependence is a crucial aspect of enhancing homeland security. As the money spent on this fuel leaves the local economy and goes to foreign oil producers, precious resources will be squandered away that could be better spent within the local economy to improve regional emergency response systems and evacuation management. These types of investments would represent real improvements to homeland security, unlike the ICC, which will only make many local roads—including potential evacuation routes—more congested.

## I.   Noise Impacts

The Lead Agencies have failed to adequately study noise impacts in park areas under Section 4(f) and NEPA.  According to the Lead Agencies: "Noise analyses for all ICC alternatives and options were conducted in accordance with FHWA criteria contained in 23

---

[173] FEIS, App. R-8, at 45.
[174] *See* ED DEIS Comments, Attachment 1.

C.F.R. 772, and SHA Sound Barrier Policy, dated May 11, 1998. . . . the Lead Agencies has interpreted their Noise Policy such that publicly owned parks are not considered a noise sensitive use except at picnic areas, pavilions, band shells, amphitheaters, and similar locations."[175] This conclusory statement is insufficient. The Lead Agencies should explain exactly how they believe the Noise Policy exempts publicly owned parks from noise analysis except at the types of locations mentioned.

Moreover, the Lead Agencies' conclusion is inconsistent with the Section 4(f) constructive use regulations, which consider "enjoyment of an urban park where serenity and quiet are significant attributes" to be a noise-sensitive use.[176] As Sierra Club pointed out in comments on the DEIS, the great majority of park users are "passive users," who simply want to enjoy some peace and quiet and natural surroundings for a few hours. Excessive noise would impair such uses, and the Lead Agencies therefore have an obligation to study noise impacts in all park areas. The Lead Agencies' flawed approach calls into question its statement that "[n]o park and recreational facilities would be impaired to the extent that a substantial diminishment of its function, features, or attributes would occur from noise, visual intrusion, or restriction of access or vibration."[177]

## IV. SECTION 4(F) EVALUATION

In addition to the noise impacts discussed above in Part III.I, the FEIS suffers from several critical deficiencies in its evaluation under Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303, and its FHWA implementing regulations. These deficiencies hinder decision-makers from making an informed decision regarding the proposed action by masking the true environmental consequences of the proposed action on Section 4(f) resources and cause the EIS to fail to meet the statutory requirements for parkland mitigation.

### A. Analysis of Constructive Use Impacts

In its comments on the DEIS, U.S. DOI pointed out that the Lead Agencies must

---

[175] FEIS, App. R-3, the Lead Agencies response to Comment # 72.
[176] 23 C.F.R. § 771.135(p)(4)(i).
[177] FEIS at IV-83.

"analyze the potential of constructive use due to noise, vibration, change in access, visual intrusion, air quality, and loss of function (conversion from FIDS habitat to edge habitat) for those portions of parkland which are adjacent to the right-of-way corridors. Parkland that should be evaluated for constructive use includes Rock Creek Regional Park, North Branch Stream Valley Park, Rock Creek Stream Valley Park, Northwest Branch Recreation Park, and Northwest Branch Stream Valley - Unit 5."[178]

The Lead Agencies' response to this and other such comments is that, according to 23 C.F.R. § 771.35, a constructive use can occur only when a "transportation project does not incorporate land from a section 4(f) resource."[179]  Under the Lead Agencies' interpretation of that provision, because certain parts of 4(f) parks would be physically occupied by the ICC, no constructive uses can occur anywhere else in those parks, even in other parts of the parks that would not be directly used for the ICC.  The Lead Agencies misapply the regulation.  Nothing in the regulations states that an entire 4(f) resource should be deemed incorporated for purposes of the statute merely because one section of the resource is in fact incorporated.  Yet this is exactly what the Lead Agencies claim:

In accordance with FHWA's Section 4(f) policy, constructive use is only applicable in the absence of permanent incorporation or temporary occupancy of the type that constitutes a use of 4(f) land by a transportation project.[180]

There is a further problem with the Lead Agencies' approach.  The Lead Agencies' interpretation of the FHWA regulations relies entirely on FHWA guidance which reversed FHWA's longstanding opinion in earlier agency guidance.  FHWA's Section 4(f) Policy Paper of October 5, 1987 ("1987 Policy Paper") said only that, with respect to "[j]oint [d]evelopment (Park with Highway Corridor)…[t]he requirements of Section 4(f) do not apply to the subsequent highway construction *on the reserved right of way* as previously planned."[181]  The 1987 Policy Paper remained in effect, with a single "minor amendment" in an unrelated area, until FHWA released its Section 4(f) Policy Paper of March 1, 2005 ("2005 Policy Paper").[182]  Only in that 2005 Policy Paper, released after the close of the DEIS comment period, does

---

[178] FEIS, App. R-3, Comment # 61.
[179] *See id.*, the Lead Agencies Responses to Comments # 61, 71, 74.
[180] FEIS, App. R-8, the Lead Agencies Response to Comment 1693.
[181] 1987 Policy Paper at 15 (#14).
[182] *See* 2005 Policy Paper at 1.

71

FHWA articulate a new interpretation that Section 4(f), and constructive use analysis in particular, do not apply to *the public park, recreation area, or wildlife refuge* when a portion of the resource is reserved for highway use prior to or concurrent with the establishment of the resource.[183]

This interpretation is wholly unreasonable, as it excludes huge masses of land within 4(f) resources from constructive use analysis merely because a fraction of the resource would be physically occupied. Table V-13 of the FEIS shows the percentages of acreage that would be used in each 4(f) resource in order to construct Corridor 1. For example, in Rock Creek Regional Park, the total use would be 8 of 1,778 acres, or 0.4 percent. In Upper Paint Branch Stream Valley Park, the total use would be 6.2 of 770. 4 acres, or 0.8 percent. Six Section 4(f) resources are listed, and no more than eight percent of any of these parks would be directly used for Corridor 1. Yet the Lead Agencies claim that the entire areas within these parks are exempt from constructive use analysis.

As even the FEIS admits, the more substantial of these parkland resources were in fact not concurrently planned or "jointly conceived" with the DTA/ ICC master plan corridor:

> As explained by the M-NCPPC, the east-west ICC and many of the counties' north-south stream valley parks (*excluding Rock Creek Regional Park, Northwest Branch Recreational Park and portions of North Branch Stream Valley Park*) were jointly conceived...[184]

These parks are part of two of the most significant greenspaces in urban Montgomery County, and connect to a park system that continues deep into the District of Columbia. The preferred alternative will bisect these parks, cutting off recreational routes and wildlife habitat, among other impacts. However, the Lead Agencies make the spurious claim that the direct use of a small portion of these lands insulates them from any obligation to evaluate any significant proximity or constructive use impacts to the remaining park area. The Lead Agencies must study potential constructive use impacts in all parts of 4(f) resources not being directly incorporated for the ICC. Without such analysis, the Lead Agencies have not complied with its Section 4(f) obligations.

---

[183] 2005 Policy Paper at 21-22 (#16); *cf.* 1987 Policy Paper at 15 (#14).
[184] FEIS at V-5 (emphasis added).

In addition, the Lead Agencies claim that they do not need to conduct constructive use analysis for non-concurrently planned Section 4(f) park resources adjacent to the reserved transportation corridor. In its response to a comment regarding the Lead Agencies' failure to evaluate constructive use noise and visual impacts upon areas adjacent to the reserved transportation corridor, the Lead Agencies asserted:

> Since there would be permanent incorporation of land from parks adjacent to all [DTAs], with the exception of the [DTA] adjacent to Little Paint Branch Stream Valley Park, a constructive use of the adjacent parkland was not evaluated.[185]

However, no further elaboration is provided. The Lead Agencies' response on this point is incomplete and inadequate, as it fails to explain how such *adjacent,* non-DTA resources will be incorporated. It also fails to identify which Section 4(f) resources are covered by this apparent exclusion from 4(f) constructive use analysis. Among the parkland Section 4(f) resources which are adjacent or proximate to a DTA or otherwise incorporated project land are East Norbeck Local Park, Redland Local Park, and Little Paint Branch Stream Valley Park. Among these, only Little Paint Branch Stream Valley Park has been identified by the Lead Agencies as being "concurrently planned,"[186] but the FEIS includes no constructive use or proximate impact analysis for any of these properties.

Even if the Lead Agencies had provided some explanation or basis for how these adjacent parks and other Section 4(f) resources will be permanently incorporated into the project, Section 4(f) still requires i) an analysis of use impacts on portions directly incorporated into the transportation project and/or right of way, and ii) analysis of constructive use impacts on all portions of these resources that are not directly incorporated into the project. Since the Lead Agencies have not met their burden to speak with specificity or finality, given its total failure to provide either of these analyses or any further explication of its "plan" to incorporate these adjacent resources, the Section 4(f) evaluation contained in the FEIS is incomplete and inadequate.

**B.  Identification Of Section 4(f) Resources**

---

[185] FEIS, App. R-8, the Lead Agencies Response to Comment 1693.
[186] FEIS at V-126.

The Lead Agencies maintain the position that so-called "designated transportation areas" need not be evaluated as Section 4(f) resources. To justify this position, the Lead Agencies purport to rely on the 2005 Policy Paper. According to the 2005 Policy Paper, "[a] recent decision, known as the Stewart Airport Case, undercuts the position that land acquired for transportation use cannot become a Section 4(f) resource by permissive interim use."[187]  In the *Stewart Airport* case,[188] the Court of Appeals for the Second Circuit held that land originally acquired for transportation purposes constituted Section 4(f) protected land because it had been used for public recreational purposes for 30 years. As the 2005 Policy Paper relates, "the Court held that Section 4(f) contains no requirement that the public parkland to which it applies must be permanently designated as such," then indicating that the Court determined that Section 4(f) applied, even though the public lands to be used in the project were originally acquired for transportation purposes.[189]  The Lead Agencies, if they are in fact relying on the 2005 Policy Paper, fails to explain why this case does not govern the application of Section 4(f) to the asserted "designated transportation areas" that have functioned for decades as parkland in Montgomery County.

Moreover, much of the parkland at issue in the FEIS does not satisfy the 2005 Policy Paper's requirement that "the land used for the highway project was reserved from and, therefore has never been part of the protected 4(f) area."[190]  Many of the lands in question were acquired *before* Section 4(f) was enacted in 1966, such as parklands near Paint Branch and Gum Springs which were acquired in April 1962 and June 1966, respectively.[191]  The timing of the acquisition undermines the Lead Agencies' assertion that part of these parklands was reserved for transportation purposes given that the statue did not even exist yet.  It appears that the Lead

---

[187] FHWA, Section 4(f) Policy Paper (2005) ("2005 Policy Paper"), App. A, at 32-33 (Legal Note # 18).  FHWA admits that this case is "contrary to FHWA policy." *Id.* at 22 (# 18).

[188] *Stewart Park and Reserve Coalition v. Slater*, 352 F.3d 545 (2d Cir. 2003).

[189] 2005 Policy Paper, App. A, at 29-30 (Legal Note # 2) (emphasis in original).

[190] *Id.* at 31-32 (Legal Note #16).

[191] The FEIS attempts to substantiate its claims of jointly planned parkland by providing references to additional technical support.  "For further details regarding the acquisition of the Designated Transportation Area within this park, refer to the ICC Technical Support Data." (FEIS at V-29).  However, there is no file named "ICC Technical Support Data" available on the ICC Study website, or on the many CDs containing the FEIS, thus this reference is meaningless.  The acquisition information is critical to the Section 4(f) evaluation and should have been included in the text of the DEIS and the FEIS in order to provide the public and decision-makers necessary information to assess the Lead Agencies' application of the "concurrently planned" exception to Section 4(f) evaluation.  Over 100 acres of parkland are excluded from the Section 4(f) Evaluation based on the Lead Agencies' assertion that these parklands were "jointly planned."

Agencies are providing a *post hoc* rationalization to avoid required statutory analysis under Section 4(f). Lastly, it is important to keep in mind that the 2005 Policy Paper itself, as agency guidance, has no binding effect. It cannot trump a federal court's decision, such as the *Stewart Park* decision.

## C. Deficiencies In The Proposed Compensatory Mitigation Of Section 4(F) Impacts

As noted above, the FEIS greatly underestimates the scope of Section 4(f) land whose functions will be significantly impaired by the proposed ICC. As a result, the functional value and acreage lost is significantly distorted. However, even based on the Lead Agencies' flawed evaluation under Section 4(f), the proposed compensatory mitigation for parkland is inadequate under both NEPA and Section 4(f). This inadequacy stems from the failure of the FEIS to identify all necessary parkland mitigation sites,[192] failure to qualitatively describe properties proposed for mitigation, and inaccurate or contradictory information contained within the FEIS related to Section 4(f) resources. Additionally, the proposed mitigation package does not meet the substantive requirements of Section 4(f). Prior to issuing the ROD, the Lead Agencies should revise the proposed Section 4(f) mitigation package to provide the necessary information to decisionmakers to make an informed decision about the proposed action and assess the adequacy of the proposed mitigation.

The FEIS focuses on the sheer acreage of compensatory land. However, there are serious flaws in the mitigation package. In Appendix R-3, the FEIS states that a property known as the Casey Property "is not a Section 4(f) parkland mitigation."[193] Yet, the FEIS includes discussion of the Casey Property in its Section 4(f) mitigation plan: "Off-site mitigation for [Forest Interior Dwelling Species("FIDS")] habitat impacted by Corridor 1 would be at the Casey Property, located outside the study area, but within Montgomery County in Poolesville."[194] In fact, this one parcel represents roughly two-thirds of the total compensatory mitigation acreage for Corridor 1, and is included in the Lead Agencies' propaganda of replacing impacted parkland at a ratio of eight to one.

---

[192] On page V-61 of the DEIS, the Lead Agencies recognized that "additional parkland replacement sites would likely need to be identified" for the Northwest Branch Recreational and Northwest Branch Stream Valley Parks. Yet, the Lead Agencies has failed to identify additional parkland replacement in the Northwest Branch watershed in the FEIS.
[193] FEIS, App. R-3 at 21.
[194] FEIS at V-102. See also V-63.

The significance of this inaccuracy within the FEIS cannot be overstated. It creates a confused picture of the Section 4(f) mitigation package which "hinders one of the primary reasons for producing [the EIS]: to provide the public with information about federal projects that will impact the environment....Inaccurate data might sway members of the public to support a project they would otherwise oppose if they were given accurate information."[195] This contradiction also impacts the ability of decisionmakers to evaluate the substantive components of the mitigation package to determine whether the Section 4(f) requirements have been satisfied.

Another problem with the Casey Property, as admitted by the Lead Agencies in the description of the Casey Property, is that the Casey Property is proposed as the sole replacement for FIDS being "taken" by the preferred alignment. Yet the Casey Property is located outside the study area, as defined by the Lead Agencies; it is not even located within the same watersheds that the proposed ICC will impact, the Rock Creek and Anacostia watersheds. Rather, the Casey Property is located in the Little Seneca and Patuxent watersheds. Thus, the Casey Property fails to provide any real mitigation to the adverse environmental impacts caused by the impact of the proposed ICC to Section 4(f) parkland.

The Lead Agencies appear to take the position that it is unconstrained geographically, or by any other parameter, when fulfilling its obligation of compensatory mitigation. But such an interpretation would severely undermine the policies and purposes motivating Section 4(f), which begins by noting that "[i]t is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303(a). Where projects such as the ICC are built in developed or developing areas, areas where land values and demand are high, compensatory mitigation properties will always be located in areas that are less developed and land less expensive. As a rule then, transportation projects will generally be built through parks, because this land entails far fewer financial and political costs than locating such projects on developed private land.

However, this result undermines the statutory purpose of Section 4(f) in two ways. First, it encourages siting of development in parkland by removing most of the burden of

---

[195] *North Carolina Alliance for Trans. Reform, Inc. v. U.S. Dept. of Transportation*, 151 F. Supp.2d 661, 688 (M.D.N.C. 2001)

compensatory mitigation. Under the Lead Agencies' theory as applied in the FEIS, compensatory mitigation will often be far less costly to the regulatory agency than siting a project outside of Section 4(f) properties. Second, fundamental functional values such as habitat, public access to recreation and passive use, and the preservation of green space and open space in the midst of developed areas are lost when compensatory mitigation properties are located at a distance remote from the lost park lands and surrounding developments. The Lead Agencies' "mitigation" of most of these functional values by replacing them in a parcel miles distant from the affected lands is not mitigation at all and therefore violates Section 4(f).

The "descriptions" of proposed mitigation sites merely recite the quantity and type of property that is available at the proposed mitigation site, but provide no information about the functional and environmental values.[196] An illustrative example of these descriptions is:

> It contains 738 linear feet of streams, 20 acres of forest, and 24.5 acres that would be reforested by SHA. Once reforested, there is a potential in the future for up to 87 acres of new FIDS habitat on site and on adjacent lands in North Branch Stream Valley Park.[197]

This description raises more questions than it answers. What type of stream quality exists at this site—pristine or heavily polluted? What type of forest exists at this site—immature or mature? What is the current FIDS value? What type of passive use exists at these sites? Further, reforestation misses the point of Section 4(f) mitigation. The current proposed action will decimate habitat, existing FIDS and passive use functions within the study area. It will take decades for these values of parklands to be replaced through reforestation. Additionally, there is no guarantee that reforestation will be successful. Mitigation should not be speculative and should address these immediate impacts so that in the interim time period, while waiting for the reforestation to occur, there is replacement of these functions *in the study area*.

Additionally, the description is not clear whether the proposed reforestation is separately required under Maryland state law or is proposed specifically to meet the requirements of Section 4(f). The Lead Agencies should not "double count" required reforestation under state law for Section 4(f) purposes and should clarify how it is accounting for this proposed

---

[196] *See* FEIS at V-60 – V-66.
[197] FEIS at V-62.

mitigation. The confusion regarding "double counting" proposed mitigation under Section 4(f) is also an issue with proposed Environmental Stewardship projects and compensatory mitigation under Section 404 of the Clean Water Act. In response to public comments, the Lead Agencies have made clear that proposed Environmental Stewardship projects are not being credited toward Section 4(f) mitigation.[198] However, the Lead Agencies insist on discussing Environmental Stewardship in the Final Section 4(f) Evaluation.[199] Even with the disclaimers, the mixing of subjects is misleading and the Lead Agencies should reserve all discussion about Environmental Stewardship to the chapter on Environmental Stewardship.

The environmental information about the proposed mitigation sites provided in the FEIS fails to provide the public and decisionmakers enough information to determine the adequacy of the proposed mitigation sites to replace the parkland functions that will be lost by the proposed action.

## V. GENERAL DEFICIENCIES OF THE FEIS

In general, the Lead Agencies' responses to public comments are riddled with inaccuracies and omissions which have curtailed our ability to follow up on those questions and comments previously submitted. For example, neither the Chesapeake Bay Foundation nor the Audubon Naturalist Society of the Central Atlantic States is identified as an "Affiliation" in the original Appendix R-7 of the FEIS.[200] Instead, only the individual names of the DEIS comment signatories on behalf of these organizations, Lee Epstein and Neal Fitzpatrick, are listed. Even in the revised Appendix R-7, Neal Fitzpatrick's affiliation is still missing. Further, although Chesapeake Bay Foundation and Audubon Naturalist Society submitted one set of comments, in a single document, the comments attributed to Mr. Epstein and Mr. Fitzpatrick in Appendix R-7 are inconsistent: only 12 comment codes are attributed to Mr. Epstein, whereas 197 comment codes are attributed to Mr. Fitzpatrick. This discrepancy still exists in the allegedly revised Appendix and creates serious questions about the accuracy of the responses, the accuracy of the entire appendix, and indeed the public participation process itself.

---

[198] FEIS at V-65. "Therefore, the improvements associated with these [Environmental Stewardship] projects would not be considered Section 4(f) uses."
[199] See FEIS at V-64, "There are also 72 Environmental Stewardship sites proposed along the Corridor 1 Alternative that will enhance many of the resources that Section 4(f) are intended to protect."
[200] FEIS, App. R-7, the Lead Agencies Response to Comment #101 at 25, 28.

## A. The FEIS Remains Fatally Riddled With Uncertainty and Inadequacy

The Lead Agencies have failed to provide adequate and complete information so as to allow meaningful public comment on the FEIS. The FEIS is riddled with uncertainty and inadequacy. For example, on page II-133, the FEIS discusses Environmentally Sensitive Areas that may contain rare, threatened, or endangered species or other species identified by the Maryland Department of Natural Resources. The Lead Agencies admit to only knowing the "approximate location" of each site and acknowledges that it cannot provide "specific information."[201] Such uncertainty, according to the FEIS, "require[s] further field verification and agency coordination prior to any corridor development."[202] The omission of this information from the FEIS fails to satisfy NEPA's disclosure requirements and prevents decisionmakers and the public from understanding the scope of environmental consequences of the proposed action. The ESA example is illustrative of the uncertainty and inadequate information throughout the FEIS.

Another example is found on page IV-3, where the FEIS discusses bridges and culverts. The proper design of bridges and culverts can mitigate to some degree damage to threatened species, water quality, and human enjoyment. Unfortunately, the FEIS fails to provide definitive information about bridge and culvert design. This uncertainty prevents the public from adequately evaluating the impact of the ICC. The FEIS says it will "*consider* stream channel dimension and channel materials where culverts are planned."[203] Culvert design is critical to prevent channel degradation, and to promote channel stability and fish movement. The public cannot meaningfully comment on critical culvert designs and their environmental impacts if such designs still remain only under "consideration" only months before the Lead Agencies plan to break ground and have not been disclosed for public review and comment. Similarly, the FEIS lists a number of other bridge, culvert, runoff, and animal crossing measures that the Lead Agencies are "either committed to or under study."[204] The difference between those two options is both meaningful and stark. A FEIS study should make clear which measures are committed to and which are merely under study. As now written, all the bridge, culvert, runoff, and animal

---

[201] FEIS at II-133.
[202] *Id.*
[203] *Id.* at IV-3 (emphasis added).
[204] *See id.* at IV-3, IV-6, IV-276.

crossing mitigations could be studied and then rejected after the administrative record on the project has been closed - harming wildlife, water quality, and public enjoyment and prohibiting fair review and comment. Failure to provide this information in the EIS prevents meaningful comment by the public and and meaningful foundations for decisions.

Uncertainty and inadequacy are also prevalent where the FEIS discusses the important issue of compensatory mitigation. The FEIS is specific as to where it intends to provide compensatory mitigation and how such mitigation will proceed.[205] However, the document fails to provide any information as to the nexus between the area being harmed by the ICC and the area subject to compensatory mitigation. Without adequate explanation of the quality of land being taken versus the quality of land identified for mitigation purposes, neither the public nor decisionmakers can adequately assess whether the Lead Agencies' compensatory mitigation meets statutory and administrative requirements.

One final example of the uncertainty and lack of adequate information inherent throughout the FEIS deals with grading. The FEIS states that "a grading plan…will be prepared[.]"[206] However, such a grading plan is not included in the FEIS. Grading directly affects erosion, and can impact wildlife, road safety, and project costs. The failure to provide an adequate grading plan, or any grading plan at all, is just one in a long line of examples that deprives the public of the right to meaningfully comment. In any event, the failure to prepare such a plan during the years of study allotted to the EIS process strongly suggests that a decision will be made to construct the ICC without the benefit of this and many other elements critical to understanding the impacts such a project will entail.

The prevalence of uncertainty and inadequacy throughout the FEIS is not easily captured in a concise narrative, but the examples above show how such uncertainty pervades the entire document, a study that purports to be final. These illustrations are a few out of many. Still, it does not take an encyclopedic set of examples to show that the FEIS is incomplete, failing to disclose to the public and decisionmakers all of the direct and reasonably foreseeable environmental impacts from the proposed project in violation of NEPA.

---

[205] *See id.* at IV 235-243.
[206] *Id.* at IV 134.

We look forward to your response to our comments.


Sincerely,


/s/ Neal Fitzpatrick

Neal Fitzpatrick
Executive Director
Audubon Naturalist Society
8940 Jones Mill Road
Chevy Chase, MD  29815


/s/ Michael Replogle

Michael Replogle
Transportation Director
Environmental Defense
1875 Connecticut Ave. N.W.
Washington, D.C. 20009


/s/ John Parrish

John Parrish
Vice President
Maryland Native Plant Society
P.O. Box 4877
Silver Spring, MD 20914

/s/ Jim Fary

Jim Fary
Chair, Conservation Group
Sierra Club - Maryland Chapter, Montgomery Group
7338 Baltimore Avenue #1A
College Park, MD 20740


/s/ Lee R. Epstein

Lee R. Epstein, Esq.
Director of Lands Program
Chesapeake Bay Foundation
Merrill Environmental Ctr.
6 Herndon Avenue
Annapolis MD 21403


/s/ Betsy Johnson

Betsy Johnson
Chair
Sierra Club - Maryland Chapter
7338 Baltimore Avenue #1A
College Park, MD 20740


/s/ Steve Caflisch

Steve Caflisch
Transportation Chair
Sierra Club - Maryland Chapter
7338 Baltimore Avenue #1A
College Park, MD 20740

# Attachment 1

### Statement of Norman Marshall, President, Smart Mobility, Inc.

*Overview*

Smart Mobility, Inc. performed independent alternatives analyses for the proposed Intercounty Connector (ICC) during the same time period that the Draft Environmental Impact Statement (DEIS) for the ICC was being prepared. A report on our analysis results was submitted as part of comments on the ICC DEIS by Environmental Defense, Chesapeake Bay Foundation, Audubon Naturalist Society of the Central Atlantic States, Sierra Club Maryland Chapter, Coalition for Smarter Growth, and Solutions Not Sprawl. The Final Environmental Impact Statement (FEIS) for the ICC has responded to this report but has not widened its analysis to include additional alternatives.

In this affidavit, we present the major findings from our report and contrast them with the findings in the FEIS. We highlight the areas in the FEIS where the performance metrics are presented, and note that the traffic benefits shown are very limited. In contrast, the traffic benefits of the other alternatives we analyzed are substantially greater.

In addition to different alternatives than analyzed in the FEIS, our analyses also used different performance metrics and a different version of the regional transportation model. Below, the performance measures are discussed first. Then the alternatives and results are described. Finally, the model issues are addressed.

*Traffic Capacity, Volumes, Congestion and Safety*

The FEIS discusses five project needs: 1) Community Mobility and Safety, 2) Movement of Goods and People To and From Economic Centers, 3) Local Land Use, 4) Environmental Stewardship, and 5) Homeland Security (Vol 1, p. I-1 - I-2). Items 1 and 2 are explicitly about traffic issues. Item 5 is implicitly about traffic issues. Items 3 and 4 are not rationales for building a highway, but instead are part of the context for choosing what highway to build, if a highway is to be built. Therefore, the project rationale is based solely on traffic issues.

Both the FEIS analyses of alternatives and our analyses of alternatives focus on traffic issues. However, as will be demonstrated below, the FEIS hides the proposed roadway's ineffectiveness by presenting dozens of results with no comprehensive summary measures. In contrast, our measures are comprehensive and are therefore more suitable for comparisons across alternatives.

The FEIS needs descriptions include many statements such as "mobility … is severely limited" (Vol 1, p. I-1) that are only meaningful when quantified. The FEIS Purpose and Need section quantifies congestion for a 2000 base year and for the 2030 No-Action alternative. Several metrics are used including 1) traffic volumes on east-west screenlines[1] (Vol 1, p. I-10 - I-12), 2) intersection and roadway levels of service (Vol 1, p. I-12 - I-21), and 3) accident analysis (Vol 1, p. I-21 - I-23).

---

[1] Screenlines are used to sum all traffic traveling across a certain boundary. The FEIS uses north-south roadways as the screenlines and sums traffic crossing or forecast to cross each screenline.

1

These same traffic metrics reappear in the FEIS when the preferred alternative is evaluated (Vol 1, p. IV-351 - IV-386). In the FEIS there are over 500 pages of text separating these two sections. It is necessary to consider the two sections together to determine whether the FEIS analysis demonstrates that the preferred alternative will address the traffic issues identified in the Purpose and Need section.

Traffic Volumes on East-West Screenlines – In the Purpose and Need section, Table 1-1 (Vol. 1, p. I-11) shows that east-west traffic volume on roadways in the study area are expected to increase considerably between 2000 and 2030. This information is used to support the conclusion that: "These increases in screenline volumes indicate that the study area will experience continued increases in the demand for east-west travel, resulting in longer periods of congestion on existing routes" (Vol. 1, p. I-10). The FEIS continues: "The ICC is intended to provide additional roadway capacity in the study area to accommodate the future traffic growth and demand for east-west travel, particularly between the I-270 and I-95 development corridors" (Vol. 1, p. I-12). The FEIS implies that the ICC would address these issues – reducing traffic on other east-west roadways possibly to below 2000 levels, and certainly to well below forecast 2030 No-Action levels.

In fact, the FEIS modeling shows that traffic volumes will increase on other east-west roadways whether or not the ICC is constructed. As shown in Exhibit 1, Capital Beltway traffic would increase by almost identical amounts with or without the ICC. The FEIS tables lump all arterials together. As shown in Figure 2, these totals also increase substantially over the 2000 base year, whether or not the ICC is built. The ICC reduces the traffic volume slightly at some screenlines but not at others.

Exhibits 1 and 2 illustrate that the primary effect on east-west traffic is not traffic relief but rather a large increase in total east-west traffic. The FEIS acknowledges this saying: "The projected increases in volumes across the screenlines for Corridor 1 range between 4% at Screenline A to 17% at Screenline B… The screenline data shows that building the ICC would increase mobility by accommodating greater traffic volumes on the transportation network." (Vol 1, p. IV-352). The problem identified in the Purpose and Need section, increased traffic volumes, has in the alternatives analysis been changed into a benefit called "mobility." At the farthest west screenline, I-270, despite the ICC, traffic volumes on both the Beltway and the arterials are shown as higher with the ICC than without, the opposite of the effect intended. For the central part of the project shown in the next three screenlines, the forecast ICC traffic volume ranges from 9 times to 67 times as much as the reductions shown in traffic volumes on parallel roadways. Even where the ICC performs best, at the eastern two screenlines – I-95 and US 1 – the forecast ICC traffic volume is 3 times the reduction in traffic forecast for parallel roads. This suggests that the proposed roadway will be ineffective at meeting the project need of relieving congestion on other east-west roadways.

Furthermore, there is no consideration of north-south roadways. No trip begins or ends on a limited access highway like the ICC. The ICC will necessarily increase traffic on other roadways, particularly those north-south roadways with ICC interchanges. In fact, the FEIS reports that the ICC will result in higher traffic volumes on several north-south roadways than

2

the No-Action alternative, including sections of I-95, US 29, MD 97, MD 182, MD 185, and MD 650 (Table IV-108, Vol. 1, p IV-363 – IV-367).

The FEIS data show that the ICC will make traffic volumes higher on some roadways and lower on others. The corridor-level metrics reported in the FEIS fail to demonstrate whether the effect of the ICC is positive or negative overall. System-wide metrics are needed that give a net value for comparison across alternatives.

Intersection and Roadway Levels of Service – The Purpose and Need section compares weekday morning and afternoon levels of service for 51 intersections between the 2000 base and the 2030 No-Action alternative (Tables I-3 and I-4, Vol. 1, p. 1-14 - 1-19). It also makes the same 2000 vs. 2030 No-Action comparison for 52 roadway segments (Table I-5, Vol. I, p. 21). The level of service is better in 2030 for some intersections where improvements are planned, but the higher forecast traffic volumes result in poorer forecast levels of service in many cases. The FEIS concludes: "The increasing levels of congestion on the roadways within the study area, demonstrated by the LOS analyses, will result in increases in travel time for east-west travel" (Vol. 1, p. I-21). The inclusion of "east-west" is misleading in this sentence. The intersection numbers are for overall intersection level of service and do not distinguish the direction of travel. More than half of the roadway level of service segments presented are for I-95 and I-270 which are north-south roadways.

The same level-of-service information for the ICC build alternative is given for intersections in Tables IV-111 and IV-112 (Vol. 1, p. IV-371 - 374) and roadway segments in Table IV-115 (Vol. 1, p. 381 - 383). The FEIS makes an attempt to summarize the detailed intersection numbers in graphics. Chart IV-1 (Vol. 1, p. IV-379) shows that some intersections would improve with the ICC relative to the No-Action alternative and some would get more congested, but that about 3.5 times as many would be better than would be worse. Chart IV-2 (Vol. 1, 384) totals the number of hours that the study area intersections will be at or over capacity. The total for the ICC alternative (Corridor 1) is 165 hours, which is considerably better than the No-Action alternative (217 hours), but much worse than the 2000 base year (116 hours). While, this summary metric is a step in the right direction, it would have been more useful to include a metric such as vehicle hours of travel that is more comprehensible and more suitable for balancing against costs.

The FEIS concludes that the ICC would not affect the freeway segment levels of service. It notes that "I-270 and I-95 are north-south oriented freeways and therefore demand in the future is not expected to be helped by an ICC" (Vol. 1, p. IV-380). It then states: "The Capital Beltway is at the lower boundary of the study area and as expected has its own travel market and would not be appreciably impacted by the construction of the ICC (Vol. 1, p. IV-380).

Accident Analysis – The Purpose and Need section uses language concerning safety including: "lack of such a highway … creates safety hazards", "dangerous mix", and "unsafe condition" (Vol. 1, p. 1-1). In fact, the FEIS demonstrates that the proposed ICC will not reduce the number of accidents significantly. Table IV-116 (Vol. 1, p. 386) forecasts the future number of accidents based on the historical accident rates for different roads. The estimate is 5,085 accidents per year for the No-Action alternative and 5,075 accidents per year for the ICC alternative. The FEIS text

3

rounds both these numbers to 5,100 (Vol. 1, p. IV-385), reflecting the imprecision in the estimates. Furthermore, the accident rate assumed for the ICC is lower than that observed for any of the study area roadways, and this assumption may be optimistic. Therefore, the calculated difference of 10 accidents per year between the No-Action and ICC alternatives is not significant. The lower accident rate forecast for the limited access ICC is balanced by the increased miles of travel.

Travel Times – The FEIS alternatives analysis results also include forecast peak period travel time between two points (Vol. 1, IV-354 – IV-358). It is obvious that building a new high-speed roadway will decrease the travel time from one end of new road to the other. However, this information is not very useful without information about how many travelers are affected. A metric such as the total travel time metric that we used in our alternatives analysis is much more useful, as this incorporates both travel time and the trips actually being made.

Summary of FEIS Analyses Related to Purpose and Need – Summarizing the information presented above, the FEIS documents the following regarding the traffic needs identified in the Purpose and Need section: 1) The traffic performance for the ICC alternative in 2030 is considerably worse than existing conditions for all metrics. 2) The Capital Beltway future traffic is forecast to be almost identical in 2030 whether the ICC is constructed or not. 3) Traffic volumes on some study area arterials will be higher with the ICC, and traffic volumes on other arterials will be lower. 4) Levels of service at some study area intersections will be better with the ICC, and the levels of service at other intersections will be worse, with the total number of hours at or over capacity being lower with the ICC. 5) There is no significant difference in the number of forecast accidents in 2030, with or without the ICC. Given the cost and environmental consequences of the ICC, the documented benefits are relatively small and are not quantified in any way that they can be made comparable to the costs.

Vehicle Hours Traveled (VHT) and Vehicle Hours of Delay (VHD) – These metrics were used in our alternatives analyses to measure congestion. Vehicle hours of travel (VHT) is simply calculated by adding up all modeled travel time for a given area. This is easily understandable and is consistent with the public's concerns. They are concerned about lost time. Vehicle hours of delay (VHD) separates out the travel time due to congestion from the travel time that would be required without congestion. VHD is an indicator of mobility in which longer-distance and higher-speed routes score higher than lower-distance and lower-speed routes when the travel time is identical.

In contrast to the metrics used in the FEIS, VHT and VHD are area-wide metrics than can be directly compared across all alternatives. This is a critical part of our alternatives analyses, because we consider alternatives that are truly different from other alternatives and we wanted to know how these different alternatives performed. Another potential value of the VHT and VHD metrics is that they can be translated into dollars (by assuming a monetary value of time), which could support benefit-cost analyses.

In our alternatives analyses, the ICC alternative results in higher VHT than the No Build alternative both in the ICC Study Area and in a larger area, Montgomery County and Northern Prince George's County. The ICC alternative also results in higher VHD than the No Build

4

alternative in both areas. While these results may be surprising, they are not contradicted by any of the FEIS analyses. As discussed above, the FEIS acknowledges that the ICC will greatly increase east-west travel. The FEIS also notes existing roadways and intersections that will have higher travel volumes with the ICC than without. The FEIS never computes whether the net result is more or less time spent traveling. In the FEIS response to the report on our analyses they also cite a third set of alternatives modeling that corroborates our finding about VHT (Appendix R-9, p. 6). This work was done by the Maryland-National Capital Park and Planning Commission (M-NCCPPC). The FEIS quotes from a memorandum from Glenn Orlin, Council Deputy Staff Director to the Montgomery County Council (July 15, 2002): … since the average VHT is unchanged, this means that while there is less congestion with the ICC, drivers are choosing to travel longer distances under the scenarios with the ICC, resulting in commensurate increases in VMT." Here, "VMT" is vehicle miles of travel.

As discussed above, the FEIS results show congestion increasing on some roads with the ICC and decreasing on others. Therefore, the primary result of the ICC will not really be congestion relief but rather increased auto travel with the same amount of time traveled (as indicated by M-NCCPCC) or more travel time (as shown in our alternatives modeling).

*A Broader Set of Alternatives Is Needed*

The FEIS defines Purpose and Need broadly as a need to address forecast traffic growth in the Study Area. It hypothesizes that a major east-west toll roadway will substantially reduce future congestion in the study area. It tests this hypothesis and finds only modest benefits. Furthermore, the comparisons are to the 2030 No-Action alternative. Compared to the 2000 base year, all of the congestion measures are significantly worse with the 2030 ICC alternative The metrics we applied, vehicle hours of travel (VHT) and vehicle hours of delay (VHD) show no benefits at all, even relative to the future No Build case.

In an open and flexible process, it would be noted that the original strategy was not found to be effective and the process would go back to step one and consider other alternatives. In comments on the DEIS, we presented four alternatives that each scored higher than the ICC on VHT and VHD as shown in Exhibit 3. These are:
- Transit Oriented Land Use and Investment.
- Add Toll Lanes-Express Bus.
- Convert to High Occupancy Toll ("HOT") Lanes-Express Bus
- Transit Oriented-HOT Lane-Rail and Express Bus.

The response to these comments in the FEIS exhibit what management science calls a "self sealing" process.[2] These additional alternatives will not be considered because they are outside boundaries that had been previously set including the selection of a travel corridor, the selection of a mode, and the selection of a financing mechanism (FEIS, Appendix R, p. 2). Only toll roads between the end points of the proposed ICC will be considered whether such an alternative addresses the purpose and need adequately or not. The potential dangers of self-sealing processes

---

[2] Argyris, Chris, Robert Putman, and Diane McLain Smith. *Action Science*, Chapter 3, p. 80-102. Josey Bass Inc. 1985.

include: "... error escalates and effectiveness in problem solving and in execution of action tends to decrease."[3]

We did not bound the set of possible solutions so severely. Transportation forecasting is based on assumptions about future land use, as it is the land uses that generate travel and traffic. Therefore, each of our alternatives is comprised of two building blocks: (1) transportation facilities, including the regional Transportation Planning Board's ("TPB") adopted 2003 *Constrained Long Range Plan* ("CLRP"); and (2) land use using forecasted patterns of growth to the year 2030, including Round 6.4, Round 6.4A, or a modified growth pattern developed for this study. Each alternative has an estimated capital cost that is less than the capital cost of the ICC. We used the latest version of the Metropolitan Washington Council of Government's TPB's computer-based traffic model to analyze the No Build, ICC, and four other alternatives in 2030. The alternatives are described briefly below. Complete descriptions are provided in the report submitted as part of comments on the DEIS.

Transit Oriented Land Use and Investment – This alternative includes the 2003 CLRP, additional transit, light rail, and localized road improvements. The land use component modifies the growth pattern of the Round 6.4 growth forecasts to reduce imbalances in jobs and households and increase transit oriented development but keeps the regional growth total constant.

The "Transit Oriented" alternative adds extensive transit investments to the projects in the adopted 2003 CLRP. These added investments include:
- The Purple Line as light rail from downtown Bethesda to College Park;
- A Metrorail extension from Shady Grove to Metropolitan Grove;
- New Metrorail station at Montgomery College;
- New and enhanced express bus service on I-270 and I-95;
- Georgia Avenue Busway from Glenmont to Olney; and
- Rapid bus service on New Hampshire Avenue, University Boulevard, Viers Mill Road and Randolph Road.

In total, this alternative would add 7 light rail route-miles, 4 Metrorail route-miles, and nearly 134 express bus route-miles beyond the route-miles assumed in the adopted 2003 CLRP. It also includes the "Metro Matters" transit improvement package, which would lift transit ridership limits in the DC regional core that reflect the limited capacity of Metro and some bus lines. Although this alternative is limited to new capital investments in Montgomery and northern Prince George's County, it would have positive impacts on southern Prince George's County as well.

This alternative also would increase investment in highways to reduce congestion at several key locations. It includes a reconfiguration of Rockville Pike in Rockville Town Center, including a deck over Route 28 and a new traffic circle for local distribution. It also widens a segment of Muncaster Mill Road to four lanes. Lastly, the Transit Oriented alternative includes capacity enhancements at the following six intersections.
- Route 355 at Gude Drive,
- Route 28 (Norbeck Road) at Viers Mill Road,

---

[3] Argyris et. al. 1985, p. 89.

- Route 28 at Muncaster Mill Road,
- Route 28 at Georgia Avenue,
- Randolph Road at Georgia Avenue, and
- Randolph Road at New Hampshire Avenue.

This alternative assumes this increased transit investment would be supported by master plans and incentives to redirect much of the future growth in jobs and households in Montgomery and northern Prince George's counties to be in close proximity to public transit and improve the local job-housing balance. Land use elsewhere—in DC, Prince George's County south of Central Avenue, and other jurisdictions—is conservatively kept consistent with the adopted forecast, although substantial development capacity does exist at several other transit nodes in Prince George's County.

The FEIS treats land use forecasts as if they are cast in stone. In response to our analyses with an alternative land use forecast in the study area, the FEIS states that our alternative is: "inconsistent with the cooperatively adopted land use plans of the counties" (Appendix R, p. 9). This misses the point of the alternative. The adopted land use plans are an artifact of the political process just as a new highway is. The point of considering them together is to determine whether better outcomes are possible if land use and transportation planning are better coordinated.

Exactly this type of coordination is becoming more and more common in the United States. The Sacramento region is at the forefront of this movement. Director of the Sacramento Area Council of Governments, Martin Tuttle, was interviewed about this process.

> For years, Tuttle says, Sacramento's COG failed to exercise regional vision in deciding where to spend transportation dollars. Instead, the organization "chased development with transportation projects" requested by individual governments.

> "It became obvious to everyone that whether we built our region out with roads or transit, congestion would still get worse, says Tuttle, executive director of the council, which directs state and federal transportation in the six-county capital region. "The consensus of the group was that we had to look at land use," he says.[4]

Compared with the ICC alternative, the Transit-Oriented Land Use and Investment alternative results in 8.8% lower VHT and 10.7% lower VHD.

Add Toll Lanes-Express Bus – This alternative includes the 2003 CLRP and a network of toll lanes comprised of both newly constructed toll lanes and converting some existing lanes to toll lanes on I-270, I-495 (the Beltway), and I-95. Both high occupancy and single occupancy vehicles would pay tolls. Extensive express bus service is assumed on the toll lanes. This alternative was tested using the unchanged Round 6.4 growth forecasts.

---

[4] Vellinga, Mary Lynne. "Blueprint for a Valley", *Planning*, May 2004, p. 13-17.

In addition to the adopted 2003 CLRP and adopted land use forecast Round 6.4, this alternative *adds* new lanes and *converts* several existing lanes along area roadways to create a toll lane network connecting Shady Grove with Laurel via the Capital Beltway. These toll lanes would carry express buses, as well as HOVs and single-occupancy vehicles, both of which would be charged an off-peak toll of $0.20/mile and a peak period toll of $0.40/mile. A share of net revenues from the tolls would be dedicated to expanding or improving transit service, traffic management, and pedestrian and bicycle access and safety in the corridor, with a portion available to pay part of the bonded cost of constructing the tolled lanes. The alternative would add 68 new lane-miles of toll express lanes and convert 35 lane-miles of the region's existing or planned HOV-only lanes and 166 lane-miles of existing or planned general-purpose freeway lanes into non-barrier separated toll express lanes. : This alternative's key elements are drawn from the express toll lane designs that Maryland

SHA is evaluating in its environmental impact study for implementation on the Capital Beltway, I-270, and I-95. It provides a continuous express toll lane network of two lanes in each direction along the western, southern, and eastern edges of the ICC Study Area by converting:

- An existing lane and adding one lane in each direction to the Capital Beltway from the American Legion Bridge to US 50;
- Two lanes in each direction to the express toll lane system on the I-270 east and west spurs;
- Two lanes in each direction to the express toll lane system on I-95 from the Capital Beltway to MD 32; and
- One HOV lane in each direction into an express toll lane and converting one general-purpose lane in each direction into an express toll lane on I-270 from east and west spurs to Germantown.

New express bus services on the toll roads would add 357 express bus route-miles beyond those planned in the 2003 CLRP. This alternative also includes the following transit improvements:

- Express bus on the Capital Beltway (I-495) between River Road and US Route 1 with in-line, in-the-median stations at Georgia Avenue/Forest Glen Metro, New Hampshire Avenue, and bus slip ramp access to transit stops at New Carrollton and Grosvenor;
- Express bus service between West Falls Church Metro and New Carrollton with stops at Tysons Corner, Rockspring, Grosvenor, Forest Glen, and Greenbelt; and
- Express bus service between Dulles Airport and Frederick, Maryland, with stops at Herndon, Tysons Corner, Montgomery Mall, Rockspring, and Germantown.

Compared with the ICC alternative, the Add Toll Lane – Express Bus alternative results in 8.1% lower VHT and 10.6% lower VHD.

Convert to High Occupancy Toll ("HOT") Lanes-Express Bus – This alternative includes the 2003 CLRP, and also some existing freeway lanes to HOT and express bus lanes. HOT lanes allow high-occupancy vehicles to travel for free and therefore encourage carpooling and

vanpooling. No new lanes are added under this alternative. It was tested using the unchanged Round 6.4 growth forecasts.

This alternative is similar to the previous one. It adds to the projects in the adopted 2003 CLRP and the Round 6.4 growth forecast a system of high-occupancy toll ("HOT") lanes by *converting* 35 lane-miles of the region's existing or planned HOV-only lanes and 234 miles of existing or planned general-purpose freeway lane-miles into HOT lanes. It provides a continuous express toll lane network of two lanes in each direction along the western, southern, and eastern edges of the ICC Study Area, as well as all of the transit improvements programmed in the Add Toll Alternative. This alternative converts:

- Two general-purpose lanes in each direction on the Capital Beltway from American Legion Bridge to US 50;
- Two lanes in each direction to the express toll lane system on the I-270 east and west spurs;
- Two lanes in each direction to the express toll lane system on I-95 from the Capital Beltway to MD 32; and
- One HOV lane in each direction to an express toll lane and converts one general-purpose lane in each direction to an express toll lane on I-270 from the spurs to Germantown.

Single-occupant vehicles would be charged an off-peak toll of $0.20/mile and a peak period toll of $0.40/mile. But high occupancy vehicles with three or more people ("HOV-3") would not pay a toll to use the managed lanes. This alternative's express bus service on toll roads would add 357 express bus route-miles beyond those planned in the 2003 CLRP. A large share of net revenues from the tolls would be dedicated to expanding or improving transit service in the region, traffic management, and pedestrian and bicycle access and safety in the corridor, with a portion available to pay part of the bonded cost of converting the lanes to tolling. The comparatively much lower capital cost of this alternative also could enable operation of these lanes as "Fast and Intertwined Regular ("FAIR") Lanes," as proposed for the Capital Beltway by Patrick DeCorla-Souza of the Federal Highway Administration. Under this strategy frequent travelers on the more congested unmanaged lanes would earn credits on their toll transponders, enabling them to use the priced, managed lanes occasionally for free, boosting public acceptability of the convert-to-managed lanes strategy.[5]

---

[5] Or alternatively, all the existing lanes of I-270, the Beltway, and I-95 connecting the end points of the ICC might be converted to peak period toll-managed lanes, following the approach suggested by FHWA's Patrick DeCorla Souza in his paper, *A New Financing Approach for Transportation Infrastructure Expansion*, Transportation Research Board 2006 (included by reference). That approach would contract for or otherwise ensure improved operation of existing capacity before the investing in new corridor capacity expansion. This might begin by improving transit and vanpool services, implementing rush hour shoulder lanes, ramp-metering, and as needed, implementing spot peak-period congestion management tolls to curb congestion in the corridor. Investment in new capacity would follow only in response to demonstrated cost-effectiveness compared with operational and service improvements. Such performance focused capacity and asset management could enable Maryland DOT and the Metropolitan Washington Council of Governments to meet their obligations to adopt state and regional transportation plans that achieve the statutory planning objectives established under Section 134(a) of the 2005 SAFETEA-LU.

Compared with the ICC alternative, the Convert HOT Lane – Express Bus alternative results in 9.7% lower VHT and 8.6% lower VHD.

Transit Oriented-HOT Lane-Rail and Express Bus – This hybrid alternative is a combination of components from other alternatives. It includes the 2003 CLRP, most of the rail transit improvements from the Transit Oriented alternative, and the converted HOT-express bus lanes from the Convert to HOT alternative. It uses the same land use component as the Transit Oriented alternative.

The Hybrid alternative is a combination of the Transit Oriented and Convert to HOT alternatives. It uses the same TOD Land Use Pattern as the Transit Oriented alternative, which balances transit, job, and household growth. Like the Transit Oriented alternative, this alternative features the following investments beyond the adopted 2003 CLRP:
• The Purple Line from downtown Bethesda to College Park;
• A Metrorail extension from Shady Grove to Metropolitan Grove;
• New Metrorail station at the Rockville campus of Montgomery College;
• New and enhanced express bus service on I-270 and I-95;
• Georgia Avenue Busway from Glenmont to Olney; and
• Rapid bus service on New Hampshire Avenue, University Boulevard, Viers Mill Road and Randolph Road.

Like the Convert to HOT alternative, the Hybrid alternative features an express bus network and converted HOT lanes in which HOV-3s are not required to pay the off-peak toll of $0.20/mile and peak period toll of $0.40/mile. To create the HOT lanes this alternative converts:
• Two general-purpose lanes in each direction on the Capital Beltway from American Legion Bridge to US 50;
• Two lanes in each direction to the express toll lane system on the I-270 east and west spurs;
• Two lanes in each direction to the express toll lane system on I-95 from the Capital Beltway to MD 32; and
• One HOV lane in each direction to an express toll lane and convert one general-purpose lane in each direction to an express toll lane on I-270 from the spurs to Germantown.

The alternative would add nearly 400 express bus route-miles, 4 Metrorail route-miles, and 7 light rail route-miles beyond the route-miles adopted in the 2003 CLRP. This alternative does not include the "Metro Matters" transit improvement package or the non-CLRP road and intersection improvements.

It produces the best overall performance. Compared with the ICC alternative, the Transit Oriented-HOT Lane-Rail and Express Bus alternative results in 12.9% lower VHT and 16.9% lower VHD.

Other Performance Metrics – In addition to the congestion metrics, VHT and VHD, we evaluated all six alternatives (including the No Build and ICC cases) with other performance measures. These include: Vehicle Miles Traveled (VMT), Total Number of Vehicle Trips, Number of

Transit Trips, and Air Quality/Public Health Impacts. As demonstrated in the FEIS analysis results and our own modeling, it is ineffective to try to build out of congestion by relying on roadway capacity alone. Both sets of modeling results show that the new roadway capacity will attract significant traffic but little relief on other roadways. A broader perspective is needed that includes land use and transportation alternatives, including transit. Compared to the other ICC, all four of the alternatives result in fewer auto trips, less vehicle miles of travel, and more transit trips. The alternatives also all produce less air pollution than the ICC alternative.

*Modeling Issues*

The FEIS states that it used Version 2.1C of the Washington Region's Travel Demand Model (Vol. 1, p. IV-344 and p. IV-387). We used the revised Version 2.1D. Actually the model used in the FEIS was not the official model but a version with "refinements" (Appendix R-9, p. 8). The refined model is more suitable for evaluating the ICC alternative that the official Version 2.1C model because a major focus of the refinements was on the proper modeling of tolls. The ICC toll modeling revisions were the basis for the procedures in Version 2.1D, and we believe that the two model versions are identical in regards to toll modeling. In a memo discussing differences between Versions 2.1C and 2.1D, the Transportation Policy Board stated: "The V2.1D model now includes improved sensitivity to highway pricing such as tolls. The capability is based on an 'equivalent minute' approach"[6] Because of these improvements, we consciously rejected the official release of Version 2.1C. The special refined version was unavailable outside the ICC project team at the time of our work.

Even if the special Version 2.1C model was available, we would have chosen to use Version 2.1D because of the other significant enhancements in the newer version. Version 2.1C was reviewed by an expert panel convened by the Transportation Research Board, a Division of the National Academy of Sciences. One of the peer review criticisms was: "TPB's extensive set of adjustment factors in trip generation, trip distribution, and mode choice to enhance the match between simulated and observed base-year data undermines the fundamental behavioral logic of the four-step modeling process."[7] In response to this criticism, the TPB reduced the number of adjustment factors in Version 2.1D.[8] The FEIS response to our comments appears to miss the rationale for these changes as they suggest that Version 2.1C is superior because it better fits traffic counts. The TRB specific guidance was that the use of adjustment factors should be reduced even if the match with traffic counts became worse.

Nevertheless, the refined model Version 2.1C and Version 2.1D are quite similar, and the ranking of alternatives probably would be the same with either model.

The FEIS response to alternatives analyses question whether we applied toll rates correctly (FEIS, ref). We did do this correctly, having understood the TPB convention of entering

---

[6] Metropolitan Washington Council of Governments, Transportation Policy Board, Memorandum from Ron Malone on "Transmittal of Version 2.1D (Draft #28) Model", June 30, 2004.
[7] Letter from David J. Forkenbrock, Chair, Transportation Research Board's Committee for Review of Travel Demand Modeling by the Metropolitan Washington Council of Governments to Peter Shapiro, Chairman, National Capital region Transportation Planning Board, September 3, 2003.
[8] Metropolitan Washington Council of Governments, Letter to David Forkenbrock, May 13, 2004.

11

monetary values in a past year's equivalent currency. We further understand that the Version 2.1C model uses 1980 dollars (Ref.) but the Version 2.1D model uses 1994 dollars (Ref.)

The FEIS is inconsistent regarding this and in error in places. The FEIS response says that coding is done in "1984 dollars" (Appendix R-9, p. 14) instead of the correct values of 1980 dollars for Version 2.1C or 1994 dollars for Version 2.1D. The *Travel Analysis Technical Report* states:

> A 2010 toll of $.30 per mile during peak hours and $.20 per mile during off-peak hours was used for all of the travel forecasts. This equates to a toll of $.17 per mile during peak hours and $.13 per mile during off-peak hours in 2004 dollars (p. II-4).

$.30 per mile in 2010 is not equal to $.17 in 2004 so this statement is wrong. FEIS Table IV-102 (Vol. 1, p. IV-350) correctly says that the rates assumed in 2004 dollars, $0.17 per mile peak and $.13 off-peak are equivalent to $.20/$.15 in 2010 and $.35/.26 in 2030. We used slightly higher values of $.20/$.15 in 2004 dollars for the ICC – trying to match the rates the project team was discussing at the time but not realizing they were being quoted in 2010 dollars. The actual future toll rates are unknown (FEIS Volume 1, p. S-31). The difference in assumed toll rates is unlikely to affect the ranking of alternatives.

N. Marshall Exhibit 1: Capital Beltway Traffic Volumes and Forecasts Reported in FEIS



Source: Graphic by Smart Mobility, Inc. of numbers in FEIS Tables 1-1 (Vol. 1, p. I-11) and IV-91 Vol. 1, p. IV-18)

N. Marshall Exhibit 2: Arterial Traffic Volumes and Forecasts Reported in FEIS



Source: Graphic by Smart Mobility, Inc. of numbers in FEIS Tables 1-1 (Vol. 1, p. I-11) and
IV-91 Vol. 1, p. IV-18)

N. Marshall Exhibit 3: Vehicle Hours of Travel (VHT) and Vehicle Hours of Delay (VHD) in Smart Mobility, Inc. Alternatives Analyses

| Vehicle Hours of Travel ("VHT") | Montgomery & Northern Prince George's | ICC Study Area |
|---|---|---|
| No Build | 2,078,792 | 1,090,022 |
| ICC Build | 2,115,496 | 1,125,627 |
| Transit-Oriented Land Use and Investment | 1,982,576 | 1,026,844 |
| Add Toll Lane - Express Bus | 1,976,736 | 1,034,214 |
| Convert HOT Lane - Express Bus | 1,993,079 | 1,016,483 |
| Hybird: Transit Oriented - HOT Lane - Rail and Express Bus | 1,925,611 | 980,493 |

| Congestion Delay ("VHD") | Montgomery & Northern Prince George's | ICC Study Area |
|---|---|---|
| No Build | 1,028,653 | 549,292 |
| ICC Build | 1,039,980 | 560,694 |
| Transit-Oriented Land Use and Investment | 958,244 | 500,805 |
| Add Toll Lane - Express Bus | 941,715 | 501,353 |
| Convert HOT Lane - Express Bus | 985,803 | 512,311 |
| Hybird: Transit Oriented - HOT Lane - Rail and Express Bus | 913,263 | 465,882 |

Exhibit D (4 of 4)

# Attachment 2

**Statement of Dr. Stephen Prince, Director, Regional earth Science Applications Center (RESAC), University of Maryland**

**24 February 2006**

### 1. Comments on the evidence used in the FEIS

The FEIS has reduced the already unrealistically low estimates of secondary development presented in the DEIS and commented upon in RESAC (2005).

*The ELUP estimated that the No-Action alternative could anticipate about 2,512 acres of additional development. The No-Action alternative was prepared by the ELUP as a baseline for which to compare both Build Alternatives indicating that the ELUP anticipates additional development even without an ICC alternative.*
*Corridor 1 could anticipate about 4,945 acres of secondary development in addition to the No-Action scenario. Based on ELUP's allocations, approximately 1,144 acres of undeveloped land could potentially be rezoned in order to accommodate the additional ELUP allocations for Corridor 1.*
*Corridor 2 could anticipate approximately 5,546 acres of secondary development in addition to the No-Action scenario. Based on ELUP's allocations, approximately 1,578 acres of undeveloped land could potentially be rezoned in order to accommodate the additional ELUP allocations for Corridor 2. A Corridor 2 selection would open up Corridor 1 lands planned for an ICC to other uses. (page IV-391)*

In Table 1 below the figures used in the FEIS are added to the data presented in the DEIS and by RESAC (2005). The DEIS estimated 8% increase in residential area caused by the ICC. RESAC (2005) showed an increment of 15% caused by the ICC (Current trends – Smart growth). In the FEIS the SHA's estimate is reduced to 3.6 % and 4% for Corridors 1 and 2 respectively. No explanation for this revision is given. The already low estimates of increased development are halved in the FEIS.

Table 1. Total residential areas and growth by 2030 estimated by SHA's DEIS, FEIS and RESAC (2005). 2000 Land Cover – baseline. DEIS 2030 - predicted area according to the Expert Land Use Panel. FEIS 2030 Corridor 1 - predicted changes in areas for Corridor 1 given in the FEIS. FEIS 2030 Corridor 2 - predicted changes in areas for Corridor 2 given in the FEIS. RESAC 2030 Smart Growth – change under Smart Growth policies predicted by SLEUTH model   RESAC 2030 Current Trends – change under Current Trends scenario predicted by SLEUTH model (RESAC 2005).  Note the FEIS approximately halves the areas given in the FEIS.

|  | Residential area (acres) | Growth 2000 to 2030 (acres) | Percent Growth |
|---|---|---|---|
| 2000 Land Cover | 136,979 | - |  |
| DEIS 2030 | 147,754 | 10,775 | 8% |
| *FEIS 2030 Corridor 1* |  | *4,945* | 3.6% |
| *FEIS 2030 Corridor 2* |  | *5,546* | 4.0% |
| RESAC 2030 Smart Growth | 182,064 | 45,085 | 33% |
| RESAC 2030 Current Trends | 198,426 | 61,447 | 45% |

The *Summary of New Impervious Cover Associated with the ICC by Corridor and Watershed in Acres* (Table IV-55, page IV-161) provides minute details of the ELUP allocations to each part of the ICC affected area but does not justify the overall low total impervious area. Two quantitative studies (Ewing and Kuzmyak 2005, RESAC 2005) estimated about four times more development as a result of the ICC..

Another example of the underestimation of full effects of the ICC on development by the FEIS is the omission of effects in watersheds not crossed by the ICC.

*"While all of the streams in these watersheds are important water resources, only those streams whose watersheds would be directly crossed by the ICC corridors are discussed in this document." (SHA II E-5a. Page II-57)*

Section IV F reviews the multifarious, potential effects of the ICC on the natural environment, but fails to quantify many of these. Hidden in the welter of detail is the overriding underestimate of the secondary effects of the ICC. The ELUP estimates cannot be taken seriously in the light of other analyses and, reportedly, the wide differences of opinion within the ELUP. Under the State's federally mandated anti-degradation policy (COMAR 26.08.02.04), the designated use class for each stream must be protected and maintained.  The errors noted in the FEIS imply adverse impacts on streams that are likely to exceed the capability of best management practices

## 2. The ELUP and the FEIS make unrealistically small estimates of the imperviousness that will be induced by the ICC in secondary development.

The FEIS uses generalized and inaccurate estimates of imperviousness associated with each land use. The FEIS uses a constant factor for each land use type, even though there is wide variability

2

in imperviousness within each category. This problem is acknowledged for some of the data used by SHA.

*"the information generated in GISHydro is less accurate than that in the CSPS since it was generated from land use categories rather than an analysis of actual impervious ground cover"* (FEIS page IV-176):

The RESAC studies measured imperviousness irrespective of land use class. For the ICC area the results were aggregated by Maryland Department of Planning Land Use Class. The differences in average imperviousness by category varies from 1 – 23% (Table 1). More important, the RESAC data provide measures of the variation within each Land Use category. The standard deviations of imperviousness in each category are, in some cases, greater than the mean. The ICC Pollutant Load Study imperviousness values are given for comparison..

Table 2. RESAC impervious surface values for each MD Department of Planning land use class within the ICC area, and values used by the ICC Pollutant Load Study (July 2005, Rev November 2005, p.4) . Note the differences and the standard deviations of the RESAC values. Unlike the ICC Pollutant Load Study, the RESAC values faithfully reproduce the inherent variability within the one land use class.

| Maryland Department of Planning Land Use Classes | | RESAC 2000 impervious surface from satellite data | | ICC Pollutant Load Study (Table 1*) Percent Impervious | Difference ICC - RESAC % |
|---|---|---|---|---|---|
| Code | Name | Average % | Std Dev | | |
| 11 | Low Density Residential | 10 | 17 | 20 | 10 |
| 12 | Med Density Residential | 23 | 22 | 30 | 7 |
| 13 | High Density Residential | 42 | 29 | 65 | 23 |
| 14 | Commercial | 65 | 34 | 82 | 17 |
| 15 | Industrial | 61 | 37 | 70 | 9 |
| 16 | Institutional | 31 | 36 | 50 | 19 |
| 17 | Extractive | 10 | 26 | - | - |
| 18 | Open Urban Land | 10 | 22 | 11 | 1 |
| 21 | Cropland | 2 | 11 | | |
| 22 | Pasture | 5 | 18 | | |
| 23 | Orchards, Vineyards | 8 | 22 | | |
| 25 | Row/Garden Crops | 2 | 6 | | |
| 41 | Deciduous Forest | 3 | 12 | | |
| 42 | Evergreen Forest | 2 | 9 | | |
| 43 | Mixed Forest | 4 | 14 | 0 | ~5 |
| 44 | Brush | 8 | 21 | | |
| 50 | Water | 2 | 9 | | |
| 60 | Wetlands | 8 | 18 | | |
| 72 | Bare Exposed Rock | 4 | 13 | | |
| 73 | Bare Ground | 15 | 30 | | |
| 80 | Transportation | 69 | 32 | 75 | 6 |
| 241 | Feeding Operations | 15 | 25 | - | - |
| 242 | Agricultural Buildings | 12 | 29 | - | - |

3

The high values of imperviousness used in the FEIS probably explain the paradox of agreement between the RESAC model and the FEIS on the total percentage impervious in the ICC area in 2030, but the FEIS's overestimate for 2000 (RESAC report, 2005 Table 5, p.24). By using a realistic value of developed area for 2000, the FEIS overestimates imperviousness since the impervious percentages for all the land cover types are unrealistically high. Although the increase in the area of development by 2030 is underestimated, the high percentage imperviousness compensates and gives approximately the same imperviousness as the RESAC model for 2030. Notwithstanding this fortuitous agreement, the FEIS and the ELUP significantly underestimate the secondary development that will be caused by the ICC.

In summary, in the light of our research, and in agreement with other research (Ewing and Kuzmyak, 2005), we find the base year impervious cover to be overestimated in the DEIS and the change in impervious cover due to the ICC to be underestimated. This problem has not been addressed by the FEIS so the disagreement on the appropriate amount of secondary development remains.

The serious consequences of the FEIS's low estimate of secondary development for environmental impacts of the ICC cannot be overemphasized.


### 3. Responses to the FEIS comments on the RESAC submissions on the Draft Environmental Impact Statement – Comments #1617 and 1618.

In February 2005 the University of Maryland RESAC submitted a study of the anticipated impact of the proposed Intercounty Connector (ICC) highway to the Maryland State Highway Administration (SHA). The RESAC study used satellite remotely sensed data to calibrate a cellular automaton model and made predictions of future impervious cover likely to be generated by the ICC through secondary development. Two future scenarios were explored with the model: "Business as Usual" which applied existing planning controls and incorporated the ICC, and "Smart Growth" that embodied Maryland Smart Growth legislation and no ICC. In both cases predictions were made of impervious cover in 2030 which were compared with the existing areas. Accuracy of the model was assessed by comparison of its predictions of current impervious surface with actual measurements. Very good agreement (± 0.5%) was found.

The results challenge the SHA's estimates of the effect of the ICC on secondary development. Much of the FEIS's conclusions rest on predictions obtained by the SHA using an Expert Land Use Panel (ELUP). The RESAC model results, however, agreed with an independent econometric model (Ewing and Kuzmyak, 2005), and also with some ELUP members' opinions. Since secondary development is likely to be the main cause of environmental degradation associated with the ICC rather than the highway itself, accurate forecasting of its extent is critical.

In response to the RESAC submission the FEIS states:

4

*"The ELUP considered a wide variety of factors, some that may not have been considered in the same way by the University of Maryland's Regional Earth Sciences Application Center (RESAC), such as the existing and planned use patterns within the study area, changing real estate and other market forces and the economy."*

and:

*"The University of Maryland study was not arguably not (sic) bound at all by the master planning process and goals of the MNCPPC and County Councils." (SHA 2006, FEIS Appendix R-8, DEIS Comment Period Comments and Responses – Public Comments, #1617.)*

and:

*"The University of Maryland study used a computer model (SLEUTH) to predict future growth based on past trends. This methodology did not take into account many of the factors considered by the Expert Land Use Panel (ELUP), such as the master planning process and other institutional constraints that influence growth patterns. There is not single method of predicting future growth that is considered to be most reliable. The ELUP's work provides a reasonable basis for estimating the induced growth impacts of the project. "(SHA 2006, FEIS Appendix R-8, DEIS Comment Period Comments and Responses – Public Comments, #1618.)*

These responses are factually incorrect. The SLEUTH model assigns a reduced probability of development according to zoning restrictions, wetlands, parks, steep slopes, and other constraints to development, appropriate to the current zoning and physical conditions. Because *probabilities* of exclusion of development are assigned to these various constraints, development *can* occur in any areas that have a constraint probability <1.0 in the model, however the model results adhere to the designated probabilities. This approach is justified since the ICC will undoubtedly lead to relaxations in zoning. The FEIS acknowledges that existing zoning is flexible:

*"According to M-NCPPC officials, who have substantial experience with land use in this region, a choice of the No-Action or Corridor 2 Alternatives would likely be deemed "a substantial change in the character of the neighborhood," opening up areas never planned for development."(SHA FEIS page IV-396)*

In fact it is the SHA's ELUP that seems not to take all constraints on development into account.

*"It should be noted that the areas identified for secondary growth were based on the ELUP estimates, and should be viewed more as a projection of general development trends rather than specific predictors of potential development. The impact quantities are not based on field delineated resources or specific project site plans, and do not consider local, State and Federal environmental laws and regulations that would likely reduce the extent of impact." (page IV-392)*

5

**4. A second charge in the SHA response  (Comment 1617 & 1618) is that current development was not considered in the RESAC study.**

*"By using the SLUETH (sic) model as a trends analysis from 1984 to the present, the research perfromed (sic) was not bound by the fact that nearly 80% of the planned residential development within the study are as already occurred (sic). The vast majority of the growth that the ELUP determined was found in the few areas in the study area where the developed has not reached this level." (loc.cit.)*

This is also incorrect since the model was calibrated using observations for 2000 and earlier years, then run forward to 2030. Thus all development up to the date used by the ELUP was included. Moreover the allegation that the master planning process was not considered in the RESAC study, while false, implies that SHA believes future development will follow existing zoning whereas, in many places in the FEIS (e.g., Table IV-105), changes in zoning are tacitly assumed.  In most cases, rezoning is incorporated in the FEIS to accommodate the ELUP's predictions.

**5. The value of the "Delphi" process used in the ELUP.**

*"The other major difference (with the University of Maryland study), and benefit, of the ELUP process is the inclusion of the DELPHI method to determine the Group's position." (loc.cit)*

When difficult predictions have to be made there is clearly a place for the opinions of experts. There is also a place for serious consideration of quantitative predictions such as the RESAC's (RESAC 2005) and other modeling studies such as Ewing and Kuzmyak's (2005). Nevertheless, one outcome that the Delphi method cannot accommodate is a wide divergence of views at the end of the process; reporting an average of diametrically opposed estimates does not do justice to the richness of opinions expressed by the experts. No indication is given of the degree of unanimity or divergence of opinions in the ELUP is given in the FEIS.

**6. Secondary and Cumulative Effects Analysis (SCEA) is not applied consistently in SHA's water quality analysis**

The impacts of the development that will be induced by the ICC are significantly greater than the effects of the roadway itself. These consequent effects are considered in the Secondary and Cumulative Effects Analysis (SCEA) by the FEIS, but they are not used in the *Affected environment, Natural Environment* chapter (SHA II E5a). The SCEA is applied *only* to Rocky Gorge, *not* to the entire area.
Great detail is provided of effects of the roadway itself, but scant information on the much larger area that will be affected by Secondary and Cumulative Effects (for example Table IV-55

Summary of New Impervious Cover Associated with the ICC by Corridor and Watershed in Acres, pages IV-161 to IV-163).

### 7. Response to Comment #991 in DEIS

*Comment 991: "What are the environmental impacts of the proposed ICC on the Anacostia and Potomac Rivers and the Chesapeake Bay?  Attachment #3 is the signed Anacostia River Restoration Agreement (signed by local officials such as Doug Duncan).  Please note that Goal #1 'dramatically reduce pollutant loads, such as sediment....'  Note that Goal #5 is to protect and expand forest cover...create riparian forest buffer....' How will the proposed ICC that adds new pollutant loads and destroys riparian forest buffer advance the Goals of restoring the Anacostia River? What is the impact of the proposed ICC on the Chesapeake Bay Restoration Agreement?"*

SHA Response:

*"The ICC will not be adding any 'new pollutants' to the Anacostia River, in fact pollutant load modeling of the right of way strip indicates a reduction some pollutants resulting from ICC construction."*

The ICC Pollutant Load Study estimates 300% increases in zinc and copper pollution in the Anacostia watershed from the roadway itself. The Pollution Load Study does not consider the much larger effects that will result from the secondary development in the watershed. The only analysis of the effects of secondary development is for Rocky Gorge Watershed (see Response #6 above), where a 200% increase in zinc and copper are estimated. Fecal coliform loads are estimated to increase by 50%. Furthermore, this Rocky Gorge Watershed analysis uses the SHA's estimates of the amount of secondary development, estimates that are significantly lower than are shown by two objective modeling exercises and in a minority opinion of the SHA's own ELUP process. The significance of these facts is not addressed in the response to Comment 991.

The response to Comment 991 also omitted this point that is acknowledged in the FEIS.

*"Additional impacts to this subwatershed* (i.e. the Anacostia) *may cause further channel instability and erosion, through SWM, erosion and sediment control, and other measures would be expected to reduce this impact" (SHA FEIS page160).*

The FEIS acknowledges, on page IV-164, and elsewhere, that additional impacts will be increased flashiness of storm water (increased peak and reduced base flows) and increased water temperature. Both these factors are likely to alter the stream biota in the Anacostia watershed.

### 8. Use of bridges to minimize effects on streams and wetlands

7

The FEIS frequently refers to the reduction in stream impact by the use of bridges rather than fill with culverts.   For example on  page IV-165.

• *Spanning streams and floodplains with bridges instead of culverts where practicable*
• *Using bridge spans much greater in length than required hydraulically to reduce fill and avoid and minimize impacts to stream channels, wetlands and floodplains*
• *Locating bridges to avoid placement of piers in stream channels and minimize impacts to wetlands*

While the physical impacts on wetlands should be reduced by the bridges (except during construction), this does not reduce the impact of increased runoff water, together with its increased concentration of pollutants from the roadway.


**9. Maximum size of rainfall events considered in the FEIS**

The FEIS states (Sect. J5, page S-37)

*"To address water quality, MDE's 2000 Stormwater Design Manual generally requires applicants to demonstrate treatment of 90 percent of all rainfall events (1 inch or less of rainfall) using Best Management Practices (BMPs) or stormwater credits identified in the manual. For the ICC, MDE's minimum requirements would be exceeded by treating 95 percent of all rainfall events (1.5 inches of rainfall)".*

While this additional 5% of rainfall events - those yielding.5 inch rainfall or less - is reassuring, it should be borne in mind that most sediment transport, bank erosion, and sediment-bound pollutant transport takes place in the largest storm events. The increase in impact is exponential, thus 2inch and 4 inch events will be much more drastic than the 1.5 inches allowed for. In fact >2 inch and >4 inch events occur in the region under consideration, on average, a little less than once a year (>2 inch) and once every 5 years (>4 inch) (Table 3).

Table 3. Number of days in the ICC area with rainfall greater than 2in and greater than 4in, by month.  The data indicate that in a 10yr period, there were 8 days in August with rainfall >2" and 2 days with rainfall >4". (From Miller, J.F. and Frederick, R.H., 1966)

| Month | Number of days with rainfall >2" | Number of days with rainfall >4" |
|-------|----------------------------------|----------------------------------|
| Jan   | .1 - .2                          | 0 - .01                          |
| Feb   | .01 - .05                        | 0 - .01                          |
| Mar   | .05 - .2                         | 0 - .01                          |
| Apr   | .2 - .4                          | 0 - .01                          |
| May   | .05 - .2                         | 0 - .01                          |
| Jun   | .2 - .4                          | 0 - .01                          |
| Jul   | .6 - .8                          | .01 - .05                        |
| Aug   | .6 - .8                          | .05 - .2                         |
| Sep   | .4 - .6                          | .05 - .1                         |
| Oct   | .2 - .4                          | 0 - .01                          |
| Nov   | .2 - .4                          | 0 - .01                          |
| Dec   | .1 - .2                          | 0 - .01                          |

## References

Ewing, R. and Kuzmyak, J.R., 2005. Comparing Forecasting Methods:  Expert Land Use Panel vs. Simple Land Use Allocation Model. Manuscript.

ICC Pollutant Load Study, July 2005, Revised November 2005.

Miller, J.F. and Frederick, R.H., 1966. Normal monthly number of days with precipitation of 0.5, 1.0, 2.0 and 4 inches or more in the conterminous United States. U.S. Department of Commerce Technical Paper No. 57, Washington, D.C

RESAC, 2005. Impacts of Alternative Transportation and Land Use Scenarios in the Anastocia River and Adjacent Watersheds Affected by the Proposed Intercounty Connector: A report by the Regional Earth Sciences Application Center (RESAC), University of Maryland to Environmental Defense, 1875 Connecticut Avenue NW Washington, DC 20009 USA. February 24, 2005, 38 pp.

State Highways Administration, State of Maryland, 2006. Intercounty Connector from I-270 to US 1. Final Environmental Impact Statement. Project #AT376B11.  2,702pp.

# Attachment 3

# The TPB Vision

*Policy Goals, Objectives and Strategies*

**Goal 1. The Washington metropolitan region's transportation system will provide reasonable access at reasonable cost to everyone in the region.**

**A. Objectives:**

(1) A comprehensive range of choices for users of the region's transportation system.

(2) Accurate, up-to-date and understandable transportation system information which is available to everyone in real time, and is user-friendly for first-time visitor and residents, regardless of mode of travel or language of the traveler.

(3) Fair and reasonable opportunities for access and mobility for persons with special accessibility needs.

(4) Convenient bicycle and pedestrian access.

**B. Strategies:**

(1) Plan, implement, and maintain a truly integrated, multi-modal regional transportation system.

(2) Plan and implement a tourist-friendly system that encourages the use of transit and provides international signage and information.

(3) Make the region's transportation facilities safer, more accessible, and less intimidating for pedestrians, bicyclists, and persons with special needs.

(4) Plan and implement a uniform fare system for transit and commuter rail.

(5) Adopt a regional transit planning process and plan, with priority to uniformity, connectivity, equity, cost effectiveness and reasonable fares.

**Goal 2. The Washington metropolitan region will develop, implement, and maintain an interconnected transportation** system that enhances quality of life and promotes a strong and growing economy throughout the entire region, including a healthy regional core and dynamic regional activity centers with a mix of jobs, housing and services in a walkable environment.

**A. Objectives:**

(1) Economically strong regional core.

(2) Economically strong regional activity centers with a mix of jobs, housing, services, and recreation in a walkable environment.

(3) A web of multi-modal transportation connections which provide convenient access (including improved mobility with reduced reliance on the automobile) between the regional core and regional activity centers, reinforcing existing transportation connections and creating new connections where appropriate.

(4) Improved internal mobility with reduced reliance on the automobile within the regional core and within regional activity centers.

(5) Efficient and safe movement of people, goods, and information, with minimal adverse impacts on residents and the environment.

**B. Strategies:**

(1) Define and identify existing and proposed regional activity centers, taking full advantage of existing infrastructure, for the growth and prosperity of each jurisdiction in the region.
(2) Encourage local jurisdictions to provide incentives for concentrations of residential and commercial development along transportation/transit corridors within and near the regional core and regional activity centers, such as zoning, financial incentives, transfer of development rights, priority infrastructure financing, and other measures.

(3) Encourage the federal government to locate employment in the regional core and in existing and/or planned regional activity centers.

(4) Give high priority to regional planning and funding for transportation facilities that serve the regional core and regional activity centers, including expanded rail service and transit centers where passengers can switch easily from one transportation mode to another.

(5) Identify and develop additional highway and transit circumferential facilities and capacity, including Potomac River crossings where necessary and appropriate, that improve mobility and accessibility between and among regional activity centers and the regional core.

(6) Intercept automotive traffic at key locations, encouraging "park once," and provide excellent alternatives to driving in the regional core and in regional activity centers.

(7) Develop a system of water taxis serving key points along the Potomac and Anacostia Rivers.

**Goal 3. The Washington metropolitan region's transportation system will give priority to management, performance, maintenance, and safety of all modes and facilities.**

**A.** Objectives:

(1) Adequate maintenance, preservation, rehabilitation, and replacement of existing infrastructure.

(2) Enhanced system safety through effective enforcement of all traffic laws and motor carrier safety regulations, achievement of national targets for seatbelt use, and appropriate safety features in facility design.

**B.** Strategies:

(1) Factor life-cycle costs into the transportation system planning and decision process.

(2) Identify and secure reliable sources of funding to ensure adequate maintenance, preservation, and rehabilitation of the region's transportation system

(3) Support the implementation of effective safety measures, including red light camera enforcement, skid-resistant pavements, elimination of roadside hazards, and better intersection controls.

**Goal 4. The Washington metropolitan region will use the best available technology to maximize system effectiveness.**

**A.** Objectives:

(1) Reduction in regional congestion and congestion-related incidents.

(2) A user-friendly, seamless system with on-demand, timely travel information to users, and a simplified method of payment.

(3) Improved management of weather emergencies and major incidents.

(4) Improved reliability and predictability of operating conditions on the region's transportation facilities.

(5) Full utilization of future advancements in transportation technology.

**B.** Strategies:

(1) Deploy technologically advanced systems to monitor and manage traffic, and to control and coordinate traffic control devices, such as traffic signals, including providing priority to transit vehicles where appropriate.

(2) Improve incident management capabilities in the region through enhanced detection technologies and improved incident response.

(3) Improve highway lighting, lane markings, and other roadway delineation through the use of advanced and emerging technologies.

(4) Establish a unified, technology-based method of payment for all transit fares, public parking fees, and toll roads in the region.

(5) Utilize public/private partnerships to provide travelers with comprehensive, timely, and accurate information on traffic and transit conditions and available alternatives.

(6) Use technology to manage and coordinate snow plowing, road salting operations, and other responses to extreme weather conditions, and to share with the public assessments of road conditions and how much time it will take to clear roadways.

(7) Use advanced communications and real-time scheduling methods to improve time transfers between transit services.

(8) Develop operating strategies and supporting systems to smooth the flow of traffic and transit vehicles, reduce variances in traffic speed, and balance capacity and demand.

(9) Maintain international leadership in taking advantage of new technologies for transportation, such as automated highway systems and personal rapid transit.

**Goal 5. The Washington metropolitan region will plan and develop a transportation system that enhances and protects the region's natural environmental quality, cultural and historic resources, and communities.**

A. Objectives:

(1) The Washington region becomes a model for protection and enhancement of natural, cultural, and historical resources.

(2) Reduction in reliance on the single-occupant vehicle (SOV) by offering attractive, efficient and affordable alternatives.

(3) Increased transit, ridesharing, bicycling and walking mode shares.

(4) Compliance with federal clean air, clean water and energy conservation requirements, including reductions in 1999 levels of mobile source pollutants.

(5) Reduction of per capita vehicle miles traveled (VMT).

(6) Protection of sensitive environmental, cultural, historical and neighborhood locations from negative traffic and developmental impacts through focusing of development in selected areas consistent with adopted jurisdictional plans.

B. Strategies:

(1) Implement a regional congestion management program, including coordinated regional bus service, traffic operations improvements, transit, ridesharing, and telecommuting incentives, and pricing strategies.

(2) Develop a transportation system supportive of multiple use and higher density (commercial and residential) in the regional core and regional activity centers as a means of preserving land; natural, cultural and historic resources; and existing communities.

(3) Support regional, state and federal programs which promote a cost-effective combination of technological improvements and transportation strategies to reduce air pollution, including promoting use of transit options, financial incentives, and voluntary emissions reduction measures.

(4) Develop a regional tourism initiative to encourage air and train arrival in the region, and additional transit access and automobile parking at the termini of Metrorail/rail services.

(5) Provide equivalent employer subsidies to employees with the intent of "leveling the playing field" between automobile and transit/ridesharing.

(6) Plan and implement transportation and related facilities that are aesthetically pleasing.

(7) Implement a regional bicycle/trail/pedestrian plan and include bicycle and pedestrian facilities in new transportation projects and improvements.

(8) Reduce energy consumption per unit of travel, taking maximum advantage of technology options.

**Goal 6. The Washington metropolitan region will achieve better inter-jurisdictional coordination of transportation and land use planning.**

**A.** Objectives:

(1) A composite general land use and transportation map of the region that identifies the key elements needed for regional transportation planning—regional activity centers, principal transportation corridors and facilities, and designated "green space."

(2) Region-wide coordination of land use and transportation planning in accordance with the recommendations of the Partnership for Regional Excellence report approved by the COG Board of Directors in 1993.

**B.** Strategies:

(1) Develop a regional process to notify local governments formally of regional growth and transportation policy issues, and encourage local governments to specifically address such issues in their comprehensive plans.

(2) Identify an agreed-upon set of definitions and assumptions to facilitate regional cooperation.

(3) Ensure that major corridor studies include options that serve the regional core and

regional activity centers shown on the regional map.

(4) Develop, in cooperation with local governments, model zoning and land use guidelines that encourage multiple use development patterns and reduce non-work automobile dependency.

(5) Plan for development to be located where it can be served by existing or planned infrastructure.

**Goal 7. The Washington metropolitan region will achieve an enhanced funding mechanism(s) for regional and local transportation system priorities that cannot be implemented with current and forecasted federal, state, and local funding.**

**A.** Objectives:

(1) Consensus on a set of critical transportation projects and a funding mechanism(s) to address the region's growing mobility and accessibility needs.

(2) A fiscally sustainable transportation system.

(3) Users of all modes pay an equitable share of costs

**B.** Strategies:

(1) Conduct outreach and education activities to promote public participation.

(2) Develop public support and approval for a specific set of regional and local transportation priorities and a funding mechanism(s) to supplement (and not supplant) priorities to be implemented with current and forecasted federal, state, and local funding.

**Goal 8. The Washington metropolitan region will support options for international and inter-regional travel and commerce.**

**A.** Objectives.

(1) The Washington region will be among the most accessible in the nation for international and inter-regional passenger and goods movements.

(2) Continued growth in passenger and goods movements between the Washington region and other nearby regions in the mid-Atlantic area.

(3) Connectivity to and between Washington Dulles International, National, and Baltimore-Washington International airports.

**B.** Strategies:

(1) Maintain convenient access to all of the region's major airports for both people and goods.

(2) Support efficient, fast, cost-effective operation of inter-regional passenger and freight rail services.

(3) Support the development of a seamless regional transportation system.

(4) Support coordinated ticketing and scheduling among Amtrak, MARC, VRE, WMATA, local bus and inter-city bus service.

(5) Develop a regional plan for freight movement.

# Attachment 4

# 4
# DETERMINING THE ENVIRONMENTAL CONSEQUENCES OF CUMULATIVE EFFECTS

> **PRINCIPLES**
> - Address additive, countervailing, and synergistic effects.
> - Look beyond the life of the action.
> - Address the sustainability of resources, ecosystems, and human communities.

The diversity of proposed federal actions and the environments in which they occur make it difficult to develop or recommend a single method or approach to cumulative effects analysis. In this chapter, we attempt to provide insight into and general guidelines for performing analyses needed to determine the environmental consequences of cumulative effects. We assume the analysis has already been scoped, including stipulating geographic and time boundaries (see Chapter 2), and that appropriate data have been gathered for the resources, ecosystems, and human communities of concern (see Chapter 3). Reference is made, when appropriate, to specific cumulative effects analysis methods described in Chapter 5 and Appendix A.

The analyst must ensure that the resources identified during scoping encompass all those needed for an analysis of cumulative effects. The analyst must also ensure that the relevant past, present, and reasonably foreseeable future actions have been identified. As an iterative process, cumulative effects analysis often identifies additional resources or actions involved in cumulative effects during the analysis phase. In addition to confirming the resources and actions to be considered, the analyst should complete the following specific steps to determine the environmental consequences of the cumulative effects:

| Step 8 | Identify the important cause-and-effect relationships between human activities and resources, ecosystems, and human communities. |
| Step 9 | Determine the magnitude and significance of cumulative effects. |
| Step 10 | Modify or add alternatives to avoid, minimize, or mitigate significant cumulative effects. |
| Step 11 | Monitor the cumulative effects of the selected alternative and adapt management. |

## CONFIRMING THE RESOURCES AND ACTIONS TO BE INCLUDED IN THE CUMULATIVE EFFECTS ANALYSIS

Even though scoping has identified likely important cumulative effects, the analyst should include other important cumulative effects that arise from more detailed consider-

37

ation of environmental consequences. In addition, as the proposed action is modified or other alternatives are developed (usually to avoid or minimize adverse effects), additional or different cumulative effects issues may arise. Specifically, the proposed action and reasonable alternatives (including the no-action alternative) could affect different resources and could affect them in different ways. For instance, hydroelectric facilities primarily affect aquatic resources by blocking fish migration routes, altering thermal regimes, and eroding stream channels as releases fluctuate. Reasonable alternatives for proposed hydroelectric facilities often include various types of power generating facilities that affect the environment in different ways. For example, the effects of coal-fired electric plants are most often related to coal-mining activities, the release of heated water to nearby water bodies in the cooling process, and the release of a variety of pollutants (including greenhouse gases) to the air during combustion. Nuclear plants also release heated water but they release radioactive materials to the air instead of greenhouse gases. Other past, present, or future actions also should be included in the analysis if evaluation of the cause-and-effect relationships identifies additional stresses affecting resources, ecosystems, and human communities of concern.

## IDENTIFYING AND DESCRIBING CAUSE-AND-EFFECT RELATIONSHIPS FOR RESOURCES, ECOSYSTEMS, AND HUMAN COMMUNITIES

In preparing any assessment, the analyst should gather information about the cause-and-effect relationships between stresses and resources. The relationship between the percent of fine sediment in a stream bed and the emergence of salmon fry (Figure 4-1) is an example of a model of cause and effect that can be useful for identifying the cumulative effects on a selected resource. Such a model describes the response of the resource to a change in its environment. To determine the consequences of

the proposed action on the resource, the analyst must determine which cumulative environmental changes (e.g., higher sediment load) will result from the proposed action and other actions.



Figure 4-1. Empirical cause and effect relationship between emergence of salmon fry and percent of fine sediment in the stream bottom (Stowell et al. 1983)

## Determining the Environmental Changes that Affect Resources

Using information gathered to describe the affected environment, the factors that affect resources (i.e., the causes in the cause-and-effect relationships) can be identified and a conceptual model of cause and effect developed. Networks and system diagrams are the preferred methods of conceptualizing cause-and-effect relationships (see Appendix A). The analyst can develop this model without knowing precisely how the resource responds to environmental change (i.e., the mechanism of the cause-and-effect relationship). If all pathways are identified, the model will be quite complex (Figure 4-2). Such a complex model can seldom be fully analyzed because sufficient data usually are not available to quantify each pathway. Because of this, the model should be simplified to include only important relationships that can be supported by information (Figure 4-3).

38



Figure 4-2. Example of a complex model of cause and effect



Figure 4-3. Example of a simpled model of cause and effect

39

The cause-and-effect model can aid in the identification of past, present, and future actions that should be considered in the analysis. In the example shown in Figure 4-3, the analyst should determine if there are other projects in the area that would affect any of the cause-and-effect pathways. The cause-and-effect model for the cumulative effects analysis will often include pathways that would not be needed for a project-specific analysis. Thus, as in defining boundaries, analyzing the consequences of cumulative effects requires broader thinking about the interactions among the activities and resources that affect environmental change.

## Determining the Response of the Resource to Environmental Change

Once all of the important cause-and-effect pathways are identified, the analyst should determine how the resource responds to environmental change (i.e., what the effect is). The cause-and-effect relationships for each resource are used to determine the magnitude of the cumulative effect resulting from all actions included in the analysis.

Cause-and-effect relationships can be simple or complex. The magnitude of an effect on a species may depend simply on the amount of habitat that is disturbed. Similarly, effects on archaeological sites may be quantified by enumerating the sites that are disturbed. Other responses may be more complex. The example shown in Figure 4-1 demonstrated that the successful hatching of salmon eggs depends on the percentage of fine particles in the stream bottom in a complex but predictable fashion. Socioeconomic models can be applied in a similar way to determine the effects of changes in immigration and emigration rates on the financial condition of a human community.

A wide variety of cause-and-effect evaluation techniques have been described in the literature (see Chapter 5). Techniques for evaluating ecological resources include the set of Habitat Suitability Index Models (HSI;

Schamberger et al. 1982; Hayes 1989) developed by the U.S. Fish and Wildlife Service for its Habitat Evaluation Procedures (HEP; U.S. Fish and Wildlife Service 1980). These models use cause-and-effect relationships for several key environmental variables to determine the suitability of different habitats for a variety of species. The change in number of habitat units (i.e., the ability of an area to support a species) as a result of multiple actions is a useful measure of cumulative effects. Species habitat models also drive the Habitat Evaluation System of the U.S. Army Corps of Engineers (1980). For wetland habitat designations, the Wetland Evaluation Technique is often used (Adamus et al. 1987). Other methods for linking measures of environmental change to effects on resources include developing relationships between loss in wetland area and functions such as flood storage, water quality, and life support (Preston and Bedford 1988; Leibowitz et al. 1992) and linking hydrology first to vegetation and then to wildlife habitat (Nestler 1992).

Nonlinear cause-and-effect relationships among several environmental changes pose an additional challenge for the analyst. A common example is the synergistic effect on fish populations that results from the combination of direct mortality losses to hydropower turbines and increased predation losses that occur as predators are attracted to dead and stunned fish. The analyst may also have to predict additional fish mortality from disease as a result of reductions in immune responses caused by toxic contamination. A third example of a common cumulative cause-and-effect problem is the combined effect on dissolved oxygen levels of excessive algal growth resulting from both increased nutrient loading and higher temperatures.

One of the most useful approaches for determining the likely response of the resource, ecosystem, and human community to environmental change is to evaluate the historical effects of activities similar to those under consideration. In the case of road construction through a

40

forest, the effects of similar past actions such as the construction of pipelines and power lines may provide a basis for predicting the likely effects of the proposed road construction. The residual effects of constructing and operating these linear facilities include fragmentation of forest tracts and the creation of homogeneous vegetation in the rights-of-way. Trends analysis (see Appendix A) can be used to model the effects of linear facilities over time and extrapolate the effects of a road construction project into the future.

If cause-and-effect relationships cannot be quantified, or if quantification is not needed to adequately characterize the consequences of each alternative, qualitative evaluation procedures can be used. The analyst may categorize the magnitude of effects into a set number of classes (e.g., high, medium, or low) or provide a descriptive narrative of the types of effects that may occur. Often, the analyst will be limited to qualitative evaluations of effects because cause-and-effect relationships are poorly understood or because few site-specific data are available. Even when the analyst cannot quantify cumulative effects, a useful comparison of relative effects can enable a decisionmaker to choose among alternatives.

## DETERMINING THE MAGNITUDE AND SIGNIFICANCE OF CUMULATIVE EFFECTS

The analyst's primary goal is to determine the magnitude and significance of the environmental consequences of the proposed action in the context of the cumulative effects of other past, present, and future actions. To accomplish this, the analyst must use a conceptual model of the important resources, actions, and their cause-and-effect relationships. The critical element in this conceptual model is defining an appropriate baseline or threshold condition of the resource, ecosystem, and human community beyond which adverse or beneficial change would cause significant degradation or enhancement of the resource, respectively.

The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process. The no-action alternative is an effective construct for this purpose, but its characterization is often inadequate for analyzing cumulative effects. Much of the environment has been greatly modified by human activities, and most resources, ecosystems, and human communities are in the process of change as a result of cumulative effects. The analyst must determine the realistic potential for the resource to sustain itself in the future and whether the proposed action will affect this potential; therefore, the baseline condition of the resource of concern should include a description of how conditions have changed over time and how they are likely to change in the future without the proposed action.

The potential for a resource, ecosystem, and human community to sustain its structure and function depends on its resistance to stress and its ability to recover (i.e., its resilience). Determining whether the condition of the resource is within the range of natural variability or is vulnerable to rapid degradation is frequently problematic. Ideally, the analyst can identify a threshold beyond which change in the resource condition is detrimental. More often, the analyst must review the history of that resource and evaluate whether past degradation may place it near such a threshold. For example, the loss of 50% of historical wetlands within a watershed may indicate that further losses would significantly affect the capacity of the watershed to withstand floods. It is often the case that when a large proportion of a resource is lost, the system nears collapse as the surviving portion is pressed into service to perform more functions.

The baseline condition should also include other present (ongoing) actions. For example, the National Ambient Air Quality Standards (NAAQS) inventory represents the universe of

present actions used in air quality analyses to determine whether new emission sources will exceed air quality standards. The NAAQS inventory includes all existing emission sources, sources with Prevention of Significant Deterioration (PSD) permits that have not yet begun to operate, and applicants for whom a PSD permit has not yet been issued. The NAAQS analysis requires explicitly modeling all existing nearby sources (as far away as 50 kilometers) be for air quality effects. In the analysis of the cause-and-effect relationships related to the anticipated impacts, each source represents a cause, and their combined emissions create an effect on air quality, the significance of which can be determined by comparing the concentration of pollutants emitted to threshold concentrations specified in the NAAQS. The NAAQS thresholds are concentrations known to cause significant human health or other environmental effects.

The historical context and full suite of on-going actions are not only critical for evaluating cumulative effects, but also for developing potential restoration as well. The first step in developing a river restoration plan is to understand how past actions (e.g., contributions of contaminants to the watershed) have contributed to the current condition of the water body. The historical trends in resource condition and its current potential for sustained structure and function are an essential frame of reference for developing mitigation and enhancement measures.

### Determining Magnitude

Initially, the analyst will usually determine the separate effects of past actions, present actions, the proposed action (and reasonable alternatives), and other future actions. Once each group of effects is determined, cumulative effects can be calculated. The cumulative effects on a specific resource, however, will not necessarily be the sum of the effects of all actions. Knowing how a particular resource responds to environmental change (i.e., the cause-and-effect relationship) is essential for determining the cumulative effect of multiple actions. Will the effects of two or more actions be additive, i.e., if one project would result in the death of 25% of a trout population (within a given level of uncertainty) and another the death of 10% of the trout, would the two projects together result in the loss of 35% of the trout? Although this is sometimes the case, there are often instances where the cause-and-effect relationship is more complex, i.e., the cumulative effect of two projects may be greater than the sum of the effects of each (in the trout example, more than 35% of the trout would die) or less than their sum (less than 35% of the trout would die). In some cases, the resource may better withstand additional adverse effects as stress increases, while in others, the resource may crash once a threshold is reached.

Once effects are identified using one of the methodologies described in Chapter 5, a table can be used to itemize effects into categories of past, present, proposed, and future actions. Tables 4-1, 4-2, and 4-3 show how these tables can be constructed using the results from different types of analyses. Regardless of the degree of quantification used, such tables are useful tools for putting the effects of the proposed action and alternatives into proper context. Table 4-1 illustrates the net cumulative effects of combining fish population increases from the proposed action with population losses from past and future actions. The table could be expanded to include the countervailing effect of sulfate aerosols on global warming (because they compensate for greenhouse gases) at the same time they are degrading ambient air quality. A series of such tables (one for each alternative) enables the analyst to compare alternatives meaningfully.

42

**Table 4-1. Example table using quantitative description of effects (within a given level of uncertainty) on various resources**

| Resource | Past Actions | Present Actions | Proposed Action | Future Actions | Cumulative Effect |
|----------|--------------|-----------------|-----------------|----------------|-------------------|
| Air Quality | No effect on $SO_2$ | 20% increase in $SO_2$ | 10% increase in $SO_2$ | 5% increase in $SO_2$ | 35% increase in $SO_2$ |
| Fish | 50% of 1950 population lost | 2% of fish population lost | 5% increase in fish population | 1% of fish population lost | 48% of 1950 fish population lost |
| Wetlands | 78% of presettlement wetlands lost | 1% of existing wetlands lost annually for 5 years | 0.5% of existing wetlands lost | 1.5% of existing wetlands lost annually for 10 years | 95% of presettlement wetlands lost in 10 years |

The separation of effects into those attributable to the proposed action or a reasonable alternative versus those attributable to past and future actions also allows the analyst to determine the incremental contribution of each alternative. Situations can arise where an incremental effect that exceeds the threshold of concern for cumulative effects results, not from the proposed action, but from reasonably foreseeable but still uncertain future actions. Although this situation is generally unexplored, the decisionmaker is faced with determining whether to forgo or modify the proposed action to permit other future actions. Identifying incremental effects, therefore, is an important part of informing the decisionmaker.

Most cumulative effects analyses will identify varying levels of beneficial and adverse effects depending on the resource and the individual action. Aquatic species will experience entirely different effects from terrestrial ones. A warm water fishery (e.g., largemouth bass) may benefit from a change that is detrimental to a cold water fishery (e.g., trout), and effects that are beneficial to the well being of a human community (e.g., provision of social services) may be detrimental to natural systems (e.g., wetlands lost during construction of a hospital).

Because of this mixture of beneficial and adverse effects, the decisionmaker is often hard pressed to determine which alternative is environmentally preferred. To overcome this problem, indices of overall cumulative effect can be developed. Some of the matrix methods used in cumulative effects analysis were developed specifically to address this need. These methods use unitless measures of effect (e.g., scales or ranks) to get around the problem of combining results from a variety of resources.

Presentation of overall cumulative effects can be controversial. Intentional or unintentional manipulation of assumptions can dramatically alter the results of aggregated indices (Bisset 1983), and experience indicates that complex quantitative methods for evaluating cumulative effects make it more difficult for the public to understand and accept the results. Effects on resources are usually presented separately, and professional judgment is used in determining the reasonable alternative with the greatest net positive cumulative effect. The U.S. EPA has developed guidelines for addressing specific kinds of risks (including cancer risks and the risks posed by chemical mixtures) and for comparing disparate kinds of risks (U.S. EPA 1993).

**Table 4-2.  Example table using qualitative description of effects on various resources, with impact ranks assigned a value from 1 to 5 (least to greatest)**

| Resource | Past Actions | Present Actions | Proposed Action | Future Actions | Cumulative Effect |
|---|---|---|---|---|---|
| Air Quality | 1 | 2 | 1 | 1 | 2 |
| Fish | 3 | 2 | 1 | 1 | 4 |
| Wetlands | 4 | 1 | 1 | 1 | 4 |

**Table 4-3.  Example table using narrative description of effects on various resources**

| Resource | Past Actions | Present Actions | Proposed Action | Future Actions | Cumulative Effect |
|---|---|---|---|---|---|
| Air Quality | Impacts dissipated | Noticeable deterioration in visibility during summer, but standards met | Visibility affected during operations, but standards met | Increase in auto emissions expected | Standards possibly violated |
| Fish | Decrease in numbers and species diversity | Occasional documented fish kills | Increase in number of fish kills | Loss of cold-water species due to change in temperature | Significant decline in numbers and species diversity |
| Wetlands | Large reduction in acreage of wetlands | Loss of small amount of wetland annually | Disturbance of a 5 acre wetland | Continued loss of wetlands | Significant cumulative loss of wetlands |

**Determining Significance**

The significance of effects should be determined based on context and intensity.  In its implementing regulations for NEPA, CEQ states that "the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality" (40 CFR § 1508.27).  Significance may vary with the setting of the proposed action.

Intensity refers to the severity of effect (40 CFR § 1508.27).  Factors that have been used to define the intensity of effects include the magnitude, geographic extent, duration, and frequency of the effects.  As discussed above, the **magnitude** of an effect reflects relative size or amount of an effect.  **Geographic extent** considers how widespread the effect might be.  **Duration and frequency** refers to whether the effect is a one-time event, intermittent, or chronic.  Where a quantitative evaluation is possible, specific criteria for significance should be explicitly identified and described.  These criteria should reflect the resilience of the resource, ecosystem, and human community to the effects that are likely to occur.

44

Thresholds and criteria (i.e., levels of acceptable change) used to determine the significance of effects will vary depending on the type of resource being analyzed, the condition of the resource, and the importance of the resource as an issue (as identified through scoping). Criteria can be quantitative units of measure such as those used to determine threshold values in economic impact modeling, or qualitative units of measure such as the perceptions of visitors to a recreational area. No matter how the criteria are derived, they should be directly related to the relevant cause-and-effect relationships. The criteria used, including quantitative thresholds if appropriate, should be clearly stated in the assessment document.

Determinations of significance in an EA or an EIS are the focus of analysis because they lead to additional (more costly) analysis or to inclusion of additional mitigation (or a detailed justification for not implementing mitigation). The significance of adverse cumulative effects is a sensitive issue because the means to modify contributing actions are often outside the purview of the proponent agency. Currently, agencies are attempting to deal with this difficult issue by improving their analysis of historical trends in resource and ecosystem condition. Even where cumulative effects are not deemed to be significant, better characterization of historical changes in the resource can lead to improved designs for resource enhancement. Where projected adverse effects remain highly uncertain, agencies can implement adaptive management—flexible project implementation that increases or decreases mitigation based on monitoring results.

## AVOIDING, MINIMIZING, AND MITIGATING SIGNIFICANT CUMULATIVE EFFECTS

If it is determined that significant cumulative effects would occur as a result of a proposed action, the project proponent should avoid, minimize, or mitigate adverse effects by modifying or adding alternatives. The proponent should not overlook opportunities to enhance resources when adverse cumulative effects are not significant. The separation of responsibilities for actions contributing to cumulative effects makes designing appropriate mitigation especially difficult. In the case of the Lackawanna Industrial Highway, the Federal Highway Administration and Pennsylvania Department of Transportation sponsored development of a comprehensive plan for the valley that provides a mechanism for ensuring that secondary development accompanying construction of the highway would protect valued resources, ecosystems, and human communities (see box).

By analyzing the cause-and-effect relationships resulting in cumulative effects, strategies to mitigate effects or enhance resources can be developed. For each resource, ecosystem, and human community of concern, the key to developing constructive mitigation strategies is determining which of the cause-and-effect pathways results in the greatest effect. Mitigation and enhancement strategies that focus on those pathways will be the most effective for reducing cumulative effects.

It is sometimes more cost-effective to mitigate significant effects after they occur. This might involve containing and cleaning up a spill, or restoring a wetland after it has been degraded. In most cases, however, avoidance or minimization are more effective than remediating unwanted effects. For example, attempting to remove contaminants from air or water is much less effective than preventing pollution discharges into an airshed or watershed. Although such preventative approaches can be the most (or only) effective means of controlling cumulative effects, they may require extensive coordination at the regional or national scale (e.g., federal pollution control statutes).

## Mitigating the Secondary and Cumulative Effects of the Lackawanna Valley Industrial Highway

Cumulative effects analysis conducted as part of the EIS for construction of a 16-mile-long, multi-lane, limited access highway in the Lackawanna Valley of Pennsylvania predicted substantial secondary environmental consequences from the expected (and desired) economic development in the valley. Specifically, additional industrial, commercial, and housing development would accompany the economic activity, producing higher demands on the valley's circulation system as well as on central water and sewer services and on other types of community services as well. To ensure that the development occurring as a result of the highway's construction would take place in an environmentally-sensitive manner, the Lackawanna Valley Corridor Plan was developed. This plan was a cooperative study sponsored by the Federal Highway Administration, Pennsylvania Department of Transportation, Pennsylvania Department of Community Affairs, and Lackawanna County through the Lackawanna County Regional Planning Commission (1996). The study produced an overall framework for the future development of the valley, including a Land Use Plan and a Circulation Plan, and a series of land development regulations that may be implemented by valley municipalities to ensure that new development protects community values and environmental resources. By undertaking the Lackawanna Valley Corridor Plan as part of the environmental decisionmaking process for the Lackawanna Valley Industrial Highway, the responsible federal and state agencies provided a concrete mechanism to avoid, minimize, and mitigate potentially adverse cumulative effects from secondary actions beyond their direct control.

## ADDRESSING UNCERTAINTY THROUGH MONITORING AND ADAPTIVE MANAGEMENT

The complexity of cumulative effects problems ensures that even rigorous analyses will contain substantial uncertainties about predicted environmental consequences (Carpenter 1995a). Risk assessment methods offer effective ways of presenting the uncertainties to decisionmakers (Carpenter 1995b), and increased scientific knowledge and improved analytical capabilities using modern computers and GIS can help reduce this uncertainty. Nonetheless, both researchers and practitioners generally agree that monitoring is critical to assess the accuracy of predictions of effects and ensure the success of mitigations (Canter 1993). Monitoring provides the means to identify the need for modifying (increasing or decreasing) mitigation, and adaptive management provides the flexible program for achieving these changes. An efficient, cost-effective approach to adaptive management is to sequentially implement mitigation measures so that the measures can be changed as needed (Carpenter 1995c).

It is important to remember that the goal of the NEPA process is to reduce adverse environmental effects (or maximize the net beneficial effect), including cumulative effects. Cumulative effects analysis, therefore, should be an iterative process in which consequences are assessed repeatedly following incorporation of avoidance, minimization, and mitigation measures into the alternatives. In this way, monitoring is the last step in determining the cumulative effects that ultimately result from the action. Important components of a monitoring program for assessing cumulative effects include the following:

- measurable indicators of the magnitude and direction of ecological and social change,

- appropriate timeframe,

46

- appropriate spatial scale,
- means of assessing causality,
- means of measuring mitigation efficacy, and
- provisions for adaptive management.

## ENVIRONMENTAL CONSEQUENCES SUMMARY

Although cumulative effects analysis is similar in many ways to the analysis of project-specific effects, there are key differences. To determine the environmental, social, and economic consequences of cumulative effects, the analyst should

- Select the resources, ecosystems, and human communities considered in the project-specific analysis to be those that could be affected cumulatively.

- Identify the important cause-and-effect relationships between human activities and resources of concern using a network or systems diagram that focuses on the important cumulative effects pathways.

- Adjust the geographic and time boundaries of the analysis based on cumulative cause-and-effect relationships.

- Incorporate additional past, present, and reasonably foreseeable actions into the analysis as indicated by the cumulative cause-and-effect relationships.

- Determine the magnitude and significance of cumulative effects based on context and intensity and present tables comparing the effects of the proposed action and alternatives to facilitate decisionmaking.

- Modify or add alternatives to avoid, minimize, or mitigate cumulative effects based on the cause-and-effect pathways that contribute most to the cumulative effect on a resource.

- Determine cumulative effects of the selected alternative with mitigation and enhancement measures.

- Explicitly address uncertainty in communicating predictions to decisionmakers and the public, and reduce uncertainty as much as possible through monitoring and adaptive management.

Determining the environmental consequences entails describing the cause-and-effect relationships producing cumulative effects and summarizing the total effect of each alternative. These activities require developing a cumulative effects analysis methodology (Chapter 5) from available methods, techniques, and tools of analysis (Appendix A).

# Attachment 5

 

**INTERCOMERY CONNECTOR FROM I-270 TO US 1**
**Montgomery and Prince George's Counties, Maryland**
**Project No. AT376B11**
**FINAL ENVIRONMENTAL DOCUMENT**

Thank you for the comments you provided on the Draft Environmental Impact Statement (DEIS) for the Intercounty Connector Project. We are contacting you for two reasons. First, on March 1, 2006 the Environmental Protection Agency (EPA) issued a new rule requiring an emissions analysis for fine particulate matter (known as PM 2.5) as part of the conformity determination for certain transportation projects. FHWA has determined, in consultation with EPA, that these new requirements apply to the ICC. FHWA is now preparing the required PM 2.5 analysis for the ICC. This analysis is expected to be completed soon. Once it is completed, a public notice will be issued in major newspapers and the analysis will be made available for public review for a period of 15 days. It is expected that the public comment period for the ICC PM 2.5 analysis will begin in mid-March. The exact deadline for the comment period will be included in the public notice for the PM 2.5 emissions analysis and will be posted on the ICC project website (www.iccstudy.org). Printed copies of the analysis will be also available for review at the locations where technical reports are available (see below). Printed copies can also be obtained by calling toll-free 1-866-462-0020 and making a request.

In addition, you recently received a compact disc (CD) that contains an electronic version of the Final Environmental Impact Statement (FEIS), including responses to the comments received on the DEIS. It has recently come to our attention that there was an error in printing Appendix R-7, index of Public Commenters, which is part of Volume 3 of 3 of the FEIS. Therefore, we are providing you with a CD that contains a new Appendix R-7 as well as the entire Volume 3 of 3. *Please note that only Appendix R-7 contained errors. No other section of Appendix R nor any other portion of the Final EIS/ Final Section 4(f) Evaluation contained these errors.*

Printed copies of the FEIS and the Public Hearing Transcript are available for review at selected libraries, community centers and government facilities listed below (or on back), during normal business hours. This Final EIS/ Final Section 4(f) Evaluation will be available for public review until March 23, 2006. The project sponsors and the Federal Highway Administration will consider comments received during the review period prior to issuance of the Record of Decision.

For more information regarding any of the issues covered in this notice, or if you have other questions, please visit the ICC Study website (www.iccstudy.org) or call toll-free 1-866-462-0020.

Neil J. Pedersen
State Highway Administrator
Date: March 3, 2006

**FEIS Distribution and Availability**
All 26 locations in and around the Study Area listed below will have a printed copy of the FEIS available for review and free CD copies of the FEIS. Locations marked with "●" denote locations where the Technical Reports are also available. The locations marked with "■" indicate locations where FEIS loaner copies are available.

### Montgomery County

**Aspen Hill Library**
4407 Aspen Hill Road
Rockville, MD 20853
(301) 871-2094

**Bethesda-Chevy Chase Regional Services Center**
4805 Edgemoor Lane
Bethesda, MD 20814
(240) 777-8200

**Eastern Montgomery Services Center ■**
3300 Briggs Chaney Road
Silver Spring, MD 20904
(240) 777-8400

**Fairland Library**
14910 Old Columbia Pike
Burtonsville, MD 20866
(301) 421-5400

**Gaithersburg Regional Library ■**
18330 Montgomery Village Ave.
Gaithersburg, MD 20879
(301) 840-2515

**Long Branch Library**
8800 Garland Ave.
Silver Spring, MD 20901
(240) 777-0910

**Mid-County Services Center ■**
2424 Reedie Drive
Wheaton, MD 20902
(240) 777-8100

**Olney Library ■**
3500 Olney-Laytonsville Road
Olney, MD 20832
(301) 570-1232

**Twinbrook Library**
202 Meadow Hall Drive
Rockville, MD 20851
(240) 777-0240

## Prince George's County

Beltsville Community Center
3900 Sellman Road
Beltsville, MD 20705
(301) 937-6613

Hyattsville Library
6530 Adelphi Road
Hyattsville, MD 20782
(301) 985-4690

Wheaton Regional Library
11701 Georgia Ave.
Wheaton, MD 20902
(240) 777-0678

White Oak Library
11701 New Hampshire Ave.
Silver Spring, MD 20904
(301) 622-2492

Rockville Library ■
99 Maryland Avenue
Rockville, MD 20850
240-777-0140

Laurel Library ■
507 7th Street
Laurel, MD 20707
(301) 776-6790

Laurel Municipal Center
8103 Sandy Springs Road
Laurel, MD 20707
(301) 725-5300

## Government Centers

Maryland State Highway
Administration ●
SHA Resource Center
707 North Calvert Street
Baltimore, MD 21202
(410) 545-5577

Maryland State Highway
Administration ● ■
District 3 Office
9300 Kenilworth Avenue
Greenbelt, MD 20770
(301) 513-7300

Federal Highway Administration ●
Baltimore Division Office
City Crescent Building
10 S. Howard Street, Suite 2450
Baltimore, MD 21201
(410) 962-4440

Maryland Transportation Authority
●
2310 Broening Highway
Suite #145
Baltimore, MD 21224
(410) 537-5654

Prince George's County Offices
9400 Peppercorn Place
Suite # 300
Largo, MD 20774
(301) 883-5600

Maryland-National Capital Park
and Planning
Commission - Montgomery
County ● ■
8787 Georgia Avenue
Silver Spring, MD 20910
(301) 495-4500

SHA Fairland Shop
12020 Plum Orchard Road
Silver Spring, MD 20904
(301) 572-5166

Maryland-National Capital Park
and Planning Commission -
Prince George's County ● ■
14741 Governor Oden Bowie
Dr.
Upper Marlboro, MD 20772
(301) 952-3680

Montgomery County Offices
101 Monroe Street
Rockville, MD 20850
(240) 777-6161

Maryland-National Capital Park and
Planning Commission - Montgomery
County ● ■
12900 Middlebrook Road
Germantown, MD 20874
(301) 495-2480

For those locations where extra printed copies are available for loan, interested stakeholders may
borrow a printed copy of the document. Much like a library system, these documents will be
available for loan and must be returned unmarked and intact so that they can be loaned to
another interested person. Borrowed copies of the FEIS may be kept for up to three weeks.



## *Maryland Native Plant Society*
P.O. Box 4877, Silver Spring, MD 20914 · www.mdflora.org
### Appreciation · Education · Conservation



AUDUBON
NATURALIST
SOCIETY
OF THE CENTRAL
ATLANTIC STATES INC.

### Montgomery County Group



SIERRA CLUB
FOUNDED 1892



e
environmental defense
finding the ways that work

April 26, 2006

Mr. Nelson J. Castellanos
Division Administrator
Federal Highway Administration
City Crescent Building
10 South Howard Street
Suite 2450
Baltimore, MD  21201

Mr. Wesley Mitchell
Project Manager
Office of Planning and Preliminary Engineering
Maryland State Highway Administration
707 North Calvert Street
Mail Stop C-301
Blatimore, MD  21202

Dear. Messrs. Castellanos and Mitchell:

Enclosed please find comments on the Project-level Conformity Determination for the
Intercounty Connector Project in Maryland from the Audubon Naturalist Society of the Central
Atlantic States, Environmental Defense, the Sierra Club- Maryland Chapter and the Maryland
Native Plant Society.  In addition to our own comments on the Project-level Conformity
Determination is an expert critique of the Hot Spot Study prepared by E.H. Pechan & Associates,
Inc.  We request that both documents be fully entered into the administrative record for the
environmental impact statement for the Intercounty Connector.

Thank you for your consideration.

Headquarters: 6 Herndon Avenue, Annapolis, MD 21403 · 410-268-8816, fax 410-268-6687
Maryland Office: 6 Herndon Avenue, Annapolis, MD 21403 · 410-268-8813, fax 410-280-3513
Pennsylvania Office: The Old Water Works Building, 614 North Front Street, Suite G, Harrisburg, PA 17101 · 717-234-5550, fax 717-234-9632
Virginia Office: 1108 East Main Street, Suite 1600, Richmond, VA 23219 · 804-780-1392, fax 804-648-4011

Printed on recycled paper

COMMENTS ON THE CONFORMITY DETERMINATION FOR THE
INTERCOUNTY CONNECTOR HIGHWAY PROJECT
*Submitted by the Audubon Naturalist Society of the Central Atlantic States, Environmental Defense, the
Sierra Club-Maryland Chapter and the Maryland Native Plant Society*

April 26, 2006 final submission

I.  **EXECUTIVE SUMMARY**

Commenters believe that the proposed conformity determination for the Inter-
County Connector Project does not meet the requirements of the Clean Air Act. Section
176(c)(1) of the Clean Air Act requires a determination that emissions from a
transportation project –

...will not –
(i) cause or contribute to any new violation of any standard in any area;
(ii) increase the frequency or severity of any existing violation of any
standard in any area; or
(iii) delay timely attainment of any standard or any required interim
emissions reductions or other milestones in any area.

The proposed conformity determination prepared by the Maryland State Highway
Administration ("SHA") and the Federal Highway Administration ("FHWA") released on
March 24, 2006, fails to demonstrate that emissions from the proposed Intercounty
Connector ("ICC") project will not cause or contribute to new, more frequent or more
severe violations of the PM 2.5 National Ambient Air Quality Standards ("NAAQS").  In
addition it does not even discuss whether the ICC will delay timely attainment of any
standard or any required interim emissions reductions or other milestones in any area.

Commenters believe that the failure of the FHWA to use recognized modeling
tools that are available for the purpose of predicting the impact of emissions from the
project on the ambient air in the neighborhoods near the Project is not authorized NEPA
and the Clean Air Act. In addition, regardless of the modeling tools used, it is unlawful to
ignore the impact of emissions from other highway projects in the Washington,
D.C./Virginia/Maryland Nonattainment Area on ambient violations of the PM 2.5 NAAQS
at numerous monitors in the Nonattainment area.

The proposed conformity determination is fundamentally flawed because it uses
neither of the two methods that have been recognized by the United States
Environmental Protection Agency ("EPA") and the courts for assessing the impacts of
emissions from a proposed facility on ambient air quality data. These are 1) air quality
modeling, recognized by EPA as the preferred method for estimating the impact of
emissions from a future source on ambient air quality,[1] and 2) monitors, sited in accord
with EPA monitoring guidance, to assess the impact of existing source emissions as the

---

[1] See Attachment 1, E.H. Pechan Report.

basis for determining current baseline emissions which are to be used in estimating the impact of future new sources.

Violations of PM 2.5 NAAQS have been measured by monitors in the Washington metropolitan area that are sited in close proximity to major highways. These data create a strong inference that violations of the NAAQS also currently occur adjacent to I-95 and I-370 at the locations where the ICC will connect to these large freeways. The additional emissions at these locations that will be generated from the incremental traffic associated with the ICC must contribute to additional or more severe violations of the PM 2.5 NAAQS at these locations.

This evidence of current violations at the termini of the proposed project, and more severe or more frequent future violations of the NAAQS demonstrates that the Project does not conform as required by the CAA, and that mitigation strategies must be considered. Available and reasonable mitigation strategies, including alternative alignments, high occupancy toll lanes and transit facilities, have not been evaluated to identify measures than will prevent new NAAQS violations, or contribute to reducing existing NAAQS violations.

Commenters therefore request that the agencies undertake a more scientifically valid investigation of future ambient air impacts from the Project by 1) determining current baseline concentrations (and the magnitude of expected current violations) by establishing monitors that satisfy EPA guidance for detecting the impact of emissions from highways at the hot spot locations where traffic from the ICC will add traffic and emissions to current traffic loads on I-95 and I-370; 2) determine the emissions reductions that will be needed to prevent NAAQS violations when additional emissions from traffic on the ICC are added to current emissions from traffic on I-95 and I-370; and 3) evaluate the potential for available and reasonable alternatives to the FEIS's preferred alternative and other mitigation strategies to achieve the emissions reductions needed for attainment.

## II.  LEGAL FRAMEWORK FOR DECISION

The CAA declares that:

No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title. No metropolitan planning organization designated under section 134 of Title 23, shall give its approval to any project...which does not conform to an implementation plan approved or promulgated under section 7410 of this title.

42 U.S.C. § 7506(c)(1). The CAA further provides that "[n]o Federal agency may approve, accept or fund any transportation...project unless such ... project has been

found to conform to any applicable implementation plan in effect under this chapter." 42 U.S.C. § 7506(c)(2). The Act defines "conformity to an implementation plan" to mean—

> (A) conformity to an implementation plan's purpose of
> eliminating or reducing the severity and number of violations of the
> national ambient air quality standards and achieving expeditious
> attainment of such standards; and
> (B) that such activities will not--
>     (i) cause or contribute to any new violation of any standard
> in any area;
>     (ii) increase the frequency or severity of any existing
> violation of any standard in any area; or
>     (iii) delay timely attainment of any standard or any
> required interim emission reductions or other milestones in any
> area.

42 U.S.C. § 7506(c)(1).

### A. The Proposed Conformity Determination Fails to Demonstrate Conformity with Statutory Tests.

The proposed conformity determination specifically addresses the statutory conformity criteria in subparagraph (c)(1)(B)(i) and (ii), but not the criteria in clause (iii) of subparagraph (c)(1)(B) or (c)(1)(A). To the extent that these provisions of the Act define factors that are relevant to the conformity determination it is arbitrary and capricious for an agency to ignore them. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983); Environmental Defense Fund, Inc. v. EPA, 898 F.2d 183 (D.C. Cir. 1990) (agency decision remanded for failure to address all statutory factors); Cerillo-Perez v. INS, 809 F.2d 1419, 1422 (9th Cir. 1987) (court will "'set aside an agency action if [it] find[s] that the agency has ... ignored factors that must be taken into account under any [governing] source[] of law.'"). Judicial deference is not due when an agency fails to apply an important term in its governing statute. Defenders of Wildlife v. Norton, 258 F.3d 1136, 1146 n.11 (9th Cir. 2001).

In a case where the D.C. Circuit vacated a provision of EPA's conformity rule for failing to implement the obligation in subparagraph (c)(1)(A) to contribute to emissions reductions, the D.C. Circuit construed the Act to require that in order for projects to conform they must satisfy all the statutory conformity tests in (c)(1)(A) and (B), to wit, projects must–

> help eliminate, reduce, or prevent violations of national ambient air quality
> standards, as required by section 7506(c)(1). According to that provision, a
> "conforming" transportation project is one that will contribute to "eliminating or
> reducing the severity and number of violations of the [NAAQS] and achieving
> expeditious attainment of the standards," 42 U.S.C. § 7506(c)(1)(A), and that "will
> not – (i) cause or contribute to any new violation of any standard in any area; (ii)

increase the frequency or severity of any existing violations of any standard in any area; or (iii) delay timely attainment of any standard or any required interim emissions reductions or other milestones in any area," *id.* § 7506(c)(1)(B)."

EDF v. EPA, 167 F.3d 641, 646-47 (D.C.Cir.1999).

In the context of the ICC Project, it is evident from the baseline air quality in areas adjacent to the major freeways with which the Project will connect that all the statutory conformity tests are relevant to determining the conformity of the Project. The statutory tests in (c)(1)(B)(i) and (ii) require a determination that emissions from the Project will not cause or contribute to new, more frequent or more severe violations of the NAAQS. These tests obviously apply whether current air quality in the vicinity of the new highway exceeds or meets the NAAQS.

The test in (1)(B)(iii) also requires a showing that emissions from the Project "will not delay timely attainment of [the NAAQS]." This most clearly applies in areas where the NAAQS is currently being exceeded. This provision requires a determination that additional emissions from the proposed Project will not delay attainment beyond the statutory deadline. This necessarily calls for a showing that additional emissions from the Project have been accounted for in the State Implementation Plan for the pollutant, and will be offset by other reductions in the control strategy adopted for the nonattainment area. As explained by the air quality analysis presented below, the termini of the ICC will connect to large existing freeways at I-95 and I-370 where the available evidence demonstrates that the NAAQS is currently being exceeded. Additional emissions at these hot spot locations that will result from additional traffic making the connection from the ICC Project to I-95 and I-370 will exacerbate these NAAQS violations. The test in (1)(B)(iii) requires more than simply reducing emissions at these termini so that the cumulative impact of the ICC will not cause or contribute to more frequent or more severe violations. This provision also requires a showing that even if there is no net increase in emissions, the emissions from the Project will not delay timely attainment by continuing to contribute to on-going violations of the NAAQS. No discussion of this statutory test is included in the conformity determination.

Finally, the construction of subparagraph (c)(1)(A) adopted by the D.C. Circuit also requires a demonstration that the Project "will contribute to 'eliminating or reducing the severity and number of violations of the [NAAQS] and achieving expeditious attainment of the standards,' 42 U.S.C. § 7506(c)(1)(A)." EDF v. EPA, 646-47. This provision is especially important in a context where the NAAQS is violated by current emissions from existing highways such as is the case in the neighborhoods around the termini of the ICC. Under these circumstances, the transportation agencies must consider and adopt a Project that will contribute to emissions reductions in the area. The ICC Project, as currently proposed, does not satisfy this statutory test. In addition, it is arbitrary and capricious for the agencies to ignore this requirement as if it were not part of the CAA.

**B. The Proposed Conformity Determination Fails to Demonstrate Conformity with EPA's Regulatory Criteria and Procedures.**

Some of the statutory conformity provisions have been explained in greater detail by EPA's conformity regulations. 40 CFR §§ 93.116, 93.123. Section 93.116, as amended,[2] requires that an "FHWA/FTA project must not cause or contribute to any new localized ... PM 2.5 violations or increase the frequency or severity of any existing ... PM 2.5 violations in ... PM 2.5 nonattainment and maintenance areas."

The General Requirements for performing a hot spot analysis are prescribed by § 93.123(c) which requires that—

(c) General requirements. (1) Estimated pollutant concentrations must be based on the total emissions burden which may result from the implementation of the project, summed together with future background concentrations. The total concentration must be estimated and analyzed at appropriate receptor locations in the area substantially affected by the project.
(2) Hot-spot analyses must include the entire project, and may be performed only after the major design features which will significantly impact concentrations have been identified. The future background concentration should be estimated by multiplying current background by the ratio of future to current traffic and the ratio of future to current emission factors.

1. Establishing Baseline Air Quality

The analysis aims to estimate the future concentration of the pollutant that will result when emissions from the project are added to "future background concentrations" at "appropriate receptor locations." The rule prescribes the starting point for an analysis that satisfies this requirement is to determine the "current background" concentration at these receptor locations. EPA's "Transportation Conformity Guidance for Qualitative Hot-spot Analyses in PM2.5 and PM10 Nonattainment and Maintenance Areas," section 4.3, p. 19 (March 2006) calls for the acquisition of air quality data to define the baseline condition.

Existing and future air quality information should be considered to assess the probability of the project causing or contributing to an air quality violation. Analysts and reviewers should be aware of the existing air quality conditions so that they can understand the relative impact that the proposed project is likely to have.

NEPA regulations also require that an agency obtain data that accurately describes the baseline condition of the environment to be affected by a project. NEPA requires

---

[2] The rule as first promulgated did not apply to PM 2.5. 58 FR 62188 (Nov. 24, 1993). The rule was subsequently amended to add PM 2.5. 71 FR 12467 (March 10, 2006).

analysis of the cumulative effects of a proposed action. 42 C.F.R. § 1508.8. In determining the environmental consequences of cumulative effects, it is necessary for the lead agency to establish a pre-project baseline condition against which the predicted post-project condition can be compared. As CEQ guidance on NEPA explains "[t]he critical element. . .is defining an appropriate baseline or threshold condition of the resource, ecosystem, and human community beyond which adverse or beneficial change would cause significant degradation or enhancement of the resource, respectively."[3] According to CEQ, this comparison "is critical to the NEPA process."[4] Courts have also recognized the importance of establishing an accurate baseline: "Without establishing the baseline conditions which exist in the vicinity of [the proposed action], there is simply no way to determine what effect the proposed [project] will have on the environment and, consequently, no way to comply with NEPA."[5] The comparison is important to determine the extent of the impact and to determine what mitigation measures to implement to lessen the impact.

The proposed ICC project corridor is located where no ambient air quality monitoring station is providing data that meets EPA monitoring siting criteria. EPA monitor siting criteria require that monitors sited for the purpose of measuring the ambient impact of highway emissions be located 5-15 meters from the closest traffic lane.[6] A search of EPA's AirData website and has not identified any PM2.5 monitors that report air quality data in the national AirData system located within less than 20 meters of a major highway in the Washington Metropolitan nonattainment area. Only three of 1490 monitors nationwide are located in PM2.5 nonattainment areas. Two of these report violations of the NAAQS for PM2.5 (northern NJ near I-78 and New Haven CT near I-95). The locations in the Washington Metro area where monitors are measuring PM 2.5 air quality data do not satisfy EPA's guideline in Part 58 Appendix E. Air quality measured at monitors that are near highways but do not satisfy the siting criteria for measuring the impact of emissions from highways are relevant to showing

---

[3] See Attachment 2, "Determining the Environmental Consequences of Cumulative Effects" at 41.
[4] Id.
[5] Half-Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988)
[6] 40 CFR Part 58, Appendix E, ¶ 8.3:
    The intent is to locate category (a) NAMS sites in areas of highest concentrations whether it be from mobile or multiple stationary sources. If the area is primarily affected by mobile sources and the maximum concentration area(s) is judged to be a traffic corridor or street canyon location, then the monitors should be located near roadways with the highest traffic volume and at separation distances most likely to produce the highest concentrations. For the microscale traffic corridor station, the location must be between 5 and 15 meters from the major roadway. For the microscale street canyon site the location must be between 2 and 10 meters from the roadway. For the middle scale station, a range of acceptable distances from the roadway is shown in Figure 2. This figure also includes separation distances between a roadway and neighborhood or larger scale stations by default. Any station, 2 to 15 meters high, and further back than the middle scale requirements will generally be neighborhood, urban or regional scale. For example, according to Figure 2, if a PM sampler is primarily influenced by roadway emissions and that sampler is set back 10 meters from a 30,000 ADT road, the station should be classified as a micro scale, if the sampler height is between 2 and 7 meters. If the sampler height is between 7 and 15 meters, the station should be classified as middle scale. If the sample is 20 meters from the same road, it will be classified as middle scale; if 40 meters, neighborhood scale; and if 110 meters, an urban scale.

that increased emissions from highways in the region cause new or more serious violations of the NAAQS, but are not adequate for the purpose of establishing actual baseline concentrations in the area affected by the ICC Project for use in making the conformity determination. Therefore SHA must establish monitors at expected hot spot locations that satisfy EPA's siting criteria for the purpose of identifying baseline concentrations to be used for a quantitative air quality impact analysis for PM2.5.

## 2. Modeling Air Quality Impacts

When EPA first promulgated the General Requirements for performing a hot spot analysis, the Agency explained its intent "that the hot spot analysis compare concentrations with and without the project based on modeling of conditions in the analysis year." 58 FR 62212, col.2. The 2006 revision to the hot spot rule continues to require that "[t]he demonstration required by § 93.116 ("Localized CO, PM10 and PM2.5 violations") must be based on quantitative analysis using the applicable air quality models, data bases, and other requirements specified in 40 CFR part 51, Appendix W (Guideline on Air Quality Models)." 40 CFR §93.123(a)(1). The specific provision governing hot spot analysis for PM2.5 requires that "[t]he hot spot demonstration required by § 93.116 must be based on quantitative analysis methods ...." 40 CFR §93.123(b)(1). These requirements for quantitative analysis of PM2.5 are limited by §93.123(b)(4) which states that "[t]he requirements for quantitative analysis contained in this paragraph (b) will not take effect until EPA releases modeling guidance on this subject and announces in the **Federal Register** that these requirements are in effect." (emphasis added).

EPA has announced in the Federal Register the availability of MOBILE6.2 as the emission factor model to be used for PM2.5 conformity determinations. "MOBILE6.2 (except in California) and AP-42 (except in areas where another dust methodology has been approved) must be used in all PM2.5 conformity analyses, until they are replaced by newer approved methods or models." 69 FR 28830, 28832 (May 19, 2004). EPA's technical guidance for the MOBILE model explains that it can be applied to estimate emissions from a specific highway project once information is obtained regarding the vehicles that will be using that particular highway segment. "MOBILE6 was designed to account for differences in vehicle activity on different roadway types and allow for more precise modeling of emissions for individual roadway links." Technical Guidance on the Use of MOBILE6 for Emissions Inventory Preparation, (U.S. EPA, Office of Air and Radiation, Office of Transportation and Air Quality, January 2002), at 28. EPA's Guidance explains that the Model provides different emissions estimates for four sets of driving cycles, one of which is a "Freeway Driving Cycle." Technical Guidance, at 25. The Guidance, at 16-21, also explains that separate emissions estimates are provided for 16 vehicle classifications. Thus MOBILE6.2 can provide useful emissions data when information regarding traffic load and vehicle type is available for a highway link.

In addition, EPA has published the availability of a dispersion model for use in predicting the ambient concentrations of primary pollutants emitted from highways (i.e., line sources) as they are dispersed into the atmosphere. See 40 CFR Part 51, Appendix

W, Appendix A, § A.3 CALINE 3, 70 FR 68,218, 68,256 (Nov. 9, 2005). Based upon these notices of availability published in the Federal Register, FHWA is required by the revised conformity hot spot rule to undertake a quantitative analysis of the impact of emissions from the ICC on PM2.5. The failure to perform such analysis to make the demonstrations required by § 93.116 is unlawful.

3. The Conformity Demonstration Fails to Apply Monitoring Methods Required by Appendix W (Guideline on Air Quality Models).

The conformity rule requires that "[t]he demonstrations required by §93.116 ... must be based on quantitative analysis using the applicable air quality models, data bases, and other requirements specified in 40 CFR part 51, Appendix W (Guideline on Air Quality Models)." To the extent that a determination is made that the modeling tools that EPA has determined to be available for determining the impact of new highway emissions on PM 2.5 are not found not to be appropriate for the current conformity determination, then the Appendix W provides the methodology to be used in applying monitoring tools.

Appendix W specifically describes the procedures to be followed when source impacts are to be determined using monitoring rather than modeling tools. In this case where existing emissions from the highways located at the termini of the ICC will be the hot spot locations of concern, the measurement of baseline concentrations must be developed in compliance with the requirements in Appendix W, ¶ 10.2.2.

10.2.2 Use of Measured Data in Lieu of Model Estimates
    a. Modeling is the preferred method for determining emission limitations for both new and existing sources. When a preferred model is available, model results alone (including background) are sufficient. Monitoring will normally not be accepted as the sole basis for emission limitation. In some instances when the modeling technique available is only a screening technique, the addition of air quality data to the analysis may lend credence to model results.
    b. There are circumstances where there is no applicable model, and measured data may need to be used. However, only in the case of a NAAQS assessment for an existing source should monitoring data alone be a basis for emission limits. In addition, the following items (i–vi) should be considered prior to the acceptance of the measured data:
        i. Does a monitoring network exist for the pollutants and averaging times of concern?
        ii. Has the monitoring network been designed to locate points of maximum concentration?
        iii. Do the monitoring network and the data reduction and storage procedures meet EPA monitoring and quality assurance requirements?

8

iv. Do the data set and the analysis allow impact of the most important individual sources to be identified if more than one source or emission point is involved?

v. Is at least one full year of valid ambient data available?

vi. Can it be demonstrated through the comparison of monitored data with model results that available models are not applicable?

c. The number of monitors required is a function of the problem being considered. The source configuration, terrain configuration, and meteorological variations all have an impact on number and placement of monitors. Decisions can only be made on a case-by-case basis. Guidance is available for establishing criteria for demonstrating that a model is not applicable?

d. Sources should obtain approval from the appropriate reviewing authority (paragraph 3.0(b)) for the monitoring network prior to the start of monitoring. A monitoring protocol agreed to by all concerned parties is highly desirable. The design of the network, the number, type and location of the monitors, the sampling period, averaging time as well as the need for meteorological monitoring or the use of mobile sampling or plume tracking techniques, should all be specified in the protocol and agreed upon prior to start-up of the network.

In the SHA draft conformity determination, monitoring data were used from monitors that were not cited to satisfy any of the criteria in Appendix W. Of greatest concern is the failure to identify a monitoring network, or even a single monitor, that has "been designed to locate points of maximum concentration." ¶ 10.2.2.b.ii. The monitors used for the analysis appear to have been selected because they are located far from any major highway, and are useful only for characterizing background air quality in nearly rural locations not affected by emissions from heavily trafficked freeways. FHWA agreed in the settlement agreement with the Sierra Club that resolved the US 95 litigation, that a monitor located more than 1000 meters from a freeway provides information regarding the urban background, and does not reflect the impact of emissions from a highway. See US 95 Settlement Agreement, Appendix A, ¶ 2.a. Selection of Monitoring Sites.

In the absence of a monitor that has been sited to provide data for determining concentrations at the point of greatest impact, Appendix W calls for the establishment of a monitoring network that includes the collection of meteorological data in order to obtain the data needed to identify the point of greatest impact from existing sources so that the cumulative impact of new emissions from the Project can be determined using reliable information. The Guideline requires that the network be established after consultation with appropriate air quality expert agencies. None of these steps have been followed by the transportation agencies. The attempt to rely upon monitors that describe air quality in the urban background, far removed from the point where current emissions from existing highways have their greatest impact on PM 2.5 concentrations, is in clear violation of the conformity rule requirement that the analysis "be based on quantitative analysis using the applicable air quality models, data bases, and other

9

requirements specified in 40 CFR part 51, Appendix W (Guideline on Air Quality Models)."

### C. The Record Does Not Support The Conformity Determination.

Given the failure of the agencies to apply either the modeling tools published by EPA, or the methods required by Appendix W for obtaining relevant monitoring evidence to determine impacts, the transportation agencies have not satisfied the regulatory requirements for making a conformity determination. In addition, the draft conformity determination does not provide a basis for determining conformity because it fails to address relevant portions of the statutory tests for determining conformity.

In the absence of an analysis that meets regulatory requirements, Commenters have undertaken two investigations to estimate the impacts of emissions from traffic in the ICC corridor. First, commenters employed the services of an expert consultant to conduct a survey of the literature to identify studies that show the impact of emissions from major freeways of comparable size on PM2.5 concentrations by measuring only the black carbon component of fine particles, the component attributed primarily to motor vehicle emissions. See E.H. Pechan Report, included as Attachment 1. Second, commenters performed an independent analysis of likely air quality concentrations based upon monitors located close to heavily trafficked freeways in other portions of the Washington metropolitan area. See Determining Baseline Air Quality Using Monitor Data, below. Those data, when scaled to account for differences in traffic loads and distances from nearby roadways, demonstrate that the NAAQS for PM 2.5 is being exceeded in neighborhoods adjacent to the roadway, and that therefore the additional emissions resulting from the additional traffic joining these existing facilities will exacerbate these violations. No conformity determination can be made until monitoring networks are established to more precisely measure the magnitude of these NAAQS violations, and mitigation is adopted that will be adequate to remedy these violations. The mitigation commitments must be enforceable to satisfy 40 CFR §§93.123(c)(4) and 93.125.

### D. NEPA And The Federal-Aid Highway Act Apply To This Decision.

EPA and FHWA concurred in the determination that conformity determinations will be made through the NEPA process. 58 FR 62209 (November 24, 1993). Since then, all hot spot conformity determinations have been made as part of the NEPA process. This result is required by the NEPA regulations which direct agencies to "prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by...other environmental review laws." 40 CFR §1502.25. In addition, the cumulative impact of emissions from the ICC in the vicinity of adjacent and connecting roadways on the NAAQS for PM 2.5 and on human health is a significant impact on the human environment that was not addressed in the Draft or Final EIS. 40 CFR §1508.27(b)(2) (impacts on public health), (b)(10) (threatened violations of environmental standards). If

10

these issues are not addressed as part of the NEPA process, then the Draft and Final EISs are deficient for having omitted significant impacts on the human environment.

Compliance with NEPA requires full disclosure of the public health risks associated with emissions from the Project. This requires more than a demonstration that Project emissions will comply with the current NAAQS for two reasons. First, extensive new health effects research has become available that demonstrate significant risks of severe adverse health outcomes associated with exposure to concentrations below the 1997 NAAQS. Second, based upon the evidence of harm that has emerged in the last nine years, EPA has proposed to strengthen the NAAQS for PM2.5 to provide protection from these serious human health impacts.

The proposed ICC Project will significantly increase air pollution, as a result FHWA has a vital obligation to disclose the resulting human health risks. See 40 C.F.R. §§ 1502.16, 1508.8 (mandating discussion of effects on "health"); see also 40 C.F.R. § 1508.27(b)(2) (defining severity of environmental impacts in relation to "the degree to which the proposed action affects public health or safety"). As explained by the Ninth Circuit, even a "marginal degradation of the quality of the air we breathe" is "environmentally significant for purposes" of NEPA. Public Citizen v. Department of Transp., 316 F.3d 1002, 1024 (9th Cir. 2003), rvsd on other grounds, 124 S. Ct. 2204 (2004). Thus, NEPA requires agencies to consider "whether any negative health effects could be associated with increased … emissions" from a proposed action. Id. (finding NEPA violation based on agency's "failure even to consider whether any negative health effects could be associated with increased diesel exhaust emissions from diesel trucks").

Here, the FHWA violated NEPA in failing to consider negative health effects associated with increased emissions of PM2.5 and toxic air pollutants emitted by motor vehicles. Fine particles classified as PM2.5 are "chiefly produced by combustion processes and by atmospheric reactions of various gaseous pollutants," and they "can remain suspended in the atmosphere from days to weeks and be transported many thousands of kilometers." Proposed Rule to revise the NAAQS for PM 2.5, 71 Fed. Reg. 2,619, 2,625 (Jan. 17, 2006). Dispersion of PM2.5 poses a major human health threat because these tiny particles "contain[] microscopic solids or liquid droplets that are so small that they can get deep into the lungs and cause serious health problems," both in the human respiratory and cardio-vascular systems. EPA, Particulate Matter, "Health and Welfare" (available at http://www.epa.gov/oar/particlepollution/health.html (last checked April 10, 2006)). Even short-term exposure to PM2.5 causes asthma, especially in children, other respiratory illnesses, heart attacks, and premature death, especially in people with heart or lung disease. See id.; see also 71 Fed. Reg. at 2,627-49 (reviewing extensive scientific literature documenting health problems caused by PM2.5 exposure). Accordingly, the Clean Air Act requires EPA to regulate PM2.5 under National Ambient Air Quality Standards ("NAAQs") that are strong enough to ensure protection of public health, including the health of vulnerable populations such as asthmatics, children, and the elderly. See 42 U.S.C. §§ 7408(a); 7409.

11

The existing NAAQS for PM2.5 no longer satisfies this statutory level of protection, and FHWA may not rely on compliance with the NAAQS to satisfy its obligation to disclose potential adverse health effects from highway emissions. In 1997, EPA set the NAAQs 24-hour concentration for PM2.5 at 65 (µg/m$^3$). However, in light of several recent studies on PM2.5-related sickness and mortality, EPA's staff scientists have published their findings that "thousands of premature deaths" and "similarly substantial numbers of incidences of hospital admissions, emergency room visits, aggravation of asthma and other respiratory symptoms, and increased cardiac-related risk" may occur nationally even if the current PM2.5 NAAQs is met. 71 Fed. Reg. at 2,643. EPA has therefore proposed to strengthen the 24-hour PM2.5 standard from 65 to 35 (µg/m$^3$), stating that "the current primary PM2.5 standards, taken together, are not requisite to protect public health with an adequate margin of safety and that revision is needed to provide increased public health protection." Id.

EPA must finalize its new standards for PM2.5 by September 17, 2006 under the terms of a court-ordered consent decree. See 71 Fed. Reg. at 2,624. In the meantime, the current PM2.5 NAAQS do not provide a reliable benchmark for evaluating impacts to public health. Based on the most recent health effects research data that has become available since the PM 2.5 standards were adopted in 1997, EPA has concluded that 24-hour concentrations over 35 (µg/m$^3$) pose a major human health risk. See id. at 2,649. EPA acknowledges that some research reports demonstrate that health risks will remain at levels even below the proposed NAAQS.

Judging by EPA's proposed 24-hour standard of 35 (µg/m$^3$), the ICC Project will create hazardous levels of PM2.5 pollution that can be expected to cause increased mortality, hospitalizations and other serious adverse health effects among the residents of the ICC corridor. Specifically, monitors near highways in the Washington metropolitan area are reporting 24-concentrations that will exceed the revised NAAQS, emissions from the existing I-95 and I-370 are likely exceeding the proposed NAAQS as well, and additional emissions from the ICC will exacerbate these levels.

Notwithstanding the fact that emissions from the ICC Project will exceed EPA's proposed 24-hour standard for PM2.5, with alarming implications for human health, the FHWA provided no analysis of health impacts associated with public exposure to significantly increased concentrations of PM2.5. The FEIS merely reports that PM2.5 emissions will be "below the applicable" Wyoming Ambient Air Quality Standards ("WAAQs") and National Ambient Air Quality Standards ("NAAQS"). FEIS at 4-19; see also id. at 4-8, App. J at Table J-5. However, the FHWA could not reasonably rely on the NAAQs to assume that PM2.5 emissions will be harmless from a human health standpoint. EPA's proposed major overhaul of the NAAQS just five months from now are based upon nearly two thousand health studies published in peer reviewed journals that EPA has collected, screened based on their scientific rigor, and published in the latest revision of the Criteria Document for PM. FHWA has an obligation under NEPA to disclose to the decisionmaker and the public that based upon this large body of compelling scientific evidence, anticipated PM2.5 emissions from the ICC Project will exceed levels shown by the research to cause significant serious adverse health

effects, and violate the 35($\mu g/m^3$) standard that EPA now deems necessary to prevent unacceptable risks of asthma, lung disease, heart attacks and premature death. The FHWA's "failure even to consider" these serious "negative health effects" violates NEPA. Public Citizen, 316 F.3d at 1024 (where there was a "wealth of government and private studies showing that diesel exhaust and its components constitute a major threat to the health of children, contribute to respiratory illnesses such as asthma and bronchitis, and are likely carcinogenic," the agency violated NEPA in failing to discuss health effects of increased diesel exhaust).

FHWA has a duty to disclose to the decisionmaker and the public that even if the project can be found to conform under the current NAAQS, emissions allowed by the Project will likely become unlawful in 5 months, and that the ROD approving the Project will then need to be withdrawn until a supplemental EIS is prepared to address the changed legal standard that will govern development of the Project. 40 CFR § 1502.9(c). If this disclosure had been made, the decisionmaker and the affected public might well have decided to develop mitigation strategies to prevent the expected health effects and to avoid the delays that will occur when the NAAQS is revised. Therefore FHWA has violated the directive of NEPA that the EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 CFR § 1502.1.

In addition, mobile source air toxics ("MSATs") also cause or contribute to significant adverse health effects. See 71 FR 15804 (March 29, 2006). These effects may be reduced if EPA issues new regulations that will apply to new vehicles after the ICC Project is opened for service in 2010, but will not provide protection for residents and travelers in the corridor before existing vehicles are replaced with new vehicles that meet the new standards. Furthermore, EPA does not claim that reduced emissions of MSATs will eliminate all significant health risks for those exposed to emissions from heavily trafficked freeways. Those health risks, even after more stringent emission standards take effect, must be considered and mitigated by FHWA.

These health risks also need to be investigated, disclosed and mitigated pursuant to FHWA's duty under 23 USC §109(h). Section 109(h) of the Federal-Aid Highway Act requires a three-step evaluation of air quality impacts and mitigation measures to ensure that "final decisions on the project are made in the best overall public interest." 23 U.S.C. § 109(h) (2004). The first step is to determine the "possible adverse economic, social and environmental effects relating to any proposed project." Id. The second step is to determine "the costs of eliminating or minimizing such adverse effects and ... (1) air...pollution." Id. The third step is to consider "the costs of eliminating or minimizing such adverse effects" together with "the need for fast, safe and efficient transportation" to make a final decision on the project "in the best overall public interest." Id. FHWA's implementing regulation further requires that any measures necessary to mitigate these adverse effects be incorporated into the project. 23 C.F.R. § 771.105(d).

13

None of these obligations have been performed by FHWA with respect to the adverse impacts of air pollution from the project even though they are required to be addressed in the EIS for a project. Id. The EIS is deficient for its failure to consider these statutory factors, determine whether the benefits of the project outweigh the adverse impacts on health, and adopt mitigation needed to prevent adverse health impacts.

## III. AVAILABILITY OF MODELING TOOLS

As documented in the Legal Framework for Decision section, the proposed conformity determination is fundamentally flawed because it fails to use air quality modeling which EPA recognizes as the preferred method for estimating the impact of emissions from a future source on ambient air quality. 40 C.F.R. Part 51, Appendix W (Guideline on Air Quality Models). Prior to EPA's March 10, 2006 amendments to the Transportation Conformity Rule (71 FR 12468), the Maryland Department of Transportation ("MDOT") and SHA emphasized that EPA's MOBILE6.2 emissions model was not designed specifically to estimate emissions at the project level, has not undergone any validation at that level, and is not officially approved or recommended for that purpose by EPA.[7] The Federal Aviation Administration within the U.S. Department of Transportation has incorporated MOBILE 6.2 emission factors into its Emissions and Dispersion Modeling System which is used to conduct project-level analysis. Moreover, as noted above, EPA's *Technical Guidance on the Use of MOBILE6 for Emission Inventory Preparation* confirms the suitability of applying MOBILE 6.2 to estimate emissions from a specific highway project once information is obtained regarding the vehicles that will be using that particular highway segment.[8] While EPA plans to undertake additional research to refine the evaluation of the emission characteristics of heavy duty diesel vehicles in the future to produce greater precision in the estimates of particulate emissions in future emission models that succeed MOBILE 6.2, the current release of the model has been used in a number of scientifically-accepted project-level hotspot analyses documented through peer reviewed scientific studies.

EPA and state and local agencies have applied the MOBILE 6.2 link-based methodology in Portland, Oregon to evaluate near-road pollution "hotspot" exposures.[9] The study concluded:

The queries and programs developed for this study can also be adapted for use by other agencies with a need for geographically detailed analyses of motor vehicle emissions.  This approach is useful in identifying potential highway

---

[7] FEIS at IV-324.

[8] *Technical Guidance on the Use of MOBILE 6 for Emission Inventory Preparation*, U.S. EPA Office of Air and Radiation, Office of Transportation and Air Quality (January, 2002), at 28; included as Attachment 3.

[9] Stein, B; Walker, D; Cook, R.; Bailey, C. *Link-Based Calculation of Motor Vehicle Air Toxin Emissions Using MOBILE 6.2*, Metro Planning Department, Portland, Oregon, October 9, 2002. Available at ftp://ftp.metro-region.org/dist/tran/tf/toxins; included as Attachment 4.

mobile source emission "hotspots" for further study, and when used in dispersion modeling, may help better characterize the spatial distribution of concentrations of HAPs, particularly in urban centers where major roadways are located.[10]

The Portland study also demonstrates that certain limitations of the MOBILE 6.2 model can be addressed during MOBILE 6.2 post-processing steps. For instances, the Metro Planning Department performed a regression analysis on emission rates for each MOBILE 6.2 generated speed bin to produce speed curve equations that allowed for the calculation of emissions – including Diesel Particulate Matter ("DPM") - at any speed.[11]

A suite of dispersion models are readily available for use in conjunction with MOBILE 6.2 and other emission models to consider how emissions at the project-level might translate into particulate emission concentrations around potential hot spots. Dispersion modeling uses mathematical formulations to characterize the atmospheric processes that disperse a pollutant emitted by a source. Based on emissions and meteorological inputs, a dispersion model can be used to predict concentrations at selected downwind receptor locations. There are a number of approved "guideline" models available to quantify pollutant concentrations generated from roadways.

Dispersion models could have been used by the Lead Agencies to translate outputs from MOBILE 6.2 into estimates of likely particulate emission concentrations that would be experienced by children and adults breathing the air in locations close to highways such as the ICC, I-370 or I-95, where traffic and emissions will increase as a result of a decision to build the ICC. The Lead Agencies should have used dispersion models such as the CAL3QHC model, which has been published by EPA as available for evaluating line sources. See 40 CFR Part 51, Appendix W, Appendix A, § A.3 CALINE 3, 70 FR 68218, 68256 (Nov. 9, 2005).

Studies demonstrate that the current science of air quality modeling has advanced to a state that allows for appraisals of fine particulate emissions to be conducted on a localized basis at sites along highway corridors. Those appraisals can be conducted by integrating the MOBILE 6.2 model using emissions estimates at the roadway link-level with dispersion models, such as CAL3QHC. Neither EPA nor SHA dispute that modeling tools are available to replicate the dispersion of emissions from highways in the atmosphere for the purpose of estimating ambient concentrations. See Part 51 Appendix W, 4.2.2.(d), 5.2.3.(b), 5.2.4.(f). Yet, SHA does not use modeling to assess the impact of incremental emissions added by the proposed ICC project. Commenters reiterate that the failure to perform such analysis to make the demonstrations required by § 93.116 is unlawful.

---

[10] *Id.* at 6.
[11] *Id.*

## IV. USING MONITORING DATA TO DETERMINE THE CURRENT BASELINE

### A. Overview

Recent review of ambient monitoring data from the Washington D.C. metropolitan area demonstrates that sites strongly influenced by motor vehicle emissions are responsible for detecting concentrations that exceed the NAAQS for PM 2.5. As evidence, commenters submit a Mobile Hot Spot Regression Study that evaluates the relationship between measurements of annual PM 2.5 in the DC-MD-VA nonattainment area and the proximity of the monitors to major freeways. The study demonstrates a significant relationship between the traffic density weighted distance of the roadway to the monitor, even when the frequency that winds will transport emissions from the freeway to the monitor are not taken into account. We suspect that the relationship would be shown to be significantly stronger when the concentrations associated with winds from the direction of the highway are accounted for separately.

The conclusions drawn from this study are –

1. neighborhoods located near highways are likely exposed to significantly higher concentrations of PM 2.5 (from 2.0 to 2.5 µg/m3) than neighborhoods located at greater distances from heavily trafficked highway sources. This raises major issues of environmental justice.
2. monitors not located in close proximity to major freeways, such as the two monitors selectively considered by SHA/FHWA, measure between 13.4 to 14.5 µg/m3, and are not identifying violations of the PM2.5 NAAQS.
3. monitors that measure violations of the NAAQS, i.e., greater than an annual mean of 15 µg/m3, are located near major freeways.
4. selectively relying upon concentrations from monitors located in rural or residential areas distant from major freeways, while ignoring nonattainment concentrations found at monitors located nearby to major freeways, provides no adequate basis for determining the "current background concentration" under the PM 2.5 Hot Spot rule, 40 CFR § 93.123(c)(2).
5. given the relationship between the proximity of monitors to freeways, traffic density on the freeway and the magnitude of reported PM 2.5 concentrations, it is apparent that a true baseline concentration at existing highways where connections with the proposed Project will create emission hot spots cannot be demonstrated if no monitor in the nonattainment area is sited in accord with EPA's guidance in Part 58 Appendix E, §8.3 to measure the impact of emissions from existing major freeways at the hot spot location.

### B. Analysis of Relationship Between Washington Metropolitan PM Monitored Pollution Levels and Proximity to Traffic.

The Mobile Hotspot Regression Study was conducted to evaluate the relationship between annual ambient concentrations of PM 2.5 and the proximity of the monitors to major roadways in the Washington metropolitan area. A second purpose of this

investigation was to estimate likely PM 2.5 baseline concentrations in 2010 at the two hot spot locations identified by SHA/FHWA. The baseline concentrations are based upon estimated traffic loads at these locations assuming that the ICC is not constructed. This investigation uses the observed relationship between ambient concentrations measured in the Washington metropolitan area and annual average daily trips reported by the state DOTs on the nearest major freeways. This relationship is then applied to the traffic loads expected at the hot spot locations in 2010 to predict the expected concentrations at a hypothetical monitor located where the point of maximum impact would likely occur.

This investigation has been undertaken by first describing the statistical relationship between annual mean PM 2.5 concentrations and distance weighted traffic volumes on major transportation facilities for all eleven (11)  monitor locations in the Washington DC-MD-VA PM2.5 Nonattainment Area, and by subsequently extrapolating from the statistical relationship of our sample to predict PM 2.5 concentrations at hypothetical receptors located in the hot spot areas in 2010. In contrast to the approach used by SHA/FHWA, this approach does not selectively consider the data from the monitors in the metro area that are most distant from major freeways, and therefore least relevant to the task, while ignoring evidence of highway emissions from the monitors that are closest to freeways, and therefore provide the most relevant information to describe the likely impact of highway emissions on ambient concentrations of PM2.5. Rather than cherry pick the data that best suits a preferred outcome, this analysis includes information derived from all PM2.5 monitors in the metro area.

### Methodology.

#### 1. Air Quality - Monitors

The eleven (11) monitors used for this study are listed in Appendix A of the Project-level Conformity Determination for the Intercounty Connector Project in Maryland (hereafter, Project-level Conformity Determination).[12] All eleven (11) monitors are located in the Washington, DC-MD-VA PM2.5 Nonattainment Area; three in the District of Columbia, five in the Commonwealth of Virginia, and three in the State of Maryland. Based on a query of PM2.5 monitoring data reported at U.S. EPA's AIRS Data website, two (2) monitors exceed the annual mean PM2.5 standard of 15.0 ug/m3 in 2005. One monitor is in Virginia -- near Pentagon City, and one is in DC -- near Tidal Basin. See Attachment I: DC Area Monitor Locations.

#### 2. Identification of Major Transportation Facilities Within 1000-meter radius of Monitors

The geographic coordinates – latitude and longitude – for the above-referenced eleven (11) monitors were obtained from U.S. EPA's AIRS Data website. GoogleEarth 2005

---

[12] Thirteen PM 2.5monitors exist in the nonattainment area; however, there are two monitors co-located at both the Upper Marlboro and RFK Stadium sites. At these sites, the monitor with the highest number of observations was included as part of our sample.

was used to map the coordinates of each monitor. The base imagery in Google Earth includes photographs taken by satellites and aircraft sometime in the last three years. The high-resolution base imagery reveals detail for individual buildings and roadways and provides a convenient tool for measuring the distance between monitors and nearby roadways. Detailed road alignment features are also available for the entire Washington DC-MD-VA region.

All major transportation facilities located within 1200 meters of a monitor were identified by applying Google Earth's measuring tool. Major transportation facilities were defined as roadways that have Annual Average Daily Traffic (AADT) volumes of more than 10,000 vehicles. Washington DC AADT volumes (2002) were collected from the District Department of Transportation, Traffic Services Administration. AADT volumes (2005) for Montgomery and Prince George's Counties were obtained from Maryland Department of Transportation, State Highway Administration, Highway Information Services Division. And AADT volumes (2004) for Fairfax County were downloaded from the Virginia Department of Transportation website.

The roadway names, AADT volumes, proximity and azimuth of each major transportation facility within 1200 meters of the eleven (11) monitoring sites are included in PM 2.5 Highway/Monitor Data Tables. See Attachment II: Raw Data Tables.

### 3. Calculating Distance Weighted Traffic Density .

Calculating distance-weighted traffic densities for the monitoring sites involved a two-step process:
   (1) Weighting traffic volumes by a distance-from-monitor decay factor, and
   (2) Summing the weighted traffic volumes for all major transportation facilities in the neighborhood scale detection zone of each monitor.

Distance-weighted traffic volumes were calculated for all major transportation facilities within a 1200-meter impact of any of the study monitors. A gamma-natural log decay function was developed to estimate decay rates for highway emissions. The decay function assumes a 49% decrease in emissions at 200 meters, and a 100% loss at 1500 meters. This gamma-natural log decay function was selected to approximate the exponential decay functions found in Gaussian air pollution dispersion models. The Microsoft Excel formula for the gamma-natural log decay function used in this study is as follows:

$$=IF (C5<=1500,GAMMALN(C5/1500)/4,0)$$

Where C5 = Distance From Monitor to Roadway

The AADT volumes were multiplied by the distance-from-monitor decay factor to derive a weighted AADT estimate for each nearby roadway segment – roadway segments within the 1200-meter impact zone of a monitor. The impact zone of each monitor was divided into eight (8) equidistant azimuth ranges (e.g., 0 to 45 degrees, 45 to 90

degrees, etc.) Multiple roadway segment records were included for roadways that traversed more than one azimuth range of the same impact zone. The decision to treat roadways that surround a monitor as multiple point sources is based on the recent findings of a research report that assessed the impacts of roadway proximity on ambient concentrations of diesel PM, which concluded:[13]

> The model presented here has a serious limitation. The wind direction and distance are important parts of the underlying physical model, and yet they did not appear to improve the regression results. We believe that these effects could be better accounted for using an approach that treated each link as multiple point sources instead of a single point source at the link centroid, which will produce a simplified dispersion model more similar to CALPUFF.

The final step involved summing the distance-weighted-traffic volumes for each monitor impact zone to determine a distance-weighted traffic density for each of the eleven monitors.

### 4. Predicting PM 2.5 concentration in 2010.

Distance-weighted traffic density volumes were plotted on the x-axis, and 2005 average annual PM 2.5 concentrations, on the y-axis. The "least squares" method was used to calculate a straight line that best fits the data. See Results section below. Distance weighted traffic density was then calculated for two hypothetical monitor locations. The hypothetical monitors were sited at points of expected greatest impact from existing sources along the proposed ICC corridor. See Results section below. The distance weighted traffic density of roadways nearby the hypothetical monitors was calculated in the same manner as documented above. However, 2010 ICC No-Build Alternative traffic estimates  obtained from the EIS were used, in lieu of current traffic counts, to more accurately predict likely PM 2.5 concentrations in 2010. The 2010 No Build Alternative traffic counts were obtained from the ICC Draft Environmental Impact Statement. Predicted average annual PM 2.5 concentrations were determined by multiplying the distance-weighted traffic density by the slope of our line of best fit and adding in the y-intercept value.

**Results:**

The results of the Mobile Hotspot Regression Study are summarized below and presented in detail in Attachment III: Results.

1. R-squared value = 0.575

2. Line of best fit using "least squared" method:
   Y = .00000327327x + 13.954, where x is equal to the distance-weighted traffic density of a monitor

---

[13] Cohen et al. 2004. Relationship between motor vehicle emissions of hazardous pollutants, roadway proximity, and ambient concentrations in Portland, Oregon. Environmental Modelling & Software. 20, 7-12.

3. Substituting the distance-weighted traffic densities of each hypothetical monitor location for x, resulted in the following predicted 2010 annual average PM 2.5 concentrations:

**Hypothetical Monitor near I-270/I-370: Predicted Average Annual PM 2.5 in 2010 = 15.10 ug/m3.**



**Hypothetical Monitor near I-95/ICC: Predicted Annual Average PM2.5 = 16.25 ug/m3**



**Limitations of the Study:**

This study accounts for only the distance of a monitor from major highway sources, and does not include consideration of major stationary sources in the vicinity of a monitor, or the frequency and duration of meteorological conditions when the monitor is downwind of the highway source.

## C. Conclusions

The 11 monitoring stations in the tri-state Washington D.C. metropolitan area demonstrate a variation of 2.4 µg/m3. This variance is more than 25% of the anthropogenic portion of ambient PM 2.5, assuming that natural background concentrations in the eastern US are 4-5 µg/m3. The magnitude of this variance among sites within a relatively small region that is mostly commercial/residential without many large industrial sources of PM 2.5 appears too large to be accounted for by long range transport. Recognizing that the study is limited by not accounting for the azimuth relationship between the highway sources, the monitors and the prevalence of winds along that azimuth, and the possible role of individual major stationary sources in the neighborhoods of the monitors, the investigation nonetheless suggests that a significant portion of the variance among sites can be accounted for by the proximity of monitors to large highways.

The monitors with the highest PM 2.5 annual concentrations in the region are either the monitors located closest to major freeways (0042 and 0041), or is surrounded on three sides by major freeways within less than 1000 meters (0020). These monitors account for the designation of the Washington metro area as nonattainment.

Other monitors in the region that are more than 1000 meters distant from major freeways, most of them more than 2000 meters from a major highway, show significantly lower annual means. These lower annual means likely represent the relatively uniform contribution of long range transport across a region the size of the Capitol region. The higher concentrations near major freeways reflect the incremental contribution of localized sources such as motor vehicle emissions emitted at ground level. These relationships suggest that the true peak microscale and neighborhood concentrations of PM 2.5 from highways will not be identified if only monitors many kilometers distant from major freeways are selected to estimate highway impacts and/or baseline concentrations.

The concentrations predicted by this method at the hypothetical monitors in the hot spot locations identified by SHA/FHWA are consistent with data obtained from highway monitoring studies analyzed by E.H. Pechan.

## V.  ESTIMATED INCREMENT FROM TRAFFIC ON THE ICC WILL CAUSE NEW, MORE FREQUENT AND MORE SEVERE VIOLATIONS

The project level conformity analysis for the proposed ICC project should account for how the ICC would alter the number of vehicle miles driven and change the composition and character of traffic, which will affect the amount of particulate pollution. This analysis should account also for changes in the motor vehicle fleet composition on the roadways for which a local area pollution impact analysis is being performed, as this influences the pollution rate per mile traveled on individual roadway segments.

The project level conformity analysis fails to address many of these basic technical requirements of a proper project-level analysis.

1.  The analysis does not provide a quantitative analysis of changes in traffic on specific roadway segments that would be caused by the ICC.

2.  The analysis assumes that the ICC will not induce traffic growth in the corridor through any of the well documented mechanisms by which new highways like the ICC are well understood to generate additional traffic over time.

3.  The analysis assumes that 2010 will be the peak year of PM 2.5 emissions, disregarding that traffic growth in the early years after the project opens will likely grow rapidly, causing emissions to grow after 2010 growth in miles driven outpaces the reduction of emission rates per mile due to gradual adoption of cleaner vehicle technologies.

4.  The analysis assumes that the share of traffic in the area that is heavy-duty trucks, which generate far more PM 2.5 than light-duty vehicles per mile driven, will remain constant over time at the same levels as in the past, contradicting local and national data indicating continual significant growth of the share of traffic that is trucks which contribute a growing share of total particulate emissions.

### A.  ICC Project Level Analysis Should Evaluate Changes in Traffic On The ICC and Other Roads.

The Lead Agencies must perform analyses to determine whether the proposed ICC will cause or worsen NAAQS violations along the ICC and I-95, I-495, and I-270 for PM 2.5.[14]  Significant portions of each of these major highways are within the study area and the traffic modeling for the ICC shows increased annual average daily traffic ("AADT") along some segments of each of these highways. Although the FEIS fails to disclose actual traffic volumes by motor vehicle classification, preliminary examination of the SHA travel model files by Smart Mobility shows that selected segments of these highways currently carry and are forecast to carry a substantial volume of trucks and

---

[14] *See* Letter from Neil Pederson, Maryland State Highway Administrator, March 3, 2006; included as Attachment 5.

heavy duty diesel vehicles.[15] Adding traffic to these already congested highways will contribute to increased motor vehicle emissions, including PM 2.5.

The project level conformity determination for the ICC issued by SHA/FHWA identifies the anticipated 2010 traffic levels for two "locations", which are vaguely defined areas spanning one to two miles. One of the likely hot spot locations identified in the proposed Determination is described as Location #1 and lists information for "I-270," "I-370/ICC," and "MD 355." The other likely hot spot is described as "Location #2" and lists information for "US 1," "I-95," and the "ICC." The share of "trucks" on these facilities at these locations in 2010 are described as varying between 6 and 12 percent and disparate values for locations such as US 1 and I-95, which are said to have highly divergent truck and bus traffic shares, are averaged to produce a "weighted truck average percent," although these roads lie nearly 2 miles apart. Neither the proposed Project-level Conformity Determination nor the FEIS provide any information about the source of these estimates for 2010 average daily traffic or truck and bus traffic shares.

Without knowing the specific roadway segments that were considered in the project level conformity analysis, it was not possible for the public to evaluate the character or quality of the assumptions used by the Lead Agencies. Thus, Environmental Defense requested further information from SHA/FHWA on April 8, 2006, regarding the assumptions for this analysis. See Attachment 6. In a response dated April 19, 2006, to Michael Replogle of Environmental Defense from Neil Pedersen and Nelson Castellanos, included as Attachment 7, the Lead Agencies provided additional information not available elsewhere. This new information reveals the specific locations considered in the analysis. Unfortunately, the less than one week that these commenters have had access to this information has not been sufficient to enable us to use this information to independently review this analysis. Detailed data contained in Attachments 1-5 to this letter were not received by Environmental Defense until April 25, 2006, one day before the close of the comment period, and hence were not made available to us for any kind of proper review. We have not had time to go through this new information upon filing these comments.

Also provided to us for the first time on April 19, 2006, was missing information about the Lead Agency's assumptions in the project level conformity analysis about truck traffic. As we noted in our April 8, 2006, letter to SHA/FHWA, the FEIS and project level conformity analysis did not reveal how truck volumes were estimated for 2010, the base year truck volumes observed in 2005 for highways affected by the ICC in the ICC study area, or the truck and bus volumes on the highways and intersections in the study area. The April 19, 2006, SHA/FHWA letter to us reveals that the project level conformity analysis assumed EPA MOBILE model default rates that were used in a regional analysis from December 2005. With more time, we would have investigated this data, which is not available on the web, and compared these assumptions with how truck traffic shares have changed historically on specific highways in the study area. However, the one day to less than one week that these commenters have had access

---

[15] Personal email correspondence, Brian Grady to Michael Replogle, March 8, 2006; included as Attachment 6.

to this information has not been sufficient to enable us to use this information to independently review this analysis.

### B. ICC Project Level Analysis Should Reflect Induced Traffic Impacts of The ICC.

Project level conformity analysis should reflect the induced traffic impacts of the ICC, taking into account impacts on land use, average trip length and trip distribution, use of different travel modes, and toll levels. The analysis released by SHA/FHWA fails to do this. Thus, the traffic volumes listed as "worst case" on page 9 of the project level conformity analysis likely understate the actual traffic volumes that would be experienced in the vicinity of the ICC. Attached are a number of induced traffic studies and expert testimony by Dr. Robert Johnston, Professor Emeritus at the University of California, Davis, which provide substantial evidence about these impacts and why they must be accounted for in traffic forecasting and air quality analysis.[16]

The biggest flaw is the use of a single land use forecast for the build and no-build scenario, failing to reflect that the ICC will cause substantial changes in the pattern and character of job and housing development in the study area and beyond, as is admitted by the Secondary Impact Analysis discussions in the EIS. The EIS and project-level conformity analysis relies on the 2010 and 2030 Round 6.3 Cooperative forecast for most of its transportation analysis (FEIS, page IV-345), even though these forecasts do not take into account the construction of the ICC.

The level of tolls on roads has a major influence on traffic levels and hence pollution from roads. The influence of possible toll levels on traffic levels in 2010 is not evaluated in the project level conformity analysis, although it is considered for 2030 in the FEIS. According to Table IV-100 of the FEIS (page IV-349) the 2030 maximum Average Weekday Traffic (AWDT) volume for Corridor 1 on the I-270 to I-370 segment (the existing extreme western segment of the ICC) would be 113,200 assuming the baseline toll of $.17/$.13 (peak/off-peak, expressed in 2004 dollars). This table indicates this volume would increase to 118,900 if the toll were lowered to $.13/$.08. On the new ICC segment immediately connecting to this highest volume segment the FEIS Table indicates AWDT of 113,500 AWDT with the lower ($.13/$.08) toll, and some other segments towards I-95 are forecast to carry as many as 101,800 and 106,700 AWDT with the lower toll level. Volumes are forecast to be slightly lower with Corridor 2.

If the volume change on the highest volume link is proportionate to the change in the toll level, dropping the toll to $.09/$.03 (which would suggest a toll of $1.60 to traverse the road in peak hours and $.50 in off-peak in 2004 dollars or $3.30 peak and $1 off peak in 2030 dollars) could cause the volume on the I-270 to I-370 segment to exceed 125,000 AWDT, if the Table IV-100 FEIS baseline estimates and sensitivity test is correct. The baseline toll rate of $.17 peak (2004 dollars) is shown in the FEIS to be equal to $.35/mile peak in 2030 dollars, which would be $6.30 to traverse the 18-mile ICC for its full length in 2030.

---

[16] See Attachment 8.

There is great uncertainty in the traffic forecasts, as attested to by questions about what the actual toll levels on the facility will be when it is open to traffic, questions about the correct assumption for land use in the analysis, and the TRB/NAS critique of the TPB model that underlies this analysis. The FEIS states that "Decisions regarding toll rates will be made by the Maryland Transportation Authority following the completion of the NEPA process, if a Build Alternative is approved." (page IV-348) There may be a backlash brewing about the ICC being a toll road, based on recent remarks made by Baltimore Mayor Martin O'Malley, a strong contender to become Maryland's Governor in 2007, and others. It is quite plausible that if the ICC is built, the tolls would be set at a level far below the high levels evaluated in the FEIS, due to popular pressure. It is unclear what toll level was assumed by the Lead Agencies for the project-level conformity analysis for 2010.

In response to Environmental Defense's critique of the DEIS, the FEIS includes a sensitivity analysis using the Round 6.4A Cooperative forecast land use. This "took into account the recommendations of the Expert Land Use Panel...to determine impacts of the ICC on land use." (FEIS IV-387). The FEIS states "the Round 6.4A traffic forecasts is a reasonable approximation of the increased traffic that could result from additional development if the ICC is constructed." (IV-388). According to the FEIS (IV-388), use of Round 6.4A data changes traffic forecasts by 3-20% on various segments. Table IV-117 on page IV-388 presents AWDT for 2030 for Corridor 1 with Round 6.3 and Round 6.4A land use. The estimated AWDT volumes associated with Round 6.3 land use shown here are in conflict with the same information presented in Table IV-100 (page IV-349). This discrepancy is not discussed in the FEIS. Table IV-91 in the Travel Analysis Technical Report, Volume 1 (page IV-18), from November 2004, provides slightly different AWDT forecasts, although reported only to the nearest 1000. With rounding, the Travel Analysis Technical Report's AWDT estimates are in agreement with the higher estimated AWDT volume shown in Table IV-117, in which the I-270 to I-370 segment of the ICC carries 128,000 ADWT using the Round 6.3 forecast and slightly less, 127,400, using the Round 6.4A forecast.

Both Table IV-117 in the FEIS and the Travel Analysis Technical Report's Table IV-91 show the 2030 traffic volume on the segment of the ICC from I-270 to I-370 as 128,000 AWDT under Corridor 1 Build and 127,000 AWDT under Corridor 2, compared with 96,000 AWDT under the No-Build Scenario. There is no analysis of the share of diesel truck traffic on the ICC in the FEIS or project-level conformity analysis. This increased traffic will lead to significantly higher PM emissions along the highway and in nearby neighborhoods, in 2010 and years that follow.

**ICC Traffic Volume Estimates from FEIS (Average Weekday Traffic)**

| ICC Segment | Table IV-100 2030 Rnd 6.3 Baseline Toll | Table IV-117 2030 Rnd 6.3 Baseline Toll | Table IV-117 2030 Rnd 6.4A Baseline Toll | Change Between 6.3 vs 6.4A |
|---|---|---|---|---|
| I-270 to I-370 | 113,200 | **128,000** | **127,400** | -0.5% |
| I-370 to MD 97 | 96,400 | 96,400 | 94,800 | -1.7% |
| MD 97 to MD 182 | 63,000 | 63,000 | 65,000 | 3.2% |
| MD 182 to MD 650 | 63,100 | na | na | |
| MD 650 to US 29 | 66,600 | 66,600 | 75,600 | 13.5% |
| US 29 to Briggs Chaney Rd | 85,800 | na | na | |
| Briggs Chaney Road to A-59 | 92,000 | na | na | |
| A-59 to I-95 | 77,200 | 77,200 | 93,200 | 20.7% |
| I-95 to Virginia Manor Rd | 40,500 | na | na | |
| Virginia Manor Rd to US 1 | 30,100 | **30,200** | 36,200 | 19.9% |
| Average Volume on all Segments for Which FEIS Provides Comparable Data | 74,417 | 76,900 | 82,033 | 6.7% |

The FEIS shows an average 6.7 percent increase in ICC traffic due to the use of the Round 6.4 forecast, which would approximate "the increased traffic that could result from additional development if the ICC is constructed." The FEIS says that as a result, "some of the local roadway network intersections would feel a greater stress from this increased volume." (page IV-389) The FEIS says, "these forecasts indicate, in general terms, that there would be more development, and more traffic, if the ICC is built than if the ICC is not built." (IV-389)

But the FEIS does not evaluate this increased stress or increased traffic volume in its extensive analysis of intersection performance and traffic impacts, which relies solely on Round 6.3 land use data assumptions that do not correspond to the traffic or development levels if the ICC is constructed.

The ICC Travel Analysis Technical Report (page IV-7, which is page 43 of the pdf file), says that the ICC was modeled using an assumed travel speed of 50 mph

"because all lanes would be managed such that all traffic could operate at that speed." This suggests that the travel demand for the ICC is likely underestimated in the FEIS analysis, because the highway is designed and likely to be managed such that the *minimum* speed may be 50 mph, but the typical operating speed for traffic on the highway is likely to be 65-75 mph, as is now observed on US 50 outside the Capital Beltway, where a posted 65 mph speed is routinely exceeded except when congestion develops.

### C. The Peak Year of Traffic Emissions for ICC and Other Roads Likely Will Be After 2010.

The project level conformity analysis assumes that 2010 will be the peak year for emissions of PM 2.5 in the study area, without providing any analysis to document that this is a reasonable assumption. There is a substantial likelihood that, as in the 1980s where widening of I-270 from 6 to 12 lanes induced sharp rapid growth in commercial and residential development and traffic, the ICC may experience sharp growth in traffic in the first few years after it opens to traffic, with slowing traffic growth in later years. This traffic in the period from 2010 to 2020, when the road is first planned to be open to traffic, might grow faster than the rate at which motor vehicle emission rates for PM 2.5 fall due to motor vehicle fleet turnover.

### D. Truck Traffic Will Increase as a Share of Total Traffic in the ICC, I-270, and I-95 Corridors.

The presumption that truck traffic will grow at no greater pace than other traffic in the ICC study area defies evidence from several sources, which suggests that truck traffic will grow faster than other traffic flows. This will lead to higher emissions per vehicle mile traveled in 2010 and years thereafter than would be estimated assuming that truck traffic shares are constant.

As the figure below shows, between 1993 and 2003, freight vehicle vehicle miles traveled (VMT) for single-unit and combination trucks across the U.S. grew 35 percent, outpacing total passenger vehicle VMT growth, which was 25 percent during the same period.[17]

---

[17] Bureau of Transportation Statistics,
http://www.bts.gov/publications/transportation_statistics_annual_report/2005/html/chapter_02/passenger_and_freig
ht_vehicle_miles_of_travel.html , accessed 4/26/06.



**SOURCE:**
http://www.bts.gov/publications/transportation_statistics_annual_report/2005/html/chapter_02/figure_01_2 1.html   Data based on **1993–1994:** U.S. Department of Transportation (USDOT), Federal Highway Administration (FHWA), *Highway Statistics Summary to 1995* (Washington, DC: 1997), table VM-201A. **1995–2003:** USDOT, FHWA, *Highway Statistics* (Washington, DC: Annual issues), table VM-1.

According to FHWA, freight shipments by highways in 1998 amounted to 206 million tons and this is expected to grow to 301 tons by 2010 and to 377 tons by 2020, a growth rate of 3.8 percent a year over 22 years.[18] This is more than twice as fast as the forecast rate of traffic growth in the metropolitan Washington, DC region, which the regional Transportation Planning Board projects at 1.5 percent a year between 2005 and 2025.[19] This indicates that truck traffic growth on I-95 and I-270 and the Capital Beltway is likely to far outpace overall traffic growth on these facilities.

The graphics shown below as "Figure 3" and "Figure 4," from the FHWA website, illustrate this sharp growth in estimated future truck traffic by 2020. These indicate approximately a doubling of truck volumes on both I-95 and I-270 in the vicinity of where the ICC would intersect with these roads. This needs to be accounted for in the ICC project-level conformity analysis by adjusting the assumed truck traffic shares that are inputs to the MOBILE emission factor model.

---

[18] Federal Highway Administration, *Freight Transportation Profile—Maryland Freight Analysis Framework*, http://ops.fhwa.dot.gov/freight/freight_analysis/faf/state_info/maryland/md.htm, accessed April 26, 2006.

[19] Metropolitan Washington Council of Governments, Transportation Planning Board, Adopted Regional Transportation Plan, 2004, http://www.mwcog.org/uploads/pub-documents/9VxbXA20041216154934.pdf , accessed April 26, 2006, page 37 of pdf file.

Figure 3. Estimated Average Annual Daily Truck Traffic: 1998

Figure 4. Estimated Average Annual Daily Truck Traffic: 2020





Federal Highway Administration

Federal Highway Administration

This evidence suggests that the SHA/FHWA assumption for the project level conformity analysis of a fixed 10.5 percentage for truck volumes in the "Location 1" where the ICC meets I-95 and/or US 1 is arbitrary and capricious and not supported by fact. Similarly the assumption of a fixed 6.6 percent truck volume at "Location 2", where the ICC meets I-270/I-370 and MD 355 is arbitrary and capricious. SHA/FHWA must make use of reasonable and supported assumptions in evaluating the air quality impacts of the ICC and make those assumptions and the evidence to support them public, with adequate opportunity for review and comment, whether using quantitative or qualitative methods of analysis. The analysis presented for public comment fails these tests.

E. Other Local Studies Show Impacts of Traffic on Particulate Levels At Traffic Levels Below That of The ICC

There is considerable evidence, cited above, showing why it is likely that the ICC will cause violations of the CAA. In addition, another local study provides evidence that the kinds of traffic growth caused by the ICC will likely lead to CAA violations.

The Northern Bus Garage Study was established by the Washington Metropolitan Area Transit Authority ("WMATA") and the D.C. Department of Health to respond to community concerns regarding the impact of Northern Bus Garage emissions activities on local air quality. With regard to the effect of bus garage activities on local air quality, the study found that daytime, weekday bus and truck traffic along 14th Street at the noon hour, when there is no Northern Bus Garage bus activity, is responsible for approximately 1 µg/m3 more diesel particulate matter (DPM) than is experienced by the city as a whole.[20] The study was designed to measure the contribution of DPM which represents a significant portion, although not all, of PM smaller than 2.5 µm in size emitted by motor vehicles. This research shows that particulate matter emissions attributable to levels of AADT typical of smaller corridors - *e.g.,* 14th Street, which carries approximately 8,200 vehicles according to the District of Columbia Department

---

[20] "The Impact of the Northern Bus Garage on Local Air Quality". A Report to the Washington Metropolitan Area Transit Authority. Versar, Inc. May 2003, at 1-27.

of Transportation's average annual daily traffic statistics - can contribute 1 µg/m3 to ambient PM 2.5 levels. Given the findings of the Northern Bus Garage Study, the background PM 2.5 concentrations which demonstrate that compliance with PM 2.5 NAAQS in the project area is within less than 1 µg/m3 of violating the NAAQS, and estimated Annual Average Daily Traffic ("AADT") levels for the ICC corridor which significantly exceed the traffic levels on 14th Street that were found to contribute a 1 µg/m3 increase to local PM, it is highly likely that the proposed ICC project will cause or contribute to PM 2.5 concentrations that will violate the NAAQS throughout the ICC corridor and adjacent segments of the I-95, I-270, and I-495 corridors. Consequently, it is critical that the FEIS include a modeling assessment to provide the best estimate of the magnitude of the NAAQS violations likely to occur at the points of greatest concentrations ("hot spots"), and identify and evaluate the effectiveness of mitigation strategies to reduce emissions to avoid the NAAQS violation.

These findings are especially significant because of the close proximity of a number of schools and day care centers to the proposed ICC. As documented in comments on the ICC DEIS, the Drew Elementary School playing fields are immediately adjacent to the ICC Right-of-Way ("ROW") and this school's building is less than 400 feet away from the ROW. Magruder High School is also located less than 900 feet away from the ROW under Rock Creek Option C, the alignment preferred by the Maryland-National Capital Park and Planning Commission and likely to be favored by the Maryland State Highway Administration as a way to reduce the substantial direct impacts to park resources posed by other possible ICC alignments. Blake High School on Norwood road is also within about 1600 feet of one of the ICC Corridor 2 alignments. The former Colesville Elementary School abuts the proposed New Hampshire Avenue interchange of the ICC, with its building within 400 feet of the ICC traffic. This has been converted into a day care center. Redland Middle School is within 1000 feet of Corridors 1&2 - Rock Creek Option C. The Briggs Chaney Middle School is also within 1000 feet of Corridor 2 - Spencerville Options A, B, & C to Burtonsville Option A. There are other schools adjacent to I-270, I-95, and I-495. These include Blair High School, which immediately adjoins sections of I-495 that the FEIS concedes will likely to experience increased traffic as a result of construction of the ICC.

## VI.  MITIGATION TO AVOID NAAQS VIOLATIONS

To remedy the likely violations of the Clean Air Act that would be caused by approval and construction of the ICC, the project sponsors must evaluate the potential for available and reasonable alternatives to the preferred alternative and other mitigation strategies to achieve the emissions reductions needed for attainment.

### A. Available and Reasonable Alternatives to the Preferred Alternative.

There are several reasonable and available alternatives to the FEIS ICC preferred alternative. Extensive comments filed by Environmental Defense, Chesapeake Bay Foundation, Audubon Naturalist Society, Sierra Club – Maryland Chapter, Maryland Native Plant Society, and other groups on the ICC Draft and Final Environmental Impact Statements are hereby included by reference. Peer reviewed

studies showed that there are several alternatives to the ICC that have less cost, fewer adverse impacts on air quality, and produce greater relief from traffic congestion than the ICC.[21]

A study by Smart Mobility, Inc., commissioned by environmental and civic groups, looked at several combinations of investment and management strategies that are under active project planning and environmental review by state and local agencies and which could better address the mobility needs that the ICC would ostensibly serve. These include improved operation of existing expressways connecting the end points of the proposed ICC with toll managed lanes, improved public transportation, and better targeting of new job and housing development and redevelopment into patterns that can reduce traffic growth.

Each alternative would have a capital cost that is less than the capital cost of the ICC. Transportation experts at Smart Mobility, Incorporated ("SMI") used the Metropolitan Washington Council of Governments Transportation Planning Board's ("TPB") computer-based traffic model to analyze the six alternatives. Using TPB's model and the MOBILE emissions model, SMI forecasted travel conditions and air quality impacts under each alternative.

The six alternatives tested in this study were:

1. **No Build.** The No Build alternative includes the 2003 Constrained Long Range Plan ("CLRP") and uses the Round 6.4 growth forecasts. This alternative provides a baseline for the region with which to compare and evaluate the effect of the ICC and other alternatives.

2. **ICC Build.** The ICC Build alternative includes the 2003 CLRP, the ICC, and uses the Round 6.4A growth forecasts. The route selected is Montgomery County's "Master Plan Alignment" (Alignment 1 in the current DEIS). Both high occupancy and single occupancy vehicles would pay tolls in all lanes.

3. **Transit Oriented Land Use and Investment.** The "Transit Oriented" alternative includes the 2003 CLRP, additional transit, light rail, and localized road improvements. The land use component modifies the growth pattern of the Round 6.4 growth forecasts to reduce imbalances in jobs and households and increase transit oriented development but keeps the regional growth total constant.

4. **Add Toll Lanes-Express Bus.** The "Add Toll" alternative includes the 2003 CLRP and a network of toll lanes comprised of both newly constructed toll lanes and converting existing lanes to toll lanes on I-270, I-495 (the Beltway), and I-95.

---

[21] Smart Mobility, Inc., *The Intercounty Connector: Performance and Alternatives*, Environmental Defense, Washington, DC, February 2005; Replogle, M., New Toll Road vs. Toll Managed Lanes on Existing Motorways: Alternatives and Impacts In Metro Washington, DC, PIARC/International Road Federation, *Proceedings of PIARC Seminar on Road Pricing with Emphasis on Financing, Regulation and Equity*, Cancun, Mexico, April 2005.

Both high occupancy and single occupancy vehicles would pay tolls. Extensive express bus service is assumed on the toll lanes. This alternative was tested using the Round 6.4 growth forecasts.

5. **Convert to High Occupancy Toll ("HOT") Lanes-Express Bus**. The "Convert to HOT" alternative includes the 2003 CLRP, and converts existing freeway lanes to HOT and express bus lanes. No new lanes are added under this alternative. It was tested using the Round 6.4 growth forecasts.

6. **Transit Oriented-HOT Lane-Rail and Express Bus.** The "Hybrid" alternative is a combination of components from other alternatives. It includes the 2003 CLRP, most of the rail transit improvements from the Transit Oriented alternative, and the converted HOT-express bus lanes from the Convert to HOT alternative. It uses the same land use component as the Transit Oriented alternative.

However, the EIS for the ICC excluded from consideration all of these potential reasonable and available alternatives except the preferred alternative and the no-build option. Our comments on the EIS reflect the reasons why it was not permissible for SHA/FHWA to exclude these alternatives by using an overly narrow purpose-and-need statement that would preclude consideration of any alternative other than a new motorway on a new right-of-way connecting the end points for the ICC.

The SMI analysis shows clearly that the ICC will increase emissions of nitrogen oxide ("NOx") and volatile organic compounds ("VOC") in the study area relative to all other alternatives, including the no-build alternative. As NOx and VOC are both contributors to PM 2.5 emissions, this will likely exacerbate existing violations of the PM 2.5 NAAQS and make it more difficult for the region to meet the stronger PM 2.5 air pollution standards recently put into effect by EPA under the Clean Air Act.

The SMI analysis shows that for the ICC Study Area the ICC Build alternative is the only alternative examined that would increase air pollution over the levels in the No Build alternative. All other alternatives would reduce air pollution emissions, as shown below.



Figure 1: Percent Change in Emissions Relative to the No Build Alternative

ICC Study Area

In the ICC Study Area, where hot spot particulate emissions are of greatest concern, the ICC produces hydrocarbon emissions 7 percent higher than the No Build and 14 percent higher than the Convert to HOT and Hybrid alternatives. The ICC Build alternative produces nitrogen oxide emissions 9.3 percent higher than the No Build and approximately 17-18 percent higher than the Convert to HOT and Hybrid alternatives.

Commitment of over $3 billion, with financing costs, to build the ICC may also preclude investments in other alternatives that were part of the SMI alternatives analysis that could better address mobility needs in the ICC study area and larger non-attainment area with less air pollution. Among these alternatives is the East-West Transitway in southern Prince George's and Montgomery Counties under study by Maryland officials. Among these alternatives is the conversion of some existing unmanaged motorway lanes to toll managed lanes and addition of toll managed lanes to existing motorways to support improved express bus services in these corridors and improved traffic management. These investments could reduce air pollution and traffic while improving mobility in the area served by the ICC, but funding to advance these projects may be imperiled by a decision to first build the ICC.

**B. Strategies to Mitigate or Avoid Health Risks from PM 2.5 Air Pollution Related to the ICC.**

There are three categories of strategies to mitigate or avoid health risks associated with transportation projects:

33

(1) Vehicle technologies and fuel fixes reduce emission rates,
(2) Traffic management strategies change the character of travel,
(3) Exposure management minimizes the contact of people to harmful pollutants.[22]

EPA regulations will reduce diesel emissions from on- and off-road vehicles, but it will take more than two decades before the full benefits of current regulations are realized due to the slow pace at which heavy-duty diesel equipment is replaced, which is considerably slower than for light-duty gasoline powered motor vehicles. A 2004 rule set tighter emission standards for new engines and requires cleaner ultra-low sulfur diesel ("ULSD") fuels beginning in 2007.[23]  The new standards will reduce NOx, VOC, and PM, but will be insufficient to fully protect public health by the deadlines established under the Clean Air Act.[24]  Timely cleanup of highly polluting existing diesel engines depends largely on voluntary retrofits with new technologies.  Without special funds and programs this cleanup will take literally decades, as the owners of diesel equipment continue to rebuild old diesel engines rather than replacing them with new cleaner equipment.

Successful diesel equipment retrofit programs have been implemented. In Manhattan, at the former World Trade Center site, construction vehicles use ULSD, and construction equipment has been retrofitted with oxidation catalysts, particulate filters, or other technologies. Connecticut's Q-Bridge project has installed diesel oxidation catalysts to cut carbon monoxide emissions by 20 tons/year, fine PM by 2 tons/year, and VOC by 8 tons/year.[25]  Given the non-attainment status of the metro Washington region with respect to the PM 2.5 NAAQS, SHA/FHWA should evaluate the impact of construction emissions as part of the PM 2.5 conformity analysis and identify strategies to mitigate these adverse pollution impacts, taking all possible steps to avoid creating local pollution hot spots that harm public health in the area.

While vehicle technologies reduce emissions at the source, traffic management can curb emissions by reducing miles driven or changing the time or means of travel. Prohibiting trucks from traveling in certain times and places can mitigate particulate matter hotspots. Anti-idling regulations and electrified truck stops can do the same.[26]

---

[22] Yuhnke, R., Federal Authorities Governing Strategies for Control of Emissions from Motor Vehicles, Workshop on Traffic, Health, and Infrastructure Planning, Johns Hopkins School of Public Health,
Baltimore, MD, February 1-3, 2004; Replogle, Michael and John Balbus, M.D., M.P.H., "Considering Cancer Risk in Transportation Decision-Making," *Environmental Manager*, June 2005, page 14-17.
[23] *Voluntary Diesel Retrofit Program.* http://www.epa.gov/otaq/retrofit/. (accessed 4/26/06); homepage included as Attachment 9.
[24] Yuhnke, R. "NEPA's Uncertainty Principle in the Federal Legal Scheme Controlling Air Pollution From Motor Vehicles", Environmental Law Reporter, April, 2005; included as Attachment 10.
[25] Environmental Defense. Cleaner Diesel Handbook.
http://www.environmentaldefense.org/documents/4110_DieselHandbook_FullText.pdf. (accessed 3/14/05).

[26] See e.g., U.S. Department of Energy. Idle Reduction: Truck Stop Electrification.
http://www.eere.energy.gov/cleancities/idle/truck_elec.html. (accessed 4/26/06); homepage included as Attachment 11.

Traffic can be managed through market incentives like congestion pricing that enables solo drivers to use managed fast lanes if they pay a toll that varies by time-of-day, with a high price in peak traffic hours and off-peak discounts, with tolls often financing improved transit to expand travel choices. Congestion pricing helps maintain free-flowing traffic, reducing vehicle idling and pollution. However, investment of toll revenues in new roads may induce more travel spurring long-term emissions growth.

Exposure management reduces people's contact with pollutants. Upgraded air monitoring can locate and manage pollution hotspots near truck and bus depots, parking garages, and high volume roads. Hotspot incident management can alert the public of harmful pollution and reduce emissions at particular locations at critical times. Planners can manage development to minimize hotspots by prohibiting development of hot spot generators near residential areas or schools or establishing development buffer zones. If hotspots occur near sensitive populations, such as schools, nursing homes, and residences, these facilities can be relocated or the transportation facility can be covered or rebuilt underground, with ventilation stack air filters, as used in Norway, Japan, and Korea.[27]

SHA/FHWA should evaluate strategies to ensure that no residents, workers, or visitors to parks and other public or private facilities or lands near the ICC will be affected by particulate pollution levels in excess of the NAAQS.

---

[27] Residents Against Polluting Stacks. How to use an Electrostatic precipitator in a tunnel. http://savewollicreek.8m.com/17jul2002filt.htm. (accessed 3/13/05); included as Attachment 12.

# ATTACHMENT 1

# CRITIQUE OF INTERCOUNTY CONNECTOR HOT SPOT STUDY

Prepared for:

Environmental Defense
1875 Connecticut Avenue, Suite 600
Washington, DC 20009

Prepared by:

E.H. Pechan & Associates, Inc.
5528-B Hempstead Way
Springfield, VA 22151

Pechan Rpt. No. 06.04.001/9454.001

April 26, 2006

PECHAN                                                                    April 26, 2006

# CONTENTS

**Page**

SUMMARY OF MAJOR CONCERNS ........................................................................1

TOOLS FOR ASSESSING THE AMBIENT AIR QUALITY IMPACTS OF $PM_{2.5}$
EMISSIONS ...........................................................................................................1

NEAR ROADWAY MEASURED FINE PARTICLE CONCENTRATIONS.............................7

SOURCE APPORTIONMENT .................................................................................9

DISPERSION MODELING ....................................................................................10
    Models.........................................................................................................10
    Road Network .............................................................................................11
    Receptor Network ........................................................................................11
    Traffic Volumes ...........................................................................................11
    Emission Factors .........................................................................................12
    Meteorological Data......................................................................................12

REFERENCES .................................................................................................13

# TABLES

**Page**

Table 1        Washington, DC-Maryland-Virginia Nonattainment Area Annual Average
               $PM_{2.5}$ Concentrations (1999-2005) ($\mu g/m^3$)........................................... 6
Table 2        Comparison of Average Source Contributions (%) to $PM_{2.5}$ Mass
               Concentrations Among PMF Studies with Eight Carbon Fractions ..................... 10

**PECHAN**                                                                    April 26, 2006

*[This page intentionally left blank.]*

# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| BC | black carbon |
| CO | carbon monoxide |
| EPA | U.S. Environmental Protection Agency |
| HDDV | heavy-duty diesel vehicles |
| ICC | Intercounty Connector |
| MDOT | Maryland Department of Transportation |
| MWCOG | Metropolitan Washington Council of Governments |
| NAAQS | National Ambient Air Quality Standards |
| $NO_x$ | oxides of nitrogen |
| $PM_{2.5}$ | particulate matter with an aerodynamic diameter of 2.5 microns or less |
| PMF | positive matrix factorization |
| SHA | State Highway Administration |
| VMT | vehicle miles traveled |

April 26, 2006

*[This page intentionally left blank.]*

This analysis evaluates the Project-level Conformity Determination for the Intercounty Connector (ICC) Project in Maryland. The ICC project area (Montgomery and Prince George's counties in Maryland) is within the Washington, DC-Maryland-Virginia nonattainment area for particulate matter with an aerodynamic diameter of 2.5 microns or less ($PM_{2.5}$); and therefore the project is required to meet transportation conformity requirements found in 40 CFR Part 43 as amended (EPA, 2006). Project-level conformity requires a determination that emissions from the Project will not cause or contribute to new violations, more severe or more frequent violations of the National Ambient Air Quality Standards (NAAQS) during the year of highest expected emission 40 CFR § 93.116. The Maryland Department of Transportation (MDOT) March 2006 document that is evaluated here addresses the project level transportation conformity requirements for the ICC, including a hot spot analysis. The design year for the ICC is 2030 and it is expected to be open to traffic in 2010.

The ICC is a proposed six-lane, 18-mile highway that would link I-95 and US 1 at its eastern terminus with I-270 at its western terminus. The Project is expected to add an additional 12,325 daily vehicle trips to current annual average daily travel of 175,575 on the segment of I-95 that connects with the Project, and 13,200 additional vehicle trips on the segment connecting with I-370.

## SUMMARY OF MAJOR CONCERNS

The Maryland SHA hot spot conformity analysis is seriously flawed on three major grounds:

1.  It selectively excludes from its analysis of air quality data in the region all the monitors located in close proximity to similarly sized highways that are the monitors that violate the NAAQS for $PM_{2.5}$;
2.  It fails to evaluate the evidence in the peer-reviewed scientific literature showing that emissions of $PM_{2.5}$ (measured as black carbon [BC]) from highways carrying as many motor vehicles as are expected to travel the ICC Project in the vicinity of the termini at I-95 and I-370 are likely to add 2.0 to 2.5 $\mu g/m^3$ to baseline concentrations in the near-roadway atmosphere; and
3.  It fails to use U.S. Environmental Protection Agency (EPA)-approved modeling tools that are readily available for estimating future emissions from the highway.

Consideration of relevant, credible scientific evidence omitted from the SHA analysis supports the conclusion that adding 120,000 vehicle trips per day in the vicinity of I-95 and I-370 will contribute to new or more frequent and more severe violations of the NAAQS.

## TOOLS FOR ASSESSING THE AMBIENT AIR QUALITY IMPACTS OF $PM_{2.5}$ EMISSIONS

Methods for evaluating the potential impact of the ICC on $PM_{2.5}$ concentrations include analysis of existing monitoring data in the region, using data for roadways with similar traffic volumes and mixes, and appropriate dispersion or receptor modeling techniques. In this evaluation, Pechan has reviewed all appropriate analytical techniques to evaluate the potential effect of the ICC. For example, EPA's Guideline for Air Quality Models (40CFR Part 51, Appendix W)

suggests modeling techniques that are appropriate for evaluating the effects of line sources, such as roadways. CAL3QHCR is one example of a guideline model that is available for evaluating line sources. While MDOT-SHA relies solely on $PM_{2.5}$ monitoring data to perform a qualitative project analysis, it is more appropriate to perform a more advanced analysis that includes a combination of modeling techniques and ambient monitoring data evaluations. This report summarizes how a quantitative dispersion modeling analysis could be performed by MDOT-SHA. In addition, critical comments on the analysis performed by MDOT-SHA are also provided.

The $PM_{2.5}$ hot spot analysis prepared by the Maryland SHA relies upon EPA's recent announcement in the March 10, 2006 Hot Spot rule that the MOBILE6.2 emissions model for $PM_{2.5}$ is not currently appropriate for project level conformity determinations. Neither EPA nor SHA dispute that modeling tools are available to replicate the dispersion of emissions from highways in the atmosphere for the purpose of estimating ambient concentrations. See Part 51 Appendix W, 4.2.2.(d), 5.2.3.(b), 5.2.4.(f). SHA does not use modeling to assess the impact of incremental emissions added by the proposed ICC project. Instead, SHA undertakes a qualitative hot spot analysis based upon data selected from 2 of 13 $PM_{2.5}$ monitors in the Washington metropolitan nonattainment area. None of these monitors have been sited in accordance with the criteria described in Appendix W, section 10.2.2.(b) for measuring near roadway concentrations. Neither of these two monitoring stations have been located in proximity to a highway for the purpose of detecting highway emissions as required by 40 CFR, Part 58, Appendix E, 8.3.

The $PM_{2.5}$ ambient air quality monitoring data presented in the MDOT-SHA analysis is largely based on the Muirkirk (Beltsville) site in Prince George's County (EPA site id 240330030). There are several concerns about using data from this single site to characterize ambient air quality characteristics in the vicinity of the proposed project.

1.    This monitoring site was inactive prior to July 2004, so only $PM_{2.5}$ measurements from 2004 and 2005 are available for analysis (49 readings of 24-hour average $PM_{2.5}$ concentrations in 2004 and 107 readings of 24-hour average $PM_{2.5}$ concentrations in 2005). This amount of data is insufficient for EPA's established criteria for computing a $PM_{2.5}$ design value at this site (which requires 3 complete data years), so using data from this site alone is not sufficient for characterizing $PM_{2.5}$ levels in the vicinity of the project. For example, the current 24-hour standard is based on a 3-year average of the 98th percentile of 24-hour $PM_{2.5}$ concentrations; the current annual standard is based on a 3-year average of annual mean $PM_{2.5}$ concentrations.

2.    As noted above, the MDOT analysis does not report the 3-year average 24-hour or annual average $PM_{2.5}$ concentrations, which is what is needed for comparison with the relevant ambient air quality standards. Because the Muirkirk site lacks the necessary data to perform a 3 year analysis per 40 CFR 50 – Appendix N, it is suggested that data from other sites in the region be presented in the analysis so that this report presents data in a form where it can be compared directly with the relevant ambient air quality standards. We reviewed the monitoring site characteristics in the Washington, DC-Maryland-Virginia area with respect to the likelihood that they represent a well developed and heavily traveled nearby roadway network similar to what exists and is planned for the

area where the ICC will be built. The two monitoring sites with surroundings most like the area of the planned project are the near roadway monitors at River Terrace/RFK (site ID 110010041) and Park Services/Ohio Drive (site ID 110010042), which are both in the District of Columbia. Both of these sites are near heavily traveled roadways/freeways that are similar in design and volume to the ICC at I-270 and the ICC at I-295. The River Terrace/RFK site is about 150 meters from both I-295 and Benning Road. The Park Services/Ohio Drive site is 115 meters from I-395 near where it crosses the Potomac River. Therefore, the analyses performed in this study use the monitoring data from these two near roadway sites as the appropriate point of comparison for the ICC evaluation.

3.    EPA's December 2005 *Draft National Ambient Air Monitoring Strategy* (EPA, 2005) recognizes that its current monitoring network design does not capture near roadway impacts, and that there is an urgent need to do so. It acknowledges that "research monitoring efforts to characterize the impacts of mobile sources near roadways are emerging as a key area for ambient monitoring development." It goes on to say the following:

> "An estimated 35 million Americans live near four-lane roads, and EPA and others will need to investigate how to incorporate near roadway conditions and exposures into NAAQS attainment monitoring. To date, ambient monitoring in these areas consists of targeted research efforts.
>
> Over 1,000 compounds have been identified in exhaust and evaporative emissions from motor vehicles. These compounds include criteria pollutants and air toxics. Motor vehicle emissions significantly impact air quality and contribute to national emission inventories for criteria and air toxic pollutants. Mobile sources account for over 75 percent of national carbon monoxide (CO) emissions, over 50 percent of national oxides of nitrogen ($NO_x$) emissions, and over 25 percent of national $PM_{2.5}$ emissions. For air toxics, mobile sources significantly contribute to air pollutant concentrations of gaseous and particulate phase compounds. For example, mobile sources emit over 50 percent of the nation's benzene, toluene, and acetaldehyde. PM air toxic emissions include metals, ions, and semi-volatile organic compounds.
>
> Given that an estimated 35 million people live within 100 meters of a four-lane roadway, near roadway exposure from these mobile source emissions is an important concern. It cannot properly be thought of as either a *hotspot* issue affecting relatively few areas in a city or a broader component of PM NAAQS attainment issues. Near roadway exposure may, in fact, emerge as one of the dominant urban air quality issues. Air quality measurements collected near roads often identify elevated pollutant concentrations at these locations, as well as pollutant composition

and characteristics that differ from those measured at a distance from roadways.

Elevated pollutant concentrations near roadways may lead to elevated exposures for populations working or residing near these roads. In addition, these populations may experience exposures to differing physical and chemical compositions of certain pollutants. The location of schools near major roads may also result in elevated exposures for children due to potentially increased concentrations indoors, increased exposures during outdoor activities, or increased exposures while commuting to school (e.g., walking along roads or riding in a school bus or passenger vehicle). Mobile sources influence temporal and spatial patterns of regulated gases, air toxics, and PM concentrations within urban areas. Since motor vehicle emissions generally occur near the breathing zone, near roadway populations may be exposed to *fresh* combustion emissions as well as combustion pollutants *aged* in the atmosphere.

Results from emissions and exposure studies suggest that simple methods of estimating the contribution of motor vehicle exhaust to exposure likely do not capture the substantial variability in the chemical and physical characteristics of motor vehicle exhaust that may be leading to adverse health effects. Comprehensive assessments of exposure will be a critical factor in identifying which compounds are leading to adverse health effects in the near roadway environment.

With this background, EPA's strategy currently involves (1) recognition of the importance of near roadway exposures and (2) the need for further exploration of what these exposures mean for both urban NAAQS-oriented monitoring networks and air toxics networks. EPA anticipates discussing these issues both internally and with partners and other stakeholders over the coming months, and then continuing to develop specific elements of a near roadway monitoring strategy that can be adopted into this overall strategy document."

5. The MDOT-SHA report references a Metropolitan Washington Council of Governments (MWCOG) report from 2005 that "showed a downward trend in annual average $PM_{2.5}$ design values between 1999 and 2004" for the region. (Regarding terminology, note that Table A-11 in the MWCOG report presents annual average $PM_{2.5}$ concentrations, which is not the same thing as design values.) Table A-11 in the MWCOG report is included in this analysis as Table 1. It is recommended that the MDOT-SHA analysis include the information in Table 1 in order to present a more complete picture of ambient $PM_{2.5}$ concentrations in the area by monitor. We have augmented this table to include the 2005

annual average $PM_{2.5}$ concentrations for the Washington, DC-Maryland-Virginia area monitors. Inspection of the annual means for the 1999-2005 time period shown in the table does not indicate that there is a downward trend in these values. In fact, the median $PM_{2.5}$ annual mean for the area monitors is as high in 2005 as it was in 1999, 2001 and 2002.

On December 20, 2005, EPA proposed revisions to the NAAQS for particle pollution to protect the public health, citing evidence from nearly 2,000 new health research studies showing adverse health effects associated with exposure to daily concentrations of $PM_{2.5}$ well below the NAAQS set in 1997. The proposal would strengthen the short-term (24 hour) NAAQS for $PM_{2.5}$ and would replace the current annual and 24-hour $PM_{10}$ standards with a new, qualified indicator for thoracic coarse particles ($PM_{10}$-$PM_{2.5}$). As proposed, the annual mean standard for $PM_{2.5}$ would be maintained at a level of 15 $\mu g/m^3$, while the 24-hour primary standard (98[th] percentile form) would be lowered from 65 $\mu g/m^3$ to 35 $\mu g/m^3$. EPA is under a court-ordered deadline to revise the NAAQS no later than September 2006. The importance of these proposed revisions to the Washington, DC-Maryland-Virginia $PM_{2.5}$ nonattainment area is that measured 24-hour average $PM_{2.5}$ concentrations at near roadway monitors will now exceed the 24-hour NAAQS rather than reaching levels that are only 55 percent of the NAAQS, and more rigorous analyses of the potential 24-hour average $PM_{2.5}$ concentration increases associated with proposed projects like the ICC are needed.

The MDOT-SHA analysis should present information about the onroad vehicle emissions for the nonattainment area as a percentage of total manmade $PM_{2.5}$ emissions to put the two direct $PM_{2.5}$ emission components in perspective. The Exhibit 1 $PM_{2.5}$ Trends Analysis for Washington, DC-Maryland-Virginia Nonattainment Area presents estimates of $NO_x$ and direct $PM_{2.5}$ emissions for 2002, 2010, 2020, and 2030 from the air quality conformity analysis. This exhibit is limited to onroad vehicle emissions, which are a subset of total $NO_x$ and direct $PM_{2.5}$ emissions for the region. The area's future attainment status for $PM_{2.5}$ will be influenced more by total nonattainment area emissions of these pollutants than by onroad vehicle emissions alone, so it is recommended that the analysis present the total emissions burden for the area.

EPA's March 2006 Transportation Conformity Guidance for Qualitative Hot-spot Analysis in $PM_{2.5}$ and $PM_{10}$ Nonattainment and Maintenance Areas (in section 4.2) says that the hot spot analysis should include a discussion of any mitigation measures that will be implemented and their expected effects. The MDOT-SHA analysis provides no information about possible mitigation measures and their expected effects. Example mitigation approaches might include retrofit of diesel truck engines operating in the area, implementing a diesel truck emissions inspection program, or a smoking vehicle identification and repair program.

PECHAN

April 26, 2006

**Table 1. Washington, DC-Maryland-Virginia Nonattainment Area Annual Average PM$_{2.5}$ Concentrations (1999-2005) (µg/m³)**

| Site ID | Monitor | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|
| 110010041 | River Terrace | 15.9 | 18.9 | 16.9 | 16.3 | 14.9 | 14.9 | 14.8 |
| 110010042 | Park Services | 15.3 | 15.3 | 15.0 | 15.6 | 13.4 | 14.5 | 15.8 |
| 110010043 | McMillan Reservoir | 18.1 | 15.7 | 16.1 | 15.6 | 14.3 | 14.4 | 14.5 |
| 240313001 | Rockville | 13.5 | 14.3 | 12.8 | 13.0 | 11.9 | 12.6 | 13.6 |
|  | Bladensburg | 19.3 | 18.3 | 17.1 | 18.4 |  |  |  |
|  | Greenbelt |  |  |  |  |  | 9.8 |  |
| 240330030 | Beltsville |  |  |  | 12.1 | 11.5 | 12.6 | 13.4 |
|  | Suitland | 15.2 | 14.4 | 13.5 |  |  |  |  |
| 240338003 | PG Equestrian Center |  |  |  | 15.4 | 12.6 | 13.3 | 13.8 |
| 510590030 | Arlington | 13.8 | 14.9 | 14.7 | 14.9 | 14.1 | 14.5 | 15.2 |
|  | Franconia | 13.4 | 14.1 | 14.3 | 13.1 | 13.2 | 13.9 | 13.4 |
|  | Seven Corners | 14.5 | 15.3 | 13.9 |  |  |  |  |
| 510591005 | Annandale |  |  |  | 13.7 | 13.2 | 13.7 | 14.3 |
| 510595001 | Lewinsville | 14.3 | 15.1 | 14.5 | 14.1 | 13.6 | 14.0 | 14.7 |
| 511071005 | Ashburn | 12.8 | 13.8 | 14.1 | 13.5 | 13.1 | 14.1 | 14.5 |
|  |  |  |  |  |  |  |  |  |
|  | Highest | 19.3 | 18.9 | 17.1 | 18.4 | 14.9 | 14.9 | 15.8 |
|  | Lowest | 12.8 | 13.8 | 12.8 | 12.1 | 11.5 | 9.8 | 13.4 |
|  | Median | 14.5 | 15.1 | 14.5 | 14.5 | 13.2 | 14.0 | 14.5 |

NOTE: Blank data indicates the monitor has not been installed or has been removed.

SOURCE: MWCOG. The 2005 data have been added to the original MWCOG table. The 2005 annual average PM$_{2.5}$ concentrations are taken from Appendix A of the MDOT-SHA analysis.

Report No. 06.04.001/9454.001

6

Report

Note also that the MDOT-SHA analysis only examined one master plan alignment for the ICC (the preferred approach). This analysis should include other scenarios, such as transit oriented land use and development, toll lane-express bus, High Occupancy Toll lane-express bus, and a combination of the above.

## NEAR ROADWAY MEASURED FINE PARTICLE CONCENTRATIONS

There is limited information in the literature about roadway traffic generated fine particle contributions to ambient $PM_{2.5}$ levels. This information is limited in part because of the recent emphasis in EPA's $PM_{2.5}$ monitoring programs to establish monitors at locations that satisfy the primary objectives of determining each area's compliance with established ambient air quality standards, and to provide data that was compatible with health effects research needs. However, it is important to consider the research that has been conducted and to use that information to assist in evaluating the potential $PM_{2.5}$ hot spots that might occur near new roadway construction, considering the contributions from other nearby roadways as well. This research also provides another indicator of what $PM_{2.5}$ concentrations might be near the ICC roadway.

For example, Zhu et al, present results of measured PM concentrations near the Interstate 405 freeway and the Interstate 710 freeway in the South Coast Air Basin. The Interstate 405 study shows that particle number concentration near the freeway was about 25 times greater than that at background locations, and that the concentration of ultrafine particles drops to background levels within 300 meters downwind of the freeway. For the conditions of these measurements, relative concentrations of CO and BC near the freeway tracked each other well as distance from the freeway increased. (BC originates as ultrafine or fine particles from primary sources during incomplete combustion of carbon-based fuels, for example, diesel engines, wood burning, and poorly maintained industrial and residential heating.) Particle number concentration (6-220 nm) decreased exponentially with downwind distance from the freeway. Data showed that both atmospheric dispersion and coagulation contributed to the rapid decrease in particle number concentration and change in particle size distribution with increasing distance from the freeway. Average traffic flow during the sampling periods was 13,900 vehicles per hour. Ninety three percent of vehicles were gasoline powered cars or light trucks.

The Interstate 405 study included measurements of concentrations of CO, BC, PM and particle number at increasing distances from the freeway. CO and BC were intentionally selected because their ambient concentrations are related closely to vehicle emissions. Averaged concentrations at five distances from the freeway are summarized below along with measured upper and lower limits:

### Measured Average (and Upper and Lower Limit) BC Concentrations at Increasing Distances from the 405 Freeway

| Downwind Distance (m) | BC ($\mu$g/m$^3$) | BC ($\mu$g/m$_3$) Downwind-Upwind Average Concentration |
|---|---|---|
| 30 | 5.4 (3.4-10.0) | 4.75 |
| 60 | 3.2 (3.0-3.5) | 2.55 |
| 90 | 2.5 (2.4-2.6) | 1.85 |
| 150 | 1.6 (1.1-2.0) | 0.95 |
| 300 | 1.3 (1.1-1.5) | 0.65 |

The Interstate 710 study was conducted in part because the freeway has a much higher percentage of heavy-duty diesel truck travel than the Interstate 405 freeway. On the 710 freeway, more than 25 percent of the vehicles are heavy-duty diesel trucks. Measurements were taken at 17, 20, 30, 90, 150 and 300 meters downwind and 200 meters upwind from the center of the freeway. As with the 405 freeway study, relative concentrations of CO, BC and particle number downwind from the freeway were found to be many micrograms per cubic meter greater than upwind concentrations and tracked each other well as one moves away from the freeway. These measured average BC concentrations at increasing distances from the 710 Freeway are shown in the table below. Both atmospheric dispersion and coagulation appear to contribute to the rapid decrease in particle number concentration and change in particle size distribution with increasing distance from the freeway. Average traffic flow during sampling periods was 12,180 vehicles per hour with more than 25 percent of vehicles being heavy-duty diesel trucks. The data resulting from this study may be used to estimate exposure to ultrafine particles in the vicinity of major highways.

### Measured Average (and Upper and Lower Limit) BC Concentrations at Increasing Distances from the 710 Freeway

| Downwind Distance (m) | BC ($\mu$g/m$^3$) | BC ($\mu$g/m$_3$) Downwind-Upwind Average Concentration |
|---|---|---|
| 200 m (upwind) | 4.6 (3.1-5.9) | |
| 17 m | 21.7 (20.3-24.8) | 17.1 |
| 20 | 19.4 (16.5-21.6) | 14.8 |
| 30 | 17.1 (12.6-19.3) | 12.5 |
| 90 | 7.8 (4.5-9.3) | 3.2 |
| 150 | 6.5 (3.9-9.2) | 1.9 |
| 300 | 5.5 (3.5-7.7) | 0.9 |

A recent study in Seattle, WA (Curtis, Gilroy, and Harper, 2004) studied the relationship between BC levels at an urban near roadway monitoring site, and a heavily traveled freeway. This study showed that there were frequently peak evening rush hour BC levels of 5 $\mu$g/m$^3$ or above near I-5. The I-5 traffic corridor is a microscale monitoring site represented by the Olive Street BC data. The traffic volumes and BC readings correlate well, supporting the hypothesis that traffic is a major contributor to PM$_{2.5}$ at the site, given that BC originates as ultrafine or fine particles. The Olive Street air monitoring site is about 20 meters west of the southbound lane of I-5. This area of I-5 contains express lanes along several high use overpasses which all contribute to the area traffic. Daily volumes along this section of I-5 average 284,700 vehicles per day (in 2003). Light-duty traffic has peak weekday flows above 10,000 vehicles per hour, with diesel traffic of about 1,000 vehicles per hour. BC tends to peak during weekdays with high traffic volumes, and is sharply lower on weekends. This reduction parallels the significantly lower weekend diesel traffic volumes.

Peak BC measurements occur during the afternoon rush hour (4-6 pm). Correlations between light-duty vehicle volumes and BC peaks (readings above 5 $\mu$g/m$^3$) are better than those between diesel truck volumes and BC peaks. This may occur because light-duty volumes overwhelm diesel truck volumes during this period (93 percent of the traffic volume is from light-duty vehicles).

The Seattle study also provides BC measurements for a Beacon Hill site, which is used as the urban background for Seattle. Hourly BC readings during the week of July 21-27, 2003 stayed within the range of 0 to 2 $\mu g/m^3$, with readings mostly below 1.0 $\mu g/m^3$.

An East Bay (California) children's respiratory health study (Kim et al., 2004) provides measurements of BC concentrations taken at schoolyards in the area around Oakland, CA. This study evaluated nearby traffic sources and average pollutant concentrations at ten schools. BC concentrations were found to be between 0.7 and 0.8 $\mu g/m^3$ at schools without nearby major traffic sources. Schools within 60 to 360 meters of major traffic sources (90,000 to 210,000 annual average daily traffic) were found to have BC concentrations between 0.8 and 1.1 $\mu g/m^3$. Notably, BC concentrations are above the study average (0.8 $\mu g/m^3$) only for those schools that are near and downwind of heavily traveled freeways. The highest BC concentration of 1.1 $\mu g/m^3$ was measured at the school 60 meters from a freeway. This East Bay study helps to define the lower bound of the range of BC contributions from highways.

The above research studies provide evidence through measurements of BC downwind of heavily traveled freeways of the likely contribution of a highway to ambient $PM_{2.5}$ levels (BC is a component of $PM_{2.5}$ and the BC measured in these studies is emitted as fine or ultrafine particles—less than 2.5 microns). Thus, these data show based on similar vehicle mixes and traffic volumes what the range of $PM_{2.5}$ contributions is likely to be at different downwind distances from the ICC. In addition, given the levels of observed BC concentrations measured downwind of roadways, baseline $PM_{2.5}$ ambient concentrations measured at non-urban sites not near heavily traveled roadways are not likely to represent ambient levels near the proposed project. Therefore, based on these data, in the residential neighborhoods along the ICC alignment, current BC levels should be near 0.7 $\mu g/m^3$. After the ICC is built, BC concentrations are likely to be in the range of 5 $\mu g/m_3$ at a 30-meter distance, and declining with distance from the roadway to values around 1.0 $\mu g/m^3$ at 300 meters.

## SOURCE APPORTIONMENT

While the MDOT-SHA analysis focuses on direct $PM_{2.5}$ emissions, information from source apportionment studies for the Washington, DC area show the complexity of $PM_{2.5}$ formation and the different source contributions to observed $PM_{2.5}$ levels in the area. Source apportionment methods for airborne PM are required to understand the relationship between human exposure and source emissions. Positive matrix factorization (PMF) has been developed to be a powerful receptor model for airborne PM and has been used to assess ambient PM source contributions. A recent research paper by Kim and Hopke (2005) examines the use of carbon fractions in source apportionment studies to identify ambient $PM_{2.5}$ sources for three monitoring areas in the eastern United States, one of which was Washington, DC. $PM_{2.5}$ samples were collected on Wednesdays and Saturdays at the IMPROVE monitoring site in Washington, DC. A total of 718 samples and 35 species collected between August 1988 and December 1997 were used for the Washington, DC study. This monitoring site is located near the Potomac River, 2 kilometers southeast of the Lincoln Memorial, 3 kilometers northeast of Ronald Reagan Washington National Airport, and 30 meters above sea level. Highways (I-395) are closely situated to the north and west of the site. At its closest point, the IMPROVE site is about 350 meters from I-395.

The average contribution of each source to the $PM_{2.5}$ area's concentrations at the Washington, DC site is shown in Table 2. The fraction of mass contributions from gasoline and diesel emissions in Washington, DC is 23 percent. High weekday-to-weekend ratios for diesel emissions demonstrate that diesel emissions are mostly from vehicles operating primarily on weekdays.

**Table 2.  Comparison of Average Source Contributions (%) to $PM_{2.5}$ Mass Concentrations Among PMF Studies with Eight Carbon Fractions**

| Variable | Average Source Contribution Washington, DC |
|---|---|
| Secondary Sulfate Aerosol (summer-high) | 42.8 (1.4) |
| Secondary Sulfate Aerosol (winter-high) | 6.0 (0.2) |
| Secondary Sulfate Aerosol (carbon-rich) | 10.6 (0.4) |
| Diesel Emissions | 1.8 (0.1) |
| Gasoline Vehicle | 21.0 (0.6) |
| Secondary Nitrate Aerosol | 8.4 (0.3) |
| Airborne Soil | 1.9 (0.1) |
| Incinerator | 3.7 (0.1) |
| Aged Sea Salt | 2.2 (0.1) |
| Oil Combustion | 1.5 (0.1) |

SOURCE: Kim and Hopke, 2005

While the IMPROVE site may not be fully representative of the $PM_{2.5}$ concentrations near the ICC, these results should provide a reasonable representation of the source contributions to observed $PM_{2.5}$ levels in the area, and should be considered in any PM hot spot analyses. Given the low sulfur dioxide emissions within the Washington, DC-Maryland-Virginia area, it is likely that the sulfate contribution observed in this research will be found at consistent levels at monitors throughout the region because it results from long-range transport. Therefore, site-to-site variations in $PM_{2.5}$ levels in the region most likely result from variations in vehicle emissions strengths. Thus, the importance of considering nearby vehicle emissions in selecting monitors as representative of the ICC location.

# DISPERSION MODELING

The $PM_{2.5}$ hot spot analysis performed by SHA should have included dispersion modeling to determine whether the any of the communities located adjacent to the ICC would be exposed to increased concentrations of $PM_{2.5}$ that might exceed the annual or 24-hour $PM_{2.5}$ NAAQS. Data and methods that could be used to perform such an analysis are described below.

## Models

CALINE-3 and CAL3QHC/CAL3QHCR are listed by EPA as preferred/recommended dispersion models. CALINE-3 is a steady state Gaussian dispersion model designed to determine air pollution concentrations at receptor locations downwind of highways located in relatively uncomplicated terrain. CALINE-3 is designed to predict air pollutant concentrations near highways and arterial streets due to motor vehicles operating under free flow conditions.

The CALINE-3 algorithms are incorporated into the more refined CAL3QHC and CAL3QHCR models. CAL3QHC is a CALINE-3 based CO and PM model with queuing and hot spot calculations and with a traffic model to calculate delays and queues that occur at signalized intersections; CAL3QHCR is a more refined version based on CAL3QHC that requires local meteorological data and can determine daily or annual concentrations of PM. The resources needed to develop the input files required by CAL3QHCR and for analyzing the output results are relatively modest. The primary inputs that would be needed to run CAL3QHCR to determine PM2.5 hot spots along the ICC corridor are described below.

## Road Network

The dispersion modeling should be focused on areas of the ICC with the heaviest expected traffic volumes (e.g., in the I-95 corridor or the area where the ICC meets I-370). Interstates, freeways, and major arterials in the selected area should be included in the road network to be modeled. For input to CAL3QHCR, roadway links need to be coded with x and y coordinates at the beginning and end of each link. This can be done fairly simply using some of the detailed maps provided in the Final Environmental Impact Statement, or from existing link coordinates used for emission and air quality modeling in the Washington area. These links should be designed to capture the approximate alignment of the ICC and the surrounding highways and major arterials.

## Receptor Network

The CAL3QHCR dispersion model allows up to 60 receptors to be modeled in a single input file. A receptor matrix should be designed to determine the maximum $PM_{2.5}$ concentrations likely to be experienced by people residing close to the ICC or by those using facilities such as schools, parks, and day care centers located near the ICC. One approach that could be used to determine the extent of the $PM_{2.5}$ dispersion would be to first design a receptor matrix with receptors located about 50 meters on either side of the ICC and at increments of 50 meters beyond that to about 300 to 500 meters from the road. Rows of these receptors should be spaced parallel to the ICC in increments of about 50 to 100 meters. Results of this sensitivity analysis could then be used to determine how far away from the highway the dispersion is significant. Using this as a guideline along with detailed maps of the areas surrounding the ICC, receptor locations could be selected within the range of the expected dispersion that includes residential and public facilities.

## Traffic Volumes

For the portions of roads to be included in the road network, daily traffic volumes are needed. These are available from the appendices to the DEIS Travel Analysis Technical Report. The data available show traffic volumes by road and direction at each key intersection in the analysis area. For input to CAL3QHCR, hourly traffic volumes are needed. The daily traffic volumes from the DEIS should be adjusted by hour using local hourly traffic allocations, such as those used by MWCOG in its emission modeling of the Washington metropolitan area for transportation conformity and SIP purposes. CAL3QHCR provides the availability to model each day of the week using different hourly traffic volumes. At a minimum, daily traffic adjustment factors to distinguish weekday traffic patterns from weekend traffic patterns should be applied.

**Emission Factors**

To determine typical emission factors on the ICC and surrounding roadways, MOBILE6.2 could be modeled using local conditions to provide a conservative estimate of $PM_{2.5}$ emission factors from onroad vehicles. As stated in the preamble to the final rule for $PM_{2.5}$ hot-spot analyses in transportation conformity determinations, MOBILE6.2 is expected to provide reasonable estimates of $PM_{2.5}$ emission factors on a regional basis. However, on the microscale level, MOBILE6.2 does not account for variations in inputs such as temperature, speed, and driving cycle (e.g., acceleration, deceleration, cruise) in determining the $PM_{2.5}$ emission factors. On a roadway such as the ICC, vehicle accelerations could increase the $PM_{2.5}$ emission factors above those predicted by MOBILE6.2.

An important local characteristic that should be captured in performing MOBILE6.2 emission factor modeling is the fraction of vehicle miles traveled (VMT) from heavy-duty diesel vehicles (HDDVs) and the distribution of vehicles by age (particularly the heavy-duty vehicles). $PM_{2.5}$ emission factors from HDDVs are generally an order of magnitude greater than $PM_{2.5}$ emission factors from light-duty vehicles, as well as from heavy-duty gasoline vehicles. Thus, the distribution of activity by vehicle type is important to capture. If the fraction of VMT from HDDVs is expected to differ on the ICC from that on the connecting roads, such as I-95, then emission factors should be developed separately for each road with a distinct HDDV VMT fraction. In addition, as more stringent vehicle control requirements are phased in, $PM_{2.5}$ emission factors from projection years with PM controls fully phased in will be significantly lower than emission factors from older vehicles subject to less stringent standards. Thus, the local registration data used in performing conformity and SIP analyses for the area should also be used in these hot spot analyses.

**Meteorological Data**

To perform dispersion modeling using CAL3QHCR, a meteorological data set including the wind flow vector, wind speed, and ambient temperature, by hour for each day of the year is needed for a year's worth of data. For a base year modeling run, the meteorology should correspond to the year being studied. For a projection year, an historical year with fairly typical meteorology should be selected. Unless data are available at a closer site to the ICC, meteorological data sets for the Reagan Washington National Airport could be used. These can be obtained from the National Climatic Data Center. The wind data that are input to CAL3QHCR must be reported in terms of wind flow (i.e., the direction the wind is blowing towards), while most meteorological data sites report wind direction (i.e., the direction from which the wind is blowing). Wind direction can be converted to wind flow by adjusting the wind direction by 180 degrees. The CAL3QCHR model requires a single set of inputs for each hour for the time being modeled. Thus, some manipulation of the meteorological data set will likely be needed to ensure that one and only one set of data are included for each hour of the selected year.

# REFERENCES

40 CFR Part 50, Appendix N to Part 50 – Interpretation of the National Ambient Air Quality Standards for $PM_{2.5}$.

Curtis, Gilroy, and Harper, 2004:  Curtis, H., M. Gilroy, and M. Harper, "Traffic Flows and Black Carbon Monitoring in the Urban Seattle Environment," Puget Sound Clean Air Agency, Seattle, WA, Fall 2004.

EPA, 2005:  U.S. Environmental Protection Agency, "National Ambient Air Monitoring Strategy (Draft)," Office of Air Quality Planning and Standards, Research Triangle Park, NC, December 2005.

EPA, 2006:  U.S. Environmental Protection Agency, "Transportation Conformity Guidance for Qualitative Hot-spot Analyses in $PM_{2.5}$ and $PM_{10}$ Nonattainment and Maintenance Areas," March 2006.

Kim and Hopke, 2005: Kim, E. and P.K. Hopke, *Improving Source Apportionment of Fine Particles in the Eastern United States Utilizing Temperature-Resolved Carbon Fractions*, J. Air & Waste Manage. Assoc. 55: 1456-1463.

Kim et al., 2004:  J.J. Kim, S. Smorodinsky, M. Lipsett, B.C. Singer, A.T. Hodgson, and B. Ostro, *Traffic-related Air Pollution Near Busy Roads:  The East Bay Children's Respiratory Health Study*," American Journal of Respiratory and Critical Care Medicine, June 2004.

Zhu et al., 2002a:  Zhu et al., *Concentration and Size Distribution of Ultrafine Particles Near a Major Highway*, J. Air & Waste Manage. Assoc. 52: 1032-1042.

Zhu et al., 2002b:  Zhu, Y., W.C. Hinds, S. Kim, S. Shen, and C. Siontas, *Study of Ultrafine Particles Near a Major Highway with Heavy-Duty Diesel Traffic*, Atmospheric Environment, 36 (2002) 4323-4335.

**PECHAN**                                                                    April 26, 2006

*[This page intentionally left blank.]*