**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

ENVIRONMENTAL DEFENSE and )
SIERRA CLUB, Inc., )
)
Plaintiffs, )
)
)
v. ) Civil Action No.
) 06-2176(GK)
UNITED STATES DEPARTMENT OF )
TRANSPORTATION, et al., )
)
Defendants. )
)
_____)

**RESPONSE IN OPPOSITION TO USDOT DEFENDANTS' MOTION TO TRANSFER
AND CROSS-MOTION TO DIRECT THE USDOT DEFENDANTS TO FILE THE
ADMINISTRATIVE RECORDS IN THIS COURT**

Environmental Defense and the Sierra Club ("Plaintiffs") file this response in opposition

to the motion of United States Department of Transportation, Mary Peters, Federal Highway

Administration and J. Richard Capka ("USDOT Defendants") to transfer the instant case to the

United States District Court for the District of Maryland.

Plaintiffs file this cross-motion requesting this Court to direct USDOT Defendants to file

the administrative records relating to the approvals and other decisions regarding the Intercounty

Connector and the fiscally constrained long-range plans and metropolitan transportation

improvement programs in this Court.

The points and authorities supporting this response and cross-motion are set forth in the

accompanying Memorandum of Points and Authorities in Support of Plaintiffs' Opposition in

Opposition to United States Department of Transportation's Motion to Transfer and Cross-

Motion to Direct the USDOT Defendants to File the Administrative Record in this Court.

DATED:        March 5, 2007                         Respectfully submitted,


                                                     _/s/_ Hope Babcock_____
                                                     Hope Babcock, Director
                                                            (Fed/D.C. Bar No. 14639)
                                                     Erik Bluemel, Staff Attorney
                                                            (D.C. Bar No.501869)
                                                     Institute for Public Representation
                                                     Georgetown University Law Center
                                                     600 New Jersey Avenue, N.W.
                                                     Washington, D.C.  20001
                                                     Phone: 202-662-9535
                                                     Fax: 202-662-9634

                                                     Robert E. Yuhnke
                                                            (C.O. Bar No. 012686)
                                                     Robert E. Yuhnke & Associates
                                                     2910 Country Road 67
                                                     Boulder, CO  80303
                                                     Phone: 303-499-0425

                                                     *Counsel for Plaintiffs*
                                                     *Environmental Defense and Sierra Club*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
ENVIRONMENTAL DEFENSE and                           )
SIERRA CLUB, Inc.,                                  )
                                                    )
                Plaintiffs,                         )
                                                    )
                                                    )
v.                                                  )          Civil Action No.
                                                    )          06-2176(GK)
UNITED STATES DEPARTMENT OF                         )
TRANSPORTATION, et al.,                             )
                                                    )
                Defendants.                         )
                                                    )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO UNITED STATES DEPARTMENT OF TRANSPORTATION'S
MOTION TO TRANSFER AND CROSS-MOTION TO DIRECT THE USDOT
DEFENDANTS TO FILE THE ADMINISTRATIVE RECORDS IN THIS COURT**

United States Department of Transportation, Mary Peters, Federal Highway

Administration, and J. Richard Capka (collectively, "USDOT Defendants") ask this Court,

pursuant to 28 U.S.C. § 1404(a), to transfer the above-captioned case to the United States

District Court for the District of Maryland.  For the convenience of the parties and in the interests

of justice, Plaintiffs Environmental Defense and Sierra Club (collectively, "Plaintiffs") oppose

the motion.

### Factual Background

The proposed Intercounty Connector ("ICC") would be an 18-mile east-west tollway

linking I-270 in Montgomery County with I-95 and US1 in Prince George's County and would

be the third largest highway construction project in the country.  Compl. at 13 ¶ 34.  The

proposed ICC has been approved by USDOT Defendants as part of the National Highway

System, which consists of highways of national significance.[1]

The proposed ICC was adopted as part of the regional fiscally constrained long-range transportation plan by the National Capital Region Transportation Planning Board of the Metropolitan Washington Council of Governments, and studied and approved for federal funding by the USDOT Defendants, all of whom are located in the District of Columbia.  The proposed ICC would funnel 125,000 vehicles per day into residential neighborhoods and in close proximity to five schools where children will be exposed to dangerous levels of toxic and particulate matter air pollution.  Compl. at 2 ¶ 2.  The proposed ICC would also destroy private property, wetlands, and other natural areas home to endangered species.  Id. at 3 ¶ 3.

A.    **Plaintiffs' Claims Are Properly Filed in the District Court for the District of Columbia.**

Despite the substantial health impacts of highway emissions, significant environmental destruction, worsened travel delays at some locations, transportation alternatives that provide better transportation system performance with less public health and environmental impacts, and costs in excess of 2.4 billion dollars to build the proposed ICC, the USDOT Defendants never analyzed whether the project is in the best overall public interest as required by federal law, 23 U.S.C. § 109(h).  Compl. at 3 ¶ 3, 8 ¶ 14.  The National Capital Region Transportation Planning Board of the Metropolitan Washington Council of Governments never concluded, as required by 23 U.S.C. §§ 134(a),(c) (2003), as amended by the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59, § 6001(a), 119 Stat. 1839 (2005), that the regional transportation plan, when revised to add the proposed ICC, would accomplish the national transportation planning objectives to minimize

---

[1] FHWA, NHS High Priority Corridors Description, http://www.fhwa.dot.gov/hep10/nhs/hipricorridors/hpcor.html.

transportation-related fuel consumption and air pollution, foster economic growth and development, and serve the mobility needs of all area residents, including those without vehicles.[2]  Compl. at 3 ¶ 4.  The USDOT Defendants violated federal law by defining the purpose and need of the proposed ICC so as to freeze out transportation alternatives in the record that would better achieve the national transportation planning objectives while minimizing adverse health impacts and air pollution, in violation of 42 U.S.C. §§ 4321-70(f).  And the USDOT Defendants violated the Clean Air Act, 42 U.S.C. § 7506(c), by determining that the proposed ICC would conform with the national ambient air quality standards for fine particulate matter pollution without making any of the regulatory findings required by the Environmental Protection Agency's regulations governing hot spot air quality conformity decisions.  Compl. at 3 ¶ 4.

Plaintiffs bring this action to enforce the Defendants' mandatory duties arising under federal law to ensure that planning the transportation system for the heavily populated metropolitan Washington D.C. area accomplishes the national planning objectives required by Congress and that the ICC project serves the best overall public interest and the transportation and environmental needs of its residents.  Subject matter jurisdiction over each of these claims is,

---

[2] A decision on the challenge to the MPO's revision of the transportation plan and program, and USDOT's approval of the revision, would likely moot all other pending claims in both courts. Plaintiffs' motion for partial summary judgment on the planning claims will be filed shortly. If the Court determines that the MPO unlawfully added the ICC to the regional plan and program because it failed  to comply with the requirements of SAFETEA-LU, then the USDOT Defendants could not have lawfully approved or funded the proposed ICC.  See 23 U.S.C. §§ 134(j)(2)(A),(3)(A)- (C); 23 C.F.R. §§ 450.222(a), .332(d). Granting judgment on these claims would likely dispose of the entirety of the case and foreclose the need for any court to reach the project-level issues raised by either set of plaintiffs.  Beverly Hosp. v. Bowen, 872 F.2d 483, 487 (D.C. Cir. 1989) (determining that when an agency action is nullified, "[t]he task for the agency is conscientiously to remold the situation to approximate fairly what it should have been initially" and ensure that treatment received is that which would have been provided "had the agency initially regulated in accordance with, and not contrary to, the terms of the [governing statute]").

therefore, appropriate in the District Court for the District of Columbia.

     **B.**    **Jurisdiction over Defendants and Venue in the District of Columbia Are Proper.**

The proposed ICC was authorized under Executive Order 13,274, which permits expedited environmental review of certain transportation projects. Exec. Order No. 13,274, 3 C.F.R. § 250 (2003). All expedited reviews conducted pursuant to the Executive Order are guided, monitored, assisted, and reviewed by the Department of Transportation's "Transportation Infrastructure Streamlining Task Force," which consists "exclusively" of the "Secretary of Agriculture, Secretary of Commerce, Secretary of Transportation (who shall chair the Task Force), Secretary of the Interior, Secretary of Defense, Administrator of the Environmental Protection Agency, Chairman of the Advisory Council on Historic Preservation, and Chairman of the Council on Environmental Quality." Id. The Task Force, whose members all officially reside in Washington D.C., studies and makes its decisions regarding projects authorized pursuant to the Executive Order in Washington D.C.

The National Capital Region Transportation Planning Board of the Metropolitan Washington Council of Governments is the federally designated metropolitan planning organization ("MPO") pursuant to 23 U.S.C. § 134(d) (West 2005) responsible for transportation planning in the Washington D.C. metropolitan area, which includes the District of Columbia, Montgomery and Prince George's counties in Maryland, and portions of northern Virginia. The MPO was designated as the entity responsible for Washington D.C. metropolitan transportation planning by an agreement between the governors of Virginia and Maryland and the mayor of Washington D.C.[3] Federal funds cannot be allocated to a transportation project in a metropolitan

---

[3] Transp. Planning Bd., The Transportation Planning Board, http://www.mwcog.org/transportation/tpb.

planning area unless the MPO evaluates the impact a project will have on the regional transportation system and adds it to the fiscally constrained long-range plan and metropolitan transportation improvement program.  23 U.S.C. § 134(h)-(j) (West 2005).  The MPO sought to make the proposed ICC eligible for federal funding by adding it in 2004 to the fiscally constrained long-range metropolitan transportation plan and improvement program.

The MPO for the Washington metropolitan area includes representatives of local governments, state transportation agencies, the Maryland and Virginia General Assemblies, the Washington Metropolitan Area Transit Authority, and non-voting members from the Metropolitan Washington Airports Authority and various federal agencies.  The MPO is obligated under federal law to engage in cooperative planning with local, state, and federal entities responsible for developing transportation policies and implementing transportation projects in the metropolitan planning area. 23 U.S.C. § 134(c)(1) (West 2005).  In fulfilling its duties under federal law, see 23 U.S.C. §§ 134(i)(5), (j)(4); 23 C.F.R. §§ 450.322(c), .324(c) (2006), the MPO held numerous meetings in the District of Columbia and provided public notice and opportunity for public comment on the proposed revisions to the transportation plan and program that would add the proposed ICC.[4]  The MPO staff prepared reports related to the proposed ICC and drafted documents for public consideration regarding the proposed ICC at the MPO offices in the District of Columbia, and the MPO policy board held public hearings and met to deliberate on the proposed addition of the ICC in the District of Columbia.  The record does not reveal that any of the MPO's planning activities, meetings, or decisions were conducted or made outside the District of Columbia.

---

[4] Transp. Planning Bd., Committee Business, http://www.mwcog.org/transportation/tpb.

The MPO also, pursuant to the requirements of SAFETEA-LU and section 176(c) of the Clean Air Act (CAA), determined that the metropolitan transportation plans and programs challenged by Plaintiffs conformed with the State Implementation Plan as required by the CAA, 42 U.S.C. § 7506(c). That emissions analysis required to support the conformity determination was funded in part by the District of Columbia Department of Transportation, the Federal Highway Administration ("FHWA"), and the United States Department of Transportation, all of which officially reside in the District of Columbia.[5]  Based upon the emissions analyses prepared by the MPO, the U.S. Department of Transportation also made an independent determination that the metropolitan transportation plan and program conform as required by CAA §§ 176(c)(1), (2) and 40 C.F.R. § 93.102.  The actions of both the USDOT Defendants and the MPO related to approval of the transportation plans and programs challenged as violating SAFETEA-LU, 23 U.S.C. §§ 134-35, Compl. at 60-65 (Counts 9-15), and § 176(c)(1) of the CAA, Compl. at 101-02 (Count 37), occurred primarily, if not exclusively, in the District of Columbia.

Numerous other federal decisions relating to the proposed ICC were made in the District. The decisions to allocate to the proposed ICC some of the federal transportation funds available to the Washington metropolitan planning region, a predicate to many of Plaintiffs' claims, as well as the USDOT Defendants' decision to include the proposed ICC within the National Highway System, were made in the District of Columbia.[6]  Similarly, the federal decision to

---

[5] See Transp. Planning Bd., Air Quality Conformity Determination of the 2004 Constrained Long Range Plan and the FY2005-2010 Transportation Improvement Program for the Washington Metropolitan Region, http://www.mwcog.org/ publications.

[6] SAFETEA-LU requires the USDOT Defendants to determine whether the "transportation planning process through which statewide transportation plans and programs are developed is consistent" with the requirements of 23 U.S.C. § 134.  23 U.S.C. § 135(g)(7).  The Secretary of Transportation is obligated to review metropolitan area planning processes to ensure that they meet the requirements of SAFETEA-LU and other applicable federal laws.  23 U.S.C. § 134(k)(5)(A)(i).  If the USDOT Defendants do not certify the state transportation improvement

review the proposed ICC under Executive Order 13,274 was made in the District of Columbia.

USDOT Defendants' hot spot air quality conformity determination, the first determination made

pursuant to the Environmental Protection Agency's hot spot conformity rule issued March 10,

2006, 71 Fed. Reg. 12,467, involved the development and application of national guidance by

FHWA's environmental branch located at the FHWA headquarters in the District[7] and was

ultimately made with guidance from FHWA's Washington D.C office.[8]  Under § 176(c)(1) of the

CAA, the conformity determination is the "affirmative responsibility" of the Secretary of

Transportation, who officially resides in the District.

   Further, the purposes of the proposed ICC include serving the transportation needs of the

Washington metropolitan area, including the District of Columbia and its residents.  The Record

of Decision ("ROD") approving the proposed ICC establishes that a purpose of the proposed ICC

is "advancing homeland security in the Study Area, which is located approximately 10 miles

outside of Washington, D.C."  ROD at 63.  The Final Environmental Impact Statement ("FEIS")

also noted that an east-west transportation network is necessary to accommodate "*city-wide* and

metro area evacuation" as part of the metropolitan Washington area's emergency planning.  FEIS

at I-3 (emphasis added).

   Defendant FHWA relied on the 1964 General Plan for Montgomery and Prince George's

counties to establish the importance of increased transportation capacity in the vicinity of the

---

program, which incorporates the metropolitan transportation improvement program without
change, 23 C.F.R. § 450.216(a)(3), federal funds may not be allocated to projects contained
therein.  See 23 C.F.R. §§ 450.222(a), .332(d).  Similarly, no federal funds or approvals may be
granted to a project unless the Secretary of Transportation determines that the project is in the
"best overall public interest."  23 U.S.C. § 109(h).

[7] FHWA, Transportation Conformity Guidance for Qualitative Hot-spot Analyses in PM2.5 and
PM10 Nonattainment and Maintenance Areas, http://www.fhwa.dot.gov/environment/
conformity/pmhotspotguid.pdf.

[8] FHWA, Project-level Conformity Determination for the Intercounty Connector Project in
Maryland, ROD, app. H, http://www.iccproject.com/PDFs/PM25Report.pdf.

proposed ICC to meet travel demand in the District of Columbia.  The General Plan "recognized Washington, D.C. as the center of geographic, economic, and cultural activities in the region and described radial 'Corridors' leading from it to channel growth into development corridors and preserve wedges of open space, farmland, and low density residential uses."  FEIS at II-27.  The development plan of the radial Corridors, then, is designed to ease traffic flow for District of Columbia residents to Maryland and Maryland residents to the District of Columbia.

The proposed ICC will also affect the District of Columbia and its residents.  Defendant FHWA established that groundwater in the Patuxent Aquifer is shared by the study area and Washington D.C., FEIS at II-50, and that building the proposed ICC could negatively affect the water supply of Washingtonians.  FEIS at IV-189 to IV-191.  The lead agencies further recognized the link between the proposed ICC and the District of Columbia by noting that "[a]ll major trunk sewers for the study area are connected to the regional Blue Plains System, located in Washington, D.C.," FEIS at II-20, Washington Metropolitan Area Transit Authority bus services are located within the proposed ICC study area, FEIS at II-21, and "[t]he I-270 Corridor stretches from Bethesda into Frederick County and is a vital, growing extension of the Washington, D.C. metropolitan economy," FEIS at II-22.  Indeed, one of the alternatives to the proposed ICC considered by the lead agencies was an extension of I-95 through the District of Columbia.  FEIS at III-5, III-24.

Plaintiffs allege that the proposed ICC would harm their members residing in the District of Columbia who "travel to the ICC right-of-way and surrounding areas to enjoy the aesthetic beauty of the area, including parks and wetlands, recreate, take their children to school, shop, and work."  Compl. at 8, ¶ 12.  These injuries would include: adverse health effects resulting from breathing the increased pollution caused by the 125,000 vehicles expected to travel daily along

the proposed ICC, <u>id.</u>, hampered ability to enjoy the area as a result of noise and litter, <u>id.</u> ¶ 13, and increased travel delays resulting from increased traffic in the FEIS study area that will exceed capacity on secondary roads, <u>id.</u> ¶ 14.  Plaintiffs also allege their members residing in the District of Columbia would be injured by the proposed ICC since it will likely cause or contribute to violations of the fine particulate matter national ambient air quality standard ("NAAQS"), and thereby prevent the entire Washington-Maryland-Virginia nonattainment area from achieving timely attainment of the NAAQS for fine particulate matter,  <u>id.</u> ¶ 17; <u>id.</u> pt. II, which will harm the District's ability to obtain federal transportation funding, <u>id.</u> ¶ 18; <u>see</u> 42 U.S.C. § 7509; 23 U.S.C. § 134(k)(5)(C)(i); 23 C.F.R. §§ 450.334(f)(1),(2).  Accordingly, venue is proper in this Court, which has jurisdiction over the Defendants.[9]  28 U.S.C. §§ 1391(e)(1),(2).

## Summary of Argument

To meet their burden for transferring a case, USDOT Defendants must establish that the convenience of the parties and the interests of justice weigh heavily in favor of transferring the case.  USDOT Defendants cannot meet this burden.  Indeed, the convenience of the parties and the interests of justice establish that the District Court for the District of Columbia is the preferred forum.[10]  Plaintiffs' choice of forum should be accorded substantial deference and

---

[9] USDOT Defendants argue that, because Plaintiffs did not plead venue in their Complaint, this evidences a lack of "meaningful ties to the controversy."  Defs.' Br. at 12.  As this Court well knows, the Federal Rules of Civil Procedure do not require pleading venue; rather, lack of venue is an affirmative defense.  Fed. R. Civ. P.  8(a).  USDOT Defendants do not allege that venue does not lie in the District of Columbia.

[10] Two actions challenging the proposed ICC are currently pending in the federal courts.  <u>See</u> <u>Audubon Naturalist Soc'y of the Central Atlantic States et al. v. U.S. Dep't of Transp. et al.</u>, No. 8:06-cv-03386-AW (D. Md.).  Both cases allege violations of federal law and seek to vindicate interests of District and Maryland residents.  While it is true the plaintiffs and some of the defendants in the case filed by Audubon Naturalist Society of the Central Atlantic States and others ("Audubon suit") are residents of Maryland, all plaintiffs and defendants in this action, which was filed first, are residents of the District of Columbia and this action raises issues of national significance that should be litigated in the District of Columbia.  As discussed below, no

should not be disturbed because Plaintiffs reside in the District, all Defendants reside in the

District, the convenience of the parties favors the District, and Plaintiffs seek to vindicate

national interests and the interests of their members throughout the Washington metropolitan

area including District residents.

### Standard for Determining Whether Transfer Is Appropriate

Section 1404(a) of Title 28 grants this Court discretion to adjudicate motions to transfer

according to an individualized, case-by-case consideration of convenience and fairness. Reiffin

v. Microsoft Corp., 104 F. Supp. 2d 48, 50 (D.D.C. 2000). To succeed on a motion to transfer,

the moving party bears the burden of showing that the transfer is necessary. Trout Unlimited v.

U.S. Dep't of Agric., 944 F. Supp. 13, 16 (D.D.C. 1996). This requires the moving party to

establish that the action could have been brought in the proposed transferee district,[11] DeLoach v.

Philip Morris Co., 132 F. Supp. 2d 22, 24 (D.D.C. 2000), and that the convenience of the parties

and witnesses and the interests of justice weigh heavily in the moving party's favor, Consol.

Metal Prods., Inc. v. Am. Petroleum Inst., 569 F. Supp. 773, 774 (D.D.C. 2000). USDOT

Defendants cannot meet this burden; indeed, these considerations weigh against transfer.

In deciding motions to transfer under § 1404(a), courts consider whether the transfer is

for the convenience of the parties and witnesses and in the interest of justice. 28 U.S.C. §

---

party in either action will be significantly inconvenienced by having to travel an additional
fifteen miles to litigate in another forum. The only inconvenience suffered by any party from a
transfer would be the serious inconvenience suffered by Plaintiffs Environmental Defense and
Sierra Club in having to obtain local counsel to pursue their claims in the District of Maryland.
See Pls.' Ex. A (Declaration of Michael A. Replogle, Transportation Director, Environmental
Defense).

[11] Plaintiffs concede that venue would be proper in Maryland under 28 U.S.C. § 1391(e).

1404(a).  To determine whether a transfer is for the "convenience of the parties," this Court

considers a number of private and public factors.  The private factors include:[12]

> (1) the plaintiff's choice of forum, unless the balance of convenience is strongly
> in favor of the defendant; (2) the defendant's choice of forum; (3) whether the
> claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of
> witnesses, but only to the extent that the witnesses may be unavailable for trial in
> one of the fora;  and (6) the ease of access to sources of proof.

Johnson v. Lumenos, --- F. Supp. 2d ---, No. 06-1270(RMU), 2007 WL 74483, at *2 (D.D.C.

Jan. 11, 2007); Onyeneho v. Allstate Ins. Co., 466 F. Supp. 2d 1, 3 (D.D.C. 2006); Reiffin, 104

F. Supp. 2d at 51-55.

     In deciding whether a transfer is in the "interest of justice," this Court considers a number

of public factors including:  (1) the transferee court's familiarity with the governing law; (2) the

relative congestion of the courts of the transferor and potential transferee;[13] and (3) the local

interest in deciding local controversies at home.  Onyeneho, 466 F. Supp. 2d at 3; Airport

Working Group of Orange County, Inc. v. U.S. Dep't of Def., 226 F. Supp. 2d 227, 229 (D.D.C.

2002).  Since the private and public factors weigh against transfer, the Court should retain

jurisdiction of the case.

---

[12] Plaintiffs agree with the government that there will be no witnesses to establish new facts
outside the administrative record relevant to the merits of the dispute and that, therefore, this
factor does not weigh in favor of transfer.  Defs.' Br. at 15.  Plaintiffs also agree that the location
of the administrative record is not a significant factor in deciding a motion to transfer and,
therefore, does not weigh in favor of transfer.  Air Line Pilots Ass'n v. E. Air Lines, 672 F. Supp.
525, 527 (D.D.C. 1987); Defs.' Br. at 15.

[13] Plaintiffs agree that the relative congestion of the dockets does not substantially impact the
determination of whether to transfer the case.  Onyeneho, 2006 WL 3411536 at *2.  Plaintiffs
note, however, that the weighted federal district court case filings per judge in Maryland (481)
were significantly higher than in the District (277).  FED. JUDICIAL CTR., 2003-2004 DISTRICT
COURT CASE-WEIGHTING STUDY app. Y tbl. 3, at 1 (2005). For whatever weight it has, this factor
weighs against transfer.

I.    **USDOT Defendants Have Not Met Their Heavy Burden to Establish that Transfer Is More Convenient for the Parties**

An evaluation of the private factors recognized in Johnson, 2007 WL 74483, at *2 (listing factors) establishes that transfer is not convenient for the parties.

A.    **Plaintiffs' Choice of Forum Should Not Be Disturbed.**

In order to succeed on their motion, USDOT Defendants have the "heavy burden" of establishing that Plaintiffs' choice of forum is inappropriate.  Shapiro, Lifschitz & Schram, P.C. v. Hazard, 24 F. Supp. 2d 66, 71 (D.D.C. 1998) (citing Pain v. United Techs. Corp., 637 F.2d 775, 783 (D.C. Cir. 1980)).  USDOT Defendants' burden is heavy because Plaintiffs' choice of forum is due substantial deference and, unless the balance of convenience is strongly in favor of the Defendants, should not be disturbed.  Int'l Painters and Allied Trades Indus. Pension Fund v. Tri-State Interiors, Inc., 357 F. Supp. 2d 54, 55 (D.D.C. 2004) (citing Int'l Bhd. Of Painters and Allied Trades Union v. Best Painting and Sandblasting Co., 621 F. Supp. 906, 907 (D.D.C. 1985)); see also Gross v. Owen, 221 F.2d 94, 95 (D.C. Cir. 1955).

USDOT Defendants argue that Plaintiffs' choice of forum should not be afforded substantial deference because Plaintiffs are *domiciled* outside the District.  USDOT Defendants misread the applicable case law to impose a higher threshold for granting deference than exists. In Deloach v. Philip Morris Cos., 132 F. Supp. 2d 22, 24-25 (D.D.C. 2000), this Court determined that a plaintiff's choice of forum receives less deference when the plaintiff "neither reside[s] in, nor ha[s] any substantial connection to, that forum."  As this Court is no doubt aware, domicile and residence are not synonyms under the law.  A corporation's residence is "[t]he place where a corporation or other enterprise does business or is registered to do business."  Black's Law Dictionary (8th ed. 2004); see 28 U.S.C. § 1391(c) (defining the

residence of a defendant corporation for purposes of venue as "any judicial district in which it is subject to personal jurisdiction").

Although USDOT Defendants are correct that Plaintiffs are national organizations with headquarters outside the nation's capital, both Plaintiffs have large corporate offices in Washington, D.C., where major portions of the work of the organizations are performed. Plaintiff Sierra Club has an office at 408 C St., N.E., Washington, D.C. 20002; Plaintiff Environmental Defense has an office at 1875 Connecticut Ave, NW, Suite 600, Washington, D.C. 2009. The numerous comments submitted by Plaintiffs in the administrative proceedings below that raise the issues being litigated here were developed in these Washington offices, by staff employed in these Washington offices.

Since Plaintiffs have offices and conduct business in the District, Plaintiffs reside in, and have substantial ties to, the District of Columbia. The Wilderness Soc'y v. Babbitt, 104 F. Supp. 2d 10, 14 (D.D.C. 2000) (noting that plaintiffs' offices in the District contributed to the nexus between the District and the case). Accordingly, Plaintiffs' choice of forum should be given substantial deference. Deloach, 132 F. Supp. 2d at 24; see also Reynolds Corp. v. Nat'l Operator Servs., Inc., 73 F. Supp. 2d 299, 306 (W.D.N.Y. 1999) (finding that "[A] plaintiff's choice of forum will not lightly be disturbed, especially where, as here, the plaintiff resides in the judicial district where the suit is filed.") (quotation omitted). Since Plaintiffs chose to litigate in their home forum, Plaintiffs' choice of forum should be accorded substantial deference and should not be disturbed. Int'l Painters & Allied Trades Indus. Pension Fund, 357 F. Supp. 2d at 55.

**B.    Defendants' Choice of Forum Merits Little Weight.**

Little weight should be given to USDOT Defendants' preference for litigating in Maryland. USDOT Defendants all officially reside in the District of Columbia, so their

preference for litigating outside of their home forum suggests forum-shopping.  Stewart v.
Capitol Area Permanent Medical Group, P.C., 720 F. Supp. 3 (D.D.C. 1989), suggests that
when a defendant seeks to transfer the case to a forum that is less convenient for it, an inference
of forum-shopping is proper.  See id. at 7; cf. Poole v. Brown, 706 F. Supp. 74, 76 (D.D.C. 1989)
("When the home forum has been chosen, it is reasonable to assume that this choice is
convenient.").  No inference of plaintiffs' forum-shopping is drawn when the case is filed in the
forum most convenient to the plaintiffs, such as here.  Stewart, 720 F. Supp. at 7; see Piper
Aircraft Co. v. Reyno, 454 U.S. 235, 255-56 (1981).  Indeed, this Court gives little weight to a
party's choice of forum when that choice is outside the party's home forum.  See Piper Aircraft,
454 U.S. at 255-56; Boers v. United States, 133 F. Supp. 2d 64, 65 (D.D.C. 2001); see also
McGlamry v. Lappin, No. 06-143(GK), 2006 WL 1382185, at *2 (D.D.C. May 18, 2006).  Since
the USDOT Defendants seek to litigate outside of their home forum, the Court should give little
to no consideration to USDOT Defendants' choice of forum.

Furthermore, the Court will note that the moving Defendants do not include the MPO.
The National Capital Transportation Planning Board and Metropolitan Washington Council of
Governments have not joined the motion to transfer.  USDOT Defendants make no claim that the
transfer would be more convenient for the MPO, or that justice would be better served if the
MPO were forced to defend its planning decisions outside the District where the MPO maintains
its offices and conducts its business.

### C.     Plaintiffs' Claims Arose in the District of Columbia.

Although the proposed ICC would be located in Maryland, as demonstrated above,
Plaintiffs' claims arose in the District of Columbia for three primary reasons.  First, the proposed
ICC was designed to address issues of concern to the District of Columbia as the nation's capital.

Mundy v. Weinberger, 554 F. Supp. 811 (D.D.C. 1982) (concluding plaintiff's claim arose in the District of Columbia because "plaintiff's grievance and the acts that gave rise to it are inextricably bound up with the District of Columbia in its role as the nation's capital" even though the defendants' "involvement in this suit may well have consisted primarily of decisionmaking in their Pentagon offices [in Virginia]").  Second, the proposed ICC would adversely affect residents of the District of Columbia.  Third, the relevant transportation planning, air quality, and funding decisions, as well as relevant project approvals, were made in the District of Columbia or by agencies headquartered in the District of Columbia which were, without doubt, involved in the ultimate decisions reached by the agency.[14]  See The Wilderness Soc'y, 104 F. Supp. 2d at 14 (concluding that the Secretary of Interior's decisions in the District of Columbia helped establish a "substantial connection" between the case and the forum

---

[14] USDOT Defendants assert that the FEIS and ROD decisions were made in Maryland.  USDOT Defendants, however, provide no evidence supporting this assertion or for the proposition that the Washington D.C. office of the FHWA was not involved in the decisionmaking process. Indeed, as demonstrated in the Index to the Administrative Record (provided to Plaintiffs by USDOT Defendants, but not yet filed any court), the Washington D.C. offices of the USDOT Defendants were intimately involved in the decisions regarding the proposed ICC.  The following non-exhaustive list of Washington D.C.-based USDOT Defendants' officers and staff, and their involvement in decisions and approvals related to the proposed ICC, demonstrates the extensive oversight of the proposed project by the USDOT Defendants' Washington D.C. headquarters offices: Susan Binder (discussing FHWA's response for a request for concurrence), Susan Hugel (discussing FHWA internal meeting), Gary Henderson (working on the air quality conformity determination), Sandra Jackson (same), Dan Johnson (drafting emails regarding the briefing of FWHA leadership on the proposed ICC in 2004 and helped prepare responses to comments submitted by Michael Replogle, Transportation Director of Environmental Defense), Cecilia Ho (helping to prepare responses to comments submitted by Michael Replogle), Robert Schlicht (detailing meetings with FHWA), Harlan Miller (helping to prepare a response to comments submitted by Earth Justice), Jessica Pilarski (preparing briefings for USDOT Defendants' headquarters prior to the issuance of the Record of Decision), Diane Mobley (helping to prepare the particulate matter hot spot analysis), Gary Jensen (same), April Marchese (same), Marlys Osterhues (discussing issues pertaining to the mobile source air toxics analysis), Veronica Davis (discussing the air quality monitors used in the air quality conformity analysis), and Benita Smith (detailing FHWA's ROD approval and concurrence).  In addition, the MPO, which is located solely in Washington D.C., approved the challenged transportation plans and programs.

sufficient to deny transfer).  Indeed, all of the MPO's decisions regarding the proposed ICC were

made in the District of Columbia.  Plaintiffs' claims arose in the District because they seek to

vindicate the interests of the nation's capital and District residents and because Defendants made

numerous decisions in the District giving rise to the final federal approval of the project.

      **D.**      **The Convenience of the Parties Weighs Against Transfer.**

The convenience of the parties requires that the Court not transfer the case to Maryland.

This Court has repeatedly held that the District of Maryland's proximity to the District of

Columbia minimizes any inconvenience for parties to appear in the District, especially when

transfer would move the case a mere fifteen miles.  See Kafack v. Promerica Life Ins. Co., 934 F.

Supp. 3, 7 (D.D.C. 1996); Liban v. Churchey Group II, L.L.C., 305 F. Supp. 2d 136, 142 (D.D.C.

2004).  USDOT Defendants have not, and indeed, cannot, demonstrate that they would suffer

any hardship from litigating in their home forum.  Kotan v. Pizza Outlet, Inc., 400 F. Supp. 2d

44, 50 (D.D.C. 2005) (requiring a showing of hardship to overcome the presumption in favor of

plaintiffs' chosen forum); Reiffen, 104 F. Supp. 2d at 53 (citing Oudes v. Block, 516 F. Supp.

13, 14 (D.D.C. 1981), for the proposition that any inconvenience or hardship to a party

occasioned by litigating in the party's home forum would be negligible or non-existent); see FC

Investment Group LC v. Lichtenstein, 441 F. Supp. 2d 3, 14 (D.D.C. 2006) ("Even if, as

Defendants contend, many of the wrongful acts did occur outside of the District of Columbia,

Defendants have not pointed to the existence of any factors that would cause them to experience

extreme hardship in accessing evidence if venue were not transferred.").  The relative distances

the parties must travel, therefore, do not weigh in favor of transfer.

Although the Plaintiffs would not suffer inconvenience by having to travel fifteen miles

to litigate their claims, the Court should retain the case because transfer would create a hardship

for Plaintiffs by requiring Plaintiffs to obtain local counsel in Maryland.  Plaintiffs' counsel are

not admitted to practice in Maryland.  Plaintiffs also investigated potential local counsel in

Maryland, and decided to file this case in the District because local counsel could not be

identified who would serve *pro bono*.  *See* Pls.' Ex. A (Declaration of Michael A. Replogle,

Transportation Director, Environmental Defense).  Being compelled to retain local counsel in

Maryland would certainly delay the proceedings, as Plaintiffs would need to search for new *pro*

*bono* counsel to pursue their claims given Plaintiffs' resource constraints as non-profit entities.

At worst, Plaintiffs might be forced to abandon their claims if the search for *pro bono* counsel

again proved unsuccessful.

Additionally, transfer would impose a hardship on existing *pro bono* counsel, who have

invested hundreds of hours mastering large portions of the administrative record in this complex

case, drafting and filing the complaint, and drafting substantive motions relying on this Court's

precedent.  See Montemayor v. Fed. Bureau of Prisons, No. Civ.A. 02-1283(GK), 2005 WL

3274508, at *6 (D.D.C. Aug. 25, 2005) (noting that the Court would not transfer the case

because, in part, the Court was reluctant to impose hardship on *pro bono* counsel); see also Platt

v. Minn. Mining & Mfg. Co., 376 U.S. 240, 244 (1964) (assuming, without deciding, that

location of counsel is a valid consideration in a motion to transfer).

Because attorneys for all parties are located in the District of Columbia, and USDOT

Defendants have failed to demonstrate that they will suffer any, let alone substantial,

inconvenience by a denial of a transfer, USDOT Defendants have not met their burden to

demonstrate the convenience of the parties weighs heavily in favor of transfer. Accordingly,

Plaintiffs' choice of forum should be accorded substantial deference and should not be disturbed.

II.     **USDOT Defendants Have Not Met Their Heavy Burden to Establish that Transfer Is in the Interests of Justice.**

An evaluation of the public factors recognized in <u>Onyeneho</u>, 466 F. Supp. 2d at 3 (listing factors) establishes that transfer is not in the interests of justice.

A.      **This Action Is the First-Filed Case Challenging the Proposed ICC.**

The Court should defer to Plaintiffs' choice of forum because the instant case was filed prior to the Audubon suit, and transfer out of the District of Columbia in anticipation of consolidation would be improper.

1.      **The Cases Are Not Sufficiently Similar to Warrant Transfer in Anticipation of Consolidation.**

Despite significant differences between this case and the Audubon suit, which involve different plaintiffs and defendants, USDOT Defendants disingenuously attempt to characterize the suits as "identical" in an attempt to justify transfer in anticipation of consolidation.  Defs.' Br. at 2, 8-9.  The cases are not sufficiently similar to warrant transfer in anticipation of consolidation.  In addition, the transfer statute is not intended to give Defendants the opportunity to transfer cases for the purpose of consolidation when the transfer would defeat the presumption in favor of Plaintiffs' choice of forum, cause serious hardship to Plaintiffs, and be contrary to the interests of justice.

USDOT Defendants argue the cases should be consolidated in the interests of judicial economy and to avoid inconsistent findings.  Defs.' Br. at 8-9.  While these may be appropriate considerations in determining whether consolidation is appropriate, this Court also considers countervailing factors, such as whether consolidation will result in confusion or prejudice.  <u>See Am. Postal Workers Union v. USPS</u>, 422 F. Supp. 2d 240, 245 (D.D.C. 2006).  In record review cases, the benefits of consolidation to judicial economy are minimal since few, if any,

18

depositions will be taken, and the parties will cite to, and provide the courts with, the relevant portions of the record.[15]

In this case, there would be minimal efficiency gains through consolidation of the two cases. First, the two cases involve different administrative records and decisions and rely on different portions of the record. Second, the overlap in the cases, to the extent such overlap exists, is minimal, given the number of claims raised, extent of the administrative record, and the factual differences in the claims raised by the parties. Finally, the claims relying on the same statute, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-70(f), depend on distinct factual bases, eliminating any risk of inconsistent findings. Instead, consolidation is likely to inject confusion that may prejudice one set of plaintiffs or the other. Accordingly, the benefits derived from consolidation of the cases are minimal, while the costs are great.

Plaintiffs' claims seek to prosecute violations of the CAA, Compl. at 76-102 (Counts 25-37), and vindicate the national transportation planning objectives articulated in SAFETEA-LU, Compl. at 56-61 (Counts 9-15).[16] These claims involve planning decisions and air quality conformity determinations, the administrative records for which do not relate to the Audubon suit. Plaintiffs' claims arising under 23 U.S.C. § 109(h), claims that are not raised in the Audubon suit, and NEPA, including Plaintiffs' allegations that the USDOT Defendants prepared an invalid purpose and need statement and conducted a faulty alternatives analysis, are designed to ensure that the national transportation planning objectives articulated in 23 U.S.C. § 134(a) are incorporated into transportation planning and project-level decisions. Compl. at 50-51, 53-55,

---

[15] In this case, the interests of private economy are also minimal because USDOT Defendants do not claim to suffer, and indeed would not suffer, hardship by litigating the cases in fora fifteen miles apart.

[16] Plaintiffs also allege a Freedom of Information Act, 5 U.S.C. § 552, violation, Compl. at 102-03 (Count 38), that does not overlap with the Audubon suit.

64-65 (Counts 2, 5-7, 18).  None of these claims overlaps with the claims in the Audubon suit.

USDOT Defendants also suggest Plaintiffs' NEPA claims relating to mitigation overlap with the mitigation claims in the Audubon suit.  Defs.' Br. at 7.  Plaintiffs' claims related to mitigation, as well as Plaintiffs' claims alleging that USDOT Defendants failed to consider environmental impacts of the proposed ICC, relate to the protection of human health and the environment from traffic-related air pollution.[17]  Compl. at 53, 65-69 (Counts 5, 19-20, 22). These claims are not mirrored in the Audubon suit, which focuses on "induced growth and development" as they relate to impacts on "streams, tributaries, and wetlands" and the failure of the defendants in that case to propose adequate mitigation to parklands protected under Section 4(f).  These claims rely on different portions of the administrative record and, therefore, there is no risk of inconsistent findings and judicial economy will not be served by consolidation.

Although Plaintiffs argue consolidation would be improper, this Court need not decide whether consolidation is proper at this time.  Indeed, if the Court denies the motion to transfer, USDOT Defendants have the option to move to transfer the Audubon suit to this Court in the hope of consolidating the two actions.  The plaintiffs in the Audubon suit would not suffer any significant inconvenience from litigating in this forum, and they would not be required to obtain new local counsel, since they are represented by counsel located in Washington D.C.  This Court should not rely on the existence of a separate case in another forum, which may or may not be

---

[17] The plaintiffs in the Audubon suit also allege that the defendants in that case violated NEPA by failing to describe the reasonable foreseeable impacts of growth on carbon monoxide air pollution.  See Audubon Compl. at 33-38 (Count 4).  This passing reference to carbon monoxide in a claim that primarily relates to impacts to aquatic resources, is not related to Plaintiffs' air pollution claims, which detail faulty analyses of mobile source air toxics, greenhouse gases, and particulate matter.  Even if this passing reference did create some factual overlap, it does not create a factual overlap sufficient to serve the interests of judicial economy.  Since there is no risk of inconsistent findings on this issue, the significant confusion that would be injected into the proceedings by consolidating the matters warrants denial of the motion to transfer in anticipation of consolidation.

consolidated with this action and which has only a minor overlap, if any, with Plaintiffs' thirty-eight count Complaint, to justify transfer when the convenience of all parties in both actions and the interests of justice demand that this case be heard in this Court. Certainly, there is no authority for the USDOT Defendants' contention that transfer should be granted to avoid overlap when the transfer would cause Plaintiffs significant hardship. See Pls.' Ex. A.

>    **2.    Assuming, *Arguendo*, There Are Overlapping Claims, the First-filed Rule Applies.**

Assuming, however, the two cases are sufficiently similar to warrant consolidation in some court, whether it is this Court or the District Court for the District of Maryland, the first-file rule gives some guidance as to where the case should be heard. The first-filed rule establishes that "[w]hen lawsuits involving the same controversy are filed in more than one jurisdiction, the general rule is that the court that first acquired jurisdiction has priority." Biochem Pharma, Inc. v. Emory Univ., 148 F. Supp. 2d 11, 13 (D.D.C. 2001); see Wash. Metro. Area Transit Auth. v. Ragonese, 617 F.2d 828, 830 (D.C. Cir. 1980) (quoting Speed Prods Co. v. Tinnerman, 171 F.2d 727, 729 (D.C. Cir. 1948)). Plaintiffs filed their Complaint before the plaintiffs in the Audubon suit, as evidenced by the Court's time stamp on the Complaint. See Smith v. US Investigations Servs., Inc., No. 04-0711(RMU), 2004 WL 2663143, at *3 (D.D.C. Nov. 11, 2004) (using time stamp to determine which filing was made first); Mead Corp. v. Stuart Hall Co., Inc., 679 F. Supp. 1446, 1453 n.1 (S.D. Ohio 1987) ("The file stamp date and time actually appearing on the complaint are . . . controlling.").

Although some courts, including this Circuit, have refused to mechanically apply the first-filed rule, Columbia Plaza Corp. v. Sec. Nat'l Bank, 525 F.2d 620, 628 (D.C. Cir. 1975) (refusing to apply the first-filed rule when equitable considerations warrant transfer), the first-filed case, nevertheless, has an advantage when it comes to balancing the interests of justice

under § 1404(a), especially when equitable considerations weigh against transfer, see, e.g., Manuel v. Convergys Corp., 430 F.3d 1132, 1135 (11th Cir. 2005) ("[T]here is a strong presumption across the federal circuits that favors the forum of the first-filed suit under the first-filed rule."); 800-Flowers, Inc. v. Intercontinental Florist, Inc., 860 F. Supp. 128 (S.D.N.Y. 1994).  Indeed, "[w]here identical actions are proceeding concurrently in two federal courts the first filed action is generally preferred in a choice-of-venue decision." Coady v. Ashcraft & Geral, 223 F.3d 1, 11 (1st Cir. 2000).  To overcome this presumption, the party objecting to jurisdiction in the first-filed forum must prove that "compelling circumstances" warrant an exception to the general rule.  Manuel, 430 F.3d at 1135.  Since this case was filed first, and USDOT Defendants' have not demonstrated the existence of compelling circumstances or that equitable consideration favor transfer, the Court should defer to Plaintiffs' choice of forum.

### B.    The District Court for the District of Columbia Is More Familiar with the Governing Law.

This Court considers the relative familiarity of the transferor and transferee courts with the applicable governing law, favoring courts located in the jurisdiction whose law will be applied.  Onyeneho, 466 F. Supp. 2d at 4.  There is no need to have a federal court thoroughly familiar and experienced in state law hear this case because there are no state law claims in either this case or in the Audubon suit.[18] Greater Yellowstone Coalition v. Bosworth, 180 F. Supp. 2d 124, 129 (D.D.C. 2001).  Instead, the action should remain with this Court because it has more experience hearing agency actions than the District Court for the District of Maryland and retaining jurisdiction in this Court would permit an appeal to be heard by the Court of Appeals for the District of Columbia Circuit.  See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def.

---

[18] Even if Maryland law did apply, its application "is not a significant hardship to a District of Columbia court, which traditionally looks to Maryland law if there is no District law on point." Stewart v. Capitol Area Permanente Med. Group, P.C., 720 F. Supp. 3, 7 n.5 (D.D.C. 1989).

Council, Inc., 435 U.S. 519, 535 n.14 (1978) ("Since the vast majority of challenges to administrative agency action are brought to the Court of Appeals for the District of Columbia Circuit, the decision of that court in this case will serve as precedent for many more proceedings for judicial review of agency actions than would a decision of another Court of Appeals."). Accordingly, this Court is the ideal forum to decide Plaintiffs' claims, and the Court should deny the motion to transfer.

      **C.**      **Plaintiffs' Claims Raise Issues of National Significance that Affect the Nation's Capital and District Residents.**

      USDOT Defendants attempt to make much of the Supreme Court's pronouncement that "there is a local interest in having localized controversies decided at home." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 509 (1947); Nat'l Wildlife Fed'n v. Harvey, 437 F. Supp. 2d 42, 49 (D.D.C. 2006). This factor should not outweigh Plaintiffs' choice of forum for three reasons: (1) this case involves issues of national significance that should be addressed on a national platform; (2) the policies underlying the local preference factor do not apply;[19] and (3) even if it did apply, the District of Columbia is local for purposes of this controversy.

      When issues of national importance are involved, this Court has recognized the need to resolve matters in this forum. The Wilderness Soc'y, 104 F. Supp. 2d at 17; see also Greater Yellowstone Coalition, 180 F. Supp. 2d at 129 ("The court determines that because both of the

---

[19] The purposes behind the "local" preference factor is to ensure that: (1) affected residents will remain apprised of the court's decisions, (2) the court most familiar with the applicable state law will interpret the applicable state laws, and (3) juries are selected from the locality in which the controversy arises. See Gulf Oil, 330 U.S. at 509 (noting the importance of having local jurisdictions resolving their own laws); Adams v. Bell, 711 F.2d 161, n.34 (D.C. Cir. 1983) (noting that the purpose is to keep informed); Poole, 706 F. Supp. 74, 75 (D.D.C. 1989) (noting the local interest in obtaining juries from the locality in which the controversy arose). None of the policy reasons underlying the local preference apply. There will be no trial or state law to apply and the proximity of the two districts and significant press coverage in both districts regarding the pending lawsuits will ensure that interested residents in both jurisdictions will be apprised of the Court's decisions.

plaintiffs' counts focus on interpretation of federal statutes, and because federal government

officials in the District of Columbia were involved in the decision . . .  this case has some

national significance and has a nexus to the District of Columbia.").  This case involves matters

of national significance and involves national conservation organizations.  See The Wilderness

Soc'y, 104 F. Supp. 2d at 17 (recognizing the national significance of the case given the presence

of national conservation organizations as parties).

      As noted above, the proposed ICC, a part of the National Highway System authorized

pursuant to Executive Order 13,274, affects the emergency preparedness of the nation's capital

and future federal transportation funding for the District.  The legal issues involved in the case

are also of national importance as they include litigation of questions of first impression relating

to national transportation and air quality objectives.  This case seeks to vindicate the national

transportation planning objectives established in SAFETEA-LU by challenging the

transportation planning decisions made by the MPO and USDOT Defendants under 23 U.S.C. §

134, and the project-level decisions that the proposed ICC is in the "best overall public interest"

under 23 U.S.C. § 109(h) even though it fails to accomplish the national transportation planning

objectives better than other alternatives in the record.  This case also raises important questions

of first impression arising under the Clean Air Act regarding USDOT Defendants' compliance

with requirements that projects be designed in a manner that enables metropolitan areas to

achieve the applicable NAAQS on the schedule established by Congress.  Each of these matters

are of national significance and should be resolved in this Court and this Circuit, where the

precedential value of the decision will provide the greatest likelihood of minimizing the need for

future litigation in other jurisdictions regarding the same issues.  Vt. Yankee, 435 U.S. at 535

n.14.  Vindication of Plaintiffs' claims will have national consequences for transportation project

analysis and planning: the proper implementation of the SAFETEA-LU planning objectives

includes minimizing transportation-related fuel consumption, which will enhance national energy

security and reduce our national contribution to global warming.

As the Supreme Court recognized in Vermont Yankee, the federal courts in the District of

Columbia Circuit hear more administrative agency challenges than any other court, and there is a

national value to establishing a uniform, national precedent that is widely applicable to similar

cases.  Vt. Yankee, 435 U.S. at 535 n.14.  Because a decision from this Court will be controlling

precedent for the Secretary of Transportation whenever she approves an MPO regional plan and

program, litigation of these claims will potentially avoid the need to relitigate these national

transportation planning issues in multiple fora.

This action is also of local significance to the District.  Determining whether a forum is a

"home" forum is not limited by jurisdictional boundaries.  Stewart, 720 F. Supp. at 5 ("State

lines are of crucial importance in making the proper choice of law, but are less important in

deciding which forum is more convenient to the parties and would best serve the interests of

justice.").  The study area of the proposed ICC is located only ten miles north of the boundary of

the District of Columbia.  This is much closer than the distance between other controversies and

the "home" fora in which they are litigated.  As demonstrated above, the purposes of the

proposed ICC include serving the transportation demand that begins or ends in the District of

Columbia, and the impacts of the proposed ICC will adversely affect residents in the District,

making it "local" for purposes of this controversy.[20]

---

[20] Indeed, other contexts suggest the minimal distance between Plaintiffs' chosen forum and the
proposed ICC right-of-way makes Plaintiffs' chosen forum an appropriate forum for determining
the controversy.  See United States v. Grinnell Corp., 384 U.S. 563, 575 (1966) (distinguishing a
local, individual station from a national central station because a local individual station serves
"only that area which is within a radius of 25 miles"); Am. Family Ass'n v. FCC, 365 F.3d 1156,

Because this case involves issues of national significance, issues of particular importance to the District of Columbia as the nation's capital, and the local interests of District residents affected by the proposed ICC, USDOT Defendants cannot establish that transfer is in the interests of justice.

## III.    The Balance of the Convenience of the Parties and the Interests of Justice Weighs Against Transfer

To prevail on their motion, USDOT Defendants must show that the convenience of the parties and witnesses and the interests of justice are sufficient to overcome the substantial deference to Plaintiffs' choice of forum. Consol. Metal Prods., Inc., 569 F. Supp. at 774. As demonstrated above, venue is proper in the District and preferable to resolve the issues of national significance in this case. Nevertheless, in deciding on a motion to transfer, this Court is not to determine which venue would be more appropriate, but to give substantial deference to Plaintiffs' choice of forum, disturbing it only if the weight of the factors heavily favors transfer. Pain, 637 F.2d at 783. USDOT Defendants have failed to meet this heavy burden. See Poole, 706 F. Supp. at 76 (recognizing that the presumption in favor of a plaintiff's choice of forum means that if the weight of the considerations are in equipoise, the plaintiff's forum should not be disturbed). In fact, the public factors, although considered to a lesser degree than the private factors, see Am. S.S. Owners Mutual Prot. and Indem. Ass'n, Inc. v. LaFarge No. Am., Inc., --- F. Supp. 2d ---, No. 06 Civ. 3123(CSH), 2007 WL 214408, at *6 (S.D.N.Y. Jan. 29, 2007), also weigh against transfer.

---

1164 (D.C. Cir. 2004) (defining "local" applicants as those within twenty-five miles of the community center to be serviced by a broadcast license); see also N.L.R.B. v. Int'l Longshoreman's Ass'n, AFL-CIO, 447 U.S. 490, 498 (1980) (defining a local port area as having a geographical radius of 50 miles); Nat'l Ass'n of Broadcasters v. Copyright Royalty Tribunal, 675 F.2d 367, 373 n.3 (D.C. Cir. 1982) (defining cable service within 100 miles as local).

This case is of national significance and should be resolved in the most national of fora, the District Court for the District of Columbia.  Accordingly, the motion should be denied.

## IV.    This Court Should Direct USDOT Defendants to File the Administrative Records.

USDOT Defendants have not met their heavy burden of showing that Plaintiffs' choice of forum should be disturbed.  Plaintiffs, therefore, request this Court to direct the USDOT Defendants to file a complete administrative record ("AR") relating to each of the USDOT Defendants' approvals and other decisions regarding the proposed ICC and the fiscally constrained long-range plans and metropolitan transportation improvement programs challenged by Plaintiffs.

Plaintiffs were initially informed by counsel for USDOT Defendants that the ARs would be filed before the end of January.  To date, USDOT Defendants have not filed the ARs in any court.  As a courtesy, days after this motion to transfer was filed, USDOT Defendants' counsel supplied Plaintiffs' counsel with a preliminary Index to the AR for the proposed ICC project-level decisions.  This Index does not appear to include documents related to the USDOT Defendants' findings, required by statute before federal funds can be allocated to the proposed ICC, regarding the metropolitan and state transportation plans and programs.

Section 706 of the Administrative Procedure Act calls on courts to "review the whole record or those parts of it cited by a party."  5 U.S.C. § 706.  In this pleading, Plaintiffs cite to documents in the preliminary Index to the project AR. These documents should be available to the Court.  Shortly, this Court will also be asked to pass upon Plaintiffs' motion for summary judgment challenging USDOT Defendants' approvals and decisions related to the revisions to the metropolitan transportation plans and programs that added the proposed ICC.  Accordingly, Plaintiffs respectfully request this Court to direct the USDOT Defendants to file with this Court

the ARs related to the challenged decisions.  Plaintiffs request that at least the Index to each AR

be filed with this Court shortly after the filing of Defendants' reply so that the ARs will be

available to the Court before this motion is decided.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request the Court to deny the motion to

transfer this case away from Plaintiffs' chosen forum and to grant Plaintiffs' cross-motion to

direct the USDOT Defendants to file the applicable administrative records with this Court in

time to allow it an opportunity to consult the AR before deciding this motion.

DATED:        March 5, 2007                          Respectfully submitted,


  /s/  Hope Babcock                                   
Hope Babcock, Director
      (Fed/D.C. Bar No. 14639)
Erik Bluemel, Staff Attorney
      (D.C. Bar No.501869)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C.  20001
Phone: 202-662-9535
Fax: 202-662-9634

Robert E. Yuhnke
      (C.O. Bar No. 012686)
Robert E. Yuhnke & Associates
2910 Country Road 67
Boulder, CO  80303
Phone: 303-499-0425

*Counsel for Plaintiffs*
*Environmental Defense and Sierra Club*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, March 5, 2007, I caused to be served a true and correct copy of the foregoing Plaintiffs' Response in Opposition to the Motion to Transfer and Cross-Motion to Direct the USDOT Defendants to file the Administrative Records, Memorandum in Support, Proposed Order, and Exhibit by filing through this Court's electronic filing system and by direct electronic transmission on:

Cynthia J. Morris                           Attorney for Defendants United States
C.J.Morris@usdoj.gov                        Department of Transportation, Mary Peters,
                                            Federal Highway Administration, and J.
                                            Richard Capka

Margaret N. Strand                          Attorney for Defendants Metropolitan
mstrand@venable.com                         Washington Council of Governments, Jay
                                            Fisette, National Capital Region
                                            Transportation Planning Board, and Michael
                                            Knapp

and by direct electronic transmission on:

Wells Burgess
Wells.Burgess@usdoj.gov

Laura Maroldy
Laura.Maroldy@usdoj.gov

Rachel Dougan
Rachel.Dougan@usdoj.gov

Scott J. Jordan                             Attorneys for Defendants United States
Scott.Jordan@usdoj.gov                      Department of Transportation, Mary Peters,
                                            Federal Highway Administration, and J.
                                            Richard Capka


                                            _/s/ Erik B. Bluemel_____
                                            Erik B. Bluemel

<table>
<tr><td>

Pls.' Ex. A

</td></tr>
</table>

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

_____

ENVIRONMENTAL DEFENSE and )
SIERRA CLUB, INC., )

    **Plaintiffs,**

        **v.**

UNITED STATES DEPARTMENT OF
TRANSPORTATION, ET AL.,

**Defendants.**
_____)

        **No. 06-2176 (GK)**

### DECLARATION OF MICHAEL A. REPLOGLE

    Michael A. Replogle declares as follows:

1. I am an employee of Environmental Defense (formerly known as 'Environmental Defense Fund'), and have been an employee since 1992.  My position at Environmental Defense is Transportation Director.  Through that position, and through prior transportation planning employment before I began work at Environmental Defense, I am familiar with the transportation planning process, and have responsibility for developing the transportation policies and programs of Environmental Defense.

2. In this capacity, I was responsible for reviewing the ICC project as it developed, and preparing and supervising the development of alternatives to the proposed ICC in conjunction with the support and technical assistance of the expert consulting firm Smart Mobility, Inc. that were submitted to FHWA and the State of Maryland for consideration as part of the public process for evaluating alternatives pursuant to the National Environmental Policy Act.

3.  In this capacity, I also developed and submitted comments to the Transportation Planning Board for the National Capitol Region opposing the approval of the ICC.

4.  In this capacity, I reviewed the final transportation and air pollution computer modeling analyses used by the State, FHWA, and The Transportation Planning Board to evaluate the air quality impacts of the project, and its expected impact on performance of the regional transportation system.

5.  Based on the issues raised in comments, and the agency responses to these comments, I recommended to the board of Environmental Defense that judicial review of the approvals of the ICC project by the State, FHWA and Transportation Planning Board be pursued because of failures to comply with various statutory obligations.

6.  In preparing this recommendation to the Board, it was also my responsibility as Transportation Director to identify and recommend the retainer by Environmental Defense of qualified counsel.

7.  The litigation team I recommended includes Robert E. Yuhnke who is a nationally recognized expert in transportation and Clean Air Act litigation, but who is not admitted to practice in the Maryland or District of Columbia District Courts.

8.  In the search for local counsel, I investigated candidates who would be available to represent Environmental Defense in either Maryland or the District of Columbia.

9.  After contacting a number of attorneys admitted to practice in Maryland, I could not find counsel who were available to commit the time required to prosecute this case, and who would be willing to represent Environmental Defense on a *pro bono* basis, or at deeply discounted rates that would allow this case to be prosecuted within the severe limitations of the Transportation Program's budget.

10. I was able to find *pro bono* representation in the District of Columbia from the Institute for Public Representation at the Georgetown School of Law. These attorneys are not admitted to practice in Maryland.

11. Based upon the availability of affordable representation in the District of Columbia, the board approved the filing of this case in the District of Columbia.

12. If the case is transferred to Maryland, I am not aware of counsel who will be available to provide representation in this major, complex litigation of national importance.

13. If we cannot find local counsel in Maryland who is willing to provide representation on a *pro bono* basis, or at deeply discounted rates that will allow this case to be funded through the Transportation Program budget, Environmental Defense will need to reconsider whether resources are available to seek protection for the interests of its members now ably represented by local counsel at the Institute for Public Representation.

14. I submit this declaration for the purpose of explaining to the Court the importance of current representation in making it possible to bring this litigation, and the potential that these claims might need to abandoned for budget reasons if the case is transferred to the District of Maryland.

  Further declarant sayeth not.

  Pursuant to 28 USC 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 3d day of March, 2007.

_____
Michael A. Replogle

APPENDIX 1: CURRICULA VITAE

## MICHAEL REPLOGLE
## SUMMARY OF EXPERIENCE

Michael Replogle has since 1992 been the Washington, DC-based transportation director of Environmental Defense, a leading nonprofit organization representing more than 400,000 members.  He is a prolific author and researcher and a recognized expert on transportation law and policy, travel behavior, travel forecasting, and impact analysis, and strategies to reduce traffic and pollution through market incentives, smart growth, marketing and accountability.

Replogle is a member of the Blue Ribbon Panel of the National Surface Transportation Policy and Revenue Study Commission chaired by the US Secretary of Transportation, and in that capacity is advising the Secretary and Congress on federal transportation policy.

He has been a frequent witness before U.S. Senate and House Committees on transportation and environmental issues and advised numerous federal and state agencies, local officials, business groups, and civic organizations. In that capacity, he has played a significant role in shaping the development and application of U.S. federal laws and regulations related to metropolitan transportation and air quality planning.

Mr. Replogle has worked extensively in metropolitan areas including Washington, DC, Baltimore, New York, Atlanta, Denver, Chicago, Portland, Oregon, to improve the state-of-the-practice in transportation modeling and promote mobility and economic development while reducing forecast traffic growth, pollution, and other adverse impacts to communities. He is a leading advocate for linking road pricing with transit-supportive smart growth strategies. He has advised the Governor of Maryland and the Mayor of the District of Columbia on transit oriented development strategies.  He has advised the New York Thruway Authority and state DOTs in Colorado, Maryland, Virginia, DC, and various metro area agencies considering HOT lanes and other value pricing strategies. He has served as an expert witness in a number of important legal cases involving transportation, air quality, induced impacts, and environmental quality. Mr. Replogle was a founding member of the US Department of Transportation's Travel Model Improvement Program Review Panel, on which he served for several years in the mid-1990s. He was for several years very active in ITS America's environmental and social impacts committee.

Replogle has long served as President of the New York based Institute for Transportation and Development Policy, a group he founded in 1984 that encourages bus rapid transit, non-motorized transportation, brownfields redevelopment, and transportation pricing reform in various cities in Latin America, Asia, Africa, and Eastern Europe. With ITDP he has worked or consulted on projects in Nicaragua, Haiti, Mozambique, and Bangladesh. Most recently, he has worked with ITDP to advise governors, mayors, and senior government officials in Indonesia and Mexico on traffic management, travel modeling, and enhancing transportation system performance.

Author of hundreds of reports and articles on transportation policy and planning, Replogle has been a consultant to the U.S. Federal Highway Administration, the World Bank, and US Environmental Protection Agency.

From 1983-92, he served as transportation coordinator for the Maryland National Capital Parks and Planning Commission, directing travel forecasting, Montgomery County growth management, corridor analysis, and comprehensive planning studies. From 1979-82 he was a research associate with Public Technology, the technical arm of National League of Cities, where he documented best practices in public transportation and urban planning.

In 1978 he served as a commissioned officer with the U.S. Public Health Service, Indian Health Service, overseeing construction and development of water systems in northeastern Arizona on the Navajo Indian Reservation.

Mr. Replogle holds M.S.E. and B.S.E. cum laude Civil and Urban Engineering degrees and a B.A. cum laude degree in Sociology, all from the University of Pennsylvania.

In 2005, Mr. Replogle was elected as an *emeritus* member of the Transportation Research Board Committee on Transportation Planning for Developing Countries in recognition of his long service in helping to establish and develop TRB's work in this arena. For a decade, he served as a member of the Committee on Bicycling and Bicycle Facilities. Mr. Replogle is a founding member of the TRB Transportation Pricing Committee and the Task Force for Advancing Activity-Based Models into Practice. Replogle was appointed to membership in the TRB Committee for the Study of Impacts of Highway Capacity Improvements on Air Quality and Energy Consumption in 1993-95, which produced TRB Special Report 245.

Mr. Replogle serves on the boards of several non-profit organizations, the Bikestation Coalition, based in Long Beach, California, and a group dedicated to public education about traffic and pollution, Clean Air and Transportation.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                )
ENVIRONMENTAL DEFENSE and                        )
SIERRA CLUB, Inc.,                               )
                                                )
                    Plaintiffs,                  )
                                                )
                                                )
v.                                               )          Civil Action No.
                                                )          06-2176(GK)
UNITED STATES DEPARTMENT OF                       )
TRANSPORTATION, et al.,                          )
                                                )
                    Defendants.                  )
                                                )
_____)

**[PROPOSED] ORDER**

The motion of the United States Department of Transportation, Mary Peters, Federal

Highway Administration, and J. Richard Capka ("USDOT Defendants") to transfer the instant

case to the United States District Court for the District of Maryland is DENIED.

The motion of Environmental Defense and the Sierra Club to have this Court direct the

USDOT Defendants to file the administrative record in this Court is GRANTED.

The USDOT Defendants are ordered to file their administrative record relating to

approvals and other decisions regarding the proposed Intercounty Connector and the fiscally

constrained long-range plans and metropolitan transportation improvement programs in this

Court no later than _____, 2007.


Dated: March _____, 2007                    _____
                                            The Honorable Gladys Kessler, District Judge
                                                District Judge for the United States
                                                District Court for the District of Columbia