## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE and SIERRA CLUB, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF TRANSPORTATION, et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 06-2176(GK) |

## PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO
## MPO DEFENDANTS' AND USDOT DEFENDANTS' MOTIONS TO DISMISS

Environmental Defense and the Sierra Club ("Plaintiffs") file this response in opposition to the motion of Metropolitan Washington Council of Governments, Vincent C. Gray, National Capital Region Transportation Planning Board, and Catherine Hudgins (collectively, "MPO Defendants") to dismiss Plaintiffs' claims against them. Plaintiffs also file this response in opposition to the motion of United States Department of Transportation, Mary Peters, Federal Highway Administration, and J. Richard Capka (collectively, "USDOT Defendants") to dismiss Plaintiffs' claims under 23 U.S.C. § 134 against them.

The points and authorities supporting this response are set forth in the accompanying Memorandum of Points and Authorities in Support of Plaintiffs' Opposition.

DATED:     May 8, 2007                        Respectfully submitted,

                                                   _/s/  Hope Babcock_____
                                                   Hope Babcock, Director
                                                        (Fed/D.C. Bar No. 14639)

Erik Bluemel, Staff Attorney
        (D.C. Bar No.501869)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C.  20001
Phone: 202-662-9535
Fax: 202-662-9634

Robert E. Yuhnke
        (C.O. Bar No. 012686)
Robert E. Yuhnke & Associates
2910 Country Road 67
Boulder, CO  80303
Phone: 303-499-0425

*Counsel for Plaintiffs*
*Environmental Defense and Sierra Club*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

ENVIRONMENTAL DEFENSE and ) 
SIERRA CLUB, Inc., )
)
Plaintiffs, )
)
)
v. )      Civil Action No.
)      06-2176(GK)
UNITED STATES DEPARTMENT OF )
TRANSPORTATION, et al., )
)
Defendants. )
)
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## PLAINTIFFS' CONSOLIDATED OPPOSITION TO
## MPO DEFENDANTS' AND USDOT DEFENDANTS' MOTIONS TO DISMISS

Metropolitan Washington Council of Governments, Vincent C. Gray, National Capital

Region Transportation Planning Board, and Catherine Hudgins (collectively, "MPO

Defendants") ask this Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss

Plaintiffs' claims against them.  United States Department of Transportation, Mary Peters,

Federal Highway Administration, and J. Richard Capka (collectively, "USDOT Defendants") ask

this Court, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss

Plaintiffs' claims under 23 U.S.C. § 134 against them.  Plaintiffs Environmental Defense and

Sierra Club (collectively, "Plaintiffs") hereby file this consolidated opposition to the motions.

# Table of Contents

Table of Contents .................................................................................................. i

Table of Authorities ............................................................................................ iii

Table of Abbreviations ....................................................................................... ix

Introduction ......................................................................................................... 1

Statutory Background .......................................................................................... 1

Standard of Review ............................................................................................. 5

Summary of Argument ........................................................................................ 6

Argument .............................................................................................................. 8

I.      Plaintiffs' Claims Against MPO Defendants Are Actionable as a Private Right of Action
        Under § 134 or Under the APA. ................................................................. 8

   A.   Plaintiffs Have a Private Right of Action Under § 134 to Enforce MPO Defendants'
        Duties. ....................................................................................................... 9

      1.   Section 134 Was Passed to Protect Plaintiffs and Their Members. ......................... 10

      2.   Congress Intended to Provide a Private Remedy to Vindicate Plaintiffs' Interests.  11

      3.   A Private Remedy Furthers the Statutory Purposes of Section 134. ....................... 13

      4.   Transportation Planning Is Not a Traditional State Concern. .................................. 14

   B.   Judicial Review of MPO Defendants' Actions Is Available Under the APA Because
        MPO Defendants Are Federal Agencies. ................................................. 15

      1.   MPO Defendants Are Federal Agencies for Purposes of the APA. .......................... 15

      2.   In the Alternative, Judicial Review Is Available Under the APA Because MPO
           Defendants Are Quasi-Federal Agencies. ............................................................ 17

   C.   Public Policy Requires Federal Judicial Review of the MPO Defendants' Violations of
        Federal Law. ............................................................................................ 22

II.     The Statute Imposes Judicially Enforceable Nondiscretionary Duties on the MPO and
        USDOT Defendants. ................................................................................. 24

   A.   Section 134(c) Imposes Judicially Enforceable Nondiscretionary Duties to Plan to
        Accomplish the Objectives in § 134(a). .................................................. 24

   B.   The Preclusion of Judicial Review in § 134(h)(2) Does Not Extend Beyond Claims
        Alleging a Failure to Consider the Factors Listed in § 134(h)(1). .............. 29

   C.   Section 134(c)(1) Invokes Duties that Are More Specific Than, and Distinct from, the
        General Duty to Consider Various Planning Factors. ............................... 33

   D.   Section 134(a)(1) Invokes Objectives That Are More Specific than, and Distinct from,
        the Planning Factors in Section 134(h)(1). .............................................. 36

III.   Plaintiffs' Major Investment Study Count States a Claim Upon Which Relief Can Be
       Granted...................................................................................................................... 41

    A.   TEA-21 Did Not Eliminate the MIS Requirement. ....................................................... 44

    B.   The MIS Regulation Is Consistent with TEA-21............................................................ 46

    C.   The Agency Statements on Which MPO Defendants Rely Are Void as Inconsistent
         with Existing Regulations. ........................................................................................... 48

IV.    Plaintiffs' Count 37 States a Claim Upon Which Relief Can Be Granted....................... 50

Conclusion ...................................................................................................................... 55

# Table of Authorities

## Federal Cases

AT&T Corp. v. Federal Communications Commission, 448 F.3d 426 (D.C. Cir. 2006)..............49

Abbott Labs. v. Gardner, 387 U.S. 136 (1967)........................................................................22

Alcorn v. Wolfe, 827 F. Supp. 47 (D.D.C. 1993).....................................................................23

Allandale Neighborhood Association v. Austin Transport Study Policy Advisory
    Committee, 840 F.2d 258 (5th Cir. 1988).........................................................................9

Allied Painting, Inc. v. Del. River Port Authority, No. Civ. A. 04-1032, 2005 WL.
    724107 (E.D. Pa. Mar. 29, 2005).....................................................................................19

American Bar Association v. Federal Trade Commission, 430 F.3d 457 (D.C. Cir. 2005) ..........32

American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106 (D.C. Cir.
    1993) ...........................................................................................................................50, 52

America Trucking Association v. Del. River Joint Toll Bridge Commission, 458 F.3d
    291 (3d Cir. 2006)...........................................................................................................19

Armstrong v. Bush, 924 F.2d 282 (D.C. Cir. 1991) ...............................................................16

Barlow v. Collins, 397 U.S. 159 (1970) .................................................................................13

Beebe v. Wash. Metropolitan Area Transit Authority, 129 F.3d 1283 (D.C. Cir. 1997) .............23

Bennett v. Spear, 520 U.S. 154 (1997) ..................................................................................25

Berman v. Parker, 348 U.S. 26 (1954).....................................................................................19

Bowen v. Mich. Academy of Family Physicians, 476 U.S. 667 (1986)..................................15, 24

*Buckingham Twp. v. Wykle, 157 F. Supp. 2d 457 (E.D. Pa. 2001)...............................21, 27, 46

C. I. R. v. Standard Life & Acc. Insurance Co., 433 U.S. 148 (1977) ........................................47

COMSAT Corp. v. Federal Communications Commission, 114 F.3d 223 (D.C. Cir.
    1997) ........................................................................................................................12, 32

C.T. Hellmuth & Associates, Inc. v. Wash. Metropolitan Area Transit Authority, 414 F.
    Supp. 408 (D. Md. 1976) ................................................................................................23

Califano v. Sanders, 430 U.S. 99 (1977) ...............................................................................22

California v. Sierra Club, 451 U.S. 287 (1981) ......................................................................10

Cannon v. University of Chicago, 441 U.S. 677 (1979)........................................................12, 13

Cellco Partnership v. Federal Communications Commission, 357 F.3d 88 (D.C. Cir.
    2004) ..............................................................................................................................37

Christensen v. Harris County, 529 U.S. 576 (2000) ...........................................................49, 52

Citizens to Preservation Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) ...............................35

Clairton Sportsmen's Club v. Pa. Turnpike Commission, 882 F. Supp. 455 (W.D. Pa.
    1995) ..........................................................................................................................4, 45

Clifton v. Schafer, 969 F.2d 278 (7th Cir. 1992)....................................................................35

Coalition for Safe Transit Inc. v. Bi-State Dev't Agency, 778 F. Supp. 464 (E.D. Mo.
    1991) ..............................................................................................................................19

Concourse Rehabilitation & Nursing Ctr. Inc. v. Wing, 150 F.3d 185 (2d. Cir. 1998)................35

Concourse Rehabilitation & Nursing Ctr. v. Whalen, 249 F.3d 136 (2d Cir. 2001) ....................29

Conley v. Gibson, 355 U.S. 41 (1957)......................................................................................6

Cort v. Ash, 422 U.S. 66 (1975) ............................................................................................10

Cuyler v. Adams, 449 U.S. 433 (1981) ..................................................................................18

Edwards v. District of Columbia, 821 F.2d 651 (D.C. Cir. 1987)..............................................11

Elcon Enterprises, Inc. v. Wash. Metropolitan Area Transit Authority, 977 F.2d 1472
  (D.C. Cir. 1992) ........................................................................................................17, 19
Environmental Defense Fund v. EPA., 167 F.3d 641 (D.C. Cir. 1999) ..................................52, 53
Fl. Audubon Society v. Bentsen, 94 F.3d 658 (D.C. Cir. 1996) ....................................................8
Fri v. Sierra Club, 412 U.S. 541 (1973) ...................................................................................26
Georgia v. Pa. R.R. Co., 324 U.S. 439 (1945) ..........................................................................47
Government of Guam v. America President Lines, 28 F.3d 142 (D.C. Cir. 1994) ......................10
Guardians Association v. Civil Service Com'n of City of New York, 463 U.S. 582 (1983) .........14
Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation Inc., 484 U.S. 49 (1987) ..............32
Hazardous Waste Treatment Council v. Environmental Prot. Agency, 886 F.2d 355 (D.C.
  Cir. 1989) ...........................................................................................................................34, 38
Heard Communications, Inc. v. Bi-State Dev't Agency, 18 Fed. Appx. 438 (8th Cir.
  2001) (unpublished) ...........................................................................................................19, 20
Henson v. W.H.H. Trice & Co., 466 F. Supp. 2d 187 (D.D.C. 2006) ...........................................5
Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30 (1994) ................................................14
Hubbard v. U.S. Environmental Protection Agency Administrator, 809 F.2d 1 (D.C. Cir.
  1986) .....................................................................................................................................14
Immigration & Naturalization Serv. v. St. Cyr, 533 U.S. 289 (2001) .........................................25
Independent Bankers Association of America v. National Credit Union Admin., 936 F.
  Supp. 605 (W.D. Wis. 1996) ..................................................................................................16
Independent Petroleum Association of America v. Babbitt, 92 F.3d 1248 (D.C. Cir.
  1996) .....................................................................................................................................50
Johnson v. Quander, 440 F.3d 489 (D.C. Cir. 2006) ...................................................................25
Kansas City Area Transport Authority v. State of Missouri, 640 F.2d 173 (8th Cir. 1981) ..........23
Karahalios v. National Federation of Federal Employees, Local 1263, 489 U.S. 527
  (1989) .....................................................................................................................................10
KiSKA Construction Corp.-U.S.A. v. Wash. Metropolitan Area Transit Authority, 167
  F.3d 608 (D.C. Cir. 1999) .......................................................................................................23
Kramer v. New Castle Area Transit Authority, 677 F.2d 308 (3d Cir. 1982) ..............................14
Krieger v. Fadely, 211 F.3d 134 (D.C. Cir. 2000) .......................................................................6
*Lampkin v. District of Columbia, 27 F.3d 605 (D.C. Cir. 1994) .........................................25, 35
Lundeen v. Mineta, 291 F.3d 300 (5th Cir. 2002) ........................................................................9
Mallett v. Wis. Division of Vocational Rehabilitation, 130 F.3d 1245 (7th Cir. 1997) ...............28
McKinney v. Caldera, 141 F. Supp. 2d 25 (D.D.C. 2001) ...........................................................16
Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353 (1982) ............................12
Meyer v. Bush, 981 F.2d 1288 (D.C. Cir. 1993) .........................................................................16
Miller by Miller v. Whitburn, 10 F.3d 1315 (7th Cir. 1993) ......................................................34
Mistick PBT v. Chao, 440 F.3d 503 (D.C. Cir. 2006) .................................................................35
Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance
  Co., 463 U.S. 29 (1983) .........................................................................................................35
National Treasury Employees Union v. Campbell, 654 F.2d 784 (D.C. Cir. 1981) ......................14
National Wildlife Federation v. Gorsuch, 693 F.2d 156 (D.C. Cir. 1982) ..................................26
Nathan v. Wash. Metropolitan Area Transit Authority, , 653 F. Supp. 247 (D.D.C. 1986) ..........16
Newcome v. Esrey, 862 F.2d 1099 (4th Cir. 1988) .......................................................................9
Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207 (1986) ........................................................32
Orengo Caraballo v. Reich, 11 F.3d 186 (D.C. Cir. 1993) .........................................................49

Otis Elevator Co. v. Wash. Metropolitan Area Transit Authority, 432 F. Supp. 1089
(D.D.C. 1976) ...................................................................................................................19
Paralyzed Veterans of America v. D.C. Arena, 117 F.3d 579 (D.C. Cir. 1997)............................50
Pennhurst State Sch. & Hospital v. Halderman, 451 U.S. 1 (1981) ..............................................35
Riverkeeper, Inc. v. Environmental Prot. Agency, 358 F.3d 174 (2d Cir. 2004) ..........................38
*Seal & Co., Inc. v. Wash. Metropolitan Area Transit Authority, 768 F. Supp. 1150
(E.D. Va. 1991) ...................................................................................................19, 20, 21
In re Sealed Case, 237 F.3d 657 (D.C. Cir. 2001) .........................................................................49
Sec'y of Labor v. Twentymile Coal Co., 411 F.3d 256 (D.C. Cir. 2005) ......................................49
Shalala v. Guernsey Mem. Hospital, 514 U.S. 87 (1995).............................................................50
Sierra Club v. Ruckelshaus, 344 F. Supp. 253 (D.D.C. 1972), aff'd per curiam, 4 E.R.C.
1815 (D.C. Cir. 1972), aff'd by an equally divided court, sub nom...................................26, 38
Sierra Club v. Slater, 120 F.3d 623 (6th Cir. 1997).......................................................................46
Simpson v. United States, 435 U.S. 6 (1978) .................................................................................37
Smith v. Doe, 538 U.S. 84 (2003).....................................................................................................25
So. Pac. Transport Co. v. I.C.C., 69 F.3d 583 (D.C. Cir. 1995) ..................................................25
Sparrow v. United Air Lines, Inc., 216 F.3d 1111 (D.C. Cir. 2000) ................................................6
State ex rel. Dyer v. Sims, 341 U.S. 22 (1951)...............................................................................23
U.S. Steel Corp. v. Multistate Tax Commission, 434 U.S. 452 (1978).........................................18
Steenholdt v. Federal Aviation Admin., 314 F.3d 633 (D.C. Cir. 2003)......................................26
Sw. Williamson County Community Association v. Slater, 173 F.3d 1033 (6th Cir. 1999).........27
Sylvia's Haven, Inc. v. Mass. Dev't Finance Agency, 397 F. Supp. 2d 202 (D. Mass.
2005) .................................................................................................................................35
Telecommunications Research & Action Ctr. v. Federal Communications Commission,
836 F.2d 1349 (D.C. Cir. 1988) .........................................................................................37
*The Bootery, Inc. v. Wash. Metropolitan Area Transit Authority, 326 F. Supp. 794
(D.D.C. 1970) ...............................................................................................................17, 19
Thompson v. Department of State, 400 F. Supp. 2d 1 (D.D.C. 2005)...........................................16
Trout Unlimited v. Department of Ag., 320 F. Supp. 2d 1090 (D. Colo. 2004)...........................38
Trudeau v. Federal Trade Commission, 456 F.3d 178 (D.C. Cir. 2006) ......................................14
Twp. of Belleville v. Federal Transit Admin., 30 F. Supp. 2d 782 (D.N.J. 1998) ...................8, 46
U.S. Telecom Association v. Federal Communications Commission, 227 F.3d 450 (D.C.
Cir. 2000) ..........................................................................................................................38
Udall v. Tallman, 380 U.S. 1 (1965)...............................................................................................49
United States v. Perry, 360 F.3d 519 (6th Cir. 2004) ....................................................................37
*Wachovia Bank and Trust Co., N.A. v. National Student Marketing Corp., 650 F.2d 342
(D.C. Cir. 1980) .....................................................................................................12, 13, 14
Wash. Research Project, Inc. v. Department of Health, Education & Welfare, 504 F.2d
238 (D.C. Cir. 1974) ..........................................................................................................16
Wash. State Department of Transport v. Wash. National Gas Co., Pacificorp, 59 F.3d 793
(9th Cir. 1995)....................................................................................................................18
Whitman v. America Trucking Ass'ns, 531 U.S. 457 (2001) .........................................................32
*Wilder v. Va. Hospital Association, 496 U.S. 498 (1990)......................................................34, 35
Worthington Compressors v. Costle, 662 F.2d 45 (D.C. Cir. 1981) .............................................13

## Federal Statutes

5 U.S.C. § 551(1) ....................................................................................................................16
5 U.S.C. § 552(f) ....................................................................................................................16
5 U.S.C. § 701(b) ................................................................................................................7, 15
16 U.S.C. § 839b(a)(2)(A) ......................................................................................................22
23 U.S.C. § 104(f) ..............................................................................................................2, 15
*23 U.S.C. § 134 ............................................................................................................. passim
*23 U.S.C. § 134(a)(1) .................................................................................................... passim
23 U.S.C. § 134(a) (1992)..............................................................................................3, 33. 41
23 U.S.C. § 134(b)(4) (1991) ..................................................................................................18
*23 U.S.C. § 134(c) ........................................................................................................ passim
*23 U.S.C. § 134(c)(1) .................................................................................................... passim
23 U.S.C. § 134(c)(3) ..........................................................................................................4, 29
23 U.S.C. § 134(d)(2) (1992) ..........................................................................................3, 18, 22
23 U.S.C. § 134(f)(1) (1999) ...................................................................................................36
23 U.S.C. § 134(f) (1991) ...........................................................................................3, 10, 13
23 U.S.C. § 134(f)(2) ..................................................................................................18, 20, 22
23 U.S.C. § 134(g)(3) ..........................................................................................................4, 29
23 U.S.C. § 134(i)(2) ..............................................................................................................16
23 U.S.C. § 134(i)(2)(D) ..........................................................................................................39
23 U.S.C. § 134(i)(3) ...............................................................................................................39
23 U.S.C. § 134(i)(5) .................................................................................................................3
23 U.S.C. § 134(i)(5)(A) ..........................................................................................................41
23 U.S.C. § 134(j)(3)(A) ..........................................................................................................16
23 U.S.C. § 134(j)(3)(C) .....................................................................................................28, 42
23 U.S.C. § 134(k)(5) ..............................................................................................................21
23 U.S.C. § 134(p) ...................................................................................................................12
23 U.S.C. § 135(g)(6) ..............................................................................................................21
23 U.S.C. § 135(g)(7) ..........................................................................................................6, 21
33 U.S.C. §§ 1251-1376 ............................................................................................................3
33 U.S.C. § 1342 .......................................................................................................................3
42 U.S.C. §§ 7401-7661 ............................................................................................................3
42 U.S.C. § 7410(c) ...................................................................................................................3
*42 U.S.C. 7506(c)(1) ..................................................................................................... passim
42 U.S.C. § 9607 .....................................................................................................................19

## Public Laws

Federal-Aid Highway Act of 1962, Pub. L. No. 87-866, § 9, 76 Stat. 1145, 1148 ........................1
Federal-Aid Highway Act of 1973, Pub. L. No. 93-87, § 112, 87 Stat. 250 ...................................2
Intermodal Surface Transportation Efficiency Act of 1991, § 1024, Pub. L. No. 102-240,
    105 Stat. 1914, 1957 ....................................................................................................3, 19
Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users,
    Pub. L. No. 109-59, § 6001(a), 119 Stat. 1839 (2005) .............................................................4

Susquehanna River Basin Compact, Pub. L. No. 91-575, § 2(l), 84 Stat. 1509 (Dec. 24, 1970) ..................................................................................................................................22
The District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-128, 87 Stat. 777 (Dec. 24, 1973)......................................................................1, 17
Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, § 1308, 112 Stat. 107 (1998) ......................................................................................................9, 43, 45, 48

## Federal Regulations

23 C.F.R. § 450.104 ..................................................................................................................42
23 C.F.R. § 450.210(a)(4) (1994) ............................................................................................29
23 C.F.R. § 450.216(a)................................................................................................................54
23 C.F.R. § 450.218(a)(4) ..........................................................................................................54
23 C.F.R. § 450.222(a)................................................................................................................16
23 C.F.R. § 450.316(a)..................................................................................................................4
23 C.F.R. § 450.316(a) (Mar. 16, 2007) ..................................................................................11
23 C.F.R. § 450.316(a)(1)(vii) (Mar. 16, 2007)........................................................................11
23 C.F.R. § 450.316(a)(2)............................................................................................................26
23 C.F.R. § 450.316(a) (Mar. 16, 2007) ..................................................................................10
23 C.F.R. § 450.316(b)..................................................................................................................9
23 C.F.R. § 450.316(b)(1)(vi)..............................................................................................11, 41
*23 C.F.R. § 450.318 ..................................................................................................... passim
*23 C.F.R. §§ 450.318(a) ............................................................................................. passim
23 C.F.R. § 450.318(b)................................................................................................................55
23 C.F.R. § 450.318(c)..........................................................................................................26, 42
23 C.F.R. § 450.318(f)................................................................................................................44
23 C.F.R. § 450.318(g)................................................................................................................54
23 C.F.R. § 450.322 ..............................................................................................................4, 42
23 C.F.R. § 450.322(b)(7)........................................................................................................5, 42
23 C.F.R. § 450.322(b)(9)............................................................................................................26
23 C.F.R. § 450.324(d)................................................................................................................28
23 C.F.R. § 450.324(f)................................................................................................................28
23 C.F.R. § 450.324(f)(2)............................................................................................................42
23 C.F.R. § 450.324(n)(1)............................................................................................................34
40 C.F.R. Part 51 ........................................................................................................................54
40 C.F.R. § 51.454 (1994) ..........................................................................................................54

## Legislative History

H.R. Conf. Rep. 102-404, 1991 U.S.C.C.A.N. 1679 ........................................................27, 28, 40
S. Rep. 101-228, 1990 U.S.C.C.A.N. 3385 ................................................................................11
S. Rep. 106-47 (1999)................................................................................................................45
S. Rep. 109-53 (Apr. 6, 2005)....................................................................................................37
H.R. Rep. 91-1554, 1970 U.S.C.C.A.N. 5392 ........................................................................18, 21
H.R. Rep. 101-490 (1990)............................................................................................................11
H.R. Rep. 105-831 (1998)............................................................................................................45

H.R. Rep. 102-171, 1991 U.S.C.C.A.N. 1526 ............................................................11, 13, 27, 37
136 Cong. Rec. 36,103 (1990) .....................................................................................52, 53
144 Cong. Rec. S1217 (Mar. 3, 1998) ..................................................................................11
144 Cong. Rec. S1665 (daily ed. Mar. 10, 1998) ..................................................................10
144 Cong. Rec. S1723 (daily ed. Mar. 11, 1998) ............................................................10, 45
144 Cong. Rec. S1821 (Mar. 12, 1998) ................................................................................11
144 Cong. Rec. S2002 (daily ed. Mar. 16, 1998) ..................................................................45
144 Cong. Rec. S6399 (June 16, 1998) .................................................................................12
144 Cong. Rec. H1888 (daily ed. Apr. 1, 1998) ....................................................................45
144 Cong. Rec. H1913 (daily ed. Apr. 1, 1998) ....................................................................45
144 Cong. Rec. H10,479 (daily ed. Oct. 10, 1998) ...............................................................45

## Federal Register Notices

58 Fed. Reg. 58,056 (Oct. 28, 1993) ...........................................................................42, 47, 54
58 Fed. Reg. 62,189 (Nov. 24, 1993) ....................................................................................52
67 Fed. Reg. 50,504 (Aug. 2, 2002) ......................................................................................45
67 Fed. Reg. 59,219 (Sept. 20, 2002) ..............................................................................45, 48
71 Fed. Reg. 12,468 (Mar. 10, 2006) ..............................................................................52, 53
72 Fed. Reg. 7224 (Feb. 14, 2007) .......................................................................................43

## State Statutes

D.C. Code § 2-510 ................................................................................................................23
Md. Code § 10-125 ...............................................................................................................23
Va. Code § 2.2-4026 .............................................................................................................23

## Other Authorities

Message from the President Transmitting Reorganization Plan No. 1 of 1966, 31 Fed.
    Reg. 11,857 (Sept. 8, 1966), reprinted in 80 Stat. 1611 (1966) ....................................2, 18, 21
Cass Sunstein, Reviewing Agency Inaction After Heckler v. Chaney, 52 U. CHI. L. REV.
    653, 655-56 (1985) ..........................................................................................................24
David M. Bearden and Linda G. Luther, Cong. Res. Serv., Environmental Streamlining
    Provisions in the Transportation Equity Act for the 21st Century: Status of
    Implementation 4 (May 30, 2003), http://www.ncseonline.org/nle/crsreports/03Jun/
    RS20841.pdf. ..................................................................................................................45
Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ..........................................................25
Oxford English Dictionary Am. Ed. (1996) .........................................................................32, 38

**Table of Abbreviations**

| | |
|---|---|
| APA - | Administrative Procedure Act |
| CLR Plan - | Constrained Long-Range Plan |
| EPA - | Environmental Protection Agency |
| FHWA - | Federal Highway Administration |
| ICC - | Intercounty Connector |
| ISTEA - | Intermodal Surface Transportation Efficiency Act of 1991 |
| Metropolitan TIP - | Metropolitan Transportation Improvement Program |
| MIS - | Major Investment Study |
| MPO - | Metropolitan Planning Organization |
| MPO Defendants - | Metropolitan Washington Council of Governments, Vincent C. Gray, National Capital Region Transportation Planning Board, and Catherine Hudgins |
| NEPA - | National Environmental Policy Act |
| Plaintiffs - | Environmental Defense and Sierra Club |
| SAFETEA-LU - | Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users |
| State TIP - | State Transportation Improvement Program |
| TEA-21- | Transportation Equity Act for the 21st Century |
| TPB - | National Capital Region Transportation Planning Board |
| USDOT - | United States Department of Transportation |
| USDOT Defendants - | United States Department of Transportation, Mary Peters, Federal Highway Administration, and J. Richard Capka |
| WMATA - | Washington Metropolitan Area Transit Authority |

## Introduction

On March 8, 2007, MPO Defendants filed a motion to dismiss Plaintiffs' claims against MPO Defendants. On March 15, 2007, Plaintiffs filed a motion to stay the briefing on the motion to dismiss pending preliminary discovery regarding the federal character of MPO Defendants. On March 22, 2007, this Court granted Plaintiffs' motion to stay and set a deadline of May 3, 2007, for Plaintiffs to file their opposition. On April 27, 2007, USDOT Defendants filed a motion to dismiss Plaintiffs' claims under 23 U.S.C. § 134. Plaintiffs sought, and received, permission from this Court to file a consolidated response to the two motions in this Consolidated Opposition by May 8, 2007. Plaintiffs now file their Consolidated Opposition.

## Statutory Background

Prior to 1962, the United States Bureau of Public Roads reviewed projects included in transportation programs submitted by the states, but there was no metropolitan transportation planning process that provided a forum for integrating the interests of central cities, growing suburbs, and states with the interest of the federal government in promoting connectivity among states and regions. In 1962, Congress for the first time mandated, and set aside funds for, metropolitan transportation planning when it added § 134 to Title 23 of the United States Code. Federal-Aid Highway Act of 1962, Pub. L. No. 87-866, § 9, 76 Stat. 1145, 1148. Section 134 directed the Secretary of the United States Department of Transportation ("USDOT") to develop long-range plans and programs for metropolitan areas in cooperation with state and local governments. Id.

In 1965, Maryland, Virginia, and the United States[1] created the National Capital Region

---

[1] Prior to the "Home Rule Act," The District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-128, 87 Stat. 777 (Dec. 24, 1973), the United States directly

Transportation Planning Board ("TPB")[2] to provide a forum where the intergovernmental cooperation required by § 134 could occur for the National Capital Region, which includes the District of Columbia, Montgomery and Prince George's Counties in Maryland, and portions of Northern Virginia. <u>See</u> General Memorandum of Agreement, Ex. 2.[3] Despite the creation of the TPB, the Secretary retained the ultimate statutory responsibility for adopting a plan to accomplish the transportation objectives established by § 134. At that time, the statute did not impose mandatory duties on metropolitan planning organizations ("MPOs") like the TPB.

In 1973, Congress added § 104(f) to Title 23, which provided that "funds apportioned to any State under paragraph (2) of this subsection shall be made available by the State to the metropolitan planning organizations designated by the State as being responsible for carrying out the provisions of section 134 of this title." Federal-Aid Highway Act of 1973, § 112, Pub. L. No. 93-87, 87 Stat. 250, 257. In 1974-75, Maryland, Virginia, and the United States designated the TPB as the MPO for the metropolitan Washington region. Ex. 3 (Maryland Designation); Ex. 4 (District of Columbia Designation); Ex. 5 (Virginia designation). Although designated MPOs were "responsible" for ensuring local cooperation in transportation planning under § 134, the Secretary of Transportation continued to retain transportation planning responsibilities for metropolitan areas until the statute was amended again in 1991.

In 1991, Congress for the first time fully delegated to MPOs the metropolitan

---

governed the District. The Mayor of the District of Columbia acted as a representative of the United States government in managing the affairs of the District. <u>See</u> CONST., art. I § 8, cl. 17.
[2] The TPB became associated with the Metropolitan Washington Council of Governments in 1966. Ex. 1. During this same year, the President acknowledged that the TPB took over some transportation planning responsibilities of the National Capital Regional Planning Council, a federal agency. Message from the President Transmitting Reorganization Plan No. 1 of 1966, 31 Fed. Reg. 11,857 (Sept. 8, 1966), <u>reprinted in</u> 80 Stat. 1611 (1966).
[3] MPO Defendants produced all exhibits cited in this brief pursuant to this Court's order permitting Plaintiffs to seek preliminary discovery.

transportation planning responsibilities formerly performed by the Secretary in the Intermodal

Surface Transportation Efficiency Act of 1991 ("ISTEA"), § 1024, Pub. L. No. 102-240, 105

Stat. 1914, 1957.  To ensure that MPOs would plan to accomplish the objectives Congress

sought to achieve with the investment of federal funds, Congress amended § 134 to impose

specific performance criteria for the development of constrained long-range plans ("CLR Plans")

and metropolitan transportation improvement programs ("Metropolitan TIPs") by MPOs.  23

U.S.C. § 134(a) (1992).  But more than merely exhorting MPOs to strive for the statutory

objectives, Congress required that MPOs develop transportation plans and programs in order to

accomplish the § 134 objectives.  Id.  Compare id. with 23 U.S.C. § 134(a) (1975).  Congress

also directed MPOs to consider 15 planning factors when "developing transportation plans and

programs."  23 U.S.C. § 134(f) (1991).

        The 1991 amendment delegated to MPOs what had previously been federal transportation

planning responsibilities and stripped the Secretary of her authority to plan the transportation

system for metropolitan areas, leaving her only an oversight role in metropolitan transportation

planning processes.[4]  Id. § 134(i)(5).  Congress recognized that this shift in power could have

federalism implications, so along with its delegation of decisionmaking authority, Congress

provided its consent to states to create interstate compacts and interstate agencies to fulfill the

requirements of § 134.  Id. § 134(d)(2).  This delegation of federal planning authority to

metropolitan entities created, empowered, and approved under federal law[5] has remained

---

[4] This delegation of federal planning authority is complete and is unlike the cooperative
federalism balance established under the Clean Air Act, 42 U.S.C. §§ 7401-7661, or Clean Water
Act, 33 U.S.C. §§ 1251-1376, under which statutes the federal government retains authority to
regulate activities affecting air or water quality when a state is unable or unwilling to do so.  42
U.S.C. § 7410(c); 33 U.S.C. § 1342.
[5] MPOs must be designated in accordance with the standards established by § 134(b) (1991)
(now § 134(d)).

substantially unchanged since the 1991 amendments.

In 2005, Congress re-enacted the planning objectives in § 134(a) and moved the "to accomplish" requirement to subsection (c). Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"),[6] Pub. L. No. 109-59, § 6001(a), 119 Stat. 1839 (2005). SAFETEA-LU also requires the MPO to give "due consideration" to related local and state planning activities to ensure that the CLR Plan and Metropolitan TIP is truly cooperative, as required by § 134(c)(3). 23 U.S.C. § 134(g)(3).

In implementing its delegated authority, MPOs are required to plan to accomplish the objectives to "serve the mobility needs of people and freight and foster economic growth and development within and between States and urbanized areas, while minimizing transportation-related fuel consumption and air pollution."[7] 23 U.S.C. §§ 134(a)(1); 23 C.F.R. §§ 450.316, 450.322; see Clairton Sportsmen's Club v. Pa. Tpk. Comm'n, 882 F. Supp. 455, 478 (W.D. Pa. 1995) ("ISTEA was enacted to reduce fuel consumption and air pollution and to encourage an 'intermodal transportation system'—that is, one based on travel by means other than cars carrying one person.").

To ensure that a major transportation project furthers the MPO's ability to plan to accomplish the § 134(a)(1) objectives, USDOT implemented regulations in 1993 that were specific to major transportation projects. These regulations, which were in effect at all relevant times in this litigation, required the MPO to demonstrate how a major investment study ("MIS"), which analyzes the ability of major transportation projects to effectively and cost-effectively achieve the § 134(a)(1) objectives, 23 C.F.R. §§ 450.318(a), (c), affected its decision to add

---

[6] The obligations described in this section, unless otherwise specified, applied to all actions taken by MPO Defendants related to the proposed ICC and the CLR Plans and Metropolitan TIPs containing the proposed ICC.

[7] Unless otherwise indicated, the statutes and regulations cited in this brief are from 2006.

major projects to the CLR Plan and Metropolitan TIP.  This analysis ensures that the CLR Plan reflects "a multimodal evaluation of the transportation, socioeconomic, environmental, and financial impact of the overall plan, including all major transportation investments in accordance with Sec. 450.318."  23 C.F.R. § 450.322(b)(7).

### Intercounty Connector and the Planning Process

On November 17, 2004, MPO Defendants added the proposed Intercounty Connector ("ICC") to the National Capital Region CLR Plan and Metropolitan TIP.  When MPO Defendants added the proposed ICC to the CLR Plan and Metropolitan TIP, they did not demonstrate how any evaluation of alternatives in an MIS, environmental impact statement, or other planning analysis affected their decisions regarding the proposed ICC, nor did they evaluate how the proposed ICC affected the ability of the CLR Plan or the Metropolitan TIP to accomplish the statutory objectives established in § 134(a).

In 2005, MPO Defendants updated the CLR Plan and Metropolitan TIP to identify additional funding sources to cover the expanded costs of the proposed ICC.  In this revision and subsequent CLR Plans and Metropolitan TIPs containing the proposed ICC, MPO Defendants repeated the failures described above.  On January 27, 2006, USDOT Defendants approved the state transportation improvement program ("State TIP"), determining that both the State TIP and Metropolitan TIP were consistent with the requirements of 23 U.S.C. §§ 134 and 135.  Plaintiffs allege that adding the proposed ICC to the CLR Plan and Metropolitan TIP will not promote the objectives in § 134(a), while other alternatives will promote them.

### Standard of Review

A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Henson v.

W.H.H. Trice & Co., 466 F. Supp. 2d 187, 191 (D.D.C. 2006) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). "[T]he factual allegations of the complaint must be presumed true and liberally construed in favor of the plaintiff." Id. at 191. Complaints "need not plead law or match facts to every element of a legal theory," Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1115 (D.C. Cir. 2000), but need only "allege[ ] the essential elements of [a] claim and put the government on notice . . . to survive a motion to dismiss." Krieger v. Fadely, 211 F.3d 134, 136-37 (D.C. Cir. 2000).

### Summary of Argument

Plaintiffs allege that the proposed ICC will undermine the statutory objectives in § 134(a) by substantially increasing transportation-related fuel consumption and air pollution, reducing user mobility by increasing vehicle miles traveled and vehicle hours delay, and undermining local planning efforts to ensure balanced regional economic development and growth, as compared to alternatives in the record. Plaintiffs allege that MPO Defendants violated § 134(c), and the implementing statutory provisions and regulations, by failing to demonstrate how: (1) adding the proposed ICC to the CLR Plan and Metropolitan TIP in 2004 and revising the CLR Plan and Metropolitan TIP in 2005 to add further funding for the proposed ICC will accomplish the statutory transportation objectives established in § 134(a)(1); and (2) any MIS supported the MPO Defendants' decision to add the proposed ICC to the CLR Plan and Metropolitan TIP. Plaintiffs allege that USDOT Defendants violated § 135(g)(7) when they concluded that the metropolitan planning process, through which the CLR Plan and Metropolitan TIP containing the proposed ICC were developed, complied with the requirements of 23 U.S.C. § 134.[8] MPO Defendants and USDOT Defendants have failed to meet their burden to demonstrate "beyond

---

[8] As USDOT Defendants correctly identify, USDOT Defs.' Br. at 7 n.5, Plaintiffs' claims under § 135(g)(7) depend on this Court concluding that MPO Defendants violated § 134.

doubt" that no set of facts would entitle Plaintiffs to relief.

Defendants' mandatory duties are sufficiently specific to allow judicial enforcement, and Plaintiffs' claims are actionable under § 134 as a private right of action, or under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, because either the MPO is a federal agency or has sufficient ties to the federal government to constitute a quasi-federal agency, thereby triggering APA review of its actions. Moreover, the limited preclusion of judicial review under § 134(h)(2) does not preclude judicial review of Plaintiffs' claims under § 134(c) because MPO Defendants' duty to design a CLR Plan and Metropolitan TIP to accomplish the national objectives under § 134(c)(1) is distinct from, and more specific than, their obligation to consider general planning factors listed in § 134(h)(1) in relation to projects and strategies.

This is a case of first impression that will determine whether interstate MPOs may be held to account under federal law for adopting transportation plans and programs that do not accomplish the four national transportation planning objectives in § 134(a)(1), in violation of § 134(c)(1). Similarly, this is a case of first impression that will determine whether USDOT Defendants may be held to account for their approval of metropolitan planning processes, CLR Plans, and Metropolitan TIPs that do not meet the requirements of § 134. This case raises important public policy concerns because, if MPO Defendants and USDOT Defendants are correct, their actions as interstate and federal agencies implementing § 134 would not be reviewable in any court, state or federal. Public policy does not support this outcome, as it would enable states to circumvent judicial review of their federally delegated planning functions simply by shifting planning responsibilities to an interstate entity.

Plaintiffs' claim that MPO Defendants failed to demonstrate how an MIS affected their decision to add the proposed ICC to the CLR Plan and Metropolitan TIP also states a claim upon

which relief can be granted.  The TEA-21 amendments did not eliminate the MIS requirement.

Rather, the MIS regulation remained in effect at the time the MPO added the proposed ICC to

the CLR Plan and Metropolitan TIP and was consistent with the TEA-21 amendments until

revised in 2007.  MPO Defendants' reliance on administrative guidance that claims otherwise is

inconsistent with the 1993 MIS regulation and unlawful.

Further, Plaintiffs' claim that MPO Defendants violated § 7506(c)(1) states a claim upon

which relief can be granted.  The Clean Air Act provides, in no uncertain terms, that an MPO

may not approve a project that does not conform to a state implementation plan.  The plain

language of the Act requires that project-level conformity determinations occur prior to MPO

approval of the project by adding it to the CLR Plan and Metropolitan TIP.

**Argument**

I.    **Plaintiffs' Claims Against MPO Defendants Are Actionable as a Private Right of Action Under § 134 or Under the APA.**

Plaintiffs' claims against MPO Defendants are actionable either as a private right of

action under § 134 or under the APA.  See, e.g., Fl. Audubon Soc'y v. Bentsen, 94 F.3d 658, 665

(D.C. Cir. 1996) (recognizing that when a statute does not provide a private right of action, "a

private individual must found his right to sue on some other basis").  MPO Defendants

acknowledge that the lack of a private right of action does not preclude judicial review.  MPO

Defs.' Br. at 15 n.18 ("Where the statute itself supports no express or implied right of action,

claims may be brought against federal agencies under the APA.").  Indeed, "[d]etermining that

no private right of action exists under ISTEA is considerably different from concluding that

plaintiff is unable to obtain judicial review under the APA."  Twp. of Belleville v. Fed. Transit

Admin., 30 F. Supp. 2d 782, 794 n.7 (D.N.J. 1998).  Public policy requires recognition of

Plaintiffs' claims seeking to enforce § 134 either as a private right of action or under the APA

8

because without federal review of MPO Defendants' actions, Plaintiffs' would have no remedy

for MPO Defendants' violations of federal law.

### A. Plaintiffs Have a Private Right of Action Under § 134 to Enforce MPO Defendants' Duties.

Plaintiffs have an implied private right of action to enforce MPO Defendants' mandatory

duties under 23 U.S.C. § 134(c) and its implementing regulations.[9]  An implied private right of

action analysis is a section-by-section analysis.  Newcome v. Esrey, 862 F.2d 1099, 1102 n.7

(4th Cir. 1988).  The question of whether there is a private right of action under § 134 is a

question of first impression for this Court.  This Court should permit Plaintiffs, who represent

members whose mobility and health will be impaired by MPO Defendants' violations of federal

law, to enforce MPO Defendants' mandatory duties.

MPO Defendants cite a number of cases pre-dating the Transportation Equity Act for the

21st Century ("1998 TEA-21 amendments"),[10] Pub. L. No. 105-178, § 1308, 112 Stat. 107

(1998), and other post-1998 cases relying on that pre-TEA-21 case law,[11] for their argument that

---

[9] USDOT Defendants do not suggest that Plaintiffs' claims do not lie against them under the APA, except insofar as they argue that review of such claims is precluded by § 134(h) and that § 134(a)(1) provides no meaningful standard of review.  USDOT Defs.' Br. at 17-20.  USDOT Defendants' arguments mirror those of MPO Defendants on the private right of action issue.

[10] MPO Defendants cite Allandale Neighborhood Ass'n v. Austin Transp. Study Policy Advisory Comm., 840 F.2d 258, 259, 265-67 (5th Cir. 1988), and its progeny for the argument that no private right exists under § 134.  Allandale, however, is wholly inapposite because it pre-dated the 1991 amendments that imposed specific duties on MPOs.

[11] MPO Defendants also cite Lundeen v. Mineta, 291 F.3d 300, 312 (5th Cir. 2002).  The Fifth Circuit in Lundeen concluded that a provision under a separate chapter of Title 23, see 291 F.3d at 309 (noting that if Congress "had wanted a putative, judicially reviewable, bicycle-safety criterion to cover federal-aid highways, Congress would have placed such a provision in . . . Chapter 1 (entitled 'Federal-Aid Highways')"), did not create an implied private right of action because Lundeen, by not briefing the private right of action issue, failed to carry his burden.  Id. at 312.  Aside from being distinguishable because it did not reach the ultimate question of law, this analysis does not comport with Supreme Court precedent, which requires courts to consider "right- or duty-creating language" as "the most accurate indicator of the propriety of implication of a cause of action."  Cannon v. Univ. of Chicago, 441 U.S. 677, 690 n.13 (1979).

no private right of action exists under § 134.  MPO Defs.' Br. at 11-12.  None of the cases cited by MPO Defendants relates to claims arising under § 134(c), and no case cited by MPO Defendants addresses the impact of the 1998 TEA-21 amendments on the implied private right of action analysis regarding sections other than § 134(f) (now § 134(h)).

The Supreme Court established four factors to determine whether a court can imply a private right of action from a statutory scheme silent on the issue of judicial enforceability.  Cort v. Ash, 422 U.S. 66, 78 (1975).  The ultimate question is whether Congress intended to create a private right of action.  California v. Sierra Club, 451 U.S. 287, 293 (1981) (quotations and citations omitted); Gov't of Guam v. Am. President Lines, 28 F.3d 142, 145 (D.C. Cir. 1994) (quoting Karahalios v. Nat'l Fed'n of Fed. Employees, Local 1263, 489 U.S. 527, 532-33 (1989)).  An evaluation of the four Cort factors demonstrates that Plaintiffs have a private right of action to enforce MPO Defendants' mandatory duties under § 134(c) and its regulations.

## 1.    Section 134 Was Passed to Protect Plaintiffs and Their Members.

Plaintiffs meet the first Cort test because they fall within "the class for whose especial benefit the statute was enacted."  Cort, 422 U.S. at 78 (internal quotation omitted).  The purposes of § 134 are to "serve the mobility needs of people and freight and foster economic growth and development within and between States and urbanized areas, while minimizing transportation-related fuel consumption and air pollution."  23 U.S.C. § 134(a).  Plaintiffs seek to vindicate the mobility and health needs of those the statute was specifically designed to protect.

Proponents of the 1998 TEA-21 amendments recognized that the statute was designed to promote mobility for "active seniors who can no longer drive," disabled individuals with limited mobility, and "lower income Americans who have no other alternative to reach their jobs."  144 CONG. REC. S1665, S1667 (daily ed. Mar. 10, 1998) (Sen. Sarbanes); 144 CONG. REC. S1723,

S1739 (daily ed. Mar. 11, 1998) (Sen. Daschle); see 23 C.F.R. § 450.316(a)(1)(vii) (Mar. 16,

2007) (requiring MPO Defendants to consider the needs of low-income and minority households

who face challenges accessing employment and other services); 23 C.F.R. § 450.316(b)(1)(vi)

(requiring MPO Defendants to consider the needs of low-income and minority households); see

also 23 C.F.R. § 450.316(a) (Mar. 16, 2007) (requiring MPO Defendants to ensure that

representatives of users of public transportation and the disabled are involved in the planning

process).  The 1998 TEA-21 amendments were also designed to assist employees with no viable

commuting alternatives to transit.  144 CONG. REC. S1217, S1219 (Mar. 3, 1998) (Sen.

Wellstone) ("[People in urban areas are saying] jobs are not available in our ghettos and

boroughs.  They are available in some of the suburbs, but people cannot get out to them.  A lot of

poor people do not own cars.  And a lot of people rely on the public transportation."); 144 CONG.

REC. S1821, S1847 (Mar. 12, 1998) (Sen. Moynihan); see also 23 C.F.R. § 450.316(b)(1)(vi).

Plaintiffs also seek to protect the mobility and health interests of sensitive populations

adversely affected by transportation-related air pollution.  Congress recognized that highways

contribute to air pollution, ISTEA H.R. REP. 102-171 pt. I, at 8-9, 1991 U.S.C.C.A.N. 1526,

1534, and that air pollution from motor vehicles harms the health of sensitive populations,

including asthmatics and children, S. REP. 101-228, 1990 U.S.C.C.A.N. 3385, 3392-95; H.R.

Rep. 101-490, pt. I (1990).  Accordingly, by designing ISTEA to protect the public from the

adverse effects of air pollution, Congress intended to protect sensitive populations, including

those populations represented by Plaintiffs in this action.

### 2.  Congress Intended to Provide a Private Remedy to Vindicate Plaintiffs' Interests.

The second test, which is given the greatest weight, Edwards v. District of Columbia, 821

F.2d 651, 654 n.4 (D.C. Cir. 1987), looks to legislative intent to imply or deny a private remedy.

11

"The quest . . . is not necessarily for evidence that Congress specifically intended to imply a private right of action, but rather for indications whether Congress meant to deny such a remedy."  Wachovia Bank and Trust Co., N.A. v. Nat'l Student Mktg. Corp., 650 F.2d 342, 352 (D.C. Cir. 1980).

When Congress enacts new legislation adopting language from a prior version, the *in pari materia* rule of statutory construction presumes that Congress is aware of existing case law and acts to amend or codify that case law.  Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 382 n.66 (1982); Cannon v. Univ. of Chicago, 441 U.S. 677, 696-97 (1979).  Courts prior to 1998, although not addressing claims under § 134(c), concluded, in broad, sweeping terms that no private right of action existed under § 134.  See MPO Defs.' Br. at 12-13.  Even prior to the 1998 TEA-21 amendments, this Circuit construed narrow preclusions of judicial review to imply the right to enforce the remainder of the statute.  COMSAT Corp. v. Fed. Communications Comm'n, 114 F.3d 223, 226 (D.C. Cir. 1997).  Against this judicial background, Congress enacted a limited preclusion of judicial review under § 134.

If Congress wanted to preclude judicial review altogether, it could have done so easily in the 1998 TEA-21 amendments, or it could have remained silent on the issue, leaving the existing case law intact.[12]  It did neither.  Instead, it precluded judicial review of an MPO's failure to consider whether a project or strategy will promote various general planning factors.  Applying the *in pari materia* canon of statutory construction, suggests, then, Congress's enactment of §

---

[12] Indeed, Congress was aware of its ability to preclude judicial review entirely and did so with respect to claims arising under NEPA.  23 U.S.C. § 134(p).  USDOT Defendants argue that § 134 establishes a "quasi-legislative" metropolitan planning process to ensure that public input exists and that such public participation supports their argument that Congress intended ex ante public participation to be the only check on MPO compliance with § 134.  However, the existence of notice and comment does not preclude judicial review of an agency's substantive actions.  See, e.g., APA, 5 U.S.C. § 701-06.

134(f) (now § 134(h)) evinced its intent to limit the preclusion of judicial review implied by the pre-1998 case law.  This limitation to the preclusion of judicial review constructed by the courts suggests Congress's intent that the remainder of § 134 be enforceable by suit, including claims arising under § 134(c), such as Plaintiffs' claims.  Enabling enforcement of § 134(c) through the courts vindicates the congressional intent that the planning process be "designed to achieve" the objectives of § 134(a)(1).  See H.R. REP. 102-171 pt. I, at 25, 1991 U.S.C.C.A.N. 1526, 1551 (noting that the transportation planning process for developing CLR Plans and Metropolitan TIPs "is designed to achieve the … objectives of the Federal surface transportation program").

Where congressional intent exists to protect the interests of a class of persons, "unless members of the protected class may have judicial review the statutory objectives might not be realized."  Barlow v. Collins, 397 U.S. 159, 167 (1970).  Unless APA review is available, effecting Congress's intent to provide persons the opportunity to protect their transportation and health interests requires an implied private right of action.  See Worthington Compressors v. Costle, 662 F.2d 45, 55 (D.C. Cir. 1981) ("The Supreme Court's refusal in Chrysler Corp. to imply a private right of action . . . was based largely on the fact that the statutory . . . provisions could be considered adequately under APA review.").

### 3.  A Private Remedy Furthers the Statutory Purposes of Section 134.

When the legislative history does not negate the existence of an implied private right of action, this Circuit analyzes the third Cort factor—"whether a private remedy 'is necessary or at least helpful to the accomplishment of the statutory purpose.'"  Wachovia Bank, 650 F.2d at 352 (quoting Cannon, 441 U.S. at 703).  A private right of action, which is limited in scope to

injunctive relief,[13] would help accomplish the purpose of § 134 and is necessary to effect

Congress's intent to provide review of MPO Defendants' planning process, CLR Plans, and

Metropolitan TIPs.  See id. at 352 (recognizing that a private right of action is necessary when

APA review is insufficient to accomplish the statutory purpose).

### 4.    Transportation Planning Is Not a Traditional State Concern.

This Court has recognized that the fourth Cort factor—whether the case involves matters

traditionally of state or federal concern—"is not as relevant as the first three in an inquiry into

congressional intent."  Wachovia Bank, 650 F.2d at 352 n.24.  Indeed, this Court has analyzed

whether a private right of action exists without considering the fourth Cort factor.  See Nat'l

Treasury Employees Union v. Campbell, 654 F.2d 784, 789 (D.C. Cir. 1981).  Although this

Court need not address the fourth Cort factor, because transportation planning is neither a

traditionally local nor state function, this factor does not weigh against finding a private right of

action.  Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 45 (1994); Kramer v. New Castle

Area Transit Auth., 677 F.2d 308, 310 (3d Cir. 1982) (recognizing that mass transit is

traditionally a federal program, "in which the states participate as late comer junior partners").

Metropolitan transportation planning is traditionally a federal activity because federal law

initiated transportation planning in metropolitan areas, and the Secretary of Transportation had

---

[13] If a private right of action is found, Plaintiffs' claims would be limited to injunctive relief
against MPO Defendants.  Although the United States has waived immunity for claims seeking
injunctive relief under § 134, Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 186 (D.C. Cir.
2006) ("APA's waiver of sovereign immunity applies to any suit whether under the APA or
not.") (internal quotation omitted), the United States has not waived its immunity from claims for
damages under § 134.  This Circuit is much more willing to recognize a private right of action
limited to injunctive relief.  See Hubbard v. U.S. Environmental Protection Agency Adm'r, 809
F.2d 1, 10 (D.C. Cir. 1986) (recognizing the significant difference in granting a private right of
action for damage versus injunctive claims); see also Guardians Ass'n v. Civil Service Com'n of
City of New York, 463 U.S. 582, 595 (1983) (recognizing that an implied private right for
damages could frustrate the purposes of the statute in ways that injunctive relief would not).

metropolitan transportation planning responsibilities until 1991, when Congress delegated those responsibilities to MPOs.  Therefore, this Court should conclude that Plaintiffs have a private right of action to enforce § 134.

> **B.    Judicial Review of MPO Defendants' Actions Is Available Under the APA Because MPO Defendants Are Federal Agencies.**

Pursuant to the "strong presumption" of APA review, <u>Bowen v. Mich. Acad. of Family Physicians</u>, 476 U.S. 667, 670 (1986), this Court should consider MPO Defendants to be federal agencies and review their actions under the APA or, in the alternative, conclude that MPO Defendants have sufficient contacts with the federal government to be quasi-federal agencies, thereby warranting APA review of their actions.

The United States created MPO Defendants to perform federally delegated functions pursuant to an interstate agreement authorized by Congress under the Compact Clause, CONST. art. I § 10.  Maryland, Virginia, and the United States gave official sanction and federally-delegated planning authority to MPO Defendants when they designated the TPB as the MPO for the metropolitan Washington region.  Nearly 90% of funding for the MPO's federally delegated planning functions comes from the federal government, Exs. 6 & 7; <u>see also</u> 23 U.S.C. § 104(f), and federal entities are members of the MPO Defendants, Ex. 2, at ¶ 7, Ex. 8 §§ III(d),(f), Ex. 9 art. VI, Ex. 10 § 3.01(b).  These facts, in combination with the presumption of reviewability under the APA, justify APA review of MPO Defendants' actions.

> **1.    MPO Defendants Are Federal Agencies for Purposes of the APA.**

In determining whether an entity is an agency for purposes of the APA—that is, whether an entity is an "authority of the Government of the United States, whether or not it is within or subject to review by another agency," 5 U.S.C. § 701(b)—the courts look to the "authority to act with the sanction behind it . . . .  The form the agency takes, or the function it performs are not

determinative of the question of whether it is an agency." <u>McKinney v. Caldera</u>, 141 F. Supp. 2d 25, 32 (D.D.C. 2001). The inquiry into whether an entity is an "agency" for purposes of the APA is flexible enough to "encompass the myriad organizational arrangements for getting the business of the government done" and focuses on the functions of the entity. <u>Meyer v. Bush</u>, 981 F.2d 1288, 1304 (D.C. Cir. 1993) (Wald, J., dissenting) (quotation omitted); <u>accord</u> <u>Armstrong v. Bush</u>, 924 F.2d 282, 289 (D.C. Cir. 1991). This Circuit has concluded that, given the many ways the government may structure its affairs, courts must examine each governmental arrangement to determine whether it falls within the APA's definition of "agency." <u>Wash. Research Project, Inc. v. Dep't of Health, Educ. & Welfare</u>, 504 F.2d 238, 245-46 (D.C. Cir. 1974); <u>see also</u> <u>Thompson v. Dep't of State</u>, 400 F. Supp. 2d 1, 22 (D.D.C. 2005) (concluding an entity comprised of non-federal employees constituted an agency for purposes of 5 U.S.C. §§ 551(1), 552(f)).

MPO Defendants meet the definition of "agency" because they exercise authority delegated by Congress with the sanction of the federal government and use that federal sanction to engage in governmental activities. <u>See</u> <u>McKinney</u>, 141 F. Supp. 2d at 32; <u>Indep. Bankers Ass'n of Am. v. Nat'l Credit Union Admin.</u>, 936 F. Supp. 605, 614 (W.D. Wis. 1996) ("For the purposes of the APA, an entity comes within the definition [of agency] if it has the authority to act with the sanction of the government."). Maryland, Virginia, and the United States created MPO Defendants for the purpose of carrying out federal transportation planning activities that Congress has linked to the expenditure of federal transportation funds.[14] MPO Defendants make binding decisions that are governmental in nature, including determining which projects may be funded or authorized by the federal government. <u>Nathan v. Wash. Metro. Area Transit Auth.</u>,

---

[14] USDOT may commit federal funds only to transportation projects included in a CLR Plan and programmed for funding in a Metropolitan TIP that have been incorporated into a State TIP. <u>See</u> 23 U.S.C. §§ 134(i)(2), (j)(3)(A); 23 C.F.R. § 450.222(a).

653 F. Supp. 247, 248-29 (D.D.C. 1986) ("Governmental functions are those functions which are for the benefit of the general public ... includ[ing] planning decisions or decisions involving governmental discretion.").

MPO Defendants are "authorities" of the "Government of the United States," warranting APA review of their federally delegated functions, because the United States government created them. Pursuant to Article I § 8, clause 17, of the Constitution, Congress regulates activities in the District of Columbia. Prior to 1975, all governmental functions in the District were initiated and authorized by the United States government.[15] See The District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-128, 87 Stat. 777 (1973). Accordingly, the federal government was a signatory to the General Memorandum of Agreement establishing the TPB in 1965, and the federal government, through the District government, designated the TPB as the MPO for the metropolitan Washington region in 1974. See The Bootery, Inc. v. Wash. Metro. Area Transit Auth., 326 F. Supp. 794, 798-99 (D.D.C. 1970) (observing that the Washington Metropolitan Area Transit Authority ("WMATA") is "an agency of each of the signatory parties including the United States on behalf of the District of Columbia" and providing federal judicial review "[i]n view of the federal interest in the Compact").

### 2.    In the Alternative, Judicial Review Is Available Under the APA Because MPO Defendants Are Quasi-Federal Agencies.

Even if this Court does not consider the MPO to be a federal agency or an authority of the United States government because the United States created it and delegated federal functions to it, this Court should still consider the MPO a "quasi-federal" agency for purposes of invoking

---

[15] That home rule has since been granted to the District of Columbia does not change the character of MPO Defendants, which were created pursuant to an interstate compact involving the United States at the time of its inception. See Elcon Enters., Inc. v. Wash. Metro. Area Transit Auth., 977 F.2d 1472, 1479-80 (D.C. Cir. 1992).

APA review of its federally-delegated functions under § 134.  The MPO was created pursuant to

a congressionally authorized interstate compact, and the federal government has significant

involvement and interest in its operations.

The Compact Clause of the Constitution provides that "[n]o State shall, without the

Consent of Congress . . . enter into any Agreement or Compact with another State."  CONST. art.

I § 10.  The Compact Clause "reaches both 'agreements' and 'compacts,' the formal as well as

the informal," so that the form of the interstate agreement is not dispositive of whether it is an

agreement for purposes of the Compact Clause.  U.S. Steel Corp. v. Multistate Tax Comm'n, 434

U.S. 452, 469-71 (1978).  When congressional authorization exists for an interstate agreement

related to an appropriate subject for congressional legislation, "the consent of Congress

transforms the States' agreement into federal law under the Compact Clause."  Cuyler v. Adams,

449 U.S. 433, 440 (1981).  Congressional consent may occur in advance or by giving "expressed

or implied approval to an agreement the States have already joined."  Id. at 441.

When Congress delegated federal transportation planning responsibilities to MPOs in

1991, it recognized that performance of those responsibilities by interstate MPOs might affect

federalism concerns and, therefore, explicitly gave its consent to interstate agreements,

compacts, and agencies to fulfill the requirements of § 134 in multi-jurisdictional areas.  23

U.S.C. § 134(d)(2) (1992) (now 23 U.S.C. § 134(f)(2)).  This consent extended to existing

interstate MPOs.[16]  See 23 U.S.C. § 134(b)(4) (1991) (now 23 U.S.C. § 134(d)(4)).  Maryland,

Virginia, and the United States created the TPB by an interstate agreement in 1965.[17]  The TPB

---

[16] By 1991, Congress was well aware that the TPB was the MPO designated for the National
Capital Region.  See H.R. REP. 91-1554, 1970 U.S.C.C.A.N. 5392, 5412; see also Message from
the President, 80 Stat. 1611.

[17] It is well-settled that a state agency acting as an instrumentality of the state is considered the
"state" and binds the state in the same manner as the state itself.  Wash. State Dep't of Transp. v.

became an interstate MPO when they designated the TPB as the MPO for the metropolitan

Washington region in 1974-75.  Congress ratified the TPB as the MPO for the National Capital

Region in 1991 when it gave its consent to existing interstate MPOs, ISTEA § 1024, Pub. L. No.

102-240, 105 Stat. 1914, 1957, transforming the TPB into a federal compact agency.[18]

The courts treat agencies created by interstate agreements pursuant to the Compact

Clause as quasi-federal agencies when they are sufficiently "federal."  See, e.g., Elcon Enters.,

977 F.2d at 1479-80 (D.C. Cir. 1992) (recognizing the viability of the quasi-federal theory by

assuming, without deciding, that WMATA is a quasi-federal agency for purposes of invoking

APA review); Seal & Co., Inc. v. Wash. Metro. Area Transit Auth., 768 F. Supp. 1150, 1157

(E.D. Va. 1991) (concluding that WMATA is a quasi-federal agency for purposes of invoking

APA review); Otis Elevator Co. v. Wash. Metro. Area Transit Auth., 432 F. Supp. 1089, 1094

(D.D.C. 1976); The Bootery, Inc. v. Wash. Metro. Area Transit Auth., 326 F. Supp. 794, 799

(D.D.C. 1970); see also Am. Trucking Ass'n v. Del. River Joint Toll Bridge Comm'n, 458 F.3d

291, 304 n.10 (3d Cir. 2006) (acknowledging the quasi-federal agency theory may trigger APA

review of interstate entities' actions); Heard Communications, Inc. v. Bi-State Dev't Agency, 18

Fed. Appx. 438, 440 (8th Cir. 2001) (unpublished) (per curiam) (adopting Seal's test to

determine whether the APA should apply to an interstate compact as a quasi-federal agency);

Allied Painting, Inc. v. Del. River Port Auth., No. Civ. A. 04-1032, 2005 WL 724107, at *1

(E.D. Pa. Mar. 29, 2005) (same); see also Coalition for Safe Transit Inc. v. Bi-State Dev't

---

Wash. Nat. Gas Co.,  Pacificorp, 59 F.3d 793, 800 (9th Cir. 1995) (concluding that the
Washington Department of Transportation is the "state" for purposes of 42 U.S.C. § 9607).
Accordingly, when the state agencies ratified the General Memorandum of Agreement, they
acted as states in so doing.
[18] Interstate transportation, including transportation within the District of Columbia, affects
interstate commerce and is easily the proper subject of congressional legislation.  CONST. art. I §
8, cls. 3, 17; Berman v. Parker, 348 U.S. 26, 31 (1954) ("The power of Congress over the District
of Columbia includes all the legislative powers which a state may exercise over its affairs.").

Agency, 778 F. Supp. 464, 467 (E.D. Mo. 1991) (denying remand because the plaintiffs' claims

against an interstate agency arose under the APA).

Determining whether an interstate compact is sufficiently federal to qualify as a "quasi-

federal" requires a case-by-case consideration of a particular compact in its performance of

particular functions.  Heard Communications, 18 Fed. Appx. at 440 (unpublished) (applying the

Seal test).  The factors courts consider are:  whether (1) the originating compact is governed,

explicitly or implicitly, by federal law; (2) Congress intended for the compact agencies to

perform federal functions in compliance with federal law; and (3) the amount of federal

participation (i.e., whether the federal government did more than simply approve the compact).

Seal, 768 F. Supp. at 1156-57.

Applying the analysis established in Seal, MPO Defendants are quasi-federal agencies for

purposes of invoking the APA because the originating compact and congressional intent both

establish that federal law governs MPO Defendants' actions.  The General Memorandum of

Agreement, which became federal law when Congress approved the interstate agreement

establishing the TPB as the MPO in 1991, explicitly invokes § 134 and notes that the purpose of

the Agreement is to ensure cooperative planning in accordance with § 134.[19]  Accordingly,

federal law explicitly governs the originating compact.  Further, there can be no doubt that

Congress intended MPO Defendants to comply with federal law while undertaking their

federally delegated planning functions.  See 23 U.S.C. § 134(f)(2).  Indeed, the Secretary of

Transportation can refuse to certify the MPO Defendants' planning process if that process does

not comply with federal law, or deny approval of a State TIP containing projects from the

---

[19] The TPB's Bylaws recognize the TPB's duties to ensure "effective implementation of Title 23, Section 134, and Title 49, Section 1607, of the United States Code concerning a metropolitan transportation planning process."  Ex. 8 § 1.

Metropolitan TIP if the planning process is not consistent with section 134. See 23 U.S.C. § 134(k)(5); 23 U.S.C. §§ 135(g)(6), (g)(7).

Federal involvement and participation in the creation and activities of the MPO Defendants are also significant. The United States created MPO Defendants, in part, for the benefit of the District of Columbia and to replace a federal agency in the National Capital Region. Message from the President, 80 Stat. 1611. The federal government retains oversight of MPO Defendants' federally-delegated planning functions. 23 U.S.C. § 134(k)(5). Indeed, in 1970, when the TPB rejected the Highway Plan espoused by the District government, Congress stepped in to mediate the dispute. H.R. REP. 91-1554, 1970 U.S.C.C.A.N. 5392, 5412. Further, the MPO's membership includes federal agencies and quasi-federal agencies,[20] creating a federal interest in the MPO's activities. Seal, 768 F. Supp. at 1156-57. There is, therefore, a substantial and unique relationship between the federal government and MPO Defendants sufficient to warrant invoking APA review of the MPO Defendants' actions. Indeed, in a situation with far fewer federal connections than are present in this case, a district court entertained claims under § 134 against a defendant MPO. Buckingham Twp. v. Wykle, 157 F. Supp. 2d 457 (E.D. Pa. 2001). As described above, MPO Defendants have a history similar to that of WMATA, see Seal, 768 F. Supp. at 1155-57 (describing history of WMATA), which has been considered a quasi-federal agency for purposes of triggering APA review for over twenty years.[21]

Notably, despite Congress's frequent disclaiming of interstate compact agencies as

---

[20] Ex. 8 § VI(f) (establishing that the TPB's members include one representative from the National Capital Planning Commission, FHWA, Federal Transit Administration, Federal Aviation Administration, and National Park Service). The Metropolitan Washington Airports Authority and WMATA are also members of the TPB. Id.; Ex. 7 § VI(d).

[21] The court in Seal noted that Congress could have, when amending the WMATA Compact, "taken notice of the 1971 decision in The Bootery and the 1976 decision in Otis, each equating WMATA with a federal agency subject to the APA, and expressly disapproved of these opinions, had Congress in fact disagreed with them. It did not." 768 F. Supp. at 1157.

federal agencies for purposes of triggering APA review, Congress included no such disclaimer when it authorized interstate MPOs under § 134(d)(2) (now § 134(f)(2)). See, e.g., 16 U.S.C. § 839b(a)(2)(A) (providing congressional consent to the Pacific Northwest Electric Power and Conservation Planning Council, but declaring that the Council "shall not be considered an agency or instrumentality of the United States for the purpose of any Federal law"); Susquehanna River Basin Compact, Pub. L. No. 91-575, § 2(l), 84 Stat. 1509 (Dec. 24, 1970). In 1998, Congress added a limited preclusion to judicial review in § 134(f)(2) (now § 134(h)(2)), but, as described below, that limited preclusion does not protect MPO Defendants from all claims arising under the APA. See infra Part II. The limited nature of the preclusion strongly implies that Congress contemplated APA review of MPO Defendants' actions. See supra Part I.A.2.

Because the MPO is either a federal or quasi-federal agency, APA review applies to enforce MPO Defendants' mandatory duties to plan to accomplish the four transportation planning objectives established by § 134.

### C. Public Policy Requires Federal Judicial Review of the MPO Defendants' Violations of Federal Law.

Judicial review of a final agency action is not barred unless congressional intent to preclude review is clear. Abbott Labs. v. Gardner, 387 U.S. 136, 140 (1967), abrogated on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977). This intent must be demonstrated by "clear and convincing evidence." Id. at 141. As a result, the Supreme Court has liberally construed the APA's judicial review provisions to cover a "broad spectrum of administrative actions." Id. at 140-41.

Plaintiffs recognize that their claims against the MPO Defendants are unique in that they raise issues of first impression in any court regarding the duties imposed on interstate MPOs by § 134. It is precisely the unique nature of the MPO as an interstate entity that requires application

of federal law because the failure to apply federal law will leave Plaintiffs without any remedy for the MPO Defendants' violations of federal law.

MPOs located within a single jurisdiction must comply with state law, and citizens may challenge their actions that do not adhere to the requirements of § 134 under state administrative law. See, e.g., MD. CODE § 10-125; D.C. CODE § 2-510; VA. CODE § 2.2-4026. Interstate MPOs, on the other hand, are federal compacts, to which state law does not apply unless the agreement founding the interstate MPO specifically authorizes the application of state law.[22] State ex rel. Dyer v. Sims, 341 U.S. 22, 33 (1951) (Reed, J., concurring); Kansas City Area Transp. Auth. v. State of Missouri, 640 F.2d 173, 174 (8th Cir. 1981); Alcorn v. Wolfe, 827 F. Supp. 47, 52 (D.D.C. 1993).

This Circuit has held that the District of Columbia Administrative Procedure Act, D.C. CODE § 2-510, cannot constrain the actions of interstate compact agencies. KiSKA Constr. Corp.-U.S.A. v. Wash. Metro. Area Transit Auth., 167 F.3d 608, 611-12 (D.C. Cir. 1999). Because the District's Administrative Procedure Act does not apply, no state law could apply to constrain MPO Defendants' behavior. C.T. Hellmuth & Assocs., Inc. v. Wash. Metro. Area Transit Auth., 414 F. Supp. 408 (D. Md. 1976). Accordingly, Plaintiffs' remedy for their injuries created by MPO Defendants' violations of § 134 exists only under federal law.

It would be poor public policy to permit MPOs to avoid judicial review under state and federal law simply because they are interstate entities, while subjecting wholly intrastate MPOs to judicial review under state law. The APA was designed to ensure that administrative agencies do not run afoul of the separation of powers doctrine after the non-delegation doctrine was

---

[22] Even if MPO Defendants' actions could be reviewed under state law, it is not clear which law would apply to MPO Defendants' actions, as they span three jurisdictions. To avoid conflicting interpretations of MPO Defendants' duties, federal review is most appropriate. Beebe v. Wash. Metro. Area Transit Auth., 129 F.3d 1283, 1288-89 (D.C. Cir. 1997).

abrogated.  <u>See</u> Cass Sunstein, *Reviewing Agency Inaction After* Heckler v. Chaney, 52 U. C<small>HI.</small>

L. R<small>EV.</small> 653, 655-56 (1985).  To allow Congress to delegate reviewable activities to interstate

agencies without subjecting those activities to review would create an accountability gap in the

administrative state and run contrary to the purpose of the APA.  <u>See</u> <u>id</u>.  Public policy requires

judicial review of MPO Defendants' actions to ensure compliance with federal law.

## II.    The Statute Imposes Judicially Enforceable Nondiscretionary Duties on the MPO and USDOT Defendants.

There is a "strong presumption" in favor of federal judicial review of agency action.

<u>Bowen v. Mich. Acad. of Family Physicians</u>, 476 U.S. 667, 670 (1986).  This presumption

attaches when judicial review of nondiscretionary agency duties is sought.  Plaintiffs' claims

arise under § 134(c)(1), which provides that "[t]o accomplish" the four § 134(a)(1) objectives,

MPOs "*shall* develop" CLR Plans and Metropolitan TIPs.  23 U.S.C. § 134(c)(1) (emphasis

added).  This mandatory duty to plan to accomplish the four transportation planning objectives

enumerated in § 134(a)(1) is given additional meaning by the entirety of the statute and the

implementing regulations, all of which impose enforceable nondiscretionary duties on MPO

Defendants.  MPO Defendants' mandatory duty to plan to accomplish the four objectives is

plainly distinct from its obligation to consider the general planning factors listed under § 134(h)

and is therefore reviewable by this Court.

### A.    Section 134(c) Imposes Judicially Enforceable Nondiscretionary Duties to Plan to Accomplish the Objectives in § 134(a).

Section 134(c)(1) requires the MPO to "develop long-range transportation plans and

transportation improvement programs" to "accomplish" the § 134(a)(1) transportation objectives.

This language is mandatory, not precatory, and establishes specific, enforceable duties.[23]

MPO Defendants' incorrectly assert that § 134(c) does not impose a mandatory duty to plan to accomplish the § 134(a)(1) objectives. The plain, ordinary meaning of the term "shall" establishes a mandatory duty on an agency. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1143 (11th ed. 2003) (defining "shall" to mean "used in laws, regulations, or directives to express what is mandatory"); see also Bennett v. Spear, 520 U.S. 154, 175 (1997) ("[A]ny contention that the relevant provision of 16 U.S.C. § 1536(a)(2) is discretionary would fly in the face of its text, which uses the imperative 'shall.'"); Lampkin v. District of Columbia, 27 F.3d 605, 611 (D.C. Cir. 1994) (concluding that "shall" means "mandatory"). By contrast, language deemed precatory in this Circuit has involved unambiguously non-binding terms such as "may."[24] So. Pac. Transp. Co. v. I.C.C., 69 F.3d 583, 589 (D.C. Cir. 1995).

Defendants improperly attempt to avoid the plain language and congressional intent that MPOs plan to "accomplish" the § 134(a)(1) objectives by citing cases that involved attempts to enforce policy sections, where no other provision mandated the agencies to take an action

---

[23] USDOT Defendants argue that the language "to accomplish" does not mean "shall accomplish." USDOT Defs.' Br. at 17. Plaintiffs agree. USDOT Defendants are mistaken, however, to suggest that "to accomplish" does not impose an obligation on MPO Defendants to plan to accomplish. Indeed, a CLR Plan and Metropolitan TIP cannot, by their very nature, serve mobility needs or accomplish the other § 134(a)(1) objectives. Rather, the projects contained within the CLR Plan and Metropolitan TIP serve mobility needs and accomplish or fail to accomplish the objectives. Plaintiffs argue that MPO Defendants' mandatory duty under § 134(c) is to plan "to accomplish" the § 134(a)(1) objectives.

[24] The section within which § 134(c)(1) is located is entitled "General Requirements," which supports Plaintiffs' argument that the term "shall" was intended to create a mandatory duty. "[W]ith all questions of statutory interpretation 'we consider the statute's text and its structure to determine the legislative objective.'" Johnson v. Quander, 440 F.3d 489, 501 (D.C. Cir. 2006) (quoting Smith v. Doe, 538 U.S. 84, 92 (2003)). Although the title does not control an interpretation of a provision and need not be considered when the language of the provision is plain, the title provides support for Plaintiffs' interpretation of the statute. Immigration & Naturalization Serv. v. St. Cyr, 533 U.S. 289, 308-09 (2001).

designed to "accomplish" those policies.[25]  Contrary to MPO and USDOT Defendants'

arguments, Plaintiffs' claims do not depend on whether § 134(a) imposes a binding obligation,[26]

but whether § 134(c), when read in conjunction with § 134(a), does.

      Construing § 134(c)(1) not to impose a mandatory duty would eviscerate the meaning

and purpose of § 134 as a whole and would be inconsistent with existing case law.  Such a

reading of the statute would render meaningless other provisions of the statute, including §§

134(i) and (j), which give meaning and content to the analyses contained in the CLR Plans and

Metropolitan TIPs, as well as many of the statute's implementing regulations, see, e.g., 23 C.F.R.

§ 450.322(b)(9) (requiring CLR Plans to reflect consideration of existing "national goals and

objectives"); 23 C.F.R. § 450.316(a)(2) (requiring that "[c]onsistency of transportation planning

with applicable Federal, State, and local energy conservation programs, goals, and objectives" be

"explicitly considered, analyzed as appropriate, and reflected in the planning process products");

23 C.F.R. § 450.318(c) (requiring major investment studies to "evaluate the effectiveness and

cost-effectiveness of alternative investments or strategies in attaining local, State and national

goals and objectives").  This reading is inconsistent with case law, which recognizes the right to

---

[25] The only case cited by MPO Defendants from this Circuit for this argument, Nat'l  Wildlife
Fed'n v. Gorsuch, 693 F.2d 156 (D.C. Cir. 1982), involved an attempt to expand the meaning of
the term "pollutant" under the Clean Water Act in light of the purposes of the Act.  This Circuit
rightfully rejected such an attempt because the term pollutant was already defined in the Act and
the purposes section was applicable only to the extent "consistent with other provisions" of the
Act.  Id. at 178.  National Wildlife Federation is wholly inapposite because § 134(c) establishes a
mandatory duty to plan to "accomplish" the § 134(a)(1) objectives.

[26] Although Plaintiffs' claims depend on the duties established in § 134(c), this Circuit
recognizes that policy sections can establish enforceable, mandatory duties.  Sierra Club v.
Ruckelshaus, 344 F. Supp. 253 (D.D.C. 1972) (concluding that the purpose of the Clean Air Act
to "protect and enhance the quality of the Nation's air resources" imposes a duty to prevent
deterioriation of air quality), aff'd per curiam, 4 E.R.C. 1815 (D.C. Cir. 1972), aff'd by an
equally divided court, sub nom. Fri v. Sierra Club, 412 U.S. 541 (1973); see also Steenholdt v.
Fed. Aviation Admin., 314 F.3d 633, 638 (D.C. Cir. 2003) (recognizing that policy statements
may be enforceable if they impose binding norms).

challenge actions under § 134.  See, e.g., Sw. Williamson County Cmty. Ass'n v. Slater, 173

F.3d 1033, 1037-38 (6th Cir. 1999) ("[Section 134] does not preclude judicial review altogether,

and though some of its many provisions are committed to agency discretion, others are not.");

Buckingham Twp. 157 F. Supp. 2d at 467-69 (reviewing claims that an MPO violated § 134).

In addition, Congress intended to create a duty on MPOs to plan to accomplish the

national objectives established in § 134(a)(1).  The directive added by ISTEA to § 134(a) (now §

134(c)) "to accomplish" the national planning objective came from the House bill, H.R. 2950,

ISTEA H.R. Rep. 102-171 pt. I, at 175-76, 1991 U.S.C.C.A.N. 1526, which Congress retained

virtually unchanged in conference.  ISTEA H.R. Conf. Rep. 102-404, at 319, 459-60, 1991

U.S.C.C.A.N. 1679, 1699, 1839 ("The Conference Bill incorporates … selected provisions of the

House Bill to revise and strengthen the metropolitan planning process.").  The report of the

House Committee on Public Works and Transportation explained that –

> An integral component of the Committee Bill is the emphasis placed on
> the transportation planning process, both at the metropolitan level and at the state
> level. . . .  The consensus view was that transportation planning needed to be
> prioritized, strengthened, integrated, focused, made more uniform, and given
> better tools for better management of decisionmaking.
> In response, the bill establishes a single intermodal planning process
> applicable to developing and implementing surface transportation programs and
> projects. . . .  The process is designed to achieve the goals and objectives of the
> Federal surface transportation program and other important Federal programs. ***
> The planning process is further strengthened by providing a structured
> framework in which to make decisions and specific directives for consideration to
> guide decisionmaking.

H.R. Rep. 102-171 pt. I, at 25, 1991 U.S.C.C.A.N. 1526, 1551.  The Committee's explanation

reinforces Plaintiffs' argument that the planning objectives added by ISTEA are not merely

precatory or hortatory and the duty of the MPO to plan to accomplish those objectives in the

CLR Plan and Metropolitan TIP is an enforceable duty.[27]  See ISTEA H.R. CONF. REP. 102-404,

at 318, 1991 U.S.C.C.A.N. 1679, 1698 (noting that ISTEA placed "increased emphasis" on

ensuring "consistency with energy conservation programs, goals, and objectives," the "effect of

transportation policy decisions on land use and development, and the provisions of land use and

development plans," and meeting the "Clean Air Act requirements").

Plaintiffs claim the MPO Defendants violated the requirements of § 134(c) by

incorporating the proposed ICC into the CLR Plan and Metropolitan TIP without considering the

project's impact on the ability of the CLR Plan and Metropolitan TIP to accomplish the

objectives in § 134(a)(1).  To ensure that projects within a Metropolitan TIP further the

objectives in § 134(a)(1),[28] these projects must be consistent with the CLR Plan.  23 U.S.C. §

134(j)(3)(C); 23 C.F.R. § 450.324(f).  Such a consistency requirement is "specific, unambiguous,

and mandatory," and it is "unquestionably within the competence of the judiciary to perform this

type of analysis."  Mallett v. Wis. Div. of Vocational Rehabilitation, 130 F.3d 1245, 1254 (7th

Cir. 1997) (concluding that the requirement that rehabilitation programs be "'consistent with the

unique strengths, resources, priorities, concerns abilities and capabilities of the individual' . . . is

unquestionably within the competence of the judiciary" to enforce).

---

[27] Further evidence of this intent is provided by the creation in the bill of the Bureau of
Transportation Statistics to "pursue a comprehensive program for the collection and analysis of
data relating to the performance of the national transportation system.  A necessary step in this
process is developing better indicators for productivity, efficiency, *energy use, air quality related
to vehicle operation, . . .* and other factors that reflect the overall performance of the surface
transportation system." ISTEA H.R. CONF. REP. 102-404, at 459-60, 1991 U.S.C.C.A.N. 1679,
1839 (emphasis added).  If the national planning objectives were merely precatory, there would
be no reason to collect the data needed to assess the performance of the system.

[28] Once a project is included in a Metropolitan TIP "priority list," the MPO cannot reprogram
funding allocated to the project for another project or use until the MPO amends the CLR Plan
and Metropolitan TIP.  Once a project is added to the Metropolitan TIP, its implementation is a
virtual certainty.  See 23 C.F.R. §§ 450.324(d) (referring to certain projects in the Metropolitan
TIP as "projects that are to be undertaken").

Finally, § 134 requires that MPOs develop CLR Plans and Metropolitan TIPs with "due consideration of other related planning activities within the metropolitan area" and after "consideration of all modes of transportation." 23 U.S.C. §§ 134(c)(3), (g)(3). This duty is necessary to comply with the cooperative planning requirements established by § 134(c)(3) and is sufficiently specific to enable judicial review. See Concourse Rehabilitation & Nursing Ctr. v. Whalen, 249 F.3d 136, 144 (2d Cir. 2001). Congress added § 134(g)(3) to give effect to its mandate that transportation planning processes be cooperative and include states and localities. 23 U.S.C. § 134(c)(3). Although Congress did not add the "due consideration" language to § 134 until SAFETEA-LU, the MPO duty to consider local planning activities preceded SAFETEA-LU. See 23 C.F.R. § 450.210(a)(4) (1994) (requiring "[c]onsideration of intermodal facilities with land use planning, including land use activities carried out by local, regional, and multistate agencies"). SAFETEA-LU made MPO Defendants' duty to consider the relationship between the proposed ICC and local land use plans and activities more specific. After SAFETEA-LU, MPO Defendants retained the proposed ICC in the CLR Plan and Metropolitan TIP, made their regional conformity determination that included the proposed ICC, and amended the Metropolitan TIP to provide additional funding for the proposed ICC. In each of those actions, MPO Defendants failed to give "due consideration" to local land use planning and other related planning activities affected by the proposed ICC.

This Court should not give weight to MPO Defendants' attempt to eviscerate much of the mandatory language contained in § 134 and its implementing regulations because their attempt is contrary to the plain language of the statute, congressional intent, and existing case law, which recognizes that MPO Defendants have mandatory duties under the statute.

**B.    The Preclusion of Judicial Review in § 134(h)(2) Does Not Extend Beyond Claims Alleging a Failure to Consider the Factors Listed in § 134(h)(1).**

MPO Defendants' duty under § 134(c)(1) to plan to accomplish the objectives in § 134(a)(1) through CLR Plans and Metropolitan TIPs is a specific duty that does not duplicate or otherwise "mirror" MPO Defendants' obligation to consider the general planning factors listed in § 134(h)(1) with respect to projects and strategies. The preclusion of judicial review established under § 134(h)(2), on which MPO Defendants and USDOT Defendants rely heavily for their argument that their actions are not reviewable, MPO Defs.' Br. at 4, 10, 11, 13; USDOT Defs.' Br. at 13-14, is limited to claims alleging a failure to consider the general planning factors specified in § 134(h)(1). That preclusion does not extend beyond a failure to consider the § 134(h)(1) planning factors. Plaintiffs do not seek to enforce obligations established by § 134(h)(1), but rather the obligations established under § 134(c).

Plaintiffs acknowledge that by shielding consideration of the general § 134(h)(1) planning factors in relation to projects and strategies from judicial review, Congress protected MPO Defendants from judicial oversight, although not from USDOT oversight, in their evaluation of specific projects in the planning process. This protection, however, did not extend to accomplishing the objectives of the planning process. Congress retained MPO Defendants' specific duty to adopt a CLR Plan and Metropolitan TIP that will accomplish the four transportation planning objectives, while giving MPO Defendants the flexibility to consider other interests not encompassed by the § 134(a)(1) objectives in relation to projects and strategies. See infra Part II.C. The preclusion from judicial review under § 134(h)(2), then, extends only to MPO Defendants' failure to consider the § 134(h)(1) planning factors when assessing the impacts of a specific strategy or project, but does not preclude review of whether the CLR Plan or Metropolitan TIP, as revised by the addition of a project, is designed to accomplish the four

transportation planning objectives in § 134(a)(1).[29]

The statutory structure does not lend itself to MPO Defendants' interpretation of the impact of § 134(h)(2).  Section 134(h)(1) identifies a variety of planning factors MPO Defendants should look to when considering projects and strategies during the planning process. These planning factors are specifically invoked in § 134(a)(2), which notes that "the planning factors identified in subsection (h)" should "guide[ ]" the "continued improvement and evolution of the metropolitan and statewide planning processes."  While the planning process culminates in a CLR Plan and Metropolitan TIP, the national objectives provide the statutory benchmarks for determining whether the contents of those plans and programs satisfy the statute.  The factors the MPO must consider in relation to projects and strategies, on the other hand, do not establish the benchmarks for measuring performance.  Rather, § 134(h)(1) establishes a procedural duty with respect to projects and strategies, while § 134(c)(1) imposes a substantive duty on the MPO with respect to CLR Plans and Metropolitan TIPs.  This distinction provides MPO Defendants flexibility in adding projects and strategies to a CLR Plan and Metropolitan TIP,[30] while requiring them to plan the overall mix of projects and strategies in the CLR Plan and Metropolitan TIP to accomplish the statutory objectives.  Plaintiffs seek to enforce the nationally uniform benchmarks required by § 134(a)(1) to ensure that MPOs plan to "accomplish" the four

---

[29] USDOT Defendants suggest that "Plaintiffs could not sustain the pleading artifice of ignoring the preclusive provisions" because Plaintiffs identified MPO Defendants' obligations to consider transportation planning factors.  USDOT Defs.' Br. at 14 n.9.  Plaintiffs do not suggest that MPO Defendants do not have judicially unreviewable obligations to consider the § 134(h)(1) planning factors.  Plaintiffs' Complaint overview section, referenced by USDOT Defendants, cites 23 C.F.R. § 450.316(a), which imposes the obligation on MPO Defendants to consider "factors." Plaintiffs' use of the terms "objectives" and "factors," like Congress's use of the terms, is consistent and gives meaning to the differences between the terms.

[30] This flexibility is constrained further when an MPO elects to add a major transportation project to a CLR Plan or Metropolitan TIP.  For such projects, the MPO must undertake a detailed analysis of the impact of the project on the CLR Plan and Metropolitan TIP in an MIS, including the national objectives.  See infra Part III.

transportation objectives in their CLR Plans and Metropolitan TIPs.

Further, the ordinary meaning of the term "accomplish" is "to succeed in doing," OXFORD ENGLISH DICTIONARY AM. ED. 11 (1996), which is substantially different than "consider," which only requires MPO Defendants to "take into account," id. at 299. Ignoring the substantial differences between the terms "accomplish" in relation to CLR Plans and Metropolitan TIPs and "consider" in relation to projects and strategies is contrary to the canons of statutory construction, which "require that we give effect to the subtleties of language that Congress chose to employ." Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 222 (1986); see Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found. Inc., 484 U.S. 49, 57 (1987) (rejecting argument that Congress's choice of language was a "careless accident").

As this Circuit has recognized, "'[Congress] does not . . . hide elephants in mouseholes.'" Am. Bar Ass'n v. Fed. Trade Comm'n, 430 F.3d 457, 467 (D.C. Cir. 2005) (quoting Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001)). Given the presumption of reviewability, Congress would not seek to preclude judicial review of an entire statute, or even key provisions of a statute such as §§ 134(a)(1) and (c), without making its intent to do so clear. As a result, limited preclusions of judicial review, such as the one found in § 134(h)(2), are construed narrowly. COMSAT Corp., 114 F.3d at 226 (construing a limited preclusion of judicial review narrowly to permit actions enforcing the remainder of the statute).

Because there is a presumption of judicial reviewability and there exist substantive differences between Plaintiffs' claims under § 134(c)(1), which seek to enforce MPO Defendants' mandatory duties to plan to accomplish the four transportation planning objectives in § 134(a)(1), and claims alleging a failure to consider general planning factors listed in § 134(h)(1) as they relate to projects and strategies, this Court should reject MPO Defendants'

attempt to preclude judicial review of Plaintiffs' claims.

**C.    Section 134(c)(1) Invokes Duties that Are More Specific Than, and Distinct from, the General Duty to Consider Various Planning Factors.**

MPO Defendants' duty to plan to accomplish the four national transportation objectives is substantially different from their duty to consider enumerated general planning factors. Accordingly, even assuming MPO Defendants are correct that the general planning factors in § 134(h)(1) overlap with the four transportation objectives in § 134(a)(1), MPO Defendants are incorrect to suggest that their duty to plan to accomplish the transportation objectives is somehow subsumed by their duty to consider the general planning factors in relation to projects and strategies.

Plaintiffs acknowledge that MPO Defendants have discretion in determining how best to accomplish the national transportation planning objectives in the CLR Plan they adopt. This discretion, however, is not unfettered, nor is it undefined. Indeed, in 1998, when Congress adopted the judicial preclusion for a challenge to an MPO's failure to consider the general planning factors, Congress also changed § 134(a) to impose a clear duty on MPOs to plan to minimize transportation-related fuel consumption and air pollution. Whereas before 1998, MPOs had a duty to both "minimize transportation-related fuel consumption and air pollution" and "maximize mobility of people and goods within and through urbanized areas," 23 U.S.C. § 134(a) (1992), in 1998, Congress clarified its priorities by recasting the statutory objectives that MPOs must accomplish. Congress determined that MPOs need not accomplish the maximization of mobility of people and goods, but need only "serve the mobility needs of people and freight." 23 U.S.C. § 134(a) (1999). The MPO's discretion, therefore, is constrained by its duty to adopt a mix of transportation projects and strategies that minimize, to the greatest extent possible while still serving mobility needs and fostering regional economic growth,

transportation-related fuel consumption and air pollution.

To implement this duty, the regulations require MPO Defendants to "[i]dentify the criteria and process for prioritizing implementation of transportation plan elements (including intermodal trade-offs) for inclusion in the TIP and any changes in priorities from previous TIPs." 23 C.F.R. § 450.324(n)(1).  When agencies have a directive, the implementation of which involves some discretion, such as MPO Defendants' discretion to adopt projects and strategies that serve mobility needs and foster regional economic growth,[31] the agency must first identify how it intends to accomplish the directive and seek to achieve that directive.  The agency action, then, is evaluated against the benchmark established by the agency.  Miller by Miller v. Whitburn, 10 F.3d 1315, 1319-20 (7th Cir. 1993) (noting that even where an agency has been accorded "some flexibility in [its] determin[ations]," courts can evaluate such determinations by the "objective benchmarks" established by the agency); see Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 507-09 (1990) (recognizing that judicial review is not precluded by a statute that provides significant discretion to states and leaves a limited oversight role to the federal government).

Here, the statute directs the MPO to adopt CLR Plans and Metropolitan TIPs that provide for the "development of surface transportation systems that will serve the mobility needs of people and freight and foster economic growth and development within and between States and urbanized areas, while minimizing transportation-related fuel consumption and air pollution."  23 U.S.C. § 134(a)(1).  Reasoned decisionmaking requires that the MPO identify the factors

---

[31] While MPO Defendants have discretion in selecting projects that serve mobility needs and foster regional economic growth, they do not have such discretion in their duty to minimize transportation-related fuel consumption and air pollution, since the term "minimize" requires MPO Defendants to "reduce [transportation-related fuel consumption and air pollution] to the greatest possible extent."  See Hazardous Waste Treatment Council v. Envtl. Prot. Agency, 886 F.2d 355, 361 (D.C. Cir. 1989) (defining "minimize" as "reduce [something] to the smallest possible amount, extent, or degree").

relevant to the statutory directive, consider facts that are relevant to these factors, and explain how the facts found and the choices made achieve the statutory objectives. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Requirements are unenforceable only "in those rare instances where statutes are drawn in such broad terms that . . . there is no law to apply." Mistick PBT v. Chao, 440 F.3d 503, 509 (D.C. Cir. 2006) (quoting Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971)). The mandatory duty set forth in § 134(c)(1), to undertake planning to accomplish the § 134(a)(1) objectives, is not one of the "rare instances" where there is "no law to apply." The objectives established in § 134(a)(1) and their implementation create duties that are sufficiently specific to enable judicial review of MPO Defendants' actions and that are distinct from MPO Defendants' obligation to consider the general planning factors specified in § 134(h)(1).

Indeed, the Supreme Court and this Circuit have recognized the right of federal courts to review state plans to determine whether they comply with federal criteria. Wilder, 496 U.S. at 512 (distinguishing Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1 (1981), in concluding that a statute requiring state plans to provide payments to hospitals at "reasonable and adequate" rates was sufficiently specific to enable judicial review); Lampkin, 27 F.3d at 611 (characterizing the State's obligations under the relevant statute as "set forth in specific, mandatory terms"); see also Sylvia's Haven, Inc. v. Mass. Dev't Fin. Agency, 397 F. Supp. 2d 202, 220 (D. Mass. 2005). As in Wilder and Lampkin,[32] the applicable statutory language is

---

[32] Wilder held that health care providers can sue to ensure that state plans meet federal laws. Clifton v. Schafer, 969 F.2d 278, 285 (7th Cir. 1992); see also Concourse Rehabilitation & Nursing Ctr. Inc. v. Wing, 150 F.3d 185, 189 (2d. Cir. 1998). Plaintiffs' claims seek to ensure that transportation plans comply with federal requirements, raising issues analytically indistinguishable from those in Wilder. These same issues were addressed in Lampkin, and again, this Circuit entertained claims seeking to ensure that state plans vindicate federal objectives. 27 F.3d at 606-07, 610-11 (distinguishing Pennhurst because the statutory language

sufficiently specific to enable judicial review of the MPO Defendants' planning process, CLR

Plans, and Metropolitan TIPs to ensure compliance with the statutory and regulatory

requirements.  Accordingly, MPO Defendants' duty to plan to accomplish the § 134(a)(1)

objectives is judicially enforceable because that duty is distinct from their duty to consider

general planning factors in relation to projects and strategies.

> **D.    Section 134(a)(1) Invokes Objectives That Are More Specific than, and
> Distinct from, the Planning Factors in Section 134(h)(1).**

Not only is MPO Defendants' duty under § 134(c) substantially different from their duty

under § 134(h)(1), but the four transportation planning objectives in § 134(a)(1) are more

specific than, and distinct from, the general planning factors listed in § 134(h)(1).

In 1998, when Congress added the preclusion of judicial review in § 134(h)(2), Congress

changed the focus of § 134(h)(1) from CLR Plans, see 23 U.S.C. § 134(f)(1) (1999), to "projects

and strategies, see 23 U.S.C. § 134(h)(1).  In doing so, Congress intended to provide flexibility in

the planning process as it relates to consideration of general factors in projects and strategies to

prevent litigation over individual projects that do not affect the ability of CLR Plans and

Metropolitan TIPs to accomplish the statutory objectives.  Through § 134(c)(1), Congress

continued to require that MPOs design CLR Plans and Metropolitan TIPs to accomplish the

statutory objectives.

Ignoring the substantive differences between MPO Defendants' duties to accomplish the

§ 134(a)(1) objectives and their obligation to consider the general planning factors in § 134(h)(1)

fails to give meaning to this reasonable approach to transportation planning and does not

comport with the canons of statutory construction because it would allow general provisions to

---

was "sufficiently clear to put the States on notice of the obligations they assume when they
choose to accept grants made under the Act").

control more specific provisions.  It is well-settled that the converse is true.  E.g., Simpson v.

United States, 435 U.S. 6, 15 (1978); United States v. Perry, 360 F.3d 519, 535 (6th Cir. 2004)

("One of the most basic canons of statutory interpretation is that a more specific provision takes

precedence over a more general one."); Telecommunications Research & Action Ctr. v. Fed.

Communications Comm'n, 836 F.2d 1349, 1361 n.25 (D.C. Cir. 1988) (noting that "unless there

is *clear* intention otherwise, a specific statute will not be controlled or nullified by a general one,

regardless of the priority of enactment") (quotation and citations omitted).  Since the four

objectives in § 134(a)(1) are more specific than the general planning factors in § 134(h)(1), it is

improper to apply the preclusion of judicial review in § 134(h)(2) to claims seeking to vindicate

the § 134(a)(1) objectives.

In arguing that Plaintiffs' claims invoke the planning factors listed under § 134(h)(1),

MPO Defendants also overlook the canon of statutory consistency, Cellco Partnership v. Fed.

Communications Comm'n, 357 F.3d 88, 96 (D.C. Cir. 2004), and the clear distinction between

the terms "objectives" and "factors" used throughout the statute.[33]  Congress specifically cabined

the preclusion of judicial review to that of MPO Defendants' consideration of the planning

factors, S. REP. 109-53, at 19 (Apr. 6, 2005) ("Current language in the statute that bars court

review of failure to consider *specified planning factors* is retained.") (emphasis added), while it

ensured that the MPO would plan to accomplish the statutory objectives, H.R. REP. 102-171 pt. I,

at 25, 1991 U.S.C.C.A.N. 1526, 1551 (noting that the transportation planning process for

developing CLR Plans and Metropolitan TIPs "is designed to achieve the . . . objectives of the

Federal surface transportation program").  The ordinary meaning of the term "objective" is

_____

[33] Indeed, Congress specifically distinguished between the § 134(h)(1) planning factors and the §
134(a)(1) transportation objectives when it incorporated the § 134(h)(1) factors into the analysis
required by § 134(a)(2), but did not similarly incorporate those factors in § 134(a)(1).  The duty
in § 134(c)(1) to "accomplish" is limited to accomplishing the "objectives" in § 134(a)(1).

specific, OXFORD ENGLISH DICTIONARY AM. ED. 1026 ("a thing aimed at or sought"), while

"factor" is more general, id. at 519 ("a circumstance, fact, or influence contributing to a result").

As demonstrated below, each of the four transportation objectives is more narrow and specific

than the general planning factors described in § 134(h)(1).

MPO Defendants err in asserting that planning to accomplish the objective of minimizing

transportation-related fuel consumption and air pollution is identical to consideration of the

factors of "promot[ing] energy conservation" and "protect[ing] and enhanc[ing] the

environment."  MPO Defs.' Br. at 10-11.  The term "minimize" is more specific, and connotes a

duty more stringent, than promoting, protecting, or enhancing.  Compare Hazardous Waste

Treatment Council v. Envtl. Prot. Agency, 886 F.2d 355, 361 (D.C. Cir. 1989) (defining

"minimize" as "reduce [something] to the smallest possible amount, extent, or degree") and

Trout Unlimited v. Dep't of Ag., 320 F. Supp. 2d 1090, 1110 (D. Colo. 2004) (holding that

where a Forest Supervisor, in striking a "balance between the use of [federal] lands for water

diversions and protecting the aquatic resources," had "not provide[d] the minimum acceptable

levels of resource protection" and thereby violated his statutory duty to "*minimize*[] damage to

fish and wildlife habitat.") with Sierra Club, 344 F. Supp. at 255 (concluding that the purpose of

the Clean Air Act to "protect and enhance the quality of the Nation's air resources" imposes a

duty to prevent deterioriation of air quality).  This duty is sufficiently specific to enable judicial

review.  Riverkeeper, Inc. v. Envtl. Prot. Agency, 358 F.3d 174, 197-98 (2d Cir. 2004)

(recognizing that the term "minimize" is sufficiently clear that "industry will be able to

understand its responsibilities under the Rule"); U.S. Telecom Ass'n v. Fed. Communications

Comm'n, 227 F.3d 450, 461 (D.C. Cir. 2000) (concluding that agency's rules failed to minimize

the cost of compliance to residential ratepayers").

Further, MPO Defendants err in asserting that the § 134(a)(1) transportation objective of "minimiz[ing] transportation-related fuel consumption" is "essentially the same as" the general planning factor in § 134(h)(1)(E) of "promot[ing] energy conservation." MPO Defs.' Br. at 11. The statutory structure and legislative history illustrates the congressional intent to minimize gasoline consumption and waste by commuters. 151 CONG. REC. E226 (Feb. 14, 2005) (Rep. Don Young) ("Let's get this job done, so that . . . [commuters] waste less gas sitting in traffic."); see 23 U.S.C. § 134(i)(2)(D) (requiring CLR Plans to include operational strategies to relieve congestion). In contrast, the broad planning factor of energy conservation encompasses all types of fuel consumption, as well as consumption of energy types other than gasoline. Accordingly, minimizing transportation-related fuel consumption is more specific and narrower than promoting energy conservation generally and requires MPO Defendants to reduce transportation-related fuel consumption to the greatest extent possible. MPO Defendants, however, retain discretion to consider whether or how to achieve additional energy conservation.

Similarly, MPO Defendants err in asserting that the § 134(a)(1) transportation objective of minimizing air pollution is identical to the general planning factor in § 134(h)(1) that requires consideration of how a project or strategy will "protect and enhance the environment." The term "environment" encompasses land and water, while "air" plainly does not. Indeed, the statute as a whole evinces a special concern with minimizing the air pollution impacts of transportation. See 23 U.S.C. §§ 134(i)(3) (requiring MPOs to coordinate the CLR Plan with transportation control measures required by the state implementation plan under the Clean Air Act), (l)(2) (rejecting abbreviated CLR Plans or Metropolitan TIPs in areas not in attainment of federal ozone or carbon monoxide standards), (m) (requiring a congestion management process for projects that will significantly increase the number of single-occupant vehicles on the road in areas not in

attainment of federal ozone or carbon monoxide standards); see also ISTEA H.R. CONF. REP. 102-404, at 459-60, 1991 U.S.C.C.A.N. 1679, 1839 (recognizing the need to develop indicators to improve the overall performance of the surface transportation system, including indicators specific to "air quality related to vehicle operation").  Accordingly, minimizing air pollution is substantially more specific than protecting or enhancing the environment generally and requires MPO Defendants to reduce air pollution to the greatest extent possible.  MPO Defendants, however, retain discretion to consider whether or how to achieve other environmental goals.

MPO Defendants also err in asserting that the § 134(a)(1) transportation objective of "fostering economic growth and development within and between urbanized areas" is "essentially the same as" the general planning factor in § 134(h)(1) of "support[ing] the economic vitality of the metropolitan area, especially by enabling global competitiveness, productivity and efficiency."  MPO Defs.' Br. at 10-11.  The § 134(a)(1) transportation objective requires MPO Defendants to plan to foster absolute regional economic improvement in the region (i.e., size of employment base and rate of employment growth).  The § 134(h)(1) planning factor, on the other hand, calls on MPO Defendants to consider whether each project or strategy will support relative economic improvement (i.e., maximization of the economic output given existing resources).  Increasing "competitiveness, productivity and efficiency" is consistent with both absolute regional economic growth and shrinkage.  Thus, shielding the § 134(h)(1) planning factor from review provides MPO Defendants flexibility to decide that relative economic gains may be sacrificed in order to ensure absolute regional economic growth and development.

Finally, MPO Defendants err in asserting that the transportation objective of "serv[ing] the mobility needs of people and freight" is "identical" to the § 134(h)(1)(D) planning factor of

"increasing the accessibility and mobility of people and for freight."[34]  MPO Defs.' Br. at 10.

Planning to accomplish the objective to serve mobility needs imposes a nondiscretionary duty to

favor transportation options that will meet regional needs, but does not necessarily require

consideration of options that increase mobility.  The statutory directives to provide special

consideration of the needs of underserved populations give specific meaning to the MPO

obligation to serve mobility needs.  See 23 U.S.C. § 134(i)(5)(A); see also 23 C.F.R. §

450.316(b)(vi).  As a result, the MPO may accomplish this objective by distributing mobility

benefits from one population to another.[35]  Consideration under §134(h)(1) of projects and

strategies that will increase mobility only requires that MPO Defendants not ignore options that

will increase net mobility.  Shielding this planning factor from review accords MPO Defendants

flexibility to decide that they need not increase net mobility in order to serve the area's mobility

needs.  Accordingly, the transportation objectives in §134(a)(1) are distinct from the general

planning factors in § 134(h)(1) and accomplishing the § 134(a)(1) objectives is a substantially

different duty than considering the general planning factors.  As a result, the judicial preclusion

in § 134(h)(2), which is limited to a failure to consider the general planning factors in relation to

projects and strategies, does not bar judicial review of Plaintiffs' claims.

### III.  Plaintiffs' Major Investment Study Count States a Claim Upon Which Relief Can Be Granted.

During all relevant periods that MPO Defendants violated the requirements of § 134 and

---

[34] It is notable that Congress, in the 1998 TEA-21 amendments, amended the objective of "maximiz[ing] mobility of people and goods within and through urbanized areas," 23 U.S.C. § 134(a) (1992), to "serv[ing] the mobility needs of people and freight."  23 U.S.C. § 134(a) (1999).  This changed language, which was retained by SAFETEA-LU, provides further support that Congress did not intend the § 134(a) objectives to be subsumed by the § 134(h)(1) factors.

[35] For example, a high-occupancy vehicle lane may increase mobility of some individuals using the lane, while decreasing mobility of other drivers not using the lane.  Such a strategy may not increase net mobility across all users, but may still serve the users' mobility needs.

its implementing regulations, the applicable regulations required the preparation of an MIS for each major metropolitan transportation investment.[36]  23 C.F.R. § 450.318(a).  An MIS analysis involves an evaluation of the "effectiveness and cost-effectiveness of alternative investments or strategies in attaining local, State and national goals and objectives."  Id. § 450.318(c).  This analysis is necessary to implement the statutory and regulatory directive to ensure that only projects consistent with the CLR Plan are included in a Metropolitan TIP.  23 U.S.C. § 134(j)(3)(C); 23 C.F.R. § 450.324(f)(2).

The MIS is required before an MPO incorporates a major project into a CLR Plan in order to provide the analysis needed to satisfy 23 C.F.R. § 450.322(b)(7), which requires the MPO to reflect, in the CLR Plan, "a multimodal evaluation of the transportation, socioeconomic, environmental, and financial impact of the overall plan, including all major transportation investments in accordance with Sec. 450.318."  USDOT unequivocally explained that "[s]uch investment studies should occur before a particular investment is ultimately defined in an area's approved plan . . . .  After a corridor/subarea study is completed, the plan would be revised to reflect the specific decision resulting from the study."  58 Fed. Reg. 58,056 (Oct. 28, 1993).  Taken together, 23 C.F.R. §§ 450.322 and 450.318 require the MPO to demonstrate how an MIS affected its determination to include a proposed project into the CLR Plan.  Section 450.322 requires that the MPO evaluate the "impact of the overall plan," and 23 C.F.R. § 450.318 requires that individual investments and strategies be evaluated for their impacts on "local, State and national goals and objectives" before the MPO adds one of the alternatives to the CLR Plan.

USDOT did not prescribe all the measures of system performance to be evaluated in an

---

[36] While an MIS is not required for non-major transportation investments, MPO Defendants do not dispute that the proposed ICC is a "major metropolitan transportation investment," see 23 C.F.R. § 450.104 (defining "major metropolitan transportation investment"), within the meaning of 23 C.F.R. § 450.318.

MIS, but the regulation requires that the MIS take account of which alternative will best

accomplish the national statutory objectives prescribed by Congress in § 134(a), along with State

and local goals and objectives.  Plaintiffs allege in their Complaint that no such assessment of

alternatives was performed before the proposed ICC was added to the CLR Plan, and that it was

unlawful for the MPO to add the proposed ICC to the CLR Plan without determining if the

national objectives would be better served by feasible alternatives in the record.

While the 1998 TEA-21 amendments instructed the Secretary of Transportation to

eliminate the separate MIS requirement, it also mandated that the Secretary "integrate such

requirement" into the metropolitan planning provisions of title 23, chapter 53 of title 49, and

NEPA.[37]  Pub. L. No. 105-178, § 1308, 112 Stat. 107 (1998).  MPO and USDOT Defendants'

argument that the 1993 MIS regulation was no longer in effect lacks merit because:  (1) Congress

did not repeal § 450.318 of the metropolitan planning regulations; (2) the 1993 regulation

remained consistent with § 134 after the 1998 TEA-21 amendments and enforceable; and (3) the

argument relies on sources that could not, and did not, lawfully revoke the regulation and that

---

[37] Section 1308 of the 1998 TEA-21 amendments reads in full:

> The Secretary shall eliminate the major investment study set forth in section 450.318 of title 23, Code of Federal Regulations, as a separate requirement, and promulgate regulations to integrate such requirement, as appropriate, as part of the analyses required to be undertaken pursuant to the planning provisions of title 23, United States Code, and chapter 53 of title 49, United States Code, and the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) for Federal-aid highway and transit projects. The scope of the applicability of such regulations shall be no broader than the scope of such section.

"The technical structure of the law is such that this action requires a two step process: (1) Eliminating and (2) proposing an approach for integrating what remains."  FHWA & Fed. Transit Admin., 67 Fed. Reg. 59,219, 59,223 (Sept. 20, 2002).  USDOT did not amend the MIS regulation until February 14, 2007, 72 FED. REG. 7224, 7274 (Feb. 14, 2007) (codified at 23 C.F.R. § 450.318 (Mar. 16, 2007))—well after the MPO added the proposed ICC to the CLR Plan and Metropolitan TIP.

have no legal effect because they are inconsistent with a valid existing regulation.

### A.    TEA-21 Did Not Eliminate the MIS Requirement.

MPO Defendants misconstrue the effect of the 1998 TEA-21 amendments.  The 1998 TEA-21 amendments did not repeal or eliminate the MIS requirement.  Rather, the amendments clarified an ambiguity latent in the MIS regulation as to whether an MIS must be prepared as a separate study with another study to follow that would comply with the requirements of NEPA, or whether a single study should be prepared that integrates the existing planning processes with the requirements of NEPA.  USDOT Defendants' 1993 MIS regulation left this issue to be determined on a case-by-case basis.  23 C.F.R. § 450.318(f).

Since MPOs had no obligation to satisfy NEPA as part of their planning processes, MPOs often did not include within the MIS a treatment of alternatives that met the comprehensive obligation of NEPA.  Accordingly, after a proposed project was added to a CLR Plan and Metropolitan TIP, FHWA would prepare a separate, but largely duplicative, environmental impact statement to satisfy NEPA.  Participants often viewed this duplication as a make-weight, paper shuffling task to meet the letter of the law, but which in fact had little to do with the final selection of a project.  See, e.g., 144 CONG. REC. S6399, S6402 (June 16, 1998) (S.J.R. 15). Indeed, as a practical matter, FHWA could not select a different alternative identified in the NEPA process because such an alternative was not in the CLR Plan and Metropolitan TIP.

The 1998 TEA-21 amendments sought to avoid this duplication of effort and paperwork by ensuring that the analyses required by the MIS regulation would also be adequate to satisfy NEPA.  Congress did not intend to eliminate the requirement for a study that evaluates

alternatives before a major transportation project is added to a CLR Plan and Metropolitan TIP.[38]

S. REP. 106-47, at 5 (1999) ("TEA-21 deletes the Major Investment Study as a stand-alone

requirement and integrates it into the planning process."); H.R. REP. 105-831, at 29 (1998) ("The

project review process is reformed by deleting the Major Investment Study as a stand-alone

requirement and integrating it into the planning process."); 144 CONG. REC. H10,479, H10,502

(daily ed. Oct. 10, 1998) (same).  It is no wonder, then, that the directive to integrate the MIS

requirement is found within the section titled "Program Streamlining and Flexibility."  Pub. L.

No. 105-178, § 1308, 112 Stat. 107 (June 9, 1998).  As a result, the MIS regulation is satisfied

when the MPO demonstrates how the analysis required by the MIS regulation affected its

decision to add a project to the CLR Plan and Metropolitan TIP.  See Clairton Sportsmen's Club,

882 F. Supp. at 481 (concluding, before the 1998 TEA-21 amendments, that FHWA did not

abuse its discretion by permitting the agencies to comply with the MIS regulation by

incorporating a section regarding MIS compliance into the environmental impact statement); see

also FHWA, Notice of Intent, 67 Fed. Reg. 50,504, 50,504 (Aug. 2, 2002) ("As directed by the

Transportation Efficiency [sic] Act for the 21st Century (TEA-21), the Major Investment Study

(MIS) will be integrated with the EIS.").

       Because the 1998 TEA-21 amendments did not eliminate the MIS requirement, failure to

---

[38] 144 CONG. REC. S1723, S1735 (daily ed. Mar. 11, 1998) (Sen. Warner) ("This amendment . . . eliminates the redundant provisions of the law by integrating the so-called major investment study, MIS, requirement into the overall transportation planning process. . . .  This amendment would eliminate only those elements of the MIS that are duplicative of other transportation planning requirements."); 144 CONG. REC. S2002, S2038 (daily ed. Mar. 16, 1998); 144 CONG. REC. H1888 (daily ed. Apr. 1, 1998) (Rep. Petri) (recognizing that the 1998 TEA-21 amendments were designed to reduce red tape by coordinating project reviews); 144 CONG. REC. H1913 (daily ed. Apr. 1, 1998) (Rep. Costello) (same); David M. Bearden and Linda G. Luther, Cong. Res. Serv., Environmental Streamlining Provisions in the Transportation Equity Act for the 21st Century: Status of Implementation 4 (May 30, 2003), http://www.ncseonline.org/nle/crsreports/03Jun/ RS20841.pdf.

comply with the MIS regulation is actionable after the 1998 TEA-21 amendments.[39]  See, e.g.,

Buckingham Twp.,[40] 157 F. Supp. 2d at 467-69 (permitting an action against an MPO for failure

to adhere to the MIS requirements).  Indeed, the court in Township of Belleville v. Federal

Transit Administration noted that it "finds further support for its position [that plaintiffs' may

challenge the adequacy of an MIS] in the recent amendment of the Transportation Equity Act,

P.L. 105-78 [sic], 112 Stat. 107, which eliminates the separate MIS requirement, *but mandates*

*an MIS*, as appropriate, as part of the analysis required under NEPA."  30 F. Supp. 2d 782, 794

& n.7, 795 (D. N.J. 1998) (emphasis added) (permitting an APA action to challenge the

adequacy of an MIS).  The Belleville court specifically acknowledged that the MIS requirement

serves to vindicate the objectives of § 134(a)(1).  Id. at 795 ("The import of the MIS requirement

appears clear.  It protects both local and state interests . . . includ[ing] the social, economic,

safety, and environmental interests of those impacted by major metropolitan transportation

investments receiving federal funds.").  Accordingly, courts have recognized MIS claims after

the 1998 TEA-21 amendments and, therefore, Plaintiffs' claim should not be dismissed.

### B.    The MIS Regulation Is Consistent with TEA-21.

Courts will not invalidate an existing regulation unless there is no interpretation of the

---

[39] USDOT Defendants argue that "no stand-alone MIS has been required" since the 1998 TEA-21 amendments.  Plaintiffs agree.  The elimination of a "stand-alone MIS," however, did not eliminate the MIS requirement altogether.  It merely integrated the requirement into existing planning processes.

[40] MPO Defendants inaccurately claim the court in Buckingham Township dismissed the plaintiffs' claims against a Pennsylvania MPO alleging an inadequate MIS because no private right of action exists under ISTEA.  Defs.' Br. at 12.  The court in Buckingham Township did not dismiss the plaintiffs' MIS claims.  Rather, the court considered those claims on the merits under the APA and resolved them on a motion for summary judgment.  Buckingham Twp., 157 F. Supp. 2d at 467-69.  Similarly, MPO Defendants misread Sierra Club v. Slater, 120 F.3d 623 (6th Cir. 1997), as standing for the proposition that an MIS claim should be dismissed because there is no private right of action under ISTEA.  Slater, however, did not address the district court's dismissal of the plaintiffs' claims under ISTEA because the plaintiffs' did not appeal that ruling.  Id. at 629.

regulation that is consistent with the governing law.  C. I. R. v. Standard Life & Acc. Ins. Co., 433 U.S. 148, 163 (1977).  If a regulation is inconsistent with governing law, courts will invalidate only the inconsistent provisions of the regulation, unless invalidation of those provisions renders the remainder of the regulation meaningless or nonsensical.  Id. (limiting invalidation of regulations only "to the extent" inconsistent with the statute); Georgia v. Pa. R.R. Co., 324 U.S. 439, 456 (1945) (noting that statutory conflicts should result in vacatur of a regulation "only *pro tanto* to the extent of the repugnancy").

MPO Defendants have not demonstrated how the 1993 MIS regulation is in any way inconsistent with section 1308 of the 1998 TEA-21 amendments.  Indeed, the regulation is not inconsistent with the 1998 TEA-21 amendments because it does not require the preparation of an MIS separate and apart from the planning processes found in title 23, chapter 53 of title 49, or NEPA.  USDOT's explanation for the 1993 MIS requirement is fully consistent with the intent of the 1998 TEA-21 amendments.  58 Fed. Reg. 58,056 (Oct. 28, 1993) ("[T]he intent of the requirement is to integrate planning and environmental requirements at the planning stage so that alternative courses of action, their costs and environmental effects as well as transportation demand are considered at this point.").

The congressional mandate that USDOT integrate the MIS requirement, "as appropriate," into existing planning processes creates a measure of discretion regarding how USDOT should carry out this directive, but creates no discretion to repeal or suspend the requirement.  Until USDOT promulgated new regulations in 2007,[41] USDOT acknowledged that its existing

---

[41] The new MIS regulation makes the preparation of an MIS wholly discretionary.  23 C.F.R. § 450.318(a) ("MPO(s), State(s), or public transportation operator(s) may undertake a multimodal, systems-level corridor or subarea planning study as part of the metropolitan transportation planning process.").  This is inconsistent with the 1998 TEA-21 amendments, which stated, in no uncertain terms, that USDOT was to "integrate such [MIS] requirement" into existing planning

regulation remained a "placeholder" to meet Congress's integration requirement.  FHWA, Partial Withdrawal of Notice of Proposed Rulemaking, § 1410.318, 67 Fed. Reg. at 59,223.  The 1993 MIS regulation in effect when the MPO added the proposed ICC to the CLR Plan and Metropolitan TIP, therefore, is not inconsistent with the statute.

Even if this Court concludes that the 1993 regulation is inconsistent with the 1998 TEA-21 amendments, the only provision that would create an inconsistency with Congress's two-step mandate would be subsection (f)(1) of 23 C.F.R. § 450.318, which establishes that an MIS need not include environmental studies which will be adequate for NEPA and other environmental documents.  Invalidation of that provision, however, would not render the remainder of the regulation meaningless or nonsensical.  Accordingly, if this Court concludes that the regulation is somehow inconsistent with the 1998 TEA-21 amendments,[42] it should only invalidate subsection (f)(1).  As Plaintiffs' challenge does not invoke subsection (f) of the regulation, Plaintiffs' claims would survive this invalidation and, therefore, should not be dismissed.

**C.    The Agency Statements on Which MPO Defendants Rely Are Void as Inconsistent with Existing Regulations.**

Despite controlling precedent in this Circuit requiring courts to enforce the plain

---

processes.  Because Defendants rely on this new regulation in their motions, which was finalized after Plaintiffs' filed their Complaint, Plaintiffs intend to challenge the revised MIS regulation as inconsistent with the 1998 TEA-21 amendments.

[42] Plaintiffs seriously question whether invalidation of subsection (f) would be proper, however, since the issue was not raised by the MPO Defendants in this litigation or by any party during the nine years following the 1998 TEA-21 amendments.  MPO Defendants argue that they "need not raise" the defense of lack of statutory authority to challenge application of the MIS regulation because those regulations were amended in February 2007.  MPO Defs.' Br.  at 18.  But a lack of statutory authority defense never existed.  USDOT had authority for the MIS requirement when it adopted the regulation in 1993, even though § 134 did not expressly require an MIS.  See 58 Fed. Reg. 58,056.  Furthermore, Congress specifically confirmed the MIS requirement in the 1998 TEA-21 amendments by requiring USDOT to adopt a regulation to "integrate such *requirement*, as appropriate, as part of the analyses *required* to be undertaken pursuant to the planning provisions of title 23." Pub. L. No. 105-178, § 1308, 112 Stat. 107 (emphasis added).

language of existing regulations in the face of contrary agency interpretations, AT&T Corp. v.

Fed. Communications Comm'n, 448 F.3d 426, 434 (D.C. Cir. 2006); Orengo Caraballo v. Reich,

11 F.3d 186, 193 (D.C. Cir. 1993) (citing Udall v. Tallman, 380 U.S. 1, 16-17 (1965)), MPO

Defendants improperly rely on a variety of documents to excuse themselves from complying

with the plain language of an existing regulation.[43]

The plain language of a regulation is controlling and obviates any need to look to agency

interpretive rules or guidance documents.  See, e.g., In re Sealed Case, 237 F.3d 657, 667 (D.C.

Cir. 2001) ("[J]udicial deference towards an agency's interpretation 'is warranted only when the

language of the regulation is ambiguous.'") (quoting Christensen v. Harris County, 529 U.S. 576,

588 (2000)).  The language of 23 C.F.R. § 450.318(a) plainly requires that "major investment

(corridor and subarea) studies shall be undertaken to develop or refine the plan and lead to

decisions by the MPO . . . on the design concept and scope of the investment" "where the need

for a major metropolitan transportation investment is identified."

Because the language of 23 C.F.R. § 450.318 plainly requires an MIS for major

metropolitan transportation investments like the proposed ICC, this Court should not go beyond

the regulation to consider any proposed rules or guidance documents interpreting the regulation

and should reject MPO Defendants' interpretations of the regulation that are inconsistent with

the mandatory requirement contained therein.  See Sec'y of Labor v. Twentymile Coal Co., 411

F.3d 256, 261 (D.C. Cir. 2005) (rejecting an agency's interpretation of a regulation as

"particularly untenable because it would render the pertinent regulation a nullity").

---

[43] USDOT Defendants also argue that § 134(h)(2) precludes judicial review of Plaintiffs' MIS
claims.  USDOT Defs.' Br. at 15-16.  Although this argument runs contrary to existing
precedent.  See Buckingham Twp., 157 F. Supp. 2d at 467-69.  USDOT Defendants' argument
depends, again, on concluding that Plaintiffs' MIS claims invoke the § 134(h)(2) planning
factors.  As discussed supra Part II, Plaintiffs' claims do not invoke § 134(h).

In any event, MPO Defendants rely on a variety of sources that are inconsistent with the plain language of the regulation. While the regulation plainly requires the preparation of an MIS, MPO Defendants interpret various federal agency statements as rendering the regulation non-mandatory. See MPO Defs.' Br. at 16-18. Even if the agency statements did constitute official agency interpretations concluding that MISs were not required after the 1998 TEA-21 amendments,[44] those interpretations would effect a significant change in the regulation, and, therefore, must be considered legislative rules. Am. Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1112 (D.C. Cir. 1993); see also Shalala v. Guernsey Mem. Hosp., 514 U.S. 87, 100 (1995) ("We can agree that APA rulemaking would still be required if [the agency] adopted a new position inconsistent with any of the Secretary's existing regulations"). None of the agency statements identified by MPO Defendants can be considered proper legislative rules because none of them was promulgated pursuant to notice and comment. Paralyzed Veterans of Am. v. D.C. Arena, 117 F.3d 579, 586 (D.C. Cir. 1997) ("Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking."). Accordingly, this Court should deny MPO Defendants' Motion to Dismiss Count 13 of Plaintiffs' Complaint.

## IV. Plaintiffs' Count 37 States a Claim Upon Which Relief Can Be Granted.

Count 37 alleges, in part, that MPO Defendants violated 42 U.S.C. § 7506(c)(1) by giving their approval to the proposed ICC before it was found to conform with the state

---

[44] The documents cited by MPO Defendants, MPO Defs.' Br. at 16-18, cannot be construed as guidance documents, however, because they either provide no guidance, were withdrawn, were unofficial internal opinions not intended for public consumption and reliance, or were contradicted by other documents or by other authors in the same document. As this Circuit recognizes, agency statements not capable of binding the agency are not official agency interpretations capable of altering the meaning of the plain language of a statute or regulation. Indep. Petroleum Ass'n of Am. v. Babbitt, 92 F.3d 1248, 1257 (D.C. Cir. 1996).

implementation plan.[45]  MPO Defendants do not dispute that they added the proposed ICC to the

CLR Plan and included it for funding in the 2004 and 2005 Metropolitan TIPs before the project-

level conformity determination was made by FHWA in May 2006.  Instead, they move to

dismiss on the grounds that it was legally sufficient for MPO Defendants to include the project in

the CLR Plan and Metropolitan TIP because the project satisfied one of the two statutory

requirements for project-level conformity, i.e., that it comes from a conforming plan and TIP.

None of the authorities Defendants cite supports this contention.

       The Clean Air Act requires that a "project" be found to "conform" before an MPO may

"approve" it.  Section 7506 establishes two separate tests for project-level conformity.  First,

emissions from the project must be shown to satisfy the general statutory conformity tests in §§

7506(c)(1)(A) and (B) that apply to any emitting activity supported by a federal agency.  These

tests require a finding that emissions from the project will not cause or contribute to localized

violations of the national ambient air quality standards.  Second, the project must also satisfy the

additional conformity tests enacted specifically for determining the conformity of transportation

plans, programs, and projects in § 7506(c)(2).  MPO Defendants concede that a project such as

the ICC must meet the requirement for a localized "hot spot" conformity analysis, but they argue

it is sufficient if this analysis is undertaken *after* the MPO adds the project to the CLR Plan and

Metropolitan TIP.  MPO Defs.' Br. at 34.  MPO Defendants' argument that a project need only

meet the second statutory test, but need not be found to conform under § 7506(c)(1), prior to

their approval of the project, is unsupported by the statutory text, Congress's intent, valid

regulatory interpretations, and this Circuit's precedent.

       EPA has consistently interpreted the Act to require that a project must satisfy both the

---

[45] Although Plaintiffs' Count 37 alleges violations of federal law by both MPO and USDOT
Defendants, USDOT Defendants have not moved to dismiss Plaintiffs' Count 37 claim.

general conformity tests in (c)(1) with respect to "localized air quality impacts," and be included in the regional emissions analysis to satisfy the additional transportation test in (c)(2).  See 58 Fed. Reg. 62,189 (Nov. 24, 1993); see also 71 Fed. Reg. 12,468 (Mar. 10, 2006).  EPA's reading of the Act was affirmed by the majority in Environmental Defense Fund v. EPA.  167 F.3d 641, 647 (D.C. Cir. 1999) (rejecting interpretation by dissenting judge that a project need only meet the requirements of (c)(2)).  This reading is consistent with Congress's intent to ensure that metropolitan planning processes identify alternatives that will achieve the Clean Air Act's objectives.  136 CONG. REC. 36,103, 36,107 (1990) (noting that the regional planning process should identify "the comprehensive transportation system for a metropolitan area" in the context of a "comprehensive consideration of alternatives . . . and careful analysis of options that can contribute toward achieving the air quality objectives of the Clean Air Act").

   As the only authority for their argument, MPO Defendants rely on EPA's discussion of the question in the recent Hot Spot rulemaking, which was not adopted by rule.  EPA's discussion is not a legally binding agency interpretation because it was merely a reason offered for rejecting a request for a rule.  "Interpretations . . . which lack the force of law—do not warrant Chevron-style deference." Christensen, 529 U.S. at 587; see Am. Mining Congress, 995 F.2d at 1112 (concluding that an agency statement is not a legislative rule unless it is issued pursuant to the APA's notice and comment requirements).  Accordingly, MPO Defendants' may not rely on EPA's discussion as having the force of law.

   Even if this Court considers EPA's discussion, EPA provides no analysis to explain how including a project in the CLR Plan and Metropolitan TIP before a Hot Spot analysis has been completed is consistent with § 7506(c)(1).  EPA's rationale is contrary to this Circuit's precedent and this Court should not give it weight.  EPA concluded that a project-level conformity

determination need not be made prior to adding a project to a CLR Plan or Metropolitan TIP

"since transportation plans and TIPs are updated on a regular basis, the MPO would be able to

reallocate the funding from the project to other projects at that time." 71 Fed. Reg. at 12,482-83.

The effect of this approach is to separate the project-level air quality impacts of the project from

the planning decision and defeat one of the purposes that Congress sought to achieve with §

7506. 136 CONG. REC. at 36,107. This Circuit rejected a similar effort by EPA to allow a

project to receive funding commitments when the CLR Plan and Metropolitan TIP no longer

conformed with the implementation plan. Envtl. Def. Fund, 167 F.3d at 648 (quoting the 1990

Clean Air Conference Report and concluding that EPA's approach undermined the congressional

objective to "require transportation planning agencies to view their task as the development of a

transportation system that meets . . . both mobility needs and air quality objectives"). The Court

reasoned that "[b]y requiring plans and programs to conform to applicable SIPs at the time of

project approval, Congress sought to ensure that transportation plans and programs [would] serve

as part of the pollution control strategy for the metropolitan area." Id. (internal citations and

quotations omitted). Indeed, this Circuit recognized that separating the air quality review

process from the planning process would "subvert[] Congress's intent that the two processes—

transportation planning and pollution control—occur simultaneously." Id.

The approach discussed by EPA in the recent Hot Spot rulemaking, on which MPO

Defendants rely, suffers from the same fundamental flaw. The four-year mandatory schedule for

updating a CLR Plan and Metropolitan TIP allows an MPO to lock-in the funds for a non-

conforming project for up to four years before there is any obligation to re-program the funds for

other, conforming, investments. As USDOT recognized, the intent of the MIS, which occurs

before the MPO adds a project to a CLR Plan or Metropolitan TIP, "is to integrate planning and

environmental requirements at the planning stage. . . .  This will streamline the environmental process and help[s] to assure that a particular alternative does not become 'locked-in' before the environmental and other effects have been considered."  58 Fed. Reg. 58,056.  As a result, to ensure that transportation planning and pollution control occur simultaneously, the § 7506(c)(1) conformity determination must be made in, or concurrent with, the MIS for major transportation projects.[46]  This Court, therefore, should not give weight to MPO Defendants' arguments because they run contrary to the statutory text, Congress's intent, existing valid EPA interpretations, and this Circuit's precedent, and because they would result in poor public policy.

To the extent EPA's explanation allows projects to be programmed for federal funding through the federal approval of a STIP, it also conflicts with the USDOT rule that prescribes when the conformity decision must be incorporated into the planning process.  USDOT required that State TIPs submitted for federal approval must "contain only transportation projects found to conform, or from programs that conform, to the requirements contained in 40 CFR part 51." 23 C.F.R. § 450.218(a)(4).[47]  Because a State TIP must include the MPO TIP without modification, 23 C.F.R. § 450.216(a), the conformity determination must be completed before the MPO submits its Metropolitan TIP to the State for submission to USDOT for approval.  USDOT's requirement that a State TIP may only include projects that have been found to conform implements the Clean Air Act requirement that an MPO may not approve a project until it is determined to conform.  EPA's non-binding views to the contrary, the MPO's approval of the proposed ICC as part of the CLR Plan and Metropolitan TIP before any determination was made

---

[46] The MIS is required to identify the project design concept and scope needed for a conformity emissions analysis. 23 C.F.R. § 450.318(g).

[47] 40 C.F.R. § 51.454 (1994). The Hot Spot conformity requirement was one of "the requirements contained in 40 CFR part 51" in 1993 when USDOT's promulgated its transportation planning rules.  The conformity rule was initially classified as 40 C.F.R. Part 51, Subpart T. See 58 Fed. Reg. at 62,215.

regarding localized hot spot conformity violates both the Clean Air Act and the USDOT regulation that implements the Act.[48]

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request this Court to deny MPO Defendants' and USDOT Defendants' motions to dismiss Plaintiffs' Counts 9-15 and 37.

DATED:        May 8, 2007                              Respectfully submitted,

                                                     _/s/  Hope Babcock_____
                                                     Hope Babcock, Director
                                                            (Fed/D.C. Bar No. 14639)
                                                     Erik Bluemel, Staff Attorney
                                                            (D.C. Bar No.501869)
                                                     Institute for Public Representation
                                                     Georgetown University Law Center
                                                     600 New Jersey Avenue, N.W.
                                                     Washington, D.C.  20001
                                                     Phone: 202-662-9535
                                                     Fax: 202-662-9634

                                                     Robert E. Yuhnke
                                                            (C.O. Bar No. 012686)
                                                     Robert E. Yuhnke & Associates
                                                     2910 Country Road 67
                                                     Boulder, CO  80303
                                                     Phone: 303-499-0425

                                                     *Counsel for Plaintiffs*
                                                     *Environmental Defense and Sierra Club*

---

[48] Plaintiffs allege only that the MPO erred by including the project in the CLR Plan and Metropolitan TIP before all required conformity determinations were made.  Ruling for Plaintiffs does not impose on the MPO a duty to perform the hot spot analysis.  The hot spot analysis, like the other issues to be addressed in an MIS, would be prepared by agencies assigned the task pursuant to 23 C.F.R. § 450.318(b).

Resolution Adopted
14 - 7/14/66 - (36)

Exhibit 1

RESOLUTION ADOPTING THE PLAN FOR ASSOCIATING THE
METROPOLITAN WASHINGTON
COUNCIL OF GOVERNMENTS
WITH THE
NATIONAL CAPITAL REGION
TRANSPORTATION PLANNING BOARD

WHEREAS, the Metropolitan Washington Council of Govern-
ments (hereinafter called the "Council") and the National
Capital Region Transportation Planning Board (hereinafter
called the "TPB") have determined to devise a plan for asso-
ciating the transportation planning process of the TPB with
the regional planning process of the Council; and

WHEREAS, both agencies have appointed a Special Committee
to formulate a possible plan for such an association; and

WHEREAS, the Special Committees have developed a plan for
associating the transportation planning process with the com-
prehensive regional planning process and have recommended the
proposed plan to their respective agencies for adoption; and

WHEREAS, the proposed plan will facilitate the coordina-
tion and cooperation of both agencies in carrying out their
planning responsibilities; and

WHEREAS, on July 11, 1966, the plan was unanimously
adopted by the TPB;

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF DIRECTORS
OF THE METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS as
follows:

(1)  That the Board hereby adopts the "Proposed Plan
for the Reorganization of the National Capital Transportation
Planning Process" which is attached to and incorporated as part
of this resolution.

(2)  That the association of the Council and the TPB
shall become effective upon the adoption of this resolution.

Adopted July 14, 1966

COG DISC0071

RESOLUTION ADOPTING THE PLAN FOR ASSOCIATING THE
NATIONAL CAPITAL REGION
TRANSPORTATION PLANNING BOARD
WITH THE
METROPOLITAN WASHINGTON
COUNCIL OF GOVERNMENTS

WHEREAS, the Metropolitan Washington Council of Governments
(hereinafter called the "Council") and the National Capital Region
Transportation Planning Board (hereinafter called the "Board")
have determined to devise a plan for associating the transportation
planning process of the Board with the regional planning process
of the Council; and

WHEREAS, both agencies have appointed a Special Committee
to formulate a possible plan for such an association; and

WHEREAS, the Special Committees have developed a plan for
associating the transportation planning process with the compre-
hensive regional planning process and have recommended the proposed
plan to their respective agencies for adoption; and

WHEREAS, the proposed plan will facilitate the coordination
and cooperation of both agencies in carrying out their planning
responsibilities;

NOW, THEREFORE, BE IT RESOLVED BY THE NATIONAL CAPITAL REGION
TRANSPORTATION PLANNING BOARD as follows:

(1) The Board hereby adopts the "Proposed Plan for
the Reorganization of the National Capital Transportation Plan-
ning Process" which is attached to and incorporated as part of
this resolution.

(2) This resolution and the association of the Board
and the Council shall become effective upon the adoption of the
proposed plan, as attached hereto, by the Board of Directors of
the Council.

Adopted July 11, 1966

**COG DISC0072**

PROPOSED PLAN FOR THE REORGANIZATION OF THE
NATIONAL CAPITAL REGION
TRANSPORTATION PLANNING PROCESS


At its regular meeting in November, 1965, the
Transportation Planning Board, which was established to guide
the administration and direction of the National Capital
Region transportation planning process, indicated its desire
and intention to integrate its functions with the Metropoli-
tan Washington Council of Governments. The rationale for this
approach was to permit the comprehensive transportation plan-
ning process to be undertaken as a functional component of
comprehensive regional planning.

Subsequently, the Council of Governments' Board of
Directors responded favorably to this initiative of the TPB.
And, within the past month, both organizations established
Special Committees to evolve proposals for aligning the
transportation planning process within COG.

This proposal suggests an organizational structure
under which a direct policy relationship between transportation
planning and comprehensive regional planning could be created.

COG's Present Organizational Structure

The Council of Governments is composed of 138 local
elected officials, representing the governing bodies of 12
major local governments in the Washington Metropolitan Area,
the Commissioners of the District of Columbia, and the State
and Federal legislators representing portions of the National
Capital Region. COG's day-to-day operations are supervised by
a Board of Directors which meets monthly and is composed of
representatives from the thirteen member governments in the
Council, and three at-large officials from the State legisla-
tures of Virginia and Maryland. In addition, the Council of
Governments has several policy committees, composed of local
elected officials, in the areas of public safety, land use,
health and welfare, water supply and pollution abatement, and
transportation. These committees are advised through a series
of special technical committees of experts from local, state,
and Federal agencies.

The Transportation Committee has been in a state of
quiescence since the establishment of the National Capital
Region Transportation Planning Board. The reason for this is

**COG DISC0073**

obvious. Since the Transportation Planning Board is com-
posed of elected officials augmented by the State Highway
Departments and several Federal agencies, the role of COG's
Transportation Committee would for the most part be redundant.
It appears, therefore, that a feasible organizational struc-
ture in which the transportation planning process can be
related to the Council of Governments may be evolved around
a reconstitution of COG's Transportation Committee.

Under this arrangement, the Transportation Planning
Board would become the Council of Governments' Transportation
Policy Committee. In addition, the Transportation Planning
Board would have certain quasi-independent responsibilities
consistent with its role as the transportation planning
process qualified under the Federal Aid Highway Act of 1962.
A suggested division of responsibilities could be delineated
as follows:

A. The Coordination Committee, composed of repre-
sentatives from all of the signatory local governments to the
Memorandum of Agreement, has been established as a broad
forum for discussion and coordination among the participants
in the planning process. The Committee also serves the pur-
pose of informing and expressing the views of the signatory
governments in the development of the TPB's transportation
plans. Since the Coordination Committee was established
under the Memorandum of Agreement, it appears necessary that
it be maintained and serve the purpose for which it was
originally created. Although most of the smaller local govern-
ments participating in the transportation planning process are
not members of the Council of Governments, it would not appear
that this would necessarily create any impediment to an inte-
gration of the transportation planning process into the Coun-
cil of Governments. There are certain conditions to a proposed
amalgamation which could assure these local governments a con-
tinued voice in the planning process. These could be accom-
plished as follows:

(1) The Coordination Committee would remain
intact and have the same prerogatives and responsibilities
that are vested in it under the Memorandum of Agreement.

(2) The Coordination Committee would also be
vested with the prerogative of commenting on the proposed land
use policies established by COG as they might affect the trans-
portation planning process.

-2-

COG DISC0074

B.  The most important aspect of the association of the regional transportation planning process with the activities of the Council of Governments is to assure that the TPB will continue to carry out its responsibilities for meeting the requirements of the Federal Aid Highway Act of 1962.  But, there can be a meaningful association of the two agencies without changing the basic responsibilities of the TPB.  This could be accomplished under the following conditions:

(1)  The Transportation Planning Board would continue to have the responsibility to develop a regional transportation planning process which would be a component of the comprehensive regional planning process of the Council of Governments.

(2)  The Transportation Planning Board would be substituted for the Council of Governments' Transportation Committee and would advise the COG Board on all transportation planning matters.

(3)  The Technical Committee of the Transportation Planning Board would be recognized by the Council of Governments as its Transportation Technical Committee.

-3-

COG DISC0075

Exhibit 2

## GENERAL MEMORANDUM OF AGREEMENT

WITNESSETH:

WHEREAS, Section 9 of the Federal Aid Highway Act of 1962 approved October 23, 1962, amended Chapter 1 of Title 23, United States Code by the addition of a new Section 134 which reads as follows:

"It is declared to be in the national interest to encourage and promote the development of transportation systems embracing various modes of transport in a manner that will serve the States and local communities efficiently and effectively. To accomplish this objective the Secretary shall cooperate with the States, as authorized in this title, in the development of long-range highway plans and programs which are properly coordinated with plans for improvement in other affected forms of transportation and which are formulated with due consideration to their probable effect on the future development of urban areas of more than fifty thousand population. After July 1, 1965, the Secretary (of Commerce) shall not approve under Section 105 of this title any program for projects in any urban area of more than fifty thousand population unless he finds that such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section, and

WHEREAS, the U. S. Bureau of Public Roads Instructional Memorandum 50-2-63, dated March 27, 1963, interprets the term "cooperatively" as follows:

"The establishment of a formal procedure – supported by a written memorandum of understanding – between the State highway departments and the governing bodies of the local communities for carrying out the transportation planning process in a manner that will insure that the planning decisions are reflective of and responsive to both the programs of the State highway department and the needs and desires of the local communities," and

COG DISC0077

WHEREAS, the National Capital Region is an urban area of more than fifty thousand population, encompassing the District of Columbia and portions of the State of Maryland and the Commonwealth of Virginia, and

WHEREAS, an Organizing Committee composed of representatives of the local governments, Maryland, Virginia, and the District of Columbia Highway Departments, and other public agencies in the National Capital Region, has cooperatively prepared "A Prospectus for Coordinated Transportation Planning in the National Capital Region" dated April 16, 1965, hereinafter called PROSPECTUS, and

WHEREAS, the parties hereto wish to cooperate with each other in implementing a continuing, comprehensive transportation planning process in the National Capital Region,

NOW THEREFORE, in consideration of the mutual promises and benefits contained herein the parties hereto agree as follows:

1.    The PROSPECTUS is an acceptable guide to implementation of a cooperative, continuing, comprehensive transportation planning process in the National Capital Region and is hereby made a supplement to this General Memorandum of Agreement.

2.    The Organizing Committee shall become the Coordination Committee effective June 30, 1965, and the parties hereto agree to continue to be represented on the Coordination Committee, the principal functions of which shall be as stated hereinafter.

3.    The principal function of the Coordination Committee shall be to provide a broad forum for discussion and for coordination between all participants in the regional transportation planning process and to ensure that all members are fully informed and have the opportunity to express both their own views and those of the organizations they represent in the development of future transportation plans for the National Capital Region.

4.    The Transportation Planning Board, as specifically described herein and in the PROSPECTUS, shall be officially constituted by the Organizing Committee on June 30, 1965, and shall immediately undertake to guide the administration and direction of the transportation planning process, initiating an action program of organizational, technical, and managerial activities as generally described in the PROSPECTUS.   To this end, the Transportation Planning Board shall be composed as stated hereinafter.

COG DISC0078

5. The Transportation Planning Board, as constituted by the Coordination Committee, shall be composed as follows:

- Three elected members of local governing bodies of the State of Maryland,

- Three elected members of local governing bodies of Northern Virginia,

- Three representatives of the Board of Commissioners of the District of Columbia,

- One representative of the Maryland State Roads Commission,

- One representative of the Virginia Department of Highways,

- One representative of the District of Columbia Department of Highways and Traffic,

- One representative of the National Capital Transportation Agency who shall be non-voting,

- One representative from the Washington Metropolitan Area Transit Commission who shall be non-voting,

- One Federal representative to be appointed by the Administration,

- One representative from the Department of Commerce Bureau of Public Roads who shall be non-voting,

- One representative from the Housing and Home Finance Agency who shall be non-voting,

- Alternates may be named for each one of the elected members of governing bodies and these alternates shall not necessarily be elected officials of local governing bodies.

6. The principal functions of the Transportation Planning Board shall be to provide guidance in the development of policies and procedures required for the effective organization, management and implementation of the

COG DISC0079

transportation planning process including the coordination of actions related to securing of Federal aid funding of the planning process and matching funding by the signatories of this Agreement (where appropriate), publication of progress reports describing the time, cost, and technical detail of the planning program, and the distribution of minutes of proceedings.

7.  No financial obligation is incurred by reason of the approval of this Memorandum.  Any financial participation or service that may later be requested will be presented separately with justifications.

8.  The parties hereto agree to cooperate with each other and with all of the participants in the cooperative, continuing, comprehensive transportation planning process in the National Capital Region as generally described in the Prospectus.

IN WITNESS WHEREOF, the parties hereto have executed this General Memorandum of Agreement made this _____ day of _____, 1965.

COG DISC0080

Attest:

Highway Department

By _____

Attest

The County/City/Town of _____

By  . . . . . . . . . . . . . . . . . . . . . . .

_____
Being authorized to sign on behalf
of said County/City/Town.

COG DISC0081

Exhibit 3

STATE OF MARYLAND

EXECUTIVE DEPARTMENT

ANNAPOLIS, MARYLAND 21404

'IN MANDEL
.OVERNOR

January 14, 1974

norable Claude S. Brinegar
:retary
S. Department of Transportation
) Seventh Street, S. W.
.shington, D. C.   20590

ar Secretary Brinegar:

     ·In response to the joint letter from the U. S. Department of Transportation
)dal administrators on November 12, 1973, we believe the guidelines developed
lcr Section 112 by the U. S. Department of Transportation to be in excess of the
;islative requirements under that section.  It is our understanding that the
ent of Section 112 of the 1973 Highway Act is to strengthen the 134 transportation
inning process in urban areas, and further that it is the State's prerogative to
signate the organization or organizations which shall be the recipient of Section
funds.

     We do, however, applaud the efforts of the U. S. Department of Transpor-
ion in consolidating the metropolitan planning process through the Unified
ork Program.  We are hopeful that your Department will pursue a consolidated
inning fund, which would also make provisions for rail and port planning, as
11 as a consolidated Transportation Trust Fund, as presently exists in Maryland.
doing this we would hope that the traditional State involvement in transportation
uld be given appropriate consideration.

     In particular regard to Section 112, we strongly believe that Maryland,
well as many other states, over the past two years under the Unified Work
ogram, have been able to establish successful cooperative arrangements
th local officials for transportation planning.  We believe that any actions
cen by FHWA, UMTA and FAA should reinforce these relationships, rather
an diminish them.

     Therefore, I hereby make the following designations in the Washington
d Baltimore metropolitan areas that reinforce the existing 134 arrangements
those regions, and which have been mutually agreed upon by State and local
cted officials.

**COG DISC0172**

53

### (1) Washington Metropolitan Area

By agreement, the Metropolitan Washington Council of Governments, the Maryland Department of Transportation, the Virginia Department of Highways, and the District of Columbia Department of Highway and Traffic, recognize the Transportation Planning Board (TPB) of the Metropolitan Washington Council of Governments (COG) as the 134 policy body. The TPB has, in turn, chosen to use the transportation staff of the Council of Governments to coordinate systems planning activities in the metropolitan region. For purposes of identifying a public body to receive UMTA Section 9 Technical Studies Funds, FAA Systems Planning Funds for metropolitan or regional studies, and HPR and Section 112 Funds received from Maryland, Virginia and the District of Columbia, the TPB has designated the Metropolitan Washington Council of Governments.

### (2) Baltimore Metropolitan Area

Within the past year in the Baltimore Metropolitan Area, a new and somewhat different set of institutional agreements have been initiated between the Baltimore Regional Planning Council, the Maryland Department of State Planning, the Maryland Department of Transportation and local jurisdictions within the region. These agreements have been ratified by each of the participating jurisdictions through a formal Memorandum of Understanding and more recent endorsement of these agreements at the December meetings of the Baltimore Transportation Steering Committee and the Baltimore Regional Planning Council.

I endorse these cooperative agreements and request that you respect these agreements as detailed in the attached resolutions of the above-named bodies as the mechanisms under which transportation systems planning funds, which may be made available to the Washington and Baltimore areas from the Federal Highway Administration, the Urban Mass Transportation Administration, and the Federal Aviation Administration, should be administered.

Sincerely,

Governor

COG DISC0173



Exhibit 4

THE DISTRICT OF COLUMBIA

WASHINGTON, D.C. 20004

APR 1 6 1974

Honorable Claude S. Brinegar
Secretary of Transportation
U. S. Department of Transportation
Washington, D. C.   20590

My dear Mr. Secretary:

I am writing to confirm for your records, designation of the agency
for receipt of Urban Mass Transportation Administration, Federal
Highway Administration, and Federal Aviation Administration System
Planning Funds.  We are fortunate in Washington to have a cooperative
transportation planning process conducted by the Metropolitan
Washington Council of Governments and mutually agreed upon by state
and local elected officials of the region.  The following designation,
therefore, identifies the Metropolitan Washington Council of
Governments as the proper recipient.

By agreement, the Metropolitan Washington
Council of Governments, the Maryland
Department of Transportation, the Virginia
Department of Highways, and the District of
Columbia Department of Highways and Traffic,
recognize the Transportation Planning Board
(TPB) of the Metropolitan Washington Council
of Governments (COG) as the 134 policy body.
The TPB has, in turn, chosen to use the
transportation staff of the Council of
Governments to coordinate systems planning
activities in the metropolitan region.  For
purposes of identifying a public body to
receive UMTA Section 9 Technical Studies
Funds, FAA Systems Planning Funds for
metropolitan or regional studies, and HPR
and Section 112 (1973 Act) Funds received
from Maryland, Virginia and the District of
Columbia, the TPB has designated the
Metropolitan Washington Council of
Governments.

COG DISC0174

..ble Claude S. Brinegar
.e Two

The District of Columbia Government will share the responsibility with
the Federal agency for administration of the local funds so designated.

Sincerely yours,

Walter E. Washington
Mayor-Commissioner

COG DISC0175

Exhibit 5

# COMMONWEALTH of VIRGINIA

### Office of the Governor
### Richmond 23219

litham
nsportation
ty

March 7, 1975

Mr. Kenneth L. Bellamy, Chairman
Intermodal Planning Group
Federal Highway Administration
31 Hopkins Plaza, Room 1614
Baltimore, Maryland   21201

Dear Mr. Bellamy:

My letter to Mr. Clarence W. Friesen of December 19, 1973, designated on behalf of the Governor the respective planning district commissions for the Roanoke, Lynchburg, Richmond, Colonial Heights-Petersburg-Hopewell, Peninsula, and Southeastern urbanized areas; and the Metropolitan Washington Council of Governments for the National Capital Region as the recipients of Section 9 (UMTA), Section 112 (FHWA), and Section 13 (FAA) planning funds. Inherent to this designation was the recognition of the agreements between the Virginia Department of Highways and Transportation and the regional agencies which specifically establish the policy mechanisms for the 3-C processes as the Transportation Policy Committees and Transportation Planning Board. Mr. Friesen's letter of January 11, 1974 acknowledged this "established formal arrangement"; however, subsequent activities of the Federal and regional participants have indicated a lack of understanding of this concept.

It is absolutely essential that the established policy forum be maintained if the 3-C process is to be effective in addressing the transportation needs of the citizens of the Commonwealth. The Transportation Policy Committees have representation of all participating local governing bodies, the Virginia Department of Highways and Transportation and the Federal Highway Administration. In addition, in most urbanized areas, the Transportation Policy Committees are the only forum which can effectively coordinate the input of all local agencies vested by statute with transportation planning and implementation responsibilities such as the transportation district commissions, airport authorities, and planning district commissions.

COG DISC0176

55

4.  Kenneth L. Dell...

In order to ensure that there is no misunderstanding, this is to advise that the following are designated to perform the metropolitan planning organization functions as set forth in all Federal guidelines:

<u>National Capital Region</u>

Transportation Planning Board of the Metropolitan
Washington Council of Governments
Reverend L. A. Moore, Chairman
c/o Mr. Albert A. Grant, Director
Metropolitan Washington Council of Governments
Transportation Planning Board
1225 Connecticut Avenue, N. W.
Washington, D. C.  20036

<u>Southeastern Urbanized Area</u>

<u>Southeastern Virginia Transportation Policy Committee</u>

Mr. H. M. Myers, Jr., Chairman
c/o Mr. R. F. Foeller, Executive Director
Southeastern Virginia Planning District Commission
110 West Plume Street
Norfolk, Virginia  23510

<u>Peninsula Urbanized Area</u>

<u>Peninsula Area Transportation Policy Committee</u>

Mr. C. E. Johnson, Chairman
c/o Mr. Henry M. Cochran, Executive Director
Peninsula Planning District Commission
2019 Cunningham Drive
Hampton, Virginia  23366

<u>Lynchburg Urbanized Area</u>

<u>Lynchburg Area Transportation Planning Council</u>

Mr. William F. Overacre, Chairman
c/o Mr. William W. Hibbert, III, Executive Director
Central Virginia Planning District Commission
2511 Memorial Avenue, Suite 301
Lynchburg, Virginia  24501

COG DISC0177

Richmond Urbanized Area

Richmond Area Transportation Policy Committee

Mr. George W. Jenkins, Jr., Chairman
c/o Mr. Edward G. Councill, III, Executive Director
Richmond Regional Planning District Commission
6 N. 6th Street, Suite 500
Richmond, Virginia 23219

Colonial Heights-Petersburg-Hopewell Urbanized Area

Tri-Cities Area Transportation Policy Committee

Mr. Roland Specter, Chairman
c/o Mr. Charles F. Turner, Executive Director
Crater Planning District Commission
P. O. Box 1808
Petersburg, Virginia 23803

Roanoke Urbanized Area

Roanoke Valley Transportation Policy Committee

Mr. Gutherie W. Nicks, Chairman
c/o Mr. Charles L. Haeussler, Executive Director
Fifth Planning District Commission
P. O. Box 2527
Roanoke, Virginia 24010

Your office will be informed at such time as the committees are
established for the Kingsport, Tennessee-Virginia urbanized area.

Be advised that in confirming this designation, I am not delegating
this Commonwealth's statutory responsibilities to the aforementioned.
Your Department of Transportation must recognize the state's role in
transportation planning and implementation and I would encourage the modal
administrations to effectuate liaison with state government. The Virginia
Department of Highways and Transportation by statute is to develop and

COG DISC0178

coordinate balanced and unified transportation systems plans for all transportation modes. The appropriate staff contact with the Virginia Department in all transportation planning and implementation matters is Mr. J. P. Royer, Jr., Director of Planning.

With best regards, I am,

Sincerely,

Wayne A. Whitham

cc:
The Honorable Mills E. Godwin, Jr.

bcc:
Mr. Douglas B. Fugate
Mr. John E. Harwood
Mr. J. P. Royer
Mr. Oscar Mabry

COG DISC0179

Exhibit 6

# METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS
## STATEMENT OF RESOURCES, EXPENDITURES, AND CHANGES IN FUND BALANCE
### PROJECT FUND
### JUNE 30, 2002

| | Fund Balance 30-Jun-01 | Resources | Expenditures | Fund Balance 30-Jun-02 |
|---|---|---|---|---|
| **Agency and Project** | | | | |
| Department of Housing and Urban Development | $ - | $ 1,004,332 | $ 1,004,332 | $ - |
| Environment Protection Agency | 264,238 | 761,286 | 958,870 | 66,654 |
| Department of Transportation (Federal Transit Administration/Federal Highway Administration) | 43,643 | 10,897,779 | 10,941,422 | - |
| Department of Health and Human Services | 76,544 | 41,203 | 41,854 | 75,893 |
| Federal Aviation Administration | 4,518 | 100,093 | 51,307 | 53,304 |
| Other Federal Agencies | 6 | 2,020,069 | 2,009,466 | 10,609 |
| **Total Federal Government Projects** | 388,949 | 14,824,762 | 15,007,251 | 206,460 |
| | | | | |
| State of Maryland | 395 | 818,212 | 815,637 | 2,970 |
| Commonwealth of Virginia | 70 | 94,829 | 94,899 | - |
| District of Columbia | 24,388 | 42,663 | 33,078 | 33,973 |
| Interstate and Regional Programs | - | 3,220,679 | 3,219,046 | 1,633 |
| **Total State and District Government Programs** | 24,853 | 4,176,383 | 4,162,660 | 38,576 |
| | | | | |
| **Other Projects** | | | | |
| Washington Housing Partner | - | 144,752 | 144,752 | - |
| Wednesday's Child Program | - | 283,372 | 283,372 | - |
| Other Programs | 224,298 | 3,936,476 | 3,549,570 | 611,204 |
| **Total Other Projects** | 224,298 | 4,364,600 | 3,977,694 | 611,204 |
| | | | | |
| **Grand Total All Projects** | $ 638,100 | $ 23,365,745 | $ 23,147,605 | $ 856,240 |

The accompanying notes are an integral part of these financial statements.

5

**COG DISC1073**

# METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS
## STATEMENT OF RESOURCES AND EXPENDITURES
### PROJECT FUND
### YEAR ENDED JUNE 30, 2002

**Resources**

| | |
|---|---:|
| Federal revenue | $ 11,558,066 |
| State and local revenue | 8,959,908 |
| Matching revenue from General Fund | 2,414,320 |
| Other revenue | 433,451 |
| | |
| Total Resources | $ 23,365,745 |

**Expenditures**

| | |
|---|---:|
| Personnel costs | $ 8,101,583 |
| Professional Fees | 7,238,090 |
| Dues and Publications | 42,997 |
| Automobile | 12,714 |
| Conferences, meetings and seminars | 267,043 |
| Printing and reproduction | 590,646 |
| Postage and delivery | 268,957 |
| Depreciation | 105,276 |
| Data processing | 868,349 |
| Insurance | 12,864 |
| Maintenance expense | 123,601 |
| Miscellaneous | 3,161 |
| Office supplies | 65,476 |
| Promotion and advertising | 965,046 |
| Recruitment | 29,820 |
| Telephone & utilities | 77,924 |
| Temporary services | 400,324 |
| Rent | 90,053 |
| Travel-Other | 165,475 |
| Child care, Tuition and Stipend | 269,238 |
| Indirect cost allocated | 3,448,968 |
| | |
| Total Expenditures | $ 23,147,605 |

The accompanying notes are an integral part of these financial statements.

6

**COG DISC1074**

Exhibit 7

## METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS
### STATEMENT OF REVENUE, EXPENDITURES AND CHANGES IN FUND BALANCES
### GOVERNMENTAL FUNDS
### FOR THE YEAR ENDED JUNE 30, 2004

| | General Fund | Project Fund | Total Governmental Funds |
|---|---|---|---|
| **REVENUES** | | | |
| Member Contributions | $ 2,574,820 | $ - | $ 2,574,820 |
| Federal Revenue | - | 14,604,861 | 14,604,861 |
| State Revenue | - | 5,833,439 | 5,833,439 |
| Local Revenue | - | 1,526,095 | 1,526,095 |
| Foundation Contributions | - | 558,599 | 558,599 |
| Other Income | - | 611,200 | 611,200 |
| Investment Income | 406,883 | - | 406,883 |
| Total Revenues | 2,981,703 | 23,134,194 | 26,115,897 |
| | | | |
| **EXPENDITURES** | | | |
| Transportation | - | 13,909,612 | 13,909,612 |
| Human Services, Planning, and Public Safety | - | 5,122,620 | 5,122,620 |
| Environmental | - | 6,547,883 | 6,547,883 |
| Direct Services | 4,063 | 267,914 | 271,977 |
| Total Expenditures | 4,063 | 25,848,029 | 25,852,092 |
| | | | |
| Excess(deficiency) of revenues over (under) expenditures | 2,977,640 | (2,713,835) | 263,805 |
| | | | |
| **OTHER FINANCING SOURCES (USES)** | | | |
| Transfers in (out) | (2,574,820) | 2,574,820 | - |
| Total Other Financing sources (uses) | (2,574,820) | 2,574,820 | - |
| | | | |
| Net Change in Fund Balances | 402,820 | (139,015) | 263,805 |
| Fund Balances, beginning-restated | 4,783,230 | 4,520,216 | 9,303,446 |
| Fund Balances, ending | $ 5,186,050 | $ 4,381,201 | $ 9,567,251 |

The notes to the financial statements are an integral part of this statement.

11

**COG DISC1148**

Exhibit 8

**BYLAWS OF THE**

## NATIONAL CAPITAL REGION TRANSPORTATION PLANNING BOARD

As Amended September 15, 1993

## I. FUNCTIONS

The Transportation Planning Board (TPB), serving as the Metropolitan Planning Organization for the Metropolitan Washington Area, shall be responsible for the development of policies of regional significance (having "significant" interjurisdictional effects in terms of financing, transportation service, location, staging, and/or socio-economic, land use, or environmental impacts), and necessary procedures for the effective implementation of Title 23, Section 134, and Title 49, Section 1607, of the United States Code concerning a metropolitan transportation planning process. The TPB's functions include, but are not limited to, organization and management direction of the planning process, actions related to securing of Federal aid funding for the planning process and matching funding by the signatories of the Agreement, publication of progress reports describing the time, cost, and technical detail of the planning program, and distribution of minutes of its proceedings.

## II. RELATIONSHIP WITH COG

In July 1966, the TPB and the Metropolitan Washington Council of Governments (COG) jointly adopted a plan for associating the two organizations, under which the TPB may also serve as the transportation policy committee of COG. The purpose of the plan is to improve coordination between the TPB's transportation planning process and COG's comprehensive regional planning process, and to achieve economies and efficiencies through joint staffing and administration of these two activities. Under this arrangement, the TPB uses COG's forecasts of land use, population and employment as the basis for developing transportation plans and programs consistent with the area's growth policies. This association does not in any way impinge upon the basic responsibilities of the TPB as the designated Metropolitan Planning Organization for transportation planning in the Washington Metropolitan Area.

## III. MEMBERSHIP AND TERMS

The TPB shall be composed as follows:

a.  One (1) elected member from each of the local governing bodies of the cities and counties in Maryland and Virginia participating in COG. In addition, membership may include one (1) elected member from the governing body of any other city or county recommended for membership by a majority vote of the TPB based on the substantial interests such jurisdiction has in the metropolitan planning process. Participation of such non-COG members shall be conditioned on such jurisdiction contributing to the financial support of the planning process in an amount determined by the TPB;

b.  Those cities or counties of Maryland and Virginia that participate in the TPB which have a population greater than 400,000 shall have one (1) additional member selected as follows:

> (1)  The County Executive or his designated representative, if the form of government includes an elected County Executive, or;

> (2)  One (1) additional elected member of the local governing body, if the form of government does not include an elected County Executive.

COG DISC0121

c. Four (4) members from the Government of the District of Columbia, two (2) of whom shall be members of the Council, and two (2) from the executive branch. One (1) of the executive branch members shall be from the Department of Public Works.

d. One (1) member from each of the Departments of Transportation of Maryland and Virginia, and one (1) member representing the Washington Metropolitan Area Transit Authority (WMATA);

e. One (1) member each from the House and Senate of the Maryland and Virginia General Assemblies and one (1) additional member from the Council of the District of Columbia. Such members and their alternates shall be selected from the members of the General Assemblies representing portions of the Washington Metropolitan Area, and the Council of the District of Columbia, respectively. Alternates for these members shall also be members of the General Assemblies or the Council of the District of Columbia, respectively.

f. One (1) member each from the National Capital Planning Commission, the Metropolitan Washington Airports Authority, the Federal Highway Administration, the Federal Transit Administration, the Federal Aviation Administration, and the National Park Service. Each member in this category shall be non-voting, but shall be entitled to offer and second motions and resolutions and otherwise enter into deliberations of the TPB.

Designated alternate representatives of the local government representatives need not be elected officials, but must be appointed by their local governing body. Designated alternate representatives of the Departments of Transportation and the District of Columbia Department of Public Works must be appointed by their respective Departments. Designated alternate representatives of the WMATA must be appointed by the Board of Directors.

Members shall serve until replaced by the organization they represent. Changes in jurisdictional membership (but not individual appointments) shall be endorsed by the Governor of the State from which local government membership is requested.

## IV. TIME AND PLACE OF MEETING

The TPB shall hold regular meetings in January, March, April, May, June, September and November. Special meetings may be called by the Chairperson at any time on ten (10) days notice in writing of the time, place, and general business to be transacted. The Chairperson shall call a special meeting of the TPB on the request of not less than one-third of the voting members of the TPB, or as required under Section VIIb(5).

## V. OFFICERS

Officers of the TPB shall consist of a Chairperson and two Vice Chairpersons who are voting members. Terms of office shall be for one year, from January 1 to December 31. Election of officers shall take place at the regular November meeting. Neither the Vice Chairpersons nor Chairperson shall be a representative of the same State or agency. If a vacancy occurs in the office of any of the officers, his successor shall be elected from the same State to complete the unexpired term, such election to be held at any regular meeting of the TPB.

2

COG DISC0122

<u>Duties of Officers</u>

The Chairperson of the TPB shall preside at all meetings and appoint all committees, and shall perform such other duties as the TPB may from time to time order.

The Vice Chairperson shall preside at meetings in the absence of the Chairperson, shall assist the Chairperson, and shall act in the absence of the Chairperson.

The Department of Transportation Planning staff shall be Secretary of the TPB. The staff shall be the custodian of all records of the TPB and shall keep accurate minutes of the meetings of the TPB. Minutes of the TPB shall be disseminated to members of the TPB and their alternates as well as to non-member jurisdictions in the region. The staff shall, on behalf of the TPB, certify, when required, copies of records, and shall perform such other duties as may be directed by the TPB. The staff shall also maintain the official copy of the Bylaws of the TPB, and shall enter upon such official copy all duly adopted modifications and amendments.

## VI. QUORUM AND VOTING PROCEDURES

a.  Ten (10) voting members or their alternates, to include at least one (1) voting member or alternate representing the District of Columbia, Maryland, and Virginia, shall constitute a quorum of the TPB.

b.  Each representative from the State Departments of Transportation (including the District of Columbia), the WMATA, the General Assemblies of Maryland and Virginia and the Council of the District of Columbia appointed under Section IIId, and the participating local governments shall be entitled to cast one (1) vote, except on any matter for which the alternate voting procedure provided for under Section VId is invoked, in which case only the votes of the representatives designated under Section VId shall be counted.

c.  Except for amendments to the Bylaws which require a majority vote of all the voting members of the TPB, whether taken on a regular or proportional voting basis, all actions, including all actions decided on the basis of the alternate voting procedure provided for in Section VId, shall be by a majority vote of those present and voting, provided that the extent of financial participation by any jurisdiction, agency or public body shall be determined only with the concurrence of that jurisdiction, agency, or public body.

d.  Any voting member may require that the vote on any matter brought before the TPB be decided on a proportional voting basis provided for in this Section VId. A proportional vote may be called for either instead of voting on a regular basis as provided in Section VIb or subsequent to a vote taken in accordance with Section VIb, provided, however, that such a subsequent vote shall be at the same meeting. For this purpose, five (5) votes each shall be assigned to Maryland, Virginia and the District of Columbia; such votes shall be distributed by first assigning one (1) vote each to the Maryland Department of Transportation, the Virginia Department of Transportation and the District of Columbia Department of Public Works. The remaining four votes each allocated to Maryland, Virginia and D.C. shall be apportioned as follows:

3

COG DISC0123

(1)  Three (3) votes shall be allocated to the participating local governments in each of the Maryland and Virginia portions of the Metropolitan Area as follows:  each participating local government from Maryland and Virginia shall have one (1) share for each 50,000 population and the next major succeeding portion thereof, except that each jurisdiction having a population of less than 50,000 shall have one (1) share.  Populations assigned to the participating local governments shall be the most recent population estimates approved by COG.  The total weighed vote cast by the participating local governments in each of the Maryland and Virginia portions of the Metropolitan Area shall be tabulated by determining the percentage of the total shares of those present and voting cast in each of the Maryland and Virginia portions for and against the question and multiplying the resultant percentage by three.  Those jurisdictions which have a population of over 400,000 shall have their weighted vote based on population divided equally between the legislative and executive branch representatives or designated alternates present and voting.  If only one representative is present, that jurisdiction's representative will be given the full weighted vote to which that jurisdiction is otherwise entitled.

(2)  Each member from the House and Senate of the Maryland and Virginia General Assemblies present and voting shall be allocated one-half (0.5) of a weighted vote.

(3)  Each member from the District of Columbia present and voting, or his alternate in his absence, shall be allocated one (1) of the four (4) remaining D.C. votes.

If the total weighted vote of those present and voting within any one of the Maryland, Virginia, or District of Columbia portions of the Metropolitan Area is less than five (5), the weighted vote for each of the representatives present and voting for that portion of the Metropolitan Area shall be increased proportionally to insure a total of five (5) votes.  The final vote on the question shall then be determined by adding the total votes cast in each of the Maryland, Virginia and District of Columbia portions of the Metropolitan Area together to arrive at the votes for or against the question.  The question shall carry if it receives a majority of the proportional votes cast in accordance with the above procedure.

## VII.  COMMITTEES

### a.  Program Committee

There shall be a Program Committee to facilitate work program planning and management of the transportation planning process.  The Committee's responsibilities include:

(1)  Working with the staff in developing the annual transportation planning work program and budget for consideration by the TPB;

(2)  Reviewing monthly recommendations from the staff and Technical Committee on technical procedures, work program progress and the overall technical conduct of the planning process;

4

COG DISC0124

(3) Working with the TPB Chairperson and the staff in developing recommendations for the TPB on revisions to the adopted regional transportation plan and transportation improvement program, and on major transportation planning policies;

(4) Recommending for TPB approval criteria for grouping by function, geographic area, and work type those non-regionally significant projects that are not of appropriate scale for individual identification in the transportation improvement program;

(5) Providing a mechanism to assist the TPB Chairperson in preparing for meetings and working with other COG Policy Committees;

(6) In months when the full TPB is not scheduled to meet, act on behalf of the TPB on proposed amendments to the Unified Planning Work Program (UPWP) or to the annual element of the Transportation Improvement Program (AE/TIP) and advise the TPB of such action. Notice of proposed amendments to the UPWP or the AE/TIP shall be given to the full TPB at least five days prior to action by the Program Committee; if a voting member objects in writing to action by the Program Committee, the proposed amendment shall be considered by the full TPB. The member objecting to the amendment shall have the option to have the Chairperson call a special meeting of the TPB to consider the amendment or agree to hold the amendment over to the next regular TPB meeting. Notwithstanding the above, the Committee shall have the full authority to approve non-regionally significant items, and in such cases it shall advise the TPB of its action.

The Program Committee shall be composed of ten (10) members of the TPB as follows: the TPB Chairperson and immediate past Chairperson, one (1) local government representative of the District of Columbia, one (1) elected local government representative of Maryland, one (1) elected local government representative of Virginia, one (1) representative each of the State Transportation Agencies, one (1) representative of WMATA, and the Chair of the Technical Committee. The Program Committee shall be chaired by the current TPB Chairperson and shall meet on a regular basis or as determined by the Chairperson.

b. Technical Committee

There shall be a Technical Committee to advise and assist the TPB in the technical actions of the planning process, to review the cost and content of the work program, to review methodology and procedures, and to review plans and programs. Members of the Committee shall be appointed by the TPB from persons nominated by the various jurisdictions, public agencies, and private organizations in the region having cognizance over transportation matters or an interest or special competence in the field of transportation. Members may also be appointed from persons of special competence nominated by TPB members. The Technical Committee shall make recommendations to the TPB concerning data collection procedures to ensure coordination of procedures and standards between city, county, State and local planning agencies and this transportation process, and shall consider and make recommendations concerning any other matters referred to it by the TPB. The Technical Committee shall elect such officers as may be appropriate, and shall meet once each month or on an as needed basis as determined by the Technical Committee Chairperson.

5

COG DISC0125

c. Advisory Committees and Task Forces

The development, maintenance and updating of the Metropolitan Area's transportation plans and programs require an assessment of contemporary viewpoints on critical issues, needs, values and priorities. To assist the TPB in ascertaining such views, the TPB may establish special Advisory Committees and Task Forces for such purpose.

Such Advisory Committees and Task Forces shall be established by resolution of the TPB, and such resolution shall include a mission statement. The Chair of the TPB shall appoint the members of the Advisory Committees and Task Forces from a broad cross-section of elected and appointed officials, and civic, business, environmental and other relevant community interests in the region. Appointments shall be subject to the review and approval of the TPB.

## VIII. STAFF

The Director of Transportation Planning of the Metropolitan Washington Council of Governments and his designees shall serve as staff to the TPB in the conduct of the transportation planning process.

## IX. PUBLIC PARTICIPATION

In order to foster greater participation by citizen, transportation, environmental, and other advocacy groups in the transportation planning process, the TPB will set aside a period of time at each of its regularly scheduled meetings to hear input from representatives of recognized regional groups.

The TPB will maintain a list of recognized regional citizen, transportation, environmental, and other interested advocacy groups. Groups not on the established list may request that the TPB add them to the list. At the discretion of the TPB Chairperson, individuals may also be recognized and given the opportunity to speak within the allotted public comment period.

Representatives of such groups desiring to speak before the TPB are requested to notify the Director of Transportation Planning that they wish to appear before TPB at least two (2) days before the scheduled date of the meeting. Such representatives should speak on topics of current interest to the TPB. Presentations to the TPB shall normally be limited to three (3) minutes. At least 50 written copies of the presentations and any additional information that the groups wish to present to the TPB should be provided when their representatives appear before the TPB.

Special meetings of the TPB may be scheduled to hear citizen and special interest group input on topics of special interest as decided by the TPB, and citizens will be invited to participate in Advisory Groups and Task Forces established under VIIc.

## X. AMENDMENTS OF BYLAWS

These Bylaws may be amended pursuant to the following procedures:

a. With the approval of the majority of those voting members of the TPB present and voting, a proposal to amend the Bylaws introduced at any regular meeting of the TPB, shall be recorded in the minutes, and

6

COG DISC0126

b. A special written notice setting forth such proposal shall be mailed to every member of the TPB at least ten (10) days before the next regular meeting.

The amendment shall be acted upon at the regular meeting next following the meeting at which it was proposed. A majority vote of the voting members of the TPB shall be required for adoption.

COG DISC0127

Exhibit 9

A265
c.2

## OFFICE OF RECORDER OF DEEDS, D. C.
### Corporation Division
Sixth and D Streets, N. W.
Washington, D. C.  20001

# CERTIFICATE

*THIS IS TO CERTIFY* that all provisions of the District of Columbia

Non-profit Corporation Act have been complied with and ACCORD-

INGLY this Certificate of _____Incorporation_____

_____

is hereby issued to the METROPOLITAN WASHINGTON COUNCIL OF

_____GOVERNMENTS_____

as of the date hereinafter mentioned.

Date    May 28, 1965

PETER S. RIDLEY,
*Recorder of Deeds, D. C.*

*Alfred Goldstein*
_____Alfred Goldstein_____
*Superintendent of Corporations*

Government of the District of Columbia
Form RD-C 55
Oct. 1962

COG DISC0030

ARTICLES OF INCORPORATION
OF
METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS

TO:  The Recorder of Deeds, D. C.
     Washington, D. C.

We, the undersigned natural persons of the age of twenty-one years or more, acting as incorporators of a Corporation adopt the following Articles of Incorporation for such Corporation pursuant to the District of Columbia Non-profit Corporation Act.

FIRST:     The name of the Corporation is Metropolitan Washington Council of Governments.

SECOND:    The Corporation shall have perpetual succession.

THIRD:     The address of its initial registered office is 1701 Pennsylvania Avenue, N.W., Washington, D. C., and the name of its initial registered agent at such address is Samuel Humes, Executive Secretary, Metropolitan Washington Council of Governments.

FOURTH:    (a)  The Corporation is organized and shall operate under the District of Columbia Non-profit Corporation Act, exclusively for charitable, educational and scientific research purposes. The Corporation shall promote a spirit of cooperation among the local governments of the National Capital Region, assist in resolving problems affecting the region in a manner which is mutually satisfactory to protect the rights and prerogatives of the local governments, and advise and assist the local governments of the region --

     (1)  to identify mutual area-wide problems affecting the sound growth and development and economical functioning of the region;

     (2)  to develop and promote the development of regional comprehensive plans for growth and development of the region as a whole for consideration by the local governments of the region;

     (3)  to agree upon mutually desirable policies and consensuses and develop cooperative mechanisms among the local governments for improving the administration of public services;

     (4)  to support and promote concerted action among the local governments for their mutual benefit and for the welfare of the region as a whole; and

     (5)  to serve upon the request of the local governments as a representative of such governments in matters such as they may determine affect the region as a whole.

     (b)  As used in these Articles of Incorporation --
     (1)  the terms "region" and "National Capital Region" mean the District of Columbia; Charles, Montgomery and Prince George's Counties in Maryland; Arlington, Fairfax, Loudoun and Prince William Counties and the Cities of Alexandria, Fairfax and Falls Church in Virginia; and all other municipalities now or hereafter existing in Maryland and Virginia within the geographic area bounded by the outer boundaries of said counties and cities;

     (2)  the term "local governments" means the District of Columbia and all of the cities, counties and municipalities now or hereafter existing in the National Capital Region.

COG DISC0031

-2-

FIFTH:    The Corporation shall have the power --
(a)  to sue and be sued, complain and defend, in its corporate name;

(b)  to have a corporate seal which may be altered at pleasure and to use the same by causing it, or a facsimile thereof, to be impressed or affixed or in any other manner reproduced;

(c)  to purchase, take, receive, lease, take by gift, devise or bequest, or otherwise acquire, own, hold, improve, use and otherwise deal in and with, real or personal property, or any interest therein, wherever situated;

(d)  to sell, convey, mortgage, pledge, lease, exchange, transfer, and otherwise dispose of all or part of its property and assets;

(e)  to make contracts and incur liabilities, borrow money at such rates of interest as the Corporation may determine;

(f)  to invest and reinvest its funds, and take and hold real and personal property as security for the payment of funds so loaned;

(g)  to conduct its affairs, carry on its operations, hold property, and have offices and exercise the powers granted by the District of Columbia Non-profit Corporation Act in any part of the United States;

(h)  to elect or appoint officers and agents of the Corporation, and define their duties and fix their compensation;

(i)  to make and alter by-laws, not inconsistent with its Articles of Incorporation or with the laws of the District of Columbia for the administration and regulation of the affairs of the Corporation;

(j)  to make donations for the public welfare or charitable, scientific, research, or educational purposes, or for other purposes for which the Corporation is organized;

(k)  to cease its corporate activities and surrender its corporate franchise;

(l)  to carry out all or any part of the aforesaid purposes, and to conduct its business in the State of Maryland, in the Commonwealth of Virginia and in the District of Columbia; and in any and all states in the United States of America; and to maintain offices and agencies in the State of Maryland, in the Commonwealth of Virginia, and in the District of Columbia, and in any and all states in the United States of America;

(m)  the foregoing objects and purposes, except when otherwise specifically expressed, shall be in no way limited or restricted by reference to, inference from, the terms of any other clause of this article, or any other article of these Articles of Incorporation or of any amendment thereto, and shall each be regarded as independent; and

(n)  the Corporation shall be authorized to exercise and enjoy all the powers, rights and privileges granted to or conferred upon, corporations of a similar character by the District of Columbia Non-profit Corporation Act, or by the laws of any other jurisdiction wherein the Corporation may do business, now or hereafter in force.

SIXTH:    The following shall be eligible for membership in the Corporation:

(1)  the members of the Board of Commissioners of the District of Columbia or their successors and the members of the governing bodies of Charles, Montgomery and Prince George's Counties in Maryland; Arlington, Fairfax, Loudoun and Prince William Counties and the Cities of Alexandria, Fairfax and Falls Church in Virginia; as long as the governments represented by such members contribute to the financing of the Corporation according to the formula provided in the by-laws;

(2)  the members of the governing bodies of other local governments in the region, not specifically named in Article Sixth (1), as provided in the by-laws of the Corporation; and

-3-

(3)  the members of the General Assemblies of the States of Maryland and Virginia and the Congress of the United States who represent portions of the geographical area of the National Capital Region, and the members of the Committees on the District of Columbia of the United States Senate and House of Representatives; Provided that upon enactment of a federal law giving the District of Columbia representation in Congress, such representatives from the Committees on the District of Columbia shall be replaced by the representative(s) of the District of Columbia in Congress.

SEVENTH:  (a)  The management of the affairs of the Corpora-tion shall be conducted by its Board of Directors in accordance with provisions of its by-laws.

(b)  The number of directors which shall constitute the whole Board of Directors shall not be less than twelve nor more than nineteen.  The initial Board of Directors shall consist of the following persons:

| NAMES | RESIDENCES |
| --- | --- |
| Brig. Gen. Charles M. Duke | 5712 26th St., N.W., Washington, DC |
| Frank J. Lastner | 19-P Ridge Rd., Greenbelt, Md. |
| Frank E. Mann | 211 Cameron St., Alexandria, Va. |
| Frederick A. Babson, Jr. | 7613 Marshall Dr., Annandale, Va. |
| Mrs. Edna P. Cook | 8319 Piney Branch Rd., S.Spring, Md. |
| Charles R. Fenwick | 6733 Lee Highway, Arlington, Va. |
| Dr. A. J. Ferlazzo | Dumfries, Va. |
| William W. Gullett | 6903 Baltimore Ave., College Park,Md. |
| Charles M. Hailey | 805 Ridge Pl., Falls Church, Va. |
| Omer L. Hirst | 7261 Little Riv.Tnpk., Annandale,Va. |
| J. Emory Kirkpatrick | Ashburn, Va. |
| Roye L. Lowry | 668 S. Jefferson St., Arlington, Va. |
| George M. Miller | 7019 Eastern Ave., Takoma Pk., Md. |
| Edgar A. Prichard | 106 N. Payne St., Fairfax, Va. |
| Achilles M. Tuchtan | 1920 Gainsboro Rd., Rockville, Md. |

each of whom shall serve until the first annual meeting of the mem-bers or until their respective successors are chosen and shall qualify.  The directors shall be elected at the annual meeting of the members, and each director shall be elected to serve until the next annual meeting of the members and/or until his or her successor shall be elected and shall qualify.

(c)  The by-laws may also contain additional pro-visions relating to the Board of Directors of the Corporation, including, but not limited to the number of directors, the manner of their election, qualifications, term of office, powers and duties, conditions upon when they may be removed from office, manner of filling vacancies, and any other provision or provisions which may be desired and which are not in conflict with statute or these Articles of Incorporation.

(d)  The initial Board of Directors shall have the power and authority to make, adopt and amend the original by-laws of the Corporation; thereafter, the power and authority to make or amend the by-laws shall vest exclusively in the membership on such terms as shall be expressly stated in the by-laws.

EIGHTH:  The Corporation shall have no power to issue any shares of stock or to declare or pay any dividends.

NINTH:  (a)  No part of the income or assets of the Corpora-tion shall inure to any of its members or officers, or be distribu-table to any of them during the life of the Corporation or upon its dissolution or final liquidation.  Nothing in this paragraph, how-ever, shall be construed to prevent the reimbursement of the officers and members of the Board of Directors for actual necessary expenses in amounts approved by the Board of the Corporation.  No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation,

-4-

and the Corporation shall not participate in, or intervene in
(including the publishing or distribution of statements) any
political campaign on behalf of any candidate for public office.
Notwithstanding any other provision of these articles, the
Corporation shall not carry on any other activities not permitted
to be carried on (a) by a corporation exempt from Federal income
tax under Section 501 (c) (3) of the Internal Revenue Code of 1954
(or the corresponding provisions of any future United States
Internal Revenue Law) or, (b) by a corporation, contributions to
which are deductable under Section 170 (c) (2) of the Internal
Revenue Code of 1954 (or corresponding provisions of any future
United States Internal Revenue Law).

    (b)   The Corporation shall not make loans to its
members, officers, or employees.  Any member who votes for or
assents to making of such loans or advances to a member, officer,
or employee of the Corporation, and any officer who participates
in the making of such loans or advances, shall be jointly and
severally liable to the Corporation for the amount of such loan
until the repayment thereof.

    TENTH:    Upon dissolution or final liquidation of the Corpo-
ration, after discharge or satisfaction of all outstanding obliga-
tions and liabilities, the remaining assets, if any, of the Corpo-
ration shall be distributed to the local governments at the same
percentage to which each local government contributed to the over-
all cost of the operation of the Corporation  during the fiscal
year of such dissolution or final liquidation.

    ELEVENTH:   The Corporation shall be nonpolitical, and, as an
organization, shall not promote the candidacy of any person for
state, local or national political office.

    TWELFTH:   Decisions of the Corporation shall not be binding
on the governments represented in the Corporation.

    THIRTEENTH: The names and places of residence of the incorpo-
rators are as follows:
NAMES                        RESIDENCES
John J. Bosley               8412 Magruder Mill Ct., Bethesda, Md.
Samuel Humes                 4112 Rosemary Street, Chevy Chase,Md.
Bruce D. McDowell            8411 Queen Anne's Dr., S. Spring, Md.

             (signed)  Samuel Humes _____

             (signed)  John J. Bosley _____

             (signed)  Bruce D. McDowell _____

                          Incorporators

Date May 27, 1965 _____

City of Washington  )
District of Columbia) ss

    I, (signed) Margaret L. Kilpatrick, a Notary Public, hereby
certify that on the 27th day of May, 1965, personally appeared
before me John J. Bosley, Samuel Humes and Bruce D. McDowell, who,
being by me first duly sworn, declared that they signed the fore-
going document as incorporators, and that the statements therein
contained are true.

             (signed) Margaret L. Kilpatrick _____

                  Notary Public

Exhibit 10



# By-Laws

## of the

## Metropolitan Washington Council of Governments

## 1986

Adopted by COG General Membership
December 10, 1986

COG DISC0048

INDEX                                    **Page**

SECTION  1.00    STATEMENT OF PRINCIPLES AND POLICIES........1

SECTION  2.00    PARTICIPATING GOVERNMENTS..................2

SECTION  3.00    MEMBERSHIP.................................2

SECTION  4.00    GENERAL MEMBERSHIP MEETINGS................3

SECTION  5.00    BOARD OF DIRECTORS.........................5

SECTION  6.00    MEETINGS OF THE BOARD OF DIRECTORS.........7

SECTION  7.00    NOTICES....................................8

SECTION  8.00    OFFICERS...................................8

SECTION  9.00    EMPLOYEES..................................9

SECTION 10.00    CHECKS.....................................9

SECTION 11.00    FINANCES..................................10

SECTION 12.00    SEAL......................................10

SECTION 13.00    AMENDMENTS TO BY-LAWS.....................11

COG DISC0049

## METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS

**Section 1.00    STATEMENT AND PRINCIPLES AND POLICIES**

1.01    The underlying concept of the Metropolitan Washington Council of Governments (hereafter referred to as Council of Governments or COG) is that the general purpose units of government which are closest to the people should exercise the basic initiative and leadership in government affairs and have the primary responsibility for dealing with those problems and needs which require action on an intergovernmental basis.

1.02    The physical, economic and social well-being of the Washington Metropolitan Statistical Area, its citizens and business enterprises, now and in the future, is dependent upon an orderly development of the entire area.  That will be possible only with the successful coordination of local governmental services and policies.

1.03    Counties and cities are the principal units of local governments in the Washington Metropolitan Statistical Area.  As such, they have the responsibility for anticipating and meeting local government needs which future development will produce, including the need for joint and coordinated intergovernmental services.

1.04    County and city governing bodies are and should continue to be the primary policy makers in local government.  They are directly concerned with all services, policies and regulations affecting the public safety, health and welfare of their communities.

1.05    Constructive and workable policies and programs for meeting and solving intergovernmental problems of local governments will be most effectively and expeditiously developed by regular meetings of county and city governing body members in an areawide voluntary council of governments dedicated to the solution of those problems.

1.06    The Council of Governments is an organization through which individual counties and cities can coordinate their efforts in this manner.  It is not a government nor does it seek to become one.

1.07    The Council of Governments, as the joint agency of its participating local governments, is an appropriate mechanism to provide specialized technical assistance to its local governments in order to enhance their capacity to make public policy decisions on issues affecting the region and their communities.

**COG DISC0050**

## Section 2.00    PARTICIPATING GOVERNMENTS

2.01    Counties with a population of 75,000 or more, located geographically within the area defined as the Washington Metropolitan Statistical Area in the latest decennial census conducted by the U.S. Census Bureau, shall be eligible to participate in the Council of Governments.

2.02    Those local governments participating in the Council of Governments on July 1, 1986 and such other cities and towns that have a population of 25,000 or more according to the latest population estimates compiled by the staff of the Council of Governments, as now or may hereafter exist within the Washington Metropolitan Statistical Area set forth in Section 2.01 shall be eligible to participate in the Council of Governments.

2.03    Cities and towns with a population of 10,000 to 25,000 and counties with a population of 10,000 to 75,000 shall be eligible to become adjunct participants in the Council of Governments, if they agree to contribute an annual fee established by the Board of Directors. Adjunct participants shall be entitled to participate and vote on the policy committees of the Council of Governments and shall receive all of the services generally provided to other participants. They shall not be represented on the Board of Directors, but the members of their governing bodies shall be entitled to vote at the General Membership Meeting on the same basis as members of the governing bodies of local governments represented on the Board of Directors. Counties not within the boundaries of the Washington Metropolitan Statistical Area, with a population of 75,000 or more, shall be eligible as adjunct participants in the Council of Governments if over 20 percent of their non-farm workers are employed within the Washington Metropolitan Area.

2.04    Participating governments shall be those eligible jurisdictions identified in Section 2.00, Subsections 2.01, 2.02 and 2.03, which voluntarily determine to contribute to the financial support of the activities of the Council of Governments as hereafter provided in Section 11.00.

## Section 3.00    MEMBERSHIP

3.01    Memberships in the Council of Governments shall be:

**COG DISC0051**

(a) The members of the governing body of each participating government defined under Section 2.00, Subsections 2.01 and 2.02. For the purpose of this Section 3.01(a), the term governing body shall include the elected executive, or his or her appointee, of any participating government.

(b) The members of the General Assemblies of Maryland and Virginia and the Congress of the United States who represent portions of the geographical area of the Washington Metropolitan Statistical Area.

## Section 4.00  GENERAL MEMBERSHIP MEETINGS

4.01  An annual general membership meeting shall be held each year, at which time the members shall elect a president, one or more vice-presidents, a secretary-treasurer, adopt a budget and assessment schedule, and consider such other business as may be referred to it. Additionally, any member may at the annual general membership meeting request a review of any action by the Board of Directors taken between general membership meetings.

4.02  At least three weeks prior to the annual general membership meeting written notice of such meeting shall be served upon or mailed to each member entitled to vote thereat, at such address as appears on the books of the corporation.

4.03  Special general membership meetings, for any purpose or purposes, may be called by the president or the Board of Directors, or at the request in writing of fifteen (15) members who represent at least four member governments. Such a request shall state the purpose or purposes of the proposed meeting.

4.04  Written notice of a special general membership meeting, stating the time, place and object of such a meeting and the specific action or actions proposed to be taken at that time, shall be served upon or mailed to each member entitled to vote thereat at least ten (10) days before such meeting. Business transacted at all special general membership meetings shall be confined to the objects and actions proposed to be taken as stated in the notice.

4.05  The times, dates and locations of the annual general membership and special general membership meetings shall be determined by the Board of Directors.

-3-

COG DISC0052

4.06     Twenty-five percent of the total number of members defined in Section 3.01(a) present in person shall be required to constitute a quorum at all meetings of the general membership for the transaction of business except as otherwise provided by these bylaws, provided that this number includes one or more members representing at least one-half of the participating governments from Maryland, and one or more members representing at least one-half of the participating governments from Virginia, and at least one member representing the Mayor or Council of the District of Columbia. If, however, such a quorum shall not be present at any meeting, the members entitled to vote thereat, present in person, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting until a quorum shall be present. At any resumption of the adjourned meeting at which a quorum shall be present, any business may be transacted which might have been transacted at the meeting originally called.

4.07     When a quorum is present at any general membership meeting, the vote of a majority of the members present shall decide any question which may be brought before such meeting unless the question is one upon which by expressed provision of the by-laws, a different vote is required, in which case such express provision shall govern and control the decision of such question:

(a) At the request of a majority of the members present representing any participating government, any question shall be determined by the majority of the aggregate votes of each participating government on a weighted basis. For this purpose, each participating government shall have one vote for each 25,000 population, and the next major succeeding portion thereof, in the jurisdiction of the participating government, except that any participating government whose jurisdiction has a population of less than 25,000 shall have one vote.

(b) Each participating government may divide the total amount of the aggregate votes it has among the members of its governing body present and voting.

(c) On a vote for which weighted voting has not been called, any member of the General Assemblies of Maryland and Virginia or member(s) of the U.S. Congress representing portions of the Washington Metropolitan Area shall be entitled to one vote, and it shall be counted to determine if a majority vote has been attained on the question before the membership.

COG DISC0053

## Section 5.00    BOARD OF DIRECTORS

5.01    The Board of Directors shall be the governing board of the Council of Governments and, between meetings of the entire membership, shall be responsible for the general policies and programs of the Council of Governments and for the control of all its funds. The Board of Directors shall also be responsible for preparing agendas for the annual general and special meetings of the membership of the Council of Governments and for the approval of an annual budget and schedule of assessment for consideration at the annual general membership meeting. It shall have the power to transfer funds within the approved total budget in order to meet unanticipated needs or changed situations.

5.02    The Board of Directors shall be selected from the general membership as follows:

(a)    one member selected by each participating local government having a population of no more than 400,000.

(b)    two members selected by each participating local government having a population of more than 400,000, but no more than 800,000.

(c)    three members selected by each participating local government having a population of more than 800,000.

(d)    four members selected by the District of Columbia, two from the Executive Branch and two from the Legislative Branch, unless the two branches shall decide on a different apportionment.

(e)    one member of the Maryland General Assembly and one member of the Virginia General Assembly, representing portions of the Washington Metropolitan Statistical Area, both of whom shall be selected biennially by separate caucuses of the members of COG from these legislative bodies.

5.03    In determining the population of each participating local government for the purpose of allocating membership on the Board of Directors, the population figures to be used shall be the annual population estimates prepared by the Metropolitan Washington Council of Governments and approved by its Board of Directors.

-5-

**COG DISC0054**

5.04    Any participating local government which has two or more members of the Board of Directors, and has an elected executive and an elected legislative body, shall divide its representation between the elected executive and elected legislative body, unless the two branches shall decide on a different apportionment.

5.05    A majority of the total number of members of the Board of Directors, representing participating governments as defined in Section II, Subsection c., shall constitute a quorum for the transaction of business; Provided that this number of Board members includes representatives of at least two participating governments from Maryland and two participating governments from Virginia and one representative of the District of Columbia. If, however, such a quorum shall not be present at any meeting, the members entitled to vote thereat shall have the power to adjourn the meeting from time to time without notice other than announcement at the meeting until a quorum shall be present. At any resumption of the adjourned meeting at which a quorum shall be present, any business may be transacted which might have been transacted at the meeting originally called.

5.06    When a quorum of the Board is present at any meeting, the vote of a majority of the Board members present shall decide any question brought before the meeting, except when a weighted vote is invoked as follows.

(a)    On a vote on any matter before the Board of Directors, weighted voting may be called for by any two (2) members present and representing two or more participating local governments represented on the Board.

(b)    Any question for which weighted voting has been called shall be determined by the majority of the weighted votes allocated to the members of the participating governments present and voting. For this purpose, each participating government shall have one vote for each 25,000 population, and the next major succeeding portion thereof in the jurisdiction of the participating government, except that any participating government which has a population of less than 25,000 shall have one vote. For the purpose of weighted voting, the population assigned to each participating local government shall be the population used for fee assessment purposes under Section 11.03.

(c)    Representatives of any participating local government having two or more members on the Board of Directors may divide their aggregate votes between or among them.

(d)    Board members from the Virginia General Assembly and the Maryland General Assembly shall be excluded from any weighted

-6-

vote. On a vote for which weighted voting has not been called, they shall each be entitled to one vote, and it shall be counted to determine if a majority vote has been attained on the question before the membership.

5.07    In the absence of any member of the Board representing a partic-ipating government, another member of the absent member's gov-erning body may serve as his/her alternate at any meeting of the Board.  Such alternate member shall have full voting privileges and shall be counted in the determination of a quorum.

5.08    The Board shall annually elect a chair and one or two vice-chairs at the first meeting following the annual meeting of the entire membership.  Where a vacancy occurs in a Board or corporate of-fice, the Board may fill such vacancy by a vote of a majority of its members present and voting.

5.09    The Board may hold its meetings and keep the books of the corpo-ration in the District of Columbia, and at such place as it may from time to time determine.

5.10    The Board may establish standing and ad hoc policy and technical committees as it deems necessary or helpful to the exercise of its responsibilities under these by-laws.

## Section 6.00    MEETINGS OF THE BOARD OF DIRECTORS

6.01    The Board of Directors shall meet monthly unless determined oth-erwise by the Board or its Chairman.  Written notice of such meetings and the business to be transacted thereat shall be served upon or mailed to each member of the Board at least seven days prior to the meeting.

6.02    Special meetings of the Board may be called by the Chairman on three days' notice to each Board member, either by mail or by telegram.  Special meetings shall be called by the Chairman or the Secretary-Treasurer in like manner and on like notice on the written request of three Board members.  The notice of all spe-cial meetings of the Board shall include the written statement of the purpose or purposes of the special meeting.

**COG DISC0056**

## Section 7.00    NOTICES

7.01    Whenever any notice is required to be given under the provisions of the by-laws to any member, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to receipt of such notice.

## Section 8.00    OFFICERS

8.01    The officers of the corporation shall hold office until their successors are chosen and qualify in their stead. Any officer elected by the Board of Directors may be removed at any time by the affirmative vote of a two-thirds majority of the whole Board.

8.02    The officers of the corporation shall be a president, one or more vice-presidents, a secretary-treasurer, a chair of the Board of Directors and one or two vice-chairs of the Board. Two or more offices may be held by the same person, except the offices of chair of the Board of Directors and secretary-treasurer.

8.03    The president shall preside at the general meetings of the members of the corporation and shall represent the corporation before Congress and the state legislatures.

8.04    The vice-presidents in order of their election shall in the absence or disability of the president perform the duties and exercise the powers of the president.

8.05    The chair of the Board of Directors shall be the chief executive officer of the corporation; shall preside at all meetings of the Board; shall be an ex-officio member of all committees; and shall see that all orders and resolutions of the Board are carried out. Additionally, he/she shall execute all contracts requiring a seal, under the seal of the corporation, except when the signing and execution thereof shall be expressly delegated by the Board to some other officer, or employee or agent of the corporation.

8.06    The vice-chairs, in order of their election, shall in absence or disability of the chair, perform the duties and exercise the powers of the chair, and shall perform such other duties as the Board shall prescribe.

COG DISC0057

8.07    The secretary-treasurer of the corporation shall attend all ses-
sions of the Board and all meetings of the general membership.
He/she shall keep in sole custody the seal of the corporation
and, when authorized by the Board, affix the same to any instru-
ment requiring it and, when so affixed, it shall be attested by
his/her signature or by the signature of another officer or an
employee or agent of the corporation duly authorized by the Board
to do so.  As treasurer of the corporation, he/she shall have
custody of the corporate funds and securities and shall keep full
and accurate accounts of receipts and disbursements in books be-
longing to the corporation and shall deposit all moneys and other
valuable effects in the name and to the credit of the corporation
in such depositories as may be designated by the Board.  He/she
shall disburse the funds of the corporation, taking certified
vouchers for such disbursements, and shall render to the presi-
dent, chairman and Board members, at regular meetings of the
Board or whenever they may require it, an account of all his/her
transactions as treasurer and of the financial condition of the
corporation.  The Board of Directors may delegate to an employee
or employees of the corporation any or all of the duties and pow-
ers of the secretary-treasurer.  If required by the Board of
Directors, the secretary-treasurer and/or any employee delegated
any or all of his/her functions, shall give the corporation a
bond in such sum, and with such surety or sureties as shall be
satisfactory to the Board, for the faithful performance of the
duties of this office.

## Section 9.00    EMPLOYEES

9.01    The Board of Directors shall appoint the chief administrative em-
ployee of the corporation who shall be the Executive Director and
it shall establish a schedule of compensation for all employees
of the Council of Governments.  The Executive Director shall be
responsible for providing:  (1) advice and assistance to the
Board and each of its committees; (2) the establishment of per-
sonnel policies and practices; (3) supervision of the staff; (4)
coordination of the work of consultants; and (5) such other du-
ties as the Board may prescribe.

## Section 10.00    CHECKS

10.01    All checks or demands for money and notes of the corporation
shall be signed by such officer or officers, or such other per-
sons, as the Board of Directors may from time to time designate.

**COG DISC0058**

## Section 11.00   FINANCES

11.01   The fiscal year shall begin on the first day of July in each year and shall end on the thirtieth day of June of the following year.

11.02   A proposed budget of the corporation shall be submitted to the Board of Directors by the Executive Director at least fourteen days before the Board of Directors meeting which precedes the annual meeting. The budget shall be submitted to the Board of Directors which shall approve or modify it for submission to the general membership at its annual meeting.

11.03   Each year upon the adoption of the annual budget, by the general membership, assessments for all participating governments shall be fixed. Assessments shall be in amounts sufficient to provide the funds required by the budget. Any member whose local government's annual assessment has not been paid by the end of the fiscal year for which the assessment was made shall forfeit all rights, privileges and prerogatives of a member of the Council of Governments until such assessment is paid in full.

11.04   The annual assessment shall be primarily on a per capita basis as reflected by the latest population estimates of the Council of Governments and verified by the participating governments. Recognizing that cities and towns in the State of Maryland and towns in the Commonwealth of Virginia are a part of counties, the Board of Directors may establish adjustments to a strict per capita assessment formula, which adjustments also shall be reflected in the assignment of weighted votes to such local governments. Further, the Board of Directors shall establish a separate assessment schedule for those local governments eligible for participation in the Council of Governments under Section 2.03.

11.05   The books of the corporation shall be audited by a certified public accountant or accountants, and the audit report for each preceding fiscal year shall be made available to the members and participating governments no later than three months after the close of the audit.

## Section 12.00   SEAL

12.01   The corporate seal shall have inscribed thereon the name of the corporation and the year of its organization. Said seal may be used by causing it or a facsimile thereof to be impressed or otherwise reproduced.

COG DISC0059

## Section 13.00    AMENDMENTS TO THE BY-LAWS

13.01   These by-laws may be altered, amended or added to only at annual or special meetings of the members called for this purpose; Provided (1) that notice of the meeting shall contain a full statement of the proposed amendment or amendments, and (2) the enactment of the amendment shall require a two-thirds vote of the members present and voting having membership under Section 3.01.

------

**COG DISC0060**